IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

HOBART CORPORATION, *et al.*,

  Plaintiffs,

   v.

THE DAYTON POWER & LIGHT
CO., *et al.*,

  Defendants.

:

:

:

:

Case No. 3:13-cv-115

JUDGE WALTER H. RICE

---

**DECISION AND ENTRY OVERRULING THE FOLLOWING WITHOUT PREJUDICE TO REFILING AFTER EXPERT DISCOVERY IS COMPLETED:** HARRIS CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOC. #677); DEFENDANT COX MEDIA GROUP OHIO, INC.'S, MOTION FOR SUMMARY JUDGMENT (DOC. #679); WASTE MANAGEMENT OF OHIO, INC.'S, MOTION FOR SUMMARY JUDGMENT ON BEHALF OF BLAYLOCK TRUCKING COMPANY, INC. (DOC. #686); DEFENDANT THE SHERWIN-WILLIAMS COMPANY'S MOTION FOR SUMMARY JUDGMENT (DOC. #687); AND DEFENDANT FRANKLIN IRON AND METAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOC. #698)

**DECISION AND ENTRY SUSTAINING THE FOLLOWING:** DEFENDANT DAYTON INDUSTRIAL DRUM, INC.'S, MOTION FOR SUMMARY JUDGMENT (DOC. #690); DEFENDANT COCA-COLA REFRESHMENTS USA, INC.'S, AMENDED MOTION FOR SUMMARY JUDGMENT (DOC. #695); AND FLOWSERVE CORPORATION'S MOTION FOR SUMMARY JUDGMENT (DOC. #696); DISMISSING ALL CLAIMS AND CROSS-CLAIMS AGAINST THESE DEFENDANTS WITH PREJUDICE

---

This matter is currently before the Court on motions for summary judgment

filed by eight of the remaining Defendants in this case: (1) Harris Corporation (Doc.

#677); (2) Cox Media Group Ohio, Inc. (Doc. #679); (3) Waste Management of

Ohio, Inc., on behalf of Blaylock Trucking Co., Inc. (Doc. #686); (4) The Sherwin-Williams Co. (Doc. #687); (5) Dayton Industrial Drum, Inc. (Doc. #690); (6) Coca-Cola Refreshments USA, Inc. (Doc. #695); (7) Flowserve Corporation (Doc. #696); and (8) Franklin Iron and Metal Corporation (Doc. #698).[1]

## I. Background and Relevant Procedural History

Beginning in the early 1940s, hazardous substances were disposed of at the South Dayton Dump and Landfill Site ("South Dayton Dump" or "the Site"), located on Dryden Road in Moraine, Ohio. Those hazardous substances allegedly include, but are not limited to, "cleaning solvents, materials containing PCBs, chemical solvents such as trichloroethene (TCE), cutting oils, paint, paint residue, Stoddard solvents, machine-tool water-based coolants, dielectric fluids, oils and brake fluids, in liquid, solid and/or gaseous states." Hazardous substances from adjacent properties also allegedly migrated through the groundwater to contaminate the Site. Doc. #636, PageID#8252.

Plaintiffs Hobart Corporation, Kelsey-Hayes Company, and NCR Corporation entered into two settlement agreements with the United States Environmental Protection Agency ("EPA"): (1) Administrative Settlement Agreement and Order on Consent for Removal Action ("2013 ASAOC"); and (2) Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study for

---

[1] The Court overrules Flowserve's request for oral argument, finding that it is not essential to a fair resolution of this case. *See* S.D. Ohio Civ. R. 7.1(b)(2).

Operable Unit 1 and Operable Unit 2 ("2016 ASAOC").[2] These ASAOCs require Plaintiffs to perform certain work at the Site, including investigation, testing, and removal of contamination.

Plaintiffs have filed suit under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, seeking contribution under 42 U.S.C. § 9613(f)(3)(B) from numerous potentially responsible parties for response costs already incurred in connection with the 2013 and 2016 ASAOCs, and for future response costs to be incurred in connection with the Site.[3] In the alternative, Plaintiffs seek recovery under a theory of unjust enrichment. Plaintiffs also seek a declaratory judgment concerning Defendants' liability for future response costs at the Site. Doc. #636. Many of the Defendants have filed cross-claims and counterclaims.

On April 11, 2016, the Court issued an Omnibus Scheduling Order, Doc. #373, establishing separate deadlines for fact discovery and expert witness discovery. At that time, the Court overruled without prejudice several pending motions for summary judgment. It established two new post-discovery deadlines for filing motions for summary judgment—one "based solely on the testimony of

---

[2] An earlier 2006 ASAOC involving the same Site was the subject of two previous lawsuits, *Hobart Corp. v. Waste Management of Ohio, Inc.*, 3:10-cv-195 ("*Hobart I*"), and *Hobart Corp. v. Coca-Cola Enterprises, Inc.*, 3:12-cv-213 ("*Hobart II*").

[3] Plaintiffs also re-asserted a claim for cost recovery under 42 U.S.C. § 9607(a). They acknowledge, however, that the Court has held that, because they entered into settlement agreements with the EPA, their exclusive remedy is one for contribution under §9613(f).

the fact witnesses," and another based on fact witnesses, plus expert witness testimony. Those deadlines were later twice extended. Docs. ##638, 778. Fact discovery has now been completed, and the above eight Defendants have moved for summary judgment.

## II.  Fed. R. Civ. P. 56

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

4

475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S.

1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

## III.  Relevant Law

### A.  Arranger/Transporter Liability Under CERCLA

Plaintiffs seek to recover contribution costs under §113(f)(3)(B) of CERCLA. That subsection provides that "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement referred to in paragraph (2)." 42 U.S.C. § 9613(f)(3)(B).

A plaintiff seeking contribution under §113(f) must prove the same elements as a plaintiff seeking cost recovery under 42 U.S.C. § 9607(a). *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000). Those elements are as follows:

> (1) the property is a "facility"; (2) there has been a "release" or "threatened release" of a hazardous substance; (3) the release has caused the plaintiff to incur "necessary costs of response" that are "consistent" with the NCP; and (4) the defendant is in one of four categories of potentially responsible parties.

*Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006).[4]

---

[4]  The "NCP" is the National Contingency Plan.

The four categories of potentially responsible parties include:

(1) the owner and operator of a vessel or a facility,

(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,

(3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

(4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance.

42 U.S.C. § 9607(a).

Plaintiffs allege that Harris Corporation, Cox Media Group Ohio, Inc., The Sherwin-Williams Co., Dayton Industrial Drum, Inc., Coca-Cola Refreshments USA, Inc., Flowserve Corp. and Franklin Iron and Metal Corporation are liable as "arrangers" under subsection (3). In *Burlington Northern & Santa Fe Railway Co. v. United States*, the Supreme Court held that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." 556 U.S. 599, 611 (2009). Plaintiffs allege that Defendant Waste Management of Ohio, Inc. ("WMO"), on behalf of Blaylock Trucking Co., Inc., is liable as a "transporter" under subsection (4).

Defendants argue that, based on the evidence presented, no reasonable factfinder could conclude that they either "arranged for disposal" of hazardous substances at the Site, or—in the case of WMO—"accepted any hazardous substances for transport" to the Site. *See* 42 U.S.C. §§ 9607(a)(3) and (a)(4). Given that this is an essential element of Plaintiffs' claims, Defendants argue that summary judgment is warranted.

### B. Derivative Claims

The parties agree that Plaintiffs' claims of unjust enrichment and declaratory judgment depend on a finding that Defendants are liable either as "arrangers" or "transporters" under CERCLA. The same is true for Defendants' cross-claims. Accordingly, if a defendant is entitled to summary judgment on the CERCLA claim, it is entitled to summary judgment on all other claims as well. *See GenCorp, Inc. v. Olin Corp.*, 390 F.3d 433, 451 (6th Cir. 2004) (holding that, in order to obtain declaratory relief, a plaintiff must "'allege facts to support a likelihood' that it will incur future response costs recoverable under CERCLA"); *Union Station Assocs., LLC v. Puget Sound Energy, Inc.*, 238 F. Supp. 2d 1226, 1230 (W.D. Wash. 2002) (holding that, in absence of substantive CERCLA claim, declaratory judgment claim must be dismissed).

### IV. Limited Scope of Pending Motions

As previously noted, the Court established two deadlines for filing motions for summary judgment. The first was for motions based solely on the testimony of

fact witnesses. The second was for motions based on the testimony of fact and expert witnesses.

In order to succeed on their claims, Plaintiffs must prove that: (1) the defendant arranged for waste disposal at the Site, or accepted waste for transport to the Site; and (2) the waste at issue contained hazardous substances. Although the first part of this test may be proved through lay witness testimony, the second part of the test requires expert witness testimony (or an admission by the defendant).

Accordingly, given the limited scope of this first round of summary judgment motions, summary judgment will be granted only if there is no genuine issue of material fact concerning whether a particular defendant arranged for waste disposal at the Site or accepted waste for transport to the Site. In other words, the only question at issue at this stage of the litigation concerns a particular defendant's nexus to the Site. Any questions concerning the allegedly hazardous nature of a particular defendant's waste must be reserved for the next round of summary judgment motions.

As instructed, the eight Defendants who have moved for summary judgment have relied only on the testimony of fact witnesses. Nevertheless, in their memoranda in opposition to some of the motions for summary judgment, Plaintiffs have relied on the expert witness reports of Dr. Jurgen Exner, who has opined about the hazardous nature and the volume of the waste that each Defendant allegedly arranged to have disposed of at the Site or transported to the Site.

Dr. Exner's reports are outside the limited scope of the first round of summary judgment motions. Moreover, as Defendants appropriately note, they have only recently received Dr. Exner's reports and their own experts have not yet had the opportunity to challenge them. Accordingly, the Court will not consider Dr. Exner's reports at this stage of the litigation.[5]

## V.   Analysis

As is often the case in CERCLA lawsuits, definitive evidence linking any particular defendant to the Site is difficult to come by. Given that much of the alleged dumping took place as early as the 1940s, many of the relevant documents no longer exist. To establish the requisite nexus, Plaintiffs rely mainly on the testimony of members of the Grillot family, who owned and operated the South Dayton Dump during the relevant time period. Cyril Grillot owned the land, along with Horace Boesch. Cyril's brothers, Alcine, Cecil and Kenneth Grillot operated the landfill. Doc. #673-1, PageID#9854. Because the original owners and operators are all deceased, Plaintiffs rely on the testimony of the next generation, Edward Grillot, David Grillot, Michael Wendling, and Horace Boesch, Jr., who spent much of their childhood visiting and working at the South Dayton Dump, and personally observed much of what happened there. Plaintiffs also rely on the testimony of certain truck drivers who took loads of waste to the Site.

---

[5]   The Court sustains Defendant Flowserve's Objection to Exhibit 17 to Plaintiffs' Response in Opposition to Flowserve's Motion for Summary Judgment, Dr. Exner's report, Doc. #743.

## A.    Harris Corporation (Doc. #677)

Plaintiffs allege that "Defendant Harris Corporation or its predecessor is the legal successor in interest to Harris-Seybold Co. Harris-Seybold Co. arranged for the disposal of wastes at the Site, including waste containing hazardous substances. . . " Doc. #636, PageID#8257.

