# EXHIBIT M

```
                                                              1


         IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF OHIO
                   WESTERN DIVISION

                       - - - - -


  Hobart Corporation,      :
  et al.,
                           :
         Plaintiffs,
                           :
         vs.                   Civil Action No.
                           :      3:13-cv-115
  The Dayton Power and         Judge Walter H. Rice
  Light Company,           :
  et al.,
                           :
         Defendants.

                       - - - - -

            DEPOSITION OF DALE A. OESTERLE

                       - - - - -



           Taken at Bricker & Eckler LLP
              100 South Third Street
                Columbus, OH 43215
            September 7, 2018, 9:02 a.m.




                       - - - - -

               Spectrum Reporting LLC
     333 Stewart Avenue, Columbus, Ohio 43206
            614-444-1000 or 800-635-9071
              www.spectrumreporting.com

                       - - - - -
```

57

1  showing you Oesterle Exhibit 7.
2              MR. ROMINE:  What was the missing page?
3              MS. NIJMAN:  36.
4  Q.        Are you familiar with the term
5  competitive -- I'm sorry.  Would you look at the
6  first page of this document.  And what's it
7  captioned?
8  A.        "Competitive Impact Statement."
9  Q.        And do you know what that is?
10 A.        Yes.
11 Q.        And what is it?
12 A.        Well, it's an antitrust proceeding
13 document.  This is -- I used to teach antitrust
14 very early in my career, and it's part of the --
15 it's part of the process for getting review of a
16 deal through the -- either Department of Justice
17 or the Federal Trade Commission.
18 Q.        Uh-huh.  And that usually happens long
19 before documents are signed, that you involve
20 the --
21 A.        Very early, yes.  Very early in the
22 case.
23 Q.        Because you want to make sure the
24 documents you signed comply with the government's

58

1 requests --
2 A.         Yes.
3 Q.         -- for antitrust, correct?
4 A.         Yes.  In fact, that's part of the
5 negotiation.  It's the opening round in a
6 negotiation with the government.
7 Q.         And looking back at Deposition
8 Exhibit 6, the transaction agreement with Bates
9 No. WMO 30963, who is that amongst?  What does the
10 caption say?
11 A.         You want me to read the caption?
12 Q.         Yes, please.
13 A.         You're testing my reading.  Transaction
14 Agreement Among Waste Management, Inc.; Genstar
15 Corporation; Genstar Refuse Services Corporation;
16 and WM Acquiring Corporation, July 13th, 1984.
17 Q.         And just for the purposes of discussing
18 today, the last entity, WM Acquiring Corp, we --
19 can we refer to that as W-M-A-C or WMAC?  Is that
20 okay with you?
21 A.         No.
22 Q.         Okay.  What would you like to refer to
23 it as?
24 A.         The proper name.

```
                                                              119

 1    A.           Cash merger followed by a cash out
 2    merger.
 3    Q.           Uh-huh.  Right.  That's what I'm
 4    getting at.  Okay.  Then it says, as promptly as
 5    practicable thereafter, the parties are going to
 6    divide and distribute to WMI and GRS the assets
 7    business and operations of SCA --
 8    A.           Yes.
 9    Q.           -- as provided in the agreement, right?
10    A.           Yeah.
11    Q.           So then the third step is, after the
12    stock is acquired by WMAC, they're going to divide
13    up the assets of SCA Services, Inc.
14    A.           Yes.
15    Q.           Correct?
16    A.           Yes.
17    Q.           Okay.
18    A.           It's a complicated little deal.
19    Q.           So the purpose of this deal here, the
20    way this was set up, was to split up SCA?
21    A.           Yes.
22    Q.           And that was because of antitrust
23    issues, correct?
24    A.           I don't know what the reasons were.
```

```
 1   Q.          Exhibit 9.
 2   A.          Yes.  I never got the final -- yeah.  I
 3   didn't -- you're right.  The version I have wasn't
 4   signed by the judge.
 5   Q.          Uh-huh.
 6   A.          So that's all I have.
 7   Q.          Right.  And now I've provided you --
 8   A.          Yes.
 9   Q.          -- with the signed one.
10   A.          Yes.
11   Q.          The entered version.  And you said
12   earlier that you are familiar with antitrust laws,
13   and you understood that the antitrust laws
14   required the split of the assets here?
15   A.          Yes.  Chapter 7 -- let's see.  Is it 7
16   or 8?
17   Q.          It's 7.  Section 7 of the Clayton Act?
18   A.          No.  I've taught antitrust.  My case
19   book talks about antitrust and mergers.  And
20   chapter -- we changed the chapters.  In Chapter --
21   they changed the chapters.  It's either 7 or 8.
22   So antitrust is the subject of -- that I know a
23   little bit about.
24   Q.          Uh-huh.  Now, in this case, in the
```

142

1  final order, the government concluded that there
2  were antitrust issues --
3  A.        Concerns.
4  Q.        -- from this merger?
5  A.        Yeah.  That was a Hart-Scott-Rodino Act
6  procedure.
7  Q.        Uh-huh.
8  A.        Yes.
9  Q.        And that's why the transaction was
10 structured --
11 A.        The way it was.
12 Q.        -- to split those assets?
13 A.        Yes.
14 Q.        Uh-huh.
15 A.        Exactly.  It's very common.
16 Q.        We found -- I've marked, as Exhibit 8,
17 the complaint.
18 A.        Do you have any questions about 6.4?
19 We never -- you showed me 6.4, but you never asked
20 me any questions about 6.4.
21 Q.        No.  I just wanted to point out that
22 that was the assumption and indemnity --
23 A.        Yes.
24 Q.        -- we'd been referring to earlier.