Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

* * *

HOBART CORPORATION,
et al.,

    Plaintiffs,

    vs.        CASE NO. 3:13-cv-00115-WHR

THE DAYTON POWER

AND LIGHT COMPANY,
et al.,

    Defendants.

* * *

    Rule 30(b)(6) deposition of Valley
Asphalt Corporation through DAN CRAGO, P.E.,
Witness herein, called by the Plaintiffs for
cross-examination pursuant to the Rules of
Civil Procedure, taken before me, Karen M.
Rudd, a Notary Public in and for the State of
Ohio, at the offices of Sebaly, Shillito &
Dyer, 1900 Kettering Tower, 40 North Main
Street, Dayton, Ohio, on Wednesday,
February 15, 2017, at 9:39 a.m.

* * *

---

Page 2

| EXAMINATIONS CONDUCTED | PAGE |
|---|---|
| BY MR. ROMINE:..................... | 13 |
| BY MR. LEWIS:...................... | 205 |
| BY MR. MERRILL:.................... | 211 |
| BY MR. ANDREASEN:.................. | 281 |
| BY MR. LEWIS:...................... | 287 |
| BY MR. ROMINE:..................... | 290 |
| BY MR. LEWIS:...................... | 298 |
| BY MR. MERRILL:.................... | 299 |

EXHIBITS MARKED

(Thereupon, Plaintiffs' Exhibit 1,
Notice of Rule 30(b)(6) Deposition
of Valley Asphalt Corporation, was
marked for purposes of
identification.).....................  15
(Thereupon, Plaintiffs' Exhibit 2,
Defendant Valley Asphalt
Corporation's Responses to
Plaintiffs' Interrogatories and
Requests for Production of
Documents, was marked for purposes
of identification.)..................  21

---

Page 3

(Thereupon, Plaintiffs' Exhibit 3,
Defendant Valley Asphalt
Corporation's Responses to Defendant
The Dayton Power and Light Company's
First Set of Combined Discovery
Requests, was marked for purposes of
identification.)....................  22
(Thereupon, Plaintiffs' Exhibit 4,
lease between Cyril J. Grillot and
Horace J. Boesch and Valley Asphalt
Corporation, was marked for purposes
of identification.)..................  41
(Thereupon, Plaintiffs' Exhibit 5,
drawing by Bowser-Morner titled
Approximate Boundary of Valley
Asphalt Site, was marked for
purposes of identification.)..........  49
(Thereupon, Plaintiffs' Exhibit 6,
printout from Google Maps, was
marked for purposes of
identification.)....................  59
(Thereupon, Plaintiffs' Exhibit 7,
Contract to Purchase Real Estate,
was marked for purposes of
identification.)....................  73

---

Page 4

(Thereupon, Plaintiffs' Exhibit 8,
copy of 2010 aerial photograph, was
marked for purposes of
identification.)....................  75
(Thereupon, Plaintiffs' Exhibit 9,
larger copy of 2010 aerial
photograph, was marked for purposes
of identification.)..................  79
(Thereupon, Plaintiffs' Exhibit 10,
Environmental Remediation Report at
Valley Asphalt prepared by David M.
Scardino, was marked for purposes of
identification.)....................  124
(Thereupon, Plaintiffs' Exhibit 11,
two-page document, document entitled
Sewer Line, Valley Asphalt
Corporation, Dryden Road Plant, and
email from NASAH@marasconewton.com
to jurensj@jrjnet.com sent
October 18, 2001, was marked for
purposes of identification.)..........  134

Page 5

```
 1      (Thereupon, Plaintiffs' Exhibit 12,
 2    copy of a folder labeled Valley
 3    Asphalt Corporation and
 4    correspondence, was marked for
 5    purposes of identification.)..........   142
 6      (Thereupon, Plaintiffs' Exhibit 13,
 7    letter to John R. Jurgensen Company
 8    from the United States Environmental
 9    Protection Agency dated December 10,
10    2002, was marked for purposes of
11    identification.).....................    148
12      (Thereupon, Plaintiffs' Exhibit 14,
13    letter to US Environmental
14    Protection Agency from Daniel T.
15    Crago dated December 11, 2002, was
16    marked for purposes of
17    identification.).....................    152
18      (Thereupon, Plaintiffs' Exhibit 15,
19    letter to Dan Crago from the United
20    States Environmental Protection
21    Agency, was marked for purposes of
22    identification.).....................    157
23
24
25
```

Page 6

```
 1      (Thereupon, Plaintiffs' Exhibit 16,
 2    letter to Fred Bartman from Daniel
 3    Crago dated August 17, 2005, was
 4    marked for purposes of
 5    identification.).....................    158
 6      (Thereupon, Plaintiffs' Exhibit 17,
 7    letter to Valley Asphalt Corporation
 8    from the United States Environmental
 9    Protection Agency dated
10    September 29, 2005, was marked for
11    purposes of identification.)..........   160
12      (Thereupon, Plaintiffs' Exhibit 18,
13    letter to South Dayton Dump and
14    Landfill Site in Moraine, Ohio, from
15    the United States Environmental
16    Protection Agency dated
17    September 10, 2012, was marked for
18    purposes of identification.)..........   169
19      (Thereupon, Plaintiffs' Exhibit 19,
20    letter to Carol Ropski from Daniel
21    Crago dated September 28, 2012, was
22    marked for purposes of
23    identification.).....................    174
24
25
```

Page 7

```
 1      (Thereupon, Plaintiffs' Exhibit 20,
 2    letter to Martin Lewis from Richard
 3    Karl dated March 22, 2013, with
 4    attached unilateral administrative
 5    order, was marked for purposes of
 6    identification.).....................    180
 7      (Thereupon, Plaintiffs' Exhibit 21,
 8    letter to Martin Lewis from the
 9    United States Environmental
10    Protection Agency dated July 13,
11    2016, was marked for purposes of
12    identification.).....................    187
13      (Thereupon, Plaintiffs' Exhibit 22,
14    letter to Leslie Patterson from
15    Martin Lewis dated March 26, 2015,
16    was marked for purposes of
17    identification.).....................    189
18      (Thereupon, Plaintiffs' Exhibit 23,
19    letter to Valley Asphalt Corporation
20    from Richard Doran dated April 14,
21    1999, was marked for purposes of
22    identification.).....................    195
23
24
25
```

Page 8

```
 1      (Thereupon, Plaintiffs' Exhibit 24,
 2    contract between Valley Asphalt and
 3    Bowser-Morner, was marked for
 4    purposes of identification.)..........   197
 5      (Thereupon, Plaintiffs' Exhibit 25,
 6    Form 1: Building Physical Survey
 7    Questionnaire, was marked for
 8    purposes of identification.)..........   200
 9      (Thereupon, Deposition Exhibit 26,
10    Environmental Remediation Report at
11    Valley Asphalt prepared by David M.
12    Scardino dated September 5th, 2000,
13    was marked for purposes of
14    identification.).....................    227
15      (Thereupon, Deposition Exhibit 27,
16    memo from Matt Justice to Karen
17    Cibulskis dated January 24, 2006,
18    was marked for purposes of
19    identification.).....................    241
20      (Thereupon, Deposition Exhibit 28,
21    phone conversation record dated
22    June 12, 2012, was marked for
23    purposes of identification.)..........   248
24
25
```

```
1    (Thereupon, Deposition Exhibit 29,
2    email string, the first email on the
3    document from Madelyn Smith to
4    Leslie Patterson sent April 7, 2014,
5    was marked for purposes of
6    identification.)......................    251
7    (Thereupon, Deposition Exhibit 30,
8    handwritten notes, was marked for
9    purposes of identification.)..........    271
10   (Thereupon, Deposition Exhibit 31,
11   handwritten notes, was marked for
12   purposes of identification.)..........    273
13   (Thereupon, Deposition Exhibit 32,
14   letter to Daniel Crago from the
15   United States Environmental
16   Protection Agency dated October 19,
17   2012, was marked for purposes of
18   identification.)......................    275
19
20
21
22
23
24
25
```

```
1    APPEARANCES:
2        On behalf of the Plaintiffs:
3        Langsam Stevens Silver & Hollaender
4        By:  David E. Romine
                 Jennifer Graham Meyer
                 Attorneys at Law
                 1818 Market Street, Suite 2610
5                Philadelphia, Pennsylvania 19103
                 215 732-3255
6                215 732-3260 fax
                 dromine@lssh-law.com
7                jmeyer@lssh-law.com
8        On behalf of the Defendant Valley Asphalt
         Corporation:
9
10       Tucker, Ellis & West
11
12       By:  Martin H. Lewis
                 Attorney at Law
13               175 South Third Street
                 Suite 520
14               Columbus, Ohio 43215
                 614 358-9305
15               614 358-9712 fax
                 mlewis@tuckerellis.com
16       On behalf of the Defendant The Dayton Power and
         Light Company:
17
18       Bricker & Eckler
19       By:  Frank L. Merrill
                 Attorney at Law
20               100 South Third Street
                 Columbus, Ohio 43215
21               614 227-2300
                 614 227-2390 fax
22               fmerrill@bricker.com
23
24
25
```

```
1        On behalf of the Defendant ConAgra Grocery
         Products Company:
2
3        McGrath North Mullin & Kratz
4        By:  John A. Andreasen
                 Attorney at Law
5                First National Tower, Suite 3700
                 1601 Dodge Street
6                Omaha, Nebraska 68102
                 402 341-3070
7                402 341-0216 fax
                 jandreasen@mcgrathnorth.com
8        On behalf of the Defendant Cox Media Group
         Ohio, Inc.:
9        (Via telephone)
10       Roetzel & Andress
11       By:  John A. Heer
                 Attorney at Law
12               222 South Main Street
                 Akron, Ohio 44308
13               330 376-2700
                 330 376-4577 fax
14               jheer@ralaw.com
15       On behalf of the Defendant Waste Management of
         Ohio, Inc.:
16       (Via telephone)
17       Nijman Franzetti, LLP
18       By:  Jennifer T. Nijman
                 Kristen Laughridge Gale
19               Attorneys at Law
                 10 South LaSalle Street
20               Suite 3600
                 Chicago, Illinois 60603
21               312 251-5250
                 312 251-4610 fax
22               jn@nijmanfranzetti.com
                 kg@nijmanfranzetti.com
23
24
25
```

```
1        On behalf of the Defendant Coca-Cola:
         (Via telephone)
2
3        Taylor English Duma
4        By:  Donald P. Boyle, Jr.
                 Attorney at Law
5                1600 Parkwood Circle
                 Suite 400
6                Atlanta, Georgia 30339
                 678 336-7167
7                770 434-7376 fax
                 dboyle@taylorenglish.com
8        On behalf of the Defendant Sherwin-Williams:
         (via telephone)
9
10       Shumaker Loop & Kendrick
11       By:  Robert Eddy
                 Attorney at Law
12               1000 Jackson Street
                 Toledo, Ohio 43604
13               419 241-9000
                 419 241-6894 fax
14               reddy@slk-law.com
15       On behalf of the Defendant Franklin Iron &
         Metal Corporation:
16       (Via telephone)
17       Crehan & Thumann, LLC
18       By:  Robert J. Thumann
                 Attorney at Law
19               1206 Race Street
                 Cincinnati, Ohio 45202
20               513 381-5050
                 513 381-1700 fax
21               Thumann@ctlawcincinnati.com
22       ALSO PRESENT:
23           Joe Stines (Via telephone)
                                * * *
24
25
```

Page 13

```
                    DAN CRAGO, P.E.
 1
 2   of lawful age, Witness herein, having been first
 3   duly cautioned and sworn, as hereinafter
 4   certified, was examined and said as follows:
 5                   CROSS-EXAMINATION
 6   BY MR. ROMINE:
 7        Q.   Good morning, Mr. Crago.
 8        A.   Good morning.
 9        Q.   My name is David Romine, Dave
10   Romine.  I represent Hobart Corporation,
11   Kelsey-Hayes Company, and NCR Corporation in a
12   lawsuit called Hobart Corporation and others
13   versus Dayton Power and Light Company and
14   others.
15        A.   Okay.
16        Q.   We are here to talk about a place
17   called -- the Superfund site called the South
18   Dayton Dump and Landfill.  Are you with me so
19   far?
20        A.   Yes, sir.
21        Q.   Okay.  Great.  So have you ever
22   had your deposition taken before?
23        A.   I have.
24        Q.   So you know the format then.  It's
25   question and answer.  I'm going to be asking
```

Page 14

```
 1   you some questions and some of the other
 2   lawyers may have some questions, and it's
 3   important that you understand the question.
 4   It's okay to say that you don't understand it.
 5   It's not a test, so say what you know.  It's
 6   okay to say that you don't know.  It's also
 7   okay to ask me to repeat it if you don't hear
 8   it or understand.
 9             We will be taking turns, so even
10   if you can anticipate what my question is going
11   to be, please wait for me to finish.
12        A.   Okay.
13        Q.   And then I'll do the same.  Even
14   if I know where you're going with your answer,
15   I'll wait for you to finish before asking my
16   next question.  That way the court reporter can
17   take it down more accurately.
18        A.   That sounds great.
19        Q.   Okay.  And also it's not an
20   endurance test, so if you need to take a break
21   for any reason, we can do that too.
22        A.   Okay.
23             MR. EDDY:  This is Bob Eddy.  I'm
24   sorry to interrupt, but I missed the witness's
25   name.
```

Page 15

```
 1             MR. ROMINE:  Go ahead.
 2             THE WITNESS:  My name is Dan
 3   Crago.
 4             MR. LEWIS:  Spell it.
 5             THE WITNESS:  It's C R A --
 6             MR. EDDY:  Can you spell that?
 7             THE WITNESS:  The last name is
 8   C R A G O.  And I'm the director of quality
 9   control and environmental for Valley Asphalt
10   Corporation based out of Cincinnati.
11             MR. EDDY:  Thank you very much.
12             THE WITNESS:  Do you want our home
13   address?
14             MR. ROMINE:  Sure, go ahead.
15             THE WITNESS:  Our corporate
16   address in Cincinnati is 11641 Mosteller Road,
17   and that is in Cincinnati, it's 45241.
18             (Thereupon, Plaintiffs' Exhibit 1,
19   Notice of Rule 30(b)(6) Deposition of Valley
20   Asphalt Corporation, was marked for purposes of
21   identification.)
22             MR. ROMINE:  For those of you on the
23   telephone, I'm marking as Exhibit 1 -- or the
24   court reporter has marked as Exhibit 1 the notice
25   of Rule 30(b)(6) deposition of Valley Asphalt
```

Page 16

```
 1   Corporation.
 2   BY MR. ROMINE:
 3        Q.   Before we get into that, I wanted
 4   to ask you, Mr. Crago, what kind of case did
 5   you testify in at your earlier deposition or
 6   depositions?
 7        A.   Early on in my career at Valley
 8   Asphalt, I was actually brought in on a court
 9   case.  One of our secretaries had a driveway
10   and a garage built.  The concrete that the
11   builder used was -- it was not placed properly,
12   so I was brought in as an expert witness.  I
13   have also had my deposition taken on some
14   zoning issues directly related to the company.
15        Q.   Okay.  So it sounds like those
16   haven't been environmental related cases.
17        A.   That is correct.
18        Q.   Have you had a chance to take a
19   look at Exhibit 1?
20        A.   Yes, sir, I have.
21        Q.   And have you seen that before?
22        A.   Yes, sir, I have.
23        Q.   And are you prepared today to
24   testify on behalf of Valley Asphalt Corporation
25   with regard to the topics listed in Exhibit 1?
```

Page 17

1       A.   I am prepared to respond.

2       Q.   And you are a Valley Asphalt

3  employee now?

4       A.   Yes, sir.

5       Q.   And how long have you worked for

6  Valley Asphalt?

7       A.   I started with Valley Asphalt in

8  April of 1993.  So almost 24 years.

9       Q.   And turning back the clock a

10  little bit, did you go to high school?

11      A.   Yes, sir, I did.

12      Q.   And where did you go to high

13  school?

14      A.   I graduated from Marietta High

15  School in Marietta, Ohio, the very southeast

16  corner of Ohio.

17      Q.   Southeast corner of Ohio?

18      A.   It's right on the West Virginia

19  border.

20      Q.   Okay.  The Ohio River?

21      A.   Yes, sir.

22      Q.   And what town or place in West

23  Virginia is across the Ohio River?

24      A.   There's -- the biggest town is

25  Parkersburg, but then directly across the river

Page 18

1  is a very small town called Williamstown.

2       Q.   And you graduated from Marietta

3  High School?

4       A.   Yes, sir, I did.

5       Q.   And did you go to college after

6  that?

7       A.   Yes, sir.

8       Q.   Where did you go to college?

9       A.   I went to Ohio State University in

10  Columbus, Ohio, main campus.

11      Q.   And did you graduate from Ohio

12  State?

13      A.   Yes.  I graduated in 1986 with a

14  bachelor's degree in civil and environmental

15  engineering.

16      Q.   And did you get employment

17  directly after you got your bachelor's degree?

18      A.   Yes, sir.  I started -- I actually

19  accepted a position when I was finishing

20  college.

21      Q.   And where was that?

22      A.   The company, it was called Economy

23  Forms Corporation.  They had offices in

24  Columbus, Ohio, off of Zane Trace Drive on the

25  west side.  I started as a district engineer in

Page 19

1  1986.

2       Q.   And what were your duties as

3  district engineer?

4       A.   The company provided concrete

5  forming apparatus for architectural concrete

6  pours.  So I would do a lot of design work for

7  stadiums, large highway projects, you know, big

8  dam projects.  Anything where you had a lot of

9  architectural concrete that was exposed that

10  you wanted smooth surface, we would do steel

11  forms for those pours.

12           So I worked my first year there as

13  a district engineer in Columbus, and then with

14  the same company I transferred to Michigan for

15  about four more years.

16      Q.   And where were you based in

17  Michigan?

18      A.   I was on the outskirts of Detroit.

19  I lived in Farmington Hills.  My office was in

20  the same area.  So it's north -- kind of

21  northwest of Detroit heading toward Lansing.

22      Q.   And so that brings you up to about

23  1992?

24      A.   That is correct.  I worked one

25  year with a supply company in Michigan also

Page 20

1  doing design work in construction.

2       Q.   So that would have been '92, '93?

3       A.   Yes, sir.

4       Q.   And what was the name of that

5  company?

6       A.   That company is called

7  Construction Supply Incorporated, or CSI.  They

8  are in Highland, Michigan.

9       Q.   And then after that, I take it you

10  got hired by Valley Asphalt?

11      A.   Yes, sir.

12      Q.   And what was your title when you

13  got hired into Valley Asphalt?

14      A.   When I was hired in 1993, I was

15  the manager of quality control and

16  environmental for Valley Asphalt.

17      Q.   And where did you show up to work

18  every day?

19      A.   My office was at our main

20  corporate office, which is 11641 Mosteller Road

21  in Cincinnati.

22      Q.   Was your main office -- not your

23  main office, but your main place of work

24  ever in Dayton?

25      A.   I frequented Dayton, because we

Page 21

1  have multiple site locations, one of which is
2  our Dryden Road facility.  So 1 did have
3  occurrence to go to the site.
4         Q.   Was that ever your main office?
5         A.   No, sir.
6         Q.   Not Valley Asphalt's main office,
7  but Dan Crago's main office.
8         A.   No, Dryden Road was never my main
9  office.
10            MR. ROMINE:  Did someone just join
11  the telephone conference?
12            MR. THUMANN:  It's Rob Thumann.
13  Sorry I'm late.
14            MR. LEWIS:  Rob, who do you
15  represent?
16            MR. THUMANN:  Franklin Iron &
17  Metal Corporation.
18            MR. LEWIS:  Thank you.
19            (Thereupon, Plaintiffs' Exhibit 2,
20  Defendant Valley Asphalt Corporation's
21  Responses to Plaintiffs' Interrogatories and
22  Requests for Production of Documents, was
23  marked for purposes of identification.)
24            MR. ROMINE:  For those of you on
25  the telephone, I've asked the court reporter to

Page 22

1  mark as Exhibit 2 Defendant Valley Asphalt
2  Corporation's responses to plaintiffs'
3  interrogatories and requests for production of
4  documents.
5  BY MR. ROMINE:
6         Q.   Mr. Crago, have you seen Exhibit 2
7  before?
8         A.   Yes, sir, I have.
9         Q.   And are the responses here by
10  Valley Asphalt true and correct?
11        A.   Yes, sir, they are.
12        Q.   Do you have any corrections you'd
13  like to make to Valley Asphalt Corporation's
14  responses since the time these were prepared?
15        A.   I do not.
16            (Thereupon, Plaintiffs' Exhibit 3,
17  Defendant Valley Asphalt Corporation's
18  Responses to Defendant The Dayton Power and
19  Light Company's First Set of Combined Discovery
20  Requests, was marked for purposes of
21  identification.)
22            MR. ROMINE:  I have asked the
23  court reporter to mark as Exhibit 3 defendant
24  Valley Asphalt Corporation's responses to
25  defendant The Dayton Power and Light Company's

Page 23

1  first set of combined discovery requests.
2  BY MR. ROMINE:
3         Q.   And my question to you, Mr. Crago,
4  is have you seen this before?
5         A.   Yes, sir, I have.
6         Q.   And are defendant Valley Asphalt
7  Corporation's answers in this document true and
8  correct?
9         A.   Yes, sir, they are.
10        Q.   And are there any corrections
11  you'd like to make to your responses -- not to
12  your responses, but to Valley Asphalt
13  Corporation's responses since this was
14  prepared?
15        A.   Not at this time.
16        Q.   What is Valley Asphalt's business?
17        A.   Valley Asphalt is a producer of
18  hot mix asphalt.  We basically will take stone,
19  gravel, limestone products, dry them in a
20  rotary drum or hot mix asphalt plant.  We'll
21  mix liquid asphalt with that dry aggregate and
22  recycled material and produce a hot mix asphalt
23  that's used for roadway construction, airport
24  paving, bike paths, driveways.
25        Q.   And does that hot mix asphalt

Page 24

1  manufacturing take place in Dayton?
2         A.   Yes, sir, it does.
3         Q.   And what's the address of the
4  Dayton facility of Valley Asphalt?
5         A.   Our Valley Asphalt plant number
6  six is located at 1901 Dryden Road in Dayton.
7         Q.   When you say plant number six,
8  does that refer to Valley Asphalt's plant
9  number six?
10        A.   Yes, sir.
11        Q.   Okay.  So I guess Valley Asphalt
12  has plants one, two, three, four, five in other
13  places other than Dayton?
14        A.   We have other plants, and it's
15  kind of a chronological -- we don't have a
16  plant one or a plant two anymore because of
17  time constraints and -- as they expire, we
18  retire the name and the number.
19        Q.   So right now there's a plant six
20  in Dayton?
21        A.   Yes, sir.
22        Q.   Was there another differently
23  numbered plant in Dayton before today?
24        A.   No, it's always been called Valley
25  Asphalt plant number six.

Page 25

1      Q.   Does plant number six engage in

2  anything other than hot mix asphalt production?

3      A.   No, Valley plant number six only

4  produces hot mix asphalt.

5      Q.   And is Valley Asphalt Corporation

6  in the business of doing things other than hot

7  mix asphalt in other locations?

8      A.   Yes, sir.

9      Q.   Is there -- is there such a thing

10  as cold mix asphalt production?

11     A.   Yes, sir.

12     Q.   Has plant number six ever done

13  cold mix?

14     A.   I'm not aware of any cold mix ever

15  being produced at Valley Asphalt plant number

16  six on Dryden Road.

17     Q.   Does Valley Asphalt do cold mix in

18  other places?

19     A.   Yes, sir, we do.

20     Q.   Just generally what's the

21  difference between hot mix and cold mix?

22     A.   Hot mix is at an elevated

23  temperature, and you typically will -- you will

24  heat the aggregate maybe to 400 degrees, and

25  then you will mix the liquid asphalt in with

Page 26

1  it.  And then that material is only good at an

2  elevated temperature.  So as it cools down to

3  ambient temperature, it becomes very stiff and

4  it turns into your final product, whether it's

5  a road or highway or airport.

6          Cold mix is a -- it's designed for

7  temporary use.  So it may be used over the

8  winter timeframe where it's very cold outside,

9  and you can't run your hot mix plant, so you

10  will use cold mix to fix a pothole or a

11  temporary pipe break or something like that.

12  And cold mix typically stays pliable at ambient

13  temperatures.

14     Q.   When you say 400 degrees, is that

15  Fahrenheit?

16     A.   Yes, sir.

17     Q.   When did Valley Asphalt start

18  plant number six?

19     A.   I believe we moved a plant on site

20  in approximately 1956.

21     Q.   And was that a hot mix plant?

22     A.   Yes, sir, it was a hot mix batch

23  plant.

24     Q.   And when you say a hot mix batch

25  plant, what does batch plant mean?

Page 27

1      A.   There's two general types of hot

2  mix plants.  One is a batch plant and one is a

3  drum plant.  A batch plant actually has a

4  batching tower.  So after the aggregate is

5  dried and before you mix the liquid asphalt

6  into it, it goes into a pug mill, and you batch

7  out individual truckloads.

8          A drum plant actually is a

9  continuous process, and the end product goes

10  into a silo that's loaded out.  So a batch

11  plant makes individual truckloads, where a drum

12  plant will make a silo full of material that's

13  batched into trucks.

14     Q.   And so was there a silo at plant

15  six in 1956?

16     A.   There was not a silo early on in

17  the process.

18     Q.   And was there a silo built at some

19  point?

20     A.   Yes, sir.

21     Q.   And when was that?

22     A.   When I looked at the documents of

23  when we purchased the price [sic], I saw an

24  investigation that was done by Bowser-Morner

25  where they actually drilled down through the

Page 28

1  site and did a soil analysis to see the

2  stability of the existing site and tried to

3  calculate or determine, you know, what the

4  capability of the site to hold a silo.  So the

5  Bowser-Morner report that I saw was in 1987,

6  September 29.

7      Q.   So based on that report, you

8  could -- it's your conclusion that there was no

9  silo from approximately 1956 to 1987?

10     A.   That is correct.

11     Q.   And was there a silo built in

12  1987?

13     A.   Yes, sir.

14     Q.   Is there still a silo there today?

15     A.   Yes.  We have three silos on site,

16  and they are sitting on the footers that were

17  put in in the 1987 report.  We actually put

18  footers down through the fill and into stable

19  ground underneath, and then we poured a slab on

20  top that supported the silos and also supported

21  the scale deck for the truck load-out.

22     Q.   So when you first started working

23  for Valley Asphalt in 1993, at some point you

24  came to plant number six?

25     A.   Yes, sir.

Page 29

1     Q.  And you saw the silos there at

2 that time?

3     A.  They were existing at that time.

4     Q.  If I could ask you to look at

5 Exhibit 3, page seven.

6     A.  Okay.

7     Q.  And there's a question,

8 interrogatory 14, and there's a response, and I

9 want you to look at the second sentence of the

10 response. Dan Crago would have information, if

11 any, regarding the presence of any waste at the

12 site.

13     A.  Yes.

14     Q.  That refers to you?

15     A.  Yes, sir.

16     Q.  And you are the person who would

17 have knowledge of any waste at the site?

18     A.  Yes, that is my responsibility for

19 the company.

20     Q.  Okay. We will get more into that

21 later, but I just wanted to make sure I'm

22 talking to the right person.

23     A.  Okay.

24     Q.  Is there a person who is the

25 principal owner of Valley Asphalt Corporation?

Page 30

1     A.  Yes, sir.

2     Q.  And who is that?

3     A.  Jim Jurgensen is the main owner of

4 the Valley Asphalt Corporation.

5     Q.  If you turn the clock back to

6 1956, was there a person who was the main owner

7 of Valley Asphalt Corporation?

8     A.  From my recollection, I believe it

9 may have been Jim Jurgensen's father, which is

10 John R. Jurgensen. I'm not sure exactly when

11 the transfer of ownership occurred.

12     Q.  Have there been any principal

13 owners of Valley Asphalt Corporation since 1956

14 other than John R. Jurgensen and Jim Jurgensen?

15     A.  No, sir.

16     Q.  I've seen some reference in some

17 of the documents to a Jim Jurgensen, II.

18     A.  Yes, sir.

19     Q.  Is that the principal owner's son?

20     A.  Yes, sir.

21     Q.  Okay. But Jim Jurgensen, II, is

22 not the principal owner right now?

23     A.  They are in transition, but I

24 believe Jim, Sr., still is principal and Jim,

25 II, has, you know, a corporate officer

Page 31

1 position.

2     Q.  Okay.

3     A.  To be honest with you, I don't

4 know where the direct ownership -- it's

5 privately held, and I'm not privy to that

6 information.

7     Q.  I understand. Does Jim Jurgensen,

8 Sr. -- does he manage the company? Does he

9 work managing Valley Asphalt?

10     A.  No, he doesn't. He's, I'll say,

11 semi-retired. He's -- his health is waning,

12 and he spends a fair amount of time south in

13 warmer weather.

14     Q.  Did Jim Jurgensen, Sr., at some

15 point manage the company?

16     A.  Yes, sir.

17     Q.  And does Jim Jurgensen, II, manage

18 the company?

19     A.  Yes, sir, he is currently managing

20 the company.

21     Q.  Okay. And again, going back in

22 time based on what you've seen, did John R.

23 Jurgensen spend time managing the company when

24 he was around?

25     A.  Yes, sir.

Page 32

1     Q.  Do you happen to know when John R.

2 Jurgensen died?

3     A.  I do not have that. It was -- it

4 predated my employment with the company, so I

5 know it predated 1993.

6     Q.  So when you got there in 1993, Jim

7 Jurgensen, Sr., was the principal manager of

8 the company; is that --

9     A.  Yes, sir.

10     Q.  Is that fair?

11     A.  He is the individual that hired

12 me, and he was the principal owner at that

13 time.

14     Q.  Okay. And the principal owner of

15 Valley Asphalt, whether that be John R., Jim,

16 or Jim, Sr., their main office was in

17 Cincinnati?

18     A.  Yes, sir. Our corporate office

19 has been at the Mosteller Road address I would

20 say from probably the mid '50s.

21     Q.  Is there a person who is in charge

22 of plant number six?

23     A.  We normally will have like a

24 manager on site.

