IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

HOBART CORPORATION, *et al.*,

    Plaintiffs,

v.

THE DAYTON POWER & LIGHT
COMPANY, *et al.*,

    Defendants.

:

:

:

:

Case No. 3:13-cv-115

JUDGE WALTER H. RICE

---

DECISION AND ENTRY SUSTAINING WASTE MANAGEMENT OF
OHIO, INC.'S MOTION FOR SUMMARY JUDGMENT REGARDING
BLAYLOCK TRUCKING CO., INC. (DOC. #865); SUSTAINING
WASTE MANAGEMENT OF OHIO, INC.'S MOTION FOR SUMMARY
JUDGMENT REGARDING INDUSTRIAL WASTE DISPOSAL CO., INC.
(DOC. #868); OVERRULING DEFENDANT THE SHERWIN-WILLIAMS
COMPANY'S MOTION FOR SUMMARY JUDGMENT (DOC. #866);
OVERRULING DEFENDANT COX MEDIA GROUP OHIO, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY FOR
VAPOR INTRUSION CLAIMS (DOC. #872); OVERRULING
DEFENDANT PHARMACIA LLC'S MOTION FOR SUMMARY
JUDGMENT (DOC. #873); OVERRULING CONAGRA GROCERY
PRODUCTS COMPANY, LLC'S MOTION FOR SUMMARY
JUDGMENT ON PLAINTIFFS' CLAIMS AND DEFENDANTS' CROSS
CLAIMS OR, IN THE ALTERNATIVE, PARTIAL SUMMARY
JUDGMENT ON PLAINTIFFS' CLAIMS AND DEFENDANTS' CROSS
CLAIMS FOR CONTRIBUTION RELATED TO THE 2013 ASAOC
(DOC. #874)

---

Plaintiffs, Hobart Corporation, Kelsey-Hayes Company and NCR Corporation,

filed suit against numerous defendants under the Comprehensive Environmental

Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42

U.S.C. § 9601, *et seq.*, seeking contribution for response costs incurred in connection with the South Dayton Dump and Landfill Site.

This matter is currently before the Court on motions for summary judgment or partial summary judgment filed by the following Defendants: (1) Waste Management of Ohio, Inc. ("WMO"), as successor to Blaylock Trucking Co., Inc. ("Blaylock") (Doc. #865); (2) WMO, as successor to Industrial Waste Disposal Co., Inc. ("IWD") (Doc. #868); (3) The Sherwin-Williams Company (Doc. #866); (4) Cox Media Group Ohio, Inc. (Doc. #872); (5) Pharmacia, LLC (Doc. #873); and (6) ConAgra Grocery Products Company, LLC ("ConAgra") (Doc. #874).

## I.    Background and Procedural History

Beginning in the early 1940s, hazardous substances were disposed of at the South Dayton Dump and Landfill Site ("South Dayton Dump" or "the Site"), an 80-acre site located on Dryden Road in Moraine, Ohio. Those hazardous substances allegedly include, but are not limited to, "cleaning solvents, materials containing PCBs, chemical solvents such as trichloroethene (TCE), cutting oils, paint, paint residue, Stoddard solvents, machine-tool water-based coolants, dielectric fluids, oils and brake fluids, in liquid, solid and/or gaseous states." Hazardous substances from adjacent properties also allegedly migrated through the groundwater to contaminate the Site. Doc. #636, PageID#8252.

Plaintiffs Hobart Corporation, Kelsey-Hayes Company, and NCR Corporation entered into two settlement agreements with the United States Environmental

Protection Agency ("EPA"): (1) Administrative Settlement Agreement and Order on Consent for Removal Action ("2013 ASAOC"); and (2) Administrative Settlement Agreement and Order on Consent for Remedial Investigation/Feasibility Study ["RI/FS"] for Operable Unit 1 and Operable Unit 2 ("2016 ASAOC"). These ASAOCs require Plaintiffs to perform certain work at the Site, including investigation, testing, and removal of the contamination.[1]

The 2013 ASAOC is limited to remedies related to vapor intrusion in several buildings at the Site. Plaintiffs were required to conduct subsurface gas sampling, install vapor abatement mitigation systems where needed, and develop and implement a landfill gas extraction system if needed. Doc. #1-1. The 2016 ASAOC requires Plaintiffs to conduct an RI/FS for Operable Units One and Two of the Site. Doc. #414-1.

Plaintiffs seek contribution from numerous defendants under CERCLA, 42 U.S.C. § 9613(f)(3)(B), for response costs incurred in connection with the 2013 and 2016 ASAOCs.[2] In the alternative, Plaintiffs seek recovery under a theory of unjust enrichment. Plaintiffs also seek a declaratory judgment concerning

_____

[1] An earlier ASAOC, executed in 2006, falls outside the scope of this particular lawsuit.

[2] Plaintiffs also re-asserted a claim for cost recovery under 42 U.S.C. § 9607(a). They acknowledge, however, that the Court has already held that, because they entered into settlement agreements with the EPA, their exclusive remedy is one for contribution under 42 U.S.C. § 9613(f).

Defendants' liability for future response costs at the Site. Doc. #636. Many of the defendants have filed cross-claims and counterclaims for contribution.

On April 11, 2016, the Court issued an Omnibus Scheduling Order, Doc. #373, establishing two deadlines for filing motions for summary judgment—one "based solely on the testimony of the fact witnesses," and another based on fact witnesses, plus expert witness testimony. On November 30, 2017, the Court issued a Decision and Entry, Doc. #814, ruling on several motions for summary judgment based solely on the testimony of fact witnesses. Now that expert witness discovery has been completed, several Defendants again seek summary judgment or partial summary judgment on the claims asserted against them.

The Court's first task is to determine which Defendants are subject to liability for past and future response costs incurred by Plaintiffs. It may then equitably allocate liability for vapor intrusion response costs incurred in connection with the 2013 ASAOC. However, until the RI/FS required by the 2016 ASAOC is completed, and the EPA issues a Record of Decision and selects an appropriate remedy, the Court will not be able to equitably allocate response costs related to the 2016 ASAOC. *See* Doc. #816.

## II.    Summary Judgment Standard

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

4

*v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute

about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

III.    Relevant CERCLA Law

Plaintiffs seek to recover contribution costs under §113(f)(3)(B) of CERCLA. That subsection provides that "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may

seek contribution from any person who is not party to a settlement referred to in paragraph (2)." 42 U.S.C. § 9613(f)(3)(B).

A plaintiff seeking contribution under §113(f) must prove the same elements as a plaintiff seeking cost recovery under 42 U.S.C. § 9607(a). *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d 648, 653 (6th Cir. 2000). Those elements are as follows:

> (1) the property is a "facility"; (2) there has been a "release" or "threatened release" of a hazardous substance; (3) the release has caused the plaintiff to incur "necessary costs of response" that are "consistent" with the NCP; and (4) the defendant is in one of four categories of potentially responsible parties.

*Reg'l Airport Auth. of Louisville v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006).[3]

On April 19, 2019, the Court sustained Plaintiffs' motions for partial summary judgment with respect to the first three elements. Doc. #1013. Accordingly, the only element still at issue is whether each defendant falls into one of the four categories of potentially responsible parties. Those four categories include:

> (1) the owner and operator of a vessel or a facility,
> (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of,
> (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and

---

[3] The "NCP," or National Contingency Plan, is a regulation promulgated by the EPA.

7

(4) any person who accepts or accepted any hazardous substances
for transport to disposal or treatment facilities, incineration vessels
or sites selected by such person, from which there is a release, or
a threatened release which causes the incurrence of response
costs, of a hazardous substance.

42 U.S.C. § 9607(a).[4]

If a defendant meets one or more of these criteria, it is strictly liable for

response costs. *See Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d at

657. In order to prove liability, plaintiffs need not prove that "a particular

defendant caused either the release or the incurrence of response costs." *Id.* at

655. They need prove only that "that the defendant's hazardous substances were

deposited at the site from which there was a release and that the release caused

the incurrence of response costs." *Id.* (quoting *United States v. Alcan Aluminum

Corp.*, 964 F.2d 252, 266 (3d Cir. 1992)).

After the Court determines which parties are liable, the Court may "allocate

response costs among liable parties using such equitable factors as the court

determines are appropriate." 42 U.S.C. § 9613(f)(1). In a § 113(f) contribution

action, a court may consider causation in *equitably allocating response costs*, but it

---

[4]  CERCLA defines a "hazardous substance" as "(A) any substance designated
pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act, (B)
any element, compound, mixture, solution, or substance designated pursuant to
section 9602 of this title, (C) any hazardous waste having the characteristics
identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act
. . . , (D) any toxic pollutant listed under section 307(a) of the Federal Water
Pollution Control Act, (E) any hazardous air pollutant listed under section 112 of
the Clean Air Act, and (F) any imminently hazardous chemical substance or mixture
with respect to which the Administrator has taken action pursuant to section 7 of
the Toxic Substances Control Act." 42 U.S.C.A. § 9601(14).

cannot consider it in determining a defendant's *liability*. *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d at 656.

In determining how to equitably allocate response costs among the responsible parties, the Court considers the following factors:

> (1) the ability of the parties to demonstrate that their contribution to a discharge[,] release or disposal of a hazardous waste can be distinguished; (2) the amount of the hazardous waste involved; (3) the degree of toxicity of the hazardous waste involved; (4) the degree of involvement by the parties in the generation, transportation, treatment, storage, or disposal of the hazardous waste; (5) the degree of care exercised by the parties with respect to the hazardous waste concerned, taking into account the characteristics of such hazardous waste; and (6) the degree of cooperation by the parties with the Federal, State or local officials to prevent any harm to the public health or environment.

*United States v. Township of Brighton*, 153 F.3d 307, 318-19 (6th Cir. 1998) (quotation omitted). These are commonly referred to as the "*Gore* factors," named after the United States Senator who proposed that CERCLA be amended to include them.

