UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | |
|---|---|
| HOBART CORPORATION, et al., | )Case No. 3:13-cv-115 |
| | ) |
| Plaintiffs, | )Judge Walter Herbert Rice |
| | ) |
| v. | ) |
| | ) |
| THE DAYTON POWER AND LIGHT | ) |
| COMPANY, et al., | ) |
| | ) |
| Defendants. | ) |

* * * * * * * * * * * * * * * * * * * * * * * * *

ORAL DEPOSITION OF

LARRY DEWAYNE LAYFIELD

TAKEN: February 9, 2017

* * * * * * * * * * * * ** * * * * * * * * * * * * *


ORAL DEPOSITION OF LARRY DEWAYNE LAYFIELD, produced
as a witness at the instance of the PLAINTIFFS, and duly
sworn, was taken in the above-styled and numbered cause
on February 9, 2017, from 9:35 a.m. to 4:22 p.m.
before HOPE LEWANDOSKI in and for the State of Texas,
reported by machine shorthand, at the law offices of
STRASBURGER & PRICE, LLP, 909 Fannin Street, Suite 2300,
Houston, Texas  77010, pursuant to the Federal Rules of
Civil Procedure 30(b)(6).

Page 2

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFFS:

 4       MR. DAVID ROMINE
         LANGSAM STEVENS SILVER & HOLLAENDER, LLP
 5       1818 Market Street, Suite 2610
         Philadelphia, Pennsylvania  19103
 6       Phone:  (215) 732-3255
         Fax:    (215) 732-3260
 7       dromine@lssh-law.com

 8

 9   FOR THE DEFENDANT DAYTON POWER AND LIGHT COMPANY:

10       MR. DREW H. CAMPBELL
         BRICKER & ECKLER, LLP
11       100 South Third Street
         Columbus, Ohio  43215-4291
12       Phone:  (614) 227-2300
         Fax:    (614) 227-2390
13       dcampbell@bricker.com

14

15   FOR THE DEFENDANT DAYTON TIRE/BRIDGESTONE AMERICAS
         TIRE OPERATIONS, LLC:
16
         MR. DAVID T. MOSS
17       HANNA CAMPBELL & POWELL, LLP
         3737 Embassy Parkway, Suite 100
18       Akron, Ohio  44333
         Phone:  (330) 670-7326
19       Fax:    (330) 670-7451
         dmoss@hcplaw.net
20

21   FOR THE DEFENDANT BRIDGESTONE AMERICAS TIRE
         OPERATIONS, LLC:
22
         MR. WILLIAM D. WICK
23       WACTOR & WICK, LLP
         180 Grand Avenue, Suite 950
24       Oakland, California  94612
         Phone:  (510) 465-5750
25       Fax:    (510) 465-5697
         bwick@ww.envlaw.com
26
```

```
 1                    APPEARANCES CONTINUED

 2    FOR THE DEFENDANT WASTE MANAGEMENT COMPANY:
           (Appeared telephonically)
 3
           MS. KRISTEN LAUGHRIDGE GALE
 4         NIJMAN FRANZETTI, LLP
           10 S. LaSalle Street, Suite 3600
 5         Chicago, Illinois  60603
           Phone:  (217) 390-0309
 6         Fax:    (312) 251-4610
           kg@nijmanfranzetti.com
 7

 8    FOR THE DEFENDANT FRANKLIN IRON & METAL CORPORATION:
           (Appeared telephonically)
 9
           MR. ROBERT J. THUMANN
10         CREHAN & THUMANN, LLC
           404 E. 12th Street, 2nd Floor
11         Cincinnati, Ohio  45202
           Phone:  (513) 381-5050
12         Fax:    (513) 381-1700
           thumann@ctlawcincinnati.com
13

14    FOR THE DEFENDANT COX MEDIA GROUP, INC.:
           (Appeared telephonically)
15
           MR. JOHN A. HEER
16         ROETZEL & ANDRESS
           222 South Main Street
17         Akron, Ohio  44308
           Phone:  (330) 762-7974
18         Fax:    (330) 376-4577
           jheer@ralaw.com
19

20    FOR THE DEFENDANT CONAGRA GROCERY PRODUCTS COMPANY, LLC:
           (Appeared telephonically)
21
           MR. JOHN A. ANDREASEN
22         MCGRATH NORTH
           First National Tower
23         1601 Dodge Street, Suite 3700
           Omaha, Nebraska  68102
24         Phone:  (402) 633-1444
           Fax:    (402) 633-0126
25         jandreasen@mcgrathnorth.com
```

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 4

```
 1                     APPEARANCES CONTINUED

 2   FOR THE DEFENDANT DAYTON POWER & LIGHT, INC.:
         (Appeared telephonically)
 3
         MR. JOSEPH G. STRINES
 4       AES
         1065 Woodman Drive
 5       Dayton, Ohio  45432
         Phone:  (937) 259-7348
 6       Fax:    (937) 259-7171
         joseph.strines@aes.com
 7

 8   FOR THE DEFENDANT SHERWIN-WILLIAMS COMPANY:
         (Appeared telephonically)
 9
         MS. KATHERINE S. DECKER
10       SHUMAKER, LOOP & KENDRICK, LLP
         1000 Jackson Street
11       Toledo, Ohio  43604
         Phone:  (419) 321-1452
12       Fax:    (419) 241-6894
         kdecker@slk-law.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 5

1                          INDEX
                                              PAGE
2

3    Appearances.......................................    2

4    LARRY DEWAYNE LAYFIELD

5        Examination by Mr. Romine....................    10
         Examination by Mr. Campbell..................   104
6        Examination by Ms. Gale......................   194
         Further Examination by Mr. Romine............   200
7

8    Signature and Changes............................   212

9    Reporter's Certificate...........................   214

10                        EXHIBITS

11   NO. DESCRIPTION                              PAGE

12   Exhibit A........................................    10

13       Objections of Defendant Bridgestone Americas
         Tire Operations, LLC, to Plaintiffs' Notice of
14       Rule 30(b)(6) Deposition

15   Exhibit 1........................................    12

16       Notice of Rule 30(b)(6) Deposition of

17       Bridgestone Americans Tire Operations, LLC

18   Exhibit 2........................................    17

19       Letter from William D. Wick to Carol Ropski -

20       9-28-12

21   Exhibit 3........................................    22

22       Letter from William D. Wick to Carol Ropski -

23       2-2-15

24

25

Case: 3:13-cv-00115-WHR Doc #: 1132-5 Filed: 01/10/20 Page: 6 of 216 PAGEID #: 42502

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 6

1                        EXHIBITS CONTINUED

2    NO. DESCRIPTION                                        PAGE

3    Exhibit 4........................................    26

4        Letter from David Moss to Leslie Patterson –

5        3-13-15

6    Exhibit 5........................................    30

7        Letter from Stephen V. Moser to Ruth Mancos;

8        Dayton interoffice memo – Re: 1977 Industrial

9        Waste Management Survey with attachments –

10       6-19-87

11   Exhibit 6........................................    58

12       Letter from J.R. Laman to U.S. EPA with

13       attachments – 7-24-81

14   Exhibit 7........................................    64

15       Quick Trash Service Invoice

16   Exhibit 8........................................    65

17       George Wiley Sanitary Service Invoice

18   Exhibit 9........................................    67

19       Copies of checks written to Peerless Transportation

20   Exhibit 10.......................................    72

21       Solvent Usage; Letter from Ashland Chemical

22       Company to Dayton Tire & Rubber Company – 7-17-72

23   Exhibit 11.......................................    74

24       Internal memo – Unisol for Motor Cleaning;

25       Letter from Chemsearch to Firestone – 8-25-67

Hobert Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 7

1                      EXHIBITS CONTINUED

2    NO. DESCRIPTION                                      PAGE

3    Exhibit 12......................................  84

4          Internal memo - Formaldehyde & Resorcinol -

5          8-14-16; Dayton interoffice letter from

6          J.W. Nevius, Sr., to George Wilson - 8-11-67

7    Exhibit 13......................................  88

8          Internal memo - Methyl Chloroform - 8-14-16;

9          Dayton interoffice letter from J.W. Nevius, Sr.,

10         to George Wilson - 8-2-67

11   Exhibit 14......................................  91

12         Environmental Data Summary - Dayton Tire &

13         Rubber Co., Dayton, Ohio - Solvent Purchases

14         and Usage Data

15   Exhibit 15...................................... 120

16         List of names who came up in review of other

17         documents by witness - list of depositions and

18         sworn statements reviewed by witness

19   Exhibit 16...................................... 120

20         Environmental Data Summary  - Dayton Tire &

21         Rubber Co., Dayton, Ohio - Solvent Purchases

22         and Usage Data (Complete copy)

23   Exhibit 17...................................... 121

24         Aerial photo - color copy

25

Mike Mobley Reporting
800-894-4327

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 8

1                          EXHIBITS CONTINUED

2    NO. DESCRIPTION                                    PAGE

3    Exhibit 18........................................  123

4        Aerial photo - color copy

5    Exhibit 19........................................  123

6        Letter from William Wick to Leslie Patterson -

7        2-2-15; letter from Dennis Mantel to

8        Ralph Ball - 5-7-80

9    Exhibit 20........................................  143

10       Letter from David Moss to Leslie Patterson -

11       3-13-15; letter from Mr. Dennis Mantel to

12       Ralph Ball - 5-7-80

13   Exhibit 21........................................  147

14       Solvent Usage (Gallons) - Data Taken from

15       Accounting Report TJV-39 - Monthly Issue of

16       Raw Materials

17   Exhibit 22........................................  151

18       Letter from J.R. Laman to Curtis Marshall with

19       attachments - 5-29-81

20   Exhibit 23........................................  158

21       Major Solvent Purchases by Month and Year as

22       Received; Solvent Usage (Gallons) - Data Taken from

23       Accounting Report TJV-39 - Monthly Issue of

24       Raw Materials

25

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 9

1                          EXHIBITS CONTINUED

2    NO. DESCRIPTION                                         PAGE

3    Exhibit 24....................................... 164

4         Interoffice letter from N.A. Daigle - 6-26-80

5         Re: Hazardous Waste Classification Resource

6         Conservation and Recovery Act (RCRA)

7    Exhibit 25....................................... 165

8         Letter from O.C. McLemore to Paul Lincoln -

9         5-21-75

10   Exhibit 26....................................... 171

11        Boiler History & Operating Data; Boiler Fuel

12        Characteristics & Consumption Data

13   Exhibit 27....................................... 175

14        Letter from Ohio Department of Health with

15        enclosure - Ohio Department of Health Air

16        Pollution Survey

17   Exhibit 28....................................... 186

18        Interoffice memo with attachments from Mr. Roose -

19        Subject:  P.C.B. Handling - 6-30-80

20

21

22

23

24

25

Page 10

1                    (Defendant's Exhibit A marked.)

2                    (Witness sworn.)

3              MR. MOSS:  And before we commence the

4    deposition, I'd just like to note that I have had marked

5    as Defendant's Exhibit A Bridgestone's objections to the

6    notice of deposition here today, and I'm incorporating

7    that as part of the record.  Thank you.

8                    LARRY DEWAYNE LAYFIELD,

9    having been first duly sworn, testified as follows:

10                   EXAMINATION

11   BY MR. ROMINE:

12       **Q.   Good morning, Mr. Layfield.**

13       A.   Good morning.

14       **Q.   My name is David or Dave Romine.  I represent**

15   **Hobart Corporation, Kelsey-Hayes Company and NCR**

16   **Corporation in a lawsuit about a place called the South**

17   **Dayton Dump, also known as the Broadway Dump or the**

18   **Grillot Dump.  And I'm going to be asking you some**

19   **questions today about Bridgestone Americas Tire**

20   **Operations, LLC.  Is that okay with you?**

21       A.   Yes.

22       **Q.   Great.  Could you give us your full name and**

23   **address.**

24       A.   It's Larry Dewayne Layfield.  And my business

25   address is PO Box 3829, Beaumont, Texas 77704.

1      Q.   I'd like to go over what I call the ground

2   rules for this morning's deposition.  Mr. Layfield, are

3   you a licensed attorney?

4      A.   Yes.

5      Q.   And so you've taken depositions before?

6      A.   Yes.

7      Q.   Okay.  Have you ever been a witness at a

8   deposition before?

9      A.   Yes.

10      Q.   On behalf of a company?

11      A.   Yes.

12      Q.   Okay.  So you're probably pretty familiar with

13   what I'm going to say, but I'll say it anyway.  The

14   deposition format is questions and answers.  It's

15   important that you understand a question.  It's okay to

16   say that you don't understand it and ask for

17   clarification.  It's not a test, so say what you know.

18   If you don't know, say you don't know.  It's okay to ask

19   to repeat if you don't hear me or understand me.  We're

20   going to be taking turns so that the court reporter can

21   understand what we say.  If you anticipate what my

22   question is going to be, please let me finish so the

23   court reporter can take it all down.  And, likewise, if

24   I see where you're going with an answer, I'll try and

25   stay quiet until you finish.  That way she can take it

Page 12

 1    all down.  And it's okay to ask for -- for breaks.  You

 2    okay with that?

 3        A.   Yes.

 4        Q.   Great.  And do you understand this is a

 5    deposition involving a lawsuit that's been filed in the

 6    Southern District of -- Southern District of Ohio called

 7    the Hobart Corporation, and others, versus the Dayton

 8    Power and Light Company, and others?

 9        A.   Yes.

10        Q.   Okay.

11             MR. ROMINE:  Is it okay if we start with

12    1?  We have a Defendant's A.  We'll start with

13    Plaintiff's 1.

14             (Exhibit No. 1 marked.)

15             MR. ROMINE:  For those of you on the

16    telephone, Exhibit 1 is the notice of deposition.

17        Q.   (BY MR. ROMINE)  Mr. Layfield, have you seen

18    Exhibit 1 before?

19        A.   Yes.

20        Q.   And do you recognize it?

21        A.   Yes.

22        Q.   What is it?

23        A.   It's the -- what's commonly referred to as a

24    30(b)(6) deposition notice of Bridgestone Americas Tire

25    Operations, LLC.

Page 13

1     Q.    Okay.  And are you prepared to testify today

2  regarding the topics listed in this notice?

3     A.    Subject to the objections that were served to

4  this notice, yes.

5     Q.    Is it okay if I refer to Bridgestone Americas

6  Tire Operations, LLC, as "BATO"?

7     A.    Yes, that's fine.

8     Q.    And so when I say "BATO," you'll know that I'm

9  talking about Bridgestone Americas Tire Operations, LLC?

10    A.    Yes.

11    Q.    Great.  Are you a BATO employee now?

12    A.    No.

13    Q.    Have you ever been?

14    A.    I was an employee of a predecessor of what is

15  now known as BATO, yes.

16    Q.    And what was that predecessor?

17    A.    At that time it was called

18  Bridgestone/Firestone, Inc.

19    Q.    And when was that, roughly?

20    A.    1994 to 1997.

21    Q.    And you were a full-time employee of

22  Bridgestone/Firestone, Inc., at that time?

23    A.    Yes.

24    Q.    And where was that?

25    A.    The employment began in Akron, Ohio, and then

Page 14

1    moved to Houston, Texas.

2        Q.    So you were an employee of

3    Bridgestone/Firestone, Inc., at some point in

4    Houston, Texas?

5        A.    Yes.

6        Q.    Were the headquarters of

7    Bridgestone/Firestone, Inc., in Houston at that time?

8        A.    No.

9        Q.    Where were they?

10       A.    The headquarters were Nashville, Tennessee.

11       Q.    Okay.  And -- and what was your capacity

12   working in Houston for Bridgestone/Firestone, Inc.?

13       A.    My title throughout the time I was employed by

14   Bridgestone/Firestone was senior counsel in the law

15   department.

16       Q.    If we could turn -- turn back the clock.  Did

17   you go to college at some point?

18       A.    Yes.

19       Q.    And where did you go to college?

20       A.    My undergraduate degree was from Lamar

21   University in Beaumont, Texas.  My law degree is from

22   University of Texas in Austin.

23       Q.    And did you get a degree from Lamar

24   University?

25       A.    I did.

Page 15

1      Q.    And what was that degree?

2      A.    A bachelor of science in chemical engineering.

3      Q.    And when did you get that degree?

4      A.    1987.

5      Q.    Okay.  And did you go straight from Lamar

6   University to law school?

7      A.    Yes.

8      Q.    And when did you graduate from law school?

9      A.    1990 May.

10     Q.    So that was a full-time, three-year law

11   course?

12     A.    Correct.

13     Q.    And did you obtain employment after you

14   graduated from law school?

15     A.    Yes.

16     Q.    And where was that?

17     A.    The first employment was as a clerk to Thomas

18   Gibbs Gee of the 5th Circuit.  And after the clerkship I

19   went to work for Vinson & Elkins in Houston, Texas.

20     Q.    And how long did your clerkship last?

21     A.    Approximately one year.  Judge Gee retired, so

22   it was just short of a year.

23     Q.    And -- and then you worked for Vinson & Elkins

24   for about three years?

25     A.    Correct.

Page 16

1      Q.    And -- and then that brought you to

2   Bridgestone/Firestone, Inc.?

3      A.    Yes.

4      Q.    And after your time with

5   Bridgestone/Firestone, Inc., did you obtain full-time

6   employment after that?

7      A.    Yes.  I had my -- since that time I've had my

8   own private practice.

9      Q.    Okay.  And so you've been in -- in private

10  practice, then, since 1997?

11     A.    Correct.

12     Q.    About -- about 20 years?

13     A.    Yes.

14     Q.    And where -- where is the offices of your law

15  firm?

16     A.    I have a couple of offices.  The primary

17  office is in Beaumont, Texas.

18     Q.    Okay.  And you've been outside counsel, I take

19  it, to BATO or its predecessors since 1997?

20     A.    Yes.

21     Q.    And does your firm have clients other than

22  BATO and its predecessors?

23     A.    Yes.

24     Q.    And are you being compensated for your time

25  here today?

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 17

1      A.    Yes.

2      Q.    **And how much are you being compensated?**

3      A.    The typical hourly rate that I always charge

4    BATO, which is $276 an hour.  I think that's right.

5      Q.    Okay.

6                   **(Exhibit No. 2 marked.)**

7      Q.    **Exhibit 2.**

8                   MR. ROMINE:  For those of you on the

9    telephone, Exhibit 2 is a letter dated September 28,

10   2012.  The letterhead is Wactor & Wick, LLP, William D.

11   Wick, and it's addressed to Carol Ropski, United States

12   Environmental Protection Agency.

13     Q.    **(BY MR. ROMINE)  Mr. Layfield, have you had a**

14   **chance to look at Exhibit 2?**

15     A.    Yes, I have.

16     Q.    **Do you recognize it?**

17     A.    I don't believe I have seen this particular

18   letter before today.

19     Q.    **Okay.**

20     A.    But I've read it.

21     Q.    **Okay.  If I could ask you to turn to the -- or**

22   **not turn, but look at the last sentence of the second**

23   **paragraph there.  It says "BATO's predecessor acquired**

24   **the assets of the Dayton Tire & Rubber Company in 1960."**

25   **Do you see that?**

Page 18

1      A.   I'm sorry.  Which -- which sentence?

2      **Q.   The last sentence of the -- of the second**

3   **paragraph.**

4      A.   Oh, yes.  Okay.  In the parenthetical.  All

5   right.  Yes.

6      **Q.   Right.**

7      A.   Uh-huh.

8      **Q.   And is that accurate?**

9      A.   I would say 1961 rather than 1960.

10      **Q.   Okay.**

11      A.   But other than that, yes.

12      **Q.   Okay.  And what was the name of BATO's**

13   **predecessor that acquired the assets of the Dayton Tire**

14   **& Rubber Company?**

15      A.   In 1960 it would have been known as the

16   Firestone Tire & Rubber Company.

17      **Q.   Okay.  And I'll represent to you that -- that**

18   **I've seen some reference to a Dayton Tire & Rubber**

19   **Company facility at 2342 Riverview Avenue in Dayton.**

20   **And my question to you is does that sound right as to**

21   **what generally the assets were that -- that BATO's**

22   **predecessor acquired?**

23      A.   Generally, yes.

24      **Q.   All right.**

25      A.   Well, let me -- the way you phrased the

1   question was -- at the time BATO's predecessor acquired

2   it, it wasn't known as Dayton Tire & Rubber Company.  It

3   was known as -- I think it was owned by DAYCO, Inc.  So

4   those -- what -- what you said are the assets they

5   acquired.

6         Q.   Okay.

7         A.   Whether it was known as DAYCO, Inc., or -- or

8   the Dayton Tire & Rubber Company, I'm not 100 percent

9   sure.

10        Q.   Okay.

11        A.   But those were the assets.

12        Q.   Okay.  So at the time of the acquisition in

13   those -- the plant at -- on Riverview Avenue in Dayton

14   may have been known as DAYCO?

15        A.   It -- it may have.  I'm not -- I'm not 100

16   percent.  I know that the -- the acquisition agreement

17   was with a company called DAYCO.

18        Q.   Okay.

19        A.   So. . .

20        Q.   I'm not worried so much about DAYCO, but at

21   some point it became known as Dayton Tire & Rubber

22   Company?

23        A.   Correct.

24        Q.   Okay.  And Firestone Tire & Rubber Company

25   renamed that division, let's say, Dayton Tire & Rubber

Page 20

 1    **Company?**

 2       A.   My --                       *

 3                MR. MOSS:  Just note objection to the

 4    form of the question.

 5                THE WITNESS:  Yeah.  My understanding is

 6    it wasn't a division.  It was actually a separate

 7    corporation.

 8       Q.   **(BY MR. ROMINE)  Okay.  And then the end of**

 9    **that corporation was Dayton Tire & Rubber Company?**

10       A.   Inc., yes.

11       Q.   **Inc.  Okay.**

12                **And was Dayton Tire & Rubber Company,**

13    **Inc., a subsidiary of Firestone Tire & Rubber Company?**

14       A.   Yes.

15       Q.   **If I could ask you to look a little bit**

16    **further down the page.  The first sentence of the third**

17    **and final paragraph begins "Nevertheless, without any**

18    **admission of liability and reserving its rights, BATO is**

19    **interested in negotiating a resolution of its alleged**

20    **potential liability in connection with the site."  Do**

21    **you see that?**

22       A.   I see the sentence, yes.

23       Q.   **Okay.  And the site refers to the South Dayton**

24    **Dump and Landfill in Moraine, Ohio?**

25       A.   That -- in the context of this letter, that

Page 21

1   appears to be the case, yes.

2      Q.    Okay.  And without getting into the substance

3   of the negotiations, did BATO negotiate a resolution of

4   its alleged potential liability in connection with the

5   South Dayton Dump and Landfill site with EPA?

6                  MR. MOSS:  Well, let me just note an

7   objection to testimony pertaining to settlement

8   negotiations and attempted resolution of the case.

9                  But subject to the objection, you may

10  answer.

11                 THE WITNESS:  Yeah.  I -- as I read the

12  deposition notice, settlement negotiations with the EPA

13  were not a topic that I was designated to speak on, so

14  I'm not comfortable answering on behalf of BATO as a

15  representative.

16     Q.    (BY MR. ROMINE)  Okay.  Without getting into

17  the substance, though, of those negotiations, do you

18  know if such negotiations have taken place?

19                 MR. MOSS:  Just note an objection.  And I

20  think he's not designated to speak to that topic.  And

21  this is a Rule 30(b) deposition, so I think it's outside

22  the scope of the notice.

23                 THE WITNESS:  And as a human being, not

24  as a 30 -- not as the corporation, I'll tell you I don't

25  know.

Page 22

 1      Q.    (BY MR. ROMINE)   Okay.   Do you know if BATO

 2    has actually resolved its alleged potential liability

 3    with EPA?

 4                  MR. MOSS:  Objection.  Same objection.

 5                  THE WITNESS:  And, yeah, the answer is

 6    the same.  I don't know.

 7      Q.    (BY MR. ROMINE)   Okay.

 8                  (Exhibit No. 3 marked.)

 9                  MR. MOSS:  And, David, before you

10    question regarding this letter, I -- I've been advised

11    by Mr. Wick, the author of both Exhibit 2 and Exhibit 3,

12    that the 1980 letter from Industrial Waste Disposal

13    Company, which is referenced in the body of both

14    letters, was actually attached to those letters.  And

15    it's not attached to the exhibits, so we'll just object

16    on that basis, that they're incomplete.  But go ahead.

17      Q.    (BY MR. ROMINE)   Mr. Layfield, have you had a

18    chance to look at Exhibit 3?

19      A.    I'm kind of in the middle of it.

20      Q.    Okay.

21      A.    Give me just --

22      Q.    Take -- take your time.

23      A.    Okay.

24      Q.    Have you had a chance to look at Exhibit 3?

25      A.    Yes.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.    Larry Dewayne Layfield

Page 23

1    Q.    And have you seen that before?

2    A.    I don't think I've seen this particular letter

3    before today.

4    Q.    Okay.  If I could ask you to look at the --

5    the first paragraph --

6              MR. ROMINE:  For those of you on the

7    telephone, Exhibit 3 is a letter with the letterhead

8    Wactor & Wick, LLP, William D. Wick.  It's dated

9    February 2, 2015.  Addressed to U.S. Environmental

10   Protection Agency, Leslie Patterson, Remedial Project

11   Manager.

12   Q.    (BY MR. ROMINE)  In the first paragraph there,

13   it says "I'm writing in preliminary response to the

14   special notice letter from Joan Tanaka to Bridgestone

15   Americas Tire Operations, LLC, dated -- (BATO), dated

16   January 16, 2015, relating to the South Dayton Dump and

17   Landfill Site."  And my question to you is did BATO

18   receive a special notice letter from Joan Tanaka on or

19   about January 16, 2015?

20   A.    Based on the representation in this letter, I

21   have no doubt that they did.

22   Q.    Okay.  Have you seen that letter?

23   A.    Not that I specifically recall, but I've seen

24   a great number of documents.  But I don't recall

25   specifically seeing that letter.

Page 24

1      Q.   Fair enough.  And I'm going to ask you to go

2   back to Exhibit 2 just for a moment.  Similar question.

3   First paragraph says "On behalf of Bridgestone Americas

4   Tire Operations, LLC (BATO), I am writing in response to

5   the General Notice letter from Jason El-Zein dated

6   September 13, 2012."  And my question to you is did BATO

7   get a General Notice letter from EPA on or about

8   September 13, 2012?

9      A.   And based on the representations in Exhibit

10   2, I have no doubt that they did.

11      Q.   Okay.  Do you remember seeing that letter?

12      A.   I do not specifically remember seeing that

13   letter, no.

14      Q.   Okay.  And if you go back to Exhibit 3.  If I

15   could ask you to just read to yourself -- I'm not going

16   to read it again.  Read to yourself the very last

17   paragraph on the first page.

18      A.   Yes, I've done it.

19      Q.   And, again, did -- without getting into the

20   substance of the negotiations, did BATO discuss with EPA

21   a resolution of its alleged potential liability in

22   connection with this site?

23              MR. MOSS:  Same objection as before with

24   regard to settlement negotiations and this line of

25   inquiry being outside the scope of the notice.

Page 25

1              THE WITNESS:  And I'm not designated to

2    speak on behalf of the corporation -- or company BATO,

3    but as a human I don't know.

4        Q.   (BY MR. ROMINE)  Okay.  And, again, did

5    BATO -- well, let me take a break here.

6                   Is it more commonly referred to BATO,

7    short A, or BATO, long A?

8        A.   I've always used long A, BATO, but --

9        Q.   BATO?

10       A.   Yeah.  But either is fine.

11       Q.   Okay.

12              MR. CAMPBELL:  That's a short A.

13              THE WITNESS:  BATO.  I think you're

14   right.

15              MR. CAMPBELL:  Note my objection.

16       Q.   (BY MR. ROMINE)  Okay.  And, again --

17              MR. MOSS:  It's an English teacher's

18   opinion.

19       Q.   (BY MR. ROMINE)  Did -- did BATO resolve its

20   alleged potential liability in connection with the South

21   Dayton Dump and Landfill site with EPA?

22              MR. MOSS:  Same objection.

23              You may answer.

24              THE WITNESS:  Yeah.  And not speaking on

25   behalf of BATO, because I'm not designated to speak on

Page 26

1   settlement negotiations -- but as a human I don't know.

2                    MR. ROMINE:  Exhibit 4.

3                    (Exhibit No. 4 marked.)

4                    THE WITNESS:  Okay.

5       **Q.    (BY MR. ROMINE)  Mr. Layfield, have you had a**

6   **chance to look at Exhibit 4?**

7       A.    Yes.

8       **Q.    And can you --**

9                    MR. MOSS:  If I could, David.  I'm sorry

10  to interrupt.  This -- this document also had at least

11  one enclosure, if not more, that are not included with

12  the letter, so I would just object to the exhibit as not

13  being complete.  But subject to the objection. . .

14                   MR. ROMINE:  For those of you on the

15  phone, Exhibit 4 is a letter.  The letterhead is Hannah

16  Campbell & Powell, LLP, David T. Moss, and the date is

17  March 13, 2015.

18      **Q.    (BY MR. ROMINE)  And, Mr. Layfield, what is**

19  **Exhibit 4?**

20      A.    Exhibit 4 is a response to -- it's addressed

21  to Leslie Patterson, the remedial project manager at the

22  United States Environmental Protection Agency.  It is --

23  states that it is in response to a request for

24  information regarding the South Dayton Dump and Landfill

25  site that was apparently dated January 16, 2015.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                Larry Dewayne Layfield

Page 27

1      Q.   Okay.  And have you seen this before?

2      A.   I have seen this letter before, yes.

3      Q.   Are you familiar with the term "104(e)

4   request"?

5      A.   Yes.

6      Q.   And is this letter, Exhibit 4, a response to a

7   104(e) request?