Harris Corporation and its predecessors operated two manufacturing facilities in the Dayton area. The "Schriber" facility was operational from the 1950s to the 1970s. A dispatching list from Industrial Waste Disposal Company ("IWD"), a waste transporter, indicates that one container of material was picked up from the Schriber Company on January 20, 1973. Another dispatching list shows that, on December 26, 1974, IWD picked up another container from Schriber Industries. Doc. #677-4, PageID##10642-43. As Harris Corporation notes, these documents do not indicate the nature or quantity of the waste in the containers or, more importantly, the place of disposal. Plaintiffs do not dispute that these documents are insufficient to link Harris Corporation to the Site and, thus, the Court need not discuss them.

The "Harris-Seybold" facility was operational from 1941-1973. It designed, manufactured and distributed printing presses and industrial paper cutting machinery. In support of their claim against Harris-Seybold, Plaintiffs rely on deposition testimony and the declaration of Horace Boesch, Jr. Boesch occasionally worked at the Site from 1947 until 1952, and sometimes visited there from 1956 to 1960. From 1960 until 1966, he had a real estate office located

11

near the entrance to the Site and could observe vehicles entering and exiting the landfill. Doc. #677-5, PageID##10652-54.

Boesch's August 25, 2005, affidavit includes "Harris SeBold [sic] Co." on the list of companies that "regularly dumped industrial materials at the site." Doc. #677-6, PageID##10716-17. In his first deposition, taken on February 28, 2006, Boesch testified that Harris-Seybold, which was in the foundry business, used to take its foundry cores to a landfill on West River Road, but switched to the South Dayton Dump in the late 1950s. Doc. #677-7, PageID#10737.

In his December 1, 2011, deposition, Boesch stated that he knew that Harris-Seybold was a customer because he saw the company's name in the landfill's record books, but he did not know "what they dumped or when." Doc. #677-5, PageID#10658. When he was deposed a third time on October 23, 2014, Boesch stated that Harris-Seybold's trucks "came in once in a while. Not often, but they came in." He saw them drive past his office. This time, however, he denied seeing Harris-Seybold's name in the landfill records. Doc. #677-8, PageID##10846-48.

Although Boesch's testimony is somewhat inconsistent, he *has* consistently testified under oath that Harris-Seybold was a customer of the Site, and that testimony is based on his personal knowledge. He saw the trucks at the Site and/or saw Harris-Seybold's name in the landfill records.

Notably, Harris Corporation has not denied that it took waste to the Site. Instead, its arguments go to the *nature* of the waste at issue. Defendant notes that Boesch conceded that, although he saw the Harris-Seybold trucks enter the dump, he had no personal knowledge that they dumped foundry cores at the Site. That information came from Kenny Grillot. Doc. #677-8, PageID##10902-03. Harris Corporation argues that Kenny's Grillot's statement is inadmissible hearsay. *See* Fed. R. Evid. 801(c). It further argues that, because Harris-Seybold's foundry closed in 1953, *see* Doc. #718-7, PageID#19161, Boesch's testimony that Harris-Seybold began sending foundry cores to the Site in the late 1950s cannot be accurate.

Plaintiffs maintain that Grillot's statement is admissible either under the residual exception to the hearsay rule, as set forth in Federal Rule of Evidence 807(a), or under Federal Rule of Evidence 803(20), the hearsay exception involving a reputation in the community concerning "customs that affect the land."

At this juncture, the Court need not decide whether Kenny Grillot's statement—that Harris-Seybold dumped foundry cores at the Site—is admissible. Boesch's undisputed testimony establishes that Harris Corporation's predecessor was a customer of the South Dayton Dump during the relevant time period and brought waste to the Site. Summary judgment is, therefore, inappropriate at this juncture. Whether the waste at issue contained hazardous substances—foundry cores or some other hazardous materials—is necessarily the subject of expert

13

witness testimony, and may be addressed in the next round of summary judgment motions.

The Court, therefore, OVERRULES Harris Corporation's Motion for Summary Judgment, Doc. #677, WITHOUT PREJUDICE to refiling after expert witness discovery is completed.

### B. Cox Media Group Ohio, Inc. (Doc. #679)

Plaintiffs allege that "Defendant Cox or its predecessor is the legal successor in interest to Dayton Daily News and Dayton Journal Herald. Dayton Daily News and Dayton Journal Herald arranged for the disposal of wastes at the Site, including waste containing hazardous substances. . . " Doc. #636, PageID#8256.

Plaintiffs' claim against Cox Media Group Ohio, Inc. ("CMGO"), rests solely on the somewhat-inconsistent testimony of Edward Grillot, whose family owned the South Dayton Dump. Grillot, who was born in 1952, Doc. #684-1, PageID#12881, worked at the Site part-time from the time he was eight years old. After quitting school at age sixteen, he worked full-time for Doyle's Auto Parts, which was also located at the Site. Doc. #673, PageID##9873-76. He then returned to part-time work at the Site until approximately 1972. Doc. #684-1, PageID##12931-32.

Edward Grillot has been deposed three times. At his first deposition, on April 24, 2012, he testified that the Dayton Daily News took most of its paper and cardboard waste to the Blaylock landfill. Doc. #673, PageID#9952. The Dayton Daily News and the Dayton Journal Herald did, however, bring tubes of ink and

waste ink to the Site.  According to Grillot, the ink was blue and when he stepped on the tubes, it would get all over his shoes.  When he was a teenager (which would have been in the mid-to-late1960s), the tubes of ink arrived in white box trucks with the "Journal Herald" logo about twice a week.  *Id.* at PageID##9953-54.

At his second deposition, on December 16 and 17, 2013, Edward Grillot again testified that the Dayton Daily News and the Journal Herald were customers of the Site.  Doc. #682-1, PageID#12193.  They brought "mostly paper products, and not so much the ink cart—I don't remember too much about ink from them."  *Id.*  They also brought pallets and "these newspaper steel things that you put newspaper in."  *Id.* at PageID##12195.  The waste was brought in white panel trucks approximately twice a week.  *Id.* at PageID##12194, 12197.

On cross-examination, Grillot was asked, "[s]o aside from the old newspapers, wood pallets, and the steel [boxes] . . . there was no other waste that the Dayton Daily News or Journal Herald dumped at the Site, correct?"  He answered, "Correct."  Doc. #683-1, PageID#12742.  He further testified that, after 1972, the newspapers no longer dumped any waste at the Site.  *Id.* at PageID#12746.  Grillot admitted that he never looked inside one of the trucks when they came to the Site and never helped unload them.  *Id.* at PageID##12748-49.

Grillot later signed a Declaration clarifying that the Dayton Daily News also disposed of ink at the Site.  It arrived in tubes in cardboard containers on wooden

skids in the back of the trucks. He stated that he did not remember this at his 2013 deposition because he was tired and his "memory began to slip" over the course of that two-day deposition. Doc. #679-10, PageID##11732-33.

At his third deposition, on December 9, 2016, Grillot again testified that Dayton Daily News and the Dayton Journal Herald were customers at the Site. They brought "[m]ostly shredded papers" and newspaper dispensers. Doc. #684-1, PageID#12889. However, they also brought black and white ink in tubes that were about 18 inches long and 3-4 inches around. *Id.* at PageID##12890-91. He again testified that the waste was brought "[t]hree times a week maybe" in white panel trucks with either the Dayton Daily News or Dayton Journal Herald logo on the door. *Id.* at PageID##12896-99.

This time, Grillot testified that, on two occasions, he helped unload material from one of the white panel vans. One load contained cardboard trash buckets with paper and other debris; the other contained steel newspaper dispensers. *Id.* at PageID##12994-95. He admitted that, if there were ink cartridges in the newspapers' waste, it was very infrequent, and he never saw them send drums of ink to the Site. *Id.* at PageID##13008, 13069.

It is undisputed that there is no documentary evidence to support a claim that the Dayton Daily News or the Dayton Journal Herald was a customer of the South Dayton Dump. CMGO argues that summary judgment is warranted because Grillot's inconsistent and uncorroborated testimony, standing alone, is insufficient to establish CERCLA liability. According to CMGO, Edward Grillot's testimony

constitutes no more than a "scintilla" of evidence, and is blatantly contradicted by other affirmative evidence that the newspapers did *not* arrange for disposal of hazardous waste at the Site.

Horace Boesch, Jr., had an office at the South Dayton Dump from 1960 to 1967, and had personal knowledge of its customers. Doc. #679-11, PageID#11738. Although he was asked about many of those customers during his depositions, the newspapers were not among them. When asked if his deposition testimony had covered all of the entities that he remembered ever disposing of waste at the Site, he replied that, to the best of his knowledge, it had. Doc. #679-13, PageID##11752-53. However, the fact that Boesch did not independently recall the newspapers disposing of waste at the Site does not directly contradict Edward Grillot's testimony. Neither does the testimony of Alcine's son, David Grillot, who testified that did not recall the newspapers dumping waste at the Site. Doc. #679-16, PageID#11781.

CMGO further contends that Edward Grillot's testimony is contradicted by the deposition testimony of current and former employees of the Dayton Daily News and the Dayton Journal Herald. Two of those employees testified that the newspapers did not use white vans in the 1960s or 1970s. Robert Michigan, who worked at the newspapers from 1968 until 1994, stated that they used green box trucks until the 1980s, and then switched to white vans. Doc. #679-5, PageID#11683. Likewise, Michael Manzo, who started working for the newspapers in 1974, stated that green delivery trucks were used prior to the

17

1980s.  Doc. #679-6, PageID#11686.  Nevertheless, given that these gentlemen have no personal knowledge of what color trucks were used prior to the dates they began working for the newspapers, their testimony does not necessarily foreclose a finding that the newspapers used white vans to deliver waste to the Site before 1968.

George Morris, Jr., who worked at the newspapers from 1969 to 1992, does not recall any "tubes" of ink.  The ink was packaged in buckets or barrels. He averred that, prior to the mid-1970s, the newspapers disposed of waste ink in large metal drums, which were picked up by a third party and hauled away, but to where, he did not know.  To the best of his knowledge, the newspapers never used their own delivery trucks to haul waste ink.  Doc. #679-1, PageID##11665-66.  Michael Manzo also averred that the waste ink was stored in 55-gallon drums, and picked up by a third party, but he did not know where it was taken.  Doc. #679-6, PageID##11688.  Again, because these individuals have no personal knowledge of the newspapers' waste ink disposal practices prior to 1969, their testimony does not necessarily foreclose a finding that, as Edward Grillot testified, the newspapers disposed of tubes of ink at the Site in the mid-to-late 1960s.

Other employees testified generally about the newspapers' general waste disposal practices after 1969.  For example, Jerry Baker, a newspaper employee from 1969 to 2009, and Xonerale Freeman, who began working at the newspapers in 1975, stated that they hired a third party to dispose of their waste, but they did not know where it was taken.  Doc. #679-3, PageID##11674-75;

Doc. #679-4, PageID##11679-80. Richard Hartle, who worked for the newspapers from 1966 to 2008, stated that he has no recollection of any waste being disposed of at the South Dayton Dump. He admitted, however, that he was never personally responsible for waste disposal and had no knowledge of how the newspapers disposed of their waste ink. Doc. #679-2, PageID##11670-71.

Although the testimony of these current and former employees may cast some doubt on the credibility of Edward Grillot's testimony, it does not warrant summary judgment in CMGO's favor. CMGO acknowledges that the Court cannot resolve credibility issues on summary judgment. It nevertheless argues that Edward Grillot's "speculative testimony is legally insufficient to withstand summary judgment." Doc. #679, PageID#11653.