25     Q.  And who is that person today?

Page 33

```
 1        A.   That person is Mike Shafer.  He is
 2   the plant foreman that kind of oversees the
 3   day-to-day operations.
 4        Q.   And going back to 1956, who was
 5   that person?
 6        A.   I'm not aware of who that would
 7   have been in 1956.
 8        Q.   Anyone before Mike Shafer?
 9        A.   Before Mike Shafer, it would have
10   been Kenny Eakins, E A K I N S.
11        Q.   And is Mr. Eakins still an
12   employee of Valley Asphalt?
13        A.   He is not.
14        Q.   And when did Mr. Shafer take over
15   for Mr. Eakins?
16        A.   I want to say Mike Shafer has been
17   in charge of that facility probably maybe eight
18   years -- seven or eight years.
19        Q.   Okay.  And how long was Mr. Eakins
20   in charge of plant number six?
21        A.   I would say maybe 20 years.
22        Q.   Okay.  So going back to about
23   1990?
24        A.   That would be -- yes, that would
25   be correct.
```

Page 34

```
 1        Q.   So when you started with Valley
 2   Asphalt, Mr. Eakins was in charge of plant
 3   number six?
 4        A.   That is correct.
 5        Q.   How about before Mr. Eakins?
 6        A.   I'm not aware of who was in charge
 7   before Mr. Eakins.
 8        Q.   Does Valley Asphalt have any
 9   records that would indicate who was in charge
10   of plant number six before Mr. Eakins?
11        A.   No, I've gone through all the
12   documentation of all the site history and
13   everything else pertaining to that from a
14   management point of view.  From an
15   environmental point of view, I know my
16   predecessor.
17        Q.   You know your predecessor?
18        A.   Yes, sir.
19        Q.   And who was that?
20        A.   Mel Levy.
21        Q.   And is Mr. Levy still alive?
22        A.   He is not.
23        Q.   Is Mr. Eakins still alive?
24        A.   I believe he is.  I haven't spoken
25   to him in years.
```

Page 35

```
 1        Q.   Are there any -- other than
 2   specifically Mr. Eakins, are there written
 3   records identifying Valley Asphalt employees
 4   let's say at the time -- at the time you were
 5   hired?  If I wanted to find out who was a
 6   Valley Asphalt employee in 1993, are there
 7   records that would show me that?
 8        A.   Are you talking generally, or are
 9   you talking about at the Dryden Road facility?
10        Q.   Let's start with Dryden Road.
11        A.   I'm not aware of records, but
12   there may be.  You know, I guess you could go
13   back through and look at financials and try to
14   determine who was maybe receiving checks, you
15   know, payment checks or weekly checks.
16        Q.   Okay.  So there may be payroll
17   records?
18        A.   Yes, sir.
19        Q.   And then just generally other than
20   just Dryden Road, are there any records that
21   would show who was a Valley Asphalt employee,
22   say, in 1993?
23        A.   I would say our corporate office
24   would also have payroll checks.  I'm not sure
25   if they keep those documents in print.  I know
```

Page 36

```
 1   just because of time and other constraints
 2   they -- I don't know how long they keep their
 3   records on the payroll side.
 4        Q.   So there may be -- those documents
 5   may exist, they may not?
 6        A.   That is correct.
 7        Q.   Okay.  And do those documents show
 8   the address of the employees?
 9        A.   I don't know that they will.
10   Again, I'm not involved in the payroll side, so
11   I'm not aware of what they do or don't show.
12        Q.   I'm just trying to get an idea of
13   if you found these records, would they show,
14   you know, the employee addresses?  If they
15   lived in Moraine or Dayton, then you could sort
16   of make an educated guess that the person was
17   employed by plant six.  But if they lived in
18   Cincinnati or Kentucky, you might think that
19   they live -- I'm sorry, that they worked at
20   some other plant.
21        A.   Yeah.  And I know a lot of our
22   facilities they will share employees, so you,
23   know, they may have worked at, you know, one or
24   two facilities that week.  So it may not
25   distinguish which actual facility.
```

Page 37

```
 1        Q.   Okay.  And how many people work at
 2   the -- at plant number six today?
 3        A.   We probably have four employees on
 4   site.
 5        Q.   And going back to 1956, has that
 6   changed?
 7        A.   No, that's a pretty consistent
 8   number to run an asphalt plant.
 9        Q.   Do you know where Mr. Eakins
10   lives?
11        A.   I do not.
12        Q.   Do you know if he is in Ohio?
13        A.   I believe he lives in Ohio, but
14   his actual address, I don't -- I'm not aware
15   of.
16        Q.   I think you mentioned there was
17   Mr. Shafer who was the plant foreman at plant
18   number six right now?
19        A.   Yes, he's currently our foreman.
20        Q.   There are about three other
21   employees?
22        A.   Yes, sir.
23        Q.   And what are their titles?  What
24   do they do?
25        A.   We typically will have a plant
```

Page 38

```
 1   operator that will be inside the control
 2   building running the physical plant.  We will
 3   have a loader man that is in a front end loader
 4   that will feed raw stock into the plant.
 5            And then normally we will have
 6   like a yard man that will interact between the
 7   loader man and the plant operator if there's,
 8   you know, belts that need to be checked or
 9   motors that need to be checked, or anything
10   like that.
11            And then the fourth would be
12   Mr. Shafer kind of supervising.  Then he would
13   be in and out.  The supervisor is not on site
14   at all times.
15        Q.   And when you say he is not on site
16   at all times, where does he go?
17        A.   Typically our supervisors are
18   responsible for several different asphalt
19   plants, so I'm not sure exactly what other
20   plants Mike is responsible for, but I think he
21   has a couple other plants.
22        Q.   If we went to plant number six
23   today, would it be in operation?
24        A.   No, we are shut down today.
25        Q.   Is that because plant number six
```

Page 39

```
 1   doesn't use the hot mix process in the winter
 2   as you were describing earlier?
 3        A.   That is correct.  It's very hard
 4   to run an asphalt plant during the winter
 5   months.  Anytime you go below freezing, the
 6   belts, the motors, the gears don't like to
 7   operate.  You have a lot of damage.  And so we
 8   typically will shut down the plants in late
 9   November, early December, depending upon the
10   weather, and then we normally will start the
11   plants back up early April.  Again, weather
12   dependent and project dependent.
13        Q.   Other than Mr. Shafer, the three
14   other employees at plant six, those are
15   full-time plant six employees?
16        A.   Yes, sir, they are full-time
17   employees.
18        Q.   Going back to 1956, did Valley
19   Asphalt own the property on which plant six
20   operated in 1956?
21        A.   My understanding is we did not own
22   the property.  We were leasing or renting the
23   property that the plant sat on.
24        Q.   And does Valley Asphalt own the
25   property on which plant six operates today?
```

Page 40

```
 1        A.   We do own it today.
 2        Q.   And at what time did Valley
 3   Asphalt buy the property on which plant six
 4   operates?
 5        A.   My understanding is May of 1993,
 6   Valley Asphalt purchased the property at which
 7   plant six sits today.
 8        Q.   So right around the time you
 9   started?
10        A.   Yes, sir.
11        Q.   Were you involved in the purchase
12   of the property at that time?
13        A.   I was not.
14        Q.   Were you aware of at around that time
15   that Valley Asphalt bought or was buying the
16   property?
17        A.   I was not aware of the purchase or
18   the process of the purchase going through.
19        Q.   When did you first become aware of
20   that?
21        A.   To be honest, probably ten years,
22   15 years later.  I knew we had a plant there.
23   I knew it was an operating plant.  I didn't
24   know the property that we sat on, whether we
25   owned it or leased.
```

Page 41

```
1              MR. ROMINE:  Okay.  Exhibit 4.
2              (Thereupon, Plaintiffs' Exhibit 4,
3    lease between Cyril J. Grillot and Horace J.
4    Boesch and Valley Asphalt Corporation, was
5    marked for purposes of identification.)
6              MR. ROMINE:  For those of you on
7    the telephone, I have asked the court reporter
8    to mark as Exhibit 4 a document -- actually
9    maybe a few documents, but we will hopefully
10   get some testimony on that, and the Bates --
11   it's Bates stamped 000005 through 25.
12   BY MR. ROMINE:
13        Q.   And Mr. Crago, I want to ask you
14   first of all just about a part of this exhibit.
15        A.   Okay.
16        Q.   And the numbers -- the Bates
17   numbers down at the bottom that I'm going to
18   ask you about are 05 through 08.
19        A.   Okay.
20        Q.   And I'm going to ask you if you've
21   seen that document before, just 05 through 08?
22        A.   Yes, I have seen this document
23   before.
24        Q.   And what is it?
25        A.   My understanding of this document
```

Page 42

```
1    is it's a lease agreement between the
2    landowner, which looks like it's Cyril Grillot,
3    and Valley Asphalt Corporation.
4         Q.   Okay.  And if you look at the very
5    first page, it references Cyril Grillot and
6    Horace Boesch.  Do you see that?
7         A.   Yes, sir.
8         Q.   Is it your understanding that
9    Mr. Grillot and Mr. Boesch owned the property
10   at that time?
11        A.   That is my understanding.
12        Q.   Okay.  And Valley Asphalt leased
13   the property then in 1971, at least according
14   to this document?
15        A.   Yeah.  I believe this is like a
16   continuation of the lease.
17        Q.   Okay.
18        A.   That's the earliest document that
19   I could locate.
20        Q.   So between 1956 and 1971, Valley
21   Asphalt leased that same property that's
22   referred to here in the 1971 lease; is that
23   correct?
24        A.   I believe that to be correct.
25        Q.   You just haven't seen any
```

Page 43

```
1    documents -- the lease that existed before
2    this?
3         A.   That's correct.  I'm not aware if
4    it was in writing or if it was a gentlemen's
5    agreement.
6         Q.   That was my next question.
7         A.   Okay.
8         Q.   Do you know if it was in writing?
9         A.   I don't know.
10        Q.   Okay.
11        A.   I know I could not locate any
12   documents when I did a thorough review.
13        Q.   Okay.  And then if you look at
14   pages nine through 13 --
15        A.   Yes, sir.
16        Q.   -- can you tell me what that is?
17        A.   It looks like a continuation of
18   the lease that started in 1977.  And again it
19   is the same principals, with Grillot and Boesch
20   as being the landowners, of which Valley
21   Asphalt is continuing our lease of the
22   property.
23        Q.   Okay.  And if you could look at
24   page 14 and tell me what that is.
25        A.   In reading the letter, it's penned
```

Page 44

```
1    by Mel Levy, which was -- he had the title of
2    the Dayton manager, but he also had the
3    environmental management duties at that point.
4    It looks like he is requesting an extension of
5    the lease agreement from February 24th, 1977,
6    and the lease would end in January 31, 1980.
7         Q.   And do you see down at the bottom
8    of page 14 there's a cc to a B. Lykins,
9    L Y K I N S?
10        A.   Yes, sir.
11        Q.   Who is B. Lykins?
12        A.   I believe that to be Bill Lykins.
13        Q.   Who is that?
14        A.   He was executive vice president of
15   Valley Asphalt probably during this same time
16   frame.
17        Q.   Is Mr. Lykins still alive?
18        A.   I believe he is alive, sir.
19        Q.   Somewhere in Ohio?
20        A.   I -- no, I think he retired and
21   moved south.
22        Q.   Okay.  How about E. VanLeeuwen,
23   V A N L E E U W E N?
24        A.   That name I do not recognize.
25        Q.   Okay.  And if you look at page 15,
```

Page 45

1  can you tell me what that is?

2       A.   It looks like a property tax bill

3  for $929.  I'm not familiar with the document

4  other than just looking at it.

5       Q.   Did Valley Asphalt pay the real

6  estate taxes for the Dryden Road property when

7  it was under lease?

8       A.   I don't know.

9       Q.   Okay.  And then if you look at

10  pages 16 through 25, can you tell me what that

11  is?

12       A.   It looks like a continuation of

13  the lease starting the 29th of February 1988.

14       Q.   And if you could turn to page 25.

15       A.   Okay.

16       Q.   What is depicted on page 25?

17       A.   What I can try to make out here,

18  it looks like a map of our property that was

19  being leased from Grillot and Boesch.

20       Q.   Okay.  If I could ask you to look

21  at page 25.

22       A.   Okay.

23       Q.   And for lack of a better word,

24  there seems to be a -- about a peanut size and

25  shape figure in approximately the middle of the

---

Page 46

1  page.  And if I'm reading it correctly, it says

2  water H L E V, period, 733.5.  Do you see that?

3       A.   I might have to have you point

4  that out.

5            MR. LEWIS:  I don't see it.

6            THE WITNESS:  I wear bifocals, and

7  I cannot see it.  Maybe if you point it out, I

8  can try to zone in on it.

9  BY MR. ROMINE:

10       Q.   I'll do my best.

11       A.   Oh, okay.  Let me -- he's looking

12  at that.

13            MR. LEWIS:  I can't read that.

14  With bifocals I can't read it.

15            THE WITNESS:  I see the shape that

16  you are referring, but I can't read the text.

17  BY MR. ROMINE:

18       Q.   Okay.  Was there water on the

19  property that Valley Asphalt leased from

20  Mr. Grillot and Mr. Boesch at that time?

21       A.   I'm not aware.  That predated my

22  involvement with the company.

23       Q.   Was there in 1993?

24       A.   I don't recall there being water

25  at that location.

---

Page 47

1       Q.   Was there ever something that you

2  referred to as a lagoon or settling pond on

3  Valley Asphalt property plant number six?

4       A.   We have a small -- I'll call it a

5  water location there today, and we use that for

6  dust control.

7       Q.   And is it in approximately the

8  location where that peanut shape is?

9       A.   It's in close proximity to that,

10  yes.

11       Q.   Okay.  And what's it used for?

12       A.   We use it for dust suppression on

13  our roadways today.  Some of our roadways in

14  material handling areas are not paved, and we

15  are under permit contract with the Ohio EPA to

16  control dust on site.  So our loader will use

17  its front bucket, pick up some of the water,

18  and distribute it over areas where dust may be

19  occurring either due to wind or to traffic.

20       Q.   And is that pond -- is it a

21  natural formation, or was that dug out at some

22  point?

23       A.   The drawing, I'm still not aware.

24  The location where we have it today is actually

25  dug out.  I mean, it's a depression in the

---

Page 48

1  ground that's pre-existing.

2       Q.   Somebody dug it out at some point?

3       A.   I don't know that it was dug out.

4  It may have been a depression in the ground

5  where water naturally occurred or naturally,

6  you know, flowed during rain events.

7       Q.   Other than what we have seen here

8  in Exhibit 4, were there other communications

9  between Valley Asphalt and Mr. Grillot?

10       A.   I'm not aware of any.

11       Q.   How about between Valley Asphalt

12  and Mr. Boesch?

13       A.   I'm not aware of any.

14       Q.   Did Valley Asphalt have any

15  communications with a company called South

16  Dayton Dump and Landfill?

17       A.   I'm not aware of any

18  communications.

19       Q.   How about with a company called

20  Moraine Recycling?

21       A.   I'm not aware of any

22  communications with Moraine Recycling.

23       Q.   Did Valley Asphalt pay monthly

24  rent checks to Mr. Grillot and Mr. Boesch when

25  the property was under lease?

Page 49

1      A.   I'm not aware of the payment
2 agreement for the lease.  The only documents
3 that are present today are what I'm aware of.
4      Q.   Have you ever seen any record of
5 any payment made under these leases?
6      A.   No.   I've done a thorough search
7 of all of our current and pre-existing
8 documents, and I have not been able to locate
9 any of those -- any addition to what has been
10 presented to your office.
11      Q.   Who did the negotiations on Valley
12 Asphalt's behalf when Valley Asphalt bought the
13 property?
14      A.   On the purchase of the property?
15      Q.   Right.
16      A.   I'm not aware of the direct
17 communications.  I was not involved, and I
18 believe it predated my employment with the
19 company, so I'm not aware who did that.
20          (Thereupon, Plaintiffs' Exhibit 5,
21 drawing by Bowser-Morner titled Approximate
22 Boundary of Valley Asphalt Site, was marked for
23 purposes of identification.)
24          MR. ROMINE:  What I'm marking as
25 Exhibit 5 is a drawing done by Bowser-Morner,

Page 50

1 B O W S E R, M O R N E R, and the title of the
2 drawing is Approximate Boundary of Valley
3 Asphalt Site.
4 BY MR. ROMINE:
5      Q.   Mr. Crago, have you seen Exhibit 5
6 before?
7      A.   Yes, sir.  I brought it to today's
8 meeting.
9      Q.   And what is it?
10      A.   It is a site map of the -- that
11 includes the Dryden Road facility.  I outlined
12 what I believe to be -- in yellow what I
13 believe to be the property line that we
14 currently work within today.
15      Q.   Okay.  When you say we, you are
16 referring to Valley Asphalt Corporation?
17      A.   Yes, sir.
18          MR. ROMINE:  Did someone just join
19 the telephone conference?
20          MR. STINES:  Yeah, this is Joe
21 Stines from DP&L.
22 BY MR. ROMINE:
23      Q.   And when was this drawing made?
24      A.   The date on the bottom header
25 shows February 2012.

Page 51

1      Q.   Okay.
2      A.   But that's referencing a demo, but
3 I believe it's in the 2012 time frame.
4      Q.   Okay.  And so Bowser-Morner
5 produced this document for Valley Asphalt?
6      A.   Yes, sir, they did.
7      Q.   And what was the purpose of that?
8      A.   We hired Bowser-Morner to do our
9 vapor remediation on site in agreement with the
10 federal EPA.  So as part of that site
11 investigation and ongoing engineering design,
12 they produced this map.
13      Q.   Okay.  And I notice you -- well,
14 let me ask you this, I notice some numbers
15 within the part that you highlighted in yellow.
16 And the numbers are in boxes.  And my question
17 to you is what do those numbers refer to?
18      A.   I've highlighted two different --
19 three different things on the map.  The one in
20 yellow is the property boundary, as I
21 understand it, and I have highlighted in pink
22 actual building numbers.  You can see number
23 one, two, four, five, six, and number seven.
24      Q.   Okay.
25      A.   And then I also put a blue dot in

Page 52

1 the center, and that's the approximate location
2 of our current asphalt plant.
3      Q.   Okay.  Is the plant a building?
4      A.   No, sir.
5      Q.   Okay.
6      A.   It's an outside structure.
7      Q.   How big is it?
8      A.   The footprint might be 100 feet by
9 100 feet.
10      Q.   What is one, the number one?  Does
11 that refer to what you might call building one?
12      A.   Yes.  Number one is building one.
13 That is our previous office building that was
14 required to be taken down because of
15 contamination underneath.
16      Q.   So does building one still exist?
17      A.   The building has been removed.
18 The slab still exists underneath.
19      Q.   And when you say because of
20 contamination, what kind of contamination?
21      A.   My understanding is there's waste
22 from the previous landfill underneath that
23 building that caused concerns with vapor
24 migrating.  So I'm not sure the exact
25 contamination, but from the reports that I've

Page 53

1  seen, there's a whole slew of different
2  contaminants.
3       Q.   So it's your understanding that
4  building one was demolished because of a vapor
5  intrusion issue?
6       A.   Yes, sir.
7       Q.   That's the same reason why
8  Bowser-Morner did this drawing in the first
9  place was because of the vapor intrusion issue?
10      A.   Yes, sir.
11      Q.   Okay.  How about building number
12  two, what is that?
13      A.   Building number two, we called it
14  a Quonset hut, and that was -- it was a very
15  old kind of semicircular warehouse building,
16  and it also had a small brick office on the
17  front of it.  So it was mostly storage, but it
18  also had a small amount of office space in the
19  front.
20      Q.   And is building two still
21  existing?
22      A.   Building two has also been taken
23  down, except for the slab underneath was left
24  in place.
25      Q.   Okay.  How about building four,

Page 54

1  what is that?
2       A.   Building number four is the
3  control building for the asphalt plant, and
4  that still remains.
5       Q.   How about building five?
6       A.   Building five is an asphalt lab,
7  and it was also an office for the site
8  superintendent.
9       Q.   And is building five still being
10  used?
11      A.   Building five has been removed.
12  The slab underneath the concrete slab
13  underneath still remains.
14      Q.   How about building six?
15      A.   Building six was a small block
16  storage building in very close proximity to the
17  asphalt plant.
18      Q.   Is that still existing?
19      A.   That building had to also be taken
20  down.  The slab underneath was left in place.
21      Q.   And how about building seven?
22      A.   Building number seven is up at the
23  front of the property.  That was a two-car
24  garage that was my understanding was owned by
25  the Boesch and Grillot families.  The fence

Page 55

1  went through the center of the building.  We
2  painted it.  We maintain the building, but we
3  had no idea what was inside of the building.
4            During the vapor intrusion, we had
5  to open it up, and at that time we discovered
6  there was a lot of family items.  I think there
7  was an old pickup truck and some boxes and
8  wedding pictures and stuff.  So they removed
9  those items, and then that building was taken
10  down.  The slab underneath was left in place.
11      Q.   And at one time was there a
12  building three?
13      A.   I believe there was a building
14  three, and I don't know the location.  I
15  believe it was along the drive into the
16  facility.  I think it was an old block building
17  that -- I think it fell down due to gravity.
18      Q.   Were you -- did you ever see
19  building three?
20      A.   I did.
21      Q.   When did that fall down?
22      A.   I would say 15 years ago
23  approximately.
24      Q.   So buildings one, two, five, six,
25  and seven have been demolished due to the vapor

Page 56

1  intrusion work?
2       A.   That is correct.
3       Q.   And has there -- did Valley
4  Asphalt build any buildings to replace any or
5  all of those demolished structures?
6       A.   We have not built buildings.  We
7  have brought in trailers and most of our
8  storage that just sit on top of the ground.  We
9  were not allowed to dig, build, put footers in.
10  Everything had to remain above grade.
11      Q.   Okay.  And how many trailers does
12  Valley Asphalt use now at the Dryden Road
13  facility?
14      A.   By the plant, I would say we have
15  approximately six or seven box trailers.  The
16  office building is toward the front of the
17  property.  It had to be located off site.  We
18  moved our operations basically.
19      Q.   And where are the office buildings
20  now?
21      A.   Enon, Ohio.
22      Q.   Enon?
23      A.   Yes, sir.
24      Q.   How do you spell that?
25      A.   E N O N.

Page 57

1      Q.   You had mentioned that building
2  five at one point had been an office and a lab?
3      A.   Yes, sir.
4      Q.   And so the office is now -- that
5  was in building five, that function is now
6  being carried out in Enon, Ohio?
7      A.   No, the office that was within the
8  test lab area was for the superintendent.  The
9  superintendent is still on site, but he kind of
10  works out of his truck.  He doesn't have an
11  on-site office.
12      Q.   Okay.
13      A.   If he needs to sit down at a desk,
14  he will go in the control building, which is
15  building number four.  There's a desk inside
16  there that he works at.
17      Q.   How about the lab; is there a lab
18  on site?
19      A.   We do have a trailer, again,
20  sitting on the ground that is our lab
21  operations if we needed it.
22      Q.   And do you need it?
23      A.   If we run state work that we have
24  to check quality control, we would have to use
25  that.  I'd say in the last five or six years,

Page 58

1  we have not used that.
2      Q.   Okay.  When you say state work,
3  does that mean a contract with the state of
4  Ohio?
5      A.   Yes, sir, it could be the state of
6  Ohio.
7      Q.   And they have some kind of quality
8  control requirements that goes along with their
9  contracts?
10      A.   Yes, sir.
11      Q.   And that may require you to use a
12  lab facility?
13      A.   Yes, sir.
14      Q.   Okay.
15      MR. LEWIS:   Excuse me, Dave.
16  Could we take a quick bathroom break?
17      MR. ROMINE:   Absolutely.
18      (Recess taken.)
19  BY MR. ROMINE:
20      Q.   Why did Valley Asphalt want to buy
21  the property back in 1993?
22      A.   I was never given a reason.  I
23  would be speculating if I gave you an answer.
24      Q.   Did any of the Jurgensens ever
25  tell you why they bought the property instead

Page 59

1  of just continuing to lease it?
2      A.   No, they did not.
3      MR. ROMINE:   Number 6.
4      (Thereupon, Plaintiffs' Exhibit 6,
5  printout from Google Maps, was marked for
6  purposes of identification.)
7  BY MR. ROMINE:
8      Q.   Mr. Crago, have you had a chance
9  to look at Exhibit 6?
10      A.   Yes, sir, I have.
11      Q.   And have you seen it before?
12      A.   Yes.  It is a Google Map that I
13  brought to the meeting today.
14      Q.   And what does it show?
15      A.   It shows an aerial view of our
16  Dryden Road facility kind of in closer than the
17  previous map that we were discussing.
18      Q.   And you see there's a blue
19  highlight it looks like?
20      A.   Yes, sir.
21      Q.   And who did that?
22      A.   I did that.
23      Q.   And what does the blue highlight
24  depict?
25      A.   I tried to show the approximate

Page 60

1  boundary of our property there as I understand
2  it.
3      Q.   When you say our property, do you
4  mean Valley Asphalt's?
5      A.   Yes, sir.  I'm sorry.  I keep
6  saying that.
7      Q.   That's okay.  I just wanted to
8  make it clear.
9      It looks like the way I'm
10  interpreting your blue outline here, it looks like
11  the Valley Asphalt property has a little bit of
12  frontage on Dryden Road; is that correct?
13      A.   That is correct.
14      Q.   But the frontage on Dryden Road
15  looks like it's no wider than maybe an
16  industrial or commercial driveway?
17      A.   That is correct.
18      Q.   And the bulk of Valley Asphalt's
19  property looks like it's between some
20  businesses on Dryden Road and the Miami River?
21      A.   That is correct.
22      Q.   If you are standing at ground
23  level on the Valley Asphalt property, can you
24  see Dryden Road?
25      A.   No, sir.

Page 61

```
 1        Q.   Can you see any traffic going by
 2   on Dryden Road?
 3        A.   Not at ground level you cannot.
 4        Q.   Can you see the river?
 5        A.   No, sir.
 6        Q.   Why?  There's trees?
 7        A.   There's trees and there's a berm.
 8        Q.   A berm?
 9        A.   Yes, sir.
10        Q.   How big is the berm?
11        A.   I'd say the berm is approximately
12   25 feet high.
13        Q.   And who built the berm?
14        A.   I don't know.
15        Q.   Has the berm been there since you
16   got there in 1993?
17        A.   Yes, sir.
18        Q.   Was it there before 1993?
19        A.   I don't know.
20        Q.   If you're at ground level at the
21   Valley Asphalt property and you're facing the
22   river, you say you can see the berm?
23        A.   Yes, sir.
24        Q.   Does the berm extend beyond the
25   Valley Asphalt property line?
```

Page 62

```
 1        A.   I believe it does.
 2        Q.   Has anyone ever told you what the
 3   berm is for?
 4        A.   No.
 5        Q.   If you look at Exhibit 6 -- and
 6   I'm just talking about the Valley Asphalt
 7   property now, nothing outside of Valley
 8   Asphalt.
 9        A.   Okay.
10        Q.   If you look at Exhibit 6, within
11   the Valley Asphalt property, are there any
12   buildings that aren't trailers?
13        A.   Yes.
14        Q.   And where are those?
15        A.   The building -- our control
16   building for the asphalt plant is still
17   pre-existing, and that's what I'll call
18   building number four from the previous map,
19   which was Exhibit 5.
20        Q.   Okay.  Could you put a number four
21   on Exhibit 6?
22        A.   Yes, sir.
23        Q.   Just write that.
24        A.   Do you want me to circle it and
25   put a number four?
```

Page 63

```
 1        Q.   Sure, whatever you think would
 2   designate it.
 3        A.   (Complies with request.)
 4             That's the control building.
 5        Q.   Could you just write a four on
 6   there?
 7        A.   Let me get a flat surface here.
 8             (Complies with request.)
 9        Q.   I'm just going to stand here for a
10   minute, because I might have some more
11   questions on that same topic.
12        A.   All right.
13        Q.   Are there any other buildings
14   within the Valley Asphalt property shown on
15   Exhibit 6 that aren't trailers?
16        A.   I do not believe there are any
17   other buildings.
18        Q.   Okay.  Can you circle for me where
19   the plant is?
20        A.   (Complies with request.)
21        Q.   And could you just write in the
22   word plant?
23        A.   Plant?
24        Q.   Yeah.
25        A.   (Complies with request.)
```

Page 64

```
 1        Q.   And just below where the plant is,
 2   it looks like there's some rectangles.  Are
 3   those the trailers that you talked about
 4   earlier?
 5        Q.   Are you pointing to these?
 6        Q.   Yes.
 7        A.   No, sir.
 8        Q.   What are those?
 9        A.   Those are tanks.
10        Q.   Tanks?  Okay.  And could you
11   circle those and write in tanks?
12        A.   Yes.
13             (Complies with request.)
14        Q.   Are there -- is there a pile or
15   are there piles of asphalt currently on the
16   Valley Asphalt property?
17        A.   Yes.
18        Q.   And are those shown on this
19   Exhibit 6?
20        A.   Yes, they are.
21        Q.   And can you circle those and put
22   asphalt?
23        A.   Do you want me to -- yeah.  Okay.
24   I'm going to write in the lighter colored area
25   so you can still read it maybe.
```

Page 65

1      Q.   Sure.

2      A.   (Complies with request).

3           MR. LEWIS:  Excuse me.  I just

4  want to make sure the record is clear.  The

5  dark area that you circled is the asphalt?

6           THE WITNESS:  Yeah.

7           MR. LEWIS:  Okay.  Not --

8           THE WITNESS:  There is a little

9  bit here.  Do you want me to do a second circle

10  up here maybe?

11           MR. ROMINE:  Please.

12           THE WITNESS:  Would that help?

13  I'm going to go over in this lighter area so I

14  can put asphalt, and you'll be able to read it.

15  And then a little area in between there.

16  BY MR. ROMINE:

17      Q.   I was wondering if this pen might

18  work a little bit better.

19      A.   It's the surface.  You'll see my

20  pen works down here fine.  But I'll try in both

21  colors, whichever you want.  I have circled

22  three general areas and written asphalt three

23  times on the map.

24      Q.   Okay.  My next question is there

25  seems to be a darker area here and then a

Page 66

1  lighter area here, and both those areas are

2  within your general area marked asphalt.  My

3  question to you is what are these two different

4  things here?  This is dark, this is light.  Is

5  it all an asphalt pile?

6      A.   Yes, sir.  You can see on the

7  lower left there's a ramp that goes to the top

8  of the asphalt pile, and that's how the trucks

9  will go to the top of the asphalt pile and dump

10  their recycled product.

11      Q.   I see.

12      A.   And the lighting and the elevation

13  changes cause some differential in the color.

14      Q.   Okay.  Why does Valley Asphalt

15  have asphalt piles on the property?

16      A.   To protect the environment.

17      Q.   Can you explain?

18      A.   Asphalt --- recycled asphalt

19  product is obviously recyclable.  It's the most

20  recyclable product in the country.  It

21  outweighs plastic, paper, and steel combined.

22  We do it not only for financial benefit of

23  conserving natural resources, both the liquid

24  asphalt and the aggregate stone that goes back

25  in, but it also helps the environment.

Page 67

1      Q.   So does the -- where does the

2  asphalt that's in the pile or piles come from?

3      A.   Typically if you're doing a new

4  project, you may have a pre-existing asphalt

5  surface or base.  So if that existing asphalt

6  in the field has deteriorated to where there's

7  no structural value to it, they will remove it.

8      Q.   So the primary immediate source of

9  the asphalt in the asphalt piles is old asphalt

10  off site rather than asphalt from your plant;

11  is that correct?

12      A.   That is correct.

13      Q.   Is there any asphalt in the

14  asphalt pile that comes straight from the

15  plant?

16      A.   There will be a very small amount

17  at the end of the day or possibly at the

18  beginning of the day.  They will call it

19  clean-out.  So at the end of the day, you may

20  have, you know, five or ten ton of hot mix

21  asphalt left in your silo or left in the plant.

22  That needs to be removed before it cools down

23  to ambient temperature.

24           So they will put that in the

25  loader bucket, then put that on the recycle

Page 68

1  pile, and then that will be run back through

2  the plant.

3      Q.   But it's your understanding that

4  the majority of the asphalt in the asphalt pile

5  comes from off site, at least the immediate

6  source?

7      A.   Yes, that would be my

8  understanding of that product.

9      Q.   Has the asphalt pile, or piles,

10  ever extended across Valley Asphalt's property

11  to someone else's property?

12      A.   I'm not aware of our asphalt going

13  onto other properties.

14      Q.   Did Valley Asphalt ever have

15  permission to put asphalt on someone else's

16  property?

17      A.   I'm not aware of anything

18  permission-wise in writing for Valley to store

19  off site.

20      Q.   Over time, let's say from 1956 to

21  today, has there been any general increase or

22  decrease in the size of the asphalt pile or

23  piles?

24      A.   In my opinion, I believe the

25  asphalt pile has grown over the years.  As you

Page 69

1  can see in today's picture, the -- there's a
2  fair volume of asphalt on site?
3       Q.   Do you have any estimate as to the
4  volume of the asphalt on site?
5       A.   I don't really have an answer for
6  that.  I would be guessing.  It would be hard
7  to guess.
8       Q.   How tall is it?
9       A.   I would say approximately 30 or
10  maybe 35 feet high from, you know, kind of
11  existing grade.
12       Q.   You mentioned that it's your
13  understanding that the pile has gotten bigger
14  over time?
15       A.   That would be my opinion, yes.
16       Q.   And has that been a steady
17  increase, or has there been ups and downs?
18       A.   There's ups and downs relative to
19  the market.  If we are doing a lot of base work
20  and we can do a lot of recycling, we'll try to
21  utilize as much as possible.  If we are doing a
22  lot of real small projects where we can't use
23  recycle or it's just not cost effective to use
24  recycle, we may not use as much.  So it's
25  market driven.

Page 70

1       Q.   Are you aware that some of the
2  adjacent property was used by Mr. Grillot and
3  Mr. Boesch as a dump?
4       A.   That is my understanding.  Yes, I
5  am aware of that.
6       Q.   Did the closing of the dump affect
7  the size of the asphalt pile or piles?
8       A.   I wasn't aware that the dump was
9  closed.  My understanding in the conversations
10  and in the history of the facility is that's
11  the concern, the dump has not been closed,
12  but --
13       Q.   So your answer is?
14       A.   What was your direct question
15  again?
16       Q.   Okay.  Let me rephrase it then.
17  Have the operation or did the operation of the
18  dump affect the size of the asphalt pile or
19  piles?
20       A.   It did not.
21       Q.   Has the location of the asphalt
22  pile changed over time?
23       A.   The general location of the
24  asphalt pile has always been in close proximity
25  to the asphalt plant.  We have always tried to

Page 71

1  keep it just for efficiencies as close to the
2  plant as possible.  So as we are using it, as
3  we need the product, it's -- the material
4  handling becomes easier the closer it is to the
5  plant.
6       Q.   When did the asphalt pile start?
7       A.   I only have recollection of when I
8  started with the company, which is in '93, and
9  the pile existed at that point.
10       Q.   Do you have any information as to
11  whether the pile or piles existed before 1993?
12       A.   I do not have any direct evidence.
13       Q.   What is in the piles?
14       A.   The pile consists of I'll call it
15  recycled asphalt pavement, or RAP for short,
16  R A P, and it consists of approximately 95
17  percent stone and five percent liquid asphalt.
18       Q.   When you say five percent liquid
19  asphalt, is it currently liquid?
20       A.   No, it's in a solid form.  At
21  ambient temperature, it is solid, and it's
22  actually coating the stone that's in the mix.
23       Q.   But at 400 degrees Fahrenheit,
24  it's liquid?
25       A.   Yes, sir.