Even though a defendant may be strictly liable for response costs under § 9607(a), this does not necessarily mean that they must be allocated any responsibility for a share of those response costs. As the First Circuit noted in *Acushnet Co. v. Mohasco Corp.*, 191 F.3d 69 (1st Cir. 1999), in certain circumstances, an otherwise responsible party may escape liability altogether. For example, a "zero allocation" may be appropriate if the defendant's disposal is "too inconsequential to affect the cost of cleaning up significantly." *Id.* at 78 (quoting

*PMC, Inc. v. Sherwin-Williams Co.*, 151 F.3d 610, 616 (7th Cir. 1998)). Although

"[q]uestions of causation and appropriate equitable allocation of response costs

involve quintessential issues of fact," they may be resolved on summary judgment

if there are no genuine issues of material fact. *Id.* at 79-80 (affirming grant of

summary judgment where plaintiffs completely failed to rebut defendant's evidence

supporting a finding that its equitable share should be zero).

Notably, Plaintiffs' other claims of unjust enrichment and declaratory

judgment depend on a finding that Defendants fall into one of the four categories

of responsible parties under CERCLA. The same is true for Defendants' cross-

claims and counterclaims for contribution under § 113(f). *See GenCorp, Inc. v.

Olin Corp.*, 390 F.3d 433, 451 (6th Cir. 2004) (holding that, in order to obtain

declaratory relief, a plaintiff must "allege facts to support a likelihood that it will

incur future response costs recoverable under CERCLA") (internal quotation

omitted); *Union Station Assocs., LLC v. Puget Sound Energy, Inc.*, 238 F. Supp.

2d 1226, 1230 (W.D. Wash. 2002) (holding that, in absence of substantive

CERCLA claim, declaratory judgment claim must be dismissed). Accordingly, these

claims rise or fall depending on whether a defendant satisfies the criteria set forth

in § 9607(a).

Plaintiffs allege that Defendants Sherwin-Williams, Cox Media Group Ohio,

ConAgra and Pharmacia, or their predecessors in interest, are liable under

§ 9607(a)(3) as "arrangers."  They allege that Defendant Waste Management of Ohio, as the successor in interest to Blaylock Trucking and to Industrial Waste Disposal, is liable as a "transporter" under § 9607(a)(4).

On summary judgment, some of these defendants challenge their alleged liability as "arrangers" or "transporters."  Others simply argue that, although they may be strictly liable for response costs, they should not be allocated any responsibility for response costs stemming from vapor intrusion at the Site.

## IV.     Waste Management of Ohio, Inc.'s Motion for Summary Judgment Regarding Blaylock Trucking Co., Inc. (Doc. #865)

Paragraph 50 of the Sixth Amended Complaint alleges as follows:

Defendant Waste Management of Ohio, Inc. or its predecessor is the legal successor in interest to Blaylock Trucking and Waste Removal ("Blaylock"). Blaylock accepted hazardous substances for transport to and disposal at the Site. Blaylock selected the Site for disposal of hazardous substances and contributed to Contamination at the Site through its disposal of wastes which included or contained hazardous substances at the Site.

Doc. #636, PageID#8253.  It is undisputed that Waste Management of Ohio, Inc. ("WMO") is the legal successor in interest to Blaylock Trucking Company, Inc., Doc. #427, Page#6355.  At issue is whether Blaylock accepted hazardous substances for transport to and disposal at the Site, or selected the Site for disposal of hazardous substances, such that "transporter" liability is triggered under 42 U.S.C. § 9607(a)(4).

This is WMO's second motion for summary judgment on this issue.  On November 30, 2017, the Court overruled the first motion without prejudice to

refiling after expert discovery was completed. Doc. #814, PageID##22055-59. In

that Decision and Entry, the Court noted that there are no documents linking

Blaylock to the Site. *Id.* at PageID#22055. The Court further noted:

> James McDonald, who hauled waste for Blaylock throughout the 1960s[,] . . . testified that Blaylock had its own landfill on Dorothy Lane, and hauled its waste there. Once that landfill was full, Blaylock hauled its waste to the Cardington Road Landfill. According to McDonald, Blaylock never hauled waste to the South Dayton Dump. Doc. #686-3, PageID##13107, 13113-13115.
>
> Vernon Vencill, who hauled waste in the Dayton area from 1969 to 1995, also testified that Blaylock used the Dorothy Lane landfill in the 1960s, and then the Cardington landfill. Doc. #686-16, PageID#13257. Likewise, John Papp, Blaylock's General Manager from 1972 through 1997, testified that, before 1972, Blaylock hauled waste only to the Dorothy Lane landfill and then the Cardington Road landfill. After 1972, Blaylock's waste all went to the county's new incinerators. Doc. #686-2, PageID#13101-13102; Doc. #686-6, PageID##13135-40.
>
> James Forney, WMO's corporate representative, also testified that Blaylock took no waste to the Site. He explained that, because Blaylock operated its own landfills, it would have no reason to pay to dispose of waste at other sites. Doc. #686-5, PageID##13121, 13123-24. He further noted that the South Dayton Dump was not included on the list of locations of disposal sites that Blaylock submitted to the EPA in 1981. Doc. #686-10, PageID##13210-11.

Doc. #814, PageID#22058. Neither David Grillot nor Michael Wendling, whose

families owned and operated the Site, recalled Blaylock bringing any waste to the

Site. Doc. #686-15, PageID#13252; Doc. #686-14, PageID#13243.

Edward Grillot, however, testified that he observed Blaylock trucks bringing

cardboard, skids and other burnable material to the Site. Doc. #720-1,

PageID##19205-06. The Court found that his testimony was "sufficient to create

a genuine issue of material fact concerning whether Blaylock transported waste to the South Dayton Dump." Doc. #814, PageID#22059. The Court noted that "[i]f his testimony is to be believed, and if Plaintiffs can prove that the waste included hazardous substances, WMO could be subject to liability." *Id.*

In its pending motion for summary judgment, Doc. #865, WMO argues that: (1) there is no reliable evidence to support a finding that Blaylock transported *anything* to the Site; (2) there is no evidence that Blaylock "selected" the Site for disposal of any waste; (3) there is no support for a finding that the cardboard and wooden skids allegedly transported to the Site constituted "hazardous substances"; and (4) the cardboard and wooden skids did not contribute to the vapor intrusion problems at the Site.

## A.    Blaylock's Nexus to the Site

Plaintiffs note that the Court has already determined that Edward Grillot's testimony, although contradicted by many other witnesses, is sufficient to create a genuine issue of material fact concerning whether Blaylock transported any waste to the Site. Plaintiffs urge the Court not to revisit this issue.

Citing *Caldwell Trucking PRP Group v. Pullman Co.*, No. 95-1690, 2002 U.S. Dist. LEXIS 28410 (D.N.J. Nov. 21, 2002), WMO argues that an allocation expert may assist the Court in assessing a defendant's nexus to the Site. WMO's allocation expert, Christopher Wittenbrink, opined that, based on the totality of the evidence he reviewed, there is no support for a finding that Blaylock has any nexus to the Site. He notes that Edward Grillot's testimony concerning Blaylock, over the

13

course of three depositions, was inconsistent and vague. He suggested that Grillot may have mistaken Blaylock for another transporter, Container Services, that disposed of cardboard and wood pallets at the Site. Doc. #935-1, PageID##34458-59. WMO's toxicology expert, Walter Shields, also found that Grillot's testimony was inconsistent. Doc. #935-2, PageID#34527.

Plaintiffs correctly note that an expert cannot testify about a witness's credibility. *Mar Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 786 (N.D. Ohio 2013). Nothing, however, prevents Wittenbrink and Shields from simply noting, in the context of their expert witness reports, that Grillot's testimony on this subject has been inconsistent, and that it is contrary to the testimony of many other witnesses. Given that the Court noted these same problems in its previous Decision and Entry, these expert witness statements add little to the analysis. The Court still finds that Grillot's testimony is sufficient to create a genuine issue of material fact as to whether Blaylock transported waste to the Site.

Grillot's testimony is also sufficient to create a genuine issue of material fact concerning whether Blaylock selected the Site for disposal. He testified that Blaylock selected the South Dayton Dump for disposal of the skids and cardboard because it was a burning dump and Blaylock's own dump was not. Doc. #935-5, PageID#34676. Again, there is evidence to the contrary. For example, WMO cites to a newspaper article from 1968 indicating that Blaylock burned refuse at his landfill. Doc. #967-2, PageID#37275. But again, the Court again finds that genuine issues of material fact preclude summary judgment on this issue.

14

## B.    Hazardous Nature of Materials Allegedly Transported

Having determined that genuine issues of material fact preclude summary judgment on the question of whether Blaylock transported any waste to the Site or selected the Site for disposal, the Court turns to the question of whether any of the waste that Blaylock allegedly transported to the Site constitutes a "hazardous substance."  Unless Blaylock transported hazardous substances to the Site, WMO has no successor liability under 42 U.S.C. § 9607(a).

Based on the expert testimony presented, no reasonable factfinder could conclude that Blaylock transported any "hazardous substances" to the Site.  Grillot testified that Blaylock disposed of cardboard, skids and other burnable stuff.  Doc. #720-1, PageID##19206.  It appears to be undisputed that cardboard is not a hazardous substance.  *See, e.g.,* Doc. #865-21, PageID#23246.

At issue is whether the skids, *i.e.,* wooden pallets, constitute a hazardous substance.  Plaintiffs' expert witness, Dr. Jurgen Exner, explains that wood consists of several naturally-occurring elements, some of which are included on CERCLA's list of hazardous substances.  Doc. #935-6, PageID#34683.  WMO's toxicology expert, Dr. Walter Shields, concedes as much.  Doc. #909, PageID##32145-46.

But the mere fact that wood naturally contains elements that are on the list of hazardous substances does not mean that the wood itself is a hazardous substance.  Plaintiffs have offered no evidence that the pallets allegedly brought to the Site by Blaylock were treated, painted or stained.  Dr. Shields noted in his

expert witness report that wooden pallets are "very rarely made from treated wood."  Doc. #865-21, PageID#23250.  He had "not located a case where pure wood or wood pallets were considered as a hazardous substance under CERCLA." *Id.*  Moreover, hazardous waste regulations promulgated by the Ohio Environmental Protection Agency specifically state that wood pallets are not a hazardous waste. *Id.* at PageID#23251.  Dr. Shields therefore concludes that the "wood pallets are not a hazardous substance."  *Id.* at PageID#23251.