8      A.   It's a response to a request for information.

9   I don't know if -- let's see.  I don't know.  I'll tell

10  you that 104(e) is referenced on the second page of the

11  letter --

12     Q.   Okay.

13     A.   -- in terms of its United States code site

14  9604(e).  But whether that request dated January 16,

15  2015, was couched as a 104(e) only or if it was

16  something else or a 104(e) plus, I don't know.

17     Q.   Have you seen that information request dated

18  January 16, 2015?

19     A.   Not that I recall.

20     Q.   I'm going to read -- read to you a

21  sentence -- second sentence, first paragraph.  "The

22  response is submitted on behalf of Bridgestone American

23  Tire Operations, LLC, with regard to operations of the

24  Dayton Tire and Rubber Company ('the Company') from 1961

25  to 1980."  Do you see that?

Page 28

1      A.    Yes.

2      **Q.    And what is the significance of the dates 1961**

3   **to 1980?**

4      A.    Those were the years that the Dayton Tire &

5   Rubber Company, as a subsidiary of BATO, operated the

6   plant that was acquired in 1961.  So that -- the plant

7   that you referred to earlier -- you know, the assets? --

8   it was operated by the Dayton Tire & Rubber Company as a

9   subsidiary of what is now known as BATO from '61 to '80.

10  It was closed in 1980.

11     **Q.    Okay.  Did the Dayton Tire & Rubber Company**

12  **continue to own the Riverview Avenue property for some**

13  **time after 1980?**

14     A.    Until some date in 1981, yes.

15     **Q.    And what happened in 1981?**

16     A.    1981 the property, buildings and fixtures were

17  sold to a company in Akron, Ohio.

18     **Q.    Do you remember the name of that company?**

19     A.    J.W. something.

20     **Q.    Okay.**

21     A.    I don't remember their whole name, but it was

22  J.W. something.  Kind of sounded like an -- a property

23  investment company name but. . .

24     **Q.    Okay.  So did -- did Firestone sell the stock**

25  **of the Dayton Tire & Rubber Company when it sold the**

Page 29

1    **Riverview Avenue property?**

2        A.    I don't believe so.  I think they just sold

3    the assets.

4        **Q.    Okay.  And when it talks about the operations**

5    **of the Dayton Tire & Rubber Company, those -- those**

6    **operations were mainly, then, at the Riverview Avenue**

7    **plant in Dayton, Ohio?**

8        A.    Yes.

9        **Q.    Okay.  And if you look at page two, Answer**

10   **1, this is a corporate response which is signed by**

11   **counsel on behalf of the company.  Do you see that?**

12       A.    Yes.

13       **Q.    And if you look at the very last page, it's**

14   **signed by Mr. Moss, who's here today?**

15       A.    Yes.

16       **Q.    And the company is the Dayton Tire & Rubber**

17   **Company?**

18       A.    That is the way it's -- yeah, that's the way

19   it's defined, yes.  Well, you know, interesting.  If you

20   read the whole sentence, okay, it says "The response" --

21                MR. CAMPBELL:  I'm sorry.  Just for the

22   record, where are you reading?

23                THE WITNESS:  First paragraph of Exhibit

24   4.

25                MR. CAMPBELL:  Okay.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                Larry Dewayne Layfield

Page 30

1                    THE WITNESS:  It says "The response is

2    submitted on behalf of Bridgestone Americas Tire

3    Operations, LLC, with regard to the operations of the

4    Dayton Tire and Rubber Company," and then it says "'the

5    Company.'"  So my answer has to be whatever Mr. Moss

6    intended "'the Company'" to define is what it means.  I

7    can read that sentence either way.  "'The Company'"

8    might mean the Dayton Tire & Rubber Company or it might

9    mean Bridgestone Americas Tire Operations.  So it's

10   whatever Mr. Moss intended it to mean is what "'the

11   Company'" means.

12                   MR. ROMINE:  Exhibit 5.

13                   (Exhibit No. 5 marked.)

14                   MR. ROMINE:  For those of you on the

15   telephone, this is a document -- it does have Bates

16   stamps on it.  And the -- there's actually two -- two

17   Bates ranges on it.  One is DTR 5236 through 5247, and

18   then the second one is 5253 through 5262.  And hopefully

19   with the questioning we'll -- we'll get some

20   enlightenment on -- on why that is.

21        Q.    (BY MR. ROMINE)  Mr. Layfield, I want to ask

22   you just -- first of all, to look at the first part of

23   this document, which is DTR 5236 through DTR 5247.

24        A.    Okay.

25        Q.    And my question to you is just with regard to

Page 31

1      the document 5236 through 5247.  Have you seen -- have

2      you seen that before?

3          A.    I have seen parts of it before.

4          Q.    Okay.

5          A.    For example, I remember seeing 5239 through

6      5244.

7          Q.    Okay.  Have you seen the other parts before?

8          A.    I can't recall.

9          Q.    Okay.  Let's focus, then, for a moment on 5239

10     through 5244.  Do you recognize that portion of the

11     document?

12         A.    Yes, I do.

13         Q.    And what is that?

14         A.    It is a response to a request from an

15     environmental authority -- and I'm not sure if it's

16     regional or state level -- for waste management

17     information.  And the -- the environmental authority was

18     affiliated with the State of Ohio.

19         Q.    Okay.  And if you look at page 5239, about a

20     quarter of the way down the page, it says "Person

21     responsible for Plant Operations."  And then it says

22     "Herald E.  Powell."  Do you see that?"

23         A.    Yes.

24         Q.    And was Harold E. Powell the plant manager of

25     the Dayton Tire & Rubber Company in or about 1977?

Page 32

1      A.    I think that is correct.  I can't tell you if

2   he was the plant manager for the entire year of 1977.

3   But I know he was plant manager, and this document pens

4   him to 1977.

5      **Q.    And what -- and then just right below that it**

6   **says "Person Providing Information:  Frank P. Miracle."**

7   **Do you see that?**

8      A.    Yes.

9      **Q.    And was Frank P. Miracle the manager for waste**

10  **control for the Dayton Tire & Rubber Company in 1977?**

11     A.    That's my understanding, yes.

12     **Q.    Okay.  And is the -- is the information on**

13  **this Industrial Waste Management Survey correct?**

14              MR. MOSS:  Just -- just note an objection

15  that this witness obviously does not have personal

16  knowledge regarding these events.  So I'm not sure what

17  you're asking.

18              MR. ROMINE:  I'm asking him as the

19  30(b)(6) representative to talk about the waste of

20  the -- waste of the Dayton Tire & Rubber Company.

21              MR. MOSS:  Well, I think your question

22  seems to call for him to testify from his own personal

23  knowledge as to the accuracy of the facts contained

24  within the document.  So I'm going to object, but I'm

25  going to allow the witness to answer to the extent he's

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 33

1    able.

2         Q.    (BY MR. ROMINE)  As a representative of

3    BATO, is this information correct?

4         A.    I believe that the information provided on DTR

5    5239 through DTR 5244 represented the best ability of

6    Mr. Miracle to respond to the Ohio environmental

7    authority's request for information, and it represented

8    the best information that he could provide at that time.

9         Q.    And has BATO come across any information to

10   indicate that Mr. Miracle was wrong or incorrect?

11              MR. MOSS:  Just note an objection.

12              But you may answer.

13              THE WITNESS:  With respect to which of

14   the answers on this?

15        Q.    (BY MR. ROMINE)  Anything on here.

16              MR. MOSS:  Just note an objection.

17              You may answer.

18              THE WITNESS:  We'll take this in pieces.

19        Q.    (BY MR. ROMINE)  Sure.

20        A.    DTR 5240, Roman numeral II, "Treatment

21   Facilities:  On-site Wastewater Treatment Facilities."

22        Q.    Uh-huh.

23        A.    There were sumps that were designed to manage

24   on-site wastewater.  So the company, as we sit here

25   today, would not have answered subsection II, No. 1,

Page 34

1    "On-site Wastewater Treatment Facilities" with the

2    answer "No."  The company would have answered that

3    "Yes."

4              It's all -- you know, in 1977 what

5    Mr. Miracle was thinking when he read "Wastewater

6    Treatment Facilities," I don't know, but the company

7    would have probably answered that one as a "Yes."

8    **Q.    Do you know what kind of treatment was going**

9    **on?**

10   A.    It's oil water separation.

11   **Q.    Anything else?**

12   A.    One second.

13   **Q.    Sure.**

14   A.    On DTR 5241 Roman numeral section IV,

15   "Off-Site Disposal," the company would have probably

16   included in item No. 3 all three of the contract

17   haulers.  In other words, they would have included IWD

18   Liquid Waste, Inc., and George Wiley Sanitary Services,

19   Inc., in addition to Industrial Waste Disposal Company

20   in subsection 3.

21              On subsection 4, I think what

22   Mr. Miracle did is he put the distance to the furtherest

23   facility that had been used at any time rather than the

24   closest.  So the company would have probably clarified

25   the answer to No. 4 because there were facilities that

Page 35

1    were closer than 40 miles that were used.

2              I believe that the answer -- okay.  This

3    relates to DTR 5242.  The answer to Roman numeral V,

4    "Costs," I think that the answer to No. 2 and the answer

5    to No. 4 are incorrect because the Dayton Tire & Rubber

6    Company had an extensive recycling program in place for

7    metals, cardboard and perhaps -- I think fabric as

8    well -- for other materials, so there probably should

9    have been answers given in dollars and cents for No. 2

10   and No. 4.  Why Mr. Miracle didn't do that, I don't

11   know.  He may have been concerned about confidentiality

12   of company income information.  But I think the company

13   would have answered No. 2 and No. 4 differently than

14   Mr. Miracle did.

15             The company might have answered No. 6

16   differently depending on whether -- I don't know exactly

17   when the internal decision to close that plant was made.

18   But if the decision to close the plant hadn't been made

19   by the date that this was filled out, the answer to

20   subsection 6 might have been different.  It may have

21   been -- the company may have answered them "Yes" if they

22   hadn't already decided to close the plant.

23             MR. MOSS:  I'm sorry.  You said -- you

24   meant Roman numeral VI?

25             THE WITNESS:  Roman numeral VI, questions

Page 36

```
 1    1 and 2, yeah.  The company might have answered those

 2    "Yes" if they hadn't already made the decision to close

 3    it.  And I don't know exactly when the decision to close

 4    was made.

 5                   With respect to DTR 5423, "Metals" --

 6    there were some small amounts of metal waste

 7    generated, and that metal -- well, I shouldn't say

 8    small.  There were -- there were some amounts of metal

 9    waste generated, and there was a program in place to

10    recycle that.  So -- that's No. 5 on the page I referred

11    to.  That should have been -- the company would have

12    filled that in differently than Mr. Miracle did.  Oh,

13    wait a minute.

14                   MR. MOSS:  Yeah.  I was just going to

15    say look at the definition.

16                   THE WITNESS:  There's a -- there's a zinc

17    down here at the bottom.  I'm sorry.  There's a -- an

18    asterisk.  All right.  No, forget that.

19                   Based on the way metals are defined, then

20    it's answered -- that's answered correctly.  So I -- I

21    withdraw that correction.

22                   No. 13, "Plastics."  There was a small

23    amount of plastic waste generated.  Some of the raw

24    materials arrived in plastic wrappers, so there would

25    have been some plastic that would have been sent to
```

Page 37

1    landfill.  So we would have probably answered that --

2    the company would have answered that differently than

3    Mr. Miracle did.

4              Then on DTR 5244, the same correction on

5    "Plastics."  There would have been information filled in

6    for "Plastics" had the company answered this today as

7    opposed to the way Mr. Miracle answered it.

8              Okay.  That's -- that's it for those

9    pages.

10   Q.   (BY MR. ROMINE)  Okay.  I interrupted you a

11   few minutes ago to ask you about the treatment of

12   wastewater, and you had said that there was an oil/water

13   separation going on?

14   A.   Yes.

15   Q.   And was there any treatment of the wastewater

16   other than oil/water separation?

17   A.   Not to my knowledge.

18   Q.   Okay.  And you had started to say that there

19   was some recycling of metals going on?

20   A.   Yes.

21   Q.   And was -- other than the -- the metals listed

22   in the asterisk there, was there recycling of metals

23   going on?

24   A.   Yes.

25   Q.   Was it -- was it iron and steel, ferrous

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 38

1    **metals?**

2       A.    Yes, primarily.  Occasionally there would be

3    some copper or -- you know, a small piece of copper

4    tubing or some other metal from a piece of manufacturing

5    equipment, but primarily it was ferrous metals.

6       **Q.    Okay.  And then if you look at the very bottom**

7    **of page 5244, it refers to general off-site disposal**

8    **practices.  Do you see that?**

9       A.    Yes.

10      **Q.    And then there's a -- a column designated**

11   **"Other Hauled by Contractor"?**

12      A.    Yes.

13      **Q.    And there's a number -- I think is says**

14   **32,116.**

15      A.    Yes.

16      **Q.    You with me so far?**

17      A.    Uh-huh.

18      **Q.    What unit of measurement is that?**

19      A.    I'm not sure.  I can tell you what the "other"

20   is that he's referring to.

21      **Q.    Sure.**

22      A.    It's wood.  There's a tremendous number of

23   wood pallets that raw materials were delivered with, and

24   those wood pallets had to be disposed of.

25      **Q.    Uh-huh.**

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 39

1      A.    And so the unit of measure there, I don't know

2      what it is.  But that's -- that's what he's referring to

3      primarily here, is the wood pallets.  He may have lumped

4      in the plastic with it too, but it's mostly wood.

5      **Q.    Okay.  Okay.  What kind of solid waste did --**

6      **did Dayton plant generate?**

7      A.    On solid waste, it would generate, wood, the

8      plastic that I referred earlier.  There were banding

9      that would hold the -- some of the raw materials to the

10     pallets.  And I think at that time most of the banding

11     was metal, like steel banding.  So they would generate

12     that.  There would be scrap or off-spec rubber.  There

13     would be -- which was -- there -- that's not a huge

14     volume, but it exists.  There would be off-spec tires,

15     completed tires, as well as tires that had been built

16     but not yet vulcanized.  Those were referred to as

17     "green tires."  So that's all -- the -- the rubber and

18     tires and green tires all fall into the category of

19     rubber.

20                   There would be -- you limited your

21     question to solid, right?  All right.  So some of the

22     off-spec rubber solid waste would have included other

23     raw materials like lampblack.  So it would have been

24     rubber with -- with lampblack.  There's general

25     cafeteria and paper waste.  So you got your basic office

Page 40

1  trash as well as cafeteria waste.  There are -- we

2  talked about the metal recycling effort.  A lot of the

3  ferrous metals were in the form of empty drums that were

4  sent -- sold actually -- sold for recycling.

5          And that's what I can recall right now.

6  **Q.   Have you heard of the term "carbon black"?**

7  A.   Yes.

8  **Q.   Is that the same as lampblack?**

9  A.   Lampblack, carbon black same thing, yes.

10  **Q.   Okay.  And moving on past solid waste to**

11  **liquid waste, have you heard the term "grease skip"?**

12  A.   I have seen the term "grease skip," yes.

13  **Q.   And what is -- what is grease skip?**

14  A.   In the Banbury portion of the plant where the

15  rubber raw material, the lampblack and other raw

16  materials are mixed together -- much like you're using a

17  mixer to make a cake, you know, in a big -- like a big

18  industrial bakery -- those machines have to be

19  lubricated.  They're very large.  You know, they're like

20  two stories tall.  And they're constantly moving against

21  a lot of resistance because you're talking about mixing

22  rubber rather than flour.  All right?  Because those

23  things have to be lubricated, there is oil drip, and

24  then some small amounts of rubber that escape from the

25  Banbury in the same way that the lubricating oils that

Page 41

1    are used on the Banbury escape, and the grease, yeah, is

2    used to hold that lubricating oil.  So it's -- I don't

3    know why they use the term "grease" exactly, but the --

4    the drips and -- oil drips with the rubber from the

5    Banbury area would be put in the grease skip.

6        Q.   And was there waste grease skip generated from

7    time to time?

8        A.   Yes.

9        Q.   You had mentioned that Dayton Tire & Rubber

10   had 55-gallon drums that it sold?

11       A.   Yes.

12       Q.   And to whom were the drums sold?

13       A.   I believe they were sold to Franklin Iron.

14       Q.   Do you have any documentation about that?

15       A.   I have seen delivery tickets where there would

16   be a pick-up at the Dayton Tire & Rubber facility and

17   then a drop-off at Franklin Iron.  We know that Franklin

18   Iron was engaged in the process of remelting ferrous

19   metals.  But beyond that, those are the only records

20   I've seen that -- that tend to corroborate that.  And

21   that -- and I know that on other waste surveys I've seen

22   the drums were indicated as being recycled, and there

23   was a dollar amount associated as income from the sale

24   of those drums.

25       Q.   Do your -- does your knowledge about the

Page 42

1   relationship with Franklin Iron & Metal come from any

2   source other than those documents that you just told me?

3        A.   No, that's -- that's it.

4        Q.   So you're -- you're inferring, then, from the

5   pick-up and drop-off that Dayton Tire & Rubber had waste

6   metal drums and that those drums were sold to Franklin

7   Iron & Metal?

8        A.   No.  I know that they had waste metal drums

9   from a variety of sources.

10       Q.   Okay.

11       A.   Not just those tickets.  I know that the drums

12  were sold to someone from a variety of sources.  Not

13  just those tickets.  And, if you will, I'm inferring --

14  I guess inferring is an acceptable adjective -- that to

15  the person to whom they were sold was Franklin Iron from

16  the drop-off ticket.  That's really all I have.

17       Q.   Okay.  I want to take you a step back.  And,

18  then, from what other sources do you know that the drums

19  were sold?

20       A.   From waste surveys done in different years

21  where the method of disposal was indicated, and for the

22  metal drums it was indicated that they were recycled.

23  The number of drums per year was indicated, and the

24  income for the number of -- for the recycling of the

25  drums was also indicated on the survey.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 43

1              MR. ROMINE:  I'd like to make a request

2    for those documents.  It's possible we have them.

3              MR. MOSS:  I'm certain you do.

4              MR. ROMINE:  Okay.  But I'd like to --

5    well, I'll send you an e-mail or a letter.

6              MR. MOSS:  Okay.

7      Q.   (BY MR. ROMINE)  Moving off the first part of

8    Exhibit 5, I want to direct your attention to the, I

9    guess, latter part of Exhibit 5, DTR 5253 through 5262.

10             MR. MOSS:  And, just for the record, in

11   looking at the sequence of the Bates numbers here, it --

12   they're non-sequential, so I think there may be missing

13   pages.  Well, for example, we have 5254, 5255, and then

14   we skip to 5257 and then -- so it looks like we may be

15   missing at least one page.

16             MR. ROMINE:  Okay.  Let me see.  You're

17   right.  We are missing page 5256.  I apologize for that.

18             MR. MOSS:  The letter which begins on

19   5253, it's -- I don't see a signature block for that

20   letter, so I think there was another page of -- of the

21   conclusion of that letter, would be my assumption.

22             MR. ROMINE:  Right.  I agree with that.

23             THE WITNESS:  Okay.

24      Q.   (BY MR. ROMINE)  Okay.  Have you had a chance

25   to look at pages 5253 through 5255 and then again 5257

Page 44

1    **through 5262?**

2        A.    Yes.

3        **Q.    And have you -- have you seen this document**

4    **before?**

5        A.    I believe that I've seen it, this document.

6    If it wasn't this one, it -- it looked a whole lot like

7    it.

8        **Q.    Okay.**

9        A.    But let me -- let me back up and clarify that

10   just a little bit.

11       **Q.    Sure.**

12       A.    I have seen 5257 through 5262.

13       **Q.    Okay.**

14       A.    And -- or -- or a document that was so similar

15   to it that I can't tell the difference.

16       **Q.    Okay.**

17       A.    And in terms of 5253 through 5255, I can't

18   recall if I've seen this exact document or not.

19       **Q.    Okay.  Let's take -- let's take it step by**

20   **step, then.  I want to ask you first about 5259 through**

21   **5262.  Can you tell me what this document is -- or these**

22   **documents are?**

23       A.    It appears to be a waste survey or catalog of

24   waste for the year 1978.  So it's slightly different

25   than the one we saw from 1977 --

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry DeWayne Layfield

Page 45

1      Q.    Uh-huh.

2      A.    -- before.

3      Q.    Uh-huh.

4      A.    And just -- I'll point out to you that if

5   you'll look on 5262, there's actually a line for drums.

6      Q.    Uh-huh.

7      A.    And it indicates they're recycled, and it

8   indicates the dollar number and the number of drums.

9   It's in column -- the dollar number and number of drums

10  is in column E, and the drum line is actually -- I can't

11  tell what that says.  Something materials, but it's

12  subpart F.  You follow F over to column E, and it's got

13  dollars and number of drums.

14     Q.    Yeah.

15     A.    Okay.

16              MR. CAMPBELL:  I'm sorry.  To clarify,

17  which column E are you looking at?

18              THE WITNESS:  On page 5262.

19              MR. CAMPBELL:  Correct.

20              THE WITNESS:  There's two sections on

21  there.  The first one goes, like, D through H, and the

22  second goes A through H.

23              MR. CAMPBELL:  Right.

24              THE WITNESS:  In the second section, if

25  you'll look at the line that's F, and then follow it

Page 46

1    over to column E in the table, you'll see that -- what

2    they ask for -- it says "Show approximate dollars and

3    number of" -- I guess that says "realize."  It's hard to

4    read.  But for the drum line it has a dollar figure and

5    then it has a number of drums.  So it looks like they

6    were getting somewhere around four bucks a drum for

7    recycling, yeah.

8        Q.    (BY MR. ROMINE)  Do you see -- I want to ask

9    you to look at page 5261.

10       A.    Okay.

11       Q.    And if you look at column A, it's designated

12   "Amount of Waste in Fiscal 1978."  Do you see that?

13       A.    Yes.

14       Q.    And then there are some -- there are some

15   categories:  "Cured rubber materials," and then it looks

16   like "Plant Green and Other Component Materials."  Do

17   you see those -- those columns for those --

18       A.    I don't see the word "green."  I see "plant"

19   something.

20       Q.    Okay.

21       A.    But I -- I can't tell -- I don't think it's

22   green.  It doesn't have the right number of letters.

23       Q.    I think it's in quotes.

24       A.    Oh, okay.  Then maybe.  Okay.

25       Q.    Under the -- under that it look -- that's a

1    little bit more legible.  It says "Green Tires" --

2        A.    Yes.

3        Q.    -- and then "wire."

4        A.    Uh-huh.

5        Q.    Then "Uncalendered Fabric."  Do you see that?

6        A.    Yes.

7        Q.    And then if you go down to the next page,

8    5262, again, column A, "Amount of Waste in Fiscal 1978."

9        A.    Uh-huh.

10       Q.    And I think it says "Liquid."  And under that,

11   B, "Lubricating oils."  And then there's another general

12   category under that.  I can't read it.  I guess it says

13   "Packaging Materials:  Cardboard, Waste paper, Paper

14   bags."  Do you see that?

15       A.    Yes.

16       Q.    Okay.  And then I want you to go back to page

17   5259, 5260.

18       A.    Okay.  I'm at 5259.

19       Q.    And column A says "Amount of Waste in Fiscal

20   1977."  Do you see that?

21       A.    Yes.

22       Q.    And same categories:  "Cured Rubber

23   Materials."  And below that "Green Tires, bead wire."

24              And then the next page, 5260, again,

25   Column A, "Amount of Waste in Fiscal 1977."  Do you see

Page 48

1    that?

2        A.    Yes.

3        Q.    And then category under that it says

4    "Lubricating oils," and then below that, again,

5    "Packaging Materials."  Do you see that?

6        A.    Yes.

7        Q.    Okay.  And then I want you to go back to page

8    5254.

9        A.    Okay.  I'm there.

10        Q.    And I'd like you to read just to yourself --

11    you don't have to read it out loud.  Read to yourself

12    the first full paragraph on page 5254.

13        A.    Okay.

14        Q.    All right.  And my question to you is:  Pages

15    5259 through 5262, are those the Solid Waste Profiles

16    for fiscal years 1977 and 1978?

17        A.    5259 and -- through 52 --

18        Q.    62.

19        A.    -- 62.

20              With -- they use qualification.  They're

21    for fiscal years '77 and '78.  So they were both

22    underlined with a little asterisk put right beside it,

23    and I never could find the asterisk.  So there was some

24    question about is this a calendar year or is it a fiscal

25    year.  So that's qualification No. 1.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 49

1      Q.    Okay.

2      A.    Qualification No. 2 is these are the waste

3   profiles that indicate materials that were disposed of

4   in a landfill and also the materials that were recycled.

5   Okay?

6              So with those two qualifications, then

7   the answer to your question is yes.

8      Q.    Okay.  And, to the best of your knowledge, are

9   the -- are the numbers here on the Solid Waste Profiles

10  accurate?

11     A.    To the best --

12             MR. MOSS:  Same objection -- but go

13  ahead -- that I made earlier.

14             Go ahead.

15             THE WITNESS:  Yeah.  To the best of my

16  knowledge, yes.

17     Q.    (BY MR. ROMINE)  And has BATO found any

18  information since this time to indicate that these Solid

19  Waste Profiles are incorrect?

20     A.    I mean, I think, as they're stated -- give me

21  just a second.

22     Q.    Sure.

23     A.    Yeah.  I mean, I think, yeah, as they're

24  stated, they're as correct as they could be when they

25  were generated.

Page 50

1    Q.   Okay.

2    A.   Yeah.

3    Q.   And if I could ask you to turn to page 5259.

4    A.   Okay.

5    Q.   It looks like columns C, D and E are generally

6    designated "Current Method of Disposal."  And within

7    that, column C is "Sent to Dump or Landfill" and D is

8    "Given Away" and E is "Sold."  Do you see that?

9    A.   Yes.

10   Q.   And that -- that goes to what you were saying

11   earlier about not all of it's going to a landfill;

12   there's some other methods of disposal?

13   A.   Correct.

14   Q.   And same thing with 1978.  If you turn to page

15   5261, it looks like the columns are -- are the same

16   columns.  C, D and E refer generally to "Current Method

17   of Disposal."  C refers to "Sent to Dump or Landfill."

18   D is "Given Away" and E is "Sold."  Do you see that?

19   A.   Yes.

20   Q.   So, again, the 1978 Solid Waste Profile refers

21   to methods disposal including landfill but also other --

22   other methods of disposal.  Are you with me so far?

23   A.   Yes.

24   Q.   Okay.  And if I could ask you to turn to page

25   5254 again.

Page 51

```
 1      A.   You know, there are -- one second.

 2      Q.   Sure.

 3      A.   Oh, okay.  Go ahead.

 4      Q.   All right.  5254 again.  In the paragraph that

 5   I asked you to read to yourself, the first full

 6   paragraph on 5254, I'm going to explore that a little

 7   bit.

 8      A.   Can I --

 9      Q.   Sure.  Go ahead.

10      A.   Is this a good time to take --

11      Q.   Absolutely.

12      A.   -- like, a restroom break?

13      Q.   Yes.

14                (Break from 10:50 a.m. to 10:57 a.m.)

15                (Previous question read back)

16      Q.   (BY MR. ROMINE)  It looks like the -- the

17   author of this letter is referring to -- in the middle

18   of the paragraph to the Solid Waste Profiles for 1977

19   and 1978 that we just looked at.  Am I -- am I correct

20   in that?

21      A.   Yeah.  I mean, I -- I read that the same way

22   you do.

23      Q.   Okay.  And above that it says "For the years

24   1971 through '76 and 1979, Firestone has been unable to

25   locate any record detailing the amount or chemical
```

Page 52

1    composition of waste material disposed of by the Dayton

2    facility."  Do you see that?

3        A.    Yeah, for 1970 -- yes, for those years.

4        Q.    Okay.  So my question to you is since this

5    letter was written in 1987, is there some kind of Solid

6    Waste Profile or other record that Firestone or BATO has

7    found for the years 1971 through 1976 or 1979?

8        A.    Hold on one second.  I want to make sure I

9    give you the right answer.

10                   I don't believe so.

11        Q.    Okay.  And so further on in this paragraph, it

12    says "For fiscal years 1977 and 1978, Firestone has

13    located a Solid Waste Profile for the Dayton

14    facility, which summarizes by general category the

15    amounts of various waste materials 'sent to dump or

16    landfill.'"  Do you see that?

17        A.    Yes.

18        Q.    And there the author of the letter is

19    referring to, looks like, column C of the Solid Waste

20    Profile designated "Sent to Dump or Landfill"?

21                   MR. MOSS:  I'll just note an

22    objection, but you can answer.

23                   THE WITNESS:  Yes, I read it that way.

24        Q.    (BY MR. ROMINE)  Okay.  And then it goes on to

25    say "However, Firestone has been unable to verify how

Page 53

1    much, if any, of these amounts were transported by IWD

2    or, if so, whether they were disposed of at the

3    Cardington Road site." Do you see that?

4        A.   I see that sentence, yes.

5        Q.   And my question to you is since 1977, has

6    Firestone or BATO been able to verify how much, if any,

7    of those amounts were transported by IWD?

8        A.   By "those amounts," you mean the amounts on

9    5259 through 5262?

10       Q.   Yes, "Sent to Dump or Landfill," column C.

11       A.   Yes.

12       Q.   And how much -- and you said that BATO has

13   been able to verify that -- those amounts?

14       A.   Yes.

15       Q.   And how much of those amounts were sent --

16   transported by IWD?

17       A.   Okay.  Since those schedules refer just to

18   solid waste --

19       Q.   Uh-huh.

20       A.   -- and if we're talking about column C, which

21   is "Sent to Dump" --

22       Q.   Yes.

23       A.   -- the answer is all of it.

24       Q.   And where does that information come from?

25       A.   A general study of -- of all of the

Page 54

1    information that was available to me, which included

2    Solid Waste Profiles, sworn statements of Firestone

3    employees, depositions taken of IWD drivers, and

4    other -- other documents such as 5257.