CMGO maintains that this case is akin to *DVL, Inc. v. General Electric Co.*, 811 F. Supp. 2d 579 (N.D.N.Y. 2010), *aff'd*, 490 F. App'x 378 (2d Cir. 2012), in which the court granted summary judgment in favor of the defendants. There, the only evidence linking the defendants to the site was the testimony of a witness who, as a child, observed what he believed to be electrical transformers and capacitors on the property. It was his "understanding" that this equipment was manufactured at a nearby General Electric facility. Although the equipment appeared to be identical to that manufactured by the defendants, he admitted that he had no knowledge of how it got there. 811 F. Supp. 2d at 595-96.

CMGO also relies on *Acme Printing Ink Co. v. Menard, Inc.*, 891 F. Supp. 1289 (E.D. Wis. 1995). There, the only evidence linking the defendant to the site

was the fact that waste with characteristics similar to those of the waste disposed of by the defendant was found at the site. The court concluded that this was too speculative to establish CERCLA liability. *Id.* at 1296. Likewise, in *New Jersey Turnpike Authority v. PPG Industries, Inc.*, 16 F. Supp. 2d 460, 469 (D.N.J. 1998), *aff'd*, 197 F.3d 96 (3d Cir. 1999), the court concluded that "it is not enough" for the plaintiff to prove that the defendant produced a particular hazardous waste, and that similar hazardous waste was later found at the site; rather, the plaintiff must prove that the defendant caused the waste to be deposited there.

These cases are easily distinguishable from the case at bar. Edward Grillot, whose testimony is based on his personal knowledge, repeatedly testified that, two or three times each week, he actually saw the newspapers deliver waste to the Site in white vans or trucks with the newspaper logo, and that the waste included paper, pallets, steel newspaper dispensers, and tubes of ink. This is a far cry from the evidence rejected by the other courts as too "speculative" to establish CERCLA liability.

Based on the foregoing, the Court concludes that genuine issues of material fact exist concerning whether CMGO's predecessors disposed of waste at the South Dayton Dump. Whether that waste included hazardous substances remains to be seen. Accordingly, CMGO's Motion for Summary Judgment, Doc. #679, is OVERRULED WITHOUT PREJUDICE to refiling after expert witness discovery has been completed.

C.   **Waste Management of Ohio, Inc. on Behalf of Blaylock Trucking Co.,
Inc. (Doc. #686)**

Plaintiffs allege that "Defendant Waste Management of Ohio, Inc.[,] or its

predecessor is the legal successor in interest to Blaylock Trucking and Waste

Removal ('Blaylock')."  Doc. #636, PageID#8253.  They further allege that

"Blaylock accepted hazardous substances for transport to and disposal at the Site.

Blaylock selected the Site for disposal of hazardous substances and contributed to

Contamination at the Site through its disposal of wastes which included or

contained hazardous substances at the Site."  *Id.*  It is undisputed that Waste

Management of Ohio, Inc. ("WMO"), is the legal successor in interest to Blaylock.

WMO argues that summary judgment is warranted because there is no

reliable, admissible evidence linking Blaylock to the Site.  It is undisputed that there

are no documents showing any such nexus.  Plaintiffs again rely solely on the

deposition testimony of Edward Grillot.  At his April 24, 2012, deposition in *Hobart*

*I*, Grillot testified that he observed Blaylock trucks coming to the Site.  Doc. #720-

1, PageID#19206.  The South Dayton Dump had an incinerator; Blaylock's own

landfill did not.  According to Grillot, when he was a little kid, Blaylock brought

"[t]he stuff they didn't want" at their own landfill, like cardboard, skids and other

burnable material.  *Id.* at PageID##19205-06.

WMO maintains that this testimony cannot be considered because Blaylock

was not a party to *Hobart I*, and did not attend the 2012 deposition.  WMO was a

party in *Hobart I*, as the legal successor to Industrial Waste Disposal, Inc. ("IWD"),

and William Harbeck, IWD's attorney, was present for Grillot's 2012 deposition. Harbeck, however, had no idea at that time that Blaylock was associated with WMO. Accordingly, he had no motivation to cross-examine statements that Grillot made concerning Blaylock. Doc. #744-1, PageID##20817-18.

Federal Rule of Civil Procedure 32(a)(1)(A) provides that, at a hearing or trial, a deposition may be used against a party only if "the party was present or represented at the taking of the deposition or had reasonable notice of it." But the fact that Grillot's 2012 deposition could not be used against Blaylock *at a hearing or at trial* does not necessarily mean that it cannot be considered in ruling on the motion for summary judgment.

Federal Rule of Civil Procedure 56(c)(2), governing motions for summary judgment, provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Nevertheless, because the substance of Grillot's 2012, deposition testimony could be "reduced to admissible evidence in the form of trial testimony" by Mr. Grillot, *see* 11 James Wm. Moore, *Moore's Federal Practice* §56.91[2] (3d ed.), the Court may consider it in determining whether there is a genuine issue of material fact. *See also United States v. Atlas Lederer Co.*, 282 F. Supp. 2d 687, 695 (S.D. Ohio 2001) (holding that, although deposition itself would not be admissible at trial, its content would be admissible through substituted, live testimony, and that the sworn deposition transcript was the functional equivalent of a Rule 56(c) affidavit).

At his second deposition, on December 16, 2013, Grillot again testified that "Baylock" [sic] was a customer of the dump, and he remembered its trucks coming to the Site, but he did not remember what kind of waste they brought. Doc. #682-1, PageID##12168-69. According to WMO, Grillot recanted his previous testimony at his third deposition on December 9, 2016, when he testified that Blaylock "wasn't connected to the South Dayton Dump whatsoever." Doc. #686-12, PageID#13234.

Plaintiffs maintain that WMO pulls this statement out of context. The Court agrees. The actual testimony, which concerned a previous deposition, was as follows:

> Q. If you continue, you described the truck. Continue reading. Line 22, what sort of truck was it, if you remember? Panel truck. That was your testimony then, wasn't it?
> A. Yeah, that was – we were talking about Blaylock, and we were going through all the different dumps. Because Blaylock is mentioned down here too, and Blaylock wasn't connected to South Dayton Dump whatsoever.

*Id.* In other words, all Grillot said was that the South Dayton Dump and Blaylock's dump were two different entities. The Court does not view this as a recantation of Grillot's 2012 and 2013 testimony that Blaylock was a customer of the South Dayton Dump.

Neither David Grillot nor Michael Wendling recalled Blaylock bringing any waste to the Site. Doc. #686-15, PageID#13252; Doc. #686-14, PageID#13243. Their testimony, however, does not exclude the possibility that it happened.

Grillot's testimony is contradicted by the deposition testimony of James McDonald, who hauled waste for Blaylock throughout the 1960s. McDonald testified that Blaylock had its own landfill on Dorothy Lane, and hauled its waste there. Once that landfill was full, Blaylock hauled its waste to the Cardington Road Landfill. According to McDonald, Blaylock never hauled waste to the South Dayton Dump. Doc. #686-3, PageID##13107, 13113-13115.

Vernon Vencill, who hauled waste in the Dayton area from 1969 to 1995, also testified that Blaylock used the Dorothy Lane landfill in the 1960s, and then the Cardington landfill. Doc. #686-16, PageID#13257. Likewise, John Papp, Blaylock's General Manager from 1972 through 1997, testified that, before 1972, Blaylock hauled waste only to the Dorothy Lane landfill and then the Cardington Road landfill. After 1972, Blaylock's waste all went to the county's new incinerators. Doc. #686-2, PageID#13101-13102; Doc. #686-6, PageID##13135-40.

James Forney, WMO's corporate representative, also testified that Blaylock took no waste to the Site. He explained that, because Blaylock operated its own landfills, it would have no reason to pay to dispose of waste at other sites. Doc. #686-5, PageID##13121, 13123-24. He further noted that the South Dayton Dump was not included on the list of locations of disposal sites that Blaylock submitted to the EPA in 1981. Doc. #686-10, PageID##13210-11.

Although WMO has presented considerable evidence tending to show that Blaylock did not transport waste to the South Dayton Dump, and would have had

no reason to do so, the Court cannot weigh the evidence or decide credibility issues at this stage of the litigation. In the Court's view, Edward Grillot's testimony is sufficient to create a genuine issue of material fact concerning whether Blaylock transported waste to the South Dayton Dump. He testified that he actually observed Blaylock's trucks coming to the Site with cardboard, skids and other burnable materials. If his testimony is to be believed, and if Plaintiffs can prove that the waste included hazardous substances, WMO could be subject to liability.[6]

Accordingly, the Court OVERRULES WMO's Motion for Summary Judgment on Behalf of Blaylock Trucking Company, Inc., Doc. #686, WITHOUT PREJUDICE to refiling after expert witness discovery has been completed.

### D. Sherwin-Williams Company (Doc. #687)

Plaintiffs allege that "Defendant The Sherwin-Williams Company arranged for the disposal of wastes at the Site, including waste containing hazardous

---

[6] WMO argues that because Plaintiffs did not specifically respond to the detailed Statement of Facts that WMO included as an exhibit to its motion, those facts should be deemed undisputed and admitted. In support, it cites to a Standing Order of Judge Dlott, and an unpublished case from the Western District of Tennessee, *Nichols v. Drexel Chem. Co.*, No. 11-2957, 2013 U.S. Dist. LEXIS 72940 (W.D. Tenn. May 23, 2013), the holding of which is based on a local rule. Neither is binding on this Court.

WMO also cites to Federal Rule of Civil Procedure 56(e)(2), which provides that "[i]f a party fails to . . . properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . (2) consider the fact undisputed for purposes of the motion." Given that Plaintiffs have adequately supported their contrary factual position by citing to particular parts of the deposition testimony of Edward Grillot, *see* Fed. R. Civ. P. 56(c)(1)(A), there is no legal basis for finding the facts set forth by WMO to be undisputed.

substances. . . " Doc. #636, PageID#8258.[7]  Again, Plaintiffs have no documentation to support this claim, relying solely on the deposition testimony of Edward Grillot and Michael Wendling.

At his April 24, 2012, deposition, Edward Grillot testified that Sherwin-Williams was a customer of the dump.  He personally observed drivers bringing 55-gallon drums in white trucks with "Sherwin-Williams" written on the side.  He testified that most of the trucks came from "the old BHA building on Patterson Road," which was Sherwin-Williams' "industrial part."  He explained that his family mixed together much of this leftover paint and used it to paint buildings.  Doc. #673-1, PageID##9991-92.

Grillot provided additional details at his December 16-17, 2013, deposition. He testified that Sherwin-Williams brought paint to the dump beginning in the mid-1960s, approximately twice a week.  Doc. #682-1, PageID#12272; Doc. #683-1, PageID#12701.  According to Grillot, Sherwin-Williams brought more 55-gallon drums to the South Dayton Dump than did Durel or Pittsburgh Paint.  Doc. #682-1, PageID##12264-65.  It usually made deliveries in white vans, but used a flatbed truck on a couple of occasions.  *Id.* at PageID#12266.  Some drums were empty. Others contained a small volume of paint thinner or creosote, which Grillot dumped

---

[7]  The Court notes that there is a pending discovery dispute between Plaintiffs and Sherwin-Williams.  Plaintiffs have filed a Motion to Compel Production of Documents, Doc. #740, related to Sherwin-Williams' paint formulations.  The parties were attempting to resolve this dispute on their own and recently submitted a status report.  Because the paint formulations are relevant only to expert witness testimony, the pending motion does not prevent the Court from ruling on Sherwin-Williams' Motion for Summary Judgment.

behind an office on numerous occasions. *Id.* at PageID##12265-66; Doc. #683-1, PageID#12662-67.