Page 72

1       Q.   And what is liquid asphalt?
2       A.   It's a derivative of the petroleum
3  industry.  When you refine petroleum products
4  out of the ground, there's a whole string of
5  products that are derived from that.  You go
6  from the light ends of, you know, kerosenes,
7  very light fuels, to the middle grade, you will
8  get into your diesel fuels, your automobile
9  fuels.  Then on the very bottom you will get
10  into your heavier liquid asphalts, which I'm
11  referencing here.  And then even heavier than
12  that you may get into some roofing grade
13  asphalts that are very stiff and very hard.
14       Q.   Has the nature of the materials in
15  the piles changed over time?
16       A.   No, it's been very consistent.
17       Q.   What does RAP stand for again?
18       A.   Recycled asphalt pavement.
19       Q.   It seems like the asphalt in the
20  piles has to be put in the plant again before
21  it can be used; is that correct?
22       A.   Yes, it's one of the raw
23  ingredients that goes in a hot mix asphalt
24  plant.
25       Q.   So it's not really recycled yet,

Page 73

```
1    or is it?
2         A.   It's continuously recycled.  We do
3    not store it on site.  It's only kept for a
4    short time frame until we can reuse it.
5              (Thereupon, Plaintiffs' Exhibit 7,
6    Contract to Purchase Real Estate, was marked
7    for purposes of identification.)
8    BY MR. ROMINE:
9         Q.   Have you seen Exhibit 7 before?
10        A.   Yes, sir, I have.
11        Q.   And what is it?
12        A.   My understanding of this is a
13   contract for Valley Asphalt Corporation to
14   purchase the real estate at Dryden Road where
15   the asphalt plant resides.
16        Q.   And -- okay.
17        A.   And that's from -- the seller is
18   listed as Grillot and Boesch, and then it may
19   be descendants of the original owners.
20        Q.   And did Valley Asphalt actually
21   purchase the property pursuant to this
22   agreement?
23        A.   My understanding is we did
24   purchase the land in 1993.
25             MR. ROMINE:  For those of you on
```

Page 74

```
1    the telephone, this document is Bates stamped,
2    and the numbers are 000051 through 75.
3    BY MR. ROMINE:
4         Q.   And if you could turn to page ten
5    of the document, which is number 60 at the
6    bottom.
7         A.   All right.  I have that.
8         Q.   And you see there's a signature of
9    James P. Jurgensen?
10        A.   Yes, sir.
11        Q.   And is that James Jurgensen, Sr.,
12   that we had talked about earlier?
13        A.   Yes, sir, it is.
14        Q.   Do you recognize his signature?
15        A.   It looks familiar, but I'm not a
16   handwriting expert.
17        Q.   Okay.  And then you see on page
18   61, it talks about lot consolidation, 9.761
19   acres?
20        A.   Yes, sir, I see that.
21        Q.   Okay.  And is the Valley Asphalt
22   property on Dryden Road approximately 9.761
23   acres?
24        A.   I believe that to be correct.
25        Q.   Is there -- does Valley Asphalt
```

Page 75

```
1    own any property in addition to the 9.761 acres
2    listed here in Exhibit 7 at plant six?
3         A.   I'm not aware of additional
4    acreage owned other than this.
5         Q.   Okay.  And does Valley Asphalt
6    lease or rent acreage for plant six other than
7    this 9.761 acres?
8         A.   I'm not aware of any additional
9    acreage leased.
10        Q.   And does Valley Asphalt use any
11   land -- use or occupy any land other than this
12   9.761 acres?
13        A.   I'm not aware of any additional
14   acreage used --
15        Q.   Okay.
16        A.   -- by Valley.
17        Q.   So when we go back to Exhibits 5
18   and 6, if you look at the yellow highlighted
19   portion on Exhibit 5 and the blue highlighted
20   portion on Exhibit 6, that's meant to be the
21   9.761 acres described in Exhibit 7?
22        A.   That is correct.
23        Q.   Anything else?
24        A.   No.
25             (Thereupon, Plaintiffs' Exhibit 8,
```

Page 76

```
1    copy of 2010 aerial photograph, was marked for
2    purposes of identification.)
3              MR. ROMINE:  Exhibit 8, for those of
4    you on the telephone, it's a document produced by
5    CRA, and the title is Figure 1, 2010 Aerial
6    Photograph, South Dayton Dump and Landfill Site,
7    Moraine, Ohio.
8    BY MR. ROMINE:
9         Q.   I want to ask you, Mr. Crago, if
10   you've seen this document before?
11        A.   It looks similar to our maps that
12   we've been talking about.  I've pulled up
13   aerials before, so it looks similar to
14   information I've seen before, yes.
15        Q.   Okay.  Do you know if you've seen
16   this particular drawing before?
17        A.   I don't recall specifically to
18   this drawing.
19        Q.   Okay.  Do you see on this document
20   there are some, I guess, yellow or orange lines
21   kind of drawn onto the aerial photograph?
22        A.   Yes, I see some colored lines on
23   the photograph.
24        Q.   And what I want to do is direct
25   your attention to, if you can read it, it's
```

Page 77

```
 1   number 5054 sort of in the upper center of the
 2   document.
 3        A.   I can't see that.  I might have to
 4   have you point that out.  It's beyond my --
 5        Q.   I'll point it out to you.  It's
 6   under small print.
 7        A.   Okay.
 8            MR. LEWIS:  Where is it?  I
 9   can't -- okay.  I don't see 5054.
10            THE WITNESS:  I can see there's
11   numbers there.
12            MR. ROMINE:  Fair enough.
13            THE WITNESS:  I'll take for
14   granted that you're correct on the number.
15            MR. ROMINE:  Okay.
16            MR. LEWIS:  I can't see it.
17   BY MR. ROMINE:
18        Q.   Do you recognize this aerial photo
19   as encompassing and includes what we have been
20   calling plant six of Valley Asphalt?
21        A.   Yes, sir, it does look like it's
22   our property line.
23        Q.   Okay.  And the reason I ask about
24   these yellow lines is there's a yellow line
25   right here --
```

Page 78

```
 1        A.   Okay.
 2        Q.   -- that I'll represent to you is
 3   supposed to be the property line.
 4        A.   Okay.
 5        Q.   And it looks like this yellow or
 6   orange line here goes right through what we
 7   looked at on Exhibit 6 as being the asphalt
 8   pile.
 9        A.   Okay.
10        Q.   So my question to you is in 2010,
11   did the asphalt pile extend over the Valley
12   Asphalt property line past the southern border
13   of Valley Asphalt's property?
14            MR. LEWIS:  I'm going to object.
15   You can go ahead and answer, but let me just
16   object, because we don't know if that's the
17   property line.  All it is is a faint yellow
18   line.  I have no idea who drew the line or what
19   the basis of drawing the line is or whether
20   it's the property line or not.  All we know is
21   it's a yellow line.
22            MR. ROMINE:  That's what I'm
23   trying to get at is as to whether --
24            MR. LEWIS:  I was only objecting
25   because your question asked does it go over the
```

Page 79

```
 1   property line, rather than does it go over the
 2   yellow line.  Go ahead, Dan.
 3            THE WITNESS:  The only thing I can
 4   tell from the picture is as you indicated, the
 5   line goes through the recycle pile.
 6   BY MR. ROMINE:
 7        Q.   Have you heard the term parcel
 8   5054 before?
 9        A.   No.
10            (Thereupon, Plaintiffs' Exhibit 9,
11   larger copy of 2010 aerial photograph, was
12   marked for purposes of identification.)
13   BY MR. ROMINE:
14        Q.   What I'm showing you as Exhibit 9
15   is simply a larger, blown up version of Exhibit
16   8.  So I'm going to ask you a similar question
17   now that you've had a chance to look at Exhibit
18   9, which I hope is a little bit easier to
19   decipher.  And my question to you is did the
20   asphalt pile extend beyond Valley Asphalt's
21   property in 2010?
22            MR. LEWIS:  Objection.  It assumes
23   we know where the property line is other than
24   just a line drawn, but go ahead.
25            THE WITNESS:  On the map you just
```

Page 80

```
 1   gave me, it is larger, and I can see the 5054
 2   number in the center.  Then in reference to
 3   kind of the horizontal line that you are
 4   calling -- that was yellow in the previous map,
 5   it looks more red in this map, I can see it
 6   kind of dissecting the recycle pile, but I'm
 7   not sure where the property line resides at
 8   that location.
 9   BY MR. ROMINE:
10        Q.   Okay.  So -- but did the asphalt
11   pile -- aside from -- if you don't look at
12   Exhibit 9 for a minute --
13        A.   All right.
14        Q.   -- and just answer, did the
15   asphalt pile extend beyond the borders of the
16   Valley Asphalt property?
17        A.   My understanding is it does not.
18        Q.   Did it at any time?
19        A.   My understanding is no, it does
20   not.  It did not and it does not.
21        Q.   Earlier this morning we had talked
22   about a pond that Valley Asphalt uses for dust
23   control.
24        A.   Yes, sir.
25        Q.   Is the pond visible anywhere on
```

Page 81

```
 1   Exhibit 9?
 2          A.   I cannot see any water on this,
 3   other than the river and the big ponds that are
 4   off our property.
 5          Q.   Right.
 6          A.   I don't see it in proximity to the
 7   asphalt plant.
 8          Q.   The title to Exhibit 9 indicates
 9   that this was taken in 2010.  Did the pond --
10   was the pond there in 2010?
11          A.   The dust control?
12          Q.   Yes.
13          A.   Yes.
14          Q.   And if you could just put an X --
15   either an X or a circle, whatever you think is
16   more appropriate, on Exhibit 9 where you think
17   the pond was located.
18          A.   Okay.
19          Q.   And just maybe with a letter P,
20   something like that.
21          A.   (Complies with request.)
22               It's right here.  I know it's
23   right to this side of the plant.  And when I
24   say pond for dust control, I'm talking maybe
25   ten foot by 15 foot in dimensions.  So it's
```

Page 82

```
 1   very small.
 2          Q.   Do you call it a pond?
 3          A.   No.
 4          Q.   What do you call it?
 5          A.   Dust control water.
 6          Q.   Do you ever use the word lagoon?
 7          A.   I don't.
 8          Q.   Have you ever heard the dust
 9   control water referred to as a lagoon?
10          A.   No.
11          Q.   How about a settling pond?
12          A.   No.
13          Q.   A little bit earlier this morning
14   I think you had said that the asphalt plant
15   is -- it's a structure, but it's not a
16   building?
17          A.   It's not an enclosed structure.
18          Q.   It's not an enclosed structure?
19          A.   It's an open structure.
20          Q.   What does it consist of?  What is
21   the plant?
22          A.   The asphalt plant at this site
23   will consist of a rotary dryer.  It's like a
24   cylinder that's approximately eight and a half,
25   nine foot in diameter, maybe 40 feet long.  It
```

Page 83

```
 1   has a flame in the middle that dries the stone.
 2               At the end of the rotary dryer,
 3   you will have a hot elevator that goes up into
 4   the batch plant, and then you will have the
 5   batch plant itself that the dry material goes
 6   into.  You will have cold feed bins.  There's
 7   approximately four of them on this site that
 8   you feed different size aggregates into the end
 9   of the drum for drying.
10               Then you'll have a liquid asphalt
11   tank that you'll pump liquid into the plant and
12   then the aggregate is combined with the liquid
13   asphalt in a pug mill in the plant, mixed up.
14   Then it can either be dropped directly
15   underneath into a truck or it can go up a slat
16   conveyor into a silo for short-term storage and
17   then truck loading.
18               On the end of the rotary dryer,
19   you'll have a collection venting system that
20   will go to a baghouse.  And there's a large
21   baghouse on site that's approximately ten foot
22   by 40 feet long and 15 feet high, and all the
23   air that comes out of the end of the drum goes
24   through the baghouse to collect the dust.
25          Q.   And was there a baghouse at the
```

Page 84

```
 1   plant say in 1956?
 2          A.   I'm not familiar with the exact
 3   operation of the plant at that point.  I know
 4   just 1993 to current.
 5          Q.   There was a baghouse in 1993?
 6          A.   Yes, sir.
 7          Q.   And how was that baghouse dust
 8   disposed of?
 9          A.   Baghouse dust, 100 percent goes
10   back into the mix.  On the bottom of the
11   baghouse -- we pulse the whole baghouse.  It
12   has felt bags inside, and all the dust gets
13   knocked down to the bottom of the baghouse,
14   which is V-shaped.  And then there's an auger
15   in the bottom of the baghouse that feeds the
16   dust back into the plant.
17          Q.   So that becomes part of the
18   asphalt?
19          A.   Yes, sir.
20          Q.   You mentioned that asphalt
21   consists of some fraction of petroleum; is that
22   correct?
23          A.   Yes, sir.
24          Q.   The pavement that you would put on
25   a road, what percentage of that by weight would
```

Page 85

1   you say is petroleum product?
2       A.   Five percent approximately.
3       Q.   The rest is aggregate?
4       A.   Yes, sir.
5       Q.   Anything else?
6       A.   You could add other small
7   components for specialty mixes.
8       Q.   Does Valley Asphalt add special
9   components for specialty mixes?
10      A.   Not typically, no.
11      Q.   Have they in the past?
12      A.   Yes.
13      Q.   What kind of specialty -- or what
14  kind of components did Valley Asphalt use for
15  the specialty mixes?
16      A.   We might use a modified liquid
17  asphalt, and we have the ability to have
18  polymers placed in the asphalt that make the
19  asphalt more user friendly for a wider variety
20  of pavement designs.
21      Q.   Is modified liquid asphalt the
22  same thing as asphalt with polymers added, or
23  are those two different things?
24      A.   Those are the same thing.
25      Q.   They are the same thing?

Page 86

1       A.   In my judgment.
2       Q.   And what kind of -- what are the
3   polymers?
4       A.   The polymer that we typically use
5   is called SBS.  It's styrene-butadiene-styrene.
6   It's a solid pellet form that goes into the
7   liquid asphalt and gives it better physical
8   properties for higher and lower temperature
9   designs.
10      Q.   And did plant six use SBS at some
11  point?
12      A.   I believe, yes.
13      Q.   Any other polymers that are used
14  in your specialty mixes?
15      A.   We have the ability -- one other
16  additive that we have used over the years, and
17  I believe we have used it at Dryden Road, is a
18  material that's called Gilsonite.
19           MR. LEWIS:  How do you spell that
20  for the record?
21           THE WITNESS:  G I L S O N I T E.
22  It's a natural occurring -- it's only mined in
23  one place in the world.  It's in western United
24  States.  It's a powder -- pulverized powder
25  material that's added into the mix to stiffen

Page 87

1   it and to make it more -- again, a better
2   design for high temperatures.  It's brought to
3   site in plastic bags and fed directly into the
4   plant.
5   BY MR. ROMINE:
6       Q.   So Gilsonite is some kind of
7   mineral?
8       A.   Yes, sir.
9       Q.   Are these specialty mixes used for
10  a particular customer that wants these
11  properties in their asphalt?
12      A.   Yes, sir.
13      Q.   What customers?
14      A.   Ohio Department of Transportation
15  is probably our biggest customer.  And if they
16  are doing a heavy highway or a project that has
17  heavy traffic flow, they might require one of
18  these additives to be in the mix.
19      Q.   Are you familiar with that
20  actually happening, where the Ohio Department
21  of Transportation says I want this polymer in
22  the mix?
23      A.   A specific project?
24      Q.   Yeah.
25      A.   No.  Over a 60-year window, I know

Page 88

1   we have done projects, and I could probably
2   produce a mix design that shows for that plant
3   we could have put -- we could have had a
4   polymer in the liquid asphalt coming to the
5   plant.
6       Q.   Are there any other customers
7   other than the Ohio Department of
8   Transportation that requested specific polymers
9   or specific properties in their asphalt that
10  would have led you to add these polymers to
11  your asphalt?
12      A.   I'm not aware of any specific
13  customers.
14      Q.   Is there any waste SBS generated
15  as a result of you using SBS in asphalt?
16      A.   No.  SBS is a very small
17  percentage of the liquid asphalt.  When SBS is
18  added to the liquid asphalt, it's approximately
19  three and a half percent of the asphalt cement.
20  And then the asphalt cement is only five
21  percent of the mix.  And when SBS is put into
22  the liquid asphalt, it's completely encased in
23  the liquid.  It can't be released in any form.
24      Q.   How about Gilsonite, is there any
25  waste Gilsonite?

Page 89

```
 1        A.   There's no waste when we use
 2   Gilsonite.  The Gilsonite comes in a little
 3   nine-pound bag.  The bag is designed to melt in
 4   our process.  So the bag will go into the pug
 5   mill, and because of the high temperature of
 6   the liquid and the aggregate, the bag melts
 7   releasing the Gilsonite into the mix, and then
 8   the pug mill blends all the product together.
 9   So there's no release to the environment.
10        Q.   A little bit earlier this morning
11   we had talked about the asphalt piles on the
12   property.
13        A.   Yes, sir.
14        Q.   And I think you said that the
15   asphalt piles consist mainly of asphalt that
16   came from off site?
17        A.   Yes, sir.
18        Q.   Does it come from roads?
19        A.   It could, yes.
20        Q.   Does it come from anything other
21   than roads?
22        A.   It could come from a driveway.  It
23   could come from an airport runway.  It could
24   come from a bike path.  We typically know, but
25   I don't personally know every little project
```

Page 90

```
 1   that's come back.
 2        Q.   Right.  So I guess it comes from
 3   some kind of pavement designed for vehicle use?
 4        A.   Vehicle or pedestrian, airplane.
 5   It could come from a potable water source.
 6   Asphalt is used for liners on large reservoirs
 7   for drinking water because of its inert
 8   capabilities.
 9        Q.   Okay.  Anything else?
10        A.   Not -- none that come to mind.
11   There's a lot of uses for asphalt.
12        Q.   I guess my question goes to this,
13   you have an asphalt pile that comes from
14   asphalt off site.
15        A.   Yes, sir.
16        Q.   And you -- I guess my question is
17   you wouldn't typically have what some people
18   might call construction and demolition debris.
19   It's not like you tear down a building and that
20   goes in the asphalt pile.  It's only for
21   pavement?
22        A.   That's correct.  We only bring
23   product in that we can use.  Construction
24   debris we cannot use.
25        Q.   And again, going back to the
```

Page 91

```
 1   asphalt pile, I think you said that there could
 2   be sometimes either at the end of the day or
 3   the beginning of the day when asphalt from the
 4   Valley Asphalt plant would actually go into the
 5   asphalt pile, correct?
 6        A.   Yes, sir.
 7        Q.   But most of the pile comes from
 8   asphalt off site?
 9        A.   That is correct.
10        Q.   And that asphalt that comes back
11   and becomes part of the pile could come from
12   really any road anywhere?  In other words, the
13   road that it came from doesn't have to be a
14   road that Valley Asphalt built?
15        A.   That is correct.
16        Q.   Do you have any sense of the
17   proportion of what's in the pile now as to what
18   portion came from off site and what portion
19   came from the plant number six?
20        A.   I would say a minimum of 99
21   percent came from off site and less than one
22   percent is plant clean-out.
23        Q.   Okay.  And you had mentioned that
24   the baghouse dust gets reused and put back into
25   asphalt?
```

Page 92

```
 1        A.   Yes, sir.  There's a screw auger
 2   in the bottom of the baghouse that feeds all
 3   the fines back into the mix in the plant.
 4        Q.   Is there an actual bag in the
 5   baghouse?
 6        A.   There's approximately 800 bags in
 7   the baghouse.  They are a very heavy duty Nomex
 8   high temperature filter.  They are
 9   approximately eight inches in diameter, maybe
10   12 feet long.  And the air enters from -- the
11   dirty air enters from one side, the clean air
12   comes out the other side.  The dust that
13   collects on the bags, we pulse the baghouse to
14   knock the dust down to the bottom of the
15   baghouse, and then that's fed back into the
16   plant.
17        Q.   Do the bags wear out over time?
18        A.   Yes, they do.
19        Q.   And how are those disposed of?
20        A.   Those are taken to a landfill.
21        Q.   And who does that?
22        A.   Our on site personnel will
23   typically do that themselves, you know, off --
24   end of the day, weekend.  They will maybe
25   replace the bags every five years, and those
```

Page 93

1    will go -- they will bring in a roll-off

2    dumpster from a local landfill, and then they

3    will place them inside the dumpster, cover it,

4    and ship it back to them for disposal.

5         Q.    So Valley Asphalt personnel will

6    rent, lease, borrow a dumpster from a landfill?

7         A.    Yes, sir.

8         Q.    And bring it to plant six and put

9    the bags in --

10        A.    Yes.

11        Q.    -- or the bag?

12        A.    Yes, depending upon the volume of

13   bags involved.  We have a contract now with a

14   dumpster on site for office, you know, paper,

15   small, you know, waste from the office side.

16        Q.    And who is that contract with?

17        A.    I don't know.  I believe it's

18   Rumpke.

19        Q.    Rumpke?

20        A.    Yes, sir.

21        Q.    And so getting back to the

22   baghouse, though, if you had a bag that needed

23   to be replaced today, would that go into

24   Rumpke's dumpster today?

25        A.    Yes.  It's a non-hazardous waste.

Page 94

1    So depending upon the volume, if we had one bag

2    break, and we were replacing one or two or

3    three bags, it would go into our normal waste

4    stream.  If we were doing a complete baghouse

5    swap out where you are doing 800, we would have

6    to rent a larger roll-off.

7         Q.    And did you ever witness that

8    personally, having -- renting a roll-off that

9    would come to plant six, Valley Asphalt

10   personnel putting the bags in the roll-off or

11   dumpster, and then taking that away?

12        A.    Yes, sir, I have witnessed that.

13        Q.    Did that happen for waste other

14   than the bags?

15        A.    A roll-off?

16        Q.    Yeah.

17        A.    Yes, sir.

18        Q.    What kind of waste did -- went

19   into the roll-off or the dumpster that you

20   bought specifically for waste removal?

21        A.    I witnessed roll-offs being used

22   for removal of drums.

23        Q.    For drums?

24        A.    Yes, sir.

25        Q.    When was that?

Page 95

1         A.    In 2000.

2         Q.    Anything other than the bags and

3    the drums in 2000?

4         A.    I'm not aware of any -- I don't

5    recall any other waste being removed by

6    roll-offs.

7         Q.    Okay.

8         A.    Well, let me add to that.

9         Q.    Sure.

10        A.    When we had to demo our buildings,

11   because of the subslab vapor issues, we did

12   have roll-offs come in at that point, and then

13   the demoed buildings would go into those, and

14   then we left the foundations.

15        Q.    Where did the drums go in 2000?

16        A.    My understanding is they went to a

17   hazardous waste landfill.

18        Q.    And how about the debris that was

19   left over from the buildings that were demoed?

20        A.    That also went into -- that one

21   I'm familiar with, because I was directly

22   involved.  Those went to, I believe, Stony

23   Hollow hazardous waste landfill.

24        Q.    Where does the Rumpke dumpster get

25   dumped?

Page 96

1         A.    I don't know.

2         Q.    You had mentioned some plant

3    equipment, like a dryer and an elevator.  Did I

4    get that correct?

5         A.    Yes, that is correct.

6         Q.    And a silo.  Is there a silo?

7         A.    Yes, sir.

8         Q.    Is that equipment the same

9    equipment that was there in 1956?

10        A.    No, sir, my understanding is it

11   was replaced.

12        Q.    And when was it replaced?

13        A.    I have a record, and I believe I

14   forwarded it to you, of a purchase of a used

15   asphalt plant on December 8th of 1986.  And

16   that was purchased, I believe, in Pennsylvania,

17   and that is the plant that's currently there

18   now.

19        Q.    So Valley Asphalt purchased a used

20   asphalt plant in 1986?

21        A.    Yes, sir.

22        Q.    And that replaced what had been

23   there previously?

24        A.    Yes, sir.

25        Q.    And what happened to the old

Page 97

1  equipment?

2      A.  My understanding is the tanks

3  were -- continued to be used, because they were

4  still in good order, and they are today.  The

5  plant, I don't -- usually those plants are sold

6  to be reused elsewhere, or they could be

7  recycled metal, and I don't know what happened

8  to that plant though.

9      Q.  Okay.  And talking about tanks,

10  tell me about what kind of tanks are on the

11  property now.

12      A.  We have tanks for a couple

13  different products.  The liquid asphalt that we

14  have been talking about previously, we

15  typically will have two tanks on site in case

16  we have two different grades of asphalt that

17  we're using, like modified, unmodified.  And we

18  normally will have, you know, one or two fuel

19  tanks on site.  We run number two diesel fuel,

20  and then we also run recycled oil as a fuel

21  source.

22      Q.  And that fuels the plant?

23      A.  Yes, sir, in addition to natural

24  gas.  Today we are burning natural gas.

25      Q.  And the natural gas, does that --

Page 98

1  how is that brought to the plant?

2      A.  It's brought in by pipe.  That was

3  installed after 1993.  That was installed

4  during my tenure here.  When we installed that

5  pipe, we were not allowed to dig, so we had to

6  bring the pipe across land.  And then when we

7  brought it across our driveway, we had to build

8  a concrete cover over the natural gas pipe.  So

9  truck traffic in and out crosses that today.

10      Q.  So the plant can use either the

11  fuel oil or the natural gas?

12      A.  Yes, sir.

13      Q.  And are the tanks all above

14  ground?

15      A.  Yes, sir.

16      Q.  Do you have any underground

17  storage tanks on the property?

18      A.  We do not have any today, and my

19  understanding is we've never had underground

20  tanks.

21      Q.  Okay.  Have there been any leaks

22  from the tanks?

23      A.  None have been released to the

24  environment.

25      Q.  Have you reported any leaks to

Page 99

1  Ohio EPA?

2      A.  We had a barrel leak during a

3  waterline installation in 2000.  That wasn't

4  our tanks.  That was the buried barrels that

5  were other people's own --

6      Q.  Right.  Because I do want to get

7  to the barrels --

8      A.  Okay.  I didn't know ---

9      Q.  -- a little later.  But let's just

10  talk about your, Valley Asphalt's, storage

11  tanks that you use either for asphalt or the

12  plant operation.

13      A.  Fuel.  Okay.

14      Q.  Have you reported any leaks from

15  those tanks to Ohio EPA?

16      A.  No.

17      Q.  You had mentioned very earlier

18  this morning that Valley Asphalt has a front

19  end loader that loads -- is it loading the

20  aggregate into the plant?

21      A.  The aggregate and the recycled

22  asphalt pavement.

23      Q.  Okay.  And does Valley Asphalt own

24  that front end loader?

25      A.  I believe we do, yes.

Page 100

1      Q.  And is that -- how is that run,

2  diesel, gasoline?  How is that -- what powers

3  the front end loader?

4      A.  Those are typically run by diesel

5  fuel.

6      Q.  Does Valley Asphalt own the front

7  end loader?

8      A.  Yes, we do.

9      Q.  Does it own only the one loader?

10      A.  We own several front end loaders

11  in our corporation.

12      Q.  How about plant six?

13      A.  Plant six typically operates off

14  of a single loader.

15      Q.  If you went there today, would

16  there be just the one front end loader?

17      A.  I would assume so, but I don't --

18  I would be speculating.

19      Q.  Typically just one?

20      A.  Yes.

21      Q.  Okay.  How about any other kind

22  of, I guess, for lack of a better word, large

23  motorized equipment?

24      A.  Not that we own.  I mean, there's

25  products that are brought to us by truck.  The

Page 101

```
 1   liquid asphalt is brought in by truck that we
 2   don't own.  The aggregates are brought to us by
 3   truck.  But then again, we don't own those
 4   either.  And then the recycled asphalt can be
 5   brought back to us by truck and again usually
 6   by private brokers.
 7        Q.   When the front end loader loads
 8   the aggregate or the recycled asphalt into the
 9   plant, how much of that is fresh aggregate, if
10   you will, and how much is recycled asphalt?
11        A.   I'd say 100 percent is fresh
12   aggregate.
13        Q.   And --
14        A.   Or you said recycle also?
15        Q.   Yeah.
16        A.   You are probably averaging 80
17   percent fresh aggregate, 20 percent recycle.
18        Q.   Okay.  Why don't you just take all
19   the recycled asphalt in the pile and put that
20   into the plant and not worry about the fresh
21   aggregate?
22        A.   Now you sound like my boss.  The
23   reason we have limits on recycle, there's
24   several reasons, one is the plant technology.
25   The plant is older.  We are limited on how much
```

Page 102

```
 1   recycle we can physically run through the plant
 2   because of screens inside.  There are newer
 3   plants that can run a higher percent, but that
 4   plant cannot.
 5        The other reason that we don't run
 6   higher percent recycle is for our ability to
 7   control quality.  Because we want our end
 8   product to be very high quality, we want to be
 9   able to add aggregates to it and add new liquid
10   asphalt to it to ensure a good final product.
11        Q.   Does Valley Asphalt own any
12   vehicles that are used at plant six?
13        A.   Yes.
14        Q.   And what are those vehicles?
15        A.   The project superintendent would
16   drive probably an F-150 pickup truck that he
17   would drive to the site.  In my position, I
18   drive usually a Ford Taurus that I drive to the
19   site.  I might have a technician that would be
20   working at the site that would also drive maybe
21   a pickup truck that's owned by the company to
22   the site.  I'm not aware of any -- really any
23   other vehicles per se.
24        Q.   Were any of those vehicles used
25   for waste disposal?
```

Page 103

```
 1        A.   None of them were used for waste
 2   disposal.
 3        Q.   How about the front end loader,
 4   was that ever used for waste disposal?
 5        A.   The front end loader may be used
 6   if they were changing out the bags in the
 7   baghouse, because the baghouse is very high up.
 8   When I have witnessed it before at this site,
 9   they will put the front end loader next to the
10   baghouse with the bucket up in the air.  The
11   employees will pull them out and put the bags
12   into the front end loader.  Then the front end
13   loader will empty that into the -- either the
14   roll-off or the dumpster on site for disposal
15   to handle it properly.
16        Q.   Other than the bags, was the front
17   end loader used for waste disposal?
18        A.   I'm not aware of any instances
19   where it's used for waste disposal.
20        Q.   We talked a little bit about the
21   bags and the baghouse dust.  What -- other than
22   that, what waste is generated at plant six?
23        A.   We have air emissions that come
24   out of the plant operations through a stack
25   that's monitored by the federal EPA and the
```

Page 104

```
 1   Ohio EPA.  Other than that, we really don't
 2   have, you know, a byproduct or a waste product
 3   associated with running the plant.
 4        Q.   Has that been the case since 1956?
 5        A.   Yes.  My understanding is the
 6   operation of an asphalt plant, it's
 7   all-encompassing.  Everything that we produce
 8   goes into the product.
 9        Q.   And that's been the same, though,
10   since 1956?
11        A.   I've only been here since '93, so
12   I'm only speaking from my tenure with the
13   company.
14        Q.   Do you have any information that
15   the waste has changed over time, the waste from
16   plant six has changed over time?
17        MR. LEWIS:  Objection, it assumes
18   there's waste, and the testimony was there was
19   no waste.  Go ahead.
20        THE WITNESS:  I'll answer.
21   Predating baghouses, before they had the
22   technology to use filter media to trap dust,
23   they used to use water mist to trap dust, and
24   then the water would be captured, and we would
25   then extract the dust out of that and put that
```

Page 105

```
1   back into our product.
2   BY MR. ROMINE:
3       Q.    That was before you bought the new
4   plant in 1987?
5       A.    I don't know.  I started in '93.
6       Q.    Okay.  I see.  Well, was that --
7   you had mentioned that there had been a
8   technology of asphalt production before the use
9   of bags and baghouses where asphalt production
10  used water to control the dust.  Am I
11  understanding that correctly?
12      A.    That is correct.
13      Q.    And was that used at plant six?
14      A.    I'm not directly aware, but I'm
15  assuming it was.
16      Q.    At some point?
17      A.    Yes, sir.
18      Q.    And what happened to the water?
19      A.    It evaporated.
20      Q.    You had mentioned that Rumpke is
21  the company that Valley Asphalt uses to dispose
22  of its general trash, for lack of a better
23  word?
24      A.    Yeah, we've always used a local
25  company, and I believe today it is Rumpke.
```

Page 106

```
1       Q.    Was there ever a different
2   company?
3       A.    I'm not -- I don't know.
4       Q.    Have you ever heard of a company
5   called Zeiler or Zeiler, Z E I L E R?
6       A.    I have not.
7             MR. ROMINE:  Do you want to go for
8   like five more minutes --
9             MR. LEWIS:  Sure.
10            MR. ROMINE:  -- then take some
11  kind of lunch break?
12            MR. LEWIS:  Fine.  Is that okay?
13  Actually, I should ask the witness.  Is that
14  okay with you?
15            THE WITNESS:  I feel fine.  I
16  mean, I can go all day if you want.
17            MR. LEWIS:  We'll come back after
18  lunch.
19            THE WITNESS:  Okay.  Sorry.  Wrong
20  answer.
21            MR. LEWIS:  But actually, Dave --
22  off the record.
23            (Thereupon, an off-the-record
24  discussion was held.)
25  BY MR. ROMINE:
```

Page 107

```
1       Q.    Do you have any information as to
2   where Valley Asphalt's, I want to say, general
3   waste was disposed of at any time?
4       A.    The only waste I'm specifically
5   aware is when we hit barrels during a water
6   pipe install.  I know those were disposed of in
7   a waste facility.  When we had to take our
8   buildings down on site because of vapor
9   intrusion, those waste materials were taken to
10  Stony Hollow.  Those are the only exact
11  locations that I'm aware of.
12      Q.    I'm talking about the waste that
13  today would go into the Rumpke dumpster.
14      A.    Okay.
15      Q.    Where did that waste go?
16      A.    I don't know.
17      Q.    At any time?
18      A.    I don't -- I'm not aware at any
19  time during my tenure.
20            MR. ROMINE:  Okay.  Is now a good
21  time?
22            MR. LEWIS:  Yeah, fine.
23            MR. ROMINE:  For those of you on
24  the telephone, we are going to take a 30-minute
25  lunch break, so plan on being back at 12:30.
```

Page 108

```
1             (Lunch recess taken.)
2   BY MR. ROMINE:
3       Q.    Before lunch, Mr. Crago, we were
4   talking about some of the storage tanks on the
5   Dayton property.
6       A.    Yes, sir.
7       Q.    And you had mentioned that there
8   were tanks for asphalt?
9       A.    Yes.
10      Q.    And for fuel oil?
11      A.    Yes.
12      Q.    And the fuel oil runs the plant?
13      A.    Yes, sir.  It fires the burner.
14  The plant is actually run off electricity, but
15  the main dryer on the plant is run by fuel or
16  natural gas.
17      Q.    Oh, okay.  Thanks.  So the dryer
18  uses fuel oil?
19      A.    Yes.
20      Q.    But the plant also uses
21  electricity?
22      A.    Yes, sir.
23      Q.    Okay.  Are there transformers on
24  site?
25      A.    I'm not aware of any.
```

Page 109

```
 1        Q.   Do you know, does the plant just
 2   use regular 220 volt electricity?  They plug
 3   into the grid?
 4        A.   I would say it's higher than that.
 5   I would guess 480 coming to the plant.
 6        Q.   Do you know how -- okay.  They use
 7   the 480.  Does it get stepped down at all?
 8        A.   It's stepped down from that.
 9        Q.   It is?
10        A.   Yes.
11        Q.   Where does that occur?
12        A.   I'm not aware.
13        Q.   Does it occur on site or off site?
14        A.   I don't know.
15        Q.   Okay.  Does the front end loader
16   run off the fuel oil?  Do you know where it
17   gets its fuel from?
18        A.   It has the ability to use the
19   number two fuel oil from the tank on site.
20        Q.   Is that typically where it gets
21   fuel from?
22        A.   Sometimes, but it also has the
23   ability to be fueled externally if we have, you
24   know, a fuel truck local.
25        Q.   And do you know what method is
```

Page 110

```
 1   used more frequently?
 2        A.   I think they fuel on site -- from
 3   fuel tanks on site is the norm.
 4        Q.   Is any asphalt stored in drums?
 5        A.   No.
 6        Q.   Is any fuel oil stored in drums?
 7        A.   Not that I'm aware of.
 8        Q.   Are drums used for storage of any
 9   substance?
10        A.   There are some drums on site that
11   store oil for maintenance.  There's some -- you
12   know, some grease, some lubrication type, you
13   know, plant maintenance, small amounts.  Maybe,
14   I don't know, three or four drums or something
15   like that.  Not a large quantity.
16        Q.   How big are the drums?
17        A.   55-gallon.
18        Q.   And how are they disposed of?
19        A.   When they are empty?
20        Q.   Yeah.
21        A.   Those are typically sent off site
22   for disposal.
23        Q.   Do you know where they go?
24        A.   I do not.
25        Q.   Do you know how they were disposed
```

Page 111

```
 1   of when you got to Valley Asphalt in 1993?
 2        A.   I wasn't directly involved in any
 3   drum disposal.  My understanding is that, you
 4   know, if a drum was empty, they would probably
 5   send it down to our corporate office where it
 6   could either be recycled or disposed of.  We
 7   have a large roll-off dumpster there that is
 8   recycled metal.
 9             So our normal operation, we have a
10   dumpster at our main office that heavy metal
11   items can go in, and then they are sent to a
12   metal recycling facility, of which I have seen
13   drums go into that.
14        Q.   Have -- were there any drums from
15   plant six that were disposed of on site?
16        A.   I'm not aware of any drums that
17   were disposed on site.  And as an environmental
18   manager, when I started in '93, I would not
19   have allowed that.
20        Q.   How does a drum get from plant six
21   to the metal recycling place in Cincinnati that
22   you were talking about?
23        A.   It would be put in the back of a
24   pickup truck I think would be the normal mode
25   of operation.
```

Page 112

```
 1        Q.   Have you seen that happen?
 2        A.   Yes, sir.
 3        Q.   Does Valley Asphalt do any testing
 4   of asphalt at plant six?
 5        A.   Yes, we do.
 6        Q.   And describe that.
 7        A.   We will test the raw products
 8   going into the plant, we will test the
 9   aggregates for gradation, and we will also test
10   the recycle asphalt for asphalt content as it
11   is fed into the plant.  We will take a
12   representative small sample.  Then we make the
13   hot mix asphalt, it's loaded into a truck, and
14   depending upon the type of mix or the project,
15   we will take a sample, a small 20-pound sample,
16   and break that down and test it for quality.
17        Q.   You mentioned a lab earlier.  Is
18   the testing done in the lab?
19        A.   Yes.
20        Q.   Is there an ASTM process or
21   reference that Valley Asphalt uses to test
22   asphalt?
23        A.   Yes.  Almost all of our testing is
24   tied to ASTM or AASHTO, which is A A S H T O,
25   which stands for American Association of State
```

Page 113

1    Highway Transportation Officials.

2         Q.   So AASHTO has asphalt testing

3    procedures?

4         A.   Yes, sir.

5         Q.   Okay.  Do you know which AASHTO

6    procedure Valley Asphalt uses?

7         A.   We do several on site.  The

8    gradation that we run follows a specific AASHTO

9    method.  The extraction that we run, AASHTO

10   method, the burn-off, they all have their own

11   specific AASHTO methods.

12        Q.   Do you know the names or numbers

13   of them offhand?

14        A.   I don't have them memorized.  I

15   can provide them for you if need be.

16        Q.   How about ASTM, does Valley

17   Asphalt use ASTM procedures that are different

18   from the AASHTO procedures?

19        A.   Both AASHTO and ASTM have very

20   similar type methods for testing, so a specific

21   ASTM method will match an AASHTO method.  So

22   you might have one test, and they both have

23   their individual numbers.

24        Q.   Okay.  And do you know any of the

25   ASTM numbers?

Page 114

1         A.   I don't have them memorized.  I

2    would have to look them up.

3         Q.   Okay.  I think you had mentioned

4    earlier that there had been a lab in what was

5    called building five?

6         A.   Yes, sir.

7         Q.   And now it's in a trailer; is that

8    correct?

9         A.   Yes, sir.

10        Q.   Has there been a lab at Valley

11   Asphalt ever since you worked there in one

12   place or another?

13        A.   Yes, there has.

14        Q.   Okay.  How about before 1993?

15        A.   I'm not specifically aware of

16   having a lab.  I know the building that the lab

17   was in when I started in '93 was not new, so

18   I'm assuming that it was a lab prior to my

19   starting.

20        Q.   Okay.  Why do you -- why does

21   Valley Asphalt test the asphalt?  What's the

22   purpose of testing it?