With respect to the pallets themselves, Plaintiffs experts do not disagree with Dr. Shields.  Dr. Exner concedes that the wood pallets are not a hazardous substance.  Doc. #865-23, PageID#23301.  Expert witness Leo J. Mullin also concedes that clean, untreated wood is not a hazardous substance.  Doc. #865-24, PageID#23311.  Likewise, Plaintiffs' expert Jeffrey Smith testified that he had never seen the EPA determine that untreated wood pallets are a hazardous substance.  Doc. #967-3, PageID#37278.  *See also Arkema, Inc. v. ASARCO, Inc.*, No. C05-5087, 2007 U.S. Dist. LEXIS 45511, at *25 (W.D. Wash. June 22, 2007) (concluding that "[r]aw wood that has not been treated, painted, or stained is not a CERCLA hazardous substance.").

The real question is whether the wood ash, created when the wood pallets were burned at the Site, contains hazardous substances.  David Grillot testified that wooden pallets that were still in good shape were sold to a recycler; the ones

16

in bad shape were burned in the air curtain destructor.  Doc. #705,

PageID##17594-95.[5]

Dr. Exner states that "[c]ombustion of wood generates hazardous

substances in ash and in air emissions containing products of incomplete

combustion."  Doc. #935-6, PageID#34683.  Chemicals are released in the

process, including "PAH compounds, benzene, acetone, toluene, xylene, styrene

and phenol."  *Id.* at PageID#34684.  The wood ash also contains "heavy metal

constituents such as manganese, chromium, copper, lead, and zinc."  *Id.* at

PageID#34685.  According to Dr. Exner, it is "highly likely that emissions from the

air curtain burner settled in the immediate vicinity of the burner" and contained

hazardous substances.  *Id.*  Dr. Exner noted, however, that the concentration of

these metals in the wood ash increases when the wood is treated or painted.  *Id.*

at PageID##34683-84.  As discussed above, there is no evidence that the pallets

that Blaylock allegedly transported to the Site were treated, stained or painted.

Dr. Shields opined that "[o]verall, heavy metal concentrations in wood ash

are low" and wood ash is often used for fertilizer on agricultural land.  Doc. #865-

21, PageID#23252.  Studies have shown that "[a]ll metal[] concentrations from

wood ash [are] below EPA's allowable levels."  *Id.*  Accordingly, Dr. Shields

---

[5]  Plaintiffs maintain that the pallets that were in poor condition are distinguishable
from the "raw wood" at issue in *Arkema.*  Absent any evidence that the pallets in
poor condition had been treated, painted or stained, the Court fails to see a
distinction.

concludes that wood ash from the air curtain destructor is not a hazardous waste. *Id.* at PageID##23252-53. Again, Plaintiffs' own expert Leo Mullin testified that he knew of no case in which the EPA had found CERCLA liability arising from burned clean wood ash. Doc. #868-29, PageID#24143. For these reasons, the Court concludes that, even if wood ash contains small amounts of hazardous substances, CERCLA liability is not triggered by the burning of Blaylock's wood pallets.

Plaintiffs take the position that because the wood pallets naturally contain hazardous substances, Blaylock's transportation of the wood pallets for disposal at the Site necessarily constitutes a disposal of hazardous substances. As WMO notes, this reasoning would lead to absurd results because nearly everything, including drinking water, contains small amounts of naturally-occurring hazardous substances. Certainly, Congress did not intend for CERCLA liability to attach to the disposal of such materials.

Plaintiffs further argue that the low concentration of hazardous substances in the wood ash is irrelevant. The cases cited by Plaintiffs, however, are inapposite. In *B.F. Goodrich Co. v. Murtha*, 958 F.2d 1192, 1200 (2d Cir. 1992), the court noted that the definition of a hazardous substance "does not depend on the concentration of the substance present." Even if a particular mixture or waste solution is not included on the list of hazardous substances, it is deemed to be a hazardous substance if its "constituent components" include hazardous substances. *Id.* at 1201. *Murtha*, however, involved the question of whether a municipality could be held liable for disposal of municipal solid waste that

contained some hazardous substances. It did not address the question of whether disposal of raw wood containing naturally-occurring hazardous substances constitutes a disposal of hazardous substances.

Plaintiffs also rely on *B.F. Goodrich v. Betkoski*, 99 F.3d 505 (2d Cir. 1995), overruled in part on other grounds by *New York v. Nat'l Serv. Indus., Inc.*, 352 F.3d 682 (2d Cir. 2003). Again, the court held that the concentration of hazardous substances was irrelevant in determining CERCLA liability. *Id.* at 515. Citing *Murtha*, the court concluded that "it makes no difference that the specific wastes disposed of by the appellees were not themselves listed as hazardous substances, because so long as their component parts were listed as hazardous substances there may be CERCLA liability." *Id.* at 516.

In *Betkowski*, the court rejected, as irrelevant, the appellees' argument that this would lead to CERCLA liability for something as innocuous as the disposal of a plastic pen that included a hazardous substance as part of its chemical makeup. The court acknowledged that this objection might be "sound in theory," but noted that the appellees were accused of dumping "waste that contained hazardous substances in separable, identifiable forms," such as paints, pesticides, and degreasers, which posed a greater threat than the disposal of a single plastic pen. *Id.*

As WMO notes, the waste in *Murtha* and *Betkoski* involved man-made chemicals. Neither case involved raw wood containing naturally-occurring hazardous substances. As previously discussed, it does not appear that any court

has held that disposal of raw wood pallets triggers CERCLA liability. Likewise, there is no evidence to support a finding that wood ash created from those raw wood pallets triggers CERCLA liability.

Based on the evidence presented, no reasonable factfinder could conclude that Blaylock transported hazardous substances to the South Dayton Dump for disposal.[6]

### C. Summary

For the reasons set forth above, the Court SUSTAINS WMO's Motion for Summary Judgment Regarding Blaylock Trucking Company, Inc., Doc. #865. Given that no reasonable factfinder could conclude that Blaylock transported "hazardous substances" to the Site, CERCLA liability does not attach. Accordingly, Plaintiffs' derivative claims for unjust enrichment and declaratory judgment for future response costs also fail. Therefore, all claims and cross-claims against WMO, as successor in interest to Blaylock, are DISMISSED WITH PREJUDICE.

---

[6]  The Court need not reach the question of whether the waste allegedly transported by Blaylock contributed to the vapor intrusion conditions at the Site. The Court notes, however, that Plaintiffs' own allocation expert, Richard L. White, did not assign any waste volume to Blaylock in allocating WMO's share of response costs at the Site because the evidence of Blaylock's nexus to the Site was "inconclusive."  Doc. #935-4, PageID#34673.

V.     **Waste Management of Ohio, Inc.'s Motion for Summary Judgment Regarding Industrial Waste Disposal Co., Inc. (Doc. #868)**

Plaintiffs also allege that WMO is liable as a successor in interest to

Industrial Waste Disposal Company, Inc. ("IWD").  Paragraph 49 of the Sixth

Amended Complaint alleges as follows:

> Defendant Waste Management of Ohio, Inc. or its predecessor is the
> legal successor in interest to Industrial Waste Disposal Co. Inc.
> ("IWD"). IWD accepted hazardous substances for transport to and
> disposal at the Site. IWD selected the Site for disposal of hazardous
> substances and contributed to Contamination at the Site through its
> disposal of wastes which included or contained hazardous substances
> at the Site.

Doc. #636, PageID#8253.  WMO admits that it is the legal successor to IWD,

Doc. #427, PageID#6354, but has moved for summary judgment on this claim.

Doc. #868.

WMO maintains that the evidence shows that IWD transported only two

loads of wooden pallets and one load of construction debris to the South Dayton

Dump, each at the direction of IWD's customer, The Dayton Power and Light

Company ("DP&L").  WMO therefore argues that summary judgment is warranted

because: (1) IWD did not select the Site for the disposal of that waste; (2) none of

that waste contained hazardous substances; and (3) IWD did not contribute to the

vapor intrusion conditions at the Site.

A.     **IWD's Nexus to Site**

As a general rule, IWD did not haul waste to the South Dayton Dump

because it owned several of its own landfills and it could dump waste there 24

hours a day, 7 days a week. Doc. #868-5, PageID#23655-56, 23658. After 1970, IWD hauled its waste to the Montgomery County incinerators as required by law. If the incinerators were down, IWD took its waste to other IWD landfills. *Id.* at PageID#23657. Although IWD has records documenting its use of these other landfills, there are no waste tickets linking IWD to the South Dayton Dump.

James McDonald and Wayne Wertz, who transported waste for IWD in the 1970s and 1980s, testified that they never hauled waste to the South Dayton Dump. Doc. #868-8, PageID#23690; Doc. #868-16, PageID#23791. McDonald testified that, after he started his own hauling business, he had the opportunity to observe vehicles going in and out of the Site almost daily, but never saw an IWD truck there. Doc. #868-8, PageID#23692. WMO also notes that none of witnesses connected to the South Dayton Dump identified IWD as a company that hauled waste to the Site. This included David Grillot, Doc. #868-12, PageID#23760, Edward Grillot, Doc. #868-13, PageID##23770-71, and Horace Boesch, Jr. Doc. #868-15, PageID##23787-88.

Nevertheless, two IWD employees testified that they did haul some waste from DP&L to the South Dayton Dump. Vernon Vencill hauled waste for IWD from 1969 until 1995. Doc. #868-5, PageID#23651. On just one occasion, probably in the early 1970s, he took one load of construction material from DP&L's maintenance yard across the street to the Site. *Id.* at PageID#23653-54. Joseph Smart hauled waste for IWD from the early 1970s until 1994. Doc. #868-6, PageID##23665-66. On just one occasion, again in the early 1970s, he picked up

two loads of skids (wooden pallets) from DP&L's property and dumped them at the Site. *Id.* at PageID##23663-64. WMO maintains that there is no credible evidence that IWD hauled anything other than this one load of construction debris and two loads of wooden pallets to the Site. The Court agrees.