5         **Q.   And that effort was undertaken after 1987?**

6         A.   Yes.

7         **Q.   And tell me about the employees of BATO or**

8    **Firestone or DT&R that you looked at their sworn**

9    **statements.  Can you tell me who those people are?**

10        A.   Sure.  One of them was Frank Miracle.  I think

11   his first name is Frank.  Miracle -- Mr. Miracle.  He's

12   the one who signed some of these things.  And -- I'm

13   really bad with names so. . .

14             MR. CAMPBELL:  Not a good time to be bad

15   with names.

16             THE WITNESS:  In terms of --

17             MR. MOSS:  Your question at this point is

18   limited to Firestone, DTR people?

19             MR. ROMINE:  Correct.

20             THE WITNESS:  Yeah, that's the way I did

21   it.  So we've got a Frank Miracle.  Yeah.  The way you

22   answered your question, that's -- that's the --

23   that's -- that's the answer.

24        **Q.   (BY MR. ROMINE)   Frank Miracle?**

25        A.   Yes.

Page 55

1      Q.    Okay.  Anybody else?

2      A.    Who worked for Dayton Tire & --

3      Q.    Yes.

4      A.    -- Rubber?

5            No.

6      Q.    Okay.  Anybody else who did not work for

7   Dayton Tire & Rubber?

8      A.    Yes.

9      Q.    Who's that?

10     A.    Got Vern Vencill, Joe Smart, Michael Wendling.

11  Got -- and I think that's it.  In terms of the fact

12  that -- that IWD -- what I took your question to be was

13  how do I know that -- that IWD hauled all of the solid

14  waste.  And those are the people, other than Dayton Tire

15  & Rubber employees, whose statements or depositions I

16  looked at that -- that confirms that.

17     Q.    Okay.

18           MR. CAMPBELL:  I'm sorry.  So that

19  confirms that?

20           THE WITNESS:  That -- that -- confirms

21  that IWD hauled all of the solid waste that went from

22  Dayton Tire & Rubber to the dump, which for the years

23  we're talking about happened to be (unintelligible.)

24           THE COURT REPORTER:  To be who?

25           THE WITNESS:  Cardington Road.  Which

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 56

1    the -- the dump in this instance happened to be

2    Cardington Road.

3        **Q.   (BY MR. ROMINE)   We're still working on**

4    **Exhibit 5 now.  If you go back to Dayton Tire &**

5    **Rubber -- I'm sorry -- DTR 5236 through 5247 --**

6        A.   Okay.

7        **Q.   -- you'll -- you'll see that it also has on**

8    **there a different Bates number, FTR 442904 through FTR**

9    **442915.  Do you see that?**

10               MR. MOSS:  I think you said 904.  It's

11    actually 914.

12               THE WITNESS:  It says zero on mine.

13               MR. MOSS:  Oh, what page?  I'm --

14               MR. ROMINE:  The very -- the very first

15    page of Exhibit 5.

16               MR. MOSS:  Okay.  I'm sorry.

17               THE WITNESS:  Okay.  Sorry.  Yeah, it

18    goes 11, 12, 13, 14, 15.

19               MR. MOSS:  I was just on the wrong page.

20    I'm sorry.

21               THE WITNESS:  Okay.  Sorry.  Could -- can

22    we get the question back, because I kind of lost --

23        **Q.   (BY MR. ROMINE:)   Sure.  I don't think I've**

24    **asked it yet.**

25        A.   Okay.  All right.

Page 57

1      Q.   But I'm asking you to look at the first --

2  first part of Exhibit 5.  There's a Bates stamp DTR 5236

3  through 5247.

4      A.   I see that, yes.

5      Q.   Okay.  And it also is FTR 442904 through

6  442915.  Do you see that?

7      A.   Yes.

8      Q.   And is this document -- has this document

9  produced -- been produced by BATO?

10     A.   I -- I don't -- I don't know.

11     Q.   Okay.  Did this document come from BATO's

12  files?

13     A.   I don't have a recollection of having seen DTR

14  5236 through DTR 5253 before, so I don't know.

15     Q.   Okay.  Let me ask, then, a more limited

16  question.  5 -- 5239 through 5244, the Ohio 1977

17  Industrial Waste Management Survey.

18     A.   Yes, I see it.

19     Q.   And have you seen that document before?

20     A.   Yes.

21     Q.   And was that document produced by BATO?

22     A.   I'm -- I'm not -- I don't think I am -- or am

23  I designated?  I think I'm designated to talk about the

24  location description, and that's equipment.  But I don't

25  know what was produced.  I know that this document is in

Page 58

1    BATO's files because I've seen it in preparing to

2    testify today.

3        Q.   Yeah.

4        A.   But I really don't know what was produced.

5        Q.   Fair enough.  And then -- let's ask it this

6    way:  Document 5259 through 5262, the Solid Waste

7    Profiles for fiscal 1977 and fiscal 1978 --

8        A.   Yes.

9        Q.   -- have you seen those documents before?

10       A.   Yes.

11       Q.   And you reviewed them in preparation for your

12   deposition today?

13       A.   Yes.

14       Q.   And they're from BATO's files?

15       A.   Yes.

16       Q.   Okay.

17              MR. ROMINE:  Exhibit 6.

18              (Exhibit No. 6 marked.)

19              THE WITNESS:  Okay.

20       Q.   (BY MR. ROMINE)  Have you had a chance to look

21   at what I've marked as Exhibit 6?

22       A.   Yes, I have.

23       Q.   And do you recognize it?

24       A.   No.

25       Q.   Okay.  If you look at the very first page,

Page 59

1   right in the middle of the page it says "This letter is

2   to advise you that the Firestone Tire & Rubber Company,

3   1200 Firestone Parkway, Akron, Ohio, has sold the

4   Dayton, Ohio, facility at the above address" -- and the

5   above address refers to 2342 West Riverview Avenue.

6   "...has sold the Dayton, Ohio, facility at the above

7   address, effective July 24, 1981, to J-V Properties."

8   And then it goes on to give some information about the

9   buyers there.

10            And my question to you is is that -- is

11   that accurate?

12       A.    Did they sell it?  Yeah.  The Firestone Tire &

13   Rubber Company sold the Dayton Tire & Rubber Company

14   facility identified on or about July 24, 1981, to J-V

15   Properties, yes.

16       Q.    Okay.

17       A.    And some of the nonfixture machinery was sold

18   to this Machinery Merchants people.

19       Q.    I see.

20       A.    Yeah.

21       Q.    I see.  So some of it went to -- it looks like

22   the real estate went to J-V Properties, and some of the

23   machinery went to Machinery Merchants, International,

24   Inc.?

25       A.    Well, the way it worked was that the real

Page 60

1    estate, the buildings and the fixtures -- fixtures in

2    a, you know, real estate context --

3        Q.    Right.

4        A.    -- went to J-V Properties.  All of the -- the

5    machinery that you would use in the -- in the building

6    of tires, that went to Machinery Merchants --

7        Q.    Okay.

8        A.    -- International.

9        Q.    All right.  And down at the bottom of the page

10   it says "Therefore, as of the aforementioned date,

11   Firestone respectfully requests that the RCRA

12   Notification/Application" -- and it gives a serial

13   number -- "be cancelled."  Do you see that?

14       A.    I see that sentence, yes.

15       Q.    Great.  Okay.  And, I guess, let me ask it

16   this way:  If you could take a look -- if I could ask

17   you to take a look at DTR 7189 and 7190.

18       A.    Okay.

19       Q.    Have you seen these pages before?

20       A.    No.

21       Q.    Okay.  You see at the top where it says

22   "Notification of Hazardous Waste Activity"?

23       A.    Yes.

24       Q.    Okay.  And if I could ask you to turn to page

25   7190, the second page.  Who was Robert Simpson?

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 61

1      A.    I don't know other than what it says beside

2    his name, where it asks for the official title, and he

3    has it reported as acting plant manager.

4      Q.    Okay.  And who was J.R. Laman?

5      A.    It identifies him as a corporate engineer for

6    Firestone.  I have come across Mr. Laman's name in the

7    past, and I know that a fellow named J.R. Laman did, in

8    fact, work in Akron.

9      Q.    Okay.  And how about Mr. Simpson's name?  Have

10   you come across his name before?

11     A.    I think I have seen it on a document or

12   two, but not this document.

13     Q.    Okay.  And having seen the first page,

14   7186, that refers to a Notification of Hazardous Waste

15   Activity, and then documents 7189 and 80 [sic], that is

16   a Notification of Hazardous Waste Activity, is this the

17   Notification of Hazardous Waste Activity sent to EPA by

18   the Dayton Tire & Rubber Company?

19              MR. MOSS:  Let me just note an objection,

20   first of all, to the lack of foundation for this

21   witness.  Mr. Layfield's already indicated he's not seen

22   this document before.  I -- I do also note that it

23   appears to be incomplete insofar as the letter.  Also

24   mentions an inspection report being enclosed from the

25   Systech Corporation, and that is not included with this

Page 62

1    document.  So --

2                    But, Mr. Layfield, you can answer to the

3    extent you're able with those objections.

4                    THE WITNESS:  I -- I don't know if it's

5    the same one or not.  It -- and part of the problem I'm

6    having is the letter -- this July 24, 1981, letter

7    doesn't say that the notication -- Notification of

8    Hazardous Waste Activity is attached.  It does say that

9    something else is attached with a different date.  So I

10   don't know.  Right?  I don't know how these things came

11   to be put together.  And there's a page missing, too.

12                    MR. MOSS:  Yeah.

13                    THE WITNESS:  Yeah, there's a page

14   missing.  So it goes from DTR 7187 to DTR 7189.  And the

15   FTR numbers also skip a page.  So I -- I don't know.

16        Q.   (BY MR. ROMINE)  Okay.  If I could ask you to

17   turn to page 7191 through 7196.

18        A.   Okay.  I'm there.

19        Q.   Have you seen this part of the document

20   before?

21        A.   No.

22        Q.   Okay.  How about 7192 through 7196?

23        A.   No.

24        Q.   Have you seen any RCRA applications made by

25   the Dayton Tire & Rubber Company?

Page 63

1     A.    No.

2     **Q.    If you look at page 7192, who is Tom Reese?**

3     A.    He was an official at Dayton Tire & Rubber.

4     Let me see if I can figure out who he was.  On this

5     document he's referred to as acting plant engineer.  I

6     think I've seen another document -- and I can't tell how

7     the dates mesh up.  But toward the end of BATO's

8     ownership of that facility he may have been the acting

9     plant manager, but it's -- on this document he says he's

10    acting plant engineer.

11    **Q.    And if you turn to page -- down at the bottom**

12    **it looks like it's signed by a George Aucott.  Do you**

13    **see that?**

14    A.    I see a signature.

15    **Q.    And to the left of the signature it gives a**

16    **name and official title?**

17    A.    Oh, yeah.  Okay.  Yeah.  Yep, I see it.

18    **Q.    And who is Mr. Aucott?**

19    A.    It says he's vice president of manufacturing

20    for North American Tire Group.  I know that a Mr. Aucott

21    did work for what's now known as BATO, so I have no

22    reason to doubt that that's his correct title.

23    **Q.    Going back to 7189 and 7190, is the**

24    **information on this notification correct?**

25    A.    I don't know.  I haven't -- I haven't seen it

Page 64

1    before.  I don't know.

2        Q.    Well, could you look at it and tell me if you

3    believe that the information is correct?

4        A.    Nope.

5                MR. MOSS:  Objection.

6                THE WITNESS:  I can't because I don't

7    have 40 CFR Part 261.33 to decode all of these code

8    numbers, so I have no idea.

9        Q.    (BY MR. ROMINE)  Okay.  Same question with

10   7192 through 7196.  Is the information on this

11   application correct?

12               MR. MOSS:  Same objection.

13               THE WITNESS:  Yeah, I haven't seen it.  I

14   have not seen it before.  And, honestly, I -- you know,

15   I did not interpret the topics for which I was

16   designated to include these type of applications,

17   particularly RCRA applications.  So my answer is I don't

18   know.

19               MR. ROMINE:  Exhibit 7.

20               (Exhibit No. 7 marked.)

21               THE WITNESS:  Okay.  I've looked at it.

22       Q.    (BY MR. ROMINE)  Have you seen DTR 173 to 174

23   before?

24       A.    Not that I recall.

25       Q.    Did Dayton Tire & Rubber hire Quick Trash

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 65

1   **Service to pick up trash from its plant in Dayton in**

2   **1974?**

3       A.    Not based on all of the information I've seen.

4   There is another facility at a different address that a

5   $60 amount would be more consistent with.  Dayton Tire &

6   Rubber plant is big, right?  They make tens of thousands

7   of tires a day, so they generate tons of trash.  There

8   is a facility at a different address that this $60

9   charge would be more consistent with.

10      Q.    And what address is that?

11      A.    It's the credit union.  There was a Firestone

12  credit union.

13      Q.    And where is the credit union?

14      A.    Not at the same location.  I can't remember

15  the street address right now, but it was at a completely

16  different address.  And they may -- you know, they,

17  obviously, have trash too, but it's office trash.  I

18  can't tell you that that's what this is about, but. . .

19      Q.    Yeah, that was my next question.

20      A.    Yeah.

21      Q.    Is it your testimony that Dayton Tire & Rubber

22  picked up -- paid Quick Trash Service to pick up trash

23  from the credit union?

24      A.    I don't know one way or the other.

25                  (Exhibit No. 8 marked.)

Page 66

```
 1                THE WITNESS:  Is this -- just -- I --

 2   just a couple other things about -- so I haven't seen

 3   Quick Trash before, but there are a couple of things

 4   I'll notice.  Quick Trash Service is -- its address is

 5   in Fairfield, Ohio, which is a long way, based on ZIP

 6   code, from the Dayton Tire & Rubber plant.  So I

 7   don't -- you know, this is more consistent -- Fairfield

 8   is right next to Akron.  This is more consistent

 9   actually with trash being picked up in Akron, Ohio, and

10   this had gotten somehow mixed in with the documents that

11   were produced in Akron.

12                I understand that you -- the plaintiffs in

13   this case went and reviewed a large number of documents,

14   about 1,138 boxes of documents, earlier in this case.

15   Based on the address of Quick Trash, it's way more

16   consistent that this was accidentally included in the

17   production, and it actually relates to a trash pick-up

18   somewhere near Akron, Ohio.

19      Q.   (BY MR. ROMINE)  How close is Fairfield to

20   Akron?

21      A.   They're contiguous.  So the city limits of

22   Akron and the city limits of -- well, Fairfield -- no,

23   that's Fairlawn.  So I don't know.  I'd have to look at

24   a map.

25      Q.   Okay.
```

Page 67

1     A.   But based on ZIP code, it's -- it's a -- it's

2   a ways from Dayton too.

3     Q.   **So is your testimony that Quick Trash Service**

4   **picked up from a Firestone facility in Akron?**

5     A.   I don't know.

6     Q.   **If I could turn your attention to Exhibit 8.**

7     A.   Uh-huh.

8          MR. ROMINE:  Oh, for those of you on the

9   phone, Exhibit 8 is a document DTR 175 through 177.

10         THE WITNESS:  Okay.

11    Q.   **(BY MR. ROMINE)  Have you seen Exhibit 8**

12  **before?**

13    A.   I don't recall seeing this specific

14  document, no.

15    Q.   **Did George Wiley Sanitary Service pick up**

16  **waste from the Dayton Tire & Rubber Company in 1974?**

17    A.   They -- George Wiley's company picked up

18  nonhazardous liquid waste from Dayton Tire & Rubber

19  Company for many years, one of them being 1974.

20         (Exhibit No. 9 marked.)

21    Q.   **(BY MR. ROMINE)  Did -- what I've marked as**

22  **Exhibit 9 is a document with Bates numbers DTR 000344**

23  **through 368.**

24    A.   Okay.

25    Q.   **Have you seen Exhibit 9 before?**

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 68

1      A.    No.

2      Q.    **And my question to you is did Peerless**

3   **Transportation haul waste from the Dayton Tire & Rubber**

4   **Company sometime in 1975 and 1976?**

5      A.    No.

6      Q.    **Did Dayton Tire & Rubber Company make payments**

7   **to Peerless Transportation Company for some reason from**

8   **1975 to 1976?**

9      A.    Yes.  The very end of '75 and '76, yes.

10     Q.    **And for what purpose?**

11     A.    Peerless delivered raw materials to Dayton

12   Tire & Rubber Company with the freight charges being the

13   responsibility of Dayton Tire & Rubber.  So -- but some

14   of the tickets that I've looked at included things like

15   spare parts for the tire-building machines.  So,

16   basically, it was -- it was a freight collect where

17   Dayton Tire & Rubber was responsible for freight.

18            We also believe, based on our research,

19   that they also shipped things for us leaving the Dayton

20   Tire & Rubber facility, but these were all new, usable

21   things either coming into the plant or being sold out of

22   the plant.  Not waste.

23     Q.    **And what were the -- when you say you looked**

24   **at tickets, what did those tickets describe?**

25     A.    The ones that I looked at dealt with

Page 69

1    parts, tubing, things that the plant was buying to bring

2    into the plant to be able to repair and do maintenance

3    on the tire-building equipment and the other machines in

4    the plant.

5       **Q.   And were these documents still -- that you**

6    **looked at, did they have these check copies similar to**

7    **what we're seeing here in these documents?**

8       A.   No, not that I recall.  I don't recall seeing

9    documents like Exhibit 9 before.

10      **Q.   So your testimony is that Peerless brought --**

11   **is it parts or materials to the plant or both?**

12      A.   It's -- they brought new things to the plant.

13   That's -- that's the document I've seen that I'm certain

14   of.

15              And the other research indicates that

16   they may have taken finished goods from the plant away.

17   But these were all new things.  And we're not talking

18   about waste.  We're talking about either new things the

19   plant bought or new things the plant was selling.

20      **Q.   And on how many -- how many tickets did you**

21   **see for new things coming from the plant that Dayton**

22   **Tire & Rubber paid Peerless for?**

23      A.   I don't remember the number.

24      **Q.   And what -- what was it?**

25      A.   The -- the new things that were coming into

Page 70

1    the plant?

2        Q.    Yes.

3        A.    It was material -- I interpreted it as

4    material that was being used to maintain machines.  So

5    it was like new copper tubing, small parts.  Can't

6    remember the exact description of them, but it was some

7    kind of small -- small parts that would be used to

8    repair equipment.

9        Q.    And what kind of vehicle did Peerless bring

10   this -- the parts in?

11       A.    I have no idea.

12       Q.    Okay.  And then you said that -- that some

13   research you did indicated that Peerless also hauled

14   some new -- new products away from the plant?

15       A.    Yeah.  It appeared that there were charges for

16   carrying finished goods away from the plant as well, but

17   the information wasn't sufficient to determine what --

18   you know, if it were tires or where they were going.

19       Q.    And what -- what was the information that you

20   had?

21       A.    They were just general records.  I can't

22   remember exactly what they were -- what they -- or how

23   they were called.  I remember that the one that -- that

24   I saw was like a shipping ticket that had the -- the

25   parts I described to you.  That's the reason I can get

Page 71

1     more specific about that one.  But the other records

2     dealing with Peerless I don't -- I don't recall exactly

3     what they were.  And there aren't that many.

4         Q.    When you say "there aren't that many," can

5     give me a rough number?  Two?  Five?  Ten?  Fifty?

6         A.    Handful.

7         Q.    Handful?

8         A.    Yeah.

9         Q.    Okay.  Just trying to get a better idea of --

10    of what these documents are when you're talking about

11    documents that indicated Peerless was taking material

12    from -- or product from the -- from the plant.  Was it

13    like a -- a check register, a --

14        A.    I don't -- I don't think it was a -- I mean,

15    what you've given me here in terms of No. 9 looks more

16    like some kind of accounting document -- right? --

17    because it -- it looks like it's a carbon copy of a

18    check.

19        Q.    Yes.

20        A.    It wasn't this.  That's -- I can tell you

21    that.

22        Q.    Okay.

23        A.    But I don't really know -- you know, sadly

24    I've -- I've looked at thousands and thousands and

25    thousands of pages, and Peerless was kind of a footnote

Page 72

1    in all of that, so I don't really remember what it

2    looked like.

3                    (Exhibit No. 10 marked.)

4                    MR. ROMINE:  For those of you on the

5    telephone, Exhibit 10 is a three-page document.  The

6    Bates numbers are ADT 1013 through 1015.

7                    THE WITNESS:  Okay.

8        Q.    (BY MR. ROMINE)  Mr. Layfield, have you seen

9    this document before?

10       A.    Yes.

11       Q.    And what is it?

12       A.    Well, it's someone's estimate of solvent usage

13   in various operations at the Dayton Tire & Rubber plant.

14   I'm trying to get you a year.  Sometime in the

15   1970s, but I can't -- I can't -- I can't give you an

16   exact year.

17       Q.    Okay.  If I could ask you to turn to the final

18   page, ADT 1015.

19       A.    Yes.

20       Q.    And up at the top there's a date July 17,

21   1972?

22       A.    Yes.

23       Q.    Does that refresh your recollection as to a

24   more precise time period for the estimate?

25       A.    No, not really.

Page 73

1    Q.    Okay.

2    A.    Because I remember that the reason -- these

3  are all exhibits to Mr. Reid's deposition.  And I

4  remember that the purpose for this document from Ashland

5  Chemical Company was to help specify the content of the

6  various solvent codes.  And it didn't mesh up exactly

7  with when this estimate was done.  They were both done

8  sometime in the -- I mean, the letter's in the '70s,

9  yes, and the estimate was done sometime in the '70s, but

10  I -- this estimate came after the date of that letter,

11  but I don't know how many years.

12    Q.    Okay.  And, I guess, my next question is do

13  the codes in the estimate mesh up with the codes in the

14  Ashland Chemical Company letter?

15    A.    Let's see here.  The solvent codes do, yes.

16    Q.    Okay.  And were these solvent usage estimates

17  accurate?

18    A.    I think they were the best -- you know, the

19  best estimates that could be made at the time by the

20  people who were in plant.

21    Q.    Right.  And -- and did -- has BATO received

22  information since that time that these estimates were

23  not accurate?

24    A.    No.  Those are -- these are usage estimates of

25  actually the solvent used in the process.  But, no, we

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                Larry Dewayne Layfield

Page 74

1    don't have any information that these were incorrect.

2                    (Exhibit No. 11 marked.)

3                    MR. ROMINE:   For those of you on the

4    telephone, Exhibit 11 is a two-page document with Bates

5    stamp ADT 0004 through 0005.

6       Q.   (BY MR. ROMINE)  Before I ask you a question

7    about Exhibit 11, I want to ask you about Exhibit --

8    Exhibit 10.  Exhibit -- is Exhibit 10 a -- a -- a BATO

9    document?

10      A.   Well, not all of it.

11      Q.   Okay.  Yeah.  Thank you.

12                   So how about 1013 and 1014?

13      A.   I don't know.  You know, I really -- I can't

14   say one way or another.  I don't recognize the -- the

15   Bates stamp, and I don't -- I only know this document

16   because it was used as an exhibit to a deposition.

17      Q.   Okay.  Mr. Reid's deposition?

18      A.   Correct, yes.

19      Q.   Okay.  And -- and who is Mr. Reid?

20      A.   Mr. Reid was a designated corporate

21   representative in other litigation that dealt with the

22   Dayton plant.  He was a -- I believe he was a tire

23   engineer from Oklahoma City.

24      Q.   Okay.  Let's move on, then, to Exhibit 11.

25   Have you seen Exhibit 11 before?

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 75

1      A.   Yes.

2      **Q.   And did you see it in connection with**

3   **Mr. Reid's deposition?**

4      A.   I don't -- well, it has an exhibit sticker on

5   it, so probably.  I may have seen it otherwise

6   too, but. . .

7      **Q.   Okay.**

8      A.   I've seen it.

9      **Q.   Okay.  And -- well, what is it?**

10     A.   The -- the first page of Exhibit 11 is a -- it

11  appears to be an internal memo from persons whose name I

12  can't read whose title is hygienist and toxicologist to

13  a Mr. J.W. Nevius, who was in the safety department at

14  Dayton, which I interpret to be Dayton Tire & Rubber.

15  And it looks like it's also written to G.L. Wilson in

16  Akron.  And it is dealing with -- the subject is "Unisol

17  for Motor" -- I'm going to say "Cleaning."  It's hard to

18  read.

19     **Q.   Okay.  Have you seen Mr. Nevius's name before?**

20     A.   Maybe.

21     **Q.   How?**

22     A.   But if I've seen it, I've only seen it one

23  other time, I think.  I -- it had -- it was dealing

24  with -- I think, if I'm remembering correctly, I saw his

25  name in connection with another safety-related issue

Page 76

 1  where someone had raised the question about what happens

 2  when you react formaldehyde with a colloquial named

 3  compound called -- well, I can't remember it.  It's -- I

 4  want to say rosisterol, but that's not it.  It's one of

 5  those old common names.  I can't remember.  It's a

 6  chemical compound.

 7     Q.   Okay.  So you may have seen Mr. Nevius's name

 8  once before?

 9     A.   Yeah, once before.  It's not something that's

10  came up a lot, but I may have seen it one other time.

11     Q.   On a -- on a Dayton Tire & Rubber document?

12     A.   Yes.  I believe so, yes.

13     Q.   Yeah.  And, then, how about Mr. Wilson's?

14  Have you seen his name before?

15     A.   Yeah, I've seen. . .

16     Q.   On -- on Dayton Tire & Rubber documents?

17     A.   No, on Firestone documents.

18     Q.   Okay.  Fair enough.

19             How about Mr. -- Mr. Ballou?

20     A.   I've seen his name before.

21     Q.   On?

22     A.   Firestone documents.

23     Q.   And who is he?

24     A.   It's Dr. Ballou.  And he was --

25     Q.   Dr. Ballou.

Page 77

1      A.    -- involved in the health and the safety

2   medical aspect of the Firestone Tire & Rubber Company

3   many years ago.

4      Q.    And how about Mr. Batche or Batche?

5      A.    Not familiar with that name.

6      Q.    Okay.  And does it appear to you -- well, let

7   me ask you to look -- read the first sentence of -- on

8   page four -- or first page of Exhibit 11.  Just read the

9   first sentence of that document to yourself.

10     A.    Okay.

11     Q.    All right.  So my question to you is does it

12  appear that -- that when the author of this memo is

13  saying "We received the composition of Unisol Solvent

14  Degreaser," he's referring to the second page of the

15  exhibit, which is ADT 5?

16     A.    Yes.

17     Q.    Okay.  And is the composition of Unisol

18  referred to on Exhibit 4 accurately reflected here

19  in -- on -- I'm sorry.

20              Is the composition of Unisol as

21  referenced on ADT 0004 accurately described on ADT 0005?

22              MR. MOSS:  Just note an objection, but

23  you can answer.

24              THE WITNESS:  I have -- I mean, the two

25  descriptions are very different.  Okay?  So I don't

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                      Larry Dewayne Layfield

Page 78

1    know -- I, being the company, doesn't know that what

2    Chemsearch said in ADT 00005 -- whether that's true or

3    not.  All we know is that's what Chemsearch said.

4        Q.    Okay.  When you say "the descriptions are

5    different," could you explain that?

6        A.    Well, sure.  In the first one it says "This

7    product is a bend of nonflammable chlorinated

8    hydrocarbons" -- okay? -- "none of which are highly

9    toxic."  That's what this sentence says on 004.

10       Q.    Uh-huh.

11       A.    When you flip it over, it says that it's a

12   blend of chlorinated hydrocarbons, and then it gets more

13   specific to say methylene chloride, perchloroethylene

14   and 1,1,1-Trichloroethane.  So those are -- they are

15   consistent with each other, but they're not the same

16   description.  The description on 005 is more specific

17   than the description on 004.

18       Q.    I see.  And are -- are those -- are the

19   methylene chloride, perchloroethylene and

20   1,1,1-Trichloroethane -- are those chlorinated

21   hydrocarbons?

22       A.    They are chlorinated hydrocarbons, yes.

23       Q.    And are they nonflammable?

24       A.    I don't know.  I think it depends on the -- it

25   depends on the circumstances.  I'm -- I'm not sure.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 79

1    Q.    Okay.  And are they highly toxic?

2    A.    No.  I think 004 has got it right when it says

3    "none of which are highly toxic."

4    Q.    Okay.  I thought I understood you earlier to

5    say that the description of Unisol on 0004 differed from

6    the description of Unisol on 0005.

7    A.    And it does.

8    Q.    Okay.  Is that just because on 0005 it's more

9    specific?

10   A.    Well, right.  There are -- there are dozens

11   and dozens of chlorinated hydrocarbons.

12   Q.    I see.

13   A.    Right.  And so on 0005 they're very specific.

14   Q.    I see.

15   A.    And they say it's -- it's the -- the three

16   listed.

17   Q.    I see.  Okay.

18   A.    That's why I said they're different.

19   Q.    I see.  Okay.

20   A.    Yeah.

21   Q.    Was Unisol used in the tire-making process by

22   Dayton Tire & Rubber?

23   A.    No.

24   Q.    Why was this memo written?

25   A.    Unisol was used as a cleaning agent.  It's in

Page 80

1    an aerosol can.  And it was used to clean the electric

2    motors at the Dayton Tire & Rubber plant.  That's -- it

3    wasn't used in making the tires.

4        **Q.    Okay.  It was used to clean electric motors?**

5        A.   Right.

6        **Q.    Okay.**

7        A.   Yeah, kind of like glass cleaner, you know, in

8    an aerosol can.  You spray it on and wipe it off.