Sherwin-Williams also brought five-gallon, one-gallon, and quart-sized containers of paint. Most of these were one-third to three-quarters full. Grillot would aggregate the paint in 55-gallon drums, separating the oil-based paint from the latex paint, so that it could be re-used. Doc. #682-1, PageID##12269-70; Doc. #683-1, PageID##12667-70. Additionally, Sherwin-Williams sometimes brought industrial paint, which Grillot used to paint poles, diesel drums, bulldozers and the tractor in the 1960s. Doc. #682-1, PageID#12271; Doc. #683-1, PageID##12650-51, 12692.

Grillot testified that Sherwin-Williams "brought big enough drums and enough paint to paint the buildings that my dad and my partner had." Doc. #682-1, PageID#12266. Between 1969 and 1973, Grillot used that paint in rehabbing several HUD houses with his father. Doc. #683-1, PageID##12694-95. In the early 1970s, he also used it to paint ten buildings at the dump on two separate occasions, along with fencing, posts, and gates. *Id.* at PageID##12649-61, 12692. In addition, his uncles used it to paint some of their off-site buildings, including a barn. *Id.* at PageID##12697-12700. Paint that the family did not use was dumped in a pit at the Site, and empty paint cans were disposed of in the dump pile. Doc. #682-1, PageID##12269-71; Doc. #683-1, PageID##12689-91.

Grillot testified that most of the waste paint that Sherwin-Williams brought to the dump came from the Patterson Road store and, later, the one on Arbor

Boulevard, Doc. #682-1, PageID#12268. He later admitted, however, that he did not know this for certain. Doc. #683-1, PageID#12693. He also admitted that he was unable to estimate the total volume of paint that Sherwin-Williams brought to the dump. *Id.*

Edward Grillot's testimony is largely corroborated by the deposition testimony of his cousin, Michael Wendling, who was born in 1945. Doc. #676-1, PageID#10483. Wendling started visiting the South Dayton Dump on a weekly basis when he was about eight years old. As a young man in the 1960s and early 1970s, he helped there in the summers, and sometimes after school and on weekends. *Id.* at PageID#10485.

Wendling testified that, throughout the 1960s, every month or so, Sherwin-Williams would deliver paint products to the dump in box trucks labeled "Sherwin-Williams." He personally observed the Sherwin-Williams trucks on about six occasions, and recalls seeing "all these paint cans" in the back of the trucks. Although he did not recall many big drums, he did recall one-gallon and five-gallon containers. He testified that, when he was eight-to-ten years old (which would have been in the early-to-mid-1950s), he used some of the paint to paint the basement at his house. He also used paint from the dump to paint an old wooden picket fence at his house. Wendling corroborated Grillot's testimony about aggregating the paint from the smaller containers into 55-gallon drums. He testified that he and his brother used it to paint buildings at the Site. *Id.* at PageID##10512-13; Doc. #676-2, PageID##10550, 10566-69, 10600. The

empty cans would be disposed of in the dump. *Id.* at PageID##10569-70, 10597-98.

Wendling included Sherwin-Williams on his list of companies that engaged in "factory type" dumping. Doc. #676-2, PageID##10541-42. However, he admitted that it was "impossible" to estimate how much paint was disposed of at the dump. *Id.* at PageID#10570. He did testify, however, that only a small fraction was used for painting buildings and other things. He estimated that "ninety-nine percent" of the paint that was brought to the dump was dumped and burned. *Id.* at PageID##10597, 10602.

Sherwin-Williams nevertheless argues that the deposition testimony of Grillot and Wendling is insufficient to withstand the motion for summary judgment. In support of its motion, it relies largely on the deposition testimony of Gregory Edsall and Timothy Bailey.

Edsall began working at Sherwin-Williams in 1971, first as a warehouseman at the store in the Hills & Dales Shopping Center, and then, around 1974, at the Arbor Boulevard location. In the late 1970s, he was promoted to warehouse manager. The Arbor Boulevard location was not a retail store; it was a commercial store, selling paint to professional painters, in five-gallon cans and 55-gallon drums. Doc. #674-1, PageID#10204-09. According to Edsall, any excess paint was re-tinted and sold it at a discount. Paint was never thrown away. *Id.* at PageID#10210-11. Any paint thinner left in the drums was reconstituted by

another entity, Solvent Resource Recovery, and empty 55-gallon drums were sold back to Dayton Industrial Drum. *Id.* at PageID##10215-16, 10246.

Edsall testified that the Arbor Boulevard store had a box truck with the Sherwin-Williams logo on it, but it was never used for waste disposal. *Id.* at PageID##10211, 10213. Sherwin-Williams never self-hauled its own dumpster waste or liquid waste. *Id.* at PageID##10220, 10246. Edsall was not aware of any Sherwin-Williams waste being sent to South Dayton Dump. *Id.* at PageID#10224.

Throughout the time Edsall worked at Sherwin-Williams, from 1971 to 1988, the company gave away Sherwin-Williams decals to the professional painters, who put them on their own trucks and vans. *Id.* at PageID#10211-13. These decals were identical to the one on the box truck owned by Sherwin-Williams. *Id.* at PageID##10263-64.

Timothy Bailey worked at numerous Sherwin-Williams' commercial and retail stores from 1974-2015. From 1979 to 1981, he was an assistant manager at the store on Patterson Boulevard. Doc. #675-1, PageID##10351-53. In 1993, he became the branch manager at the Arbor Boulevard store. *Id.* at PageID#10356. Like Edsall, Bailey testified that no paint was ever thrown away; it was all sold. *Id.* at PageID##10361, 10367. At the Arbor Boulevard store, small amounts of waste paint thinner was stored in 55-gallon drums, picked up by another entity, Safety Kleen, and reclaimed. *Id.* at PageID#10363-64.

According to Bailey, empty paint cans were placed in a dumpster to be hauled away with other trash, but he did not know where the trash company took it. *Id.* at PageID##10361, 10367, 10376-77. He was not aware of any waste being sent to the South Dayton Dump. *Id.* at PageID#10378. Nor was he aware of Sherwin-Williams ever hauling its own waste. *Id.* at PageID#10398.

Bailey testified that the Patterson Boulevard store had a white pickup truck with the Sherwin-Williams logo, and the Arbor Boulevard store had a white box truck with the Sherwin-Williams logo, but neither was used for waste disposal. *Id.* at PageID##10362-63. He admitted, however, that he knew nothing about Sherwin-Williams' waste disposal practices prior to 1974 when he began working for the company. *Id.* at PageID##10377, 10404.

Sherwin-Williams argues that the testimony of Grillot and Wendling is insufficient to withstand summary judgment because there is no evidence that the trucks that they saw at the Site were actually owned and operated by Sherwin-Williams. Although the trucks had the Sherwin-Williams logo on them, Grillot and Wendling had no personal knowledge of where these trucks came from. Sherwin-Williams maintains that, given the testimony of Edsall and Bailey—that Sherwin-Williams never disposed of any paint, and that it regularly gave decals to local professional painters—the trucks that Grillot and Wendling saw were likely owned and operated by independent painting contractors who were disposing of excess paint after their commercial jobs were completed.

Sherwin-Williams argues that Plaintiffs' claim, that Sherwin-Williams arranged for the disposal of hazardous substances at the South Dayton Dump, is purely speculative and is unsupported by the facts in the record. In support of this argument, it cites to *DVL, Inc. v. Niagara Mohawk Power Corp.*, 490 F. App'x 378 (2d Cir. 2012). There, although a witness testified that he had observed electrical capacitors and transformers at the site as a child, he did not identify either defendant as the source of this discarded equipment, and there was no other evidence linking the defendants to the site in question. On these facts, the Second Circuit granted summary judgment in favor of the defendants, concluding that the alleged nexus to the site was too speculative. *Id.* at 383-84.

The Court agrees with Plaintiffs that *DVL* is factually distinguishable. Rather than simply observing paint products that had been dumped at the Site, Grillot and Wendling testified that they personally observed trucks and vans with the Sherwin-Williams logo delivering waste paint to the dump in the 1960s and early 1970s.

True, Sherwin-Williams offers a plausible alternative explanation. Based on the testimony of Edsall and Bailey, Sherwin-Williams suggests that the trucks and vans belonged to independent painting contractors who had placed a Sherwin-Williams decal on their own vehicles, and who were much more likely to be disposing of waste paint. There are two problems with this argument, however. First, there is no evidence that Sherwin-Williams gave out any decals prior to 1971, when Edsall started working there. Second, the waste disposal practices at issue took place in the 1960s. Neither Edsall nor Bailey has any personal

32

knowledge of Sherwin-Williams' waste disposal practices prior to the dates they were first employed there, in the early 1970s.

Based on Grillot's testimony, it is reasonable to infer that the vehicles that he and Wendling saw were owned and operated by Sherwin-Williams. Given that, on a motion for summary judgment, the Court is required to draw all reasonable inferences in favor of the non-moving party, this raises Plaintiffs' claims against Sherwin-Williams above the "speculative" level.

Moreover, Grillot testified that it was his understanding that most of the paint came from the Sherwin-Williams commercial stores on Patterson Road and Arbor Boulevard. The basis for this understanding was not fully explored at his depositions. The Court notes, however, that Grillot specifically recalled talking to Sherwin-Williams drivers from "an industrial place up north somewhere," who complained about the roads between there and the dump. Doc. #682-1, PageID##12267-68.

Sherwin-Williams maintains that Grillot admitted that he had no personal knowledge about where the trucks and vans with the Sherwin-Williams logos came from. The actual testimony, however, was as follows:

> Q. To your knowledge, did most of the material that came in for Sherwin-Williams to the site that you've told us about, come in from Patterson Road?
> A. I don't know that.
> Q. Okay. There's no way for you to estimate it?
> A. No.

Doc. #683-1, PageID#12693. As the Court reads this, Grillot did not admit that he had no personal knowledge that the trucks and vans were owned and operated by Sherwin-Williams. He admitted only that he was not certain that the majority of the deliveries originated at the Patterson Road location; they may have come from another Sherwin-Williams facility instead.

In light of the foregoing, the Court finds that genuine issues of material fact preclude summary judgment on the question of whether Sherwin-Williams disposed of waste at the South Dayton Dump.

Sherwin-Williams next argues that, even if its trucks and vans did haul hazardous waste to the Site, intervening events by employees and family members of the South Dayton Dump absolve Sherwin-Williams of CERCLA liability. It is undisputed that these employees and family members set aside paint that was brought to the dump, aggregated it and used it to paint buildings and equipment both on-site and off-site. They then disposed of any paint that was left over after these painting projects were completed.

Citing *NCR Corporation v. George A. Whiting Paper Co.*, 768 F.3d 682 (7th Cir. 2014), and *Consolidation Coal Co. v. Ga. Power Co.*, 781 F.3d 129, 153-54 (4th Cir. 2015), Sherwin-Williams argues that, because a third party took possession of the waste and subsequently disposed of it at the Site, Sherwin-Williams can no longer be liable as an "arranger." The Court rejects this argument.