23        A.   To prove the quality of the final

24   mix.  And we do it for our own accord, because

25   being in business, we want to make sure our

Page 115

1    customers are getting a good product.  But then

2    there are specific customers that mandate us to

3    test it, which might be the Ohio Department of

4    Transportation, the FAA, you know, private

5    companies.

6         Q.   Do you ever test the raw material

7    asphalt, the petroleum fraction that comes in?

8         A.   No, we don't have the ability to

9    test that on site by itself.

10        Q.   Does the testing procedure use any

11   solvents?

12        A.   The testing of the hot mix asphalt

13   does.  There are certain tests that require

14   solvents.

15        Q.   And what solvents are used?

16        A.   Historically we have used two

17   different solvents.  One is called

18   trichloroethylene, which is a chemical compound

19   that breaks down asphalt, and it's used in a

20   centrifuge where we will take a sample of hot

21   mix asphalt, put it in the centrifuge, put the

22   solvent in with it, cover it with a filter, and

23   then it spins out, removing the liquid asphalt

24   and the solvent.

25             The second method uses a solvent,

Page 116

1    but it's a derivative of oranges, it's called

2    d-limonene.  To spell it, it's -- I think it's

3    D I M E L Y L E N E.  And it's -- again, it's a

4    citrus-based product.  We put it in the same

5    centrifuge.  It extracts the asphalt.  It's

6    just a newer style.

7         Q.   Have you ever heard of the

8    abbreviation TCE?

9         A.   Yes.

10        Q.   And is that an abbreviation for

11   the trichloroethylene that you were just

12   talking about?

13        A.   Yes, it is.

14        Q.   And does Valley Asphalt still use

15   TCE to test asphalt?

16        A.   Yes, we do.  Not on this site, but

17   in our main office.

18        Q.   Okay.  Was -- did Valley Asphalt

19   ever use TCE at plant six in Dayton?

20        A.   I'm not specifically aware of us

21   using it, but I assume that we did use it at

22   some point.

23        Q.   Why do you assume that?

24        A.   It was a standard practice.

25        Q.   Up until what time?

Page 117

1          A.   When I started in '93, we were
2    actively using the orange-based d-limonene
3    products.  So we typically did not run them in
4    the field at that time.  So since 1993 to
5    current, I would say we have not run
6    trichloroethylene at the site.  Prior to that,
7    I don't know for sure that we did, but I'm
8    speculating that we did.
9          Q.   Okay.  Based on your knowledge of
10   the asphalt industry --
11         A.   Yes, sir.
12         Q.   -- has there been any written
13   policy in place at Valley Asphalt that says
14   something like don't use TCE at plant six?
15         A.   Written policy, no.
16         Q.   How about standard operating
17   procedure whether written or not?
18         A.   The standard operating procedure
19   is not to use it, and that's under my
20   directive.
21         Q.   Do you know if that was a change?
22   In other words, when you became the
23   environmental person for Valley Asphalt, did
24   you go into plant six and say all right, stop
25   TCE, now we are going to use the orange-based

Page 118

1    solvent?
2          A.   No, it was already -- the change
3    had already been made.
4          Q.   Did anyone at plant six ever tell
5    you that plant six had used TCE?
6          A.   I have never been directly told
7    that.
8          Q.   Have you ever been directly told
9    that plant six did not ever use TCE?
10         A.   I have not been directly told that
11   either.
12         Q.   Did plant six ever use any solvent
13   other than the orange-based solvent since you
14   were there?
15         A.   I'm not aware of any other
16   products that would have been used as solvents,
17   so no, we have not used any others.
18         Q.   And I think you mentioned that the
19   two solvents that were typically used were TCE
20   and the orange-based solvent?
21         A.   That is correct.
22         Q.   Are there any others that Valley
23   Asphalt used to test asphalt?
24         A.   No, we don't use any others
25   currently or prior --

Page 119

1          Q.   Or in the past?
2          A.   -- at any locations.
3          Q.   Okay.  Does TCE have any advantage
4    over the orange-based solvent?
5          A.   No big advantage.  There's --
6    it tends to be a stronger chemical, which
7    there's some advantages to that.  But then the
8    handling -- the extra safety you have to handle
9    with that is a disadvantage.  So in my opinion,
10   it's better to use the orange-based product.
11         MR. ROMINE:  For those of you on
12   the telephone, we are getting a beeping noise
13   here.  I don't know if that's someone on the
14   phone.
15         (Thereupon, an off-the-record
16   discussion was held.)
17   BY MR. ROMINE:
18         Q.   Before the interruption,
19   Mr. Crago, we were talking about the testing of
20   asphalt.
21         A.   Yes, sir.
22         Q.   And I think you had said that
23   based on your knowledge of the asphalt
24   industry, it was likely that plant six at some
25   point tested its asphalt with TCE; is that

Page 120

1    accurate?
2          A.   I believe that's correct and
3    accurate.
4          Q.   And that would have taken place in
5    building five?
6          A.   Yes, it would have been in
7    building five.
8          Q.   Okay.  And what happened to the
9    asphalt that had been tested?
10         A.   The normal mode of testing, you'll
11   put the hot mix asphalt in the centrifuge, you
12   put the solvent in with it, it breaks it down,
13   you spin it out.  There's a nozzle on the side
14   of the centrifuge that we have to collect in a
15   graduated cylinder, because we have to keep
16   track of the milliliters of solvent that comes
17   out, because there's a correction factor in the
18   test.
19         So our normal mode of operation,
20   it goes into the graduated cylinder, they take
21   the measurement off the cylinder, and then that
22   product, as it is used and spent, gets poured
23   into a five-gallon plastic receptacle.
24         Q.   And you have seen that happen with
25   the orange-based solvent?

Page 121

```
1            A.    Yes.
2            Q.    What happens to the solvent after
3    it's put in the five-gallon receptacle?
4            A.    Those are all non-usable in the
5    field, so we will bring that back to our main
6    office.  Sometimes it's disposed of.  But under
7    current policy, we are actually able to recycle
8    it through a distillation process.
9            Q.    And before you had the ability to
10   recycle it, how was it disposed of, focused now
11   on the orange-based solvent?
12           A.    It would be -- you know, we bring
13   it back in five-gallon jugs sealed, multiple
14   ones at a time.  They would go into a 55-gallon
15   drum, and then we would contact a local -- or a
16   waste disposal company to come pick them up.
17           Q.    When we go back in time, and if we
18   talk about a time when TCE was used to test the
19   purity of asphalt, was the testing procedure
20   similar?  In other words, was there the
21   centrifuge that you were talking about?  Was
22   that also used when TCE was used?
23           A.    Yeah, the process is identical
24   with the centrifuge, capture the solvent,
25   measure how much volume comes out, and then
```

Page 122

```
1    it's put into a receptacle, five-gallon
2    sealable jug for disposal.
3            Q.    And have you seen -- was there any
4    written standard operating procedures regarding
5    the testing of asphalt by Valley Asphalt during
6    the time when TCE was used?
7            A.    The written procedure we would
8    have been following is ASTM, AASHTO.  Valley
9    Asphalt didn't have a written procedure for the
10   steps following that.
11           Q.    When you say the steps following
12   that, you mean after the asphalt had been
13   tested?
14           A.    Yeah, for the disposal.
15           Q.    So there was no -- Valley Asphalt
16   had no written procedure for the disposal of
17   the solvent?
18           A.    That is correct.
19           Q.    Do you have any information as to
20   how the solvent was disposed of when TCE was
21   the solvent?
22           A.    Just as documentation, I believe,
23   we have some old historical records from other
24   locations where we would have bought trichlor
25   from whatever location back to our corporate
```

Page 123

```
1    office and then arranged to have it disposed
2    of.
3            Q.    So you are saying you have
4    documentation that shows -- for the arrangement
5    of transportation of used TCE from locations
6    other than plant six back to Cincinnati?
7            A.    Yes.  It would also be our main
8    lab, because there's actually a second test we
9    only do at our main lab that requires us to use
10   TCE even today.
11           Q.    Do you have similar documentation
12   showing the transportation of used TCE from
13   plant six back to Cincinnati?
14           A.    I do not have written
15   documentation of that.
16           Q.    A few minutes ago we were talking
17   about drums, and I think you testified that
18   plant six has lubricating oil in drums?
19           A.    Yes, sir.
20           Q.    Anything else in drums?
21           A.    I'm not aware of any other drum
22   bulk material that would be on site.
23           Q.    Are you aware of any leaks or
24   spills from those drums?
25           A.    No, sir.  Those are typically kept
```

Page 124

```
1    inside the concrete containment where we have
2    the big fuel tanks.  The normal mode of
3    operation is to keep the smaller drums in that
4    same footprint.
5            Q.    I see.  Okay.  So you have -- so
6    there's a location on the site where the tanks
7    are grouped, for lack of a better word?
8            A.    Yeah.  I've drawn it on your
9    previous maps that you provided to me, and I
10   labeled it as tanks.
11           Q.    Okay.  And that's also where the
12   55-gallon drums are kept?
13           A.    Yes.
14           Q.    Okay.
15                 (Thereupon, Plaintiffs' Exhibit
16   10, Environmental Remediation Report at Valley
17   Asphalt prepared by David M. Scardino, was
18   marked for purposes of identification.)
19                 MR. ROMINE:  For those of you on
20   the telephone, Exhibit 10 is a document, there
21   are no Bates stamps, but the title is
22   Environmental Remediation Report at Valley
23   Asphalt.  There's a letterhead, which is TCA
24   Environmental, Inc., and there's a stamp on it
25   that says received Ohio EPA September --
```

Page 125

1　actually, just SEP, but September 05, 2000.
2　BY MR. ROMINE:
3　　　Q.　And Mr. Crago, have you seen this
4　document before?
5　　　A.　I have seen this report before.
6　　　Q.　And what is it?
7　　　A.　This is an environmental
8　remediation report that was done by TCA
9　Environmental with regard to barrels that were
10　dug up during a water pipe installation on our
11　property at Dryden Road.
12　　　Q.　And did you -- were you involved
13　in the commissioning of this report?
14　　　A.　I was involved with the -- this
15　report, yes.
16　　　Q.　When you say barrels, were those
17　drums?
18　　　A.　55-gallon drums.
19　　　Q.　And how were those discovered?
20　　　A.　We had a construction crew
21　actually using a backhoe excavator opening a
22　trench line from out along the main road back
23　into the back side of our office building on
24　site, and as you can see on the last page of
25　this, it gives like a schematic.

Page 126

1　　　Directly where it says office, the
2　51 by 31 foot office, that kind of dark spot in
3　the middle of the paper is where we hit barrels
4　while we were excavating for this waterline
5　with our excavator.
6　　　Q.　So you were planning on putting in
7　a waterline; is that correct?
8　　　A.　Yes, sir.
9　　　Q.　Is this potable water or sanitary
10　sewer or something different?
11　　　A.　This would be -- I believe it was
12　a potable water source.
13　　　Q.　Okay.　And what happened when the
14　backhoe hit the barrels?
15　　　(Thereupon, an off-the-record
16　discussion was held.)
17　BY MR. ROMINE:
18　　　Q.　Mr. Crago, we were talking about
19　Exhibit 10, the environmental remediation
20　report.　I think I had asked you what happened
21　when the backhoe uncovered or found drums?
22　　　A.　I think just the manner that they
23　were excavating the trench, I think some of the
24　barrels were knocked over, I think some of the
25　barrels were punctured, and then some of the

Page 127

1　barrels remained upright.
2　　　Q.　So these were barrels that were
3　underground?
4　　　A.　They were underground.
5　　　Q.　And was Valley Asphalt aware of
6　the existence of these barrels before the
7　construction of the waterline?
8　　　A.　We were not aware of any
9　underground barrels.
10　　　Q.　Okay.　And then where did the
11　drums come from?
12　　　A.　We don't know.
13　　　Q.　Did Valley Asphalt do any
14　investigation as to where they came from?
15　　　Q.　Before the trench?
16　　　Q.　At any time.
17　　　A.　Yeah, I know there's been
18　depositions given that gave a very specific
19　reference to where these barrels came from.
20　　　Q.　And what's your understanding just
21　based on those depositions as to where they
22　came from?
23　　　A.　My understanding is there was a
24　barrel remanufacturer company that resided in
25　our -- in the old Quonset hut that we currently

Page 128

1　use for warehousing.　Our predecessor would
2　recondition barrels in there.　So he would
3　bring old barrels in, he would clean them out,
4　take the residue, put it in another barrel,
5　clean up one of the barrels, sell it.　Once the
6　residue was full in a new barrel, they would
7　bury it on site in the same location that we
8　hit our barrels.
9　　　Q.　What was the name of that company?
10　　　A.　I don't recall the company name.
11　I would have to look it up under the
12　deposition.
13　　　Q.　Was it -- did this happen before
14　1956?
15　　　A.　No, my understanding is it may
16　have been occurring after 1956 when we were
17　renting the property for the asphalt plant.　I
18　believe this barrel remanufacturer was in the
19　Quonset hut building doing this process.
20　　　Q.　When you say you have seen
21　deposition testimony on this topic, is that in
22　this case or some other case?
23　　　A.　It's in this case.
24　　　Q.　I'm going to suggest to you that
25　we have heard some testimony about a company

Page 129

```
1    called Ottoson Solvents.
2         A.   That is the name that I cannot
3    recall.
4         Q.   That is the name?
5         A.   Yes.
6         Q.   So now that I've said that word,
7    that jogs your memory, and it's your
8    understanding from reading other depositions in
9    this case that Ottoson Solvents is the name of
10   the company that occupied the Quonset hut?
11        A.   That is correct.
12        Q.   Okay.  Do you have any
13   understanding --
14             MR. EDDY:  Can you spell that,
15   David?
16             MR. ROMINE:  Sure.  O T T O S E N,
17   I think.
18             MR. LEWIS:  I thought it was
19   S O N.
20             MR. ROMINE:  Could be S O N.
21             MR. LEWIS:  I'm not sure.
22   BY MR. ROMINE:
23        Q.   Do you have any understanding
24   either from depositions in this case or from
25   your work at Valley Asphalt as to when Ottoson
```

Page 130

```
1    Solvents used the Quonset hut?
2         A.   I have never seen any specific
3    dates.
4         Q.   Was Ottoson Solvents still using
5    the Quonset hut in 1993?
6         A.   They were not.
7         Q.   Do you know if Ottoson Solvents
8    was still using the Quonset hut, say, in 1992
9    right before Valley Asphalt purchased the
10   property?
11        A.   I'm not aware if they were still
12   on site at that point.
13        Q.   Was the Quonset hut part of the
14   leased property?
15        A.   No, it was not.  My understanding,
16   it was not part of our leased property.
17        Q.   So did Ottoson Solvents pay rent
18   to Valley Asphalt pursuant to a lease or
19   sublease?
20        A.   No, they were not a sublease of
21   ours, and we did not receive rent from them.
22        Q.   As far as Valley Asphalt knows,
23   they were another tenant of the owners,
24   Mr. Grillot and Mr. Boesch?
25        A.   That is correct.
```

Page 131

```
1         Q.   Do you know if Ottoson Solvents
2    owned the Quonset hut at one time?
3         A.   I don't know.
4         Q.   Okay.  What was in the drums that
5    Valley Asphalt uncovered?
6         A.   From the technical report --
7    there's been a lot of testing done.  There's
8    very high levels of PCBs.  There's very high
9    levels of toluene.  There's high levels of TCE.
10   And then there's other chemicals at medium to
11   high levels also that I'd have to go back
12   through the report to try to remember them.
13        Q.   And what was done with the drums?
14        A.   We had the EPA, the fire
15   department, the local police department all
16   involved in the proper securing and disposal of
17   these drums.  So the drums were pulled out of
18   the trench, they were placed on an impervious
19   plastic membrane that was at grade level, in
20   addition to some free soil that was around them
21   that may have also been contaminated by the
22   liquids inside.
23             Then we made arrangements for --
24   or TCA Environmental made arrangements for
25   roll-off dumpsters to be brought in.  The
```

Page 132

```
1    dumpsters were sealed up with plastic
2    impervious liners.  The drums, the contaminated
3    soils, any product that came out of the hole
4    was put into those dumpsters for disposal.
5             MR. ANDREASEN:  Can we go off the
6    record for just a minute?
7             (Thereupon, an off-the-record
8    discussion was held.)
9    BY MR. ROMINE:
10        Q.   If I could ask you to turn to page
11   two of Exhibit 10.
12        A.   Okay, I'm on page two.
13        Q.   You see where it says I guess
14   bullet point two, topography?
15        A.   I see that.
16        Q.   The topography is fairly level and
17   surface drainage tends toward the south.  Do
18   you see that?
19        A.   Yes, sir.
20        Q.   Is that accurate?
21        A.   I didn't write the report, so I
22   don't know.
23        Q.   But aside from the -- do you have
24   any knowledge that -- let's break it down.  Is
25   the topography on Valley Asphalt's property
```

Page 133

1   there fairly level?

2          A.   Yes, I would agree with that.

3          Q.   And does the surface drainage tend

4   toward the south?

5          A.   I would agree with that generally,

6   yes.

7          Q.   Did you see the drums when they

8   came up out of the ground?

9          A.   Yes, sir, I did.

10         Q.   And were there any markings on

11  them?

12         A.   I did not get in real close

13  proximity, because I didn't have correct PPE.

14  I didn't have coverings, face mask, anything

15  like that.  I wasn't aware of the chemicals

16  involved, so I did not want to put myself in

17  harm's way.  But I was probably 25, 30 feet

18  away.  I could see that there were markings on

19  some of the barrels, but I couldn't tell what

20  it said.

21         Q.   Do you know how it came to be

22  known that the drums came from Ottoson

23  Solvents?

24         A.   The deposition that I was privy to

25  and read, I believe that individual that was

---

Page 134

1   speaking in the deposition said he personally

2   was aware that they would take the drums out

3   back, bury them in the proximity of where we

4   hit them when we were digging.

5          Q.   When you say they, meaning the

6   witness in the deposition you are talking about

7   testified that Ottoson Solvents used drums and

8   buried them in the place where you now know is

9   where they were discovered in about the year

10  2000?

11         A.   Yes, that is correct.

12              (Thereupon, Plaintiffs' Exhibit

13  11, two-page document, document entitled Sewer

14  Line, Valley Asphalt Corporation, Dryden Road

15  Plant, and email from NASAH@marasconewton.com

16  to jurensj@jrjnet.com sent October 18, 2001,

17  was marked for purposes of identification.)

18              MR. ROMINE:  For those of you on

19  the telephone, Exhibit 11 is a two-page

20  document, the first page has a title to it, it

21  says Sewer Line, Valley Asphalt Corporation,

22  Dryden Road Plant.  And page two is an email --

23  a printout of an email.  On the top it is

24  printed from, it looks like, the email of Jim

25  Jurgensen, II.

---

Page 135

1   BY MR. ROMINE:

2          Q.   My question to you is have you

3   seen the first page of Exhibit 11 before?

4          A.   I have.

5          Q.   And what is it?

6          A.   It looks like a summary of what I

7   will call the barrel incident in 2000 when we

8   struck the barrels underground.

9          Q.   And so it happened -- it looks

10  like it happened sometime in the middle of May

11  of year 2000?

12         A.   That is correct.

13         Q.   And who is Roy Turton?

14         A.   Roy Turton was the manager of one

15  of our -- our construction division in Dayton

16  for Jurgensen Company.

17         Q.   Okay.  What is Jurgensen Company?

18         A.   It's one of our sister companies

19  that handles construction activities.

20         Q.   Was he a Valley Asphalt employee?

21         A.   No.

22         Q.   Does the sister company still

23  occupy space at Valley Asphalt in Dayton?

24         A.   Not -- they do a little bit of

25  storage maybe of some construction equipment,

---

Page 136

1   but very little.  They used to have office

2   space, but with us required to take the

3   buildings down, they had to move off site.

4          Q.   Who prepared this first page of

5   Exhibit 11?

6          A.   I don't know.

7          Q.   Who is Kiefer, or Kiefer,

8   K I E F E R?

9          A.   I don't recognize that name.

10         Q.   If you look towards the bottom of

11  Exhibit 11, there's a recitation of some

12  amounts paid to TCA Environmental and Waste

13  Management.  Do you see that?

14         A.   Yes, sir.

15         Q.   Did Valley Asphalt pay these

16  amounts?

17         A.   My understanding is Valley Asphalt

18  paid those amounts.

19         Q.   Did you have any role in cutting

20  the checks?

21         A.   I did not.

22         Q.   Going back to the storage tanks

23  that you told me about earlier.

24         A.   Yes, sir.

25         Q.   Have any of those tanks been

Page 137

1   removed or disposed of?
2       A.   I'm not aware of any of our tanks
3   being removed from site.
4       Q.   Are you familiar with the term
5   phase one?
6       A.   Yes, sir.
7       Q.   Was there a phase one
8   investigation done for the Valley Asphalt land
9   at about the time that Valley Asphalt bought
10  the land in 1993?
11      A.   I have not seen a report or I have
12  not heard anybody tell me there was a report.
13      Q.   So to the best of your knowledge,
14  probably not?
15      A.   That is correct.
16      Q.   Okay.  How about going back to
17  1956, I don't think that there was such a
18  term -- I don't think there was such a term in
19  1956, but was there any environmental
20  investigation done in 1956 when Valley Asphalt
21  first started using that piece of property?
22      A.   I'm not aware of any reports back
23  in 1956.
24      Q.   But other than reports, are you
25  aware of any investigation?

Page 138

1       A.   No.
2       Q.   Have you heard the term Cinn Dump,
3   C I N N?
4       A.   I've read it somewhere.  Within
5   the documentation somewhere, I remember reading
6   that.
7       Q.   Is it your understanding that the
8   land where Valley Asphalt has its Dayton plant,
9   plant six, is on a portion of what used to be
10  called the Cinn Dump?
11      A.   I haven't heard it referenced as
12  Cinn Dump.  My readings and recollections are
13  it was called the South Dayton Dump.
14      Q.   Okay.
15      A.   And I don't know if that's the
16  same terminology.
17      Q.   Okay.  Earlier this morning we had
18  talked about some employment records, and I
19  think you said that if we wanted to know who
20  may have worked at the Dayton plant, we would
21  have to go back to employment records --
22  historical employment records; is that
23  accurate?
24      A.   They may be available, but I don't
25  know that they would designate who was

Page 139

1   physically at that plant site versus who just
2   worked for us corporately.
3       Q.   Right.  And where are those
4   records?
5       A.   I believe they would be at our
6   corporate office in Cincinnati at Mosteller
7   Road in Cincinnati.
8       Q.   Other than employment records, are
9   there any other records dealing with plant six
10  historical, let's say before 1993?
11      A.   I'm not aware of any.
12      Q.   Does Valley Asphalt have a
13  document retention policy now?
14      A.   I'm not aware of a specific
15  policy.  I know I try to -- personally I try to
16  save any and all documents with anything that
17  would be relevant to long-term storage.
18      Q.   Documents relevant to long-term
19  storage?
20      A.   Yes.  I mean, you know, long-term
21  potential issues.
22      Q.   I see.  Okay.  Are you aware of
23  any -- are you aware of any documents now in
24  Cincinnati dealing with plant six going back to
25  before 1993?

Page 140

1       A.   I did a very thorough search of
2   any and all of my records.  I did a very
3   thorough search of anybody even remotely
4   potentially involved verbally, and physically
5   went through any and everything we had.  A lot
6   of the documents that we've provided to you
7   already I already had.  Some of them came from
8   other sources within the company, or they may
9   have just been in our, you know, archived vault
10  in the basement.
11      Q.   So you are saying that you have
12  gone through Valley Asphalt's documents, and
13  where a document referred to plant six, such as
14  the leases with Mr. Boesch and Grillot --
15      A.   Yes.
16      Q.   -- you produced those?
17      A.   I produced everything that we
18  could find that pertained to it in any manner.
19      Q.   And you gave them to Mr. Lewis?
20      A.   That is correct.
21      Q.   And to your knowledge, those
22  documents have been produced as part of this
23  lawsuit in this litigation?
24      A.   Yes, that was our intent.
25      Q.   Do you know if Valley Asphalt has

Page 141

```
 1   things like check registers going back before
 2   '93, let's say?
 3        A.   I'm not aware of any.
 4        Q.   Okay.  I think you said that as
 5   far as you know, Valley Asphalt doesn't have a
 6   document retention policy?
 7        A.   I don't know what the formal
 8   policy is.  I know from a legal point of view
 9   that there's certain time frames that documents
10   have to be kept.  I don't know what those are.
11        Q.   Okay.  So is it your understanding
12   that documents that were kept in the ordinary
13   course of business, files, correspondence,
14   check registers, from 1993 and before that
15   relating to the Dayton plant may have been
16   destroyed at some point?
17        A.   They could very well have been
18   destroyed.
19        Q.   Did anyone ever tell you that they
20   were destroyed?
21        A.   No, sir.
22        Q.   Did anyone ever tell you that oh,
23   no, we don't destroy any of that, that's stored
24   in place X, wherever place X might be?
25        A.   No, I've never been told it's
```

Page 142

```
 1   stored elsewhere or in place X.
 2            (Thereupon, Plaintiffs' Exhibit
 3   12, copy of a folder labeled Valley Asphalt
 4   Corporation and correspondence, was marked for
 5   purposes of identification.)
 6   BY MR. ROMINE:
 7        Q.   Mr. Crago, have you seen Exhibit
 8   12 before?
 9        A.   Yes, sir, I have.
10        Q.   And what is it?
11        A.   It looks like different
12   correspondence with the Ohio EPA, some of them
13   are to Dear Concerned Party at our address at
14   Dryden Road, and then others look like --
15   almost like a phone diary or maybe handwritten
16   correspondence.  It looks like they were with
17   regard to the Ohio EPA and Mel Levy.
18            MR. ROMINE:  For those of you on
19   the telephone, Exhibit 12 is a document -- it
20   looks like -- the first page looks like it's a
21   copy of a manila folder titled Valley Asphalt
22   Corp., and there is a Bates number on it which
23   is SDD-3_00025242 through 256.
24   BY MR. ROMINE:
25        Q.   My question to you is, Mr. Crago,
```

Page 143

```
 1   does Valley Asphalt have this in its file
 2   somewhere?
 3        A.   I have a copy of this, because
 4   I've read through this before.
 5        Q.   Okay.
 6        A.   So these are some of the
 7   historical files that I -- when I went back
 8   through and brought everything into one source
 9   and started digging through it, I did see this
10   document.
11        Q.   Okay.  Fair enough.  And if I
12   could ask you to turn to the third page where
13   the numbers at the bottom end in 44.
14        A.   Okay.
15        Q.   And if you could look at the, I
16   guess, middle paragraph, it says Valley Asphalt
17   has been in operation since 1956.  My first
18   question to you is does that refer only to the
19   Dayton plant?  In other words, did Valley
20   Asphalt have operations, say, in Cincinnati or
21   some other location before 1956?
22        A.   I don't know.  I believe we were
23   in operation before 1956.  My understanding of
24   that line would be that's referencing the
25   Dryden Road facility.
```

Page 144

```
 1        Q.   The next sentence, five materials
 2   are used to produce asphalt.  Then it says
 3   sand, gravel, asphalt cement, number four fuel
 4   oil, and water.
 5        Okay.
 6        Q.   Is that accurate?
 7        A.   No.
 8        Q.   Can you explain how it's --
 9        A.   I agree with the sand, gravel,
10   asphalt cement, and the fuel oil, but the water
11   we wouldn't add to our process, because we are
12   drying the material.  So that would be
13   counterproductive.
14        Q.   Okay.  Number three, asphalt
15   cement, is that the petroleum fraction, or is
16   that something different?
17        A.   No, that is the petroleum product.
18   It's like the glue.
19        Q.   Okay.  And does the number four
20   fuel oil, does that go into the asphalt, or is
21   that used only for the dryer?
22        A.   That's only used for the dryer.
23        Q.   So number four fuel oil is not an
24   actual ingredient of the asphalt?
25        A.   That is correct.
```

Page 145

```
 1        Q.   The next sentence said a settling
 2   pond is present on site, but there's no
 3   discharge to the Great Miami River.  Do you see
 4   that?
 5        A.   Yes, sir, I do.
 6        Q.   And was that accurate as of 1985?
 7        A.   I didn't work for the company in
 8   1985, so I'm not sure.
 9        Q.   Is it your understanding from your
10   knowledge of the operations as to whether
11   that's accurate or not?
12        A.   It could have been, but I'm not
13   aware specifically to that pertaining to that
14   site.
15        Q.   Okay.  Then it says the dust from
16   the wet washers are settled in the pond.  Do
17   you see that?
18        A.   The dust -- okay, I see that
19   sentence.
20        Q.   And is that sentence accurate?
21        A.   That would be a normal process,
22   yes, if you had a wet wash scrubber.
23        Q.   Okay.  And that -- and if I
24   understand your testimony from earlier this
25   morning correctly, that would be created if you
```

Page 146

```
 1   didn't have a baghouse?
 2        A.   That is correct.
 3        Q.   Okay.
 4        A.   Predating baghouses, there was wet
 5   wash scrubbers.
 6        Q.   So -- again, I'm trying to
 7   understand how the process worked.  It says the
 8   dust from the wet washers are settled in the
 9   pond.  I'm wondering, does that include water
10   and dust that was put in the pond, or just the
11   dust only?
12        A.   It would be water and dust.  Then
13   the dust would evaporate -- the water would
14   evaporate leaving only the dust product.
15        Q.   And is this -- he is talking about
16   a pond here.  Is this the same pond that Valley
17   Asphalt uses currently as a water source for
18   controlling dust?
19        A.   No, that would be a different --
20        Q.   A different water source?
21        A.   A different process, yeah.
22        Q.   Okay.  Do you know where this pond
23   is that is referred to on page 44?
24        A.   No.  When I started in '93, we had
25   a baghouse, so --
```

Page 147

```
 1        Q.   So it was already gone?
 2        A.   It predated me.
 3        Q.   Okay.  Was there any body of water
 4   on the Valley Asphalt site since you started
 5   working there in 1993 other than the water that
 6   you now use for controlling dust?
 7        A.   There is not.
 8        Q.   Did you ever meet Mr. Levy?
 9        A.   Yes.  I worked with Mel Levy
10   numerous times.
11        Q.   It's Levy?
12        A.   Mel Levy, yes.
13        Q.   I wanted to make sure I was
14   pronouncing his name correctly.
15        A.   Okay.
16        Q.   When you were hired on in 1993,
17   did he completely retire, or did he stay on for
18   some time?
19        A.   He stayed on.  He was a licensed
20   professional engineer, and he was very
21   experienced on environmental concerns, so he
22   was on the environmental front.  He might have
23   been called my mentor.
24        Q.   And when did he pass away?
25        A.   I don't know.  I was -- if I
```

Page 148

```
 1   speculated, maybe 12, 14 years ago.
 2        Q.   Was he still acting as your mentor
 3   when he passed away?
 4        A.   No, he retired.
 5        Q.   At some point he completely
 6   retired?
 7        A.   Yeah.  I worked with Mel for
 8   maybe -- I started in '93.  I probably worked
 9   with Mel for maybe four or five years.
10        Q.   All right.  Did you ever talk with
11   Mr. Levy about the document or any portion of
12   the document we are calling Exhibit 12?
13        A.   No, I don't ever recall seeing
14   this document or talking to Mel Levy about it
15   prior to my digging it out of our historical
16   files.
17        Q.   Okay.  And I take it when you dug
18   this out of your historical files, that was
19   after Mr. Levy's passing?
20        A.   That is correct.
21             (Thereupon, Plaintiffs' Exhibit
22   13, letter to John R. Jurgensen Company from
23   the United States Environmental Protection
24   Agency dated December 10, 2002, was marked for
25   purposes of identification.)
```

Page 149

```
 1              MR. ROMINE:  For those of you on
 2   the telephone, Exhibit 13 is a document, and
 3   there are Bates stamps, and it goes from 000938
 4   through 000957.
 5              MR. EDDY:  Does it indicate whose
 6   production it was, David?
 7              MR. ROMINE:  There's no prefix,
 8   but my understanding is it was produced by
 9   Valley Asphalt Corporation.
10              MR. LEWIS:  Correct, it was
11   produced by us.
12              MR. EDDY:  Okay.  Thank you.
13   BY MR. ROMINE:
14        Q.   Mr. Crago, have you had a chance
15   to look at Exhibit 13 before?
16        A.   I have.
17        Q.   And what is it?
18        A.   This is a letter addressed to John
19   R. Jurgensen Company, and it is requesting
20   specific information with regard to the Dryden
21   Road facility.
22        Q.   And what is the John R. Jurgensen
23   Company?
24        A.   That's one of our sister companies
25   that I referenced earlier that Roy Turton
```

Page 150

```
 1   worked for.  It's a construction division of
 2   our corporation.
 3        Q.   And that division still exists?
 4        A.   Yes, sir.
 5        Q.   Were there any companies other
 6   than John R. Jurgensen Company that you might
 7   call a sister company that used the Dryden Road
 8   facility?
 9        A.   Yes, at one point very early on
10   there was a very small office area on the front
11   of what we have been calling the Quonset hut.
12   And there was a small construction company in
13   there called Titus Construction, which is a
14   sister company of ours that no longer
15   functions, but has not -- it's still a viable
16   name.
17        Q.   And was the John R. Jurgensen
18   Company owned by John R. Jurgensen?
19        A.   It's owned by Jim Jurgensen now.
20        Q.   Now it's owned by Jim Jurgensen?
21        A.   Yes.
22        Q.   The senior?
23        A.   Yes.  The original founder of the
24   company is John R. Jurgensen.  That's Jim
25   Jurgensen, Sr.'s, dad.
```

Page 151

```
 1        Q.   Got you.  If you look at pages --
 2   the last bit of the document, pages 954 through
 3   957.
 4        A.   Yes, sir.
 5        Q.   It looks like you are listed there
 6   as the environmental manager of John R.
 7   Jurgensen Company.
 8        A.   Yes, sir.
 9        Q.   Did you ever get a paycheck from
10   John R. Jurgensen Company?
11        A.   I did not.
12        Q.   Solely Valley Asphalt?
13        A.   Yes, sir.
14        Q.   How about Mr. Turton?
15        A.   I believe Mr. Turton only worked
16   for John R. Jurgensen Company.
17        Q.   How about Mr. Bonner?
18        A.   Jim Bonner is a surveyor for the
19   John R. Jurgensen Company.
20        Q.   Is he still employed by the John
21   R. Jurgensen Company?
22        A.   He is not.  Mr. Turton is not and
23   Jim Bonner is not.
24        Q.   Are they still alive?
25        A.   I don't know.
```

Page 152

```
 1        Q.   If you look at page 953, it looks
 2   like Valley Asphalt is writing a letter to EPA
 3   saying we are going to respond to your
 4   information request; is that accurate?
 5        A.   Yes, sir.
 6        Q.   And you signed this letter?
 7        A.   I did.
 8        Q.   Was the information request from
 9   EPA that you are referencing here on page 953,
10   was that similar to the information request to
11   the John R. Jurgensen Company on pages 938
12   through 952?
13        A.   Yes, it is in reference to those
14   same questions.
15              (Thereupon, Plaintiffs' Exhibit
16   14, letter to US Environmental Protection
17   Agency from Daniel T. Crago dated December 11,
18   2002, was marked for purposes of
19   identification.)
20              MR. LEWIS:  I think this is the
21   same thing, Dave, isn't it?
22              THE WITNESS:  No, it's dated
23   different.  One is December 11, and one is --
24              MR. LEWIS:  Sorry.
25              THE WITNESS:  -- January 7.
```