Cecil Younker, who worked for Dayton Tire and Rubber Company ("DTR"), testified that, once, in the early 1970s, he followed an IWD truck hauling DTR waste. He did not remember what was included in that load; nor did he remember the name of the dump. However, when shown an aerial map, he did identify the South Dayton Dump as the truck's destination. Doc. #912-6, PageID##33043-47.

WMO maintains that this aerial map showed only the South Dayton Dump and none of the surrounding area. Larry Layfield, the corporate representative for DTR's successor in interest, testified that, based on Younker's description of the trip, there is no doubt that the IWD driver went to the Cardington Road Landfill and not the South Dayton Dump. Doc. #953-3, PageID#36863. Layfield's testimony is corroborated by a letter, sent by IWD to DTR in May of 1980, listing places where IWD had disposed of DTR's waste from 1956 through May of 1980. The South Dayton Dump is not included on the list. Doc. #868-2, PageID##23636-37. It is also corroborated by the testimony of Edward Grillot, who stated that DTR hauled its waste to the Site in its own trucks. Doc. #953-8, PageID#36925.

Regardless of whether Younker's testimony might be sufficient to support a finding that IWD disposed of any of DTR's waste at the Site, WMO notes that Plaintiffs' expert witnesses did not rely on Younker's testimony in establishing

23

IWD's nexus to the Site. The Court will therefore limit its inquiry to the three loads transported by Vencill and Smart.

### B. Genuine Issue of Material Fact Whether IWD Selected the Site for Disposal

Although it is undisputed that Vencill and Smart hauled these three loads of material to the Site, there is a genuine issue of material fact as to whether it was IWD that "selected" the Site for disposal of these three loads. WMO argues that, because IWD owned its own landfills, it would not have selected the South Dayton Dump as a disposal site. Nevertheless, Mr. Smart testified that an IWD dispatcher told him to take the two loads of wooden pallets to the Site. Doc. #868-6, PageID ##23664. Mr. Vencill could not recall who told him to take the one load of construction debris to the Site, but stated that it would have been someone at IWD. Doc. #868-5, PageID##23653-54.

James Forney, WMO's corporate representative, speculated that the IWD dispatcher probably told Vencill and Smart to take the loads to the South Dayton Dump at the customer's request, but he admitted that he had no proof of that. Doc. #868-7, PageID#23676. WMO's expert witness, Christopher Wittenbrink, noted that DP&L had a long history of disposing of waste at the Site, and paid a monthly fee for the right to dispose of waste there. *See* Doc. #868-27. Wittenbrink therefore concluded that it could reasonably be inferred that DP&L selected the Site for disposal. Doc. #868-17, PageID##23815.

As further evidence that IWD selected the Site for disposal, Plaintiffs point to a document that IWD submitted to the EPA in June of 1981 in response to the mandate set forth in § 103(c) of CERCLA. Within 180 days after December 11, 1980, any person who "accepted hazardous substances for transport *and selected*, a facility at which hazardous substances . . . are or have been stored, treated, or disposed of" was required to notify the EPA of "the existence of such facility, specifying the amount and type of any hazardous substance to be found there, and any known, suspected, or likely releases of such substances from such facility." 42 U.S.C. § 9603(c) (emphasis added).

In June of 1981, when IWD sent its § 103(c) notification to the EPA, it listed eleven facilities, including the South Dayton Dump and Landfill Site. Doc. #868-3, PageID##23639-42. A copy of the same letter was also sent to the EPA in 2002.[7] Doc. #912-2, PageID#33013. Plaintiffs note that, by statute, unless IWD had "selected" the South Dayton Dump for disposal, there would have been no need to include it on this list.

Based on the testimony of Vencill and Smart, and on the inclusion of the South Dayton Dump on the § 103(c) notification form, the Court finds that genuine

_____

[7] Plaintiffs argue that, from these submissions, it can reasonably be inferred that IWD transported hazardous waste from *several* sources to the South Dayton Dump. There is, however, no evidence to support a finding that IWD transported anything to the Site other than the three loads taken by Vencill and Smart.

issues of material fact preclude summary judgment on the question of whether IWD selected the Site for disposal of these three loads.

### C.   Hazardous Nature of Materials Allegedly Transported

The next question is whether the three loads of waste that IWD allegedly hauled to the South Dayton Dump contained hazardous substances. Unless they did, WMO has no "transporter" liability under 42 U.S.C. § 9607(a)(4) as the successor in interest to IWD.

For the reasons set forth above in connection with the Blaylock summary judgment motion, the Court finds that neither the wood pallets nor the resulting wood ash constitutes a hazardous substance.[8] As to the one load of construction debris, Dr. Walter Shields concluded that this typically would have included wood, sheetrock and concrete, none of which is a hazardous substance. Doc. #868-22, PageID##24025; Doc. #868-28, PageID#24134. Plaintiffs have offered no evidence that the load of construction debris contained anything different.

This, however, does not fully resolve the issue. Plaintiffs argue that IWD's § 103(c) response to the EPA, which included the South Dayton Dump on the list of facilities to which IWD transported hazardous substances, Doc. #868-3, PageID#23640, standing alone, is sufficient to create a genuine issue of material fact as to whether IWD transported hazardous substances to the Site.

---

[8]   Again, there is no evidence that the wood pallets at issue were painted, treated or stained.

WMO disagrees. Its expert witness, Christopher Wittenbrink, concludes that the § 103(c) report likely refers only to the three loads transported by Vencill and Smart, Doc. #912-9, PageID##33065, and, as the Court concluded above, there is no evidence that those loads included hazardous substances. James Forney, WMO's 30(b)(6) witness, speculated that the South Dayton Dump was included on the report because of these three loads. He explained that, because of CERCLA's heavy enforcement penalties, and fear that the company may inadvertently fail to disclose a disposal site, IWD "tended to overreport its involvement on 103(c)s." Doc. #868-7, PageID##23677-78.

Forney's explanation is consistent with IWD's cover letter to the June 1981 report. It states that, because some of the waste transported to the sites listed may be subject to regulation, and because "Superfund law imposes heavy penalties for failure to file a notification when one is required," IWD was submitting the § 103(c) notification to fulfill any reporting requirements. IWD noted that because any small amounts of hazardous waste would have been disposed of in connection with much larger quantities of non-hazardous solid waste, it did not have reasonably available records concerning the "areas, types and quantities of 'hazardous' wastes disposed at these sites." Doc. #868-3, PageID#23639.

Given that there is no evidence that IWD transported anything other than two loads of wood pallets and one load of construction debris to the South Dayton Dump, or that these three loads contained any hazardous substances, and given Forney's explanation of why the South Dayton Dump was included on the § 103(c)

report, the Court finds that the 103(c) report is insufficient to create a genuine issue of material fact as to whether IWD transported any hazardous substances to the Site. The Court sustains WMO's motion for summary judgment on this basis.[9]

### D. Summary

For the reasons set forth above, the Court SUSTAINS Waste Management of Ohio, Inc.'s Motion for Summary Judgment Regarding Industrial Waste Disposal Co., Inc., Doc. #868. Given that no reasonable factfinder could conclude that IWD transported "hazardous substances" to the Site, CERCLA liability under 42 U.S.C. § 9607(a)(4) does not attach and WMO has no successor liability. Plaintiffs' derivative claims for unjust enrichment and declaratory judgment for future response costs also fail. Accordingly, all claims and cross-claims against WMO, as successor in interest to IWD, are DISMISSED WITH PREJUDICE.

### VI. Defendant Pharmacia's LLC's Motion for Summary Judgment (Doc. #873)

Paragraph 58 of the Sixth Amended Complaint alleges as follows:

Defendant Monsanto arranged for the disposal of wastes at the Site, including waste containing hazardous substances from its facilities and operation[s] located in and around Dayton. Monsanto contributed to Contamination at the Site through its disposal of wastes that included hazardous substances at the Site.

---

[9]   Again, although the Court does not reach the question of whether IWD contributed to vapor intrusion condition at the Site, it notes that Plaintiffs' own expert witness, Richard White, allocates no individual response costs to WMO as the successor in interest to IWD. Doc. #868-20, PageID#23962; Doc. #868-24, PageID#24081.

Doc. #636, PageID#8255. Monsanto Research Company ("Monsanto") operated the Dayton Research Laboratory and Pilot Plant (the "Dayton Lab"). Monsanto is now known as Pharmacia LLC ("Pharmacia"). It is undisputed that Pharmacia is Monsanto's successor in interest. Doc. #442, PageID#6549.

Pharmacia has moved for summary judgment on the question of whether it is subject to "arranger" liability under 42 U.S.C. § 9607(a)(3). Doc. #873. It claims that no reasonable factfinder could conclude that Monsanto took purposeful steps to dispose of hazardous substances at the South Dayton Dump. As set forth below, the Court rejects this argument.

A.    Nexus to Site

In 1983, Monsanto employee Thomas Ctvrticek compiled a list of the Dayton Lab's history of chemical waste disposal. This list was based on his review of certain documentation and interviews with several retired employees. Doc. #873-10, PageID##25063-64. The list indicates that, in 1976-1977, the Dayton Lab disposed of less than 800 pounds of "inorganics, (e.g., $Na_2CO_3$, alumina) in 100 lb. sacks" at the South Dayton Dump. Doc. #890-3, PageID#28623. At his deposition, Ctvrticek explained that Na2CO3 is sodium carbonate. Doc. #873-10, PageID#25069. Pharmacia argues that this is the only documented reference to a disposal of materials at the South Dayton Dump.