9        **Q.    What were the electric motors for?**

10       A.   The electric motors did a variety of things at

11   the plant.  There were electric motors in the Banbury

12   area that actually turned the Banbury mixtures.  There

13   were electric motors on each of tire-building machines.

14   And there would have been a variety of other electric

15   motors here and there.  I can't -- you know, give me

16   some minutes, I can think of them.

17            But in terms of the number of motors, the

18   greatest number of electric motors would have probably

19   been on the tire-building machines because there are

20   just many, many, many, many, many separate tire-building

21   machines, each of which had at least on electric motor.

22       **Q.    Okay.**

23       A.   And the -- the Banbury area would have had a

24   number of different electric motors to power the mixing

25   operations.  The -- you may have seen references to

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 81

1    something called a wig-wag machine.  That would have had

2    at least one electric motor on each of those machines.

3    And then there would have been other smaller electric

4    motors on other pieces of equipment.  I'll have to think

5    about it.  There would have been winders, for example,

6    that wound up different materials that came out of

7    calendering process like the -- some of the components

8    of a tire are wound up on a reel, so that may be the

9    sidewall material, for example, or it may be the -- the

10   plies that go below the tread.  So that -- those all

11   have to be wound, and there would be electric motors in

12   that operation too.

13       Q.   Okay.  So the -- a little bit earlier you were

14   talking about the Banburies and how it's a little bit

15   like mixing flour for a cake only it's rubber.

16       A.   Right.  It's that big commercial --

17       Q.   Right.

18       A.   -- kind of mixer.

19       Q.   And the -- the mixing components, I guess,

20   were powered with an electric motor?

21       A.   Again, that's my -- yeah, that's my

22   understanding, is that the Banburies were driven by

23   electric motors and gearboxes.

24       Q.   Okay.  And the -- each tire-building machine

25   had at least one electric motor?

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 82

 1     A.   Right.

 2     Q.   **And the wig-mag -- wig-wag machine had an**

 3   **electric motor?**

 4     A.   Yeah.  There may have been, and likely were,

 5   more than one wig-wag, but yes.

 6     Q.   **Okay.  And do you know the -- the voltage that**

 7   **was used by the electric motors?**

 8     A.   It's going to vary.  I mean, a lot of them

 9   will probably be three-phase power, which is at least

10   240 volt, but I don't -- yeah, I can't tell you motor by

11   motor.  Some of them may have been higher voltage than

12   that.  And then the tire-building machines probably

13   wouldn't have been any higher than 240 based on the load

14   that -- that -- the work that they're doing.  But I

15   can't tell you.  And it could have all been three-phase.

16   You know, this plant was built in the '60s.  It's an

17   industrial facility.  So my -- my basic answer is I

18   don't know, but. . .

19     Q.   **When you say "three phase," what is that?**

20     A.   What you have -- power in a house or an office

21   building like this is two-phase power.  So there's one

22   hot and one neutral.  And my understanding is -- and I'm

23   not an electrical engineer, but my understanding is that

24   three-phase power you got two hots and a neutral, and

25   somehow that is better for certain operations where

Page 83

1   you're using electric motors so. . .

2       **Q.    Okay.   So it sounds like the plant used --**

3   **used a lot of electricity?**

4       A.    Yeah, it would have used quite a bit of

5   electricity.

6       **Q.    And was there some kind of machinery used to**

7   **reduce the voltage from electricity coming into the**

8   **plant to -- to reduce the voltage to where it could be**

9   **used by these electric motors?**

10      A.    I know from the documents I've reviewed that

11  Dayton Power and Light had one or more substations on

12  the plant property that would reduce the voltage from

13  the power lines that, you know, came to the plant down

14  to some level before it was actually delivered to the

15  plant.

16      **Q.    Uh-huh.**

17      A.    And I've also seen other documents that

18  referenced transformers that were within the plant

19  itself, you know, that weren't the property of Dayton

20  Power and Light that further reduced voltage.  And I say

21  "reduced."  It -- I think I can guess it's possible it

22  could go the other way, but rarely does.  Yeah, so they

23  were transformers both -- some owned by Dayton Power and

24  Light and some owned by Dayton Tire & Rubber.

25      **Q.    There were -- and who -- so there were**

Page 84

1    **transformers at the plant some owned by Dayton Tire &**

2    **Rubber and some owned by someone else?**

3        A.    Right.

4        **Q.    And who -- who was the someone else?**

5        A.    Dayton Power and Light.

6                MR. MOSS:  He just answered that.

7        **Q.    (BY MR. ROMINE)  And anybody else?**

8        A.    Not that I'm aware of.  Those are -- from the

9    documents that I've been able to study, those were the

10   only two folks, until the plant was sold in 1981.  And

11   then -- there's actually a list of all of the

12   transformers that were considered fixtures and were

13   transferred to the new owner --

14       **Q.    Uh-huh.**

15       A.    -- in '81.

16       **Q.    And did some of those transformers have PCBs**

17   **in them?**

18       A.    Yes.

19       **Q.    Some of the ones owned by Dayton Tire &**

20   **Rubber?**

21       A.    Yes.

22       **Q.    How about the capacitors?**

23       A.    I haven't seen anything about capacitors.

24                (Exhibit No. 12 marked.)

25       **Q.    (BY MR. ROMINE)  Exhibit 12 is a two-page**

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 85

1    **document dated AD -- not dated -- numbered ADT 0006 and**

2    **07.  And have you seen this before --**

3        A.    Yes.

4        **Q.    -- Mr. Layfield?**

5        A.    I have.

6        **Q.    And what is it?**

7        A.    It's actually what I was remembering from

8    before.  It's the other -- actually two documents where

9    I saw Mr. Nevius's name.

10       **Q.    Okay.**

11       A.    And it also reminds me that that word I was

12   trying to remember is resorcinol.

13       **Q.    Okay.**

14       A.    So there was an issue that came up, I think,

15   through the union where the union was concerned about a

16   reaction between formaldehyde and resorcinol that was

17   part of creating a resin.  And Mr. Nevius is the -- his

18   title here is safety supervisor -- sent a note to George

19   Wilson to say "Hey, what's -- you know, what are we --

20   what do we do about this?"  And then there's a response

21   back -- let me make sure I've everything in the right --

22   yep -- a very prompt response back, actually, from the

23   industrial hygienist and toxicologist, whose name isn't

24   typed here, so I'm not sure who it was.  So that's what

25   it is.

Page 86

1       Q.    Okay.   Based on your knowledge of -- of

2   Firestone and Dayton Tire & Rubber Company, is this

3   document -- the first page of Exhibit 12 here, was this

4   document generated in Akron or Dayton?

5       A.    It would have -- it appears to me that it was

6   generated in Akron.

7       Q.    Okay.   And going back to 11, it's a very

8   similar -- Exhibit 11 is a very similar format.  Do you

9   see that?

10      A.    Yes.

11      Q.    And so let me ask the same question.  Exhibit

12  11, does appear to you to be generated in Akron or

13  Dayton?

14      A.    Akron.

15      Q.    And going back to Exhibit 12, was formaldehyde

16  used by the Dayton plant?

17      A.    Yeah, it appears.  Yes.

18      Q.    And what for?

19      A.    A reaction between formaldehyde and resorcinol

20  makes a resin, and that resin was used in the

21  tire-making process.  I think it was actually used on

22  the bead material.  But, at any rate, resorcinol and

23  formaldehyde were reacted together to make a resin.

24      Q.    Okay.

25      A.    You may have seen testimony that said it was

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 87

1    used as a pigment -- resorcinol was used as a pigment.

2    That's not actually accurate.

3        Q.    Okay.  That's my next question.  What is

4    resorcinol?

5        A.    And I used to know what it looked like.

6    Resorcinol is a hydrocarbon, and it -- its

7    properties -- it's a dry, flaky kind of powder.  It

8    comes in a bag.  And I can't -- I can't remember the

9    structure as we sit here right now, but maybe it'll --

10   it'll come to me.  But it -- yeah, it's -- it's a

11   hydrocarbon chemical.

12       Q.    Okay.  And -- but resorcinol as a raw material

13   is -- is a -- is a solid?

14       A.    Yes.

15       Q.    Okay.  And then the reaction -- it reacts with

16   formaldehyde to make a resin?

17       A.    Right.

18       Q.    Okay.  And that resin is used in the

19   tire-making process?

20       A.    Yes.

21       Q.    Can you give me an estimate as to how much

22   formaldehyde is used per tire?

23       A.    No.  No way to do that.

24       Q.    Okay.  How about how much resorcinol per tire?

25       A.    No.

Page 88

1              And I hate to be a whiner.  It's noon.

2    It looks like you're switching to a -- a new exhibit.

3       **Q.  Do you want to take a break?**

4       A.  Yeah, if you don't mind.

5       **Q.  Absolutely.**

6                   **(Break from 12:04 p.m. to 12:15 p.m.)**

7                   **(Exhibit No. 13 marked.)**

8              MR. ROMINE:  For those of you on the

9    telephone, Exhibit 13 is a document marked ADT 0013 and

10   14.

11             THE WITNESS:  Okay.

12      **Q.   (BY MR. ROMINE)  Have you seen Exhibit 13**

13   **before?**

14      A.   Yes.

15      **Q.   And what is it?**

16      A.   It's a combination of two documents.  They're

17   in reverse order again.  On August the 2nd Mr. Nevius,

18   the safety supervisor at Dayton Tire & Rubber, sent a

19   memo to Akron asking about methyl chloroform, also known

20   as 1,1,1-Trichloroethane, and -- asking for some advice.

21   And then on August the 4th the folks in Akron responded

22   with respect to his question.

23      **Q.   Okay.  And so one of my questions is is methyl**

24   **chloroform the same thing as 1,1,1-Trichloroethane?**

25      A.   Yes.

Page 89

1      Q.   Okay.  And was methyl chloroform used in the

2   Dayton plant?

3      A.   Only as a component in the electrical cleaning

4   solution.  That's what this whole exchange is about.

5      Q.   Okay.

6      A.   This is kind of how we get to the Unisol from

7   the actual Chemsearch.  One component of that is

8   1,1,1-Trichloroethane.

9      Q.   Okay.  And so the 1,1,1-Trichloroethane is a

10   component of the motor-cleaning solution?

11      A.   It's a component of Unisol.

12      Q.   I see.

13      A.   That's what it says actually on Exhibit 11.

14      Q.   Okay.  And if you look at -- on page -- or --

15   excuse me -- yeah, page ADT 00013, I guess about

16   two-thirds of the way down the page, it refers to a

17   material which could be used for motor cleaning.

18      A.   All right.  Where it says "The Electrical

19   Standards Manual, Section 3, page 16, specifies the

20   material"?

21      Q.   Right.

22      A.   Yes, I see that sentence.

23      Q.   All right.  So it's "25 percent methylene

24   chloride, 70 percent Stoddard solvent and 5 percent

25   perchloroethylene."  You see that?

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 90

1     A.   I see that sentence, yes.

2     Q.   **Yeah.  Does methyl chloroform fit into that in**

3   **any way?**

4     A.   I would have to figure out what Stoddard

5   solvent is, so the answer to your question is I don't

6   know.

7     Q.   **Okay.**

8     A.   But the sentence right above that says we were

9   checking out this Unisol thing, and then later in the

10  month of August we see that they kind of settled on

11  using Unisol.

12    Q.   **Okay.  And that refers back to Exhibit 11?**

13    A.   Correct, yeah.

14    Q.   **Okay.**

15    A.   You see that Exhibit 13 is earlier in time

16  than Exhibit 11.

17    Q.   **Okay.  I gotcha.**

18         **This morning, Mr. Layfield, I had asked**

19  **you about whether there were industrial waste surveys**

20  **from the periods 1971 through '76 and '79.  Do you**

21  **remember that?**

22    A.   Yes.

23    Q.   **Because we had seen some for '77 and '78?**

24    A.   Yes.

25    Q.   **And I believe you referred at that time to a**

Hobart Corporation. et al. v. The Dayton Power & Light Co., et al.                                      Larry Dewayne Layfield

Page 91

1    document at your elbow here.  If you could just identify

2    that document.

3         A.    On the front of it it says "Environmental Data

4    Summary - Dayton Tire & Rubber Company, Dayton, Ohio."

5    And it has the number 100921 on the front.

6         Q.    Okay.  What I'm going to do is I'm going to --

7    my next document is going to be a portion of the

8    Environmental Data Summary.  And after I ask the court

9    reporter to mark it, I'll identify the -- the Bates

10   numbers.

11                 (Exhibit No. 14 marked.)

12                 MR. ROMINE:  For those of you on the

13   telephone, and also the people in this room, I have to

14   apologize because when I copied this, I copied it so

15   that some of the Bates numbers got cut off.  And the

16   Bates numbers should be ADT 00094 and 95.  And, I

17   believe, those got -- last ones got cut off.

18                 And then I did not copy the entire

19   Environmental Data Summary.  I only copied a chapter --

20   or a portion of it entitled "Solvent Purchases and Usage

21   Data."  And my question to you -- I'm sorry.  And those

22   Bates numbers are ADT 00135 through 141.

23        Q.    (BY MR. ROMINE)  And have you had a chance to

24   look at Exhibit 14?

25        A.    Yeah.  Generally, yes.

Page 92

1     Q.    Okay.  And is this --

2                MR. ANDREASEN:  David Romine, John

3     Andreasen.  Is that all one exhibit or is that two

4     exhibits?

5                MR. ROMINE:  It's one exhibit.  I'm

6     calling it Exhibit 14.

7                MR. ANDREASEN:  Okay.  Thank you.

8                MR. ROMINE:  Yeah.  It's 94 and 95 and

9     then 135 through 141.

10    Q.    (BY MR. ROMINE)  And is this -- is this --

11    what I've marked as Exhibit 14, is this a part of the

12    Environmental Data Summary that you were looking at

13    earlier?

14    A.    Yeah, it appears to be.  Yes.

15    Q.    And that -- the Environmental Data Summary is

16    a Dayton Tire & Rubber Company document?

17    A.    Yes.

18    Q.    Okay.  And you referred to that Environmental

19    Data Summary when you were preparing for this

20    deposition?

21    A.    Yes.

22    Q.    And if you look at the portion of the

23    Environmental Data Summary entitled "Solvent

24    Purchases, which is on page 136.  And, again, I'm sorry

25    if I -- some of that's been cut off.  It says "Major

Page 93

1    Solvent Purchases By Month and Year as Received."  Do

2    you see that?

3        A.   Yes.

4        Q.   Okay.  And it looks like it's designed to

5    capture the years 1978 through 198?  Or through May of

6    1980.  Excuse me.

7        A.   Yes.

8        Q.   Okay.  Are those numbers accurate?

9        A.   They're as accurate as they could be based on

10   the information available to the folks at that time.

11       Q.   Okay.  And have you had -- have you come

12   across any information that contradicts these numbers

13   here?

14       A.   No.

15       Q.   Okay.  And the next few pages, 137 and --

16   through 141, it looks like this is designed to capture

17   usage of particular solvents.  Do you see that?

18       A.   Yes.

19       Q.   And are these numbers accurate?

20       A.   Yeah, as --

21            MR. MOSS:  Objection.

22            THE WITNESS:  You know, they're accurate

23   as they can be.  There's -- I mean, it's -- it's the

24   best data available.  You're -- you're really kind of

25   doing apples and oranges.  Right?  So what they're --

Page 94

1    they're taking the data from accounting reports, which

2    means when you buy the solvent, so there could be timing

3    problems here because you've got -- for example, on ADT

4    00137, you got a $25,000 -- a 25,000-gallon tank where

5    it's stored.  So just because of the timing of

6    purchases, the numbers could be skewed a little bit.

7    But these were as accurate as -- as it was possible

8    to -- to get them.

9        Q.    Okay.

10       A.    And it was -- this is attributed as usage, so,

11   I mean, it -- they're as good a quality of numbers as

12   you can get.

13       Q.    Okay.  If you go back to page 136, the first

14   item is listed as "332 White Gasoline"?

15       A.    Yes.

16       Q.    What was -- well, was white gasoline used in

17   the Dayton plant?

18       A.    I'm sorry.  Ask that one more time.

19       Q.    Was white gasoline used in the Dayton plant?

20       A.    Yeah.  Well, white gasoline is one of those

21   funny terms.  It doesn't mean anything.  It's kind of

22   like -- I mean, it's -- it's -- it's imprecise.  Solvent

23   332 was used, yes.

24       Q.    Okay.

25       A.    And it -- solvent 332 -- if somebody wants to

Page 95

1    commonly refer to it as white gasoline, it's nothing

2    like a layperson would think of.  It's not gasoline.

3    Okay?  So that's the thing.  It's a whole bunch of light

4    end hydrocarbons.  So you're talking about C4 or C5,

5    C6s.  Gasoline has got all kinds of stuff in it.  I

6    mean, you know, it's -- you go to the gasoline pump,

7    you're going to have stuff up to C12.  So the behavior

8    of 332 is nothing like gasoline.  But we did use solvent

9    332, and it was a mixture of, basically, C4s, C5s and

10   C6s.

11       Q.   And what was that used for?

12       A.   A variety of different things.  It was used in

13   the -- in the tire-building process.  And mostly it's

14   used to make two rubber surfaces tacky.  You put the

15   solvent on them.  The solvent evaporates very quickly,

16   within 15 seconds, but it leaves the surfaces of the

17   rubber tacky so that you can get a better adhesion.

18       Q.   Was it used in the tire-building process?

19       A.   Yes.

20       Q.   How about 374, aromatic solvent A?  Was that

21   used at the Dayton plant?

22       A.   It was used at the Dayton plant.

23       Q.   And what was that used for?

24       A.   It -- it's used in the tire-manufacturing

25   process.  I don't think it's used at the tire-building

Page 96

1    machine.  But, basically, it -- it -- it's the same

2    basic function.  It's to make rubber surfaces tacky.

3    All right?  So there are reasons why they would use 374

4    in some places and 372 in others.

5              MR. MOSS:  332 you mean?

6              THE WITNESS:  I mean -- I'm sorry -- 332.

7    So if I'm remembering correctly, 374 was used -- the

8    tread rubber, when you're building a tire, is cut to

9    length before it gets to the tire-building machine.

10   Some things are spooled up.  We talked about that.  Some

11   things are cut to length.  And I think 374 was actually

12   used on the tread that was cut to length.  And there are

13   just very slight property differences.  Like, 374 has

14   got more C6s in it and 332 has got more C4s and C5s in

15   it.  So it's -- they're just slightly different, and

16   they use them at different points in the manufacturing

17   process.

18      Q.   (BY MR. ROMINE)  Can you describe for me

19   how -- how that makes a difference in a functional

20   sense?

21      A.   Not really.  I mean -- okay.  To be quite

22   honest, I mean, the manufacturing of tires is, in part,

23   an art.  So over time the plant learned that it's better

24   to use a solvent that has more C6s in it at certain

25   places and use a solvent that has more C4s and 5s at

```
 1   other places, and it just results in an overall better

 2   tire.  You know, you don't -- you don't have a tire that

 3   fails to adhere and you have to scrap it out.  And I

 4   can't tell you exactly why.  Honestly, I'm not sure that

 5   you can -- you know, you can probably write a whole

 6   dissertation on why.

 7        Q.   Okay.

 8        A.   Don't know.

 9        Q.   Fair enough.

10             How about the next one:  "n-Hexane"?

11        A.   Yeah.

12        Q.   What is n-Hexane?

13        A.   N-Hexane is a straight chain six carbons.  A

14   very pure solvent.  So it's -- it's, you know, 99-plus

15   percent normal hexane.

16        Q.   And what is that used for?

17        A.   Again, it's used in the tire-building process.

18   It's going to be more expensive since it's pure, so

19   there -- there's some special step where they needed to

20   use normal hexane to tactify the rubber.

21        Q.   Okay.

22        A.   And I -- I can't tell you which step it was.

23        Q.   Fair enough.

24             How about the next one:  "isopropyl

25   alcohol"?  What is that used for?
```

Page 98

1    A.    I don't know.

2    Q.    **Okay.**

3    A.    It's not used to tactify rubber, I don't

4    think.

5    Q.    **Okay.**

6    A.    So I don't know.

7    Q.    **And how about "heptane"?**

8    A.    Yeah, heptane -- hang on a second.  I got

9    to -- I have to translate from a code number to

10   something I understand.

11              Yeah, very -- very -- or, you know,

12   relatively small quantities of heptane were used.

13   Heptane is a C7.  So it's a straight chain C7, and,

14   again, it's going to be used for a special application.

15   You can tell from the volumes of solvent that 332, 374

16   and normal hexane were the higher-volume solvents.  And

17   then they used a little bit of isopropyl alcohol and a

18   little bit of heptane.  So there was some special

19   function that they needed heptane for, and I -- I don't

20   know which step.  But it's going to -- heptane's a

21   tactifier too.

22   Q.    **And when you say "tactifier," that means you**

23   **put it on -- on rubber, it evaporates, but it makes the**

24   **surface tacky?**

25   A.    Yes.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 99

1     Q.   Okay.  And it looks like on page 136 isopropyl

2     alcohol is not a tactifier, but the other -- the other

3     solvents listed here are tactifiers?

4     A.   Yes.

5     Q.   Okay.

6     A.   And I'm -- you know, isopropyl is spelled

7     wrong.

8     Q.   Uh-huh.

9     A.   But on -- on the exhibit it's spelled wrong.

10    Q.   Right.

11    A.   To my knowledge, it is not a tactifier.  I've

12    never seen isopropyl alcohol in any tire-building

13    process used as a tactifier.  And I just don't know what

14    they would have used it for either.

15    Q.   Okay.  All right.  During the period 1961

16    through 1980, did Dayton Tire & Rubber haul their own

17    waste?

18    A.   No.

19    Q.   How do you know that?

20    A.   I looked at the vehicles that they acquired

21    when they bought the plant in 1961.  There's actually a

22    schedule of every vehicle that they acquired.  And --

23    and I looked for any other records of them having

24    purchased a vehicle capable of hauling waste, and

25    there's just -- there aren't any.  I mean, you know,

Page 100

1    like three-quarter-ton trucks, which is like a -- a

2    little bit bigger than a normal pickup truck kind of --

3    that size thing.

4        Q.    Uh-huh.

5        A.    They don't -- they didn't have any vehicles

6    that were capable of hauling waste off the site.  They

7    had some small vehicles that they referred to as "Mules"

8    that were capable of moving waste from one location to

9    another on the site.  Like, they would take small

10   containers of waste out to a larger dumpster with a

11   thing called a Mule, which -- which was a vehicle, and

12   then they would dump the smaller containers of waste

13   into the larger dumpster.  But nothing capable of

14   hauling the waste off site.

15       Q.    Have you heard of the term "Lugger"?

16       A.    Yes.

17       Q.    What's a Lugger?

18       A.    A Lugger is some form of waste container.  And

19   I can't tell you whether it's the kind that -- you know,

20   there's waste containers that you stick like forklift

21   things in on the front of the truck, and you kind of

22   flip it up like this.  There's other kinds -- I think

23   they're called anchor packs -- that you pull onto the

24   back of the truck with a winch.  It's -- it's a waste

25   container, a Lugger is.  I don't -- but I can't tell you

1    exactly what it looks like.

2        Q.   You had talked a few minutes ago about -- you

3    had talked a few minutes ago about vehicles that -- that

4    Firestone, I guess, acquired when it bought the Dayton

5    Tire & Rubber plant?

6        A.   Yes.

7        Q.   Did those -- did that include any Luggers?

8        A.   I don't think a Lugger is a vehicle.  I think

9    of a Lugger as a -- as a type of dumpster.  I mean, if

10   I'm wrong, I'm wrong.  Educate me.  But I -- I think a

11   Lugger is a type of waste dumpster.

12       Q.   Okay.  Let me just take a look at my outline.

13   I may -- I might be done.

14       A.   Okay.

15       Q.   Mr. Layfield, have you interviewed former

16   Dayton Tire & Rubber employees in preparation for this

17   deposition?

18       A.   Personally, no.

19       Q.   Do you know if Dayton Tire & Rubber -- former

20   Dayton Tire & Rubber employees were interviewed in

21   preparation for this deposition?

22            MR. MOSS:  Just note an objection to the

23   extent that it seems to invade the attorney-client and

24   attorney work-product privilege.

25            But if you -- if you can answer that

Page 102

1    without, you know, invading those privileges, go ahead.

2                    THE WITNESS:  Yeah, I didn't interpret

3    what I reviewed as having been done in preparation for

4    this deposition because it was done before anybody

5    thought about having this deposition.  I reviewed sworn

6    statements of former Dayton Tire & Rubber Company

7    employees and depositions, you know.  So sworn

8    testimony.  But that was all taken years ago.

9        Q.   (BY MR. ROMINE)  Okay.  And -- and who -- who

10   were they?

11       A.   I think we went over it before, but let me

12   see.  We had Cecil Yonker.  We had Frank Miracle.  I

13   don't think I gave you Yonker's name before, but --

14   Frank Miracle, I've looked at his sworn testimony.

15   Cecil Yonker, I've looked at his sworn testimony.

16                    And the way you asked your question,

17   which was employees of, I don't think Mr. Reid was ever

18   an employee of the Day -- oh, yeah, he was.  No.  Well,

19   maybe.  Yeah, because Dayton was -- I think Oklahoma

20   City was a Dayton Tire & Rubber facility too, so

21   Mr. Reid would have been an employee of Dayton Tire &

22   Rubber as well.  So I reviewed his -- his testimony too.

23   So those would be the three.

24       Q.   Okay.

25       A.   Yeah.

Page 103

1     Q.    But you reviewed the testimony from another

2  case?

3     A.    Right, from years past.

4     Q.    Okay.

5     A.    I don't -- I guess sworn statements may or may

6  not be taken in any particular case, but yeah.

7     Q.    Okay.  Okay.  I think that's all I have for

8  now.  Thank you.

9               MR. CAMPBELL:  Do you want to take a

10  lunch break?

11               MR. MOSS:  Yeah, if you -- I mean, you

12  think you're going to have about an hour?

13               MR. CAMPBELL:  Yeah.

14               MR. MOSS:  Just for the folks on the

15  phone, just for planning purposes, any estimate as to

16  questioning?  First of all, will there be questioning of

17  Mr. Layfield?  And if so, can you give any estimate -- I

18  won't hold you to it but -- of the length of any

19  questioning?

20

21               MS. GALE:  This is -- yeah, this Kristin

22  Gale.  I'll have maybe 15, 20 minutes of questions.

23               MR. MOSS:  Okay.  Anyone else?

24               MR. ANDREASEN:  This is John Andreasen.

25  I don't anticipate any questions at this time.

Page 104

```
 1                    MR. MOSS:  Okay.

 2                    MS. DECKER:  Kate Decker.  I don't

 3    anticipate any either.

 4                    MR. THUMANN:  Rob Thumann.  I don't

 5    anticipate any questions.

 6                    MR. HEER:  This is John Heer.  I don't

 7    anticipate any questions either.

 8                    MR. MOSS:  Okay.  Is that everybody?  I

 9    think it is.

10                    Okay.  Do you want to -- we're going to

11    break quickly for lunch.  Maybe -- want to try to keep

12    it to half an hour, 45 minutes?

13                    MR. CAMPBELL:  Yeah, we'll get back as

14    fast as we can.

15                    We're off the record.

16                    (Break from 12:41 p.m. to 1:36 p.m.)

17                         EXAMINATION

18    BY MR. CAMPBELL:

19        Q.   Mr. Layfield, good afternoon.

20        A.   Good afternoon.

21        Q.   We're continuing the deposition we began this

22    morning.  And you've been sworn, so with that I'll go

23    ahead and start.

24                    I had a couple of preliminary questions

25    for you.  You are here today designated as the Rule
```

Page 105

1    **30(b)(6) representative for the entity we've been**

2    **referring to as BATO, correct?**

3    A.   On the 13 topics in the deposition notice

4    served by plaintiffs, subject to the objections, yes.

5    **Q.   Correct.  So you've been anticipating my next**

6    **question.  You are the witnesses to all 13 topics,**

7    **correct?**

8    A.   Subject to the objections, yes.

9    **Q.   And the objections, as I understand them,**

10   **basically, limited the corporate testimony to the time**

11   **period between 1961 and 1980.  Is that your**

12   **understanding?**

13   A.   That's one of the objections.

14   **Q.   What's the other one?**

15   A.   There are several.  I mean, they -- the

16   document speaks for itself.

17              MR. MOSS:  I think it's right there.

18   Exhibit A.

19              THE WITNESS:  Objected to inquiry into

20   privileged matters; objected to the extent that the

21   information seeks material not relevant or reasonably

22   calculated to the discovery of admissible evidence.  We

23   objected to the time frame that you mentioned, '61 to

24   '81.  We didn't object to -- we did object to the

25   others.  We objected to inquiring into the identity of

Page 106

1     employees of -- that were employed more than 40 years

2     ago as an unduly burdensome inquiry.  Let's see.  We

3     objected that categories 2, 3, 4 and 7 did not describe

4     the categories with reasonable particularity.  We

5     objected to the extent any of the categories required a

6     legal conclusion.  Let's see.  And we objected to

7     inquiries into specific payroll or personnel records

8     that would cause the information that was contrary to

9     the privacy interest of the former employees to be

10    revealed.  That's the list.

11        Q.    **What did you do to prepare for your deposition**

12    **today?**

13        A.    I reviewed --

14              MR. ANDREASEN:  Excuse me, Drew.  This is

15    John Andreasen.  I'm sorry to interrupt.  I don't have

16    that down as being marked as an exhibit to this

17    deposition.  Was it?

18              MR. CAMPBELL:  No.

19              MR. MOSS:  Yes, it was.  We marked it

20    before we started.