The cases cited by Sherwin-Williams are clearly distinguishable from this one. At issue in *NCR* was whether the defendant paper manufacturer could be

held liable for "arranging for disposal" of its PCBs[8] based solely on the fact that it sold its "broke" (waste, scrap and undersized rolls of paper), which contained PCBs, to a second company that used the broke to manufacture recycled paper and then dumped wastewater containing PCBs into the river. The district court held that the first company could not be held liable as an "arranger" given that its "main purpose in selling broke was not to get rid of it, but instead to place it on a competitive market and recoup some of its costs of production." *NCR*, 768 F.3d at 705. The Seventh Circuit held that it is not enough that the first company took intentional steps to get rid of the broke, knowing that it would ultimately end up in the river. Once it sold the broke, the first company no longer had any control over what the second company did with it. This "lack of control" was "good reason" not to impose arranger liability on the first company. *Id.* at 706.

Likewise, in *Consolidation Coal*, the question was whether Georgia Power could be held liable for "arranging for disposal" of PCBs based on the fact that it sold used electrical transformers containing PCBs at an auction to a second company that repaired, rebuilt and resold the transformers to third parties. The district court granted summary judgment in favor of Georgia Power; the Fourth Circuit affirmed. Again, the primary purpose of the sale was not to dispose of PCBs, and Georgia Power had no knowledge of what the purchaser would do with the PCBs. Under these circumstances, the court concluded that there was insufficient evidence that Georgia Power intended to arrange for the disposal of

---

[8] PCBs are polychlorinated biphenyls, which are toxic compounds.

hazardous waste when it sold the transformers. It noted that "a party does not 'intend to dispose' of a hazardous substance solely by selling a product to a buyer who at some point down the line disposes of a hazardous substance that was within the product." 781 F.3d at 149-50.

Unlike the defendants in *NCR* and *Consolidation Coal*, Sherwin-Williams did not sell its waste paint to the South Dayton Dump to be used for another purpose. If Grillot and Wendling are to be believed, Sherwin-Williams instead took intentional steps to dispose of the waste paint products by hauling them to the dump for disposal.[9] As previously noted, the Supreme Court has held that "under the plain language of the statute, an entity may qualify as an arranger under § 9607(a)(3) when it takes intentional steps to dispose of a hazardous substance." *Burlington Northern & Santa Fe Railway Co.*, 556 U.S. at 611. Sherwin-Williams' alleged conduct appears to fall squarely within this definition.

Sherwin-Williams argues, however, that it is not enough that it intended to dispose of a hazardous substance; arranger liability does not attach unless it actually did so. It maintains that, because third parties took possession of the paint waste, used it for their own purposes, and then disposed of the remnants at the dump, liability is shifted to the Site employees and family members. As an analogy, Sherwin-Williams argues that if it sent a truck to dispose of paint waste

---

[9] "Disposal" is defined as "the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3).

at the Site, but the truck was hijacked on the way there, and the hijackers took possession of the paint, used some of it, and then disposed of the rest at the Site, Sherwin-Williams could not be held liable.

The obvious problem with this analogy is that, according to Grillot and Wendling, Sherwin-Williams not only *intended* to dispose of hazardous substances at the South Dayton Dump, but in fact *did* dispose of them there. Sherwin-Williams' drivers brought trucks and vans containing paint waste, unloaded them at the Site, and left. Liability attaches at that point. What the Site's employees and family members did with the paint waste after the vehicles drove away could play a factor in determining equitable allocation of response costs, but it does not absolve Sherwin-Williams of liability.

Moreover, according to Grillot and Wendling, they did not use all of the paint that Sherwin-Williams brought to the Site; much was dumped into the pit. Grillot also testified that Sherwin-Williams disposed of paint thinner and creosote that was dumped at the Site. Accordingly, the fact that the Site's owners may have used some of the paint for their own purposes does not warrant summary judgment in Sherwin-Williams' favor.

Finally, Sherwin-Williams argues that the *de micromis* exemption set forth in 42 U.S.C. § 9607(o)(1)(A) applies. This subsection exempts from liability disposals of "less than 110 gallons of liquid materials." Given that this is a contribution action, the burden of proof is on Plaintiffs to show that this exemption does not apply. 42 U.S.C. § 9607(o)(4). Sherwin-Williams argues that there is no

evidence to support a finding that Sherwin-Williams disposed of more than 110 gallons of liquids at the South Dayton Dump. The Court disagrees.

Although neither Grillot nor Wendling could estimate the total volume of paint that was disposed of at the dump, Grillot testified that Sherwin-Williams made deliveries twice a week for at least 10-15 years, and that most of the one-gallon and five-gallon containers it brought to the dump were at least half full. Moreover, given Grillot's and Wendling's testimony that there was enough paint to paint the interior and exterior of numerous on-site buildings more than once, as well as a barn, several other houses, fences, gates, poles, and equipment, a reasonable factfinder could conclude that the 110-gallon threshold was met. The Court also notes that Wendling testified that the family used only a small fraction of the paint that was brought to the Site; the rest was dumped in the pit. This evidence is sufficient to withstand summary judgment on the *de micromis* exemption.

The Court concludes that genuine issues of material fact preclude summary judgment on the question of whether Sherwin-Williams arranged for the disposal of hazardous waste at the South Dayton Dump. Accordingly, the Court OVERRULES The Sherwin-Williams Company's Motion for Summary Judgment, Doc. #687, WITHOUT prejudice to refiling after expert witness discovery has been completed.

### E. Dayton Industrial Drum, Inc. (Doc. #690)

Plaintiffs allege that "Defendant Dayton Industrial Drum, Inc.[,] arranged for the disposal of wastes at the Site, including waste containing hazardous

substances. . . " Doc. #636, PageID#8256. Dayton Industrial Drum maintains

that Plaintiffs have no competent, admissible evidence to support this claim.

Dayton Industrial Drum ("DID") was formerly known as Lammers Barrel

Corporation, which was incorporated by Paul Lammers and two others in 1955.

The company's stated purpose is "to engage in buying and selling, at wholesale

and retail, new and used barrels, drums and other containers, and to manufacture,

process and recondition the same."  In 1973, after the company was purchased by

William Hussong, it changed its name to DID.  Doc. #690-1, PageID##13578,

13584.  Since approximately 1965, the company has operated on Radio Road in

Dayton.  Doc. #693-1, PageID#13715.

Prior to that date, Lammers Barrel Corporation conducted operations in

Beavercreek at the same site as Kohnen and Lammers, Inc., another company

founded by Paul Lammers.  Doc. #690-2, PageID#13590.  Kohnen and Lammers

was formed in 1953 for the purpose of manufacturing and reclaiming solvents.

Doc. #690-1, PageID##13564-66.  In 1969, the Kohnen and Lammers facility was

destroyed in a huge fire, and eventually became an EPA Superfund site.  Doc.

#690-3, PageID#13591-93.  The plant was locally known as "the barrel factory."

*Id.* at PageID#13592.  In 1971, Kohnen-Lammers, Inc., changed its name to

Lammers, Inc., and moved its operations to Kentucky.  Doc. #690-1,

PageID##13574-76.

As with other defendants, there is no documentary evidence proving that

DID arranged for the disposal of waste at the South Dayton Dump.  Again,

Plaintiffs' claims are based largely on the deposition testimony of Edward Grillot. DID maintains that Grillot has confused Lammers Barrel Corporation with Kohnen-Lammers, Inc. ("the barrel factory"). DID argues that summary judgment is warranted because Plaintiffs have presented no competent evidence that DID disposed of waste at the Site.

At his April 24, 2012, deposition, Grillot testified about 55-gallon drums full of liquid that were delivered to the South Dayton Dump in the mid-1960s. He would cut the lids off the drums and empty the liquid into pits at the Site. His family would then resell the empty drums. Doc. #673-1, PageID##9869-72, 9877-79, 9927-29. It was his understanding, from talking to other drivers, that most of these drums came from the "barrel factory" in Beavercreek, the site of the explosion in the "early seventies." He testified that, although he had heard of the name "Dayton Industrial Drum," the drums that he was talking about came from the "barrel factory." *Id.* at PageID##9929-31.

Grillot's recollections were somewhat different when he was deposed again on December 16-17, 2013. He testified that DID was a customer of the South Dayton Dump, and was one of several companies that brought 55-gallon drums to the Site. Approximately one-third of those drums were "at least pretty full." According to Grillot, DID delivered drums at least once a week in a white truck with black railings and no logo. The drivers would throw the drums off the truck. Doc. #682-1, Page ID##12219-23.

Grillot beat the paint off the drums and was paid a quarter for each drum. He admitted, however, that he did not pay much attention to what company they came from. He said that sometimes he would look at the "little paper inserts" that indicated the contents of the drum and where it came from, but he did not remember any specifics. *Id.* at PageID##12223-24. As Grillot recalled, DID had "another site in Beavercreek," known as the "barrel factory." It was his understanding that DID and the "barrel factory" were the same company. *Id.* at PageID##12220-21. He admitted, however, that he did not remember hearing the name "Dayton Industrial Drum" until he was working at the Powell Road landfill, around 1970. He claims that this was the first time he saw a paper insert indicating that a drum came from Dayton Industrial Drum. *Id.* at PageID#12224; Doc. #683-1, PageID#12836, 12838-40.

On cross-examination, Grillot admitted that he did not know whether the drums that were delivered to the South Dayton Dump came from DID or the "barrel factory." Nor did he know whether the two companies were one and the same. He also admitted that he had no personal knowledge that the drums came from the "barrel factory." He only knew that from talking to other drivers. Doc. #683-1, PageID#12836-38.

Plaintiffs also submit the deposition testimony of Gary King, who started working for Lammers Barrel Corporation in 1969, and continued working there, as a truck driver, after it became DID. At that time, the company had several tractor trailers, a straight truck, and a rusty, old dump truck. Doc. #694-1,

41

PageID##13904-06. King testified that he thinks that, on one occasion, he used a dump truck to deliver approximately ten 55-gallon drums to the South Dayton Dump. *Id.* at PageID##13906-07.

King further testified, however, that the drums were empty and had been processed. He explained that "evidently, [the dump] wanted to use them or something." *Id.* at PageID#13907, 13912. He dumped the load off the truck, letting the drums slide out, because that was the only way to unload it. *Id.* at PageID##13909-10. Plaintiffs ask the Court to infer that, because the drums were dumped instead of unloaded by hand, this was more than likely a "disposal" of waste rather than a "sale" of reconditioned drums.

King explained, however, that the company never delivered anything that had any product in it. It only hauled *empty* 55-gallon drums. Dirty drums were picked up and taken back to the plant, where they were cleaned and reconditioned, then sold to paint companies, oil companies and chemical companies. If, for any reason, a drum could not be reconditioned, it would be crushed and sold for scrap iron. *Id.* at PageID##13905-07, 13912. The company could not accept dirty drums containing more than one inch of liquid, because the drums would then be too heavy to lift by hand onto the trucks. At the plant, any liquid residue was flushed from the drums into a big tank. *Id.* at PageID##13909-10.

King's testimony is consistent with that of David Hussong, DID's current President, who has been involved in all aspects of the business since 1972, when his father purchased the company. Doc. #690-4, PageID#13594; Doc. #693-1,

42

PageID#13666. He admitted that he knows nothing about Lammers Barrel Corporation's waste disposal practices prior to that date. Doc. #693-1, PageID#13715.