Page 153

```
 1              MR. ROMINE:  I might have given
 2   you the wrong one.
 3              MS. MEYER:  I don't think so.
 4              MR. LEWIS:  Maybe I'm mistaken.
 5              MS. MEYER:  The header is
 6   different.
 7              MR. LEWIS:  Okay.  You're right.
 8   Never mind.
 9   BY MR. ROMINE:
10        Q.    Have you seen Exhibit 14 before,
11   Mr. Crago?
12        A.    Yes, sir.
13              MR. ROMINE:  Okay.  For those of
14   you on the phone, Exhibit 14 is a document
15   Bates stamped 000042 through 45, also, I
16   understand, produced by Valley Asphalt
17   Corporation.
18   BY MR. ROMINE:
19        Q.    And what is Exhibit 14?
20        A.    This is a response letter that I
21   wrote to the US EPA based out of Chicago,
22   Region Five, and they sent me a 30-day
23   information request, and this is my response to
24   that.
25        Q.    Okay.  And when you say they sent
```

Page 154

```
 1   you the request, that's US EPA?
 2        A.    Yes, sir.
 3        Q.    And the questions that they asked
 4   you, were those the same questions that they
 5   asked of the John R. Jurgensen Company that we
 6   saw on Exhibit 13?
 7        A.    I believe they are, because they
 8   show one through 13, and this answers one
 9   through 13, so --
10        Q.    The reason I ask is -- sorry.  Go
11   ahead.
12        A.    Without going through one through
13   13, it looks like they match up, so --
14        Q.    Fair enough.  The reason I ask is
15   we see Exhibit 13, there's a request to John R.
16   Jurgensen Company.  I didn't see a request
17   specifically addressed to Valley Asphalt.  We
18   do have the responses, and so my -- I'm trying
19   to get at whether these answers are to the same
20   questions as that were on Exhibit 13.
21        A.    I see.
22        Q.    And your understanding is after a
23   brief glance, it appears that the answers that
24   appear on Exhibit 14 appear to be answers to
25   the same questions that we saw in Exhibit 13?
```

Page 155

```
 1        A.    Yes, just briefly starting down
 2   the list, it looks like the answers.
 3        Q.    Okay.  And if you look on page 44,
 4   still on Exhibit 14, that's your signature
 5   there?
 6        A.    Yes, sir, it is.
 7        Q.    And the answers here are true to
 8   the best of your knowledge?
 9        A.    Yes, sir, they are.
10        Q.    If you look on page 43, question
11   11 D, the John R. Jurgensen Company is a
12   subsidiary of Valley Asphalt Corporation?
13        A.    That is correct.
14        Q.    If you look at the first page of
15   Exhibit 14, page 42.
16        A.    Okay.
17        Q.    The very last question, it says
18   that Valley Asphalt has a permit to burn
19   off-spec oil.
20        A.    Yes, sir.
21        Q.    Is that -- when you burn off-spec
22   oil, is that off-spec asphalt or off-spec fuel
23   oil?
24        A.    It's fuel oil.
25        Q.    So I take it, and you correct me
```

Page 156

```
 1   if I'm wrong, I take it that was burned
 2   separate from any burning that might have gone
 3   in to fuel the dryer?
 4        A.    That fuel oil would have been
 5   burned in the dryer.  Is that what you're
 6   asking?
 7        Q.    Well, yeah.
 8        Q.    Okay.
 9        Q.    It is.  Would you burn off-spec
10   fuel oil to get rid of it, or are you putting
11   it in the plant to burn?
12        A.    It's a fuel source.  It's not --
13   we are not disposing of it.  We are actually
14   deriving the BTUs out of it.
15        Q.    That was my question.
16        A.    And technically speaking, it's not
17   off-spec oil.
18        Q.    Okay.
19        A.    That's a mistype.  It should be
20   on-spec oil, because it's tested and certified
21   and has to follow certain EPA guidelines.
22        Q.    Okay.  What's the meaning of the
23   word off-spec?  Like why is -- why did you use
24   the word off-spec there?
25        A.    We used to call it off-spec fuel
```

Page 157

```
1   because it doesn't meet the specifications of
2   number two fuel oil, but it does meet the
3   guidelines of the federal and the Ohio EPA
4   for -- there's specifications that they
5   require.
6           (Thereupon, Plaintiffs' Exhibit
7   15, letter to Dan Crago from the United States
8   Environmental Protection Agency, was marked for
9   purposes of identification.)
10  BY MR. ROMINE:
11      Q.   Mr. Crago, have you seen Exhibit
12  15 before?
13      A.   I have.
14      Q.   And what is it?
15      A.   It was a notice letter sent to me
16  addressed to Valley Asphalt.  This is from the
17  US EPA, Region Five, out of Chicago,
18  notifying -- making me aware of the potential
19  for a Superfund alternative approach to
20  resolution.
21      Q.   Okay.  And I'm going to read the
22  re or subject line.  It says general notice
23  letter for the South Dayton Dump and Landfill
24  site in Moraine, Ohio, and potential for
25  Superfund alternative site approach.  And what
```

Page 158

```
1   is the South Dayton Dump and Landfill site,
2   Moraine, Ohio?
3       A.   My understanding, it was the
4   property that our asphalt plant was located at
5   on Dryden Road prior to our leasing the
6   property.  My understanding is it was called
7   the South Dayton Dump.
8           MR. ROMINE:  And for those of you
9   on the telephone, it's pages 000961 through
10  000976.
11  BY MR. ROMINE:
12      Q.   If I could ask you to turn to the
13  last page.  It looks like there's some pen or
14  pencil markings on the last page there.  Do you
15  see that?
16      A.   Yes, sir, I do.
17      Q.   Do you recognize that writing?
18      A.   It looks like my handwriting.  Not
19  being a handwriting expert, but I can read it,
20  so it -- I think it might be mine.
21      Q.   Did you receive this on or about
22  August 4th, 2005?
23      A.   I believe I did, yes.
24           (Thereupon, Plaintiffs' Exhibit
25  16, letter to Fred Bartman from Daniel Crago
```

Page 159

```
1   dated August 17, 2005, was marked for purposes
2   of identification.)
3           MR. ROMINE:  For those of you on
4   the telephone, Exhibit 16 is a one-page
5   document Bates stamped 000959.
6   BY MR. ROMINE:
7       Q.   Have you seen Exhibit 16 before?
8       A.   Yes, sir, I have.
9       Q.   And what is it?
10      A.   This is my response to Mr. Fred
11  Bartman with the US EPA with regard to our
12  involvement with the site at Dryden Road.
13      Q.   Okay.  So you are saying that
14  Exhibit 16 is your response to Exhibit 15?
15      A.   I believe that to be correct.  My
16  penning the letter to Fred Bartman, I'm not
17  sure why -- his name must be written within
18  this document.  I don't want to go through page
19  by page to find it, but I'm assuming that
20  statement is correct.
21      Q.   Okay.  So you are assuming, then,
22  looking at these documents -- well, let me ask
23  it this way, did you send Exhibit 16 to EPA on
24  or about August 17, 2005?
25      A.   Yes, I did.
```

Page 160

```
1       Q.   And the re, or subject line, of
2   Exhibit 16 is the August 4, 2005,
3   correspondence general notice letter for South
4   Dayton Dump.  Do you see that?
5       A.   Yes, sir.
6       Q.   That appears to refer to Exhibit
7   15, which --
8       A.   You're correct, the dates match.
9       Q.   It says general notice letter for
10  South Dayton Dump?
11      A.   That is correct.
12      Q.   Okay.  So it looks like Exhibit 16
13  is your response to the August 4th general
14  notice letter, Exhibit 15?
15      A.   That is correct.
16      Q.   Okay.  Did you send any other
17  letters specifically regarding the general
18  notice letter to EPA?
19      A.   I'm not aware of any, and I don't
20  know that I have copies of any.
21      Q.   Fair enough.
22           (Thereupon, Plaintiffs' Exhibit
23  17, letter to Valley Asphalt Corporation from
24  the United States Environmental Protection
25  Agency dated September 29, 2005, was marked for
```

Page 161

```
 1    purposes of identification.)
 2              MR. ROMINE:  Exhibit 17 has Bates
 3    stamp 931 through 936.
 4    BY MR. ROMINE:
 5         Q.   Mr. Crago, have you seen Exhibit
 6    17 before?
 7         A.   Yes, sir, I have.
 8         Q.   And what is it?
 9         A.   It's a notice from the US EPA,
10    Region Five, written to me, and they are
11    basically spelling out their steps moving
12    forward, I guess, for trying to get resolution
13    of remediation of the Dryden Road facility.
14         Q.   Of the South Dayton Dump?
15         A.   Yes, sir.
16         Q.   If you could go back to Exhibit 9.
17              MR. LEWIS:  Which one is 9?
18              MR. ROMINE:  9 is the --
19              THE WITNESS:  Bigger map.
20              MR. ROMINE:  -- bigger map that
21    you showed --
22              MR. LEWIS:  This one right here?
23              MR. ROMINE:  Yeah.
24    BY MR. ROMINE:
25         Q.   Do you have an understanding if
```

Page 162

```
 1    the South Dayton Dump existed on any part of
 2    what's shown on Exhibit 9?
 3         A.   As far as my personal
 4    understanding, I think everything within the
 5    colored boundaries is part of the dump either
 6    through solid waste or through under water --
 7    underground migration of liquids and solids and
 8    gas.
 9         Q.   When you say the colored
10    boundaries, what's that?
11         A.   I would include the river, I would
12    include the parcel and properties northwest of
13    the river as part of this investigation.  I
14    would include all the businesses.  Pretty much
15    everything shown within the borders of the map.
16         Q.   Okay.  Basically everything?
17         A.   Yes, sir.
18         Q.   How about let's limit it and not
19    talk about the site definition, but let's limit
20    it to where waste may have been dumped.
21         A.   Okay.
22         Q.   Do you know where waste was dumped
23    as part of the South Dayton Dump's business
24    operations?
25         A.   Yeah, my understanding is it
```

Page 163

```
 1    started in the -- kind of up close to our
 2    entrance to our property, that very narrow
 3    entrance that you referenced earlier.
 4         Q.   Now, you are talking about on the
 5    left -- if you look -- if we are looking at
 6    Exhibit 9 on the left side of Dryden Road close
 7    to the bridge?
 8         A.   That is correct.
 9         Q.   Okay.  Keep going.
10         A.   Then it pretty much followed a
11    south, southwest progression all the way back
12    through the lake that's shown in the bottom,
13    and then possibly even into that forested area
14    on the very lower left corner.
15         Q.   Okay.  I want to specifically ask
16    you about -- if you look at Exhibit 9, and we
17    had talked about the Valley Asphalt portion of
18    Exhibit 9, and then directly south of that you
19    can see there's a green or wooded area?
20         A.   Yes, some trees and stuff.  Yes, I
21    see that.
22         Q.   Is it your understanding that at
23    least some of the dumping part of South Dayton
24    Dump was done there?
25         A.   I personally saw it happening,
```

Page 164

```
 1    occurring.
 2         Q.   You personally saw it happening?
 3         A.   Yes, sir.
 4         Q.   What did you see?
 5         A.   I saw -- there used to be an auto
 6    salvage yard there, and I saw oil fluids
 7    leaking out, being dumped out of vehicles
 8    outside of our fence line.
 9         Q.   Is the main part of the auto
10    salvage yard identifiable on Exhibit 9 here?
11         A.   I wouldn't be able to do that.
12         Q.   Okay.  Could you get to the auto
13    salvage yard from Dryden Road or from East
14    River Road?  How would you do that?
15         A.   There used to be an access road to
16    the lake, so I'm assuming that would put you in
17    close proximity to the -- that open area too.
18         Q.   Okay.
19         A.   I think you can kind of see in the
20    middle -- right on the middle fold, you'll see
21    kind of a horizontal corridor.  I believe
22    that's an access road going back to the lake
23    and to that open field that you're referencing.
24         Q.   Okay.  I see.  Did you see any
25    other disposal -- again, south of Valley
```

Page 165

1    Asphalt property now, did you see any other
2    disposal other than the -- from the auto
3    salvage yard?
4         A.   I don't recall seeing any specific
5    disposal.
6         Q.   Do you have any understanding as
7    to whether the disposal was authorized or
8    unauthorized when you were witnessing it?
9         A.   I didn't have any understanding.
10   It was outside our property value, so -- or
11   defined area.
12        Q.   I understand.  When was that?
13        A.   That would have been maybe mid
14   1990s, '96, '98, '99.
15        Q.   Did you witness any landfill going
16   on?
17        A.   I did not see any landfill going
18   on.
19        Q.   When you started in the '90s, was
20   the portion -- or when you looked south from
21   Valley Asphalt property, was it at grade?
22        A.   Yeah, it was flat in that grade.
23   When I looked into what I'll call the auto
24   area, it was flat.  It was finished.  There
25   was, you know, no big depressions or anything.

Page 166

1         Q.   Right.  Could you tell that it had
2    been filled?
3         A.   I didn't go to inspect it for that
4    manner.
5         Q.   But could you tell that it had
6    been filled?
7         A.   No.
8         Q.   How far away was the disposal when
9    you saw the people disposing the auto parts or
10   whatever they were doing?
11        A.   It might have been as close as 30
12   feet.
13        Q.   If you go back to Exhibit 17 now,
14   the special notice letter, did Valley Asphalt
15   respond specifically to the special notice
16   letter?
17        A.   I don't show a letter referencing
18   a response directly to this response letter.
19        Q.   So as far as you know, Valley
20   Asphalt did not respond directly to the special
21   notice letter?
22        A.   That is correct.
23        Q.   And if you go to page 933, if you
24   look at the first paragraph, there's a demand,
25   it looks like, for $404,000.  Do you see that?

Page 167

1         A.   I do see that.
2         Q.   And I'm going to say between the
3    time you got this letter -- between the time
4    Valley Asphalt got this letter in 2005 to 2012,
5    did Valley Asphalt negotiate with EPA for the
6    payment of any money to EPA regarding the South
7    Dayton Dump and Landfill?
8         A.   I don't believe we negotiated any
9    direct cost or settlements to the EPA
10   financially.  We did agree to, you know,
11   certain steps that would be taken that are
12   non-monetary, but financially incurred by us,
13   Valley Asphalt.
14        Q.   Can you tell me about those
15   non-monetary steps?  Again, I want to limit the
16   time period to 2005 through 2000 -- actually,
17   let me say 2011.
18        A.   We vacated our office facilities
19   on site because of unknown concerns.  We
20   limited our warehousing on site because of
21   unknown, undiscovered concerns.  So we didn't
22   make direct payment to the federal EPA with
23   reference to the 404,000, but there's steps
24   that we took that were financially burdensome
25   to us, being Valley Asphalt.

Page 168

1         Q.   Did they have -- did anybody from
2    EPA tell you that those concerns were based on
3    vapor intrusion?
4         A.   I don't think those studies were
5    done at that point.  I think those came a
6    little bit later than that time frame you're
7    referencing.
8         Q.   And when did Valley Asphalt vacate
9    those buildings you're talking about?
10        A.   I don't have an exact date.
11        Q.   Sometime between 2005 and 2011?
12        A.   I believe that to be correct, yes.
13        Q.   If you look at page 932, up at the
14   top of the page, it talks -- it says EPA is
15   again inviting the PRPs for the site to enter
16   into our RI/FS settlement negotiations.  Do you
17   see that?
18        A.   The first full paragraph?
19        Q.   I'm sorry.  The very top of the
20   page, the run-on paragraph starting on page one
21   and then moving over to page two.
22        A.   Okay.  I see the statement EPA
23   again inviting.
24        Q.   Yeah.  And again, we will limit it
25   to the time period between 2005 and 2011.  Did

Page 169

1   Valley Asphalt enter into RI/FS settlement
2   negotiations with EPA regarding the South
3   Dayton Dump?
4          A.   I don't believe we did.  I do not
5   believe we entered any settlement with the EPA.
6          Q.   How about enter into environmental
7   negotiations?
8          A.   I don't remember any specific
9   negotiations towards settlement.
10             (Thereupon, Plaintiffs' Exhibit
11  18, letter to South Dayton Dump and Landfill
12  Site in Moraine, Ohio, from the United States
13  Environmental Protection Agency dated
14  September 10, 2012, was marked for purposes of
15  identification.)
16  BY MR. ROMINE:
17         Q.   Mr. Crago, have you seen Exhibit
18  18 before?
19         A.   Yes, sir, I have.
20         Q.   And what is Exhibit 18?
21         A.   This is a letter written by the US
22  EPA dated September 10, 2012.  It's addressed
23  to the South Dayton Dump Landfill site, general
24  notice of potential liability.  They give a
25  spill ID number of B52B, and then it's a

Page 170

1   general memo outlining concerns and, you know,
2   risks and liabilities and different legal code,
3              And then starting on page five,
4   there's a list of what's being called potential
5   responsible parties that this letter was sent
6   to.  And it continues through page ten.
7          Q.   And Valley Asphalt is listed on
8   page nine?
9          A.   Yes, sir.
10         Q.   And did Valley Asphalt receive
11  this letter on or about September 10, 2012?
12         A.   I believe we did, yes, sir.
13         Q.   And if I could ask you to turn to
14  page two of the letter.
15         A.   Okay.
16         Q.   And towards the bottom, it says
17  EPA notifies you of your potential liability
18  with regard to this matter and encourages you,
19  as a potentially responsible party, to agree to
20  reimburse EPA for costs incurred to date and to
21  voluntarily perform or finance activities that
22  EPA has determined or will determine are
23  required at the site.  Do you see that?
24         A.   Yes, sir, I see that.
25         Q.   And did Valley Asphalt agree to

Page 171

1   reimburse EPA for costs incurred up to
2   September 10, 2012?
3          A.   No.  And my recollection of the
4   verbal conversations were that we were not a
5   responsible party, and all of the documentation
6   and data that we had that showed we were not a
7   responsible party, and we asked if there was
8   additional documentation and, as such, have
9   never received anything.
10         Q.   When you say verbal conversation,
11  you talked to someone at EPA?
12         A.   Yes, US EPA.
13         Q.   And who did you talk to?
14         A.   I don't have it noted, but that's
15  been our general stance is if there's
16  information available that we are not aware of,
17  we would like to be privy to it or copied on
18  it, and we have never been given any additional
19  information.
20         Q.   If you look at the bottom of page
21  three, it mentions a Ms. Carol Ropski and
22  Mr. Thomas Nash.
23         A.   Yes, sir.
24         Q.   I'm wondering if that refreshes
25  your recollection as to somebody you might have

Page 172

1   spoken with?
2          A.   I've directly spoken to both Carol
3   and to Tom Nash over the years both directly
4   face-to-face and by phone conversation, so --
5          Q.   Okay.
6          A.   It could very well have been to
7   either or both.
8          Q.   So my question is after you got
9   this letter around September 10, 2012, your
10  testimony is that you spoke possibly either
11  with Thomas Nash or Ms. Ropski?
12         A.   That could very well be, yes.
13         Q.   Okay.
14         A.   I don't have a written document of
15  that though.
16         Q.   But I'm asking do you remember --
17  do you remember yes, I spoke with Mr. Nash in
18  September 2012, or yes, I spoke with Ms. Ropski
19  in 2012?
20         A.   Yes.  I remember speaking by
21  phone, and then we actually lined up a direct
22  meeting in Chicago with reference to this.
23         Q.   Okay.
24         A.   Marty Lewis was present at the
25  meeting.  That was --

Page 173

```
1        Q.   Do you remember when that meeting
2   was?
3        A.   Yeah, I'll have a date here.  That
4   date that Marty and I met with Tom Nash in
5   Chicago was April 9th, 2013.
6        Q.   Okay.  April 9th, 2013?
7        A.   Yes, sir.
8        Q.   Okay.
9        A.   We met with Tom Nash and Steve
10  Renninger, who is with Region Five, but I
11  believe he is based out of Cincinnati.
12       Q.   Okay.  Where did that meeting take
13  place?
14       A.   The downtown offices of the
15  federal EPA in Chicago.
16       Q.   Oh, in Chicago?
17       A.   I think verbally at that meeting I
18  actually asked for compensation for sealing and
19  capping the landfill with our paving and our
20  recycle pile half in jest, half serious,
21  because we have made a high percentage of our
22  surface area on site impervious.
23       Q.   And what was their response?
24       A.   They kind of smiled until, you
25  know, I told them I was serious, because you
```

Page 174

```
1   know, one of the resolutions to capping this is
2   an asphalt impervious layer.
3        Q.   Did they have any response other
4   than a smile?
5        A.   No.
6             (Thereupon, Plaintiffs' Exhibit
7   19, letter to Carol Ropski from Daniel Crago
8   dated September 28, 2012, was marked for
9   purposes of identification.)
10  BY MR. ROMINE:
11       Q.   Have you seen Exhibit 19 before?
12       A.   Yes, sir.
13       Q.   And what is it?
14       A.   This is a response written by me
15  to Carol Ropski with the US EPA out of Chicago,
16  and it's referencing the letter and then the
17  meeting.  It looks like it's referencing a
18  phone meeting on September 19th.
19       Q.   Okay.  So let's take it step by
20  step.  It's regarding or re South Dayton Dump
21  and Landfill site, Moraine, Ohio.  Do you see
22  that?
23       A.   Yes, sir.
24       Q.   And that's the dump we are talking
25  about basically on Exhibit 9?
```

Page 175

```
1        A.   Yes.  Yes, sir.
2        Q.   Okay.  And you write -- you began
3   I am writing on behalf of Valley Asphalt
4   Corporation in response to your letter of
5   September 10, 2012, regarding the above
6   referenced site.  And that September 10, 2012,
7   letter is what we just looked at, Exhibit 18?
8        A.   Yes, sir.
9        Q.   And then it says we have reviewed
10  this letter and also attended by phone the
11  informational meeting on this matter on
12  September 19, 2012.  Do you see that?
13       A.   I'm sorry.  Can you repeat that?
14  I was reading this one line.
15       Q.   Sure.  It's just the second
16  sentence of the letter, we have reviewed this
17  letter.  And again, I guess you are talking
18  about the September 10 letter?
19       A.   Yes, sir.
20       Q.   And also attended by phone the
21  informational meeting on this matter on
22  September 19, 2012.
23       A.   Yes.
24       Q.   So I guess you spoke on the
25  telephone with EPA on September 19?
```

Page 176

```
1        A.   Yes, sir.
2        Q.   And do you remember that telephone
3   conversation?
4        A.   Yeah, I believe it was an
5   informational conference call that they gave a
6   dial-in number, everybody dialed in, and then
7   they kind of gave a verbal rundown of their
8   letter and kind of where they were at --
9        Q.   Okay.
10       A.   -- with the process.
11       Q.   All right.  And then the second
12  paragraph, we have learned nothing to change
13  our longstanding position that Valley Asphalt
14  has no liability at the site.  Do you see that?
15       A.   Yes, sir.
16       Q.   And then it says in fact, Valley
17  Asphalt is currently incurring expenses on its
18  property due to vapor intrusion from the South
19  Dayton Dump site.  Do you see that?
20       A.   Yes, sir.
21       Q.   So -- and I think you had said a
22  few minutes ago that Valley Asphalt had to move
23  out of some buildings?
24       A.   Yeah, we did a gradual move-out
25  over several years, I would assume.
```

1      Q.   Is that the expenses you are

2  referring to in Exhibit 19?

3      A.   I believe that would be part of

4  the expenses.  I don't know that that included

5  everything.

6      Q.   Can you think of anything other

7  than that?

8      A.   There's a legal liability any time

9  you're involved with instances similar to this.

10  A lot of the projects that we bid on, they will

11  do legal background checks, and if we are

12  involved in litigation, potential litigation,

13  it may prevent us from bidding on a project.

14  It may prevent us from negotiating to be

15  awarded a project.

16          So there's a lot of intangibles

17  that I can't say, you know, it cost us $5, but

18  there could be a potential there of millions of

19  dollars.

20      Q.   Are you aware that Valley Asphalt

21  lost business as a result of EPA thinking

22  Valley Asphalt is a PRP at the South Dayton

23  Dump site?

24      A.   No, we had no business dealings

25  with the EPA.  They would have been with

1  private customers.

2      Q.   No, but I mean are you aware that

3  Valley Asphalt Corporation lost business with

4  private customers as a result of EPA

5  identifying Valley Asphalt as a PRP with

6  respect to the South Dayton Dump?

7      A.   I can't site specific projects,

8  no.

9      Q.   And I think you had talked about

10  expenses incurred moving from buildings?

11      A.   Yes, sir.

12      Q.   And then possibly intangible

13  expenses like possibly losing business.  Can

14  you think of any expenses other than those that

15  Valley Asphalt incurred as a result of the

16  South Dayton Dump site?

17      A.   I know we had the direct expenses

18  that were shown earlier when we were digging

19  and we hit the barrels.  We had direct expenses

20  there that were spelled out earlier.  We had to

21  stop that project.  So that part of that

22  project was not -- it was funded by, I believe,

23  the city, and I don't know that we completed

24  that.  So there would be non-payment, because

25  the project was never finished.  So those are

1  some of the ones that I can recollect off the

2  top of my head.

3      Q.   Can you recollect any more off the

4  top of your head?

5      A.   Nonspecific.

6      Q.   Okay.  And I think you testified

7  in April of 2013, you went to a meeting with

8  EPA in Chicago?

9      A.   Yes, sir, that is correct,

10  April 9th, 2013.

11      Q.   And what came out of that meeting?

12      A.   We met with -- Steve Renninger

13  gave a presentation on vapor mitigation, the

14  concerns.  You know, pretty lengthy, about an

15  hour long presentation on vapors and vapor

16  mitigation, after which I believe Tom Nash

17  started talking about the importance of -- and

18  he almost kind of mandated the starting of a

19  vapor mitigation process.

20          We had to name an external

21  contractor to do the vapor testing, and we had

22  to -- I think within like a ten-day window, we

23  had to name an external project manager that's

24  going to handle all of the vapor mitigation on

25  site for Valley Asphalt.

1      Q.   Were there other PRPs at that

2  meeting?

3      A.   No, sir.

4      Q.   Just Valley Asphalt?

5      A.   I believe that's correct.

6          (Thereupon, Plaintiffs' Exhibit

7  20, letter to Martin Lewis from Richard Karl

8  dated March 22, 2013, with attached unilateral

9  administrative order, was marked for purposes

10  of identification.)

11  BY MR. ROMINE:

12      Q.   Have you seen Exhibit 20 before?

13      A.   Yes, sir, I have.

14      Q.   And what is it?

15      A.   This is a letter written by the US

16  EPA, Region Five.  It's addressed to Valley

17  Asphalt, Mr. Martin Lewis, at his office in

18  Cleveland, Ohio.

19      Q.   And that's your counsel with you

20  today?

21      A.   Yeah, that is our legal

22  representation counsel.  And it's referencing

23  the South Dayton Dump and Landfill site, site

24  spill ID number, the B52B, and it's the

25  unilateral administrative order.

Page 181

1    Q.   And did you get this on or about
2  March 22, 2013?
3    A.   Yes, sir, we did.
4    Q.   And you had mentioned just a
5  couple minutes ago about a meeting you had in
6  Chicago with Mr. Nash and Ms. Ropski.
7    A.   Yes.
8        MR. LEWIS:  Mr. Renninger.
9  BY MR. ROMINE:
10   Q.   Renninger?
11   A.   Steve Renninger.
12   Q.   I'm sorry.  Thank you.  And --
13  well, you tell me.  Was the meeting in Chicago
14  designed to explain what you needed to do to
15  comply with this Exhibit 20, the order?
16   A.   I believe that's -- yeah, that was
17  correct.
18   Q.   Okay.
19   A.   We got this notice, and then
20  immediately contacted US EPA, and they said
21  that we were required to directly meet with
22  them in a very timely manner.
23   Q.   Okay.  And just could you describe
24  briefly for me what Valley Asphalt has done to
25  comply with this unilateral order that was

Page 182

1  marked as Exhibit 20?
2    A.   There was -- there was specific
3  contaminants that came out of the subslab
4  investigations, and they were being derived
5  from the landfill underneath.  We were given
6  the option of either remediating the vapors
7  that were potentially intruding, or another
8  option, which is what we chose, was to take
9  down a lot of the buildings.
10       Our concern with remediating is
11  the installation cost was high and the
12  long-term maintenance required testing every
13  six months, every year, every two years.  It
14  was an ongoing expense.
15   Q.   And so it sounds like the option
16  that Valley Asphalt chose was to take down the
17  buildings?
18   A.   All but one, that is correct.
19   Q.   Okay.  Was the Quonset hut one of
20  the old World War II era buildings?
21   A.   Yes, sir.  It has like an arched
22  roof, and it was actually -- my understanding,
23  it was deconstructed over when they built I-75,
24  reconstructed on site back in the '40s and
25  '50s.

Page 183

1    Q.   Okay.  And that was one of the
2  buildings that was, I guess, demolished as part
3  of the vapor intrusion work?
4    A.   Yes, sir.
5    Q.   Okay.  Did the buildings come down
6  before or after Valley Asphalt got the order in
7  2013?
8    A.   It was after.  I mean, do you want
9  the date of the demo?
10   Q.   Sure.
11   A.   I mean, that was November 13th of
12  2013.  So we met with them in April, and then
13  between April and November we went through all
14  the testing, verification, checking for
15  hazardous materials within the buildings
16  themselves, and had them properly removed.
17   Q.   Did Valley Asphalt vacate the
18  buildings before the unilateral order?
19   A.   Some were vacated before, some
20  were vacated after.
21   Q.   Do you happen to remember which?
22   A.   The Quonset hut office, the brick
23  office on the front, was vacated before.  The
24  main office building -- do you want me to give
25  you the number?

Page 184

1    Q.   Sure.
2        MR. LEWIS:  It's on the map with
3  the numbers, isn't it?
4        THE WITNESS:  It's on this one
5  right here.
6        MR. LEWIS:  Yeah, with the
7  numbers.
8        THE WITNESS:  The office building
9  is building number one.  And then the Quonset
10  hut office portion is part of number two.  The
11  back warehouse was still fully functional and
12  used.  Then the other buildings, building
13  number five, building number six, were still in
14  use.  Building number seven was still used as
15  storage.
16       And then there's also -- up in the
17  upper right-hand corner, there's an MP that's
18  not highlighted, that's Murphy's Plumbing.
19  That one was still also in use, and there was a
20  person operating there in 2013.
21  BY MR. ROMINE:
22   Q.   Is he still operating?
23   A.   No, we had to -- we had to take
24  out his office.  It was a very small, ten by
25  15, office.  And then at some point he vacated

Page 185

```
 1   the property.  He was -- he is actually the
 2   only tenant that we had on the whole site.
 3            He sold old, historical toilets I
 4   guess I'll call them.  They were, you know,
 5   purple and orange and, you know, ugly green,
 6   and people wanted them for restoration of old
 7   homes.  And he had a pretty good business doing
 8   it.  But that was separate from us, and it was
 9   on our property.  He was a tenant.
10       Q.   And during what period was
11   Murphy's Plumbing a tenant of yours?
12       A.   When we -- my understanding is
13   when we bought the property, he was already
14   pre-existing.
15       Q.   I see.  So he had a lease probably
16   with the Grillots?
17       A.   I believe that to be correct.
18       Q.   And when you bought the property,
19   you sort of became the landlord by inheritance
20   or whatever?
21       A.   Yes.
22       Q.   And you kept him on as a tenant?
23       A.   Yes, sir.
24       Q.   So he had been there a long time?
25       A.   Yeah, he has been there for a very
```

Page 186

```
 1   long time.
 2       Q.   But he is not there now?
 3       A.   No, sir.
 4       Q.   He had to leave in 2013?
 5       A.   That is correct.  That would be a
 6   revenue source that we lost because of the
 7   proceedings.  That would be another financial
 8   concern that we had that I couldn't remember
 9   earlier.
10       Q.   It sounds like he really didn't do
11   any plumbing services.  It sounds like he was
12   more of a -- sold goods?
13       A.   He had some inside sales, you
14   know, like the internal mechanisms to the water
15   tanks on toilets.  He sold some sinks.  He had
16   some -- I think he had some stainless sinks,
17   you know, big industrial size, so --
18       Q.   But if my sink was clogged, I
19   wouldn't call him and say come over and fix my
20   sink?
21       A.   No.  No, he's not a plumber.  He
22   has retail sales.
23       Q.   I just wanted to get an
24   understanding of what kind of business he's in.
25       A.   Okay.
```

Page 187

```
 1            (Thereupon, Plaintiffs' Exhibit
 2   21, letter to Martin Lewis from the United
 3   States Environmental Protection Agency dated
 4   July 13, 2016, was marked for purposes of
 5   identification.)
 6            MR. ROMINE:  For those of you on
 7   the telephone, Exhibit 21 is a letter from US
 8   EPA to Valley Asphalt Corporation July 1, 2016,
 9   and the Bates numbers are 001110 through 1135.
10   BY MR. ROMINE:
11       Q.   Have you seen Exhibit 21 before?
12       A.   Yes, sir, I have.
13       Q.   And what is it?
14       A.   It's a bill from the US EPA
15   directed to Valley Asphalt.
16       Q.   And it's regarding the South
17   Dayton Dump and Landfill, Moraine, Ohio?
18       A.   Yes, sir.
19       Q.   And how much is the bill for?
20       A.   It's $76,520.80.
21       Q.   And did Valley Asphalt pay US EPA
22   $76,520.80?
23       A.   We did pay the bill in full in the
24   time frame requested.
25       Q.   Has Valley Asphalt received any
```

Page 188

```
 1   bills other than Exhibit 21 from EPA regarding
 2   the South Dayton Dump and Landfill?
 3       A.   Yes, sir, we did receive an
 4   additional bill.
 5       Q.   Was that before or after this?
 6       A.   After.
 7       Q.   Did Valley Asphalt receive any
 8   bills before this July 13, 2016, letter from US
 9   EPA regarding the South Dayton Dump and
10   Landfill?
11       A.   No, sir.
12       Q.   When was the second bill?
13       A.   The second bill was on
14   November 18th, 2016.
15            MR. ROMINE:  Okay.  Have you
16   produced that?
17            MR. LEWIS:  Yeah.
18            MR. ROMINE:  You have?
19            MR. LEWIS:  I'm pretty sure I did.
20   If not, I will, but I'm almost sure I did.
21   BY MR. ROMINE:
22       Q.   How much was the second bill for?
23       A.   $20,050.37.
24       Q.   And has Valley Asphalt paid that?
25       A.   Yes, sir, we have paid that in
```

Page 189

```
 1   full in the time requested.
 2        Q.   Okay.  Other than bills, has --
 3   other than bills that you paid, Exhibit 21, and
 4   then the second bill in November of 2016, has
 5   Valley Asphalt paid EPA any money regarding the
 6   South Dayton Dump and Landfill?
 7        A.   No direct funds for the EPA.
 8        (Thereupon, Plaintiffs' Exhibit
 9   22, letter to Leslie Patterson from Martin
10   Lewis dated March 26, 2015, was marked for
11   purposes of identification.)
12        MR. EDDY:  This is Bob Eddy.  Is
13   this a convenient time for a break?  We have
14   been at it for quite a while.
15        MR. ROMINE:  Sure.  Do you want to
16   take ten minutes?
17        MR. EDDY:  Yeah, that would be
18   great.  Thanks.
19        (Recess taken.)
20   BY MR. ROMINE:
21        Q.   I think right before the break,
22   Mr. Crago, I had shown you Exhibit 22.  And my
23   question is have you seen Exhibit 22 before?
24        A.   I have.
25        Q.   And what is it?
```

Page 190

```
 1        A.   This is a letter written by
 2   Mr. Marty Lewis, our counsel, directed to
 3   Leslie Patterson with US EPA, Region Five, and
 4   it's a response to a January 16, 2015, letter
 5   from the US EPA, special notice and request for
 6   information.
 7        Q.   And was there -- well, let me ask
 8   you this, you see in the bottom of the first
 9   paragraph it talks about a January 16, 2015,
10   letter?
11        A.   Yes, sir, I see that date.
12        Q.   Okay.  And I don't have it here
13   today, but did Valley Asphalt get a letter on
14   or about January 16, 2015, from US EPA?
15        A.   I believe we have.
16        Q.   Okay.  And the letter says -- or
17   Exhibit 22 says Valley Asphalt declines to
18   reimburse US EPA for past costs at the site as
19   demanded in the letter of January 16, 2015, and
20   declines to conduct or finance a remedial
21   investigation/feasibility study at the site.
22   Do you see that?
23        A.   Yes, sir, I do.
24        Q.   And has Valley Asphalt conducted
25   or financed a remedial investigation
```

Page 191

```
 1   feasibility study at the site?
 2        A.   We have conducted, and we have
 3   financed that study.
 4        Q.   And what's the status of that?
 5        A.   That was the vapor intrusion, and
 6   we came to the conclusion it was more cost
 7   effective to take down several of our
 8   buildings, all of which were removed, and we
 9   have one remaining on site that we previously
10   discussed.
11        Q.   Okay.  And other than the vapor
12   intrusion work, though, have you done any work
13   at the South Dayton Dump site?
14        A.   We are doing normal maintenance
15   right now, wintertime maintenance:  We are
16   trying to potentially look at an upgrade on the
17   site.  So normal operations.  Nothing -- no big
18   projects associated with environmental
19   concerns.
20        Q.   How about work that the US EPA has
21   asked you to do?
22        A.   I don't believe they have directly
23   asked us to do any additional work other than
24   the vapor intrusion, and we do have to do
25   annual monitoring and reporting back to the EPA
```

Page 192

```
 1   on those results.
 2        Q.   I'd like to ask you to look at --
 3   do you see on -- I guess it's the fourth page
 4   of the document, it says response to requests
 5   for information?
 6        A.   Yes, I see it.
 7        Q.   Then if you go down to 16 L.
 8        A.   I see that.
 9        Q.   Okay.  Office waste, approximately
10   four cubic yards weekly.  Do you see that?
11        A.   Yes, I see that under -- yep.
12        Q.   Has that remained approximately
13   the same over time?
14        A.   I believe so.
15        Q.   Any more or less going back to
16   '93?
17        A.   No, I think it would be pretty
18   consistent going back through.  Under that same
19   L, the second part of that talks about the
20   recycled oil that we were consuming on site.
21   Probably in the last four to five years with
22   natural gas being at all time lows, we are not
23   using the oil anymore, we are running natural
24   gas.
25        Q.   I see.  Okay.  So because natural
```

Page 193

1   gas is cheap, you have been using natural gas
2   rather than recycled oil?
3       A.   Yes, sir.
4       Q.   That's to power the dryer?
5       A.   Yes, sir.
6       Q.   But going back before the last few
7   years, Valley Asphalt was using approximately
8   500 gallons per month of oil?
9       A.   That would be a fair number, yes.
10  It would fluctuate depending upon production.
11      Q.   And then if you turn the next
12  couple pages, there's -- it looks like we are
13  still on 16 P 3.  16 P, as in Paul, 3.
14      A.   Okay, I see it.
15      Q.   Office number one had six
16  personnel until it was shut down.  And office
17  number four has four personnel working
18  full-time.  Do you see that?
19      A.   Yes, sir.
20      Q.   Okay.  So it looks like as of now,
21  Valley Asphalt has four personnel working
22  full-time during the March to December time
23  frame?
24      A.   Yeah, that was above and beyond
25  this six and four.  Those were office staff,

Page 194

1   where plant staff are separate.
2       Q.   I see.  So it was six plus four?
3       A.   Yeah.  There was six plus four on
4   the two different offices on site.  So we had
5   ten office personnel, and then we also had an
6   additional four running the plant.
7       Q.   I see.  Okay.  So six plus four
8   plus four?
9       A.   Yes, sir.
10      Q.   And are those ten people still
11  working at the Dryden Road site?
12      A.   No, sir.
13      Q.   Those are the ones that are in
14  Enon?
15      A.   Yes, sir.
16      Q.   Okay.  Are the answers that you
17  gave here or that Valley Asphalt gave here in
18  Exhibit 22, are they true and correct to the
19  best of your knowledge?
20      A.   At the time given, they were true
21  and correct, yes, sir.
22      Q.   Is there anything that you'd like
23  to correct?  Is there anything different?
24      A.   No, I don't think there's anything
25  that has changed.