Pharmacia acknowledges, however, that there is also an undated permit issued by the Montgomery County, Ohio General Health District for "open burning" at the South Dayton Dump. Doc. #873-27, PageID#25580. Pharmacia suggests

29

that this may have been issued in conjunction with "a one-time incineration of a small quantity of glass equipment with residue" that took place in the late 1970s. Doc. #873, PageID#24875. Former Dayton Lab employees Thomas Beal and Alan Wurstner both testified about this disposal, which was spearheaded by Monsanto chemist George Richardson.[10]

Thomas Beal, a fire safety employee at Monsanto, testified that he applied for the permit to dispose of "combustible and flammable lab waste." Beal accompanied Richardson to the South Dayton Dump on one of the two days that it took to burn the materials. The lab waste was transported in 4-to 8-ounce glass bottles that were packed in vermiculite inside 55-gallon drums. At the Site, they broke the glass bottles on a big boulder down in the air curtain destructor to make sure that the materials burned. According to Beal, Richardson transported two pickup loads of 55-gallon drums to the Site, but each load contained only about four drums. Given the amount of vermiculite in each drum, Beal estimated that each drum contained only about 5 gallons of lab waste. The lab waste included "[a]nything and everything in chemistry probably." Beal was uncertain exactly what was burned but it was combustible and flammable chemicals like "methanol, acetone, methyl ethyl ketone." Doc. #894-1, PageID##29012-20; Doc. #873-6, PageID##24925-26.

---

[10] As Plaintiffs note, this incineration was not included on Ctrvticek's list, and there is no indication that he interviewed Richardson, Beal or Wurstner.

Alan Wurstner, chief of the emergency brigade at the Dayton Lab, also accompanied George Richardson to the South Dayton Dump on one of those two days. He testified that Richardson opened the glass bottles and threw them into the fire. Wurstner testified that the chemicals were probably all organic because that is what was used at the plant. Wurstner estimated that the total amount of chemicals burned would have filled less than one drum. Doc. #894-3, PageID##29027-31.

Plaintiffs argue that, based on the admissions of Beal and Wurstner, Pharmacia's motion for summary judgment must be denied as there is little doubt that Monsanto disposed of this waste at the Site. In response, Pharmacia argues that the statements of these former employees cannot be considered "admissions" and cannot bind the company. This argument is misplaced. The question is not whether Beal and Wurstner have authority to bind the company, but rather whether their deposition testimony, based on their personal observations, is sufficient to create a genuine issue of material fact concerning whether Monsanto disposed of this waste at the Site. It clearly crosses that threshold.[11]

B.    **Hazardous Nature of Materials Allegedly Disposed Of**

The parties' expert witnesses, Jurgen Exner and Dallas Wait, agree that the sodium carbonate and alumina that Monsanto disposed of in 100-pound bags at

---

[11] In addition, Horace Boesch, Jr., Doc. #873-29, PageID#25589, Edward Grillot, Doc. #673-1, PageID##10110-14, and David Grillot, Doc. #873-31, PageID#25597, each testified that they observed Monsanto trucks at the Site.

the Site are not hazardous substances under CERCLA. Doc. #873-25, PageID#25572; Doc. #873-32, PageID#25611. Thus, at issue is whether the lab waste that Richardson, Beal and Wurstner disposed of at the Site contained hazardous substances.

Plaintiffs' expert witness, Jurgen Exner, concluded that the wastes that Monsanto burned at the Site "contained hazardous substances such as methyl ethyl ketone, acetone," and other organic chemicals that he determined were used by Monsanto during this time period. Doc. #894-7, PageID#29062. His opinion is obviously based, at least in part, on Beal's testimony about what was contained in the lab waste.

Pharmacia argues, however, that neither Beal nor Wurstner knew exactly what chemicals were burned at the Site. Wurstner believed that they were all organic materials because that is what was used at the lab. Beal knew that they were combustible and flammable, things like "methanol, acetone, methyl ethyl ketone." He admitted, however, that he did not know exactly what Richardson was burning. Doc. #894-1, PageID#29018. Nevertheless, as the person in charge of fire safety at the lab, and as the person who applied for the permit to burn the lab waste, it can be inferred that Beal had at least a rudimentary knowledge of the chemicals at issue. Likewise, as the chief of the emergency brigade, Wurstner likely had an understanding of the kinds of chemicals used at the lab.

Pharmacia's expert witness, Dr. Dallas Wait, testified that "there's no factual information that indicates that Pharmacia disposed of any hazardous

substance at the South Dayton Dump." Doc. #958-4, PageID#37171. Waite acknowledged that Beal and Wurstner both testified that they burned "flammable organic materials," but he noted that it is not clear what they were. Doc. #958-5, PageID#37186-87.[12]

Although Beal and Wurstner may not have known exactly what materials Richardson burned at the Site, they were adamant that they were flammable and combustible and were most likely organic in nature. In the Court's view, their testimony, combined with Dr. Exner's report on the types of organic chemicals used at the Dayton Lab facility during this time period and his opinion that the materials burned contained hazardous substances, is sufficient to create a genuine issue of material fact concerning whether Monsanto took intentional steps to dispose of hazardous substances at the South Dayton Dump.

## C. *De Micromis* Exception

Pharmacia also argues that it is exempt from CERCLA liability under the *de micromis* exemption set forth in 42 U.S.C. § 9607(o)(1). That subsection of CERCLA provides, in relevant part, as follows:

---

[12] Dr. Waite also concludes that, based on the relatively small quantity of waste that was burned, and on the procedures used by Richardson to optimize the combustion of all of the materials, there would be little residue that remained. Doc. #958-5, PageID#37186-87. In contrast, Dr. Exner opines that it is "highly likely that a large portion of the chemicals that were placed into the burner were not destroyed but were deposited in the immediate vicinity of the burn site." He further opines that "[i]t is likely that products of incomplete combustions, such as PCDD/PCDF, were formed." Doc. #894-7, PageID##29061-62.

Except as provided in paragraph (2), a person shall not be liable, with respect to response costs at a facility on the National Priorities List, under this chapter if liability is based solely on paragraph (3) or (4) of subsection (a), and the person, except as provided in paragraph (4) of this subsection, can demonstrate that—

> (A) the total amount of the material containing hazardous substances that the person arranged for disposal or treatment of, arranged with a transporter for transport for disposal or treatment of, or accepted for transport for disposal or treatment, at the facility was less than 110 gallons of liquid materials or less than 200 pounds of solid materials (or such greater or lesser amounts as the Administrator may determine by regulation); and

> (B) all or part of the disposal, treatment, or transport concerned occurred before April 1, 2001.

42 U.S.C. § 9607(o)(1).

Pharmacia maintains that, based on the testimony of Beal and Wurstner, the chemicals disposed of constituted less than 110 gallons of liquid materials, rendering Pharmacia exempt from liability. As Plaintiffs note, however, on its face, this exemption does not apply because the South Dayton Dump and Landfill Site is not on the National Priorities List ("NPL"). Rather, it is on a list of "proposed" NPL sites. *See* https://www.epa.gov/ superfund/proposed-national-priorities-list-npl-sites-state#OH (last accessed 9/18/19).

Pharmacia also notes that, in the 2016 ASAOC, Plaintiffs agree not to assert any claims for contribution against persons whose contributions fall below the *de micromis* levels set forth in § 9607(o)(1). Doc. #414-1, PageID##6234-35. This contractual promise is not dependent on the Site being on the NPL. Unfortunately, the 2013 ASAOC contains no similar provision. Accordingly, with respect to the

vapor intrusion claims, Pharmacia is not entitled to either the statutory *de micromis* exemption or a contractual one.[13]

## D. Causation

Pharmacia also argues that it is entitled to summary judgment because Plaintiffs cannot show that they incurred response costs for vapor intrusion as a result of releases that were *caused by Pharmacia*. Pharmacia notes that Dr. Exner admitted at his deposition that the chemicals that Monsanto allegedly burned at the Site would not have included the kinds of volatile chlorinated organic hydrocarbons that were the original impetus for the vapor intrusion investigation at the Site. Doc. #873-25, PageID##25571-72. Plaintiffs note that Dr. Exner also concluded, however, that Monsanto generated aromatic hydrocarbons such as benzene and xylene, which also contributed to vapor intrusion concerns at the Site. Doc. #894-7, PageID##29064, 29069, 29071-72.

Plaintiffs also argue that, even if the hazardous substances that Monsanto burned at the Site were not the driving force behind the need for vapor intrusion mitigation, summary judgment is still improper because CERCLA contains no causation requirement. As explained above, in order to establish liability, Plaintiffs need not prove that "a particular defendant caused either the release or the incurrence of response costs." *Kalamazoo River Study Group v. Menasha Corp.*,

---

[13] The Court makes no determination at this time as to whether Pharmacia's contributions to contamination at the Site are, in fact, *de micromis*.

228 F.3d 648, 655 (6th Cir. 2000). They need prove only "that the defendant's hazardous substances were deposited at the site from which there was a release and that the release caused the incurrence of response costs." *Id.* at 655-56 (quoting *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 266 (3d Cir. 1992).

The Court has already determined that genuine issues of material fact preclude summary judgment on the question of whether Monsanto took intentional steps to dispose of hazardous substances at the Site. In addition, the Court has already granted summary judgment in Plaintiffs' favor on the question of whether there was a release at the Site that caused the incurrence of response costs. Therefore, regardless of whether Monsanto's disposal of hazardous substances at the South Dayton Dump directly contributed to the need for vapor intrusion mitigation at the Site, Pharmacia is not entitled to summary judgment on the question of *liability*.[14]

### E.    Summary

Genuine issues of material fact preclude summary judgment on the question of whether Monsanto, Pharmacia's predecessor in interest, took intentional steps to dispose of hazardous substances at the Site. Moreover, the *de micromis*

---

[14] The Court may consider causation in determining equitable allocation of response costs. *Kalamazoo River Study Group v. Menasha Corp.*, 228 F.3d at 656-57. However, at this stage of the litigation, Pharmacia has not moved for summary judgment on the question of equitable allocation.

exemption does not apply. Accordingly, the Court OVERRULES Defendant

Pharmacia LLC's Motion for Summary Judgment, Doc. #873. It also denies

Pharmacia's request for defense costs, including attorneys' fees and expert

witness fees.