21              MR. ANDREASEN:  Okay.  Thank you.

22              MR. MOSS:  It was marked, John.  This is

23    Dave Moss.  We marked it as an exhibit, Defense Exhibit

24    A, at the beginning of the deposition.

25              MR. CAMPBELL:  Oh.

Page 107

1              MR. ANDREASEN:  Oh, I'm -- okay.

2              MR. CAMPBELL:  I don't have copy of that.

3              MR. ANDREASEN:  Okay.  Thank you.

4     **Q.    (BY MR. CAMPBELL)  Okay.  What did you do to**

5   **prepare for your deposition today, sir?**

6     A.   I reviewed the sworn testimony of -- of a

7   variety of individuals, including some former Dayton

8   Tire & Rubber employees, some IWD employees, and others.

9   I reviewed a large number of historical documents that

10  related to the topics, and I met with Counsel.  And

11  that's -- that was -- generally describes what I did.

12    **Q.   Okay.  With respect to the historical**

13  **documents, are you -- can you describe those documents**

14  **for me?  In other words, were these documents that were**

15  **part of the business records of BATO?**

16    A.   Yeah, by in large they were part of the

17  business records.  They were things that had been

18  produced or made available in the production.  They were

19  exhibits to depositions.  They were material that had

20  been shared with the U.S. EPA or Ohio environmental

21  agencies.

22             And I should say that I have some

23  knowledge of the waste disposal practice of Dayton from

24  the 1990s.  Not that they were disposing of anything in

25  the '90s.  But back then I became aware of it because I

Page 108

1    worked on Cardington Road and Valley Crest.

2        Q.    Okay.  So we'll come back in a moment to

3    information you may have known -- just had personal

4    knowledge of, but I want to get back just for a minute

5    to the historical documents reviewed.

6              So you said the documents you looked at,

7    among others, were documents that came -- that were the

8    business records of BATO, correct?

9        A.    Right.  They were former Dayton Tire & Rubber

10   documents that -- when Dayton Tire & Rubber was sold

11   were taken into the custody of what is now known as

12   BATO.

13       Q.    You also mentioned that you reviewed documents

14   that have been produced in the document production in

15   this case?

16       A.    Yes.

17       Q.    By that, I take it, you mean documents

18   produced by BATO in this case?

19       A.    Yes.

20       Q.    Okay.  Did you review documents produced by

21   any other parties in this case?

22       A.    It's hard for me to say because I didn't -- I

23   didn't focus on the Bates number on the document to be

24   able to tell who had actually produced them, but I -- my

25   belief is that most of the documents I reviewed came

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 109

1    from BATO or were made exhibits to depositions.

2        Q.    Okay.  Did you see any documents produced by

3    BATO that were not business records of BATO?  In other

4    words, documents that did not come from their record --

5    from the company itself that would have been generated

6    and retained in the ordinary course of BATO's business?

7        A.    Sure.  I mean, there was some correspondence

8    from -- from other folks.  I mean, I think we saw some

9    examples of that today.

10       Q.    Okay.

11       A.    There was a letter in there from -- what was

12   it? -- National Chemsearch or something like that.

13       Q.    In other words, a document from a third-party

14   to BATO --

15       A.    Yeah.

16       Q.    -- would be a document that might have been

17   retained in the file but wasn't a BATO document,

18   correct?

19       A.    Correct.

20       Q.    Okay.  Fair enough.

21             You mentioned the review -- and you

22   talked about it several times today -- of some sworn

23   testimony from IWD and DTR employees.  I think you

24   mentioned previously the names -- let's see -- Yonker --

25   well, actually, why don't you tell me so I don't have to

Page 110

1    **go back through my notes.**

2        A.   Okay.

3        **Q.   Unless it's easier for me to go back to my**

4    **notes.**

5        A.   No, it's --

6        **Q.   Okay.**

7        A.   It's probably easier -- because I -- I tried

8    to make a list in anticipation of being asked.

9                MR. MOSS:  So you're limiting your

10   question, Drew, to IWD?

11               MR. CAMPBELL:  No.  I'm asking him

12   which -- which individuals' sworn testimony did he

13   review in preparation for his deposition today.

14               THE WITNESS:  Okay.  Here we go.  Vernon

15   Vencill, Joseph Smart, Michael Wendling, Cecil Yonker.

16   I'm not going to be able to pronounce the next last

17   name.  Horace --

18       **Q.   (BY MR. CAMPBELL)  Boesch.**

19       A.   -- Boesch, B-O-E-S-C-H; Edward Grillot; Frank

20   Miracle; Dan Connaughton.  Connaughton.

21       **Q.   How do you spell that?**

22       A.   C-O-N-N-A-U-G-H-T-O-N.  And John Hogue,

23   H-O-G-U-E.

24       **Q.   Okay.**

25       A.   And did I say William Fournier?

Page 111

1    Q.   No.

2    A.   F-O-U-R-N-I-E-R.

3    Q.   F-O-U-R-N-I-E-R?

4    A.   Yeah.  And those are the ones I reviewed

5    principally.  There may have been a couple others that I

6    looked at a page or two, but the ones I gave you are the

7    ones I really --

8    Q.   Okay.

9    A.   -- kind of studied.

10   Q.   And I take it, then, each of these individuals

11   you reviewed with -- were they deposition transcripts?

12   A.   Or they -- in some instances multiple

13   deposition transcripts and sworn statements.

14   Q.   Okay.  Tell me about the sworn statements.

15   What were they and who gave them?

16   A.   I remember that there was a -- I think I

17   remember.  There -- there are two sworn statements that

18   I think I remember.  I think Frank Miracle gave a sworn

19   statement in addition to deposition testimony.  And I

20   believe -- I could be wrong, but I believe

21   Mr. Grillot -- Edward Grillot gave a sworn statement in

22   addition to deposition testimony.

23   Q.   Okay.

24   A.   The rest of them, I think, were all

25   transcripts.  But in several instances there were -- it

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 112

1    was more than one transcript taken in different years.

2        Q.   Uh-huh.  Okay.  Did you speak with any

3    individuals who are either current or former employees

4    of BATO in preparation for your deposition?

5        A.   None other than Counsel.

6        Q.   Okay.  I take it, then, you didn't speak with

7    any individuals who, while not former or current

8    employees of BATO, may have been former or current

9    vendors or people with other third-party relationships

10   with BATO?

11       A.   Yeah, that's correct.

12       Q.   Okay.  Was there any information that you had

13   to ask BATO to provide to you other than the documents

14   you've just talked about?  In other words, did you have

15   any questions that came up in your mind that caused you

16   to go follow up with BATO to see if they had any

17   information relevant to your inquiry?

18              MR. MOSS:  I'm just -- I'm just going to

19   note an objection because I think this -- this may get

20   into privileged communications.

21              But subject to that objection, you can

22   answer.

23              THE WITNESS:  I asked for any additional

24   information -- in the -- in the historical documents I

25   reviewed, I had some information about solvent 332, and

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 113

1    I asked for any additional information that might exist

2    about solvent 332 because I know, just because I've

3    worked with the company long enough, that that solvent

4    number is the same.  I mean, it's the same solvent

5    number.  Not just to Dayton Tire & Rubber, but it would

6    have been the same solvent number.  So I asked if there

7    was any addition information about the composition of

8    332.

9        **Q.   (BY MR. CAMPBELL)  Okay.  And were they able**

10   **to provide it to you?**

11       A.   A little bit.  But it really didn't clarify it

12   any further than white gasoline.  And then I had to --

13       **Q.   Okay.**

14       A.   -- you know, kind of dig into what -- what's

15   the colloquial meaning of white gasoline and what --

16   what are the physical properties, so I can kind of

17   backed into what --

18       **Q.   Okay.**

19       A.   -- what it really was.

20       **Q.   So other than asking for some additional**

21   **information about solvent 332, were there any other**

22   **topics that you asked BATO to provide information about?**

23       A.   Not that I --

24              MR. MOSS:  Same objection.

25              But go ahead.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 114

1              THE WITNESS:  Yeah, not that I recall.

2       Q.   (BY MR. CAMPBELL)  All right.  You said that

3    you met with Counsel?

4       A.   Yes.

5       Q.   With whom did you meet?

6       A.   With Mr. Moss and Mr. Wick.

7       Q.   How many times?

8       A.   I met with them one day.

9       Q.   Did you have any telephonic contact with them

10   prior to that one meeting?

11      A.   Yes.

12      Q.   How many times?

13      A.   I think it was three occasions.

14      Q.   Was that in connection with your role as a

15   30(b)(6) witness?

16      A.   Yes.

17      Q.   So I take it the one -- the meeting that took

18   place for one day, that was an in-person meeting?

19      A.   Yes.

20      Q.   That was prior to this deposition?

21      A.   Yes.

22      Q.   Was that yesterday?

23      A.   Yes.

24      Q.   Did you obtain any facts from either Mr. Moss

25   or Mr. Wick that are material to your testimony today?

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 115

1     A.    No.

2        Q.    So they didn't tell you anything you didn't

3     already know from your review of BATO business records?

4              MR. MOSS:  Just note an objection to the

5     extent that you're now getting into communications with

6     Counsel.

7              But you can answer.

8        Q.  (BY MR. CAMPBELL)  Well -- and just to

9     clarify -- I'm only asking for facts.  I'm not asking

10    for your communications of Counsel.  But if you received

11    facts from Counsel, I am asking about those.

12             MR. MOSS:  Same objection.

13             You can answer.

14             MR. CAMPBELL:  Well, those -- those are

15    not subject to the attorney-client privilege or the

16    work-product privilege.

17       Q.  (BY MR. CAMPBELL)  So the question, again, is

18    did you learn any facts from your meetings with Counsel

19    that are playing any role in your testimony today?

20             MR. MOSS:  Note my objection.

21             But you may answer.

22             THE WITNESS:  The facts came from records

23    and from the sworn testimony.

24       Q.  (BY MR. CAMPBELL)  Okay.

25       A.    Not from Counsel.

Page 116

1       Q.    Okay.   You had identified a few names that I

2   had not heard previously, and so I'm going to ask you,

3   first of all, to tell me who is Don Connaughton?

4       A.    Oh, Connaughton was an IWD driver.   There are

5   a whole bunch of IWD drivers that were either deposed or

6   had sworn statements.   And I'm pretty sure Connaughton

7   was one that we deposed.   So he was just -- he was a

8   driver.

9       Q.    So he would have been deposed in the Valley

10  Crest litigation or Cardington Road?

11      A.    Don't get -- I -- I don't know.

12      Q.    Okay.

13      A.    Because there were at least four different

14  styles on the depositions that I had, so I don't

15  really -- I don't -- sorry.   I can't tell you.

16      Q.    Okay.   Fair enough.

17                  What about William Fournier?

18      A.    William Fournier was -- he was also -- he was

19  also an IWD driver.   And he was actually the guy that,

20  from his deposition, I figured out what a Lugger was

21  so -- because he -- that's one of the things that he

22  hauled, was Luggers.

23      Q.    Well, if you look it up on Wikipedia, you

24  won't find that definition so -- they define it as a

25  ship.   I'm just saying.

Page 117

1              MR. MOSS:  Just saying.

2              THE WITNESS:  Well, anyway, Fournier

3    described it as one of the boxes he picked up.  He

4    called it a Lugger.

5        Q.   (BY MR. CAMPBELL)  Gotcha.

6              MR. MOSS:  It's not a truck.

7        Q.   (BY MR. CAMPBELL) How about John Hogue?

8        A.   He was also an IWD driver.

9        Q.   Also a deposition transcript you reviewed?

10       A.   Yeah, that's my recollection.  There were very

11   few sworn statements, so I'm virtually certain that --

12       Q.   Okay.

13       A.   -- Hogue was a transcript.

14       Q.   Okay.  You mentioned that Mr. Miracle --

15   what's the first name again?

16       A.   Frank.

17       Q.   Frank.  That you thought you had seen both a

18   deposition and a sworn statement from him?

19       A.   Yes.

20       Q.   Can you describe the sworn statement?  Was

21   that an affidavit?

22       A.   It -- it may not have been really a sworn

23   statement, but it was a -- a memorandum talking about

24   what Frank had said.  And it was a Firestone document.

25   I can't remember the date.  I can kind of see it in my

Page 118

1    mind.  But it wasn't in a traditional sworn statement

2    format, but it was a whole bunch of "this is what Frank

3    said about A, B, C, D."

4        Q.   So was it some kind of an internal memo just

5    memorializing the conversation with him?

6        A.   Could have been.

7        Q.   All right.  Do you recall who the author was?

8        A.   No.

9        Q.   But you've looked at that document?

10       A.   Oh, yes.

11       Q.   Do you have a copy of that document?

12       A.   I don't have a copy with me today.

13       Q.   Could you -- could you retrieve a copy?  In

14   other words, would you know where to go find it if we

15   asked you to get it?

16       A.   Yeah, I -- I -- I think so.  I mean, I can

17   narrow it down to one of 20,000 pages, at least.

18       Q.   Well, now you know how I feel.  We --

19   actually, we -- I'm sorry.  Go ahead.

20       A.   No, I'm -- but that's -- that's about -- you

21   know, that's about what -- what I looked through.

22       Q.   Okay.

23       A.   And that -- that collection is. . .

24       Q.   We would like a copy of the document that you

25   reviewed that was memorializing things that Mr. Miracle

Page 119

1    said, so I will ask you to look for that as part of

2    your -- your participation here today.

3                   MR. MOSS:   What I would just ask, just so

4    it doesn't get lost in the shuffle, is if you would put

5    it in an e-mail to Bill and me and -- with your request.

6                   MR. CAMPBELL:   Okay.

7        Q.   (BY MR. CAMPBELL)   Now, Mr. Layfield, I

8    noticed you brought some documents with you today.

9    Could we talk about those for a moment?

10       A.   Sure.

11       Q.   Let's start -- if you just want to give me a

12   brief summary of each document, and then we'll go ahead

13   and enter them as exhibits.

14       A.   Okay.   I brought a list of names of different

15   people that -- whose names came up in my review of other

16   documents.

17       Q.   Okay.

18       A.   And that's -- there's a three -- I've got a

19   three-page document here.   The first two pages is,

20   basically, a list of the names that I came across and

21   kind of who they were.

22       Q.   Okay.

23       A.   Very briefly who they were.

24                   And if I could determine readily when

25   they were in that position, then I -- I had made a note

Page 120

1    of the year.  But if -- in my instances, I didn't -- you

2    know, couldn't, so their name just came up.

3         Q.    Okay.

4         A.    And then the third page of this document are a

5    list of the deposition transcripts and -- and sworn

6    statements that I had.  And I told you off this list the

7    ones that I principally studied.  The others I'd say I

8    might have reviewed a page or two of those.

9         Q.    Okay.

10                 MR. CAMPBELL:  Shall we go ahead, then,

11   and mark this 15, just to keep it in sequence?

12                 MR. ROMINE:  Whatever you want.

13                 (Exhibit No. 15 marked.)

14        Q.    (BY MR. CAMPBELL)  And what do you have next?

15        A.    I have what I think is a more complete copy of

16   14, which is the Environmental Data Summary for Dayton

17   Tire & Rubber Company, Dayton, Ohio.  And it has a

18   different set of Bates numbers on it than this one, but

19   I think it's the complete one of those.

20                 MR. CAMPBELL:  This will be 16.

21                 (Exhibit No. 16 marked.)

22                 MR. CAMPBELL:  All right.  You want to

23   ask your question again, John.

24                 MR. ANDREASEN:  Mine?

25                 MR. CAMPBELL:  Yours.

Page 121

1            MR. ANDREASEN:  Description of what that

2    document is.

3       Q.   (BY MR. CAMPBELL)  Mr. Layfield, do you want

4    to describe that again?

5       A.   Sure.  I mean, the first page of it has

6    Environmental Data Summary, Dayton Tire & Rubber

7    Company, Dayton, Ohio.  And I don't -- I don't have it

8    in front of me anymore.  But on my copy it has a Bates

9    number of 100921, and then the Bates numbers continue in

10   sequence all the way through 100975, so however many

11   pages that is.  It is what I think is a complete copy of

12   what was marked as Exhibit 14.

13            MR. ANDREASEN:  Thank you.

14      Q.   (BY MR. CAMPBELL)  And what else do you have?

15      A.   Well, this one you've already got a copy of.

16   I just happened to have two copies.

17      Q.   Okay.

18      A.   The next thing I have is a map.  It's an

19   aerial photograph with the streets and stuff overlaid on

20   it.  And this one we're lucky enough to have extra

21   copies of.

22      Q.   Thank you.

23            (Exhibit No. 17 marked.)

24      Q.   (BY MR. CAMPBELL)  Mr. Layfield, I'm going to

25   hand you back a copy of the map now marked as Exhibit

Page 122

1    17.  And can you tell me what role this map played in

2    your preparation for today?

3        A.   I was orienting myself with the location of

4    the plant, which is up toward the upper left-hand part

5    of this aerial photograph, to the location of what we've

6    been calling the South Dayton Dump and to the location

7    of what is known as the Cardington Road Landfill.

8        Q.   Okay.  Would you mind for us marking with a

9    pen just -- and if you have a color pen, that would be

10   better.

11       A.   No, I got a black --

12            MR. MOSS:  I got a red one, if that would

13   help.

14            THE WITNESS:  All right.

15       Q.   (BY MR. CAMPBELL)  Okay.  Each of those

16   locations.  And, perhaps, you could also just briefly

17   label them.

18       A.   Okay.

19       Q.   Or the approximate locations.

20       A.   Sure.

21       Q.   Thank you.

22       A.   Uh-huh.

23       Q.   Do you have any other documents to show us?

24       A.   I have another map, which is -- again, it's an

25   aerial photograph of the streets overlaid on it.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 123

1              (Exhibit No. 18 marked.)

2        Q.    (BY MR. CAMPBELL)  Mr. Layfield, can you tell

3    me what role this document played in your preparation

4    for your testimony today?

5        A.    Exhibit 18 covers a larger geographic area

6    than Exhibit 17.  And the reason that I have it is

7    because it helps me orient myself to where the Valley

8    Crest Landfill is located relative to the other three

9    features that we marked on Exhibit 17.

10       Q.    Would you mind marking Valley Crest for us as

11   well?

12             Okay.  Thank you.

13             (Exhibit No. 19 marked.)

14             MR. MOSS:  Didn't we have this one

15   already?

16             MR. CAMPBELL:  Yes.

17             MR. MOSS:  Okay.

18             MR. CAMPBELL:  But this one is better.

19             MR. MOSS:  Okay.

20       Q.    (BY MR. CAMPBELL)  Mr. Layfield, I'm going to

21   hand you a copy of what we have marked as Deposition

22   Exhibit No. 19.  Ask you to take a moment to review

23   that, and then I'm to going to ask if you've seen it

24   before?

25       A.    I have seen pages 1 and 2 of Exhibit 19

Page 124

1    earlier today in this deposition.

2         Q.   Okay.

3         A.   And I have seen pages 3 and 4, which bear the

4    number 100936 and 100937, on several occasions prior to

5    today.

6         Q.   And can you --

7              MR. CAMPBELL:   For those who are on the

8    phone, the -- the exhibit is a February 2, 2015, letter

9    from Mr. Wick to the U.S. EPA.  It also references an

10   attachment.  The second two pages of this exhibit are

11   the May 7, 1980, letter from Industrial Waste Disposal

12   Company, Inc., to Dayton Tire & Rubber.

13        Q.   (BY MR. CAMPBELL)   Now, Mr. Layfield, do you

14   recognize the -- the attachment of this letter, the May

15   7, 1980, letter?

16        A.   Yes.

17        Q.   Is it your understanding that that is the

18   document referenced in the letter from Mr. Wick of

19   February 2, 2015?

20        A.   Yes.

21        Q.   Okay.  Let's take a look at that exhibit,

22   then, and the May 1987 letter.  Can you tell me that

23   this is?

24        A.   What the letter is?

25        Q.   Yes.

Page 125

1     A.    As the Dayton Tire & Rubber plant in Dayton,

2   Ohio, was getting prepared to be shut down, there was an

3   investigation by BATO -- the predecessor of BATO to get

4   an understanding of the waste situation:  where solid

5   waste had been disposed of, what the waste disposal

6   practices were.  What we marked as exhibit -- I don't

7   have it.  The big thick one.

8     Q.    Exhibit 16?

9     A.    Yeah, what we marked as Exhibit 16 was part of

10   that effort.

11     Q.    Okay.

12     A.    Okay.  And requesting information from

13   Industrial Waste Disposal was part of the effort.  So

14   the predecessor of BATO had asked Industrial Waste

15   Disposal to, please, identify where they had hauled the

16   solid waste from the Dayton Tire & Rubber plant, and

17   this letter that we're talking about is their response.

18     Q.    Okay.  Now, when you said "investigation," are

19   you describing something that was done at the behest of

20   a governmental entity, or was this merely the -- the

21   company's own due diligence as part of the

22   decommissioning of the plant?

23     A.    It's my understanding that it was the

24   company's own due diligence as part of decommissioning

25   the plant.

Page 126

1      Q.   Okay.  So, then, it's your understanding,

2    then, that this May 7, 1980, letter was written to BATO

3    at BATO's request?

4      A.   Right, in -- in response to their request for

5    information.

6      Q.   Okay.

7      A.   It was -- I mean, in other words, BATO didn't

8    say "Write me a letter that says this."  BATO said,

9    "Please answer this question," and this was the answer.

10     Q.   Understood.

11     A.   Yeah.

12     Q.   Thank you for you that clarification.

13          So, then, I think, as you've just so well

14   articulated, this letter is one that was not created by

15   BATO, it's simply one that was maintained in BATO's

16   files since in or around 1980, correct?

17     A.   Yeah, that's correct.

18     Q.   Do you know what the basis was for each of the

19   contentions set forth in this letter?

20     A.   In other words, do I know what facts IWD

21   relied on when they wrote the letter?

22     Q.   Exactly.

23     A.   No.

24     Q.   Do you know whether there's any documentation

25   that you're aware of that supports any of the

Page 127

1    contentions made by IWD in this letter?

2         A.   Well, there's a lot of documentation that

3    supports the contentions that are -- at least some of

4    the contentions that are made in this letter.

5         Q.   Okay.  Well, let me clarify my question, and

6    then we'll come back to your answer.

7                   Are you aware of any documentation upon

8    which IWD relied to support the contentions it made in

9    this letter?

10        A.   I don't know on what IWD relied.

11        Q.   Okay.  You're not aware of any contemporaneous

12   correspondence between BATO and IWD requesting

13   supporting documentation for IWD's letter?

14        A.   I'm not aware of any.

15        Q.   Okay.  And you didn't see anything in the

16   files that suggested at some point after this letter was

17   written that BATO was trying to understand the accuracy

18   of these contentions, correct?

19        A.   I don't recall seeing such documents.

20        Q.   Okay.  So you're, then, not aware of whether

21   any steps were taken by BATO at the time this letter was

22   written to confirm its accuracy, correct?

23        A.   At the time it was written?

24        Q.   At or about the time it was written.

25        A.   In -- in -- I'm not aware of steps taken in

Page 128

1    1980 by BATO to confirm the accuracy of these letters.

2        Q.    Okay.  So BATO played no role in the

3    preparation of this letter, correct?

4        A.    That's my understanding, yes.

5        Q.    Played no role in identifying underlying

6    support for this letter at the time it was written,

7    correct?

8        A.    In 1980, that's correct.

9        Q.    Okay.  We may have asked this question

10   earlier.  Who is Mr. Ralph Ball, who is the intended

11   recipient of this letter?

12       A.    I believe at the time he was the plant

13   manager.  Let me check.  He may have had a different

14   title.  And I might have some note about what his title

15   was.  No.  He may have been at some -- at one point he

16   was a general services manager.  So I'm not sure if he

17   ever was acting plant manager or not, but he was at

18   least general services manager at Dayton Tire & Rubber.

19       Q.    Do you know if Mr. Ball is still with us

20   today?

21       A.    I don't know whether he's alive or dead.

22       Q.    Okay.  You didn't make any effort to locate

23   him as part of your preparation for today?

24       A.    I did not.

25       Q.    Okay.  How about the author of the letter,

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 129

1    Dennis Mantel, M-A-N-T-E-L?  Did you make any effort to

2    contact -- to locate or contact him?

3        A.    No.

4        Q.    Okay.  So as far as you know, then, when BATO

5    received this letter, they simply took Mr. Mantel's word

6    for the accuracy of its representations, correct?

7                  MR. MOSS:  Object to the

8    characterization.

9                  But you may answer.

10                  THE WITNESS:  In 1980 that is -- I don't

11    have any information to dispute that as of 1980.

12        Q.    (BY MR. CAMPBELL)  Okay.  Now, if we go back

13    to the first page of this exhibit, the third full

14    paragraph, second sentence begins, and I quote, There is

15    a voluminous record developed in litigation relating to

16    the Dayton Tire & Rubber Company plant which

17    corroborates the 1980 letter from Industrial Waste

18    Disposal Company (the waste hauler for the plant from

19    1956 to 1980) that other disposal sites-and not the

20    South Dayton Dump-were used to dispose of Dayton Tire &

21    Rubber Company wastes.  That letter is attached.

22                  Did I read that correctly?

23        A.    Yes.

24        Q.    What other information are you aware of that

25    corroborates the 1980 letter?

Page 130

    1     A.    Okay.  This is going to take a while.

    2     Q.    **I got a pen.**

    3     A.    All right.

    4     Q.    **I got a court reporter.**

    5     A.    We talked about the depositions that I

    6   reviewed.

    7     Q.    **Uh-huh.**

    8     A.    The totality of those depositions, which were

    9   all taken after 1980 and before this February 2nd, 2015,

   10   letter was written -- the totality of the testimony in

   11   those depositions corroborates what was said here.

   12              The proceedings in the litigation

   13   involving Valley Crest and Cardington Road, including

   14   extensive negotiations with counsel for the plaintiffs

   15   in this action, and exchange -- informal exchange of

   16   information in the Valley Crest and Cardington Road

   17   litigation, confirm what that May of 1980 letter says,

   18   that all of the solid waste from the Dayton Tire &

   19   Rubber plant was taken to the landfills as indicated

   20   here.

   21              And to prove that Firestone believed what

   22   this letter said and that that subsequent investigation

   23   corroborated it, Firestone paid mightily at Valley Crest

   24   and Cardington Road based on the fact that the entire

   25   volume of their waste went there.  And all of the

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 131

1   participants in those sites, including plaintiffs here,

2   or at least some of the plaintiffs here, benefited from

3   the payments that Firestone BATO made at Valley Crest

4   and Cardington Road.  So not only did the information

5   that was developed support what the letter said, but

6   BATO put its money where its belief was and paid at

7   Valley Crest and Cardington Road as if all of its solid

8   waste had gone to those two sites.

9       **Q.   Other than the fact that Bridgestone**

10  **voluntarily elected to settle other litigation, I'm**

11  **really much more interested in the facts that you are**

12  **pointing to that you think corroborate this letter.  So**

13  **we'll put to one side that BATO at some point made a**

14  **business decision to settle other litigation and focus**

15  **more on the specific information that you considered.**

16              MR. MOSS:  Well, I'm just going to object

17  to your characterization and your colloquy here.  He --

18  he elucidated other facts.  It was more than -- he -- he

19  gave a lengthy answer, and it was more than just

20  settling the lawsuit.  The record will speak for itself.

21  So I object to the -- the characterization of his prior

22  answer.

23              MR. CAMPBELL:  Fair enough.  So you mean

24  to say "I object to the form of the question"?

25              MR. MOSS:  That's what I meant, yes.

Page 132

```
 1                    MR. CAMPBELL:  Okay.

 2                    MR. MOSS:  But I'll -- I'll say what I

 3    need to say to protect the record as well.

 4                    MR. CAMPBELL:  We try to limit our -- we

 5    try to limit our objections to the basis for the

 6    objection, not the speaking objections.  That's the rule

 7    in the Southern District, as you know.

 8                    MR. MOSS:  I -- I've given my objections.

 9                    MR. CAMPBELL:  Uh-huh.

10                    MR. MOSS:  And now it stands.

11                    MR. CAMPBELL:  Yeah.
```

**12    Q.    (BY MR. CAMPBELL)  So not withstanding BATO's**

**13    settlement of that litigation, did you review the**

**14    transcript of Cecil Yonker?**

15    A.    Yes.

**16    Q.    What did he say that corroborated your**

**17    testimony that the information contained in the IWD**

**18    letter of May 7th, 1980, is correct?**

19    A.    He said that landfill that he couldn't see

20    because he was sitting on a milk crate was behind a

21    trailer park, and he said that the truck he was riding

22    in on the milk crate was not required to stop at the

23    gate when entering the landfill.  Those two facts

24    corroborate the fact that Cecil Yonkers actually went to

25    the Cardington Road site and not the South Dayton Dump.

Page 133

1    **Q.   So despite the fact he specifically testified**

2    **he went to the South Dayton Dump, you concluded that he**

3    **went somewhere else?**

4    A.   Based on what he actually said, that he

5    couldn't see because he had to sit on a milk crate and

6    not on a seat in the truck, because he described the

7    dump as being behind the trailer park and not in front

8    of the trailer park, because he testified under oath

9    that the truck did not have to stop at the gate when it

10   entered the site, and because I read the testimony

11   that -- Mr. Yonkers had been taken by an investigator

12   hired by Mr. Silver, counsel represented by plaintiff

13   here -- taken to the dump, shown pictures of

14   insignia, taken to dinner by the investigator, all in

15   advance of the testimony that he gave -- I considered

16   all of those things:  Principally the physical location

17   of Cardington versus the trailer park and the fact that

18   he couldn't see anything because he was seated too low

19   and, perhaps most importantly, that the truck did not

20   have to stop at the gate when entering the dump.

21       **Q.   So you did not find Mr. Yonker to be credible?**

22       A.   I did not find his testimony as a whole to be

23   credible.  That's correct.