Hussong averred, however, that DID never owned a white truck with black railings, never self-hauled waste to any disposal sites, and made no arrangements to have waste transported to the South Dayton Dump. Doc. #690-4, PageID#13594. Hussong also testified that, given the nature of the business, DID would have no reason to dispose of any 55-gallon drums—full or empty—at a landfill. In the 1970s, DID poured all liquid residue from dirty drums into a 1300-gallon, pre-flush tank and then emptied into the city sewer. Doc. #693-1, PageID##13729-32, 13749-50. It then reconditioned the drums and resold them. Any drums that could not be reconditioned were sold as scrap to Franklin Iron & Metal or Patterson Iron & Metal. *Id.* at PageID##13713-14, 13791. All reconditioned drums had to be certified for re-use. DID attached a Department of Transportation label to its reconditioned drums, but the label contained only the company's reconditioning number, the month and the year. The label did not have DID's name on it. *Id.* at PageID##13716-19.

Plaintiffs argue that the testimony of Grillot and King is sufficient to withstand DID's motion for summary judgment. Both testified that DID disposed of 55-gallon drums at the Site. In addition, although King testified that that the drums he delivered to the Site were "empty," Plaintiffs note that he also testified that drums could have up to one inch of liquid in them and still be considered

43

"empty." Doc. #694-1, PageID#13909. This overlooks the fact that King also testified that the drums that he delivered to the Site were not only "empty" but also "processed," or reconditioned, negating any inference that they contained even a small amount of liquid. *Id.* at PageID#13907.

Plaintiffs argue that, because the Court cannot make credibility determinations in ruling on a motion for summary judgment, it would be inappropriate for the Court to disregard the testimony of Grillot and King, and make a factual finding that no disposal occurred. They also note that, because Hussong has no knowledge of the company's waste disposal practices prior to 1972, there is no evidence to contradict Grillot's testimony that the company delivered 55-gallon drums to the Site in the 1960s.

As DID notes, however, this is not a matter of credibility. Grillot admitted that he had no personal knowledge about where the 55-gallon drums at issue came from. The delivery trucks had no logo on them. Drivers told him that the drums came from the "barrel factory," but these statements are inadmissible hearsay. Moreover, Grillot admitted that he did not know whether the "barrel factory" and DID are one and the same.

Grillot testified that, sometime after 1970, he observed drums at the Site with labels identifying DID as their source. But the presence of these drums at the Site is not enough. Again, Grillot lacks personal knowledge concerning the source of these drums. Moreover, as the testimony of Mr. King and Mr. Hussong indicates, not only was DID physically incapable of transporting drums containing

more than one inch of liquid, but there would have been no reason for DID to dispose of *any* 55-gallon drums at the Site. All drums were either reconditioned and resold, or crushed and sold as scrap metal.

Given Grillot's lack of personal knowledge about the *source* of the drums that were allegedly delivered to the Site, his testimony is insufficient to establish a genuine issue of material fact concerning Lammers Barrel Corporation/DID's nexus to the Site. Accordingly, the Court SUSTAINS Defendant Dayton Industrial Drum, Inc.'s, Motion for Summary Judgment, Doc. #690, and dismisses all claims and cross-claims against that defendant with prejudice.

### F. Coca-Cola Refreshments USA, Inc. (Doc. #695)

Plaintiffs allege that "Defendant Coca-Cola Refreshments USA, Inc.[,] or its predecessor is the legal successor in interest to Dayton Coca-Cola Bottling Co. ('Dayton Bottling'). Dayton Bottling arranged for the disposal of wastes at the Site, including waste containing hazardous substances . . ." Doc. #636, PageID#8255. The disposals at issue allegedly took place in the 1960s and early 1970s.

Coca-Cola Refreshments USA, Inc., argues that it is entitled to summary judgment because: (1) it has no successor liability; and (2) Plaintiffs have no evidence that Dayton Coca-Cola Bottling Co. arranged for the disposal of hazardous substances at the Site. Because the Court finds the first argument to be dispositive, it need not address the second.

Coca-Cola Refreshments USA, Inc. ("CCR"), denies that it is the successor to Dayton Coca-Cola Bottling Co. ("Old DCCB"), an Ohio corporation that operated a local bottling plant during the relevant time period. In 1982, Old DCCB was merged into its parent company, Mi-Ko, Inc. The Agreement of Merger provided that "all assets of [Old DCCB] shall become assets of [Mi-Ko, Inc.] and all liabilities of [Old DCCB] shall become liabilities of [Mi-Ko, Inc.]." Doc. #695-4, PageID#13986.

At the same time, The Spectrum Group, Inc., sought to purchase some of Old DCCB's assets from Mi-Ko's shareholders. A new entity, Dayton Coca-Cola Bottling Co. ("New DCCB"), was incorporated in Delaware, and was appointed as Spectrum's designee for the Asset Purchase Agreement, which was dated April 30, 1982. The agreement was governed by Ohio law. Doc.#695-4, PageID##13995, 13998, 14000-28. New DCCB was then merged into other entities which eventually merged into CCR. *Id.* at PageID##13981-82.

CCR denies that it is legally responsible for the environmental liabilities of Old DCCB. Not only did Mi-Ko expressly assume all of Old DCCB's liabilities in the Agreement of Merger but, in addition, the April 30, 1982, Asset Purchase Agreement expressly disclaimed liability for "[a]ny liabilities or obligations of Sellers or Predecessors arising by reason of any violation of federal, state, local or foreign law or any requirement of any governmental authority," and "[a]ny other liability or obligation of Sellers or Predecessors or any other Person not expressly assumed by Buyer . . ." *Id.* at PageID##14004-05.

State law governs the question of corporate successor liability under CERCLA. *City Mgmt. Corp. v. U.S. Chem. Co., Inc.*, 43 F.3d 244, 250 (6th Cir. 1994). As a general rule, "the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." *Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St. 3d 344, 346, 617 N.E.2d 1129, 1132 (Ohio 1993). There are, however, four exceptions to this rule.

> A successor corporation may be held liable when "(1) the buyer expressly or impliedly agrees to assume such liability; "(2) the transaction amounts to a *de facto* consolidation or merger; "(3) the buyer corporation is merely a continuation of the seller corporation; or "(4) the transaction is entered into fraudulently for the purpose of escaping liability." *Flaugher, supra*, 30 Ohio St. 3d at 62, 30 OBR at 167, 507 N.E.2d at 334.

*Id.* Here, only the first exception is at issue. It is undisputed that, in the April 30, 1982, Asset Purchase Agreement, New DCCB expressly assumed *some* liabilities of Old DCCB, but environmental liabilities were not among them.

Plaintiffs argue, however, that CCR *impliedly* agreed to assume the environmental liabilities of Old DCCB when CCR's immediate predecessor, Coca-Cola Enterprises, Inc., entered into a 2001 "Global De Minimis Settlement Agreement" in *Cargill, Inc. v. Abco Construction*, No. 3:98-cv-3601, a separate CERCLA case involving Old DCCB's environmental liability at the Valleycrest landfill. Paragraph 6 of the *Cargill* settlement agreement states:

> 6. **Settling Party Certification.** Settling Party [Coca-Cola Enterprises, Inc.] certifies, to the best of its knowledge, after appropriate and reasonable inquiry, that the wastes *it contributed* to the Site are not materially different, either in quantity, composition or toxicity, from the wastes described in

> the nexus information previously provided to the Settling Party by the [plaintiffs], as supplemented by the Settling Party's discovery responses submitted in this case . . .

Doc. #721-8, PageID#19740 (emphasis added).

According to Plaintiffs, Coca-Cola Enterprises' admission that "it" contributed waste to the Valleycrest landfill constitutes an admission that CCR is the same entity as Old DCCB, and an implicit assumption of *all* of Old DCCB's environmental liabilities.[10] Plaintiffs note that, because the Valleycrest landfill closed in 1975, the waste at issue would have been disposed of by Old DCCB prior to the 1982 Asset Purchase Agreement that purportedly absolves CCR from liability in the instant case.

CCR argues that Federal Rule of Evidence 408 renders the Valleycrest settlement agreement inadmissible to establish successor liability. Rule 408 provides:

> **(a) Prohibited Uses**. Evidence of the following is not admissible--on behalf of any party--either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction:
>
> > (1) furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim; and

---

[10] In their sur-reply, Plaintiffs also point to a consent decree involving the Cardington Road landfill, which closed in 1980. There also, Coca-Cola paid the liabilities of Old DCCB. This argument, however, was not raised in Plaintiffs' earlier briefing and will not be considered.

> (2) conduct or a statement made during compromise
> negotiations about the claim--except when offered in a
> criminal case and when the negotiations related to a
> claim by a public office in the exercise of its regulatory,
> investigative, or enforcement authority.
>
> **(b) Exceptions.** The court may admit this evidence for another
> purpose, such as proving a witness's bias or prejudice, negating
> a contention of undue delay, or proving an effort to obstruct a
> criminal investigation or prosecution.

Fed. R. Evid. 408.

Citing *Uforma/Shelby Business Forms, Inc. v. NLRB*, 111 F.3d 1284 (6th

Cir. 1997), Plaintiffs argue that Rule 408 does not apply when the claim at issue is

one *other than the one that was the subject of the compromise*. CCR notes,

however, that *Uforma* is factually distinguishable in that it involved the question of

the admissibility of evidence of alleged threats made during settlement

negotiations. The Sixth Circuit stated:

> The inapplicability of Rule 408 to suits seeking to vindicate wrongs
> committed during settlement discussions derives from the more
> general principle that "Rule 408 only bars the use of compromise
> evidence to prove the validity or invalidity of the claim that was the
> subject of the compromise, not some other claim." *Id.* at n. 25.
> Evidence of the compromise of a claim different than the claim
> currently in dispute therefore is admissible unless "the compromise
> evidence require[s] an inference as to the offeror's belief concerning
> the validity or invalidity of the compromised claim." *See id.* at § 5308.

*Uforma*, 111 F.3d at 1293–94 (quoting 23 Charles Alan Wright & Kenneth W.

Graham, Jr., *Federal Practice and Procedure: Evidence* §§ 5308, 5314 n.25 (1st

ed. 1980)).

CCR maintains that the exception cited in *Uforma* is applicable here, and that the Valleycrest settlement agreement is inadmissible because it "requires an inference as to the offeror's belief concerning the validity or invalidity of the compromised claim." Plaintiffs ask the Court to find that, because CCR's predecessor settled claims involving Old DCCB's environmental liabilities at the Valleycrest landfill, CCR cannot disclaim liability for Old DCCB's environmental liabilities at the South Dayton Dump.

In the Court's view, regardless of whether the exception cited in *Uforma* applies, there are strong policy reasons for excluding evidence of the Valleycrest settlement agreement. As the Fifth Circuit noted in *Lyondell Chemical Company v. Occidental Chemical Corporation*, 608 F.3d 284 (5th Cir. 2010), the exclusionary powers of Rule 408 exist because: (1) settlement communications are often "an attempt to purchase peace rather an admission of liability"; and (2) more importantly, parties are less likely to voluntarily settle disputes if evidence of compromise may later be used against them in court. *Id.* at 294-95. As the court stated, "[t]he need for voluntary settlement is especially critical in CERCLA litigation, with the statute's emphasis—and dependency—on the willingness of potentially liable parties to negotiate with the government and with each other." *Id.* at 295.