Page 195

1       Q.   Okay.  Have you ever heard of a
2   company called Doyle's Auto Salvage?
3       A.   I have not.
4       Q.   What was the name of the company
5   where you said you saw them disposing of I
6   think it was oil or something like that?
7       A.   I never knew the name.  I knew
8   there was old automobiles behind our facility
9   on somebody else's property.  I didn't know the
10  company name or I didn't really know what their
11  operations were.  I saw vehicles sitting there,
12  you know.  Like I said, some leaked, some
13  didn't.
14      Q.   Okay.  Have you ever heard of a
15  company called Pollard Trucking?
16      A.   I have not.
17      Q.   Apollo Trucking?
18      A.   I have not.
19      Q.   Dayton Recycling?
20      A.   I have not.
21      Q.   Moraine Transfer?
22      A.   I have not.
23           (Thereupon, Plaintiffs' Exhibit
24  23, letter to Valley Asphalt Corporation from
25  Richard Doran dated April 14, 1999, was marked

Page 196

1   for purposes of identification.)
2   BY MR. ROMINE:
3       Q.   Have you seen Exhibit 23 before?
4       A.   Yes, sir, I have.
5       Q.   And what is it?
6       A.   The front page is a continuation
7   request or inquiry on continuation for a pipe.
8   It's dated April 14th, 1999.  If you look at
9   page two and three, you -- it goes to an older
10  document dated September 17, 1956.  It looks
11  like some sort of drainage pipe for dewatering
12  some area on site.  I believe it would be like
13  kind of a dewatering pipe that would head
14  toward the river.
15      Q.   And is the dewatering pipe still
16  in use?
17      A.   We have pipes that are used for
18  water flow that go toward the river.  They are
19  not -- they don't look similar to this.  I
20  would say they are different.
21      Q.   So as far as you know, this -- the
22  pipe described in this permit is not in use?
23      A.   That is correct.  I don't know
24  where it is.  I've never seen it.
25      Q.   Okay.  But there are pipes that

Page 197

1  discharge into the Miami River?
2       A.   We have pipes along the berm that
3  you talked about earlier to the west of our
4  property.  We do have some, I would say,
5  six-inch pipes going through that berm for --
6  if water backed up, it would allow water to
7  flow toward the river into kind of a grassy
8  swale area.  They are not direct discharge.  We
9  do monitor those for water quality.
10      Q.   You do monitor them for water
11 quality?
12      A.   Yes, sir.
13      Q.   Do you know if it so happened that
14 the Valley Asphalt property has had water or
15 flooding such that those pipes have been in
16 use?
17      A.   Yes, we have had flow going
18 through those pipes.
19      Q.   From time to time?
20      A.   Yes, sir.
21      Q.   Are those pipes used for the
22 disposal of anything?
23      A.   No.
24           (Thereupon, Plaintiffs' Exhibit
25 24, contract between Valley Asphalt and

Page 198

1  Bowser-Morner, was marked for purposes of
2  identification.)
3           MR. ROMINE:  For those of you on the
4  telephone, this is a document Bates stamped 000026
5  through 34.
6  BY MR. ROMINE:
7       Q.   Mr. Crago, have you seen this
8  document before?
9       A.   I have seen this document.
10      Q.   And what is it?
11      A.   This is a contract between Valley
12 Asphalt and Bowser-Morner company.  They did a
13 subsurface soil investigation, and our intent
14 was when we were looking at locating a new
15 plant there in 1986, 1987, we wanted to know
16 the subsurface conditions, whether it would
17 support silos and other plant operations.
18      Q.   So this was done in connection
19 with your buying the plant in Pennsylvania?
20      A.   Yes, sir.
21      Q.   If you look at page 28, it talks
22 about the soil conditions.  And is it accurate
23 that these are the soil conditions on the
24 Valley Asphalt property in Moraine?
25      A.   Under the silo locations, yes.

Page 199

1       Q.   I see.  And it says 22.5 to 23.5
2  feet of fill composed of black cinders with
3  varying amounts of coal, sand, gravel, wood,
4  glass, steel wire, and paper.  Do you see that?
5       A.   Yes, I see that line.
6       Q.   Is that accurate?
7       A.   I did not personally see it, but
8  I'm assuming -- you know, Bowser-Morner is a
9  very reputable company.  So if they said it was
10 there, they would have taken samples with split
11 spoon technology, and I'm assuming it's
12 correct.
13      Q.   And where did that fill come from?
14      A.   I'm assuming it's part of the
15 original fill conditions at the South Dayton
16 Dump.
17      Q.   When did that fill happen?
18      A.   I would assume it predated our
19 1956 asphalt plant.
20      Q.   And you assume that because the
21 1956 asphalt plant was built on top of the
22 grade level?
23      A.   Yeah, as close to that area.  So
24 we would have had the plant or something there.
25      Q.   And if you could turn to page 31.

Page 200

1       A.   Okay.
2       Q.   It talks about methane gas.
3       A.   Okay.
4       Q.   And am I correct that this report
5  says that methane gas was discovered as part of
6  Bowser-Morner's investigation?
7       A.   Yes, it looks like part of their
8  drilling operation they incurred and actually
9  tested for some certain levels of methane gas.
10      Q.   Was the methane gas part of what
11 was addressed in the administrative order that
12 we saw a few minutes ago?
13      A.   Yes.
14      Q.   Did Valley Asphalt address the
15 methane gas issue between 1987 and 2013?
16      A.   No.
17           (Thereupon, Plaintiffs' Exhibit
18 25, Form 1: Building Physical Survey
19 Questionnaire, was marked for purposes of
20 identification.)
21           THE WITNESS:  With reference to
22 the methane gas question you just asked me, one
23 caveat to that I will say is we have done an
24 extensive amount of paving on site, which
25 would, in fact, encapsulate methane gas.  Our

Page 201

```
 1   intent I can't say was directly involved in
 2   trying to capture that, but that was a benefit
 3   in doing that.
 4   BY MR. ROMINE:
 5        Q.   Have you seen Exhibit 25 before?
 6        A.   Yes, I have.
 7        Q.   And what is it?
 8        A.   This looks like a field report,
 9   and then I think there's even more in-depth --
10   maybe some lab information that was done by
11   Conestoga-Rovers.  The inspector is Adam Loney.
12   He is an individual that I had several dealings
13   with over the -- over several years on site.
14        Q.   And did you participate in a
15   walk-through with Mr. Loney on or about
16   June 22nd, 2011?
17        A.   I don't have direct reference to
18   that, but that sounds correct.  I met with Adam
19   on site numerous times, so I don't have all of
20   our meetings on site --
21        Q.   Okay.
22        A.   -- documented.
23        Q.   All right.  If you look at the --
24   I guess maybe two-thirds of the way down the
25   very first page, it says previous uses.
```

Page 202

```
 1        A.   Okay, I see it.
 2        Q.   And does this refresh your
 3   recollection regarding Titus Construction or
 4   Dayton Recycling?
 5        A.   Yeah, Titus Construction I was
 6   clear earlier was a subcompany of ours.
 7        Q.   It was.  Okay.  I see.
 8        A.   That was the one, they had an
 9   office on the front in the Quonset hut
10   building.
11        Q.   Okay.
12        A.   I see that Ottoson Recycling
13   [sic], which is one that I think we talked
14   about earlier rehabbing the barrels.  Dayton
15   Recycling, I see it listed here, but I still
16   don't recollect who they were.
17        Q.   It also says Ohio State.  I'm
18   assuming that's the state of Ohio rather than
19   the university, but I'm not sure.
20        A.   You've got to watch those
21   Buckeyes.
22        Q.   Do you know what that refers to?
23        A.   I do not.
24        Q.   Okay.  And was Titus Construction
25   in a line of business different from the
```

Page 203

```
 1   John R. Jurgensen Construction Company?
 2        A.   It would be very similar.
 3        Q.   Very similar?
 4        A.   Yes.
 5        Q.   Why was it two different
 6   companies?
 7        A.   We purchased Titus Construction,
 8   and it's common for us to keep the pre-existing
 9   company name.  So a very small company, but
10   when we purchased them, we kept the Titus name,
11   and they operated out of the office there on
12   Dryden Road.
13        Q.   Did Titus Construction operate out
14   of the Dryden Road location before the
15   Jurgensens bought it?
16        A.   No, I do not believe so.
17        Q.   It was somewhere else?
18        A.   Yes.
19        Q.   Does Valley Asphalt have contracts
20   with the federal government for road
21   construction?
22        A.   Yes, sir, we do.
23        Q.   In addition to the state of Ohio?
24        A.   Yes.
25        Q.   And do they have -- does the
```

Page 204

```
 1   federal government have quality control
 2   requirements similar to the state of Ohio's
 3   requirements?
 4        A.   Yeah, they would be very similar.
 5        Q.   Very similar?  Do you know if they
 6   are exactly the same?
 7        A.   The type of testing methods might
 8   be exactly the same, but the frequency of
 9   testing would be different.
10        Q.   The federal government is more
11   frequent or less frequent?
12        A.   There's several branches of the
13   federal government.  One would be state
14   highway, another might be airport.  So when you
15   say federal government, we deal with a couple
16   different branches.  So I'll kind of try to
17   answer all of them at one time.
18        Q.   Sure.
19        A.   Usually the federal government is
20   a little more stringent.  They require more
21   testing, more frequency.  They require us to
22   run a test, and then they will document or
23   actually do a sister test to that.  So similar
24   tests, but more frequent.
25        Q.   And is that spelled out in the
```

Page 205

```
 1   construction contracts as to the testing
 2   procedures?
 3        A.   Yes, they are very specific.
 4        Q.   The same with the state of Ohio?
 5        A.   Yes, sir.
 6        MR. ROMINE:  I think that's all I
 7   have for right now.  We may have some
 8   follow-up, but in the interest of time, we'll
 9   turn it over to other counsel, and then if we
10   have more, we'll try and take it up at a later
11   time.  Thank you very much, Mr. Crago.
12        MR. LEWIS:  Thank you, Dave.
13   Frank, I just have a couple questions.  Do you
14   want to go first, and or me just follow up at
15   the end?  Do you want me to do it now?
16        MR. MERRILL:  Why don't you do it
17   now.
18        MR. LEWIS:  I may have some
19   follow-ups, but I only have a few direct
20   questions, and then I'll be done.
21             DIRECT EXAMINATION
22   BY MR. LEWIS:
23        Q.   Mr. Crago, Mr. Romine cited
24   Exhibit 20, which was the South Dayton Dump and
25   Landfill site unilateral administrative order.
```

Page 206

```
 1   That was the order issued by US EPA March 22nd,
 2   2013, to Valley Asphalt, correct?
 3        A.   Yes, sir.
 4        Q.   And that was the order we
 5   discussed at US EPA in that meeting I believe
 6   in April of 2013; is that correct?
 7        A.   That is correct.
 8        Q.   Is it your recollection that
 9   Valley Asphalt told US EPA that it would comply
10   with the order in full?
11        A.   Yes, our intent and our
12   discussions verbally were to, you know, comply.
13        Q.   And who have you been dealing with
14   in the implementation of that?
15        A.   Our primary contact is Steve
16   Renninger with the US EPA.
17        Q.   To your knowledge, has
18   Mr. Renninger ever given us any notice of any
19   displeasure of anything we have been doing or
20   anything Valley Asphalt has been doing?
21        A.   Yeah, Steve has personally spoken
22   to me about our response to this, and he said
23   absolutely without doubt we have responded
24   faster, more efficiently, more professionally,
25   more environmentally sound than anybody else
```

Page 207

```
 1   involved with the projects.
 2        Q.   And as part of the implementation
 3   of that order, you testified to Mr. Romine that
 4   we -- that Valley Asphalt paid the oversight
 5   cost bills that were presented to them,
 6   correct?
 7        A.   Yes, sir.
 8        Q.   As part of the implementation of
 9   the order, did Valley Asphalt have to engage a
10   consultant with the approval of US EPA?
11        A.   Yes.
12        Q.   And what consultant was engaged?
13        A.   The primary consultant was
14   Bowser-Morner located here in Dayton, Ohio.  We
15   had to -- we had to name a project manager to
16   handle the subsurface investigation and
17   remediation for the vapor intrusion.
18        Q.   And has Valley Asphalt paid all
19   their bills directly?
20        A.   Yes, sir.
21        Q.   And do you have an idea of how
22   much those bills have been to date
23   approximately?
24        A.   We're approximately $180,000
25   directly to Bowser-Morner.
```

Page 208

```
 1        Q.   For implementation of the order
 2   from US EPA, correct?
 3        A.   Yes, sir.
 4        Q.   And do you foresee that those
 5   expenses will continue?
 6        A.   Yes, they will.  Yes, they will
 7   continue.
 8        Q.   For what tasks?
 9        A.   We have to continually monitor the
10   subslab vapor intrusion system to make sure
11   it's operating properly.  So every cycle, we
12   have to go out and do interior air monitoring
13   and subslab air monitoring to prove the system
14   is working.
15        Q.   And for how long will that
16   continue?
17        A.   We were not given a date of
18   stopping it.  As long as we have a building
19   there with a slab with the system on it, we
20   have to monitor it.
21        Q.   And is Valley Asphalt's intent to
22   continue that monitoring?
23        A.   Yes, sir.
24        Q.   You mentioned the buildings.  Is
25   part of -- I don't want to be redundant, but
```

Page 209

```
 1   you did testify as part of the implementation
 2   of the order from EPA regarding vapor
 3   intrusion, a number of buildings were
 4   demolished, correct?
 5       A.   Yes, sir.
 6       Q.   And who actually did the
 7   demolition?  Did Valley Asphalt do that,
 8   Bowser-Morner, or another vendor?
 9       A.   We had to have some specific
10   materials removed before demolition.  There was
11   some material that contained asbestos and some
12   coverings that contained lead, so those had to
13   be done by independent contractors that were
14   licensed to do that.  And then once all the
15   hazardous materials were removed within the
16   building, we actually demoed it with our own
17   crews.
18       Q.   Now, a few minutes ago you
19   testified about the amount paid to
20   Bowser-Morner to implement this project.
21       A.   Yes.
22       Q.   Were there separate and additional
23   payments to those subcontractors involved with
24   the demolition or removal of asbestos, lead,
25   et cetera, prior to demolition?
```

Page 210

```
 1       A.   Yes, we had to incur additional
 2   costs both for the hazardous material removal
 3   and the building demolition material to be
 4   removed.
 5       Q.   And do you know approximately how
 6   much that was?
 7       A.   I would guess that to be $30,000.
 8       Q.   And that was in addition to the
 9   Bowser-Morner costs?
10       A.   Yes, sir.
11       Q.   And then finally, one more
12   question, Mr. Romine asked you whether the
13   order addressed methane, the order that we --
14   that Valley Asphalt has been complying with,
15   and you testified, I believe, that was one
16   component?
17       A.   Yes.
18       Q.   Were there other VOCs or elements
19   of concern which had to be addressed in the
20   vapor intrusion issue?
21       A.   Yeah, there's a list of
22   contaminants that had to be -- that were
23   initially monitored or came out in the test
24   results, and then they had to be checked over
25   time.
```

Page 211

```
 1       Q.   Methane was just one of many?
 2       A.   Methane was one.
 3            MR. LEWIS:  No further questions
 4   at this time.  I may have some follow-up, but
 5   I'm done.  Thank you very much.
 6            THE WITNESS:  Thank you.
 7            MR. MERRILL:  Can I take two
 8   minutes and switch seats, because I think it
 9   will be -- expedite the court reporter.
10            (Thereupon, an off-the-record
11   discussion was held.)
12                CROSS-EXAMINATION
13   BY MR. MERRILL:
14       Q.   My name is Frank Merrill,
15   Mr. Crago, and I'm an attorney with Bricker &
16   Eckler and representing The Dayton Power and
17   Light Company in this lawsuit.  So I'm going to
18   ask you questions similar to what Mr. Romine --
19       A.   Okay.
20       Q.   -- just asked you.  So I just want
21   to kind of follow up on a couple questions, and
22   then I have some, I guess, questions for
23   myself.
24            So you testified that your
25   background is as an engineer; is that correct?
```

Page 212

```
 1       A.   Yes, sir.
 2       Q.   And I notice on your card it
 3   indicates you are a PE.
 4       A.   Yes, sir.
 5       Q.   You are a professional engineer?
 6       A.   Yeah, I'm a professional engineer
 7   licensed in Ohio, Kentucky, and Indiana.
 8       Q.   Okay.  And is there a certain area
 9   of expertise of your engineering professional
10   licensure?
11       A.   Professional engineering now is
12   getting more specific.  At the time that I
13   actually sat for and passed my PE license, it
14   was general.  So it wasn't mechanical
15   engineering, electrical engineering, as it is
16   today.  It was actually more of a general civil
17   engineering.
18       Q.   What is -- is there an area of
19   specialty in engineering that you hold yourself
20   out to be or feel that is your area of
21   expertise?
22       A.   I have got 23 years of
23   environmental field work, designs, testing,
24   investigation, site remediation.  So a fair
25   amount of hands-on field experience on the
```

Page 213

```
 1   environmental front.
 2        Q.   So it sounds like, based on your
 3   testimony, you have had a very vast experience
 4   in the concrete and asphalt business; would
 5   that be correct?
 6        A.   That would be a fair statement.
 7        Q.   And the Jurgensen companies, or I
 8   believe Valley Asphalt -- let me step back.
 9   Can you just maybe provide me with a snapshot
10   of the corporate structure for Valley Asphalt?
11        A.   Yes.  Valley Asphalt Corporation
12   is listed as the parent company.  John R.
13   Jurgensen Company is a subsidiary of Valley
14   Asphalt.  And I call it a sister company.  And
15   then there's, you know, a few other similar
16   type organizations that fall under the same
17   umbrella as sister companies.
18        Q.   And what do they do?
19        A.   Pretty much our whole business is
20   involved in construction.  So we produce
21   aggregates, sand and gravel, limestone
22   products, and quarry and sand and gravel
23   operations.  We have hot mix asphalt plants
24   that actually take the sand and gravel, add
25   liquid asphalt to it to make hot mix.  Then we
```

Page 214

```
 1   have construction crews that do both paving and
 2   other types of construction in the field.
 3        Q.   Is it all flexible pavement?
 4        A.   No, we do concrete work, we do
 5   heavy highway construction, a lot of dirt
 6   moving, a lot of excavation.  So it's -- it has
 7   a variety of different areas.
 8        Q.   Okay.  In your experience with
 9   the -- in the concrete and asphalt business,
10   have you ever experienced use of alternative
11   raw materials in the production of concrete or
12   asphalt, something not aggregate that's mined?
13   For example, use of like slag, a byproduct?
14        A.   Yes, I have seen that used before.
15        Q.   Do you -- does Valley Asphalt use
16   any slag in their production?
17        A.   We have used slag in our
18   production.
19        Q.   And where does the slag usually
20   come from?
21        A.   Probably the largest local source
22   is Middletown Steel, AK Steel, located in
23   Middletown, Ohio.
24        Q.   And can you describe for me what
25   slag is?
```

Page 215

```
 1        A.   Slag is a byproduct of steel
 2   production.  There's two main slag definitions.
 3   One is called bottom or boiler slag, which
 4   is -- it's very heavy, very dense, almost
 5   steel-like, and it's contaminants that come out
 6   of the production of steel.  And then there's
 7   also a very lightweight slag that's -- it's a
 8   derivative of placing limestone on top of the
 9   kettle during molten making -- you know,
10   production of steel, and then, again, it's kind
11   of a contaminant coming out of the steel
12   production.
13        Q.   What about the use of fly ash or
14   bottom ash, have you ever seen that used in
15   the -- as a raw material additive for concrete
16   or asphalt?
17        A.   Fly ash I believe is used as a
18   standard in concrete today.  It's an extender
19   for the cement.  So you can reduce cement by
20   adding fly ash to concrete.  We don't use fly
21   ash in asphalt production.
22        Q.   Do you use bottom ash in concrete
23   production?
24        A.   Not ash, no.  Or in concrete?  You
25   said in concrete?
```

Page 216

```
 1        Q.   Concrete.
 2        A.   We don't produce concrete.  So
 3   when I say it's used, Valley Asphalt doesn't
 4   have a concrete plant, so we are not directly
 5   producing it.  It's more of what I have read in
 6   technical magazines and seen used in the field.
 7        Q.   So Valley Asphalt doesn't use any
 8   fly ash in the production of concrete?
 9        A.   No, sir.
10        Q.   Okay.  But through your
11   professional experience, it is used in the
12   concrete business?
13        A.   Yes, sir.
14        Q.   You mentioned at the Valley
15   Asphalt plant number six on Dryden Road, kind
16   of the facility in question --
17        A.   Uh-huh.
18        Q.   -- you have aggregate piles?
19        A.   Yes, sir.
20        Q.   And what actually is in those
21   aggregate piles?
22        A.   The aggregate will be brought to
23   site in different sizes.  So you'll have very
24   fine sand.  That could either be limestone or
25   natural sand.  Then you'll have a larger size
```

Page 217

1  stone.  It might be called like a number eight
2  size stone.  And these are meshes that they are
3  measured on.  And then you might have a number
4  57 size stone, which is getting up to maybe an
5  inch and a half in size.  And then occasionally
6  you'll bring in even a larger stone, it might
7  be two to two and a half inches in diameter.
8  It's called a number four size stone.
9        Q.    And the aggregate that's used at
10 plant number six, does all of that aggregate
11 come from the Valley Asphalt mining operations?
12       A.    No, very little does actually at
13 that site.
14       Q.    But the Valley Asphalt family, the
15 larger family we talked about earlier --
16       A.    Yes.
17       Q.    -- you do have mining -- aggregate
18 mining operations within that umbrella; is that
19 correct?
20       A.    Yes, sir.
21       Q.    But the aggregate that you're
22 using at plant number six, not a lot of it is
23 coming from a business that is owned or
24 controlled by Valley Asphalt; is that correct?
25       A.    That's correct, most of the local

Page 218

1  sources to that plant Are external to us.
2        Q.    And where do you get most of your
3  aggregate for that plant?
4        A.    One large vendor is Martin
5  Marietta in Phillipsburg, Ohio.  It's a little
6  bit northwest of Dayton, kind of directly west
7  of the Dayton Airport.  It's a limestone
8  operation, very good quality.  We use that in a
9  lot of our work.  Sand and gravel, again,
10 Martin Marietta has some facilities in and
11 around the Dayton area where we bring sand and
12 gravel into Dryden Road.
13       Q.    Do you ever test the sand and
14 gravel prior to acceptance?
15       A.    Yes, all of it.
16       Q.    And what type of tests do you run?
17       A.    We usually run gradations,
18 specific gravity absorption, typical quality
19 tests.
20       Q.    Any chemical tests on the
21 material?
22       A.    Not usually.
23       Q.    Let's talk, then, a little bit
24 about -- I think it's called RAP?
25       A.    Yes.

Page 219

1        Q.    The recycled asphalt?
2        A.    Pavement.
3        Q.    Pavement?
4        A.    Yes.
5        Q.    What's the typical source for the
6  RAP that's used at plant six?
7        A.    At Dryden Road, it would come from
8  close proximity paving projects where they are
9  removing asphalt pavement.  So it would be a
10 certain window or a certain area around the
11 plant that's in close proximity.
12       Q.    But not necessarily a Valley
13 Asphalt controlled project?
14       A.    No.  And it may not even be our
15 original asphalt.  There's numerous asphalt
16 production companies that we don't own and we
17 are not involved with that they might have
18 paved a road 15 years ago, and it gets removed
19 and brought back to us.
20       Q.    Do you run any chemical tests on
21 the RAP that you receive?
22       A.    No, we do not run chemical tests
23 on the RAP.  We run gradations and we run
24 extractions so we know the size and the liquid
25 asphalt content.

Page 220

1        Q.    Do you ever run any tests on the
2  RAP piles at plant six for polyaromatic
3  hydrocarbons?
4        A.    We have not.
5        Q.    You have not?
6        A.    No.
7        Q.    Have you ever run any soil tests
8  at plant six that include polyaromatic
9  hydrocarbons?
10       A.    The subsurface investigation was
11 done by Bowser-Morner for our footers for our
12 plant.  There was quite a few tests listed
13 there.  I don't know for sure if they had the
14 PAH run on those.  The subslab investigation
15 was done in accordance with the federal EPA in
16 2012, 2013.  There's an extensive amount of,
17 you know, testing done there.
18             So I don't know that I could
19 directly answer, you know, what specific tests
20 and what they showed, but I'm assuming those
21 would have had that.
22       Q.    In your experience as a
23 professional engineer in the asphalt business,
24 is it your opinion that PAH is -- polyaromatic
25 hydrocarbons are a common constituent of

Page 221

1 asphalt?

2 A. They are a component, yes. I

3 mean, I would say maybe a small component.

4 Q. Have you ever testified as an

5 expert witness?

6 A. Yes.

7 Q. And how many times?

8 A. I would say maybe two.

9 Q. Can you give me a summary of the

10 cases -- those two cases?

11 A. The first case I referenced

12 earlier was -- it was a case where concrete was

13 placed on a residential complex, the garage was

14 built, elevations were wrong, concrete was

15 poured poorly, and I was brought in as an

16 expert witness as far as the material sourcing

17 and actually the geometry of the placement of

18 the driveway. So it just wasn't placed

19 properly.

20 Q. What was the area of expertise

21 that you were qualified to render an opinion?

22 A. Material testing and understanding

23 basic geometry, according to the judge.

24 Q. And where was this case?

25 A. Cincinnati.

Page 222

1 Q. Do you recall if it was in

2 Municipal Court or Common Pleas?

3 A. It was -- I don't know that I

4 could distinguish between the two. Sorry.

5 Q. Fair enough.

6 A. It was downtown Cincinnati.

7 Q. Do you remember the case name?

8 A. No. It was Sherry Moore, she was

9 the homeowner, versus the concrete company,

10 construction company, that placed the concrete.

11 Q. And who did you testify for?

12 A. Sherry Moore.

13 Q. The plaintiff in the case?

14 A. Yes.

15 Q. And the second case where you were

16 qualified as an expert witness?

17 A. I have been used usually for --

18 when we are expanding operations, we might be

19 buying new property, we have had court cases

20 where I've been brought in to testify on

21 asphalt production. And usually I'm dealing

22 with either the EPA or local zoning, and I'm

23 speaking on behalf of emissions from an asphalt

24 plant, both air, water, storm water runoff.

25 Q. Do you recall how many times

Page 223

1 you've testified as an expert witness in that

2 regard?

3 A. Most of them are public hearings,

4 so when you say testified, I don't know the

5 legality of it. I was at an official public

6 hearing and, you know, I don't know where the

7 legality of -- I wasn't in a court setting, but

8 I was in a legal hearing testifying on behalf

9 of the asphalt plants.

10 Q. You were testifying on behalf of

11 Valley Asphalt --

12 A. Yes.

13 Q. -- or a company?

14 A. Valley Asphalt typically, yes.

15 Q. Let's look at Exhibit 5.

16 A. Okay.

17 MR. LEWIS: Is that the big map?

18 MR. MERRILL: The big map.

19 THE WITNESS: I have it right

20 here. Okay. I have Exhibit 5 in front of me.

21 MR. MERRILL: For the folks on the

22 phone, Exhibit 5 is a Bowser-Morner site map

23 approximate boundary of Valley Asphalt site,

24 more than likely dated around 2012.

25 BY MR. MERRILL:

Page 224

1 Q. And Mr. Crago --

2 MR. EDDY: I'm sorry. I don't

3 mean to interrupt, Frank. I thought you were

4 done. I was just going to ask you to repeat

5 the number on that again.

6 MR. MERRILL: It's Exhibit 5.

7 There's no Bates stamp number on it. It was

8 provided by counsel for Valley Asphalt prior to

9 the deposition to assist in the deposition.

10 MR. EDDY: Very good.

11 MR. MERRILL: But it's essentially

12 an aerial map of the South Dayton Dump area,

13 including the Valley Asphalt facility.

14 BY MR. MERRILL:

15 Q. And Mr. Crago, I believe you

16 testified earlier that the area within the

17 yellow highlighted area is the Valley Asphalt

18 property; is that correct?

19 A. I believe so, that is correct.

20 Q. Can you identify on Exhibit 5

21 approximately where the Quonset hut is located

22 or was located?

23 A. Yes. It's building number two.

24 It's highlighted in pink.

25 Q. And is that also the location or

Page 225

```
 1   former location for Ottoson Solvents?
 2        A.   My understanding is yes.
 3        Q.   Could you identify on Exhibit 5
 4   where the drums were uncovered in 2000 during
 5   the waterline excavation?
 6        A.   Yes.  Do you see building number
 7   one?
 8        Q.   Yes.
 9        A.   That's our old office building.
10   We were bringing the waterline to that.  So
11   there's a line kind of extending to the back of
12   that building number one, and that almost looks
13   like the line that we were digging.  And I
14   would say approximately 30 to 40 feet straight
15   south of building number one is where we hit
16   the barrels.
17        Q.   Could you mark an X on Exhibit 5
18   where the approximate location of those -- that
19   barrel excavation occurred?
20        A.   I marked an X in blue, and I
21   circled it.  Do you want me to put barrels?
22        Q.   Yeah, if you could.
23        A.   Okay.
24        Q.   Let me ask you some questions
25   about this 2000 barrel excavation.  Valley
```

Page 226

```
 1   Asphalt was in the process of extending a
 2   potable waterline to the office building; is
 3   that correct?
 4        A.   I believe that is correct.  It was
 5   either a sanitary line or a potable line.  I
 6   don't know which.
 7        Q.   Prior to 2000, where did the
 8   potable water come from for the Valley Asphalt
 9   site?
10        A.   They were -- for drinking water,
11   they were using five-gallon, you know, jugs in
12   the office area.
13        Q.   What about sanitary sewer?
14        A.   Sanitary sewer, my understanding
15   is that was on a well.
16        Q.   Okay.  So when they -- the sewage
17   would go into a well or a septic system?
18        A.   No.  No, the water coming in for
19   the toilets and the sinks came from the well.
20        Q.   There was a well on site?
21        A.   Yes.
22        Q.   Okay.  And then where was the
23   sewage discharged?
24        A.   I don't know.
25        Q.   Was there a septic system on site?
```

Page 227

```
 1        A.   I don't know.  I don't know if
 2   there's -- if there's a sanitary sewer tied to
 3   the city or not.
 4        Q.   Currently how does Valley Asphalt
 5   receive potable water for plant number six?
 6        A.   When you say potable, I'm assuming
 7   you mean drinking water.
 8        Q.   Drinking water, that's correct.
 9        A.   Five-gallon jugs.
10        Q.   Are there toilet facilities on
11   site?
12        A.   I believe there is a toilet
13   facility inside the control building.
14        Q.   And where does it discharge to?
15        A.   I don't know.  My understanding is
16   it is tied to the city lines, but I do not have
17   documentation as such.
18        Q.   So you believe that there's a city
19   sewer line somewhere in that vicinity of the
20   plant number six?
21        A.   Yes.
22             (Thereupon, Deposition Exhibit 26,
23   Environmental Remediation Report at Valley
24   Asphalt prepared by David M. Scardino dated
25   September 5th, 2000, was marked for purposes of
```

Page 228

```
 1   identification.)
 2             MR. MERRILL:  I have handed the
 3   witness what has been marked Deposition Exhibit
 4   26.  We are just going to keep the numerical order
 5   of exhibits.  And it's a document titled
 6   Environmental Remediation Report at Valley
 7   Asphalt, Dryden Road, prepared for Valley Asphalt
 8   by David Scardino at TCA Environmental.  It's
 9   dated September 5th, 2000.
10   BY MR. MERRILL:
11        Q.   Mr. Crago, have you seen this
12   document before?
13        A.   Yes, I have.
14        Q.   And can you explain for us what
15   this document is?
16        A.   This is kind of all the testing
17   and the steps that were taken with the barrels
18   that were discovered during our trenching
19   operations.  Mr. Scardino was working directly
20   with the EPA.  He developed a remediation plan
21   to dispose of the barrels and to seal up the
22   trench.
23        Q.   Did Mr. Scardino take any soil
24   samples as part of this investigation?
25        A.   Yeah, I believe there's soil --
```

1  solid samples referenced within this document.