VII.    **ConAgra Grocery Products Company, LLC's Motion for Summary Judgment on Plaintiffs' Claims and Defendants' Cross Claims or, in the Alternative, Partial Summary Judgment on Plaintiffs' Claims and Defendants' Cross Claims for Contribution Related to the 2013 ASAOC (Doc. #874)**

Paragraph 60 of the Sixth Amended Complaint alleges as follows:

Defendant ConAgra or its predecessor is the legal successor in
interest to McCall Corporation. McCall Corporation arranged for the
disposal of wastes at the Site, including waste containing hazardous
substances from its facilities and operations located in and around
Dayton. McCall Corporation contributed to Contamination at the Site
through its disposal of wastes that included hazardous substances at
the Site.

Doc. #636, PageID#8255. ConAgra admits that it is the successor in interest to

McCall Corporation, a large commercial printing company.

ConAgra has moved for summary judgment. Doc. #874. It alleges that it is

not liable as an "arranger" under § 9607(a)(3) because there is no credible

evidence that ConAgra disposed of hazardous substances at the Site. In the

alternative, ConAgra moves for partial summary judgment on the question of its

liability for response costs related to vapor intrusion at the Site. ConAgra also

moves for summary judgment on Plaintiffs' claims of unjust enrichment and

declaratory judgment, and on Defendants' cross-claims for contribution. For the reasons set forth below, the Court overrules ConAgra's motion in its entirety.

### A.    Nexus to Site

Applications for permits to operate the South Dayton Dump from the mid-60s to 1973 show that McCall was a major customer of the South Dayton Dump. Doc. #883-3, PageID##26569-98. Although there are no records of specific waste disposals, Edward Grillot, Michael Wendling, David Grillot, Cecil and Richard Hunter, whose families either owned or worked at or near the South Dayton Dump, all testified that McCall disposed of waste at the Site.

Edward Grillot, over the course of three depositions, provided the most extensive testimony about McCall's nexus to the Site. He initially testified that McCall self-hauled drums with ink waste and some kind of solvents. McCall brought about 50 drums each month. These drums were dumped into a pit at the Site. Doc. #917-13, PageID##33789-91. Grillot later clarified, however, that these drums did not contain ink. Doc. #874-16, PageID##25893, 25895.

Grillot also testified that Container Services, a local waste hauler, brought McCall's burnable waste, including a lot of magazines, paper and cardboard, to the Site at least once a day. They had their own key. Along with the paper, Container Services also brought yellow and blue waste ink from McCall in long cardboard cylinders that looked like large tubes of caulking. Doc. #917-19, PageID##33836, 33845-46; Doc. #917-15, PageID##33800-15.

38

Michael Wendling, Grillot's cousin, testified that McCall brought magazines and barrels with some type of thick sludge material, possibly ink or "cleanup material." Doc. #917-12, PageID#33783. David Grillot also recalled seeing ink being sent by McCall for disposal to the Site. Doc. #883-7, PageID#26608. Cecil Hunter testified that he saw the Container Services trucks at least once a day bringing McCall magazines and 55-gallon drums of ink and paint thinner. Doc. #1015-2, PageID#38477-78; Doc. #1029, PageID##38657, 38664, 38669-70. Cecil's brother, Richard Hunter, also testified that McCall self-hauled waste to the Site two or three times each week, dumping magazines and small barrels with a dark substance on them. Doc. #1030, PageID#39080-81, 39084-87; Doc. #1010-2, PageID#38441.[15]

ConAgra argues that the testimony of these witnesses is inconsistent, unreliable and contrary to the testimony of several other witnesses. Horace Boesch, Jr., who had an office at the entrance to the Site, did not mention McCall or Container Services as a customer of the dump. Container Services employee Robert Aldredge testified that all of McCall's waste was hauled to the Espe dump on Guthrie Road. Doc. #874-8, PageID##25816, 25821. Joseph Smart, a driver for Container Service, testified that he never hauled McCall waste to the South

---

[15]  Richard Hunter testified that he could not read at the time, but his grandfather told him the truck door said "McCall." Doc. #1030, PageID#39080-81, 39084-87. The Court sustains ConAgra's objection to the admission of this statement on hearsay grounds. Hunter also testified, however, that he independently recognized the McCall logo on the truck. *Id.* at PageID##39084, 39237-38. This statement does not constitute hearsay.

Dayton Dump. Doc. #874-10, PageID#25843. Likewise, Container Service dispatcher Richard Fahrenholz testified that he never dispatched drivers to haul McCall's waste to the South Dayton Dump. He admitted, however, McCall could have had other trucks that did haul waste there. Doc. #874-9, PageID#25834.

The mere fact that Aldredge, Smart and Fahrenholz, employees of Container Services, were not aware of any waste from McCall being disposed of at the South Dayton Dump does not necessarily mean that it did not happen, particularly given the other testimony that McCall also self-hauled waste to the Site. The conflicting testimony of the above witnesses creates a genuine issue of material fact concerning whether McCall disposed of any waste at the Site.

## B.  Hazardous Nature of Materials Allegedly Disposed Of

The next question is whether any of the materials that McCall allegedly disposed of at the Site contained hazardous substances. It appears to be undisputed that the magazines, paper and cardboard are not hazardous substances. Assuming *arguendo* that McCall disposed of waste ink at the Site, expert witnesses Jurgen Exner and B. Tod Delaney agree that it would have contained hazardous substances. Doc. #886-20, PageID#27689; Doc. #886-3, PageID#27473; Doc. #916-9, PageID#33415.

ConAgra argues, however, that there is no credible evidence that McCall sent waste ink to the Site. ConAgra does not dispute that Edward Grillot saw tubes of ink at the South Dayton Dump, but argues that they could not have come from McCall because McCall never used ink in tubes. Dr. Delaney testified that,

given the size of the McCall operation, its ink would have come in multi-gallon drums, not in tubes. Doc. #874-4, PageID#25714. Joseph Smart sometimes helped load McCall's empty ink buckets into the Container Services containers. Doc. #874-10, PageID#25842. These were 5-gallon buckets that were 99% empty. He never saw ink in tubes. *Id.* at PageID##25844-45. George Morris, Jr., a McCall employee, testified that the ink used in the press room was in 5-gallon buckets, and the ink in the ink room was in 55-gallon containers. He did not recall seeing any ink in tubes. Doc. #874-11, PageID#25856.

Regardless of whether the *tubes* of ink that Edward Grillot saw at the Site came from McCall, there is other evidence to support a finding that McCall disposed of waste ink at the Site. Michael Wendling testified that McCall brought "barrels of some type of sludge material," possibly used ink. Doc. #917-12, PageID#33783. Cecil Hunter testified that he regularly saw Container Services bring 55-gallon drums of ink from McCall to the Site. Doc. #1015-2, PageID#38477-78; Doc. #1029, PageID##38657, 38669-70, 38820-21. Richard Hunter testified that McCall dumped small barrels with a dark substance on them, Doc. #1030, PageID##39085-86, and his Declaration states that McCall disposed of 55-gallon drums filled with old ink. Doc. #1010-2, PageID#38441. David Grillot also recalled seeing ink sent by McCall. Doc. #883-7, PageID#26608. This testimony is sufficient to create a genuine issue of material fact about whether McCall disposed of hazardous substances at the South Dayton Dump.

Recently-discovered evidence indicates that McCall may have disposed of *other* hazardous substances at the Site also. Plaintiffs recently discovered a report issued in 1975 by the United States Department of Health, Education and Welfare, National Institute for Occupational Safety and Health ("NIOSH"). Doc. #917-7. The NIOSH report indicates that McCall used numerous bulk solvents in its printing process, including kerosene, Ottoson #9, and several ink solvents. It further indicates that trichloroethylene ("TCE") was sprayed onto the new rolls of paper to soften the glue-coated starter. Doc. #917-7, PageID#33717.

Based on this report, Dr. Exner opines in his rebuttal report that it is "highly likely" that McCall generated and disposed of waste containing TCE and other solvents. Doc. #975-1, PageID#37411. ConAgra's expert witness, Tod Delaney, suggests that, because the TCE that was sprayed onto the rolls of paper would have evaporated or been consumed in the process, McCall would not have generated any waste containing TCE. Doc. #957-1, PageID##37111-12. Dr. Exner counters that "[s]ome TCE always remains in the rags, absorbents for spills, or other materials used to clean machinery. In addition, some product remains in the bulk containers such as drums, which are then disposed of." Doc. #975-1, PageID#37411.

ConAgra maintains that, even if TCE or other hazardous substances might have been contained in McCall's waste stream, there is no evidence proving that such waste was disposed of *at the South Dayton Dump.* On summary judgment, however, all reasonable inferences must be drawn in favor of the non-moving

42

party. Evidence shows that McCall was a major customer at the Site. Not only did McCall self-haul waste there, but it also arranged for the disposal of its waste through Container Services. The NIOSH report and Dr. Exner's rebuttal report indicate that McCall's waste stream would have included TCE and several other solvents containing hazardous substances. Given Edward Grillot's testimony about the drums of solvents that McCall brought to the Site, and Michael Wendling's testimony about the barrels of sludge material that McCall brought to the Site, it can reasonably be inferred that McCall disposed of these other hazardous substances at the South Dayton Dump.

Moreover, regardless of whether there is sufficient evidence to support a finding that McCall disposed of TCE and other solvents containing hazardous substances at the South Dayton Dump, the Court has already determined that genuine issues of material fact preclude summary judgment on the question of whether McCall disposed of waste ink containing hazardous substances at the Site.

## C. Liability for Vapor Intrusion Mitigation Costs

ConAgra argues that, even if summary judgment is not warranted on the question of whether it arranged for the disposal of hazardous substances at the South Dayton Dump and is therefore liable under § 9607(a)(3), the Court should grant summary judgment on the question of whether ConAgra should be allocated responsibility for any of the response costs related to vapor intrusion.