24       **Q.   Okay.  And so based on your -- in part, on**

25   **your assessment of his credibility, you've chosen to**

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 134

1    **discount his direct testimony that, in fact, he went to**

2    **the South Dayton Dump with an IWD driver, correct?**

3                    MR. MOSS:  Object to the form.

4                    THE WITNESS:  What I have chosen to do is

5    listen to what Mr. Yonker actually said in his

6    testimony.

7                    Dump names are -- you know, both -- you

8    can tell from the map that I gave you, and that we

9    marked as Exhibit 17, that the Cardington Road Landfill

10   and the South Dayton Dump are less than one mile apart.

11   And between those two dumps is the trailer park that

12   Mr. Yonkers relied on as his geographic anchor in

13   deciding where he went.  Both of those landfills are

14   south of Dayton.  So in colloquial speak, they could be

15   referred to as the South Dayton Dump.  We heard that the

16   South Dayton Dump itself was referred to by at least

17   three names in the questioning this morning when I was

18   asked, you know, it's known as the South Dayton

19   Landfill, it's known as this name, it's known as this

20   name.

21                   What I relied on were those two things I

22   told you:  the geographic anchor of that trailer park

23   and the fact that Yonkers said that the landfill was

24   behind it -- okay? -- and the second anchor, which was

25   he said the truck he was riding did not have to stop.

Page 135

1    And you don't have to be able to see to know whether the

2    truck had to stop at the gate or not.

3        Q.    (BY MR. CAMPBELL)  Were you unaware of

4    testimony that -- with respect to the South Dayton Dump

5    the gate was open during business hours?

6        A.    I'm not aware one way or another whether

7    what -- your representation to me is correct or not

8    correct.

9        Q.    So my question was a little different.  Were

10   you unaware of any testimony to that effect?  And I take

11   it your answer was yes, you were unaware of that?

12       A.    I'm not aware whether there's testimony to

13   that effect or not.

14       Q.    Okay.  So you did not take into consideration

15   whether the gate was open during business hours;

16   therefore trucks did not need to stop as they passed the

17   gate when you considered the credibility of Mr. Yonker's

18   testimony, correct?

19       A.    I don't know if the predicate of your question

20   is correct.  The mere fact that a gate is open doesn't

21   mean that a truck doesn't still have to stop at the

22   gate, because there's an attendant there.

23       Q.    Are you aware of any testimony that put an

24   attendant at the gate at the South Dayton Dump?

25       A.    I am aware that the South Dayton -- South

Page 136

1    Dayton Dump charged a fee for depositing refuse there

2    and --

3        Q.    Right.   My question was different.

4                MR. MOSS:  Well, let him finish, please.

5    You've interrupted him.  Let him finish his answer.

6                THE WITNESS:  I'm aware of testimony that

7    the dump charged a fee for everybody who dumped waste

8    there; therefore, there had to be an accounting system

9    for people to pay.

10       Q.    (BY MR. CAMPBELL)  Okay.  Well, setting aside

11   the several assumptions in your answer, my question was

12   very specific.  Were you aware or do you have any

13   information that there was actually an attendant at the

14   gate that required trucks to stop when they entered

15   during normal business hours?

16               MR. MOSS:  Object to the form of the

17   question and the mischaracterization of his prior

18   testimony.

19               But you may answer.

20               THE WITNESS:  I do not know one way or

21   another whether there is or is not testimony that

22   discusses whether there's an attendant or under what

23   circumstances an attendant, if there was one, would

24   require or not require a truck to stop.

25       Q.    (BY MR. CAMPBELL)  So, then, you're unable to

Page 137

1    **evaluate that portion of Mr. Yonker**'s **testimony that**

2    **suggested that he drove straight in and the truck didn't**

3    **stop, right?**

4        A.    That's not correct.

5        Q.    **Okay.  Because you disbelieved other portions**

6    **of his testimony?  That's why?**

7        A.    No.

8                    MR. MOSS:  Objection.

9                    THE WITNESS:  Because I have read the

10   totality of testimony concerning the operation of the

11   South Dayton Dump, how it collects its money and how the

12   other dumps, including Cardington Road, function.

13       Q.    **(BY MR. CAMPBELL)  Okay.  And so sitting here**

14   **today, you will not be able to point me to any specific**

15   **fact that establishes your -- part of the basis for your**

16   **conclusions about Mr. Yonker's testimony that the**

17   **truck -- that there was an attendant that would have**

18   **caused the truck to stop as it entered the South Dayton**

19   **Dump, right?**

20                   MR. MOSS:  Objection.  He's already

21   answered that question.

22                   THE WITNESS:  You're going to have to

23   repeat that question.

24       Q.    **(BY MR. CAMPBELL)  Yeah, it** wasn't a very good

25   **question.**

Page 138

1      A.    Yeah.

2      **Q.    I just want to know -- since you say you don't**

3   **know one way or the other whether there was an attendant**

4   **at the gate, you don't have any other fact to point to**

5   **explain why the truck did or didn't stop as it entered**

6   **the South Dayton Dump, at least according to**

7   **Mr. Yonker, right?**

8               MR. MOSS:  Objection.  He's already --

9   he's told you a couple of times what the other facts

10  are.

11              You can tell him again, Mr. --

12              THE WITNESS:  Yeah.  No, the other -- the

13  other fact is that the IWD-owned facilities, for

14  example, Cardington Road, would require non-IWD vehicles

15  to stop at the gate.  And I know from sworn testimony

16  that the South Dayton Landfill also charged people for

17  dumping refuse at the South Dayton Dump.

18              When you take those facts into

19  consideration, in addition to the geographic location of

20  the Cardington Road Landfill relative to the trailer

21  park that Mr. Yonker used as an anchor in his testimony,

22  that is what leads me to believe that Mr. Yonker

23  actually went to the Cardington Road site when he rode

24  with that driver that day.

25      **Q.    (BY MR. CAMPBELL)  No, I've heard that portion**

Page 139

1   **of your testimony.  It didn't respond to my question.**

2   **But I'm going to ask a different question.**

3                   **What about Frank Miracle?**

4                   MR. MOSS:  Can we refrain from the --

5   from the editorial comments?  You can ask questions, but

6   I'm not -- you -- you can't -- you can't comment on his

7   previous answers.  I'm not going to permit that.  Ask a

8   question.

9                   MR. CAMPBELL:  David, if you want to

10  instruct your witness not to answer a question, make the

11  instruction or make an objection --

12                  MR. MOSS:  No, I'm not.

13                  MR. CAMPBELL:  -- or make an objection,

14  but I'm going to keep asking questions.  And I'm going

15  to go to my next question.  Is that okay with you?

16                  MR. MOSS:  No, it's not.  You -- you --

17  you're not asking questions.  You're making speeches in

18  between questions, and I won't stand for it.  Ask a

19  question.  Mr. Layfield has answered every question

20  you've put to him.  So, please, ask your next question.

21                  MR. CAMPBELL:  I don't agree with your

22  last statement, but I will ask the next question.

23                  MR. MOSS:  Thank you.

24    **Q.   (BY MR. CAMPBELL)  Mr. Miracle testified that**

25  **he went to the South Dayton Dump.  Do you recall that**

Page 140

1    **testimony?**

2        A.    Mr. Miracle testified that he went to a

3    dump --

4        **Q.    You don't recall --**

5        A.    -- that he thought --

6        **Q.    -- him using the term South Dayton Dump?**

7        A.    -- that he thought was the South Dayton Dump.

8    And if you actually read his testimony in total rather

9    than just the words South Dayton Dump, you will see

10   beyond a doubt the dump he went to was Cardington Road

11   Landfill.

12       **Q.    Okay.  What facts do you rely on from his**

13   **testimony in his deposition to support your conclusion**

14   **that beyond a shadow of doubt he did not go to South**

15   **Dayton Dump?**

16       A.    Well, Mr. Miracle described the route that he

17   and the other two individuals from Firestone took.  If

18   you recall, they had -- I think it was Mr. Miracle,

19   Mr. Ball, and then they had an individual from Plant

20   Protective Services, who apparently was driving the car.

21   Okay?  Or had the car.  That was Mr. Miracle's

22   testimony.

23                 They followed the truck from IWD in a

24   separate vehicle, a Firestone car.  So we got three

25   Firestone personnel in a Firestone car.  And I'm using

Page 141

1    Firestone.  I mean Dayton Tire & Rubber.  Okay?  They're

2    following the ID -- IDW truck.  Mr. Miracle testified

3    "We went south down Dixie Highway.  We turned off behind

4    the Ford dealership, and there was the dump that we went

5    to."

6              If you actually follow the map -- and

7    we've got a pretty decent one as Exhibit No. 17.  If you

8    follow South Dixie Highway to where Stanger Ford was

9    located, it's now a Walmart.  If you turn to the right,

10   as Mr. Miracle said -- he said, "We turned to the right

11   towards 75" -- you will see that behind that Walmart

12   that used to be Stanger Ford is the Cardington Road

13   Landfill.

14              It is geographically impossible to

15   continue on past 75 to get all the way over to where the

16   South Dayton Dump is for a couple of reasons.  The first

17   reason is there's a railway switchyard in there with

18   eight, ten, twelve tracks that don't have any way to get

19   across them.  And then beyond that you've got I-75.

20              So if you actually read what Miracle

21   said and you look at a map and you figure out where

22   Stanger Ford was, it's now the Walmart, it's absolutely

23   clear they went to Cardington Road.

24   **Q.   Okay.**

25   A.   In addition to that, he specifically said they

Page 142

1    stopped at the gate because they weren't an IWD truck.

2    The truck went in ahead of them.  They stopped at the

3    gate and talked to the gate personnel and said, "We're

4    just trying to see where IWD is taking our waste."

5                    And the gate guard said, "Go on ahead.

6    Go on back there."

7                    Those are the facts that make it crystal

8    clear Miracle actually went to the Cardington Road

9    Landfill.

10       Q.    So, then, you chose to disregard his testimony

11   that he went to the South Dayton Dump based on your

12   analysis of the way he recited the directions to a

13   dump, correct?

14                   MR. MOSS:  Object to the form.

15                   You may answer.

16                   THE WITNESS:  No.  He certainly went to a

17   dump that was south of Dayton.  But all these dumps are

18   known by a whole bunch of different names, as proved by

19   counsel for plaintiffs at the beginning of this

20   deposition.  He said geographically where the dump was

21   located.  It is south of Dayton.  It just happens to be

22   that what we today call the Cardington Road Landfill is

23   the dump south of Dayton that Mr. Miracle went to.

24       Q.    (BY MR. CAMPBELL)  Well, my question was you

25   chose to disregard his naming of the dump as the South

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 143

1    Dayton Dump in your analysis, correct?

2              MR. MOSS:  Object to the form.

3              You may answer.

4      Q.  (BY MR. CAMPBELL)  You rejected the fact that

5    he said, "I went to the South Dayton Dump" because you

6    think he described a different dump?  That's all I'm

7    asking you.

8              MR. MOSS:  Objection.

9              You may answer.

10             THE WITNESS:  I chose to discount that

11   name, yes.

12     Q.  (BY MR. CAMPBELL)  Okay.

13             (Exhibit No. 20 marked.)

14     Q.  (BY MR. CAMPBELL)  Mr. Layfield, did you

15   encounter the name Wayne Wertz as part of your

16   preparation for your testimony today?

17     A.  Can you spell it?

18     Q.  W-E-R-T-Z.  Wayne Wertz.

19     A.  I think, yes.

20     Q.  Okay.  Do you recall what information you

21   learned about him?

22     A.  No.  Other than his name came up, I can't

23   remember anything about him.

24     Q.  All right.  Do you recall how the name came

25   up?  In what context?

Page 144

1      A.   No.   I remember the name, but I don't remember

2  in what context it came up.

3      **Q.   Do you recall whether it came up in the**

4  **context of identifying drivers for IWD?**

5      A.   I don't remember.   Sorry.

6      **Q.   Okay.   Have you received any information that**

7  **Mr. Wertz hauled many loads of lampblack dust from the**

8  **63-acre Dayton Tire & Rubber facility to the South**

9  **Dayton Dump?**

10      A.   No, I have not.

11      **Q.   I'll hand you what's been marked as Exhibit**

12  **20.**

13           MR. CAMPBELL:   And for those on the

14  telephone, this is the March 13, 2015, letter from

15  Mr. Moss -- is it? -- to the U.S. EPA.

16      **Q.   (BY MR. CAMPBELL)   And I'll just ask you,**

17  **Mr. Layfield, to take a quick look at the document, and**

18  **then I'm going to ask if you've ever seen it before?**

19      A.   I think this is maybe a complete copy of a

20  document we looked at earlier which was marked as

21  Exhibit 4.

22      **Q.   Could be.**

23      A.   But, yeah, I haven't --

24      **Q.   Okay.**

25      A.   I haven't confirmed we got all the pages here.

Page 145

1    It is, at least, a longer version of what we marked as

2    Exhibit 4.  I'm not 100 percent sure it's complete, but

3    it's longer.

4              MR. CAMPBELL:  I'll note for the record

5    that the letter is consecutively numbered pages 1

6    through 13, and the 13th page has Mr. Moss's signature.

7    It also has attached to it the May 7, 1980, letter,

8    which is referenced as an exhibit in the letter.  So I

9    think we have the complete letter.

10     **Q.    (BY MR. CAMPBELL)  But, Mr. Layfield, if you**

11   **are unsure, let me know, and we'll see if we can't find**

12   **the entire thing.**

13     A.    Well, if we find it that there's a reference

14   to any other attachment other than the May 7th letter,

15   that would be my only concern.

16     **Q.    Okay.**

17     A.    I didn't want to take the time to read the 13

18   single-spaced pages to see if there was a reference to a

19   second exhibit.

20     **Q.    I appreciate that.**

21             **Let's turn to page nine, starting with**

22   **the "Answer" at the bottom.  And then it carries over to**

23   **page ten.  And if we count down one, two, three, four,**

24   **five, six, seven, eight lines, it begins "Subject to and**

25   **without waiver of these objections."  Do you see that?**

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 146

1     A.    Yes.

2     Q.    And then it reads "...the plant's primary

3   solid waste transporter during the relevant time frame

4   was Industrial Waste Disposal Company, Inc. (IWD)."  Did

5   I read that correctly?

6     A.    Yes.

7     Q.    Are you aware who the other haulers were for

8   BATO during the time period addressed by this letter?

9     A.    Haulers of any waste?

10    Q.    Any waste.

11    A.    Any waste.  Yeah, there was a George Wiley.

12   And the rest of his company name I'm not 100 percent

13   sure of.  George Wiley Sanitation, George Wiley & Sons,

14   George -- anyway, George Wiley.  And then there was IWD

15   Liquid Waste.

16    Q.    Okay.  Any others you can think of?

17    A.    No, not for waste.

18    Q.    Okay.  Were there any other kind of haulers

19   you're thinking of other than for waste?

20    A.    Well, Peerless was a hauler paid by Dayton.

21   But as we -- I mean, they were bringing new stuff.  They

22   weren't hauling waste.

23    Q.    Understood.  Okay.

24    A.    Yeah.

25    Q.    Thanks.

Page 147

1      A.   And there -- there was also a railroad too.

2  They brought in tank cars and raw material.

3      Q.   Okay.

4              (Exhibit No. 21 marked.)

5      Q.   (BY MR. CAMPBELL)  Mr. Layfield, I'm going to

6  hand you a copy of what we marked Exhibit 21.

7              MR. CAMPBELL:  And for those on the

8  phone, this document begins at page No. DTR 011056

9  through DTR 011064.

10     Q.   (BY MR. CAMPBELL)  Mr. Layfield, if you want

11  to take a moment.  And then when you're done, I will ask

12  you if you can tell me what this is?

13     A.   It appears to be part of the data that was

14  contained in what we have marked as Exhibit -- it's that

15  one in front of you.  What number?  The big black one.

16     Q.   Oh, I'm sorry.

17     A.   The big thick one.  What number is that?

18     Q.   16.

19     A.   Yeah.  This -- this -- what you marked as

20  Exhibit 21 appears to be part of the data that is

21  contained in Exhibit 16.

22     Q.   Okay.

23     A.   But, so we don't get tangled up in a minute,

24  it looks like every page -- even though it has different

25  Bates numbers on it --

Page 148

1    Q.   Uh-huh.

2    A.   -- it looks like every page is duplicated.

3    Q.   Yes.

4    A.   Okay.

5    Q.   I -- I noticed that too.

6    A.   Okay.

7    Q.   So we'll assume that we have some duplication

8    here.

9            My first question is, then, this

10   document, which is Exhibit 21, is a business record of

11   BATO; is that right?

12   A.   Again, that's my understanding, yes.

13   Q.   And, then, if we look at the first page, the

14   heading says "Solvent Usage (Gallons)."  And I'll stop

15   right there.  Did I read that correctly?

16   A.   Yes.

17   Q.   Then across the top just, I guess, below that

18   we have one column that says "Month," and it runs 1

19   through 12 vertically, correct?

20   A.   Yes.

21   Q.   And then horizontally we have "1977,"

22   "1978," "1979" and "1980," correct?

23   A.   Yes.

24   Q.   And then for each year at each month we have

25   numbers.  So, for example, under Month 1, 1977, the

Page 149

1    number's 24,166, correct?

2        A.   Yes.  Uh-huh.

3        Q.   Okay.  Is it your understanding, then, that

4    this is attempting to account by month for the usage of

5    solvents for Solvent Code 332 for each of these years?

6        A.   Yes, using accounting data.  Not actual

7    consumption data from the plant.

8        Q.   Right.  And I think you testified earlier that

9    there may well be some timing issues, and so I

10   understand that.

11                As I'm looking at this, at the bottom it

12   has a column that says "Total Usage."  It's my

13   understanding, reading this document, that it's

14   attempting to quantify the total gallons of solvent used

15   for the calendar year 1977.  Is that a fair assumption

16   here?

17       A.   Right.  For the page that you're looking at

18   right now, that's correct, for solvent 332.

19       Q.   Okay.

20       A.   Yeah.

21       Q.   If we turn the page to DTR 11057, we have the

22   same information displayed for Solvent Code 374,

23   correct?

24       A.   Correct.

25       Q.   If we skip a page and go to 11059, the same

Page 150

1    information for Solvent Code RP4081, correct?

2        A.    Yes.

3        Q.    Skipping a page, 11061 we have the same

4    display of information for Solvent code RP10373,

5    correct?

6        A.    Yes.

7        Q.    And, again, skipping a page to 11063, we have

8    the same information displayed for Solvent Code RP4732,

9    correct?

10       A.    Yes.

11       Q.    Now, going back to the header on the first

12   page of this exhibit, it says "Data Taken From

13   Accounting Report TJV-39, Monthly Issue of Raw

14   Materials."  Do you see that?

15       A.    Yes.

16       Q.    Can you explain to me what that term means

17   "Monthly Issue of Raw Materials"?

18       A.    No.

19       Q.    Okay.  And down below it says "332 Underground

20   storage - 25,000 Gallons."  Do you see that?

21       A.    Yes.

22       Q.    Each one of these pages re solvent code makes

23   a reference for underground storage.  Can you tell me

24   were there -- was there one underground storage tank for

25   each solvent code, or was there one large tank that each

Page 151

1   of these codes were stored in or how that worked?

2       A.   First, not all of them refer to underground

3   storage.  RP4732 was stored in drums.  And there were

4   underground storage tanks.  There -- you wouldn't have

5   mixed solvents in the tanks, so there would have been

6   separate storage for each of the solvents.  Whether the

7   25,000 gallons for 332 was made up of a single tank or

8   multiple tanks, I don't know.

9       Q.   Okay.

10                  (Exhibit No. 22 marked.)

11      Q.   (BY MR. CAMPBELL)  Mr. Layfield, I'll just

12   hand you a copy of what we've marked as Exhibit 22.  You

13   can take a moment to review that, and then I will have a

14   few questions for you, starting with:  Have you seen it

15   before?  And can you tell me what it is?  Take -- take a

16   moment.

17      A.   I have not seen it before, but I'm glad to

18   have it now.  Thank you.

19      Q.   Okay.

20      A.   What else do you want to know?

21      Q.   You've had a chance to familiar -- just

22   briefly familiarize --

23      A.   Yes.  I've briefly familiarized myself with

24   it, yes.

25      Q.   If you go to the second page, after the

Page 152

1    **lettered paragraphs --**

2              MR. CAMPBELL:  And -- I'm sorry -- for

3    those on the phone, the document is DTR 008553 through

4    8558.  The letter is dated May 29th, 1981.  It is a

5    letter bearing the letterhead of Firestone sent to

6    Mr. D. Curtis Marshall at the Regional Air Pollution

7    Control Agency for Montgomery County, Dayton, Ohio.

8         **Q.   (BY MR. CAMPBELL)  So, Mr. Layfield, if we go**

9    **to the second page, beginning with the first paragraph**

10   **after the lettered paragraphs --**

11        A.   Yes.

12        **Q.   -- it says "The Dayton Tire & Rubber Company**

13   **(DTR) purchased five basic solvents that it used in the**

14   **preparation of rubber cements and for other uses such as**

15   **'stock refreshening' (i.e., to impart tack) during the**

16   **manufacturing and assembling of the various tire**

17   **components.  A tabulation of these solvents along with**

18   **the quantities are shown on Exhibit A, attached."  Did I**

19   **read that correctly?**

20        A.   Yes.

21        **Q.   And so if you go to the -- the exhibit that's**

22   **attached, there are -- the top says "Table I - Solvent**

23   **Purchases."  Do you see that?**

24        A.   Yes.

25        **Q.   And then below that there's a "Table II" that**

Page 153

1    says "Solvent Issued."  Do you see that?

2        A.    Yes.

3        Q.    And the next page "Table III - Cement House

4    Production Figures."  Do you see that?

5        A.    Yes.

6        Q.    And I'll just stop there.

7              Let's go back to the first table.  I

8    realize this -- this may cover some ground we've already

9    covered.  But if we look again across the top of this

10   table under "Solvent Code," we see the same five solvent

11   codes we've been talking about today, right?

12       A.    Yes.

13       Q.    And then in the left-hand column we have the

14   years 1978 through 1980, correct?

15       A.    Yes.

16       Q.    And then the far right it says "Totals."  We

17   have a column that says "Pounds" and one that says

18   "Tons," correct?

19       A.    You do, yes.  Uh-huh.

20       Q.    Okay.  Based on the information you have

21   reviewed so far in your role as the corporate

22   representative for BATO, can you tell me what your

23   understanding is of what Table I is representing?

24       A.    It's representing solvent purchases at the

25   Dayton Tire plant in Dayton, Ohio, which is -- now that

Page 154

1    we have these two tables together, is slightly different

2    than the solvent issued.  But that -- you know, that --

3    that's fine.  So this is what they actually bought.

4         Q.    Okay.

5         A.    Paid for.

6         Q.    Okay.

7         A.    So Table I is what did they pay for that year.

8         Q.    Uh-huh.

9         A.    And Solvent II is what did they issue out to

10   the production floor to be used that year.  You know,

11   you -- because you had big -- you had a big tank.

12   Right?

13        Q.    Uh-huh.

14        A.    And then you issue it out to the production

15   departments where they each have smaller vessels that

16   they use.

17        Q.    Uh-huh.

18        A.    For example, each tire machine has its own

19   little vessel that the tire builder uses to -- when he's

20   building the tire.

21        Q.    Okay.  So, then, if we just go back to Table

22   I, we have an annual purchase by solvent code for each

23   of those five solvents, correct?  Rendered both in

24   pounds and in tons.  Fair enough?

25        A.    Yes.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 155

1        Q.    And it looks to me like this is just

2    another -- another snapshot of some of the data we just

3    reviewed in the last exhibit.

4        A.    On 21, yes.

5        Q.    Yeah.  Just another way of looking at the same

6    information.

7        A.    It's slightly different points in time.  Table

8    I and Table II are at slightly different points in time.

9        Q.    Great.

10       A.    But, yeah, it's -- they're trying to get at

11   the same answer.

12       Q.    Okay.  I take it, then, that Exhibit 22 --

13   this -- this is a business record of BATO, correct?

14       A.    Let's see.  Yes.  Yes.

15       Q.    Okay.  It was authored by J.R. Laman?

16       A.    Yeah.

17       Q.    And I think you testified about him earlier

18   today?

19       A.    Uh-huh.

20       Q.    Okay.  Now, I think you mentioned -- or maybe

21   you didn't mention.  But I -- there's been some

22   discussion about gaps in data for some of the -- the

23   years that are at issue, at least following BATO's

24   purchase of this facility in 1961.  This report is only

25   quantifying the years '78 through 1980.

Page 156

1      A.    Uh-huh.

2      Q.    And when I say "this report," I mean -- just

3   referring specifically to say Table I and Table II of

4   Exhibit 22.

5              Do you have any understanding as to

6   whether the purchases and the issuance of solvents would

7   have been materially different in any of the years

8   between 1961 and, say, 1978?

9      A.    Yes.   The -- based on the testimony I've seen

10  from others, there was a ramp-up of production at

11  Dayton.   So what you're looking at in '78 and '79 is

12  probably the apex of production.   So up to 22,000 tires

13  a day.   So the -- the per day tire production, based on

14  what I've studied, was lower in 1961 than it was in

15  1978.   So there was a -- there was an increase either

16  through efficiency improvement or -- at one point

17  because they made a conscious decision to increase the

18  production capacity.

19     Q.    Uh-huh.

20     A.    So the numbers prior to 1978 I would expect to

21  be lower.   And probably, you know, kind of, say, from

22  '61 up to '78 and '79, I -- it would be an increasing --

23     Q.    Right.

24     A.    -- slope.

25     Q.    Okay.

Page 157

1      A.     Yeah.

2      **Q.     I take it, then, you don't know what the angle**

3      **of that slope would be?  It's just your understanding**

4      **that there would have been a ramp-up during that time**

5      **period?**

6      A.     No, I don't -- I don't know.

7      **Q.     Okay.  You mentioned that it was based on -- I**

8      **think you said documents you've read or testimony**

9      **reviewed?**

10     A.     Testimony I had reviewed.  And I'm trying to

11     remember which person it was that -- someone took the

12     deposition of a Dayton Tire & Rubber employee who

13     happened to know what the daily production rate was, and

14     they were asking questions similar to what you're asking

15     now.  Well, would it have been more or less?  But they

16     weren't focused on solvents so much as I think solid

17     waste:  pallets and stuff like that.  And I can't

18     remember the person's name.

19     **Q.     Was it -- was it a deposition in this case or**

20     **one of the other cases?**

21     A.     Sorry.  I don't -- I don't remember.

22     **Q.     Okay.**

23     A.     It could have been back to Cardington Road.

24     **Q.     Uh-huh.  Would the solvents that the company**

25     **was using between 1961 and, say, 1977 been the same**

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 158

1    **types of solvents?**

2        A.    Same basic types of solvents, yes.

3        **Q.    Okay.**

4        A.    I would have expected that there would have

5    been slight composition changes, particularly in --

6    maybe in 374, over that period of time, but it would

7    have been the same basic types.  All the local light

8    hydrocarbons.

9        **Q.    I want to back up to Exhibit 21 for just a**

10   **minute, if you have that in front of you.**

11       A.    I do.

12       **Q.    I neglected to ask you whether Exhibit 21 was**

13   **a business record of BATCO.**

14       A.    Yeah, BATO.

15       **Q.    I'm sorry.  BATO.**

16       A.    I believe it to be, yes.

17       **Q.    Okay.  Thanks.**

18                **(Exhibit No. 23 marked.)**

19       **Q.    (BY MR. CAMPBELL)  Mr. Layfield, I'm going to**

20   **hand you a copy of what's been marked as Exhibit 23.  I**

21   **think we saw this within one of the other exhibits we**

22   **looked at earlier today.**

23                MR. CAMPBELL:  For those on the

24   telephone, this is document DTR 011054.

25                THE WITNESS:  Exhibit 23 was part of

Page 159

1   Exhibit 14, and it's also a part of Exhibit 16.  It's

2   one -- one page out of those.

3       Q.   (BY MR. CAMPBELL)  Okay.

4       A.   Now, I'm not swearing -- I mean, the

5   information is the same.  It may have a different Bates

6   number in both of those other exhibits, but it's the

7   same information.

8       Q.   Okay.  Yeah, the -- there were, as you might

9   expect, some duplication of the production, so sometimes

10  the same document appears more than once.

11            So Exhibit 23, you -- you've seen this

12  before?

13      A.   Yes.

14      Q.   Okay.  This is a business record of BATO?

15      A.   Yes.

16      Q.   And, again, just to -- for my benefit, again

17  we have across -- well, the -- the document is entitled

18  "Major Solvent Purchases by Month and Year as Received

19  (all units in gallons)."  Do you see that?

20      A.   Yes.

21      Q.   Okay.  And then across the top it gives us the

22  same five solvent codes with descriptions.  Do you see

23  that?

24      A.   Yes.

25      Q.   And then down the left-hand column we have the

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 160

1    **months January through December.  Correct?**

2        A.   Yes.

3        **Q.   And then for each solvent code we have it**

4    **broken up by 1978, '79 and a portion of 1980, correct?**

5        A.   Let's see.  Yes.

6        **Q.   Okay.  And so could you tell me your**

7    **understanding of what this document is reflecting?**

8                 MR. MOSS:  I'm just going to note an

9    objection.  I think there's already been extensive

10   testimony.

11                But go ahead.

12                I think we're getting into repetitive

13   areas here.

14                THE WITNESS:  It -- without identifying

15   what they're using to quantify the purchases -- okay? --

16   they are attempting to tabulate how much of each of

17   these five solvents was purchased -- it says purchased

18   so -- was purchased each month for each of these years.

19       **Q.   (BY MR. CAMPBELL)  But by gallon, correct?**

20       A.   It says it's in gallons.  And that would be --

21   yeah, it would seem like this would be gallons, yes.