In *Lyondell*, the court held that the district court abused its discretion in admitting evidence of reports that were the product of an earlier dispute over contamination at a different location. Although the reports involved a different

50

site, there was a "shared factual nexus" that bore "directly on present issues of liability between many of the same parties." *Id.* at 299. The court held that "[m]aking the content of such a discussion available for use in related litigation would invite the very situation that Rule 408 is designed to avoid, and worse, in CERCLA litigation, reduce the likelihood that responsible parties would volunteer to right their environmental wrongs." *Id.*

In another CERCLA case similar to the one at bar, a district court rejected efforts by the plaintiff to establish successor liability by pointing to a prior consent decree involving *other* sites, and a prior settlement agreement regarding contribution claims at the *same* site, as evidence that the defendant had agreed to assume the environmental liabilities of its predecessor. *City of Mishawaka v. Uniroyal Holding, Inc.*, No. 3:04-cv-125, 2009 WL 499105 (N.D. Ind. Feb. 26, 2009). The court held that, "[b]ecause Mishawaka attempts to offer evidence of prior settlement agreement[s], precisely for the reasons prohibited by [Rule 408], this Court will not consider it as part of its determination on successor liability." *Id.* at *5.

As in *City of Mishawaka*, Plaintiffs here are attempting to use evidence of a prior settlement agreement to establish successor liability and prove the validity of a disputed CERCLA claim. As in *Lyondell*, there is a "shared factual nexus" that bears "directly on present issues of liability between many of the same parties." 608 F.3d at 299. However, as the Fifth Circuit noted, making the content of prior settlement agreements available for use in related litigation contravenes the very

purpose of Rule 408 and reduces the likelihood of settlements in CERCLA cases. For this reason, the Court concludes that evidence of the Valleycrest settlement agreement is inadmissible under Rule 408.

Even if the Court were to consider the Valleycrest settlement, more is needed to succeed on a theory of implied assumption of liability. In *Carpenter v. New Age Logistics, LLC*, 9th Dist. No. 27689, 2016-Ohio-281, the court explained that "[i]mplied assumption is also referred to as equitable assignment." An "equitable assignment . . . 'is accomplished where there is an intention on one side to assign and an intention on the other to accept, supported by a sufficient consideration and disclosing a present purpose to make an appropriation of a debt or fund.'" *Id.* at ¶23 (internal quotations omitted). There is no evidence of sufficient consideration supporting the alleged implied assumption of liability in this case.

Moreover, not only does the Valleycrest settlement agreement say nothing about Coca-Cola Enterprises assuming the environmental liabilities of Old DCCB, but it contains an express disclaimer of liability:

> **8. Denial of Liability.** This Settlement Agreement shall not constitute, be interpreted as, or be construed as evidence of any admission of liability, law or fact, a waiver of any right or defense by the Settling Party . . .

Doc. #721-8, PageID#19741.[11]

---

[11] Likewise, as noted above, the 1982 Asset Purchase Agreement also expressly disclaims all liability not expressly assumed.

Several courts have held that an express disclaimer of liability negates a finding of implied assumption of liability. *See U.S. Herbs, Inc. v. Riverside Partners, LLC*, No. 1:15-cv-2557, 2017 WL 238446, at *6 (N.D. Ohio Jan. 19, 2017) (interpreting Ohio law on implied assumption of liability); *City Mgmt. Corp.*, 43 F.3d at 256 (interpreting similar Michigan law, and concluding that "[i]n the face of contractual language that expressly disclaims liability, we cannot find that there was an implied assumption of liability, and we need not consider the argument that plaintiff's conduct manifested an intent to assume such liability."); *City of Mishawaka*, 2009 WL 499105, at *5 (holding that, even if the court were to consider evidence of the prior settlement agreements, "the express terms of both agreements show clear disclaimers of liability on the part of all Uniroyal parties.").

Given that Coca-Cola Enterprises expressly disclaimed liability in the Valleycrest landfill settlement agreement, there can be no finding of an implied assumption of liability even if the settlement agreement were admissible. Accordingly, the Court SUSTAINS Defendant Coca-Cola Refreshments USA, Inc.'s, Amended Motion for Summary Judgment, Doc. #695.

### G.     Flowserve Corporation (Doc. #696)

Plaintiffs allege that "Defendant Flowserve or its predecessor is the legal successor in interest to Duriron Corporation. Duriron Corporation arranged for the disposal of wastes at the Site, including waste containing hazardous substances . . . " Doc. #636, PageID#8257.

Duriron manufactured pumps and valves, primarily for the chemical industry. It is undisputed that Flowserve is the corporate successor to Duriron. Flowserve argues, however, that, based on the evidence presented, no reasonable factfinder could find the requisite nexus tying Duriron to the South Dayton Dump. As with many other defendants, there are no documents showing that Duriron arranged for the disposal of waste at the Site. Plaintiffs' claims again depend solely on the deposition testimony of Edward Grillot, describing what he observed as a child.

In his April 24, 2012, deposition, Grillot characterized Duriron as a "good customer" of the South Dayton Dump. Doc. #673-1, PageID#9964. He personally observed trucks with the name "Duriron" on the door, carrying a cone-shaped container that looked like the Apollo space craft, "a pretty cool sight." His uncle, Kenny, told him it contained sludge skimmed off the top of molten steel. The container "was on two chains 'cause it was so hot. And it would be swinging, and it would be smoldering." They took it "down to the bottom pit to dump it 'cause it was so heavy and hot that it would lay in the fly ash and the liquid, and sometimes it would catch the liquid – because the liquid would be sometimes a little toxic. It would catch that on fire." Grillot testified that Duriron made these deliveries to the South Dayton Dump at least once or twice a day from the time he was nine or ten until he was fifteen or sixteen, and again a few years later when he returned to work there. *Id.* at PageID##9965-68. This would have been in the 1960s and early 1970s.

At his December 16-17, 2013, deposition, Edward Grillot again testified that Duriron was a customer of the dump. He reiterated that the "hot loads" arrived in a container shaped like the Apollo spacecraft "if not twice a day, maybe three times a day," and that they had to be careful not to "catch the whole pit on fire." Doc. #682-1, PageID##12228-30. The door of the delivery truck said "Duriron." Doc. #683-1, PageID#12793.

Grillot further testified that, two or three times a day, the same Duriron truck delivered a dumpster with "a lot of liquid in it," an "oily substance." That liquid "would splash all over, even coming down the street and into the entrance of the dump in front of the office, and so it made quite a mess." Doc. #682-1, PageID##12229-31.

Flowserve argues that Grillot's deposition testimony is insufficient to establish a genuine issue of material fact concerning Duriron's nexus to the Site, given all of the evidence that contradicts it. It notes that, despite Edward Grillot's testimony that Duriron was a "good customer" and that these deliveries occurred several times each day, for years on end, neither Michael Wendling, Horace Boesch, Jr., nor David Grillot identified Duriron as a customer of the South Dayton Dump. Although their failure to independently recall Duriron as a customer does not necessarily contradict Edward Grillot's testimony, it does cast a long shadow of doubt, given the frequency of Duriron's alleged deliveries.

Flowserve further notes that Edward Grillot's testimony is blatantly contradicted by other evidence in the record. Flowserve has submitted the

deposition testimony and affidavits of five retired employees who worked at the Duriron foundry during the 1960s and 1970s—Ronald Arndts, William Dybvad, Joseph Pizzino, Thomas Spence, and Robert Roberts, Jr., Flowserve's 30(b)(6) representative.[12] Their testimony leads to the inescapable conclusion that Grillot's recollections are irreconcilable with Duriron's manufacturing operations and waste disposal practices during the relevant time period.

Roberts testified that Duriron operated a low-volume, high-alloy steel foundry on North Findlay Street in Dayton. Doc. #696-1, at PageID#14213. Until 1988, Duriron also owned and operated its own landfill less than ¼ mile away. The vast majority of Duriron's foundry waste—primarily spent foundry sand—was taken there. *Id.* at PageID##14209, 14218-21; Doc. #696-19, PageID#16057.

Because Duriron used induction furnaces to melt the steel, it generated far less slag than it would have if other methods had been used.[13] Doc. #696-1, at PageID##14389-91. Roberts testified that the volume of slag produced at the foundry was "very small." *Id.* at PageID#14412. The slag was skimmed off the top of the melted steel and knocked into the concrete pit below the furnace so that

---

[12]  Arndts started at Duriron in 1966. Doc. #696-7, at 10. Dybvad worked there from 1973-1990. Doc. #717, PageID#19028. Pizzino was employed at Duriron from 1960 until 1996. Doc. 696-19, PageID#16057. Spence started there in 1971. Doc. #715, PageID#18918. Roberts worked at Duriron in 1977 as an associate engineer, and then again from 1990 until 2016 as legal counsel. Doc. #696-1, at PageID##14205, 14208.

[13]  Slag is the material that accumulates on top of the melted steel. Doc. #696-1, PageID#14391.

it could cool. Then, every few days, it was shoveled out by hand. Doc. #696-19, PageID#16057. The slag that contained a high percentage of nickel and chrome was quite valuable, and would be resold for scrap. Doc. #696-1, at PageID##14387, 14392, 14397; Doc. #715, PageID#18911, 18925; Doc. #713, PageID#18537. The lower-alloy slag was taken to the Duriron landfill. Doc. #696-1, at PageID#14398; Doc. #715, PageID#18907; Doc. #713, PageID#18571-72; Doc. #696-19, PageID##16057-58.

Several times each day, the solid foundry waste, which included spent foundry sand, low-alloy slag, and baghouse dust, was transported from the foundry to the Duriron landfill in a lugger box placed on a flatbed truck. This was typically the only vehicle used to transport foundry waste.[14] Doc. #696-1, at PageID##14273, 14275-76, 14416-17; Doc. #717, PageID#19035-36. The truck had metal arms and hooks with chains to lift the lugger boxes onto the truck. Because this "lugger truck" was not licensed to drive on the public road, it was not used for offsite waste disposal. It was used only to haul waste to the Duriron landfill. Doc. #696-13, PageID##14975-76; Doc. #717, PageID#19037; Doc. #715, PageID#18904; Doc. #713, PageID##18529-30; Doc. #696-7, at 17-18; Doc. #696-1, at PageID##14416, 14437; Doc. #696-19, PageID#16057; Doc.

---

[14] Plaintiffs note that Arndts testified that another flatbed truck with rails on the side was occasionally used to haul trash to the dumpster. However, he also testified that this truck was not licensed and never left the property. Doc. #696-7, at 15-18. Likewise, Duriron had a dump truck that was used mainly for snow removal, but might have been used to transport foundry sand to the Duriron landfill if the lugger truck broke down. *Id.* at 42.

#696-20, PageID#16060. Moreover, the lugger truck did not have the "Duriron" name on the side. Doc. #715, PageID##18905, 18935; Doc. #713, PageID#18532; Doc. #696-1, at PageID#14415; Doc. #696-13, PageID#14976; Doc. #696-19, PageID#16057; Doc. #696-20, PageID#16060.

None of the retired employees recalled any cone-shaped vessel for transporting molten slag. They noted that there would have been no reason to transport molten slag anywhere. The small amount of slag that was produced was allowed to cool in the concrete pits below the induction furnaces, then collected and either sold for scrap value or disposed of at the Duriron landfill. Doc. #713, PageID##18538-39, 18544-45; Doc. #696-19, PageID#16058; Doc. #696-20, PageID##16060-61; Doc. #696-13, PageID##14975-76; Doc. #715, PageID##18914-15, 18935; Doc. #717, PageID#19042; Doc. #696-1, at PageID##14390-91, 14396, 14409.