2      Q.  Do you recall if the soil samples

3  indicated contamination of VOCs in excess of

4  regulatory limits?

5      A.  I don't know that the -- they are

6  volatile.  The samples that were taken were

7  solid soils and then liquids.  And I know under

8  the testing for those, on this one page here,

9  they are showing 75,000 parts under PCB 1254.

10       There's an extensive amount of

11  test data here with different contaminants.

12  But I can't say that they were tested as

13  volatiles.  My understanding is they would be a

14  chemical test, not a volatile test.

15      Q.  Unfortunately this document is

16  not -- the pages aren't numbered.  But I'm

17  going to show you a page --

18      A.  Okay.

19      Q.  -- volatile organic analysis, and

20  maybe that will refresh your memory.  It looks

21  like there's a detection of trichloroethene?

22      A.  Okay.

23      Q.  What is that, 50 --

24      A.  59.

25      Q.  59.  And those are parts per

1  billion?

2      A.  Per kilogram.  That's -- it's a

3  fractional part of grams per kilogram.

4      Q.  Okay.

5      A.  I think it's ten to the negative

6  nine.

7      Q.  And ethyl benzene, toluene?

8      A.  Yes.

9      Q.  Xylene?

10      A.  Yes, sir.

11      Q.  So, I mean, is it -- I'll let you

12  have as much time as you want with the

13  document, but I guess what I'm trying to get on

14  the record is that the investigation indicated

15  through the analysis, the soil analysis, that

16  VOCs and PCBs were detected at this barrel

17  trench area.

18      A.  I would agree with that.

19      Q.  And, in fact, didn't some of the

20  soils have to be manifested off site as

21  hazardous waste?

22      A.  Yes, sir, there was soils,

23  barrels, liquids.

24      Q.  And does Valley Asphalt own the

25  property where this barrel excavation occurred?

1      A.  We currently own it today, yes.

2      MR. EDDY:  I did not hear the

3  witness's response to that.

4      THE WITNESS:  We do own the

5  property where the barrels were extracted,

6  Valley Asphalt.

7      MR. EDDY:  Thank you.

8  BY MR. MERRILL:

9      Q.  This report was prepared by TCA

10  Environmental?

11      A.  Yes, sir.

12      Q.  Do you know, do you still use TCA

13  Environmental?

14      A.  We haven't used them, I don't

15  think, you know, beyond this report, or this

16  investigation.

17      Q.  When is the last time you've

18  talked with David Scardino?

19      A.  I dealt with David on two

20  projects.  This was one, and we did one other

21  about the same time frame down in Cincinnati.

22  It was a tank removal.  So I'll bet I haven't

23  talked to David in, I don't know, ten

24  years maybe.

25      Q.  Do you know if David is still

1  around?

2      A.  I don't.  He was local at one

3  point, but I -- I haven't gone trying to find

4  him recently.

5      Q.  Do you know if TCA Environmental

6  is still in business?

7      A.  I don't know.

8      Q.  So this document that has been

9  identified as Exhibit 26, is this a document

10  that's a business record for Valley Asphalt

11  that's kept in the normal, ordinary course of

12  business?

13      A.  This would be, but this was a

14  document that I was not able to locate.  I knew

15  it was taken at one time.  I knew it was

16  available at one time, because David handled

17  this project turnkey for us.  So we said EPA

18  is, you know, requesting specific steps, you

19  know, go through those steps for them, handle

20  everything properly.  That's when he created

21  this document.  I never had this within my

22  records, and then it was produced -- it was

23  given to me recently.

24      Q.  Let me ask you a couple other

25  questions regarding the barrel excavation.

Page 233

1 After the barrels were discovered, you
2 indicated that, you know, it was all hands on
3 deck. You had Ohio EPA there, the fire
4 department, the police department, and everyone
5 else, it looks like all the first responders;
6 is that correct?
7     A. And the news crew.
8     Q. And the news crew.
9     A. Uh-huh.
10     Q. After David Scardino and TCA
11 generated this report, what happened next with
12 respect to the barrel site, as in responses,
13 reactions from Ohio EPA or US EPA?
14     A. The issue was closed. The
15 excavation site was filled properly with inert
16 materials, the report was filed, the hazardous
17 material was disposed of off site properly, and
18 my understanding was that it was a done deal,
19 you know, finished, completed.
20     Q. Is that your understanding now?
21     A. Yes.
22     Q. Have you had any conversations
23 with Ohio EPA or US EPA regarding this barrel
24 excavation since this report in 2000?
25     A. I don't believe I've had any

Page 234

1 direct conversations with them. The barrels,
2 you know, are -- you know, the location is
3 talked about occasionally. There was one
4 instance where -- and I can give you the
5 date -- the Ohio EPA came on site with I
6 believe Conestoga-Rover, were interested in
7 trying to locate the barrel location, were
8 doing a bunch of studies.
9     So I went out, and I said right
10 here is where the barrels -- where we hit them.
11 They did a dig there. I think they dug in four
12 locations, one of which is exactly where I told
13 them. They located one barrel at about a depth
14 of, I'd say, 25 to 30 feet. They extracted it
15 and tested it and filled it, filled the site
16 back in.
17     Q. And approximately when was that?
18     A. I show that 10-8 of '08.
19     Q. 2008?
20     A. Yes, sir.
21     Q. Have you ever had a meeting or do
22 you know a guy named Matt Justice with Ohio
23 EPA?
24     A. It sounds familiar, but I don't
25 recall who he is.

Page 235

1     Q. Is it your understanding that
2 there are no barrels left on the Valley Asphalt
3 property, that they have all been removed?
4     A. I don't know that they have all
5 been removed. We ran into a portion of them,
6 and what we exposed we pulled out and removed.
7 I don't know if there's others in that
8 proximity. I know there's been extensive
9 studies by the federal EPA, the Ohio EPA, and
10 Conestoga-Rover with ground penetrating radar
11 trying to locate solid objects underground.
12     Q. And what was the result of that
13 ground penetrating radar analysis?
14     A. I was never given the results.
15 That was done by the PRP group, and we were --
16 even though we were participating to the extent
17 that we would let them come on our property and
18 test, we were never given the results. So I
19 don't know what they found or didn't find.
20     Q. You mentioned this meeting you had
21 with US EPA in Chicago. Was it 2012?
22     A. Yes.
23     Q. Tell me a little bit about that
24 meeting. Why did you go to that meeting?
25     A. I think we were contacted in

Page 236

1 writing legally, and Steve Renninger said that
2 we have to have a direct immediate meeting. He
3 said within the next week time frame we need to
4 sit down face to face. I said that's fine with
5 us. I contacted Marty Lewis. I said they are
6 requesting a direct, face-to-face meeting.
7     And at that point, we were
8 notified by -- from Steve Renninger that they
9 wanted the meeting in Chicago at EPA, US EPA,
10 Region Five's, main office.
11     Q. What was the problem? I'm sorry
12 to interrupt.
13     A. I guess from a legal point of
14 view, I think they wanted to know where our
15 stance was, because I think in writing and
16 letters we were taking the stance that we
17 weren't really directly involved. We have
18 never disposed of any waste in the landfill.
19 We have never disposed of any waste on our
20 property. And we wanted to participate with
21 the remediation, but we didn't want to be
22 brought into a large group of people that had
23 deposited hazardous materials into the
24 landfill.
25     Q. But I guess my question is more

Page 237

```
 1   direct in that what was the environmental issue
 2   that concerned US EPA to contact you and say
 3   you need to come to Chicago and meet?  What's
 4   the environmental issue that was causing the
 5   concern?
 6             THE WITNESS:  What was the legal
 7   document that --
 8             MR. LEWIS:  I can't really
 9   testify.
10             THE WITNESS:  Oh.
11             MR. LEWIS:  To the best of your
12   knowledge.
13   BY MR. MERRILL:
14        Q.   I'm not asking you about the legal
15   document.  I want to know what's the
16   environmental issue?  Was it air emissions, or
17   was it, you know, a leaking underground storage
18   tank?  What was the environmental issue?
19        A.   I think there was issues with the
20   subsurface gases.  I think there was concern
21   for health and safety, immediate health and
22   safety, from propane and methane, and other
23   immediate safety issues.
24             That's why when we went to the
25   EPA, the first order was that Steve Renninger
```

Page 238

```
 1   gave a one-hour presentation on subslab
 2   distribution of gases.
 3        Q.   What did -- what did Steve tell
 4   you with respect to the source of the methane,
 5   the VOCs, the TCE, whatever it was that was
 6   causing this problem?
 7        A.   South Dayton Dump.
 8        Q.   The South Dayton Dump?
 9        A.   Yes.
10        Q.   And did he describe like where the
11   South Dayton Dump or what was in the South
12   Dayton Dump that was causing it?
13        A.   I think part of his presentation
14   to us was a short history of, you know, when,
15   you know, it was originally a sand and gravel
16   operation, it created a big hole in the ground.
17   It was filled over the years with different
18   waste products, and then it was, you know,
19   brought up to level and then developed.  So he
20   kind of gave, I think, a snapshot view of the
21   history of the site, and of such they said that
22   there's waste underneath.
23        Q.   And did he say that there's waste
24   underneath the Valley Asphalt property?
25        A.   Yes.
```

Page 239

```
 1        Q.   And that's part of the South
 2   Dayton Dump in US EPA's mind; is that correct?
 3        A.   I believe so, yes.
 4        Q.   And so since you've got buildings
 5   on top of the former South Dayton Dump, it
 6   created -- it creates vapors that build up in
 7   your buildings, and that's -- that was alarming
 8   to US EPA; is that the basis of it?
 9        A.   Yes, that's a fair statement.
10        Q.   Was there any other discussion
11   about the barrels from Ottoson Solvents being
12   located right underneath your office building
13   and perhaps causing a problem?
14        A.   The barrels were never directly
15   addressed.  It was the vapor.  There was
16   mention of long-term remediation of the water
17   underneath the site.  The first step is the
18   immediate concern, health and safety of vapors,
19   because those are close to the surface.  Those
20   can penetrate into a building.
21             The federal EPA's long-term stance
22   is fix the vapor issue, then the water issue
23   will be next.
24        Q.   Was there any discussion at this
25   US EPA meeting of any disagreement with Ohio
```

Page 240

```
 1   EPA on the investigation of barrels underneath
 2   the Valley Asphalt property?
 3        A.   I'm not aware of any discussions
 4   between the Ohio EPA and the federal EPA.
 5        Q.   So you have never heard of that
 6   issue?
 7        A.   No.
 8        Q.   You mentioned you are the head of
 9   environmental compliance, is that right, for
10   Valley Asphalt?
11        A.   For all the corporations, yes.
12        Q.   For all the corporations?  Are you
13   familiar with a regulation in Ohio called --
14   it's commonly called Rule 13?
15        A.   Yes, I've heard of it.
16        Q.   And am I correct that Rule 13
17   basically says you can't build or excavate on
18   top of a closed landfill?
19        A.   That is correct.
20        Q.   Did you -- did Valley Asphalt ever
21   approach Ohio EPA and try to build silos on the
22   Valley Asphalt property, and Ohio EPA pushed
23   back and said you have to go through a Rule 13
24   authorization?
25        A.   We have had discussions with them
```

Page 241

1    directly pertaining to Rule 13 construction.
2         Q.   Did you build the silos on the
3    Valley Asphalt property?
4         A.   Yes, silos were built.  There's
5    existing silos, yes.
6         Q.   When were they built?
7         A.   The Bowser-Morner report is
8    September 29th, 1987.  So I want to say in
9    close proximity to that.  1987 plus or minus a
10   year maybe, six months plus or minus.
11        Q.   Did you get a Rule 13
12   authorization from Ohio EPA to build the silos?
13        A.   I have not seen that document
14   pertaining to that time frame in 1987 or '86.
15             (Thereupon, Deposition Exhibit 27,
16   memo from Matt Justice to Karen Cibulskis dated
17   January 24, 2006, was marked for purposes of
18   identification.)
19             MR. MERRILL:  I have handed the
20   witness what has been identified as Deposition
21   Exhibit 27.  It's a memo from Matt Justice to
22   Karen Cibulskis at US EPA, Matt Justice being the
23   site coordinator for Ohio EPA.  It's regarding the
24   South Dayton Dump, Valley Asphalt reconnaissance
25   brief dated January 24, 2006.  It has a Bates

Page 242

1    number of Ohio EPA-PRR-005572.
2    BY MR. MERRILL:
3         Q.   And Mr. Crago, have you ever seen
4    this document?
5         A.   I believe I have seen this
6    document.
7         Q.   And in the document, it mentions
8    that Matt Justice and Dale Farmer of Ohio EPA
9    visited Valley Asphalt on January the 20th,
10   2006.  Do you see that in the middle of the
11   document where it talks about sewer excavation
12   location?
13        A.   Yes, I see that sentence.
14        Q.   It says that the approximate
15   location of the excavation was identified using
16   the following sources, the photographs and
17   location sketch and the TCA report, which we
18   just discussed as Exhibit 26, Montgomery County
19   aerial photograph from 2000, interviews with
20   Valley Asphalt employees, including Hutch
21   Rogge.  Do you know who Hutch Rogge is?
22        A.   Yeah, Hutch Rogge is a project
23   superintendent for John R. Jurgensen Company.
24   He's still currently employed.
25        Q.   Is he located at plant six?

Page 243

1         A.   He is not.
2         Q.   Where is his business location?
3         A.   His office is in Enon, Ohio.  He
4    was -- I think under previous questions, they
5    were asked where did the office help go.  They
6    were relocated to Enon, and Hutch would have
7    been one of the people that got relocated.
8         Q.   So it indicates that Valley
9    Asphalt wells, it says the TCA reports stated
10   that two wells were present at Valley Asphalt
11   at the time of the sewer excavation, a drinking
12   water well and a production well.
13        A.   Uh-huh.
14        Q.   Do you see that?
15        A.   Yes, sir.
16        Q.   What's the purpose for the
17   production well?
18        A.   There's a high flow well on site
19   that we will use to fill I'll call them tanker
20   trucks, like big water trucks.  Sometimes we
21   can use them to water the roads on site if it's
22   very dusty.  We also use the front end loader
23   with our small pit in the back to water our
24   roads, just depending on availability of either
25   the pieces of equipment.  And then that water

Page 244

1    in a large construction truck could be used for
2    other construction aspects.
3         Q.   Is that production well still
4    there?
5         A.   I believe it is, yes.
6         Q.   This memo also mentions a drinking
7    water well.
8         A.   Yes.
9         Q.   Does that refresh your
10   recollection of whether there's a drinking
11   water well there on the property?
12        A.   I've never seen a drinking well on
13   site.  I know the water that came to the
14   offices, the water that goes to the plant, is
15   non-potable.  Since my employment at Valley
16   Asphalt, it was always a -- you know, water
17   that comes in is used for the toilets only,
18   don't drink it.  And then there was potable
19   water in the offices and control buildings and
20   test lab and everything else.
21        Q.   Do you have any groundwater
22   monitoring wells on site?
23        A.   I believe there are monitoring
24   wells that were installed and are being
25   monitored by Conestoga-Rovers.

Page 245

1    Q.    Were you provided with the results
2  of those monitoring wells?
3    A.    I've seen some results over the
4  years, but it's not consistent, and they are
5  there for their testing, so I normally don't
6  see those results.
7    Q.    They don't routinely provide them
8  to you as a courtesy?
9    A.    I don't know how often they test
10  them, so if I get a report once every four or
11  five years, I don't know if that's all the
12  reports or if that's the only time they test.
13  So I've seen some reports, but I don't know if
14  it's one report in ten or I have gotten every
15  report.  I don't know their frequency of
16  testing, but I have received some reports.
17    MR. MERRILL:  I don't believe we
18  received any groundwater monitoring data in our
19  requests for documents, so to the extent that
20  they do exist, I'd like to see them.
21    MR. LEWIS:  Yeah.  Yeah.
22  BY MR. MERRILL:
23    Q.    Do you recall if there have been
24  any detections in those groundwater monitoring
25  wells?

Page 246

1    A.    I don't recall.  I'm not sure what
2  the test results have shown.
3    Q.    Do you know what they are testing
4  for?
5    A.    I don't.
6    Q.    You had mentioned in previous
7  testimony regarding all the steps that Valley
8  Asphalt has to do to comply with US EPA's vapor
9  monitoring.
10    A.    Yes.
11    Q.    And you generically mentioned
12  monitoring.  So my question is what type of
13  monitoring are you doing?
14    A.    It's vapor monitoring only.
15    Q.    And when you say vapor monitoring,
16  is that putting like canisters in the ground
17  and collecting vapors?
18    A.    Yes.  We have -- we have only left
19  one building on site.  All the other buildings
20  that were removed are obviously not tested.
21  The one building on site that we do test is the
22  control building for the plant.  In the
23  basement of that plant, they have drilled
24  through the concrete and actually installed a
25  collection spigot.  It's kept closed at all

Page 247

1  times.  But whenever we have to do a test, they
2  will come in and collect it in a canister as
3  you are describing.
4    Q.    So that's the only sampling port
5  on the Valley Asphalt property for vapor
6  testing?
7    A.    That's the only site that we test.
8  Conestoga-Rovers does a lot of different tests,
9  and I'm not privy to what they are looking for
10  or what they are testing.  I know they have
11  wells.  I thought they were pulling liquid out
12  of them, but I don't know.  I don't know if
13  they are testing vapor or if they are testing
14  liquid underneath.
15    Q.    What does the latest vapor testing
16  show in that building?
17    A.    The tests are very clear.  They
18  show that our vapor mitigation system is
19  functioning properly.  It's preventing any
20  vapors from building up under the slab.
21    Q.    What type of -- what's the vapor
22  mitigation system that you have installed in
23  that building?
24    A.    As far as a description, it's --
25  basically it looks like a radon mitigation

Page 248

1  system where you have an eight-inch PVC pipe,
2  drill an eight-inch hole in the floor, the pipe
3  is inserted, goes down through the floor into
4  the subslab, it's sealed.  And then the pipe
5  comes up, goes through the sidewall, and goes
6  up above the building, and then there's a fan
7  system that prevents any vapors from
8  accumulating under the slab.
9    (Thereupon, Deposition Exhibit 28,
10  phone conversation record dated June 12, 2012,
11  was marked for purposes of identification.)
12  BY MR. MERRILL:
13    Q.    Let me know when you're ready,
14  Mr. Crago.
15    A.    Okay.
16    Q.    Have you ever seen that document
17  before?
18    A.    I have not.
19    MR. MERRILL:  I have handed the
20  witness what has been marked Deposition Exhibit
21  28, which is an interoffice phone conversation
22  record from Ohio EPA, Laura Marshall, regarding
23  a conversation that she had with David Scardino
24  at TCA Environmental and Karen Cibulskis at US
25  EPA on June 12, 2012, subject South Dayton Dump

Page 249

```
 1   and Landfill site, methane mitigation work plan
 2   for Valley Asphalt building number two, drums
 3   found in 2000 sewer line excavation at Valley
 4   Asphalt.
 5   BY MR. MERRILL:
 6        Q.  It indicates that Mr. Scardino
 7   called Ohio EPA and US EPA to get guidance on
 8   the mitigation work plan required for the
 9   explosive gas, methane, exceedances under the
10   slab at Valley Asphalt building two, which is
11   also known as the Quonset hut building/Ottoson
12   Solvents building.  Do you see that?
13        A.  Yes, I see that.
14        Q.  Was Mr. Scardino calling on behalf
15   of himself, or was he calling on behalf of
16   Valley Asphalt?
17        A.  Himself.
18        Q.  So you didn't authorize
19   Mr. Scardino to reach out to Ohio EPA and US
20   EPA to get guidance in 2012 on this mitigation
21   plan?
22        A.  No.  I didn't -- I was not aware
23   he was conversing with them, so -- as
24   previously stated, I hadn't spoken to him in
25   quite a long time.
```

Page 250

```
 1        Q.  So it's probably surprising that
 2   he reached out in 2012 to Ohio EPA and US EPA
 3   to talk about this without talking to you about
 4   it?
 5        A.  Yes, it's news to me.  I wasn't
 6   aware of it.
 7        Q.  In number two, it indicates
 8   Mr. Scardino said that he was also the
 9   consultant for Valley Asphalt when drums were
10   unearthed during the sewer line excavation in
11   May 2000.  It says he said that the area behind
12   the Valley Asphalt office building, building
13   one, is a, quote, unquote, honeycomb of barrels
14   from Ottoson Solvents.  Do you see that?
15        A.  Yes, I see that.
16        Q.  Do you have any reason to believe
17   that Mr. Scardino is not correct in his
18   characterization of honeycomb of barrels near
19   building one?
20        A.  No, I think that would be
21   consistent with the trench that we were
22   digging, and we struck barrels in that area, so
23   that statement is consistent with what we have
24   actually seen.
25        Q.  But you -- do you believe that
```

Page 251

```
 1   there's barrels still there?
 2        A.  Personally, yes.
 3             (Thereupon, Deposition Exhibit 29,
 4   email string, the first email on the document
 5   from Madelyn Smith to Leslie Patterson sent
 6   April 7, 2014, was marked for purposes of
 7   identification.)
 8             THE WITNESS:  Okay.  I've read the
 9   document that was Exhibit Number 29.
10   BY MR. MERRILL:
11        Q.  Have you seen this document
12   before?
13        A.  I have not.
14             MR. MERRILL:  For those on the
15   phone, this is a memo, or a letter, email, from
16   Madelyn Smith, who is with Ohio EPA, to Leslie
17   Patterson at US EPA, dated April 7, 2014,
18   regarding the Scardino report, and it
19   references the Scardino phone memo of June 12,
20   2012, which is Exhibit 28.
21   BY MR. MERRILL:
22        Q.  According to Madelyn Smith of Ohio
23   EPA in the second paragraph, she indicates that
24   Dave Scardino met with Ohio EPA to discuss this
25   barrel and trenching issue.  Do you see that?
```

Page 252

```
 1   At about two-thirds of the way down, the
 2   statement that says in the meeting notes
 3   attached, taken by Mike Starkey, the current
 4   manager of DERR and southwest district office,
 5   he is outlining Valley Asphalt's steps forward.
 6        A.  Okay.
 7        Q.  He is outlining Valley Asphalt's
 8   steps forward as indicated by Dave Scardino
 9   during the meeting.
10        A.  Okay.
11        Q.  It says at the end Dave is
12   indicating that they only have about 60 feet of
13   the sewer line left to install, but they may
14   consider abandoning it and continuing to use
15   the septic system.  Valley Asphalt didn't
16   determine the extent of the drums.  They
17   stopped the line when they encountered the
18   drums, got rid of the ones that he had taken
19   out and the soil they had taken out, and
20   backfilled with clean material.  Do you see
21   that?
22        A.  Yes, I do.
23        Q.  So is -- this is 2014 time frame,
24   and Mr. Scardino is talking to Ohio EPA.
25        A.  Okay.
```

Page 253

```
 1      Q.   And you are not aware of any of
 2  this?
 3      A.   No.
 4      Q.   In your meetings with US EPA or
 5  Ohio EPA, you've never had occasion to have a
 6  conversation about further investigation of
 7  these barrels?
 8      A.   No, it's never been brought up.
 9      Q.   So it would surprise you that Ohio
10  EPA wants the investigation and US EPA is not
11  pressing forward for the investigation?
12      A.   Yes, it's very surprising.  You
13  would think they would at least have
14  conversation with us.  We are talking with them
15  about the site more current, so I'm very
16  surprised at the conversations.  We would like
17  to be part of them, but we're not.
18      Q.   What conversations are you having
19  with them right now regarding the site?
20      A.   We would currently like to update
21  the site.  As indicated in some of the previous
22  discussions, the plant is very old, and it's
23  not running at a very high efficiency.  One is
24  because of its age, and then the other because
25  it's a batch plant.
```

Page 254

```
 1           Newer technology with drum plants
 2  allow more recycle to be used.  Obviously the
 3  plant is not balanced on site because the
 4  recycle continues to grow.  So that's an
 5  indicator to us that we are not recycling
 6  enough.  So there has been a decision made to
 7  try to upgrade the plant on site, and that is
 8  being looked at.
 9      Q.   Prior to this deposition, did you
10  have any conversations with Jim Jurgensen about
11  this deposition?
12      A.   Yes.  Jim Jurgensen, II, yes.
13      Q.   The second.  And what did you guys
14  talk about?
15      A.   I basically informed Jim that
16  there would be a deposition, kind of an inquiry
17  of all the available information.  I told him
18  we had cooperated and tried to locate, compile,
19  forward all the information that we could find.
20  I asked Jim, I go are there any
21  other locations where there may be some old
22  files stored, and he said there was not.  I
23  think he had a couple files in his office,
24  which I saw marked in here as evidence.  So we
25  have had, you know, a few brief conversations,
```

Page 255

```
 1  nothing in-depth.
 2      Q.   When is the last time you had a
 3  conversation with US EPA regarding plant six?
 4      A.   It's -- well, I can tell you the
 5  exact date, because they came to the site.
 6  July 7th, 2016, we had a meeting at Dryden
 7  Road, US EPA, Leslie Patterson, and she
 8  brought, I want to say, one other person from
 9  the US EPA's office, and then she also had
10  technicians from CH2M Consulting, so -- and the
11  reason to visit the site was to try and locate
12  potential well sites.  That's what they told
13  us.
14      Q.   Groundwater monitoring well sites?
15      A.   I was assuming.  My understanding
16  of the visit was that they are planning the
17  next step to go -- to remediate the subsurface
18  liquid issues, groundwater contamination in the
19  groundwater.
20           So the first step that they
21  required was the vapor remediation, and then
22  now they are going back after groundwater.
23      Q.   How long did the meeting take?
24      A.   It was very surprising.  I bet
25  they were on site ten minutes.
```

Page 256

```
 1      Q.   Came all the way from Chicago to
 2  meet with you guys for ten minutes?
 3      A.   I don't know that she is based out
 4  of Chicago.  US EPA has offices in Cincinnati.
 5  I don't know where all the different people are
 6  involved.  Their site visit on Valley's
 7  property was ten minutes.  They were visiting
 8  all the surrounding sites that we don't own
 9  that are still part of the overall
10  investigation.  So I had a feeling that they
11  were going to be there a couple days maybe, but
12  our portion of it only took, like I said, ten
13  minutes maybe.
14      Q.   So did they walk around the site,
15  or did they just meet you at like a trailer and
16  talk to you about --
17      A.   We met at the control building for
18  the asphalt plant, and then we did not a full
19  perimeter walk, but they kind of walked toward
20  the site where they used to have the auto
21  salvage yard behind our property to the south,
22  we walked to that fence line, looked around.
23  We walked the berm to the west towards the
24  river.
25           And we didn't walk all the way to
```

Page 257

```
1    the front, because they drove in that
2    direction, so they said there's really not much
3    to see here.  You know, the buildings are gone.
4    There's one control building.  There's an
5    asphalt plant.  There's some storage stock
6    piles.  And they were satisfied with what was
7    available.
8         Q.    So they were looking for well
9    locations to sink a well on your property; is
10   that --
11        A.    That's my understanding, yes.
12        Q.    And they wanted to identify a
13   location that they could access and not
14   interfere with your operations or --
15        A.    I believe that would be correct.
16        Q.    Have you heard back from them
17   since this July 2016 meeting?
18        A.    I have not heard back from them.
19        Q.    What about Ohio EPA, when is the
20   last time you've talked to Ohio EPA about plant
21   six?
22        A.    I'm currently directly talking to
23   them about what I'll call the new plant six,
24   our desire to upgrade.  So I'm -- probably
25   within the last week I've talked to Ohio EPA
```

Page 258

```
1    division about upgrades.
2         Q.    Which division?
3         A.    Hazardous waste, Title 13, that
4    you referenced earlier.
5         Q.    Who did you talk to?
6         A.    I don't have her name with me.
7    I'll have to acquire that.
8         Q.    Did Ohio EPA indicate that you
9    would need to get a Rule 13 authorization to do
10   your upgrade?
11        A.    Yes.
12        Q.    And why would you need a Rule 13
13   authorization based on Ohio EPA, or what did
14   Ohio EPA say why you needed one?
15        A.    We had verbal discussions first
16   with the office located here in Dayton, and
17   internal to their office they were split.
18   There was a group that said it's not required.
19   You're not digging down.  You're basically
20   placing an asphalt plant.  You're not changing
21   the grade.  You're not digging.  You're not
22   doing anything to the existing.
23              There was more conservative that
24   said well, let's go through the Rule 13 and do
25   a full review.  So in discussions with them, we
```

Page 259

```
1    agreed to do the Rule 13 just so there's no
2    questions or concerns or, you know, if it was
3    ever brought up later, that it was thoroughly
4    discussed.
5         Q.    So Ohio EPA believes you need a
6    Rule 13 authorization because there's a closed
7    landfill underneath the Valley Asphalt
8    property; is that correct?
9         A.    Yeah, that's a fair statement.
10        Q.    When is the last time you had a
11   conversation with Ohio EPA about the barrel
12   excavation?
13        A.    I don't even remember.  I mean,
14   it's been six, eight, ten years.  I don't
15   recall a direct conversation about barrels.
16        Q.    Have you had any conversations
17   regarding the Valley Asphalt site there, plant
18   six, with anyone from what I'll call the PRPs
19   in this case, that would be Hobart, Illinois
20   Tool Works, NCR, Kelsey-Hayes, TRW?
21        A.    It seems like most of the
22   conversation comes directly from Illinois Tool
23   Works.  It seems like they are kind of the
24   spokesperson for the PRP.  And most of the
25   correspondence comes through, you know, emails
```

Page 260

```
1    or, you know, we have shown a lot of the back
2    and forth, you know.
3              And then their investigation team,
4    which is Conestoga-Rovers, I believe, is -- it
5    seems like they are on site a lot checking
6    their wells and, you know, oversight.
7         Q.    So do you talk to Ken Brown at
8    Illinois Tool Works?
9         A.    Yes, I believe that's the name
10   that's -- he usually pens the letters or is
11   making the contact.
12        Q.    When is the last time you talked
13   to him regarding the site?
14        A.    It's been -- it's been probably a
15   couple years at least.  I don't think there's
16   been any recent correspondence that I've had
17   with him.
18        Q.    Do you recall like what the
19   purpose of or the subject of your discussion
20   was last time?
21        A.    It seemed like they keep
22   revisiting with, you know, we think you are
23   involved because you own the land, and then we
24   kind of go through a full discourse of we have
25   never put anything in the site.  Our current
```

Page 261

1  process does not have waste.  We have been
2  trying to take care of our footprint and do the
3  right thing for the environment.  And then it's
4  quiet for a while, then it will come back again
5  where they try to -- I think they want us to
6  participate, or be part of the PRP.
7       Q.   And does ITW or Conestoga-Rovers
8  ever, you know, contact you and talk to you
9  about the barrel excavation, whether there's
10 barrels still there and whether they can go in
11 and conduct a more extensive investigation?
12      A.   Yeah, there were discussions
13 probably three or four years ago, and then
14 there was that time frame that I referenced
15 earlier where I thought it was the EPA, and I
16 don't know if Conestoga was involved, and they
17 came out and they dug four test sites.  I can
18 give you the exact date.
19      Q.   If you could, please.
20      A.   10-8 of '08, the Ohio EPA, and I
21 don't know what other divisions through the PRP
22 or Conestoga-Rovers was involved, but they
23 wanted to come out on site and dig a couple
24 test sites to see if they could locate
25 anything.  Three of the sites they didn't find.

Page 262

1  The fourth site, where I told them to dig,
2  where I knew we had seen barrels previously,
3  they found one barrel.  That was removed from
4  the trench and I think taken for testing.
5       Q.   Do you know whether the tests came
6  back detecting anything?
7       A.   I don't recall that I saw the test
8  results on that.  That was not -- that was not
9  our --
10      Q.   Who disposed of the barrel?
11      A.   I don't know.  There was a
12 consultant involved.  I would guess it to be
13 Conestoga-Rovers, but, again, I don't know.  I
14 know the EPA was involved with it, and they
15 requested that they could come on site, dig
16 some test pits, and they did.
17      Q.   Have you had any conversations
18 with an attorney by the name of Larry Silver?
19      A.   The name is familiar.  I think
20 I've seen him on correspondence, but I don't
21 know that I've directly spoken to him.
22           MR. LEWIS:  He knows I would kill
23 him if you did.  Sorry.
24           THE WITNESS:  I don't think I've
25 directly spoken to a Mr. Silver.

Page 263

1           MR. LEWIS:  I apologize.
2  BY MR. MERRILL:
3       Q.   Let me ask you a couple questions
4  about the site.
5       A.   Okay.
6       Q.   I'm getting close here.  For plant
7  six, do you have to file TRI reports?  Do you
8  know what a TRI report is, toxic release
9  inventory report?
10      A.   Yeah, toxic release.  We do not.
11      Q.   SARA Title III reports?
12      A.   We do file.
13      Q.   What do you file on?  What
14 chemicals, hazardous chemicals, do you have to
15 list?
16      A.   We have fuel oil.  We have asphalt
17 cement.  It's hazardous because of the
18 temperature.  I think I also may include some
19 of the maintenance oils.  So I think those are
20 the major components that we deal with.
21      Q.   Have you filed SARA Title III
22 reports for those chemicals since the
23 implementation of the SARA Title III reporting
24 program?
25      A.   Yeah, I believe it's a yearly

Page 264

1  report that we have to file on March 1st.
2       Q.   Right.  I guess my question is for
3  the last 15, 20 years, have you always filed
4  the report for those chemicals?  Has it changed
5  any, like --
6       A.   I see what you're saying.
7       Q.   -- where you used to have to file
8  because we had an ammonia tank, or something
9  like that?
10      A.   I don't think we have changed our
11 chemical composition on site, because, like I
12 said, we are relatively basic and
13 straightforward with the components that we
14 deal with.  I probably have included the citrus
15 based d-limonene at one point.  But again, we
16 are not really actively testing that anymore.
17      Q.   Do you have a hazardous waste
18 generator ID number for plant six?
19      A.   We have a hazardous waste ID
20 number that allows us to burn recycled oil.  So
21 I wouldn't say it's a generator ID, but it's a
22 handling -- it's permission through the Ohio
23 EPA to handle waste oil as a fuel source.
24      Q.   You don't generate any hazardous
25 waste at plant six?