As previously noted, the 2013 ASAOC is focused on vapor intrusion mitigation in several buildings located at the Site. Vapor intrusion occurs when chemicals migrate through the soil into the foundations of structures and into the indoor air. Sub-slab and indoor air testing done at the Site in 2012 found that the concentrations of various volatile organic compounds, including trichloroethylene ("TCE"), exceeded the relevant screening levels and posed a threat to public health. Sub-slab samples also showed that methane exceeded the screening levels, posing the risk of an explosion. Doc. #1-1, PageID##34-38. The 2013 ASAOC requires Plaintiffs to conduct further testing and to install vapor abatement mitigation systems and gas extraction systems where necessary. *Id.* at PageID##40-41.

1. **Expert Witnesses Agree that, although TCE and other Chlorinated Volatile Organic Compounds are Driving the Remedy, there are other Contaminants of Concern**

Stephen Quigley, the General Manager for GHD, the Site's project director, estimated that the vapor intrusion remedy will cost $1.5-$2.7 million, plus agency oversight costs. Doc. #887-2, PageID##27807-08; Doc. #887, PageID#27742. He testified that, although methane was one of the initial causes of concern, TCE is now the primary contaminant of concern that is driving the vapor intrusion remedy. Nevertheless, methane does remain a contaminant of concern at the Site. Doc. #887, PageID##27745, 27758, 27760. Quigley testified that the remedy imposed for the TCE contamination has helped to reduce methane levels. He noted, however, that, had this remedy not been imposed, the EPA likely would

have taken other action to address the methane levels.  Doc. #917-23, PageID#33907.

Plaintiffs' expert witness, Dr. Jeffrey Smith, likewise opined that "[t]he occurrence, distribution and migration of CVOCs [chlorinated volatile organic compounds], primarily trichloroethene (TCE) and vinyl chloride (VC), and to a lesser degree methane and non-CVOCs like benzene identified in soil, shallow groundwater, soil gas and indoor air are the dominant contaminants that drive the response actions for [vapor intrusion] at the [] Site."  Doc. #891-2, PageID#28795.  Smith concluded that "[b]ased on current data, the [vapor intrusion] response actions related to explosive gases (methane) are relatively minor in comparison to contributions due to CVOCs (mainly TCE and vinyl chloride) beneath the business parcels along Dryden Road."  *Id.* at PageID#28796.

Plaintiffs' expert witness, Dr. Jurgen Exner, concedes that the primary vapor intrusion drivers at the Site are chlorinated solvents.  Doc. #886, PageID#27371. He concludes that, although chlorinated volatile organic hydrocarbons remain "[t]he primary chemicals of interest," aromatic hydrocarbons and methane are of secondary interest.  Doc. #894-7, PageID#29071.

The Dayton Power and Light Company's expert witness, Remy Hennet, likewise concluded that, even though vapor intrusion costs are driven primarily by chlorinated VOCs, non-chlorinated VOCs and methane also play a secondary role. Doc. #897-10, PageID#30353.  Walter Shields, an expert witness for Waste Management of Ohio, Inc., also concludes that "[m]ethane from landfill gas also

45

contributes to the need for [vapor intrusion] remediation." Doc. #897-15,

PageID#30377.

### 2. Genuine Issues of Material Fact Preclude Summary Judgment on the Question of Whether ConAgra Should Be Allocated Some Share of Vapor Intrusion Response Costs

ConAgra first argues that there is no proof that McCall's waste contained

TCE or any chlorinated solvents that are driving the vapor intrusion remedy. Dr.

Delaney and Dr. Exner agree that the *waste ink* would not have contained such

substances. Doc. #874-5, PageID#25730; Doc. #874-13, PageID#25868.

Nevertheless, as discussed above, the NIOSH report indicates that McCall

used TCE and the Court has found that genuine issues of material fact preclude

summary judgment on the question of whether McCall's TCE was disposed of at

the Site. Based on the NIOSH report, Dr. Exner concluded that McCall generated

waste containing volatile, chlorinated organic hydrocarbons that may affect vapor

intrusion at the Site. Doc. #883-6, PageID#27478.

Moreover, as Plaintiffs point out, even though TCE is the primary

contaminant of concern, non-chlorinated VOCs and methane are also a problem.

Dr. Exner concluded that McCall likely generated waste containing volatile aromatic

hydrocarbons, including benzene, that may affect vapor intrusion at the Site. Doc.

#886-3, PageID#27473, 27479. With respect to McCall, Exner further noted that

"[w]aste printing ink contains mineral and linseed oil, aliphatic hydrocarbons, and

phenolic resin oil. These materials all are likely to form methane." Doc. #886-3,

PageID#27473. Accordingly, regardless of whether McCall's waste contained TCE

or other chlorinated volatile organic compounds, genuine issues of material fact exist concerning whether McCall's waste contributed to the need for vapor intrusion mitigation at the Site.

ConAgra next argues that all of the alleged waste from McCall "would have been disposed of in an area of the Site that makes it highly unlikely that it could have contributed to the vapor intrusion now being remedied." Doc. #874, PageID#25664. Edward Grillot testified that the drums of solvents were dumped into a pit located to the south and west of the buildings affected by the vapor intrusion. Doc. #917-13, PageID##33789-91. Dr. Tod Delaney opines that, because the groundwater flows from this pit *away* from the buildings at issue, the substances contained in those drums could not have caused the vapor intrusion. Doc. #874-5, PageID#25731.[16]

Plaintiffs note, however, that Edward Grillot testified that drums of heavy liquids were sometimes dumped behind Office Number 3 instead, Doc. #681-1, PageID##11889-91, 11935-36, a location that expert witness Jeffrey Smith has identified as one of the focal points for the vapor intrusion issues. Doc. #867-2, PageID#23493.

In the Court's view, based on the foregoing, genuine issues of material fact preclude summary judgment on the question of whether McCall disposed of any

---

[16] Dr. Neil Ram maintains that Dr. Delaney failed to consider that the groundwater flow is variable and it sometimes flows in the opposite direction. Doc. #874-20, PageID#25922.

hazardous substances that contributed to the need for vapor intrusion mitigation at the South Dayton Dump. The opinions of the expert witnesses on allocation support this conclusion. Plaintiffs' allocation expert, Richard White, allocates a portion of the vapor intrusion response costs to McCall. Doc. #935-3, PageID##34600-03. Dr. Remy Hennet, DP&L's allocation expert, does also. He found that McCall contributed waste containing non-chlorinated volatile organic compounds, and assigned McCall a mid-range "vapor intrusion score" of 60. Doc. #884-3, PageID#26992; Doc. #884-2, PageID#26987; Doc. #884-6, PageID#27127.

Moreover, as Plaintiffs point out, they have incurred *general* response costs that are not attributable to any particular contaminant. These include Site investigation costs to determine the source and pathways of the contaminants of concern, and EPA oversight costs related to the 2013 ASAOC. McCall does not rebut this argument. The Court agrees that McCall's disposal of waste at the Site contributed to the need for these general response costs, regardless of whether its specific waste contributed to vapor intrusion problems at the Site.

### D.  Summary

The Court finds that genuine issues of material fact preclude summary judgment on the question of whether McCall disposed of hazardous substances at the South Dayton Dump. Likewise, ConAgra, as McCall's successor in interest, is not entitled to summary judgment on the question of liability for response costs related to vapor intrusion at the Site. Accordingly, the Court OVERRULES

ConAgra's Motion for Summary Judgment on Plaintiffs' Claims and Defendants'

Crossclaims or, in the Alternative, Partial Summary Judgment on Plaintiffs' Claims

and Defendants' Crossclaims for Contribution Related to the 2013 ASAOC. Doc.

#874.


## VIII. Defendant The Sherwin-Williams Company's Motion for Summary Judgment (Doc. #866)

Paragraph 70 of the Sixth Amended Complaint alleges as follows:

Defendant The Sherwin-Williams Company arranged for the disposal of wastes at the Site, including waste containing hazardous substances from its facilities and operation[s] located in and around Dayton. The Sherwin-Williams Company contributed to Contamination at the Site through its disposal of wastes that included hazardous substances at the Site.

Doc. #636, PageID#8258.

On November 30, 2017, the Court overruled Sherwin-Williams' first motion

for summary judgment on the question of whether Sherwin-Williams arranged for

the disposal of hazardous waste at the South Dayton Dump. Doc. #814,

PageID##22059-72. Edward Grillot and Michael Wendling each testified that

Sherwin-Williams disposed of paint, paint products, and paint thinner at the Site.

Sherwin-Williams has again moved for summary judgment. For purposes of

this motion, Sherwin-Williams does not dispute that it arranged for the disposal of

hazardous wastes at the Site. Instead, like ConAgra did, Sherwin-Williams argues

that the vapor intrusion remedy is driven by the presence of TCE and other

chlorinated volatile organic compounds and that, because there is no evidence that

49

Sherwin-Williams disposed of such substances at the Site, there is no basis to allocate responsibility for any vapor intrusion response costs. Sherwin-Williams points out that Dr. Exner concluded that it was "unlikely that Sherwin Williams [] generated waste streams that contained volatile, chlorinated organic hydrocarbons." Doc. #866-4, PageID#23440.

Dr. Exner did find, however, that Sherwin-Williams generated waste containing volatile aromatic hydrocarbons such as xylene and toluene that could affect vapor intrusion at the Site. *Id.* at PageID#23439, 23441. He also found that Sherwin-Williams likely generated several organic wastes that could lead to methane formation. *Id.* As noted above, the experts agree that although TCE and other chlorinated volatile organic compounds drive the vapor intrusion remedy at the Site, non-chlorinated volatile organic compounds and methane are also contaminants of concern.

Sherwin-Williams argues that there is no evidence that any of the vapor intrusion response costs incurred by Plaintiffs are specifically attributable to contamination from the xylene or methane. According to Sherwin-Williams, because there is no causal connection between the hazardous substances that it allegedly disposed of at the Site and Plaintiffs' incurrence of response costs for vapor intrusion mitigation, it would be unfair to allocate any portion of those response costs to Sherwin-Williams.

As discussed earlier, however, the high levels of xylene and methane found at the Site contributed to the need for further investigation and triggered the need

for a response to the vapor intrusion. Accordingly, the Court rejects Sherwin-Williams' claim of the absence of any causal connection between its waste disposal at the Site and Plaintiffs' incurrence of response costs.