22       **Q.   So just another snapshot of some of the other**

23   **information we saw before?  One was measuring in pounds,**

24   **one in tons, now in gallons.  This is -- you're**

25   **understanding this is the same kind of information being**

Hobart Corporation. et al. v. The Dayton Power & Light Co.. et al.                    Larry Dewayne Layfield

Page 161

1    **displayed in a slightly different way?**

2        A.    Right.  And it could be another -- remember I

3    made the point about timing?

4        Q.    **Uh-huh.**

5        A.    It could be -- we saw in Exhibit 22 that they

6    were trying to quantify this is what we purchased, this

7    is what we issued -- okay? -- and those numbers were

8    different, if you look at the tables.

9        Q.    **Uh-huh.**

10       A.    So I don't know what data they're using to

11   arrive at these numbers, you know.  Were they using the

12   PO when the solvent was ordered?  Were they using the

13   check when the solvent was paid for?  Were they using,

14   again, issued -- some kind of issued data?  But, yes,

15   what they're -- they're trying to quantify the solvent

16   that was bought or used at the Dayton Tire & Rubber

17   plant, yes, in gallons.

18       Q.    **Okay.  And I see this document was dated June**

19   **10th of 1980.  Is it your understanding that this**

20   **document was prepared, again, in -- in anticipation of**

21   **the decommissioning of the Dayton plant?**

22       A.    Yes.  As a matter of fact, I think that May

23   was the last -- they -- they didn't do anything after --

24   after May of 1980 in terms of production, so this was

25   part of the decommissioning effort.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 162

1      Q.   Do know why they would have been capturing

2   this information as part of that decommissioning effort?

3      A.   Well, we saw one example of it in Exhibit 22.

4   And that is that in Ohio they, apparently, were very

5   progressive and already had emissions banks that -- that

6   a company could use from one site to another.

7      Q.   Uh-huh.

8      A.   And since Firestone had other manufacturing

9   sites in the state of Ohio, they were probably -- with

10  this Exhibit 22, they were trying to document what they

11  should have in the emissions bank by closing down the

12  Dayton Tire & Rubber plant.  There may have been other

13  reasons too, but that's one.

14     Q.   Well, I mean, it just looked to me that there

15  was an extensive effort to catalog the activities at

16  that facility, including the usage of solvents, for

17  example, and some other things we'll talk about in a

18  minute.  But I was just -- I'm just curious if there was

19  more to that than just tidying things up before they

20  transferred the property to the new buyer?

21     A.   No, I don't believe so.  I mean, I've had the

22  opportunity to look at other plant sites that were being

23  closed down for Firestone, and this sort of effort that

24  you see here was typical.

25     Q.   Uh-huh.  Okay.

Page 163

1      A.    You know, they tried to do things the best

2      they could.  As a matter of fact, I've seen a lot of

3      deposition testimony about that.  Not -- you know, not

4      necessarily related to environmental issues.  But

5      whatever they were doing at the time, they tried to do

6      it the best they could.

7            That's the whole reason Frank Miracle

8      followed that truck, is because they were concerned that

9      there had been press reports of somebody in North

10     Carolina taking oils and just dumping them on dirt

11     roads.  And when they read those press reports, they

12     said, "Hey, wait a minute.  We need to actually follow

13     all of our waste disposers to make sure that we know

14     what they're doing with the waste they take out of our

15     plant."  And that's -- he testified that's why they

16     followed the truck.

17           So they were trying to be proactive.

18     **Q.    Mr. Layfield, if you would go back into the**

19     **exhibits in front of you.  I want you to take a quick**

20     **look at Exhibit 10.**

21           MR. CAMPBELL:  For those on the phone,

22     this was marked ADT 01013 through 015.  It was entitled

23     "Solvent Usage."

24     **Q.    (BY MR. CAMPBELL)  And just a very quick**

25     **question about that document.  Was this also a business**

Page 164

1    **record of BATCO?**

2                    MR. MOSS:  I think he's already answered

3    that.

4                    But go ahead.

5                    THE WITNESS:  Yeah, I did.  And my answer

6    was then, and it is now, certainly page ADT 01015 is

7    not.  And as far as ADT 01013 and 01014, based on what I

8    have in front of me, I can't tell for sure.  We'd have

9    to have some additional information from somebody else.

10   Maybe it is.  The typeface is consistent with the

11   typeface that Firestone uses.  But it's not signed by

12   anybody at Firestone, it's not on any of the letterhead,

13   so I cannot say for sure.  It's using our code numbers,

14   which is indicative that it is, but I can't say with 100

15   percent certainty that it is a business record.

16   Although, it appears to be.

17                    (Exhibit No. 24 marked.)

18       **Q.    (BY MR. CAMPBELL)  Mr. Layfield, I'm going to**

19   **hand you a copy of what's been marked as Exhibit 24.**

20                    MR. CAMPBELL:  For those on the

21   phone, Exhibit 24 is Bates-stamped DTR 007206 through

22   7209.  The document bears the Firestone letterhead.  It

23   is dated June 26th, 1980.  And it appears it was

24   authored by N.A. Daigle, D-A-I-G-L-E.

25       **Q.    (BY MR. CAMPBELL)  Mr. Layfield, have you seen**

Page 165

1    this document before?

2        A.   I don't think so.

3        Q.   Okay.

4        A.   I mean, it also appears that it's probably

5    missing some pages, but it may just be a list of

6    recipients that it's missing.

7        Q.   Can you tell me whether this is a business

8    record of BATCO?

9        A.   I would say that this is a business record of

10   what's now known as BATO, yes.

11       Q.   And my question was actually purely one of

12   housekeeping.  You see on the first page there's a

13   column that says "Material Code"?

14       A.   Yes.

15       Q.   And that carries over to the subsequent pages.

16   It looks to me like this is kind of a key for, among

17   other things, the solvent codes that we've seen on some

18   of the other documents today.  Is that your

19   understanding?

20       A.   The code numbers on here -- for example, 332

21   on here and 374 on here, that's the same 332 and 374,

22   yes.

23       Q.   Okay.

24                 (Exhibit No. 25 marked.)

25       Q.   (BY MR. CAMPBELL)  Mr. Layfield, I'm going to

Page 166

1    hand you a copy of what's been marked as Exhibit 25.

2    It's Bates-stamped DTR 011378 through 379.  It is a

3    letter bearing the letterhead of Dayton Tire & Rubber

4    Company, and it has the date May 21, 1975.

5                Mr. Layfield, after you've had a moment

6    to review that, I'm going to ask you if you've seen this

7    before?

8        A.   No, I don't think I've seen it.

9        Q.   Okay.  Can you tell me what it is?

10       A.   It appears to be a letter from O.C. McLemore,

11   the plant engineer -- that's the title he gives -- at

12   the Dayton Tire & Rubber Company, to the Regional Air

13   Pollution Control Agency in Dayton.  In particular,

14   Mr. Paul Lincoln.  And it is in response to his request

15   for information.

16       Q.   Okay.  Do you recognize this as a business

17   record for BATO?

18       A.   Yeah, I think this would -- would now be a

19   business record of BATO.

20       Q.   Okay.

21       A.   At the time it was created, it would be the

22   Dayton Tire & Rubber Company, but those records were

23   transferred to BATO.

24       Q.   Okay.  Thank you.

25                If we look at the first numbered

Page 167

1    paragraph, it reads "Last full year using coal - 1969."

2    Did I read that correctly?

3        A.    Yes.

4        Q.    No. 2 says "Tons of coal used for year 1969 -

5    28,642 tons."  Did I read that correctly?

6        A.    Yes.

7        Q.    And then it says "Attached are copies of

8    typical coal analysis being used at this time."  Did I

9    read that correctly?

10       A.    Yes, you did read that.

11       Q.    Okay.  Now, Mr. Layfield, I looked for the

12   "attached copies of the typical coal analysis" and could

13   not find that in the -- the production that we received.

14   And it's not contained in this letter.  Do you know

15   where that attachment would be?

16       A.    I don't know where the attachment would be,

17   but there is information about coal in what you have

18   marked as Exhibit 16.

19       Q.    I'll hand that back to you.

20             MR. CAMPBELL:  And for those of you on

21   the phone, Exhibit 16 was the Environmental Summary that

22   Mr. Layfield brought with him to today's deposition.

23             THE WITNESS:  Okay.  If -- in Exhibit

24   16, if you look at -- I think the page you're going to

25   want -- and I'm not sure this was the attachment --

Page 168

1    right? -- but it's information along the same lines.  It

2    has a Bates No. 100971.  And it actually has the number

3    of tons of coal that were used each year, and it has a

4    characterization of the Sulfur, Ash and Heating Value of

5    the coal.  But that's -- that's the only data I've seen

6    relative to the coal.

7        Q.    Okay.

8        A.    Is -- is that page.

9        Q.    Okay.  Can I look at that?

10       A.    Sure.

11       Q.    Okay.  I'll give that back to you.  Or put it

12   right there.

13            If you'll go back to the letter, numbered

14   paragraph 4 -- excuse me -- numbered paragraph 6, it

15   says "Solvent usage for year 1974."  Do you see that?

16       A.    Yes.

17       Q.    And then under (a) it has a reference to "332

18   White Gasoline - 275,000 gallons."  Do you see that?

19       A.    Yes.

20       Q.    And then "374 Solvent - 16,500 gallons"?

21       A.    Yes.

22       Q.    And then immediately below that "Hexane" and

23   "Heptane" at "32,518,000 gallons" respectively.  Do you

24   see that?

25       A.    Yes.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 169

1      Q.   I want to go back to a prior exhibit, which I

2   think is 23.  I think that was the exhibit where I had

3   asked you if we had any information regarding the use of

4   these solvents in the years prior to 1978.  And I think

5   that is when you testified that you thought that -- that

6   the use had likely ramped up between 1961 and 1978,

7   correct?

8      A.   Yes.

9      Q.   So here we have a reference to the year 1974

10  for solvents, so we could, at least, fill in, perhaps,

11  one year.  And to just look at apples to apples, I

12  think -- since the chart in Exhibit 23 is based on units

13  and gallons, I thought we could take a quick look here

14  and see if they -- if we can draw any conclusions from

15  this.

16            So when it says "332 White Gasoline -

17  275,000 Gallons," that appears to be, well, more -- more

18  substantial than either '78 or '79 or '80, according to

19  Exhibit 23, correct?

20     A.   Incorrect.  The total for the year 1978 on 332

21  was 301,835 gallons.

22     Q.   I'm sorry.  You're right.  I'm looking at the

23  month.  You're looking at the annual.  Correct.  Okay.

24            So, yeah, then it's a little bit below.

25  275 versus 301,835?

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 170

1    A.    Yes.

2        Q.    If we look at "374 solvent," we're at about

3    16,500?

4    A.    About half.

5        Q.    About half?

6    A.    Uh-huh.

7        Q.    For '78?

8    A.    Yeah.

9        Q.    And heptane?

10   A.    About half.  No, heptane is a little higher on

11   that year.

12       Q.    A little higher that year.  Okay.

13   A.    No.  Well, yeah, a little higher on heptane.

14       Q.    It's 18,000 gallons in 1974 versus 14,643 in

15   '78?

16   A.    Correct.  And hexane is just over -- right at

17   half.

18       Q.    Yeah.

19   A.    So --

20       Q.    Yeah, that's 32,500 in 1974 versus 67,774 in

21   '78.  And about 93,779, correct?

22              MR. MOSS:  I think you said 67,000, Drew.

23   It's actually 63,000.

24       Q.    (BY MR. CAMPBELL)  I'm sorry.  63,774 --

25   A.    Right.

Page 171

1     Q.    -- for '78, yeah.

2     A.    Right.

3           (Exhibit No. 26 marked.)

4     Q.    (BY MR. CAMPBELL)  Mr. Layfield, I'm going to

5     hand you a copy of what we've marked as Exhibit 26.

6           MR. CAMPBELL:  For those on the phone,

7     this is Bates-stamped DTR 011273.

8     Q.    (BY MR. CAMPBELL)  Well, let's take a moment

9     here to look at these Bates-stamp numbers.

10    A.    You got something I don't.  Like, the back of

11    my page doesn't have anything on it.

12    Q.    I -- oh, you know what?  You're right.

13    A.    Yeah.

14    Q.    Because the exhibit is DTR 011273 through 274.

15    You have the complete exhibit.

16    A.    Okay.

17          MR. CAMPBELL:  And for those on the

18    phone, the document is titled "Boiler History and

19    Operating Data."

20    Q.    (BY MR. CAMPBELL)  Mr. Layfield, after you've

21    had a moment to look at that, I'm going to ask you if

22    you can tell me what this is?

23    A.    It's actually a copy of the same information

24    that was in what you've marked as Exhibit 16.

25    Q.    16?

Page 172

1      A.    Yeah.

2      **Q.    Okay.  So --**

3      A.    So I've seen it before.

4      **Q.    Yeah.  So this is a business record for BATO?**

5      A.    Yes.

6      **Q.    If we go to first page, the second header,**

7      **which says "Boiler Operating History," do you see that?**

8      A.    Yes.

9      **Q.    Okay.  And then right below that, the next**

10     **header says "1960 and Earlier (Pre-Firestone)."  Do you**

11     **see that?**

12     A.    Yes.

13     **Q.    It says "Tabulated operating data for the**

14     **years 1955 through 1960 reveal that the average coal**

15     **consumption for this six-year period was 25,800**

16     **tons/year."  Did I read that correctly?**

17     A.    Yes.

18     **Q.    Next paragraph:  "After Firestone's purchase**

19     **of the Dayton plant in 1961, boiler fuel consumption**

20     **records could not be found for any year earlier than**

21     **1966."  Did I read that correctly?**

22     A.    Yes.

23     **Q.    So if we go to page two, under the header**

24     **"Boiler Fuel Characteristics and Consumption Data,"**

25     **Roman numeral II says "Boiler Fuel Consumption Data."**

Page 173

1    Do you see that?

2        A.    Yes.

3        Q.    And then we have a list of years from 1955

4    through June 1 of 1980 in the left column, correct?

5        A.    Yes.

6        Q.    Coal by tons in the middle column.  Do you see

7    that?

8        A.    Well, it's --

9        Q.    Or the second column.

10       A.    It's the second column.

11       Q.    Right.

12       A.    Yeah, from the left.

13       Q.    Now, I note here that for the years '61

14   through '66 it indicates that there are no records

15   available, correct?

16       A.    Yes.

17       Q.    And in 1970 there's no record, correct?

18       A.    Yes.

19       Q.    And if I read the document correctly, it looks

20   like the company was converting to gas somewhere right

21   around 1970?

22       A.    The conversion wasn't -- let's see.  They were

23   actually -- let's see.  It says "In late 1966 boiler No.

24   2 was converted to gas/oil firing."  And then they

25   didn't convert the No. 4 boiler until 1970.  But it's

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 174

1    not gas.  It's gas and oil.  It was a dual fuel boiler.

2        **Q.    Okay.**

3        A.    Which is important for some other reasons.

4        **Q.    Right.  Point taken.**

5                 **And what I was really focused on was the**

6    **fact that they had transitioned away from coal.**

7        A.    Yes.

8        **Q.    Okay.  So the coal consumption, according to**

9    **the second page of this -- of this exhibit, looks like**

10   **it stopped in 1971 -- or '71?  Is that -- does that ring**

11   **true to you?**

12       A.    Yeah.  It says -- the written sentence on page

13   1 of the exhibits says that the boiler -- the No. 4

14   boiler remained on coal until the late 1970s.  So by '71

15   they should have been completely off of coal.

16       **Q.    And so that would explain, then, why from '71**

17   **through the June of '80 we have no records for coal**

18   **usage on this document?**

19       A.    Yeah, except it's not really no records.  In

20   1970 it says there are no records, but then in '71 it

21   switches to none.

22       **Q.    Exactly.**

23       A.    So it means zero tons.

24       **Q.    Exactly.**

25       A.    Yeah.

Page 175

1        Q.    Yeah.    Okay.

2              (Exhibit No. 27 marked.)

3        Q.    (BY MR. CAMPBELL)  Mr. Layfield, I'm going to

4    hand you a copy of what we marked as Exhibit 27.

5              MR. CAMPBELL:   For those on the

6    phone, this document is Bates-stamped ADT 01203 through

7    01207.  It bears -- there's a letter from the State of

8    Ohio Department of Health.  Although the letter is

9    undated, there is a stamp which indicates June 8th,

10   1970.

11       Q.    (BY MR. CAMPBELL)  So, Mr. Layfield, when

12   you've had a chance to take a look at that, then I'll

13   ask you if you can tell me what this is?

14       A.    Okay.  Exhibit 27 appears to be a letter from

15   the state of Ohio Department of Health.  It has an

16   enclosure which is on a "Ohio Department of Health Air

17   Pollution Unit Air Contaminant Emissions Survey."  I

18   can't tell who prepared that survey.  But that's --

19   that's what it is.

20       Q.    Okay.  If you look at the survey, which begins

21   on the third page of the exhibit, it says "Firm Name:

22   Dayton Tire & Rubber Company"; "Person to contact

23   regarding this report:  J.M. Mattingly"; Title:  Chief

24   Engineer."  Did I read that correctly?

25       A.    You -- you read what's on this report, yes.

Hobart Corporation. et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 176

1      Q.    Okay.  Do you know who J.M. Mattingly is or

2   was?

3      A.    No.  Although the name is vaguely familiar to

4   me, I don't -- I don't think I came across that name in

5   connection with my work on this.

6      Q.    If you wanted to find out who he -- who he

7   was, what would you do to find out that information?  In

8   other words, if you wanted to find out if he was the

9   chief engineer at the Dayton Tire & Rubber plant at or

10   about the time that this survey was completed, what

11   would you do to find out that information?

12      A.    If he didn't -- in 1970.  If he didn't turn up

13   in some records, which he hasn't, as far as I know -- I

14   don't -- that name is not ringing any bells with me --

15   the only other thing I could do would be to see if the

16   company had a record of -- from BATO had a record of

17   having employed him.  But that's -- yeah, that's --

18   that's all I've got.

19      Q.    Okay.

20      A.    And that's always a crapshoot whether --

21   because if the person has died -- you know, passed

22   away, then they may not have a record.  It's -- it's --

23   usually when they have a record, it's because somebody's

24   still getting a pension.

25      Q.    Uh-huh.  Okay.  Well, I note that they

## Page 177

```
 1    indicate his mailing address is 2342 West Riverview
 2    Avenue.  That's the address for the -- the BATO
 3    facility, correct?
 4        A.   Yes.
 5        Q.   Do you see his telephone number, 278-2666?  Do
 6    you recognize that exchange as relating to that
 7    facility?
 8        A.   No.
 9        Q.   Okay.  So as we go through this document, the
10    first column A -- you can't make out everything, but it
11    says "Sources of" something "boilers."  Do you see that?
12        A.   Yeah, I see that.
13        Q.   Okay.  And then column B says "Size of" -- I
14    can't make out the next word, but it looks like "input."
15    And then we have "Btu/hour."  Do you see that?
16        A.   Uh-huh.  "Millions of BTUs per hour."
17        Q.   Yeah.
18        A.   Uh-huh.
19        Q.   Column C says "Type unit."  Do you see that?
20        A.   Yeah.
21        Q.   Underneath that it says "Pulverized Dry BTM
22    Without flyash Reinjected."  Did I read that correctly?
23        A.   Yeah.
24        Q.   Do you know what that refers to?
25        A.   Not really.  I'm not a coal guy, but I'm --
```

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                                    Larry Dewayne Layfield

Page 178

1    that's -- I believe that -- that to be coal terminology.

2        **Q.   Okay.  Well, column D says -- it says "Type."**

3    **And then underneath that it says "Anthracite coal."  Did**

4    **I read that correctly?**

5        A.   Yes.

6        **Q.   So that's the type of coal that was being**

7    **used, at least, at the date of this report, as far as**

8    **you can tell?**

9        A.   I -- I don't know.  And I don't know who this

10   is according to.  In other words, I don't know if this a

11   document that was prepared by -- by Dayton Tire & Rubber

12   or if it was prepared by the air control authority

13   and -- and sent to them to review.  I have no, you

14   know --

15       **Q.   Well, we're going to get to the bottom of**

16   **that.  Because if I wanted to know what was going on**

17   **here, I would have called J. M. Mattingly, the chief**

18   **engineer, at 2342 West Riverview.  Now, I understand**

19   **that you'll have to do some homework to see if we can**

20   **definitively identify Mr. Mattingly.  But let's proceed**

21   **for a minute.**

22              **Under column E, it says "Amount per year**

23   **- 28,460 tons."  Do you see that?**

24              MR. MOSS:  I'm just going to object to

25   the form of the question and the editorializing.

Page 179

1                    But you can answer.

2                    THE WITNESS:  I mean, I see the number

3    28,640, yes.

4       Q.    (BY MR. CAMPBELL)  If we go over to column G,

5    it says "Percent Sulfur 1.06."  Do you see that?

6       A.    Yes.

7       Q.    Column H, "Percent ash 6.37."  Do you see

8    that?

9       A.    Yes.

10      Q.    Column K, it says -- under "Estimate of

11   contaminants," it says "Fly Ash."  Do you see that?

12      A.    Yes, I see that.

13      Q.    Okay.  And then column L says under "Quantity"

14   "2.6 pounds/Mill BTU," and then comma, and it looks

15   like -- I can't make out the next word, but then it says

16   "Stack Test."  Did I read that correctly?

17      A.    Yes.

18      Q.    Just going back to the -- the volume of coal,

19   does that tie into the document we looked at a minute

20   ago that was estimating annual coal usage?  Is it 26?

21      A.    Where -- 1969 it does.

22      Q.    Uh-huh.

23      A.    And the sulfur percentage and the fly ash

24   percentage is roughly the same as reported on that same

25   document.

Page 180

1      Q.    Okay.  If you go down to the very bottom of

2   this document, in the lower left-hand corner, there's

3   a -- there's two columns:  One "A" and one "B."  Do you

4   see those columns?

5      A.    Yes.

6      Q.    The next to last entry says "Fly ash and

7   Cinders - 1,600,000 pounds."  Do you see that?

8      A.    Yes.

9      Q.    And then below that "Liquid Waste - 524,000

10  Gallons."  Do you see that?

11     A.    Yes.

12     Q.    Can you tell me what those refer to?

13     A.    The fly ash and cinders --

14              MR. MOSS:  Objection.

15              You can answer.

16              THE WITNESS:  Fly ash and cinders is

17  pretty self-explanatory.

18     Q.    (BY MR. CAMPBELL)  Uh-huh.

19     A.    If we are to assume that this document is

20  correct -- and I don't know that it is -- I don't know

21  who prepared it, and I don't know if it was later edited

22  and -- but if we are to assume that the document is

23  correct, "Liquid Waste at 424,000 Gallons" has got to be

24  the Wiley waste.  In other words, the oil-water mixture

25  that George Wiley's company was hauling out of the

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 181

1    plant.

2        Q.    Okay.  If we go to the last page of this

3    Exhibit, ATD 01207 --

4        A.    Yes.

5        Q.    -- under "Section III - Process Emissions" --

6    do you see that?

7        A.    Yes.

8        Q.    We have another table.  And under column A

9    there's a reference to "Compounding."  Do you see that?

10       A.    Yes.

11       Q.    And then column B says in parens "Rubber," and

12   then it says "Carbon Black 138,549,399."  It looks like

13   the pound symbol.  Do you see that?

14       A.    Yes.

15       Q.    Do you have any understandings what that's

16   referring to?

17       A.    It appears to be a combined entry totaling the

18   pounds of rubber, carbon black and miscellaneous

19   compounds that are used in the compounding part of the

20   Dayton Tire & Rubber plant, which is where the Banburies

21   are.  So, basically, I think what that is saying is in

22   the Banbury area, in total we mixed together rubber,

23   carbon black and other miscellaneous ingredients that in

24   total equal 138,549,399 pounds.  That's what I think it

25   means.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Devayne Layfield

Page 182

1       Q.    Okay.  We go over to column F, it says --

2    again, looks like "Carbon Black."  And then column G

3    "Quantity per year - 15,400 pounds."  Do you see that?

4       A.    Yes.

5       Q.    And what does that mean to you?

6       A.    It means that there is a stack collector on

7    the compounding area that moves 74,000 cubic feet per

8    minute, and on that stack there appears to be a bag

9    collector.  And if you'll permit me to use kind of a

10   colloquial word.  The fluffiest thing that you use in

11   the compounding area is carbon black.  In other words,

12   it's -- it's the thing that can be entrained in air the

13   easiest.  It's like a -- can be like a dust.

14      Q.    Uh-huh.

15      A.    So I think what that's saying is that the bag

16   collectors on the stack from the compounding area over

17   the course of a year collect 15,400 pounds of carbon

18   black.  But it also says "Stack sampling strictly

19   estimate.  (Not known)."  So I -- you know, take it for

20   what it's worth, I guess.

21      Q.    Okay.  No. 4, "Fabric Coating."  Column A.

22   Column B says "Fabric" -- it looks like "Rub. and

23   Solvents"?

24      A.    Yep.

25      Q.    Next column "41,200,000 pounds."  Can you tell

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                     Larry Dewayne Layfield

Page 183

1    me what you understand that to mean?

2        A.    I think what that tells me is that in the --

3    what we would call the -- calendaring area, what they

4    say is fabric coating, that the entire Dayton Rubber --

5    Tire & Rubber plant over the course of a year used

6    fabric, rubber and solvents which in total added up to

7    41,200,000 pounds.  That's what I think that -- that's

8    telling us.

9        Q.    Column F says "Essentially Aliphatic

10   hydrocarbons"?

11       A.    Yes.

12       Q.    And column G says "545,000 Gallons."  Can you

13   tell me what you think that means?

14       A.    It means that -- remember there's another

15   stack here.  And the reason you can tell there's another

16   stack is there's a 15,500 cubic feet per minute.

17   There's a ventilation system that's moving 15,500 cubic

18   feet per minute of air.  The solvents used in a tire

19   plant are designed to evaporate.

20              As a matter of fact, if you look at the

21   document that said, "I'm happy you gave it to us," on

22   the emissions credits, you know --

23       Q.    Uh-huh.

24       A.    -- the amount that they say are VOCs exactly

25   equal the amount they used.  And that's right.  Because

Page 184

1    in a tire plant 100 percent of your solvent is supposed

2    to go straight into the air.  There's no solvent waste

3    stream.  The waste train stream is the air.

4              So what we're seeing here is -- they're

5    saying the same thing.  They're saying that out of this

6    41,200,000 pounds of material that go into the fabric

7    coating area, which includes fabric, rubber and

8    solvents, there's 545,000 gallons of solvent that go

9    into the air.  That's why there's no liquid waste stream

10   from that operation.

11        Q.    Okay.  So we go down to "Tread Cementing,"

12   which shows 259,000 gallons per year, under column G it

13   says -- under "Estimate of Contaminants," it says "Not

14   Known."  Can you tell me what you think that means?

15        A.    It means that they didn't know.

16        Q.    Well, what is the reference to 259,000

17   gallons?  Do you know what that refers to?

18        A.    Tread cement is composed of two things.  It's

19   composed of rubber and solvent.  So I suppose they knew

20   that they made a total of 259,000 gallons of tread

21   cement.  But, again, you -- when you use the tread

22   cement, the solvent is designed to evaporate.  Because

23   by the time they're -- the -- the tire is a green tire,

24   there's no solvent left.  I mean, it's -- it's going to

25   go and get cooked in the presses.  So everything -- all

Page 185

1    the solvent goes into the air.

2                Why they didn't try to make a estimate of

3    what part of the 259,000 gallons was rubber and what

4    part was solvent, I don't know.  We've seen other

5    documents that tell us, though.

6        Q.    **Uh-huh.**

7        A.    As a matter of fact, I think they're an

8    exhibit in here.  It says in the cement it's this much

9    percent solvent and this much percent rubber.  And I'm

10   seeing the numbers, but I'm not sure which pertains to

11   which, but I -- it's in here.

12       Q.    **Okay.**

13       A.    Yeah.  One of them is 91.2 percent, but I --

14   I -- sorry.  I can't tell if that's a solvent or the

15   rubber in my mind and -- it's on one of these documents,

16   though.

17       Q.    **Okay.**

18                MR. MOSS:  Drew, how much longer do you

19   think you're going to be?  Because if you're going to be

20   a while, I think now would be a good time for a --

21                MR. CAMPBELL:  I'm actually on my last

22   document.

23                MR. MOSS:  Well, let's go.

24                MR. CAMPBELL:  Let's go with this, and

25   then we can see where we're at.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

                                                              Page 186

1                    MR. MOSS:  I guess I should ask the

2      witness.  Is that okay?

3                        THE WITNESS:  Yeah, we can do one more

4      document.

5                    (Exhibit No. 28 marked.)

6        **Q.    (BY MR. CAMPBELL)  Mr. Layfield, I'm going to**

7      **hand you a copy of what we've marked as Exhibit 28.**

8                    MR. CAMPBELL:  For those on the

9      phone, this document begins at DTR 010322.  It ends at

10     DTR 010406.  There should be front and back of each

11     page.

12       **Q.    (BY MR. CAMPBELL)  And I'm going to ask,**

13     **Mr. Layfield, if you can take a look at this, and then**

14     **I'm going to ask you if you can tell me what it is?**

15       A.    Okay.  Give me a second to kind of --

16       **Q.    Yeah.  While you're looking at that --**

17                    MR. CAMPBELL:  For the record, between

18     pages 010322 and 013383 there are a few places where

19     there is a document missing.  That's the way it was

20     produced to us.  Beginning at 010393 some of these got

21     put in reverse order, so you're going to see that, in

22     fact, all the pages are here.  But between 393 and --

23     from 384 it looks like they got reversed, just to make

24     things interesting.

25                    MR. MOSS:  Well, they must have gotten

Page 187

 1    reversed after they got Bates labeled, then.

 2                    MR. CAMPBELL:  Oh, I think they got

 3    reversed when I assembled the exhibit.