Roberts pointed out two other reasons why Grillot's testimony concerning the loads of molten slag is implausible. The Duriron foundry, located on the northeast side of Dayton, was six to seven miles from the South Dayton Dump, which was located on the southwest side of the city. Doc. #696-1, at PageID#14410. Any load of molten slag transported that distance would have cooled in transit. Roberts explained that "[I]t's not thermodynamically possible" that the slag would have arrived at the South Dayton Dump "still molten and/or red hot." *Id.* at PageID##14411-12. Moreover, Grillot testified that these loads of

molten slag arrived two or three times per day. Roberts noted that this far exceeded the volume of slag generated by Duriron. *Id.* at PageID#14411.

With respect to Grillot's testimony concerning Duriron's alleged deliveries of dumpsters full of oily liquid, Roberts admitted that it is not entirely clear how Duriron disposed of liquid waste in the 1960s and early 1970s. *Id.* at PageID#14459. Spent oils were hauled away by Clark Oil for recycling. *Id.* at PageID#14293. It appears that, as early as 1977, Duriron contracted with Peerless Transportation to haul away spent coolant, which was taken to the Valleycrest landfill. *Id.* at PageID#14294, 14422; Doc. #713, PageID#18579. Ecolotec also picked up some liquid waste. Doc. #717, PageID##19046-47. Roberts speculates that, prior to 1977, Duriron either dumped its liquid waste down the sewer or disposed of it in the Duriron landfill. Doc. #696-1, at PageID#14459.

Nevertheless, for several reasons, it is highly unlikely that Duriron transported any dumpsters full of oily substances to the South Dayton Dump. First, Duriron's lugger boxes were not watertight; they were incapable of holding liquids. Doc. #717, PageID#19037; Doc. #696-1, PageID##14434-35; Doc. #696-13, PageID#14975. The retired employees testified that they never saw the lugger truck hauling liquids. Doc. #715, PageID#18904; Doc. #713, PageID##18547-48. More importantly, because Duriron's manufacturing process did not generate large batches of oily liquids, Doc. #696-1, at PageID#14420, there would have been no need to dispose of two or three dumpsters full each day.

Finally, it defies common sense that a company would have transported open containers full of sloshing, leaking, oily substances six or seven miles through Dayton several times each day, even in the 1960s and early 1970s.

Plaintiffs argue that even if the retired employees worked at Duriron's foundry in the 1960's and 1970's, their job duties did not place them in a position with relevant knowledge. Roberts, however, testified that if Duriron used the South Dayton Dump during this time period, Dybvad, Spence and Pizzino were in the best position to know. Doc. #696-1, at PageID#14271. *See also* Doc. #717, PageID#19054. Likewise, Dybvad, Spence and Pizzino all testified that, if Duriron had been transporting molten slag off-site for disposal, they would have known about it. Doc. #696-13, PageID#14976; Doc. #715, PageID#18913; Doc. #696-20, PageID#16061; Doc. #696-19, PageID#16058.

Roberts testified that Flowserve has absolutely no evidence that any of Duriron's waste ever went to the South Dayton Dump. Doc. #696-1, at PageID##14345, 14380, 14438-39.[15] Plaintiffs have only Edward Grillot's testimony. Flowserve argues that, because Grillot's childhood memories are wholly contradicted by the record concerning Duriron's manufacturing operations

---

[15] Given Grillot's testimony that Duriron sent nothing other than the molten slag and oily liquids to the Site, Doc. #683-1, PageID#12807, the Court need not consider whether Duriron's general refuse, which was picked up by IWD, was transported to the Site. The Court notes, however, that there is no evidence that any of this waste was transported to the South Dayton Dump. Doc. #696-1, at PageID##14354-56.

and waste disposal practices, his testimony is insufficient to create a genuine issue of material fact. The Court agrees.

As Flowserve notes, although the Court cannot resolve credibility issues in ruling on a motion for summary judgment, and must draw all reasonable inferences in favor of the non-moving party, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). That is the case here. Viewing the record as a whole, Grillot's testimony is insufficient to create a genuine issue of material fact.[16] Based on the evidence presented, no reasonable factfinder could conclude that Duriron arranged for the disposal of hazardous waste at the South Dayton Dump. Accordingly, the Court SUSTAINS Flowserve Corporation's Motion for Summary Judgment, Doc. #696, and dismisses all claims against Flowserve with prejudice.

---

[16] Flowserve speculates that Edward Grillot may have confused Duriron with Dayton-Walther, the predecessor-in-interest to Plaintiff Kelsey-Hayes. Dayton-Walther operated the Dayton Steel Foundry, which was located less than one-half mile from the South Dayton Dump, and was a regular customer there. *See* Doc. #696-28, PageID##17216-17. Moreover, Flowserve suggests that Dayton-Walther's manufacturing processes would have been more consistent with what Grillot described, and consistent with what Horace Boesch and David Grillot remembered. Plaintiffs note, however, that Grillot identified both Dayton Steel Foundry and Duriron as customers of the dump. *See* Doc. #673-1, PageID##10064, 10088. The Court need not address the question of whether Grillot may have mistaken Duriron for Dayton-Walther. For the reasons set forth above, the Court is satisfied that Grillot's testimony is insufficient to create a genuine issue of material fact concerning Duriron's alleged nexus to the Site.

## H.    Franklin Iron & Metal (Doc. #698)

Plaintiffs allege that "Defendant Franklin arranged for the disposal of wastes at the Site, including waste containing hazardous substances. . . " Doc. #636, PageID#8257. According to Greg Clouse, General Manager of Franklin Iron & Metal ("FI&M"), the company is in the business of purchasing and recycling scrap materials. Doc. #689, p. 18.

At his July 17, 2012, deposition in *Hobart I*, Michael Wendling testified that FI&M disposed of "coiled up wire and brake shoes and brake cylinders that had the rubber caps on the end," and that this waste was brought from the Delco brake plant. Doc. #726-1, PageID#19843. Given that FI&M was not a party in *Hobart I*, this deposition testimony would be inadmissible at trial against FI&M. *See* Fed. R. Civ. P. 32(a)(1) (deposition testimony may be used against a party at trial if "the party was present or represented at the taking of the deposition or had reasonable notice of it"). However, as previously discussed, if the substance of Wendling's testimony can be "reduced to admissible evidence in the form of trial testimony" by Mr. Wendling, *see* 11 James Wm. Moore, *Moore's Federal Practice* §56.91[2] (3d ed.), the Court may consider the deposition in determining whether there is a genuine issue of material fact.

At his April 23, 2014, deposition, Wendling again testified that, in the 1960s and 1970s, FI&M brought brakes pads, wheel cylinders and metal shavings from Delco to the South Dayton Dump on a daily basis. They arrived on box

trucks that said "Franklin." The same trucks would sometimes take away other scrap metal. Doc. #726-2, PageID##19846-54.

Although Wendling saw the trucks dump brakes and shavings, he admitted that he had no personal knowledge that they came from the Delco plant. That is what his uncles had told him. Doc. #726-2, PageID##19854-55. Wendling's statement that the waste came from Delco is inadmissible hearsay under Fed. R. Evid. 801 and 802. However, to the extent that Wendling personally observed trucks that said "Franklin" dumping brake shoes, pads, cylinders, and metal shavings at the Site, Doc. #676-2, PageID#10604, his testimony is admissible.

Wendling's testimony is also consistent with the December 16, 2013, deposition testimony of Edward Grillot. Grillot testified that FI&M, a customer of the South Dayton Dump, brought truckloads of brakes and picked up scrap metal. Doc. #726-3, PageID##19861-62. FI&M also dropped off wood pallets and broken up drums. According to Grillot, FI&M made deliveries about once a month during the 1960s and 1970s. *Id.* at PageID##19862-64.

Henry Jordan was employed by FI&M as a truck driver sometime in the 1960s. Doc. #732, PageID##20386-89. He delivered loads of waste to several different places, including the dump in question on Dryden Road. He later indicated that the dump was on River Road, near Dryden Road, but he was unsure exactly where. *Id.* at PageID##20392-93, 20396-97, 20401.

FI&M maintains that the deposition testimony of Wendling, Grillot and Jordan fails to raise any genuine issues of material fact concerning FI&M's

potential liability. According to FI&M, the deposition testimony of Gregory Clouse conclusively proves that FI&M did not arrange for the disposal of hazardous waste at the South Dayton Dump.

Clouse has been FI&M's General Manager since 1984. Doc. #689, p. 12. He testified that FI&M purchases scrap metal from individual customers and industrial plants. *Id.* at 19-20. FI&M may have purchased some scrap metal from dumps, including the South Dayton Dump. *Id.* at 46, 83-84. The scrap metal purchased by FI&M is recycled and resold. Larger pieces, such as automobiles, are crushed and baled. *Id.* at 23-25, 33, 90. Any material that FI&M cannot recycle or resell, including wooden pallets, is hauled to one of Montgomery County's incinerators. *Id.* at 23, 30-32, 34. FI&M argues that, given the nature of its business, it would make no sense for FI&M to dispose of recyclable material, such as steel drums, brake pads and cylinders, at a dump. This would be akin to throwing away money.

FI&M has also presented deposition testimony of James Forney, who has been employed by Waste Management, Inc., since 1988. Doc. #698, PageID#17270. Daily logs indicate that FI&M was a customer of Waste Management, and that FI&M hired Waste Management to pick up certain materials from various companies. However, nothing in the logs indicates that Waste Management transported the materials to the South Dayton Dump. *Id.* at PageID#17278-85.

Neither the testimony of Mr. Clouse nor Mr. Forney is sufficient to warrant summary judgment. Wendling, Grillot and Jordan all testified about FI&M's waste disposal practices at the South Dayton Dump in the 1960s and 1970s. Clouse admitted that he has no personal knowledge of what happened to FI&M's waste prior to 1984 when he started working there. He simply assumed that "we just carried on to what they did before." Doc. #689, at 89-90. Mr. Forney's testimony, that there is no evidence showing that FI&M hired Waste Management to haul materials to the South Dayton Dump, is unhelpful, particularly given that Wendling, Grillot and Jordan all testified that FI&M hauled waste to the dump in its own truck.

The Court finds that genuine issues of material fact preclude summary judgment on the question of FI&M's nexus to the Site. Whether the waste at issue contained hazardous substances is the subject of future expert witness testimony. The Court therefore OVERRULES Defendant FI&M's Motion for Summary Judgment, Doc. #698, WITHOUT PREJUDICE to refiling after expert witness discovery is completed.

## VI. Conclusion

For the reasons set forth above, the Court SUSTAINS the following

Defendants' motions for summary judgment, and DISMISSES WITH PREJUDICE all

claims and cross-claims brought against them:

- Dayton Industrial Drum, Inc. (Doc. #690);

- Coca-Cola Refreshments USA, Inc. (Doc. #695); and

- Flowserve Corporation (Doc. #696).

Finding genuine issues of material fact concerning the nexus of the following

Defendants to the Site, the Court OVERRULES their motions for summary

judgment WITHOUT PREJUDICE to refiling after expert witness discovery has been

completed:

- Harris Corporation (Doc. #677);

- Cox Media Group Ohio, Inc. (Doc. #679);

- Waste Management of Ohio, Inc., on behalf of Blaylock Trucking Co., Inc. (Doc. #686);

- The Sherwin-Williams Company (Doc. #687); and

- Franklin Iron and Metal Corp. (Doc. #698).


Date: November 29, 2017

_____
WALTER H. RICE
UNITED STATES DISTRICT JUDGE