Page 265

1    A.   No.

2         Q.   The solvent that you use to test

3    your asphalt is not a hazardous waste?

4         A.   If I was actively disposing of it,

5    it would be hazardous waste.  We recycle 100

6    percent of it now, so it's -- it's a -- it's a

7    source for us to reuse that product.

8         Q.   Where do you get the fuel oil that

9    you burn on site?

10        A.   I think there's one or two main

11   suppliers when we run fuel oil.  You said fuel

12   oil?

13        Q.   I'm sorry.  The oil that you burn

14   that you have an Ohio EPA permit for.

15        A.   Okay.  There's a local company

16   here in Dayton that we use, I think, a lot for

17   that source, or we did before natural gas came

18   down so much.

19        Q.   What's the name of that company?

20        A.   It was originally titled

21   Perma-Fix, and I believe now it's called Clean

22   Water, and they are a -- I think they collect

23   different oil products, they test it, they

24   remanufacture it, and then sell it as a fuel

25   source.

Page 266

1         Q.   Do you have any air permits there

2    at plant six?

3         A.   We do have an air permit to run

4    the plant.

5         Q.   To run the plant for the asphalt

6    plant?

7         A.   Yes, sir.

8         Q.   I believe you testified earlier

9    you do not have an NPDS permit?

10        A.   We do have an NPDS permit.

11        Q.   You do?

12        A.   Yes.

13        Q.   And is that for direct discharge,

14   or is it a storm water permit?

15        A.   It's a storm water.  Those were

16   the pipes where I think I indicated earlier

17   that we do test, and we test for suspended

18   solids.

19        Q.   You mentioned you started in what,

20   1993?

21        A.   That is correct.

22        Q.   What did Valley Asphalt look like

23   in '93 as compared to what it looks like now?

24        A.   It's very similar in makeup,

25   where, you know, we produce -- we take sand and

Page 267

1    gravels, we run them through hot mix asphalt

2    plants, and we do road construction.  I'd say

3    the company maybe has grown a little bit in

4    size.  I don't know percent-wise or -- it's

5    privately held, so I don't know the dollar and

6    cents-wise, but the overall quantity of plants

7    may -- asphalt plants I think is reduced,

8    because rather than having a multitude of

9    plants, we found it to be more efficient to

10   have less quantity, but higher efficient

11   plants, higher production facilities.

12        Q.   You mentioned that you saw an auto

13   salvage yard just south of plant six; is that

14   correct?

15        A.   Yes.

16        Q.   Like a junkyard, I assume?

17        A.   Yes.

18        Q.   Auto junkyard?

19        A.   Yeah, there was cars sitting on

20   site.

21        Q.   Approximately how many cars would

22   you say?

23        A.   100.

24        Q.   When were those cars removed?

25        A.   I would guess maybe late 1990s,

Page 268

1    1998, maybe 2000.

2         Q.   Do you know what happened to them?

3         A.   I do not.

4         Q.   Just one day you showed up at

5    plant six, and it's like there are no more cars

6    over there?

7         A.   They removed them in a very fast

8    manner.  I remember it was, you know, solid

9    cars, and then -- and I don't go to the site

10   every day, but I showed up two weeks later, and

11   they're gone.  So they were -- it was a clear

12   lot.

13        Q.   Did it appear like they buried

14   them on site?

15        A.   No, I don't think they buried

16   them.

17        Q.   Have you guys ever taken a survey

18   of your property?  There was a question early

19   on about property boundaries, the property

20   boundaries for Valley Asphalt.

21        A.   Yes.  Yes.  Yes.

22        Q.   My question is have you ever

23   conducted a property survey for that property?

24        A.   I would say our company has, our

25   survey department.  We have a survey

Page 269

1   department.  I would say at one point they
2   probably have surveyed the property.  And
3   sometimes they will do it to check fence lines,
4   sometimes they will do it to check other
5   concerns.
6       Q.   Do you know what parcel numbers
7   that Valley Asphalt owns for plant number six?
8       A.   I don't.
9       Q.   There was a previous exhibit that
10  showed a parcel number I believe 5054.
11      A.   Correct.
12      Q.   You don't know whether that is the
13  parcel number for the property that Valley
14  Asphalt owns?
15      A.   No.  I think I know at one point
16  there was some consolidation of parcel numbers,
17  so my -- the two maps that I brought today and
18  I outlined were my current -- my understanding
19  of our current property ownership and
20  boundaries.
21      Q.   Is plant number six property owned
22  by the Valley Asphalt Corporation?
23      A.   Yes.
24      Q.   You mentioned baghouse dust.
25  What's the chemical analysis of the baghouse

Page 270

1   dust?
2       A.   It would be a very high percentage
3   of either limestone or natural sand and gravel,
4   very, you know, fine in texture and size.  We
5   actually design with it.  So when we do mix
6   designs in the lab, we will include one and a
7   half percent, two percent, one percent baghouse
8   dust, because it's part of the process that
9   comes back to us.
10      Q.   Do you ever put any additives into
11  your production?  I know you mentioned those
12  specialty additives.
13      A.   The SBS, polymers.
14      Q.   The polymers.  But besides that,
15  any other additives like barium or anything
16  like that for your product because a certain
17  customer needs the product to do a certain --
18  have a certain characteristic or quality?
19      A.   No.  Definitely not barium.  I've
20  never heard of that being an additive.  But no,
21  our raw components are pretty consistent.  We
22  did an experiment years ago in Kentucky with
23  ground tire rubber, but it was not at this
24  facility.
25      Q.   When was the baghouse installed?

Page 271

1       A.   I show when we purchased the plant
2   that's on site now, December 8, 1986.  I think
3   those are documents that we forwarded back
4   through.  But part of that was the asphalt
5   plant, and then I'm pretty sure there was
6   verbiage in there for the baghouse.  So I feel
7   confident at that time we definitely had a
8   baghouse incorporated.  We may have had one
9   prior to that, but I don't have physical record
10  of it.
11      Q.   You mentioned Bowser-Morner.  They
12  did some work for you guys?
13      A.   Yes, sir, they did.
14      Q.   Who is the main contact person
15  that you worked with at Bowser-Morner?
16      A.   Katherine Beach was kind of our
17  project manager for the vapor mitigation.
18      Q.   Is she still with Bowser-Morner?
19      A.   Yes, she is.
20      Q.   Is that in the Cincinnati office?
21      A.   No, they are in Dayton.
22           MR. MERRILL:  Let's go ahead and
23  take a five-minute break.
24           (Recess taken.)
25           (Thereupon, Deposition Exhibit 30,

Page 272

1   handwritten notes, was marked for purposes of
2   identification.)
3           MR. MERRILL:  Let's go back on the
4   record.  Folks, if anyone is still on the
5   phone, we are going back on the record.  I have
6   handed the deponent an exhibit marked
7   Deposition Exhibit 30, and it looks like it's a
8   scale paper with Valley Asphalt's name on it.
9   It looks like something you would write up a
10  job on.
11  BY MR. MERRILL:
12      Q.   Mr. Crago, do you recognize that
13  handwriting?
14      A.   Yes.
15      Q.   Whose handwriting is that?
16      A.   That looks like it's my
17  handwriting.
18      Q.   By looking at the handwritten
19  notes, can you tell what this is regarding?
20      A.   This looks like notes I would have
21  taken either during a phone conversation or a
22  meeting.  It looks like I was -- maybe the
23  company names on the top left I was trying to
24  show who is participating in the meeting.  Then
25  there's some other notes.

Page 273

```
1              It says indirect costs, scope of
2   work, good faith offer.  So it looks like notes
3   where I was sitting in a meeting and tracking
4   some of the things that were being discussed.
5         Q.   You don't recall why you wrote
6   down NCR or TRW?
7         A.   If I wrote those down, they were
8   probably either on the phone or they were at
9   the meeting that this was pertaining to.
10        Q.   But you don't remember anything in
11  particular about NCR or TRW?
12        A.   I do not.
13             (Thereupon, Deposition Exhibit 31,
14  handwritten notes, was marked for purposes of
15  identification.)
16             MR. MERRILL:  I have handed the
17  witness what has been marked Deposition Exhibit
18  31, more handwritten notes, but it also has the
19  card of Matt Justice of Ohio EPA photocopied
20  over top of it.
21  BY MR. MERRILL:
22        Q.   Do you recall -- do you recognize
23  the handwriting on Exhibit 31?
24        A.   This looks like my handwriting
25  again, and the letterhead says Valley Asphalt,
```

Page 274

```
1   which looks like a notepad I might have had in
2   the field or something.
3         Q.   And you notice that Matt Justice's
4   business card is attached here.
5         A.   Yes, I do see that.
6         Q.   And it says October 8, 2008.
7         A.   Yes, sir.
8         Q.   Does that maybe jog your memory as
9   to a conversation you might have had with Matt
10  Justice at Ohio EPA?
11        A.   Not the conversation, but I would
12  say this is indicating he was with the group
13  that came out to the site and dug the four test
14  pits and located the one drum.
15        Q.   This is what you testified about
16  earlier --
17        A.   Yes.
18        Q.   -- about there were -- Ohio EPA
19  wanted to come out and dig four test pits, and
20  they found one drum in one test pit when you
21  told them right here --
22        A.   Yes.
23        Q.   -- this is where we drilled, dig
24  right here?
25        A.   Yes.  There were several people
```

Page 275

```
1   there, so I don't know all the players.  They
2   said they wanted to come, and we have always
3   tried to be open and helpful.  And that was the
4   one card I have, and I don't know if there was
5   other entities represented there or -- I know
6   there's a consultant that actually physically
7   dug the hole and went down and extracted the
8   barrel.
9         Q.   Do you recall which consultant
10  that was?
11        A.   I don't.
12             (Thereupon, Deposition Exhibit 32,
13  letter to Daniel Crago from the United States
14  Environmental Protection Agency dated October
15  19, 2012, was marked for purposes of
16  identification.)
17  BY MR. MERRILL:
18        Q.   I have handed you what has been
19  identified as Deposition Exhibit 32, a letter
20  from US EPA to you dated October 19th, 2012,
21  regarding an administrative settlement
22  agreement order on consent.  Do you see that?
23        A.   Yes, sir.
24        Q.   I don't believe we've talked about
25  this document before in your earlier testimony.
```

Page 276

```
1   Do you recall?
2              MR. LEWIS:  I was going to say I
3   thought we had, but I can't remember exactly to
4   be honest.  I thought Mr. Romine had used this
5   as an exhibit, but I could be wrong with all
6   the dates.  I don't know.
7              THE WITNESS:  I think we have
8   talked about this, because it shows the 85,968
9   dollar amount, and I think there was questions
10  on whether or not we had paid anything to the
11  federal EPA.
12             MR. LEWIS:  I think you're right.
13             MR. ROMINE:  It's different.  I
14  haven't asked about this.
15             MR. LEWIS:  Is it different?
16  Okay.
17             MR. ANDREASEN:  Yeah, it's
18  different.
19             MR. MERRILL:  So my question is --
20  and this is a document, it's Bates stamped
21  VA001438.  Is that a Valley Asphalt document?
22             MR. LEWIS:  Yeah, I believe it is.
23  VA, yeah.  I believe it is.
24  BY MR. MERRILL:
25        Q.   Can you explain this document for
```

Page 277

```
1    me and why is it different than the other
2    documents that were kind of provided about the
3    same time that appear to be about the same
4    subject?
5         A.    I'm not sure why the document
6    would be different than any of the other
7    previous correspondence.  My concern in this,
8    briefly looking at it, it looks like the
9    federal EPA is asking for the approximate
10   amount of $85,968.57 for costs they have
11   already incurred.  There's no time frames.
12   They don't indicate that this is, you know, a
13   two-week window or a two-year window or a
14   ten-year window of incurred costs.
15        Q.    I'm going to direct your attention
16   to Exhibit 20.
17             MR. LEWIS:  That's the unilateral
18   order?
19             THE WITNESS:  Okay, I have that.
20   BY MR. MERRILL:
21        Q.    So it appears that -- I mean, they
22   both have in the subject line site spill
23   identification number B, as in boy, 52B, as in
24   boy.  And the document that is Exhibit 32 dated
25   October of 2012 is an administrative settlement
```

Page 278

```
1    agreement and order on consent, while Exhibit
2    20 is dated March of 2013.  It looks like it's
3    a unilateral administrative order.
4              Was Exhibit 20, the unilateral
5    order, issued after Valley Asphalt declined to
6    enter into the administrative settlement
7    agreement that was offered in October of 2012?
8         A.    That timeline seems consistent,
9    because this is October 2012, where the
10   unilateral is March of 2013.
11        Q.    Do you recall having any
12   conversations with US EPA regarding the offer
13   that's provided in Exhibit 32?
14        A.    I'm going to check to see who
15   penned it.  It came from Tom Nash.  I don't
16   recall a conversation with Tom as far as this
17   offer is concerned.  Again, just looking at it,
18   my initial concern would be there's no time
19   that this is covering.  It's just, you know,
20   here is an $85,000 bill for today.
21             MR. LEWIS:  Can we go off the
22   record for a second?
23             MR. MERRILL:  Yeah.
24             (Thereupon, an off-the-record
25   discussion was held.)
```

Page 279

```
1    BY MR. MERRILL:
2         Q.    One last question.  We talked
3    about the barrel excavation and the soil tests.
4    Do you remember that?
5         A.    Yes, TCA.
6         Q.    The TCA Environmental report, and
7    there were some PCB detections.  Do you recall
8    those?
9         A.    Yes.
10        Q.    Any thought as to where or the
11   source of those PCBs?
12        A.    My first, foremost thought is
13   that, you know, we don't deal with any of those
14   type of products.  Then my only recollection of
15   hearing about those type of products would be
16   through the depositions that I read from
17   previous occurrences.
18        Q.    But why would there be PCBs on the
19   Valley Asphalt property that would show up in
20   the soils?
21        A.    The depositions that I read
22   clearly stated that transformers were being
23   brought on site and dismantled, liquids were
24   being poured on the ground.  I don't know where
25   that occurred, and I -- even the time frame of
```

Page 280

```
1    occurrence is a little bit fuzzy with the
2    deposition.  The gentleman they were deposing
3    was older.  So it was kind of a general
4    statement that it was very -- it was witnessed.
5    But the exact location, I don't know that I
6    knew that.
7         Q.    And Valley Asphalt has been
8    operating on the current Valley Asphalt
9    property since 1956, did you say?
10        A.    Yes, with -- I think some of the
11   other -- like the buildings that we took down
12   were inhabited by other companies.  Like the
13   individual who was remanufacturing the barrels,
14   that was part of our eventual property.  So in
15   1956 when we were renting, our footprint was a
16   lot smaller.  When we purchased the property, I
17   think our footprint spread out a little bit to
18   its current locations.
19        Q.    In '56, were there landfill
20   operations going on on the Valley Asphalt
21   property -- what is now the Valley Asphalt
22   property?
23        A.    I don't know.  My understanding is
24   the original location of the asphalt plant was
25   closer to the front road, our entrance now.  So
```

Page 281

```
 1   I don't know what was going on further back on
 2   the property.
 3              MR. MERRILL:  No further
 4   questions.
 5              MR. LEWIS:  I just have a couple.
 6   Do you mind if I go ahead?
 7              MR. ANDREASEN:  You might want me
 8   to go first.
 9              MR. LEWIS:  You go first, that's
10   fine.
11                 CROSS-EXAMINATION
12   BY MR. ANDREASEN:
13         Q.   Mr. Crago, I just have a couple
14   questions --
15         A.   Okay.
16         Q.   -- about Exhibits 28 and 29.  And
17   basically my questions are regarding the issue
18   of Mr. Scardino having conversations and
19   contact with the Ohio EPA.  And it looks like
20   Exhibit 28 is from 2012 and Exhibit 29 is in
21   2014 and references a Scardino report.
22         A.   Yes, I have those documents.
23         Q.   If Mr. Scardino was acting in
24   those conversations and contacts on behalf of
25   Valley Asphalt --
```

Page 282

```
 1         A.   Okay.
 2         Q.   -- is there someone other than you
 3   that he may have been working with at Valley
 4   Asphalt?
 5         A.   That's a possibility, but I don't
 6   think so.  Because I spoke to Jim Jurgensen,
 7   II, and kind of was very clear, you know,
 8   what -- what is all the information available,
 9   whether it's, you know, letters, written
10   documentation, anything like that.
11              So by the 2012, 2013, 2014 time
12   frame, you know, I was quarterbacking most of
13   the -- all of the conversations, all of the
14   operations, everything going on.
15         Q.   When did Valley Asphalt begin
16   doing planning for any type of vapor intrusion
17   remediation?
18         A.   It was days after our meeting in
19   Chicago with Tom Nash and Steve Renninger.
20   They put a very, very tight timeline on us of I
21   had to -- I had to name a project manager
22   external to our company and have a plan of
23   action submitted and approved within a very
24   tight window of -- the manager, I think, had to
25   be named within ten days.  I think the plan of
```

Page 283

```
 1   action had to be submitted within 30 days.
 2              So we immediately went and --
 3   actually, my first steps were to say can we use
 4   Conestoga-Rovers, they are on site, they are
 5   familiar, they are doing testing, it would be
 6   easy.  And we approached them.  They were
 7   willing to do it, but they wanted to check with
 8   the potential responsible party.  And after
 9   talking to whomever they were directly working
10   for, they felt it was a conflict of interest
11   and did not want to do our testing and our
12   management of our systems, and they
13   immediately reached out to Bowser-Morner.
14         Q.   And your previous testimony was
15   the meeting in Chicago was on April 9, 2013?
16         A.   That is correct.
17         Q.   So Valley Asphalt had done no
18   investigation or planning of any kind regarding
19   a vapor intrusion remedy prior to April 9,
20   2013; is that correct?
21         A.   That is correct.
22         Q.   So I guess I'm a little confused,
23   and you probably are too, when this phone
24   conversation record, Exhibit 28, dated June 12,
25   2012, indicates that Mr. Scardino was working
```

Page 284

```
 1   on a vapor intrusion mitigation work plan on
 2   behalf of Valley Asphalt.
 3         A.   Yeah, that's very puzzling to me.
 4   When I saw the document today, I'm like that's
 5   a new one I have not seen, and that's a
 6   conversation I did not have, so --
 7         Q.   Okay.
 8         A.   It doesn't bother me.  I'm never
 9   opposed to, you know, whomever wants to look at
10   the site.  But we have been very open and very
11   forthcoming with all of our conversations, all
12   of our meetings with the federal EPA, Ohio EPA,
13   Conestoga-Rover, the PRP, but, yeah, that was a
14   little surprising.
15         Q.   To your knowledge, Valley Asphalt
16   never retained Mr. Scardino to do any vapor
17   intrusion investigation work; is that correct?
18         A.   That is correct.
19         Q.   So I think you indicated that
20   Valley Asphalt did retain Bowser-Morner to do a
21   work plan for vapor intrusion mitigation; is
22   that correct?
23         A.   That is correct.
24         Q.   Who did the actual work for the
25   vapor intrusion mitigation system?
```

Page 285

```
 1        A.   The installation?
 2        Q.   Yes.
 3        A.   That was completed by
 4   Bowser-Morner.  I think they did the install --
 5   there was a subconsultant that worked on
 6   Bowser-Morner's behalf that I think physically
 7   drilled the concrete and placed the pipe.
 8        Q.   A subcontractor?
 9        A.   Yes, a subcontractor of
10   Bowser-Morner.  I don't remember the name.
11        Q.   And then just one brief question
12   about Exhibit 30.
13        A.   Okay.
14        Q.   At the top of that, of the graph
15   box --
16        A.   Yes.
17        Q.   -- it says EPA hyphen Nash.
18        A.   Yes, sir.
19        Q.   Would that represent that these
20   notes were taken based upon a conversation or
21   meeting that you had with Mr. Nash?
22        A.   Yeah, I would say he was involved
23   in the meeting.  I think I've only directly met
24   with him once, so I'm assuming this is a phone
25   meeting.
```

Page 286

```
 1        Q.   Okay.  In the top left-hand corner
 2   of the actual graph box there's a name, it
 3   looks like, written down and then scratched
 4   out.
 5        A.   Yes.
 6        Q.   Can you tell what that is?
 7        A.   It looks like it reads Steve
 8   McQuew, M small C capital Q U E W.
 9        Q.   Do you know who that person is?
10        A.   I don't.
11        Q.   Do you know -- going down that
12   column, if you will, the next handwriting says
13   waste.  Do you see that right above the word
14   Cargill?
15        A.   I do.
16        Q.   Do you have any recollection as to
17   whether or not that refers to Waste Management?
18        A.   I don't have a recollection.
19        Q.   Okay.
20        A.   My feeling is it's a company name,
21   or a start of a company name, because it's in
22   line with -- I've tried to keep track of who
23   was there or who was on the phone. .
24        Q.   Okay.  And go down three more
25   items, and there's a two-thirds something.
```

Page 287

```
 1        A.   Yes, it says two-thirds lake
 2   owned.
 3        Q.   Do you know what that represents?
 4        A.   I don't recall.
 5             MR. ANDREASEN:  That's all I have.
 6   Thank you.
 7             THE WITNESS:  Okay.
 8             REDIRECT EXAMINATION
 9   BY MR. LEWIS:
10        Q.   I just have a couple follow-ups.
11   Mr. Andreasen did ask most of my questions.  I
12   just want to make clear in items 28 -- I'm
13   sorry, Exhibits 28 and 29 -- Exhibits 28 and 29
14   would be conversations Mr. Scardino had with
15   Ohio EPA and US EPA.
16             Your testimony is to the best of
17   your knowledge Mr. Scardino was not working for
18   Valley Asphalt at the time, and you had no
19   knowledge of those conversations; is that
20   correct?
21        A.   That is correct.
22        Q.   Okay.  After those conversations,
23   did anyone from Ohio EPA or US EPA contact
24   Valley Asphalt to your knowledge or you
25   personally as director of environmental and
```

Page 288

```
 1   quality control regarding the issue of drums on
 2   the site or issues raised by Mr. Scardino in
 3   these two exhibits?
 4        A.   No one has contacted me.
 5        Q.   So other than the, I'm sorry,
 6   October 8, 2008, incident when Ohio EPA and the
 7   consultant was on site digging the test pits,
 8   you have had no communications whatsoever with
 9   anyone from Ohio EPA or US EPA regarding the
10   barrels or drums -- and/or drums that were
11   originally removed in 2000?
12        A.   That is correct.
13        Q.   Also you testified that Valley
14   Asphalt hired Bowser-Morner to do the
15   mitigation work plan pertaining to the vapor
16   intrusion issue on site; is that correct?
17        A.   That is correct.
18        Q.   Do you know if Mr. Scardino was
19   working for them or a subcontractor to
20   Bowser-Morner, if you know?
21        A.   I was not aware of any contact
22   with -- between David Scardino and
23   Bowser-Morner.
24        Q.   Now, you've mentioned
25   Conestoga-Rover, which I think you testified --
```

Page 289

```
 1    your understanding was they were working for
 2    the main PRPs in this case?
 3         A.    Yes, that's what they have
 4    directly told me.
 5         Q.    Do you have any knowledge that
 6    Mr. Scardino was working with them either as an
 7    employee or as a contractor?
 8         A.    I have no knowledge of them being
 9    combined or working together or a sub or
10    anything.
11         Q.    Is it fair to say that you had no
12    contact with Mr. Scardino whatsoever in at
13    least ten years, or approximately ten years, if
14    not more?
15         A.    That would be a fair statement,
16    because he did the original barrel clean-up,
17    and he did one other small project around the
18    same time frame, but I don't know where he
19    resides or where he works or where he went.
20         MR. LEWIS:    Okay.  No further
21    questions.  Thank you.
22         MR. ROMINE:    Anybody on the
23    telephone?
24         MR. HEER:    No questions.
25         MR. THUMANN:    No questions
```

Page 290

```
 1         MR. BOYLE:    No questions.
 2         MS. GALE:    No questions.
 3         MR. LEWIS:    Thank you.
 4         MR. ROMINE:    I do have a couple
 5    follow-up questions, Mr. Crago.
 6         THE WITNESS:    Okay.
 7              RECROSS-EXAMINATION
 8    BY MR. ROMINE:
 9         Q.    Mr. Merrill had asked you about
10    slag as an ingredient of asphalt.  Do you
11    remember that?
12         A.    Yes, sir.
13         Q.    And does Valley Asphalt use slag
14    as an ingredient for asphalt?
15         A.    We have used slag as an
16    ingredient.
17         Q.    The heavier slag or the lighter
18    slag?
19         A.    We have used the lighter slag.
20         Q.    And during what time period?
21         A.    We are required to run slag for a
22    skid resistant mix specific to the Ohio
23    Department of Transportation, and we run a
24    project maybe once every four or five years at
25    one of our facilities in southwest Ohio.
```

Page 291

```
 1         Q.    So did plant six ever use slag?
 2         A.    I don't recall any specific
 3    projects where we ran slag at Dryden Road.
 4         Q.    And you say you only used that for
 5    a particular Ohio DOT contract?
 6         A.    It's for a specific mix design.
 7    It's called an 803 anti-skid mix.  It's a
 8    design actually specific to Mr. DeWine, who is
 9    in politics in Ohio.  His daughter perished on
10    a curvy road, and there was a specific mix
11    design made up for friction, and my
12    understanding it related to that accident.
13         Q.    So it's a specific mixture to
14    enhance the non-skid qualities of the asphalt?
15         A.    That is correct.
16         Q.    Any other uses for slag as an
17    ingredient in asphalt?
18         A.    The state of Indiana uses the
19    bottom steel slag for surface mix for
20    durability and skid resistance.
21         Q.    And does plant six make slag for
22    that -- I'm sorry, make asphalt for that
23    purpose?
24         A.    Plant six Dryden Road has never
25    made hot mix asphalt for Indiana or this heavy
```

Page 292

```
 1    steel slag.
 2         Q.    To your knowledge, has plant six
 3    ever used slag as an ingredient of asphalt?
 4         A.    I don't recall a specific project.
 5    Like I said, they are very hit and miss
 6    projects, once every three or four years.  I
 7    don't recall any specific projects.
 8         Q.    But you can't rule it out?
 9         A.    I cannot rule that out.
10         Q.    Mr. Merrill had asked you about
11    Exhibit 26, which is the full report done by
12    TCA Environmental.
13         A.    Yes.
14         Q.    I think you testified that it was
15    given to you recently?
16         A.    Yes.
17         Q.    Who gave it to you recently?
18         A.    That was forwarded to me by my
19    attorney, Marty.
20         Q.    Have you received this from any
21    other source -- from any source other than your
22    attorney?
23         A.    I have not.
24         Q.    Did you see this full report when
25    it was produced in the year 2000?
```

Page 293

1      A.   I did not see the original report
2  in 2000.
3      Q.   So when you got it recently, that
4  was the first time you had seen the full
5  report?
6      A.   That's the first time I've ever
7  seen that report.
8      Q.   Mr. Andreasen had asked you about
9  a meeting in Chicago in April of 2013.
10     A.   Yes.
11     Q.   And we had talked about Exhibit 20
12 before, which is a letter from EPA March 22,
13 2013.
14     A.   Okay.
15     Q.   Was the meeting in Chicago in
16 April of 2013 related to this Exhibit 20, which
17 is the unilateral administrative order?
18     A.   So your question is did the
19 March 22, 2013, letter prompt the meeting?
20     Q.   Sure.
21     A.   I believe it did.  I don't
22 remember the exact correspondence, but I
23 believe we had a written notice, and we
24 immediately contacted counsel with the federal
25 EPA, Mr. Tom Nash, and I think I also had

Page 294

1  direct phone conversation with Steve Renninger
2  with federal EPA also.  He is the one that said
3  you need to meet immediately, here's two dates,
4  three dates, to pick from.  And it was not a
5  matter of weeks.  It was a matter of days.
6      Q.   Okay.  So when you say you
7  received written notice, you are talking about
8  the unilateral order that's been marked as
9  Exhibit 20?
10     A.   I believe that's correct.
11     Q.   And you contacted or someone on
12 Valley Asphalt's behalf contacted EPA?
13     A.   Yes, I did.
14     Q.   Okay.  And EPA said you have got
15 to come meet with us?
16     A.   Yes.  Steve emphasized a direct
17 meeting.  I said that's easy.  Then he said
18 it's in Chicago.  Here is the address.  It's
19 with myself and Mr. Nash, and I believe they
20 had other people at the meeting.
21     Q.   And that led to the meeting in
22 April of 2013 that you had talked about a
23 couple times earlier today?
24     A.   Yes.  Yes.
25     Q.   I had asked you earlier about

Page 295

1  solvents, and you mentioned there was an
2  orange-based solvent and TCE.
3      A.   Yes.
4      Q.   When you test the asphalt, is the
5  amount of orange solvent that you use similar
6  to the amount of TCE that was used earlier?
7      A.   The volume used for both tests
8  would be very similar.
9      Q.   And how much -- what is that
10 volume?
11     A.   You typically would do three
12 washes of maybe a quart.  So three quarts per
13 test.
14     Q.   Did I understand you correctly
15 that you would test, what is it, an eight-pound
16 sample of asphalt?
17     A.   The full sample we pull out of the
18 truck I think I previously mentioned might have
19 been 20 pounds.
20     Q.   20 pounds.  Okay.  Sorry.
21     A.   The sample that we run an
22 extraction on for gradation is approximately
23 2,000 grams in weight.
24     Q.   2,000 grams.  So that's two
25 kilograms.  So about five pounds?

Page 296

1      A.   That would be a fair calculation
2  or weight.
3      Q.   Okay.  What's the difference
4  between the 20-pound testing weight and the
5  2,000-gram testing weight?
6      A.   When we pull a sample out of a
7  truck to do quality testing, one of the tests
8  uses solvent to do the extraction.  We also run
9  a pan sample for asphalt content that we use a
10 nuclear gauge, a sealed source nuclear gauge,
11 that reads hydrocarbons.  We also use a
12 Marshall hammer that compacts samples that we
13 do bulk density testing on to tell us our air
14 voids and compaction effort.  So the 20-pound
15 sample is broken down into smaller testable
16 sizes for several different tests.
17     Q.   I see.  And what's the weight that
18 you use specifically for the test that uses the
19 solvent?
20     A.   We are about 2,000 grams.
21     Q.   Okay.  So that's the 2,000 gram
22 weight you were talking about earlier?
23     A.   Yes.
24     Q.   And how much solvent do you use a
25 year?

Page 297

1       A.   It has changed over the years.
2   It's somewhat based on production, you know,
3   how much direct, you know, paving are we doing
4   for the state where we have to run tests.  I
5   want to say we might run -- we might buy five
6   barrels a year across the whole company.
7       Q.   And how much of that is used at
8   plant six?
9       A.   Less than one percent, because we
10  don't run a lot of state mix out of plant six.
11      Q.   Did the proportion of state mix
12  change over the years?  In other words, did
13  you -- going back in time, did you have more
14  state mix coming out of plant six or less state
15  mix coming out of plant six?
16      A.   I would say it's consistent.  It's
17  not -- it's -- we do a fair amount of private
18  work out of Dryden Road, but it seems like we
19  don't do a lot of state work.  That's been
20  consistent over the years.
21      Q.   Do you have somewhere a record of
22  how much solvent is used at plant six?
23      A.   I don't have record of that.
24      Q.   Does that exist anywhere?
25      A.   No.

Page 298

1       Q.   Is there anyone other than you
2   that would have a better idea as to how much
3   solvent is used at plant six?
4       A.   I would have, I guess, the most
5   direct knowledge, because I oversee the
6   day-to-day environmental, and I also oversee
7   all testing for the company, so --
8       Q.   But some solvent is used at plant
9   six --
10      A.   Yes, sir.
11      Q.   -- for testing purposes?
12      A.   Yes.
13           MR. ROMINE:  I think that's all I
14  have.  Thank you.
15           FURTHER REDIRECT EXAMINATION
16  BY MR. LEWIS:
17      Q.   I just want to clarify one thing
18  for the record.  When you just testified that
19  some solvent is used at plant six, is that the
20  citrus-based solvent?
21      A.   Yes.  Ever since I've started with
22  the company in 1993, it's pretty much been the
23  citrus-based solvent.
24           MR. LEWIS:  Okay.  Thank you.
25           MR. MERRILL:  One final question.

Page 299

1           THE WITNESS:  Okay.
2           RECROSS-EXAMINATION
3   BY MR. MERRILL:
4       Q.   Plant six, who is the oldest or
5   longest serving employee?
6       A.   I would have to say that would be
7   the -- me as their environmental director with
8   oversight on the plant.  I have been there 23
9   years.  Mike Shafer, the current supervisor on
10  site, I think it's probably a little bit less.
11  Oversight on that facility is definitely less.
12           He used to run a plant at, you
13  know, a different location, not there.  I
14  think, you know, like the loader operators,
15  they are relatively new, you know, five years,
16  ten years.
17      Q.   Is there anyone that you could go
18  to if you wanted to find out some historical
19  information about plant six because everyone
20  knows this is the guy, because -- he's retired,
21  but he knows everything about this operation
22  because his tenure goes back the longest?  Is
23  there such a person?
24      A.   The first person that jumps to
25  mind is Mel Levy, who is deceased.

Page 300

1       Q.   Right.
2       A.   Because he was the manager, he was
3   environmental, he was -- his office was there.
4   I really don't recall, you know, anybody else
5   that would have, you know, a real large window
6   that would have more information or different
7   information.
8       Q.   So you're the best we've got?
9       A.   You couldn't ask for better, come
10  on.  No.  Just because of the role, between
11  quality, environmental, and duration, it gives
12  me a pretty good scope.
13           MR. MERRILL:  No further
14  questions.
15           MR. LEWIS:  Thank you.
16           (Thereupon, the deposition was
17  concluded at 6:05 p.m.)
18
19
20
21
22
23
24
25

Page 301

```
1            I, DAN CRAGO, P.E., do hereby certify
2   that the foregoing is a true and accurate
3   transcription of my testimony.
4
5
6            _____
7
8       Dated _____
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25   Job: 170215KMR
```

Page 302

```
1   STATE OF OHIO        )
2   COUNTY OF MONTGOMERY )  SS:  CERTIFICATE
3            I, Karen M. Rudd, a Notary
4   Public within and for the State of Ohio, duly
5   commissioned and qualified,
6            DO HEREBY CERTIFY that the
7   above-named DAN CRAGO, P.E., was by me first duly
8   sworn to testify the truth, the whole truth and
9   nothing but the truth.
10           Said testimony was reduced to
11  writing by me stenographically in the presence
12  of the witness and thereafter reduced to
13  typewriting.
14           I FURTHER CERTIFY that I am not a
15  relative or Attorney of either party, in any
16  manner interested in the event of this action,
17  nor am I, or the court reporting firm with which
18  I am affiliated, under a contract as defined in
19  Civil Rule 28(D).
20
21
22
23
24
25
```

Page 303

```
1            IN WITNESS WHEREOF, I have hereunto set
2   my hand and seal of office at Dayton, Ohio, on
3   this 23rd day of February, 2017.
4
5            Karen M. Rudd
6            KAREN M. RUDD
             NOTARY PUBLIC, STATE OF OHIO
             My commission expires 5-21-2017
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```