Plaintiffs' allocation expert, Richard White, and Defendant DP&L's allocation expert, Remy Hennet, each allocated to Sherwin-Williams a portion of the response costs related to vapor intrusion at the Site, albeit a very small portion. Doc. #897-9, PageID#30300; Doc. #897-10, PageID#30356. In addition, some of the response costs incurred by Plaintiffs, such as investigation costs and EPA oversight costs are not attributable to any specific contaminants of concern. As with ConAgra, the mere presence of Sherwin-Williams' waste at the South Dayton Dump contributed to the incurrence of these general response costs.

Based on the foregoing, the Court finds that genuine issues of material fact preclude summary judgment on the question of whether Sherwin-Williams should be held partially responsible for Plaintiffs' response costs related to vapor intrusion at the Site. The Court therefore OVERRULES Defendant The Sherwin-Williams Company's Motion for Summary Judgment, Doc. #866.


IX.    **Defendant Cox Media Group Ohio, Inc.'s Motion for Partial Summary Judgment on Liability for Vapor Intrusion Claims (Doc. #872)**

Paragraph 61 of the Sixth Amended Complaint alleges as follows:

Defendant Cox or its predecessor is the legal successor in interest to Dayton Daily News and Dayton Journal Herald. Dayton Daily News and Dayton Journal Herald arranged for the disposal of wastes at the Site, including waste containing hazardous substances from their

facilities and operations located in and around Dayton. Dayton Daily
News and Dayton Journal Herald contributed to Contamination at the
Site through their disposal of wastes that included hazardous
substances at the Site.

Doc. #636, PageID#8256.

In November of 2017, the Court overruled Cox Media Group Ohio, Inc.'s

("CMGO") first motion for summary judgment on the question of whether CMGO's

predecessors disposed of waste at the Site. Doc. #814, PageID##22048-54.

Edward Grillot testified that these companies disposed of tubes of waste ink at the

Site, along with old newspapers, cardboard and wood pallets. Doc. #673-1,

PageID##9953-54; Doc. #679-10, PageID##11732-33; Doc. #684-1,

PageID##12890-91.[17] Although there was considerable evidence that contradicted

Grillot's testimony, the Court found that his testimony was sufficient to create a

genuine issue of material fact on the question of CMGO's nexus to the Site.[18]

---

[17] Dr. Exner concedes that, other than the waste ink, none of these other
materials constituted hazardous substances. Doc. #886, PageID#27370.

[18] More recently, Cecil and Richard Hunter also testified that the Dayton Daily
News dumped barrels of what appeared to be ink at the Site. Doc. #1029,
PageID##38692-93, 38820; Doc. #1010-2, PageID##28441-42; Doc. #1020-1,
PageID##38593-94. Richard Hunter later admitted, however, that he did not
know what was in the drums; he knew only what his grandfather had told him.
Doc. #1020-1, PageID##38600-01. Likewise, Cecil Hunter admitted that he did
not see barrels come in from the Dayton Daily News. Doc. #1029,
PageID##38826-27, 38872. Given the equivocal nature of their testimony, the
Court gives it little weight. In any event, the Court has already found that Edward
Grillot's testimony precludes summary judgment on the question of whether
CMGO's predecessors sent waste ink to the South Dayton Dump.

Like Sherwin-Williams, for purposes of the pending motion for summary judgment, CMGO does not dispute that it might be subject to "arranger" liability under 42 U.S.C. § 9607(a)(3). Rather, CMGO's motion is directed to its responsibility for response costs related to the vapor intrusion remedy that is the subject of the 2013 ASAOC. It argues that Plaintiffs have not presented sufficient evidence that CMGO's predecessors arranged for the disposal of wastes containing the specific kinds of hazardous substances that are driving the vapor intrusion remedy at the Site. CMGO further argues that summary judgment is warranted on the derivative declaratory judgment and unjust enrichment claims, and any pending cross-claims.

CMGO again notes that it is undisputed that chlorinated solvents, primarily TCE, are the driving force behind the vapor intrusion remedy. The Court agrees with CMGO that Plaintiffs have failed to present sufficient evidence to create a genuine issue of material fact as to whether *TCE or other chlorinated solvents* were disposed of by CMGO's predecessors at the South Dayton Dump.

Dr. Exner notes that CMGO's predecessors not only printed newspapers, but also operated a garage for repairing trucks and cars at the facility. Doc. #908-5, PageID#31730. Exner found that such garages typically generated degreasing solvents. *Id.* He maintains that these solvents likely contained chlorinated volatile organic compounds that may affect vapor intrusion at the Site. Doc. #886, PageID#27373; Doc. #908-5, PageID#31734. The problem is that there is

absolutely no evidence that CMGO's predecessors disposed of any such degreasing solvents at the South Dayton Dump.[19]

CMGO's expert witness, David Hagen, and Plaintiffs' expert witness, Jurgen Exner, agree that the waste ink, if disposed of at the Site, would have contained hazardous substances, but no TCE or other chlorinated solvents. Doc. #1034-1, PageID##39790-91; Doc. #872-1, PageID##24742, 24745. Accordingly, the Court agrees with CMGO that Plaintiffs have failed to produce sufficient evidence to create a genuine issue of material fact as to whether CMGO's predecessors disposed of TCE or other chlorinated volatile organic compounds at the Site.

That, however, does not end the inquiry. As previously noted, TCE and chlorinated solvents are not the only contaminants of concern at the Site. Non-chlorinated volatile organic compounds and methane are of secondary concern.

Dr. Remy Hennet, DP&L's expert witness, opined that the newspapers' waste ink "would typically contain aliphatic and aromatic solvents, carbon black (for black ink) or titanium (for white ink), and a petroleum base (among other components." These are non-chlorinated volatile organic compounds. Doc. #908-13, PageID#31981. CMGO's expert witness, David Hagen, conceded that the

---

[19]    Likewise, although Exner opined that the waste oil from the garage would have contained "PAH, aromatic organic hydrocarbons, and heavy metals such as lead," Doc. #908-5, PageID#31726, there is no evidence that CMGO's predecessors disposed of any such waste oil at the Site.

waste ink may have contained toluene and xylene, both non-chlorinated volatile organic compounds.  Doc. #908-8, PageID##31791-93.

Likewise, Dr. Exner opined that CMGO waste contained "lead, chromium, cadmium, zinc, copper, selenium, cyanide, and barium salts as well as PAH and kerosene."  Doc. #908-5, PageID#31726.  Most of these hazardous substances were contained in the waste ink.  Doc. #886, PageID#27370.  Dr. Exner also explained that waste ink contains oils and aliphatic hydrocarbons that are likely to form methane.  Doc. #908-5, PageID##31729-30.  He therefore concluded that it is likely that CMGO's predecessors generated wastes containing volatile aromatic hydrocarbons that may affect vapor intrusion at the Site, and generated organic wastes that can lead to methane formation.  *Id.* at PageID#31735.

Dr. Hennet also concluded that CMGO's predecessors contributed some non-chlorinated volatile organic compounds that led to vapor intrusion at the Site.  Doc. #908-13, PageID#31981.  He therefore allocated a small portion of the response costs for vapor intrusion to CMGO.  *Id.* at PageID#31979.  So did Plaintiffs' allocation expert, Richard White.  Doc. #908-12, PageID#31925.[20]

CMGO notes that its expert witness, David Hagen, concluded that "the hazardous substances typically associated with the newspaper printing industry would not cause or contribute to an unacceptable risk to human health from the

---

[20]  CMGO argues that White's allocations are based on the faulty assumption that CMGO sent two loads of waste to the Site each week from 1960-1972, an assumption derived from Edward Grillot's testimony.  Doc. #872-11, PageID##24850.

soil vapor to indoor air inhalation pathway at the Site." Doc. #1034-1, PageID#39790. He further concluded that "printing inks allegedly disposed of at the Site by DDN are not causing or contributing to the vapor intrusion risks that have been identified at the Site." *Id.* at PageID#39791. As explained above, however, Hagen's opinion is contradicted by the opinions of several other expert witnesses.

There is sufficient evidence to support a finding that CMGO's predecessors disposed of waste ink containing non-chlorinated volatile organic compounds that contributed to the vapor intrusion problem at the Site. There is also sufficient evidence to support a finding that they disposed of other organic wastes that could lead to methane formation which contributed to the need for the vapor intrusion removal action. Moreover, as before, Plaintiffs have incurred general response costs, including investigation costs and EPA oversight costs, not attributable to any particular contaminant of concern.

For the reasons cited above, the Court concludes that genuine issues of material fact preclude summary judgment on the question of whether CMGO should be held liable for a portion of the response costs related to vapor intrusion at the South Dayton Dump. The Court therefore OVERRULES Defendant CMGO's Motion for Partial Summary Judgment on Liability for Vapor Intrusion Claims, Doc. #872.

## X.  Conclusion

For the reasons set forth above, the Court:

- SUSTAINS Waste Management of Ohio, Inc.'s Motion for Summary Judgment Regarding Blaylock Trucking Co., Inc. (Doc. #865);
- OVERRULES Defendant The Sherwin-Williams Company's Motion for Summary Judgment (Doc. #866);
- SUSTAINS Waste Management of Ohio, Inc.'s Motion for Summary Judgment Regarding Industrial Waste Disposal Co., Inc. (Doc. #868);
- OVERRULES Defendant Cox Media Group Ohio, Inc.'s Motion for Partial Summary Judgment on Liability for Vapor Intrusion Claims (Doc. #872);
- OVERRULES Defendant Pharmacia, LLC's Motion for Summary Judgment (Doc. #873); and
- OVERRULES ConAgra Grocery Products Company, LLC's Motion for Summary Judgment on Plaintiffs' Claims and Defendants' Cross Claims or, in the Alternative, Partial Summary Judgment on Plaintiffs' Claims and Defendants' Cross Claims for Contribution Related to the 2013 ASAOC (Doc. #874).

Date: September 23, 2019

WALTER H. RICE
UNITED STATES DISTRICT JUDGE