 4                    MR. MOSS:  Yeah.  Okay.

 5                    MR. CAMPBELL:  I think that much is

 6    obvious, yeah.  But other than that, all the -- all the

 7    pages are here, except there were a couple of individual

 8    gaps.  And that was the way it was produced to us.

 9                    MR. MOSS:  I don't -- I'm not sure I

10    understand.

11                    THE WITNESS:  Okay.  All right.

12        Q.   (BY MR. CAMPBELL)  So, Mr. Layfield, can you

13    tell me what Exhibit 28 is?

14        A.    It appears to be an effort by what we've been

15    referring to as BATO to fulfill requirements regarding

16    P.C.B. regulations.  And the document is dated 1980.

17    Most of what follows the first page of Exhibit 28,

18    though, relates to those efforts at the Dayton Tire &

19    Rubber plant that we've been talking about in Dayton,

20    Ohio.  And what they're doing is testing transformers

21    and various pieces of oil field -- oil-filled switch

22    gear for the presence of PCBs.

23        Q.   Uh-huh.  So if, for example, we turn to

24    010330, just as an example --

25        A.   010330.

Page 188

1    Q.   It's just a few pages in.

2    A.   Okay.

3    Q.   It is a document from High Voltage Maintenance

4    Corporation dated October 17th, 1980.  And it says "The

5    following liquid samples have been analyzed by a gas" --

6    how's that -- "chromatograph" --

7    A.   Chromatograph, yeah.

8    Q.   -- "utilizing an electron capture detector and

9    found to contain the indicated type and amount of PCB

10   contamination."  Did I read that correctly?

11   A.   Yes, you did.

12   Q.   Now, as we go down this list there's a -- it

13   says "Sample number."  That's the first column.  Then

14   the second column says "Description," and there's a

15   series of numbers there.  For example, "HVM Test No.

16   1296."  And it looks like they go, more or less,

17   sequentially after that.  Can you tell me what that's

18   referring to?

19   A.   Well, the HVM -- those numbers?

20   Q.   Yeah.

21   A.   It's referring to a piece of equipment.

22   Q.   And that's what I was wondering.  Are they --

23   is this a reference to a specifically cataloged

24   transformer that they were testing?

25   A.   I think so.  If you flip back to DTR 010328,

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 189

1    this is a transmittal letter that's transmitting test

2    reports.

3         Q.   Uh-huh.

4         A.   So the test report says that they're sending

5    reports DT-2-80 and DT-3-80 covering PCB analysis of 28

6    samples of oil removed from units.  So they're testing

7    the oil inside transformers that are in place.  And --

8    let's see.  The -- and then it refers to a previous

9    group of 48 that were sent under separate cover.  So

10   let's see if we got a test number on this.  It says

11   "test results."  I really think this October 17 test

12   report is part of what's being transmitted by this

13   October 24th letter.

14        Q.   Right.  Right.

15        A.   I can't tell you which -- like -- you know,

16   HVM 1296, I can't tell you which transformer or piece of

17   switch gear that relates to, but I think that's the

18   identification number.

19        Q.   Right.  And I -- and I wouldn't ask you that.

20   But I think you confirmed what I thought I was reading,

21   which is that someone has gone and tested each and every

22   transformer at that facility to determine, A, whether or

23   not there was oil in it, correct?

24        A.   Well --

25        Q.   And then, B, whether, if it did have oil,

Page 190

1    **there was PCB contamination present in it?**

2        A.    Right.  I think all of their transformers and

3    switch gear had oil or they identified all those that

4    did, and then they just tested the oil.  But, yeah --

5        Q.    Okay.

6        A.    Yeah.

7        Q.    **Now, you had testified earlier that it was**

8    **your understanding that transformers that were on the**

9    **BATO site were BATO transformers.  But I think you also**

10   **said you thought there might have been some DP&L-owned**

11   **transformers within the BATO facility?**

12       A.    Yeah.

13       Q.    **Now, what was the basis for your understanding**

14   **of that?**

15       A.    The sales agreement from BATO to JM -- JM --

16             MR. MOSS:  JV.

17             THE WITNESS:  JV.  Sorry.  J -- JV or JMV

18   Properties.  That sales agreement has some schedules

19   attached to it.  And one of the schedules that's

20   attached to it specifically identifies the Dayton Power

21   and Light-owned transformers as not being part of the

22   transaction because they belong to Dayton Power and

23   Light.  That's -- that's -- that's all I got there.

24       Q.    **(BY MR. CAMPBELL)  Okay.**

25       A.    That's what I'm basing it on.

Page 191

 1      Q.   Did they quantify that at all?

 2      A.   They did.  They listed them.  They listed

 3   them.  I mean, they're -- they're listed.

 4      Q.   Okay.

 5      A.   So. . .

 6      Q.   You can count them up?

 7      A.   I guess.

 8      Q.   Okay.

 9      A.   I mean, it may refer to a whole substation,

10   and there may be a bunch in there, but, at least, it

11   identifies them in some fashion.

12      Q.   Okay.

13      A.   Yeah.

14      Q.   Okay.  And, I guess, do you recall whether

15   it -- whether it's identified -- quantified them or it

16   just made a more generic reference to them?

17      A.   I can't remember what the words said.

18      Q.   Okay.

19      A.   I know it said, "We are not selling you Dayton

20   Power and Light's transformers," and then it had a

21   description of what they weren't selling.  And that was

22   one of the schedules.  But I can't remember what the

23   description said.

24      Q.   Okay.

25      A.   Whether it listed them by number or what, I

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 192

1   don't know.

2        Q.   So if I go through Exhibit 28 and look at

3   these transmittal letters and add up the references to

4   the BATO transformers, I should be able to come up with

5   a fairly accurate reading as to how many transformers

6   were actually at the BATO facility?

7        A.   Yeah.  As a matter of fact, that cover letter,

8   I think, tells you.  Well, there's two different places.

9   There was a first batch of 48 and then there's a second

10  batch of 30.

11       Q.   I'm sorry.  You're looking at 10323?

12       A.   010328.

13       Q.   8.

14       A.   The cover letter.

15       Q.   Uh-huh.

16       A.   And it refers to two batches, or tranches.

17  The first one is 48 and the second one is 30.  And then

18  if you flip over -- hang on.  There's actually a --

19  there's another letter in here that spits out a number.

20       Q.   Well, there's -- there's 0101340 which says

21  "There are still about 23 transformers and starters that

22  have been tested."

23            I guess that's really -- the point of my

24  question was if I -- if you go through the various cover

25  letters and add them up, as far as you know this is the

Page 193

1    **universe of information about the transformers and the**

2    **PCB testing process?**

3        A.   Yeah, it's the only information we have.  But

4    there is a letter in here, that I'm going get to any

5    second now, that actually did an overall quantification.

6    Here we go.  We may have to do math to figure it out.

7    It's DTR 010361.

8        Q.   361?

9        A.   Uh-huh.  And it says that they're going to

10   spend a total of 2,025 at $75 per test.  And that's, of

11   course -- that doesn't work out right.

12       Q.   **Yeah, this is an April 1980 letter.**

13       A.   Yeah.

14       Q.   **So that may pre -- that pre-dates --**

15       A.   That pre-dates it, yeah.

16       Q.   **Yeah.**

17       A.   You're just going to have to add them up.

18   Sorry.

19       Q.   **Okay.  Fair enough.**

20       A.   I thought there was a total, but there's not.

21       Q.   **That was my question.**

22              MR. CAMPBELL:  Why don't we go off the

23   record for a minute and take a break.

24              (Break from 3:49 p.m. to 3:57 p.m.)

25              MR. CAMPBELL:  Mr. Layfield, I have

Page 194

1    nothing further.  I appreciate your time.  I'll turn

2    this back over to Mr. Romine.

3              MR. ROMINE:  Yeah, I do have some

4    follow-up.  Before that I'll give an opportunity to

5    those on the telephone.  And I think Ms. Gale mentioned

6    that she had some questions.

7              MS. GALE:  Yes, but very brief.

8                        EXAMINATION

9    BY MS. GALE:

10     **Q.   Hi.  Well, first, can you just -- I actually**

11   **haven't yet to get your name.  Can you, please, tell me**

12   **what it is, so I know what to call you, please.**

13     A.   Oh, sorry.  It's Larry Dewayne Layfield.  And

14   if you call me Larry, I won't know who you're talking

15   to, so pick one of the other two.

16     **Q.   But -- but, I guess, I don't know why.**

17   **Whenever you say your last name, the phone cuts out.**

18   **Can you just spell it for me, please.**

19     A.   Oh, sure.  Yeah.  It's Layfield,

20   L-A-Y-F-I-E-L-D.  Like "hay field," but with an "L."

21     **Q.   Hay field.  Right.  I don't know why I kept**

22   **hearing Winfield.  Okay.  Great.  Layfield.**

23              **Mr. Layfield, my name is Kristin Gale,**

24   **and I am here in Chicago.  I represent Waste Management**

25   **of Ohio.  And Drew pretty much covered most of what I**

Page 195

1      wanted to ask, but I just wanted to solve a couple small

2      things.

3                  You said to Drew that in your research,

4      IWD sent Dayton Tire & Rubber's waste to the Cardington

5      Landfill, correct?

6      A.    To Cardington Road, Valley Crest.

7      Q.    Right.

8      A.    And, you know, basically, the landfills that

9      are listed on the May 7th, 1980, letter and the time

10     frames that are listed there --

11     Q.    As exhibit --

12     A.    Yeah.  Yeah, our --

13     Q.    Exhibit 19, I think it was?

14     A.    Oh, let's see.  Hang on.

15     Q.    Yeah, I think it was -- or attached to it.

16     A.    I'm getting close to Exhibit 19.  Hang on.

17     It's attached to Exhibit 19, yes.

18     Q.    And you have -- just to confirm, you have no

19     information that IWD hauled Dayton Tire & Rubber's waste

20     to any other landfill, correct?

21     A.    Other than the ones that are listed on the May

22     7th, 1980, letter that's attached to Exhibit 19, that's

23     correct.

24     Q.    Right.  And you have no information that IWD

25     hauled Dayton Tire & Rubber's waste to South Dayton

Page 196

1    **Dump; isn't that correct?**

2        A.    Yeah, that's correct.  As a matter of

3    fact, all the information we have indicates that you did

4    not do that.

5        **Q.    Right.  Okay.  You have -- or been unable to**

6    **find a contract between IWD and Dayton Tire & Rubber,**

7    **correct?**

8        A.    We haven't been able to find a physical copy

9    of a contract.  We have been able to find sworn

10   testimony that the relationship between Dayton Tire &

11   Rubber and IWD was governed blanket purchase orders that

12   were issued for between one- and three-year periods, but

13   we haven't found the pieces of paper yet.

14       **Q.    Okay.  Do you recall whose testimony said**

15   **there were blanket purchase orders?**

16       A.    If you had asked me this morning, I might.

17   This afternoon --

18       **Q.    I know.**

19       A.    I'm sorry.  It's -- it's become -- it's become

20   name soup today.  I'm sorry.  It -- it would be one of

21   the people that I listed on my list of people that I

22   studied.  Because to get that level of detail I had --

23   you know, I had to read deposition in a lot of -- a lot

24   of detail.  But, yeah, it's one of those people I listed

25   on my list.

Page 197

1      Q.   All right.  That's fine.  I get it.  My

2   head -- my brain is fried as well.

3           So in your research you found nothing

4   that shows the terms of the business arrangement between

5   IWD and Dayton Tire & Rubber, correct?

6      A.   Other than it was governed by a blanket

7   purchase order, that's correct.  The typical practice

8   for Dayton Tire & Rubber and Firestone BATO at that

9   point in history was to incorporate terms into its

10  purchase orders.  But, as I said, we do not have paper

11  copies of it.  Haven't located them as of yet.

12     Q.   And so you don't -- we don't know the terms of

13  those purchase orders, right?

14     A.   Other than as evidenced by the course of

15  dealing and the checks that were written and the --

16  the -- you know, the tickets that we have -- I mean, we

17  have the terms that were evidenced by the course of

18  dealing.  Beyond that, no.

19     Q.   Which --

20     A.   Yeah.

21     Q.   Right.  And those terms show the price paid,

22  correct?  Right?

23     A.   It shows the price paid, the loads hauled, the

24  frequency.  Yeah, that type thing.

25     Q.   Right.  Yeah.  But it doesn't show, say, an

Page 198

1    **indemnity, correct?**

2        A.    The course of dealing doesn't show an

3    indemnity term.  That's correct.

4        **Q.    And it doesn't show that IWD owed DTR a duty**

5    **to defend, do they?**

6        A.    The course of dealing does not show that.

7    That's correct.

8        **Q.    And in your research you found nothing that**

9    **shows that IWD owes Dayton Tire & Rubber indemnity,**

10   **correct?**

11       A.    No, I wouldn't go that far.

12       **Q.    Oh, no?  Why not?**

13       A.    Because if it turns out that the facts stated

14   in this May 7th, 1980, letter that we've been talking

15   about are incorrect --

16       **Q.    Uh-huh.**

17       A.    Dayton Tire & Rubber thinks they're correct.

18   IWD, as far as we know, think they're correct.  But if

19   it turns out that those facts stated in that letter are

20   not correct -- they're not truthful, then I think at the

21   time we discover that, then a cause of action for

22   common-law indemnity will accrue.

23       **Q.    A cause of action for what kind of indemnity?**

24   **Again, the phone broke out.**

25       A.    Common-law indemnity based on fraud.

Page 199

1    Q.   Okay.  Common-law indemnity.  So you don't

2  have a cause of action -- you don't have anything

3  showing a contract indemnity, correct?

4    A.   We haven't located the blanket purchase orders

5  yet.  That's correct.

6    Q.   Right.  And you don't have anything showing a

7  contract to defend; is that correct?

8    A.   We don't have any -- any documents that show a

9  contractual duty to defend.  That's correct.

10   Q.   Right.

11            MS. GALE:  I having nothing further.

12  Thank you.

13            MR. ROMINE:  Anybody else on the phone?

14            MR. THUMANN:  Nothing for me.  This is Rob

15  Thumann.

16            MR. HEER:  This is John Heer.  I have no

17  questions.

18            MS. DECKER:  This is Kate Decker.  No

19  questions here either.

20            MR. ANDREASEN:  John Andreasen.  No

21  questions.

22            MR. ROMINE:  Anyone else on the phone?

23            MR. MOSS:  I think that's everybody.

24            MR. ROMINE:  I do have a couple follow-up

25  questions from Mr. Campbell's questioning.

Page 200

 1                        FURTHER EXAMINATION

 2    BY MR. ROMINE:

 3        Q.    Mr. Layfield, I'd like you to find in your

 4    stack there Exhibit 24.

 5        A.    Okay.  I have it.

 6        Q.    And do you -- if I could ask you to turn to

 7    page 7208.

 8        A.    Okay.

 9        Q.    And do you see where a couple things have been

10    crossed out, it looks like, by pen or pencil?

11        A.    Yes.

12        Q.    Who crossed those out?

13        A.    I have no idea.

14        Q.    Do you know why those things were crossed out?

15        A.    No, I do not.

16        Q.    Do you know whether or not those things were

17    crossed out by someone in Dayton or someone in Akron?

18        A.    I -- I don't know.  I don't -- if you see,

19    this document pertains to all locations.  It doesn't

20    apply just to -- to Dayton.  So I don't even know if

21    these substances are used in Dayton, and I have no idea

22    who made the -- the cross-outs.

23        Q.    If I could ask you to turn to Exhibit 23.

24        A.    Okay.

25        Q.    If you look at the bottom, you see where it

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 201

1    says "D.E. Burnham" and then it says "Plant Staff

2    Engineer."  Do you see that?

3        A.   Yes.

4        Q.   Are you familiar with the name D.E. Burnham?

5        A.   Yes.

6        Q.   And who is D.E. Burnham?

7        A.   He was a plant engineer at Dayton Tire &

8    Rubber in Dayton.

9        Q.   In 1980?

10       A.   It appears so, yes.

11       Q.   For some time before that?

12       A.   Can't tell you for sure.

13       Q.   Do you know what his first name is?

14       A.   No.  Every time I've seen it it's always been

15   D.E.  Just the initials.

16       Q.   If I were to suggest the name Doug, would that

17   refresh your recollection?

18       A.   Not a bit, because I've only seen it as D.E.

19   I've never seen it as Doug.

20       Q.   Fair enough.  If I could ask you to turn to

21   Exhibit 22.  And I want to ask you about page 8557.

22       A.   Okay.

23       Q.   I believe in a response to a question asked by

24   Mr. Campbell you had testified that you would expect

25   that the solvents used in the years between 1961 and

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                          Larry Dewayne Layfield

Page 202

1    **1977 would likely be less than the quantities shown on**

2    **this page because the tire production in those years was**

3    **generally less.  Do you remember that?**

4        A.    Yes.

5        **Q.    And -- and, in fact, we looked at some numbers**

6    **from 1974 in a different document.  Do you remember**

7    **that?**

8        A.    Yes.

9        **Q.    Okay.  Was the -- was -- the solvent used per**

10   **tire, did that different -- differ over time?**

11       A.    I do not know.  I've never seen data on

12   solvent per tire.

13       **Q.    Okay.  And so if it should turn out -- I'm not**

14   **saying it is.  But if it should turn out to say that**

15   **tire production in 1969, 1970 and 1971 were higher than**

16   **1978, '79, '80, you would expect, then, the solvent**

17   **usage for the years in which tire production was higher**

18   **to be higher than these years listed here?**

19       A.    Well, if your hypothetical were true -- but I

20   know for a fact that there was a plant expansion, so

21   there is no way that the unit tire production was higher

22   in '61, '62, '63 than it was -- or even '71 than it was

23   in '78, '79 and '80.

24                And the document you refer to was from

25   1974.  It had "total solvent."  And, if you remember,

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                    Larry Dewayne Layfield

Page 203

1    in 1974 the total 332 solvent was 70 -- 275,000 gallons

2    whereas in 1978 it's 313,266, which agrees with the

3    testimony I read about a ramp-up in production at the

4    plant.

5        Q.   Right.  But my specific question was if it

6    should so happen that -- that tire production was higher

7    in the years before 1977 -- or before 1978, then you

8    would expect that the solvent usage would also be

9    higher?

10                MR. MOSS:  Objection.  Asked and answer.

11                But go ahead.

12                THE WITNESS:  If -- if that hypothetical

13    were true, yes.  But I've found nothing that indicates

14    it would be, and information that indicates it's not

15    true.

16        Q.   (BY MR. ROMINE)  Okay.  And if I could ask you

17    to turn to Exhibit 20, and specifically page ten.

18        A.   Okay.

19        Q.   I wanted to ask you about the answer that

20    starts at the bottom of page nine and carries over to

21    page ten.  I'm thinking in response to a question by

22    Mr. Campbell, you had identified some other waste

23    transporters -- transporters other than IWD.  And I

24    think you mentioned George Wiley?

25        A.   Hang on.  George Wiley transported liquid

Page 204

1    waste.  I can answer your question that way.  But I

2    haven't read all this so. . .

3         Q.   **Go ahead.**

4         A.   Right.  The answer to question 16 that you're

5    referring to is limited to solid waste.

6         Q.   **Okay.**

7         A.   And my answer was not so limited.

8         Q.   **Fair enough.  So now I'm going to limit it and**

9    **ask you what was Dayton Tire & Rubber Company's solvent**

10   **waste transporter other than Industrial Waste Disposal**

11   **Company, Inc., during the time period?**

12        A.   None.

13        Q.   **And has BATO notified EPA that there were no**

14   **over solid waste transporters during that time period?**

15        A.   I don't know.

16        Q.   **Okay.  I believe you --**

17             MR. MOSS:  Are you finished?

18             THE WITNESS:  Yeah.  Yeah, I don't -- I

19   mean, I -- you know, if I were reading this answer, I

20   would take it that, okay, our solid waste transporter

21   is, you know, IWD.  Yes, I see that the word "primary"

22   is in there, but, you know, subsequent investigation has

23   revealed that there are no other solid -- solid waste

24   transporters other than IWD for the time frame at issue.

25        Q.   **(BY MR. ROMINE)  And have you notified EPA of**

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 205

1   that?

2        A.   I don't know.

3             MR. MOSS:  Objection.

4        Q.   (BY MR. ROMINE)  I believe you testified --

5   or, yeah, I believe you testified in response to a

6   question from Mr. Campbell that you worked -- when you

7   worked as a Firestone employee, you worked on the --

8   part of your work was working on the Cardington Road and

9   Valley Crest landfills.  Do you remember that?

10       A.   Yes.

11       Q.   Okay.  What I want you to do is go back to

12  Exhibit 5.

13       A.   Okay.

14       Q.   If you could turn to page 5237.

15       A.   Okay.

16       Q.   And who was Stephen V. Moser?

17       A.   Steve Moser was a senior counsel in the law

18  department that was -- had already left by the time I

19  got there.  Yeah.

20       Q.   Okay.  Did you ever meet him?

21       A.   No.

22       Q.   And he had at this time -- or I should say in

23  1987 he had the same title that you did when you got to

24  Firestone, senior counsel; is that correct?

25       A.   Right.  There was more than one senior

Page 206

 1   counsel.

 2       Q.   Gotcha.  And who was Mr. Hurst?

 3       A.   I don't recognize that name.

 4       Q.   How about Mr. Barnes?

 5       A.   Nope, don't recognize it.

 6       Q.   Okay.  If I could ask you to turn to page 5254

 7   again.

 8       A.   Okay.

 9       Q.   Again, first full paragraph on page two, it

10   says "However, Firestone" --

11       A.   I'm sorry.  Okay.  All right.  All right.

12   Okay.

13       Q.   "Firestone has been unable to verify how much,

14   if any, of these amounts were transported by IWD."  Do

15   you see that?

16       A.   You said the first full paragraph on page two?

17       Q.   Right.

18       A.   To locate --

19            MR. MOSS:  It's towards the very end of

20   the paragraph.  "However" --

21            THE WITNESS:  Oh, okay.  Yeah.

22       Q.   (BY MR. ROMINE)  And it -- I believe your

23   testimony earlier today was 100 percent of those amounts

24   were transported by IWD; is that correct?

25       A.   No.  No.  No.  You read this -- you -- you

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 207

1    stopped the sentence before it was finished.  Okay.  So

2    hang on.

3                   First of all -- first of all, that's

4    limited to Cardington Road.  It says "...how much, if

5    any, of these amounts were transported by IWD or, if so,

6    whether they were disposed to Cardington Road."  But

7    hang on a second.  I'm trying to find where the question

8    started.  Yeah, this is not limited to solid waste.

9    That's the other problem.  So there were other companies

10   that disposed of liquid waste.  And the -- this

11   statement that you're pointing me to isn't limited to

12   solid waste.

13        Q.    Okay.  But do -- let's go up and try to narrow

14   it down, if we can.  It says -- the sentence before that

15   says "For fiscal years 1977 to 1978, Firestone has

16   located a 'Solid Waste Profile' for the Dayton facility,

17   which summarizes by general category the amounts of

18   various waste materials 'sent to dump or landfill.'"  Do

19   you see that?

20        A.    Yes.

21        Q.    And then we had looked at the Solid Waste

22   Profiles for 1977 and 1978 at 5260 -- excuse me --

23   5259, 5260, 5261 and 5262.  Do you see that?

24        A.    Yep.

25        Q.    And this refers to solid waste, correct?

Page 208

 1      A.    It does refer to solid waste, yes.

 2      Q.    **And not liquid waste?**

 3      A.    Right.

 4      Q.    **And column C says "Sent to dump or landfill"?**

 5      A.    You're right.

 6      Q.    **And so it -- so, according to your testimony**

 7   **earlier, all of these amounts -- and "these amounts"**

 8   **refer to sent to dump or landfill on solid waste**

 9   **profiles.  All of these amounts were transported by IWD?**

10      A.    Yeah.

11      Q.    **Is that your testimony?**

12      A.    Yep.  As we sit here in 2017 in the month of

13   February, that is what BATO knows.

14      Q.    **Okay.**

15      A.    That is my testimony.

16      Q.    **And when you worked on the Cardington Road**

17   **site, did you -- were you aware of that?**

18      A.    No.

19      Q.    **Okay.  Has -- when did you become aware of**

20   **that?**

21      A.    When did -- when did I or when did BATO became

22   aware of that?

23      Q.    **Say BATO.**

24      A.    Specific date I don't know.  I can tell you

25   that in 2000 -- in 1987 and in 1997 BATO was not aware

Page 209

1    of it.  But between 1997 and 2017, in that 20-year

2    interval, BATO learned additional information.  And as

3    of today BATO knows that IWD transported all of its

4    solid waste.  And for the time intervals specified on

5    the May 7th, 1980 letter, IWD took those wastes to the

6    landfills so indicated on that 1980 letter.

7        Q.    **Can you give me a anymore precise time between**

8    **1997 and 2017?**

9        A.    No.  But it's beyond the scope of what I'm

10   designated for.  I mean, could I try to figure it out?

11   Sure.  But it wasn't one of the topics that I studied

12   for today.

13       Q.    **Earlier today you testified that Firestone**

14   **Tire & Rubber Company bought the Dayton plant and at**

15   **some point there became a company known as Dayton Tire &**

16   **Rubber Company.  Do you remember that?**

17       A.    I -- I know that Firestone Tire & Rubber

18   Company entered into an agreement with DAYCO, Inc., to

19   buy the assets.  It was an asset purchase agreement.

20   And I know that there was a Dayton Tire & Rubber

21   Company, Inc., thereafter.  Exactly how it was done I

22   don't know.  Because sometimes it's -- you know, they

23   create all kinds of subsidiaries and whatnot, and I

24   don't know those details.

25       Q.    **Okay.  And what -- when the plant was sold in**

Page 210

1    1981, did Firestone sell the company or did Firestone

2    sell the assets only?

3        A.    Assets.

4        Q.    And does the Dayton Tire & Rubber Company,

5    Inc., still exist today?

6        A.    I don't think so.  That's -- that's -- I will

7    claim that's beyond the scope of what I was asked to

8    testify about, but I don't think so.

9        Q.    Okay.

10             MR. MOSS:  I'd also add that it's a

11   matter of public record.

12       Q.    (BY MR. ROMINE)  Do you have an

13   attorney-client relationship with BATO?

14       A.    Yes.

15       Q.    And is your testimony today -- do you consider

16   that part of representing BATO legally?

17       A.    No.

18       Q.    I think that's all I have.

19             MR. ROMINE:  Any follow-up questions on

20   the phone?

21             MR. MOSS:  Mr. Layfield, will read.

22             MS. GALE:  No, none for me.

23             MR. MOSS:  Okay.  Hearing none --

24             MR. ROMINE:  Thank you very much for

25   coming in, Mr. Layfield.

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 211

1                THE WITNESS:  Thank you.  No problems.

2       (Whereupon, the deposition was concluded at 4:22 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                    Larry Dewayne Layfield

Page 212

1                        CHANGES AND SIGNATURE

2    WITNESS: LARRY DEWAYNE LAYFIELD

3    DATE OF DEPOSITION: 2-9-17

4    PAGE   LINE       CHANGE          REASON

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Page 213

1        I, LARRY DEWAYNE LAYFIELD, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5                        _____

6                        LARRY DEWAYNE LAYFIELD

7

8

   THE STATE OF _____)

9
   COUNTY OF _____)

10

11        Before me, _____, on this day

12    personally appeared LARRY DEWAYNE LAYFIELD, known to me

13    (or proved to me under oath or through _____)

14    (description of identity card or other document) to

15    be the person whose name is subscribed to the

16    foregoing instrument and acknowledged to me that

17    they executed the same for the purposes and

18    consideration therein expressed.

19        Given under my hand and seal of office this

20    _____ day of _____, 2017.

21

22

23                        _____
                          NOTARY PUBLIC IN AND FOR

24                        THE STATE OF _____

25

Page 214

```
 1                 UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF OHIO
 2                 WESTERN DIVISION AT DAYTON

 3   HOBART CORPORATION, et al.,   )Case No. 3:13-cv-115
                                   )
 4              Plaintiffs,        )Judge Walter Herbert Rice
                                   )
 5        v.                       )
                                   )
 6   THE DAYTON POWER AND LIGHT    )
     COMPANY, et al.,              )
 7                                 )
                Defendants.        )
 8

 9                   REPORTER'S CERTIFICATION

10                    ORAL DEPOSITION OF

11                  LARRY DEWAYNE LAYFIELD

12                     FEBRUARY 9, 2017

13

14       I, HOPE LEWANDOSKI, Certified Shorthand Reporter in

15   and for the State of Texas, hereby certify to the

16   following:

17       That the witness, LARRY DEWAYNE LAYFIELD, was duly

18   sworn by the officer and that the transcript of the oral

19   deposition is a true record of the testimony given by

20   the witness;

21       I further certify that pursuant to FRCP Rule

22   30(f)(1) that the signature of the deponent:

23       __x__ was requested by the deponent or a party

24   before the completion of the deposition and returned

25   within 30 days from date of receipt of the transcript.
```

Hobart Corporation, et al. v. The Dayton Power & Light Co., et al.                                          Larry Dewayne Layfield

Page 215

1    If returned, the attached changes and Signature Page

2    contain any changes and the reasons therefor;

3    _____ was not requested by the deponent or a party

4    before the completion of the deposition.

5        I further certify that I am neither attorney nor

6    counsel for, related to, nor employed by any of the

7    parties to the action in which this testimony was taken.

8        Further, I am not a relative or employee of any

9    attorney of record in this cause, nor do I have a

10   financial interest in the action.

11       Subscribed and sworn to on this date the 21st day

12   of February, 2017.

13

14

15

16   _____

     HOPE LEWANDOSKI, Texas CSR 6255

17   Expiration Date: 12-31-17

18

19

20

21

22

23

24

25