IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

HOBART CORPORATION, et al., :

    Plaintiffs,

v. : Case No. 3:13-cv-115

THE DAYTON POWER AND : JUDGE WALTER H. RICE
LIGHT COMPANY, et al.,

    Defendants. :

---

DECISION AND ENTRY OVERRULING BRIDGESTONE AMERICAS TIRE OPERATIONS, LLC'S MOTION FOR SUMMARY JUDGMENT (DOC. #1151)

---

Plaintiffs, Hobart Corporation, Kelsey-Hayes Company and NCR Corporation, filed suit against numerous defendants, including Bridgestone Americas Tire Operations, LLC ("BATO"), under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. § 9601, *et seq.*, seeking contribution for response costs incurred in connection with the South Dayton Dump and Landfill Site ("South Dayton Dump" or "the Site"). Other Defendants have asserted cross-claims and counterclaims against BATO.

This matter is currently before the Court on BATO's Motion for Summary Judgment, Doc. #1151. BATO argues that it cannot be held liable under a theory of "arranger" liability because its predecessor, The Dayton Tire and Rubber

Company ("DTR"), disposed of no hazardous substances at the South Dayton Dump. BATO notes that the viability of Plaintiffs' claims of unjust enrichment and declaratory judgment, and the cross-claims and counterclaims of other Defendants, hinge on this same issue.

I. **Background and Procedural History**

BATO is the successor-in-interest to The Dayton Tire and Rubber Company ("DTR"), previously known as Dayton Rubber Manufacturing Company, and later as Dayco Corporation. DTR, which was then the only tire manufacturer in the Dayton area, produced tires from 1961 until 1980.[1] At its peak in the late 1970s, it produced approximately 22,000 tires each day.

In the Sixth Amended Complaint, Plaintiffs allege that DTR arranged for the disposal of waste containing hazardous substances at the South Dayton Dump from 1962-1980. Plaintiffs maintain that BATO, as DTR's successor-in-interest, is liable as an "arranger" under 42 U.S.C. § 9607(a)(3) for response costs incurred by Plaintiffs at the Site. Doc. #636, PageID##8255, 8265. *See also* Doc. #895-6, PageID##29630-38 (expert witness report of Richard L. White).

BATO has moved for summary judgment, arguing that, based on the evidence presented, no reasonable jury could find that DTR arranged for the disposal of *any* waste at the South Dayton Dump, let alone waste containing

---

[1] Plaintiffs have settled all claims against Dayco Corporation, which operated the tire factory prior to this time. *See* Doc. #314-1.

2

hazardous substances. BATO therefore maintains that summary judgment is warranted. BATO's motion is fully briefed and ripe for decision.

## II.     Fed. R. Civ. P. 56

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support

3

of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe. Credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* Civil 3d § 2726 (1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). If it so chooses, however, the court may also consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

4

III.  Analysis

In order to succeed on their contribution claim against BATO, Plaintiffs must prove that: "(1) the property is a 'facility'; (2) there has been a 'release' or 'threatened release' of a hazardous substance; (3) the release has caused the plaintiff to incur 'necessary costs of response' that are 'consistent' with the NCP; and (4) the defendant is in one of four categories of potentially responsible parties." *Regional Airport Auth. v. LFG, LLC*, 460 F.3d 697, 703 (6th Cir. 2006). Those four categories are set forth in 42 U.S.C. § 9607(a).

Plaintiffs maintain that BATO is liable as an "arranger" under 42 U.S.C. § 9607(a)(3). That subsection imposes liability on:

> any person who by contract, agreement or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility . . . owned or operated by another party or entity and containing such hazardous substances. . .

*Id.*

BATO does not deny that DTR generated waste containing hazardous substances. BATO argues, however, that Plaintiffs are unable to establish the requisite nexus between DTR and the South Dayton Dump. Absent evidence that DTR's waste was disposed of at that Site, Plaintiffs cannot prevail on their claims against BATO. As with many CERCLA cases, the events in question took place so long ago that the quality and quantity of evidence available to support, and defend against, the contribution claims asserted is less than ideal.

5

BATO's 30(b)(6) witness, Larry Layfield, testified that, from 1956-1980, DTR contracted with Industrial Waste Disposal ("IWD") for all of its solid waste disposal. Doc. #1132-5, PageID#42551. A letter dated May 7, 1980, from IWD to DTR, indicates that, between 1956 and 1980, IWD transported DTR's solid waste to a variety of landfills, but not to the South Dayton Dump. Doc. #868-2, PageID#23636; Doc. #1132-5, PageID##42626-27, 42691-92.

It is undisputed that there are no documents showing that IWD transported any of DTR's waste to the South Dayton Dump. Moreover, BATO notes that, in ruling on IWD's motion for summary judgment, the Court cited the lack of evidence to support a finding that IWD transported *anything* to the South Dayton Dump other than three loads of wooden pallets and construction debris from DP&L. *See* Doc. #1072, PageID##40718-23. In so holding, the Court discussed the deposition testimony of former DTR employee, Cecil Younker, submitted by Plaintiffs in support of their claim. The Court stated:

> Cecil Younker, who worked for Dayton Tire and Rubber Company ("DTR"), testified that, once, in the early 1970s, he followed an IWD truck hauling DTR waste. He did not remember what was included in that load; nor did he remember the name of the dump. However, when shown an aerial map, he did identify the South Dayton Dump as the truck's destination. Doc. #912-6, PageID##33043-47.
>
> [Waste Management of Ohio] maintains that this aerial map showed only the South Dayton Dump and none of the surrounding area. Larry Layfield, the corporate representative for DTR's successor in interest, testified that, based on Younker's description of the trip, there is no doubt that the IWD driver went to the Cardington Road Landfill and not the South Dayton Dump. Doc. #953-3, PageID#36863.

6

Doc. #1072, PageID##40720. Given that Plaintiffs' expert witnesses had not relied on Younker's testimony to establish IWD's nexus to the Site, the Court, however, did not reach the issue of "whether Younker's testimony might be sufficient to support a finding that IWD disposed of any of DTR's waste at the Site." *Id.* at PageID##40720-21.

The Court now finds that Younker's testimony is insufficient to establish a genuine issue of material fact as to whether IWD ever transported DTR's waste to the South Dayton Dump. As the Court noted in its previous Decision and Entry, because IWD owned several of its own landfills, it had no reason to pay to dispose of waste at the South Dayton Dump. *Id.* at PageID##40718-19. None of the individuals who worked at the Site identified IWD as one of its customers. *Id.* at PageID#40719. Moreover, several IWD drivers testified that they never transported waste to the South Dayton Dump, and knew of no other IWD drivers who did. Doc. #716, PageID#19013; Doc. #893, PageID#28933; Doc. #868-16, PageID##23791.[2]

At his deposition, when questioned about the IWD truck that allegedly dumped one load of DTR waste at the South Dayton Dump, Younker admitted that he did not know where the driver took that load. Doc. #910, PageID#32607. Younker was not familiar with the area, and did not know what road the dump

---

[2] The only exception is the three loads of wooden pallets and construction debris from DP&L.

7

was on. *Id.* at PageID#32609, 32638, 32642. He could not remember whether there were any buildings on the site or any distinguishing features. *Id.* at PageID##32642-43. Younker did remember seeing a trailer park near the landfill. *Id.* at PageID#32608. However, Layfield testified that the trailer park was located between the South Dayton Dump and the Cardington Road Landfill, which are less than one mile apart. Doc. #1132-5, PageID#42630. BATO maintains that, coming from DTR, the IWD truck would have reached the entrance to the South Dayton Dump prior to passing that trailer park. This gives rise to a reasonable inference that the IWD truck actually went to the Cardington Road Landfill, not the South Dayton Dump.

In addition, Younker's testimony that the IWD driver did not talk to anyone on the way into the dump, Doc. #910, PageID#32659, is inconsistent with the South Dayton Dump's standard practice of having an employee at the gate to either fill out a ticket voucher or take the customer's cash, and then instructing them where to dump their loads. Doc. #705, PageID#17642.

The Court finds that, based on the foregoing, Younker's purported identification of the South Dayton Dump (on the aerial map which depicted only the South Dayton Dump, and not the nearby Cardington Road landfill) as the place where the IWD truck took this one load of DTR waste amounts to no more than a scintilla of evidence. Given the overwhelming evidence that IWD did not transport waste to the South Dayton Dump, Younker's testimony is insufficient to establish

8

a genuine issue of material fact concerning whether IWD ever transported DTR's waste to the South Dayton Dump.

Nevertheless, even if *IWD* did not transport DTR's solid waste to the South Dayton Dump, this does not necessarily rule out the possibility that DTR either transported its *own* hazardous waste there or arranged to have a *different* company do so.[3]

BATO argues that there is no credible evidence that DTR was a customer of the South Dayton Dump. Neither Horace Boesch, Jr., whose office was at the South Dayton Dump in the 1960s, nor Michael Wendling, who worked at the South Dayton Dump in the 1960s and 1970s, nor David Grillot, whose family owned the South Dayton Dump, identified DTR as a company that dumped waste at the Site. *See* Docs. ##709, 676, 705.

In addition, it is undisputed that there are no documents, such as written ticket vouchers, to support a finding that DTR hauled its own waste to the South Dayton Dump.[4] Larry Layfield testified that DTR did not haul its own waste and owned no vehicles capable of hauling waste. Doc. #1132-5, PageID##42595-96.

---

[3] Plaintiffs note that the May 7, 1980, letter from IWD, detailing the various disposal sites, does not state that IWD was DTR's *exclusive* waste hauler. Doc. #868-2, PageID#23636.

[4] Regular customers were issued a written ticket voucher for each load brought to the Site, and then billed. Doc. #682-1, PageID#12312.

9

Younker corroborated Layfield's testimony in this regard. Doc. #910, PageID#32620.

Nevertheless, Edward Grillot, who worked at the Site from 1960 until 1972, testified that DTR was one of the dump's customers, and that DTR hauled its own waste to the Site. In the early 1960s, when he was 8-12 years old, he started seeing trucks with the DTR horse logo, dumping inner tubes, rubber shrouds, and tires at the Site about once each week. He testified that the horse logo "stuck with [him]." Doc. #673-1, PageID##9959-63, 10091-92.

On cross-examination, Grillot admitted that he had been shown the DTR logo when he was preparing for his deposition. *Id.* at PageID##10095-98. He further testified that it was possible that he was confused about which trucks he saw at the Site and which trucks he saw at the auto parts company across the street. *Id.* at PageID#10092. BATO notes that the Court rejected Grillot's deposition testimony concerning Defendant Duriron's manufacturing operations and waste disposal practices, because it was wholly contradicted by the record. Doc. #814, PageID##22094-95. BATO urges the Court to do the same now.

Here, however, Grillot's testimony is corroborated, at least in part, by the testimony of Richard and Cecil Hunter. In the 1960s and early 1970s, these two brothers played at the South Dayton Dump several times a week in the summers

10

when they were kids. Their grandfather worked there as a bulldozer operator, and their father worked across the street. Doc. #1030, PageID#38985-90.[5]

Richard Hunter testified that he remembers seeing green or blue DTR trucks, with horse heads on the logo, dumping whitewall tire pieces and other tire pieces at the South Dayton Dump several times a day, two or three times each week. *Id.* at PageID##39018-27, 39163-64, 39174-75. He testified that he sometimes saw DTR drivers open the entrance gate, dump their loads, then leave and shut the gate. "I couldn't swear he had a key, but he had to get in some way." Doc. #1030, PageID#39029. Given Edward Grillot's testimony that regular customers had charge accounts and were given keys so that they could have access to the dump at all times, Doc. #682-1, PageID#12360, this gives rise to a reasonable inference that DTR was a regular customer.

Richard admitted that, because he could not yet read, he relied on what his grandfather told him about the company logos on the doors of the trucks. However, in identifying the companies that brought waste to the dump, Richard also relied on the contents of the trucks. Doc. #1030, PageID##39080, 39143-45, 39157.

Richard also testified that, approximately three times a week, he saw DTR trucks dump large drums filled with thick, black liquid. His grandfather told him

---

[5] Although Richard testified that his aunt, Lucy Hunter, worked at the gate to the South Dayton Dump, Doc. #1030, PageID#38991, she has submitted an affidavit stating that she never worked there. Doc. #1029-6.

11

was this was either paint or glue that was used in the manufacturing process. *Id.* at PageID#39024-28, 39163-68. According to Richard, after the full barrels were dropped into a pit, his grandfather covered them up with the bulldozer. *Id.* at PageID##39024-25, 39169-70. BATO notes, however, that this testimony is inconsistent with Edward Grillot's testimony that any liquids were emptied into the pits and the drums were resold. Doc. #673-1, PageID##9869-72.

BATO also argues that Richard's grandfather's statements, concerning the company names on the trucks and the contents of the metal drums, constitute inadmissible hearsay. Although the grandfather's statement that the trucks with the horse logo came from DTR is inadmissible hearsay, Richard's statement that he was able to personally identify the company by the contents being dumped is not subject to the same challenge. Moreover, the grandfather's statements, that the metal drums contained paint or glue used to make tires, are not being offered for the truth of the matter asserted, but rather to establish DTR's nexus to the Site. Accordingly, they are not hearsay.

Cecil Hunter also testified that DTR was a customer at the South Dayton Dump. He testified, however, that it was *Container Services* that hauled DTR waste to Site once a week. The waste consisted of old tires, pieces of rubber and recycled rubber. Doc. #1029, PageID##38725-26. Cecil testified that this particular waste had to come from DTR because "they were the only ones that did that." *Id.* at PageID##38853-56.

12

BATO notes that Cecil's testimony is inconsistent with that of Container Services' employees, who testified that DTR was not one of its customers. Doc. #882, PageID##26279-80; Doc. #1132-4, PageID#42478. In addition, his testimony that the waste consisted of "old tires" and "junk tires" is inconsistent with the waste stream that would have been generated by a manufacturer of new tires.

BATO argues that not only is the testimony of Edward Grillot and Richard and Cecil Hunter inconsistent with each other, but it is also directly contradicted by a "mountain" of other evidence contained in the record. BATO maintains that their testimony, which based on childhood memories, is insufficient to rebut the testimony of the many *adults* who worked at DTR and the South Dayton Dump during the relevant time period.

The Court agrees that the testimony of Edward Grillot, Richard Hunter and Cecil Hunter, concerning DTR's nexus to the South Dayton Dump, is subject to several challenges. Nevertheless, the Court cannot ignore the fact that these are three separate individuals who each testified that hazardous waste from DTR was disposed of at the South Dayton Dump. In the Court's view, Plaintiffs' evidence, although not particularly strong, is not so insufficient that no reasonable factfinder could find the requisite nexus. Viewing the evidence in the light most favorable to Plaintiffs, and drawing all reasonable inferences in their favor, the Court finds that genuine issues of material fact preclude summary judgment on Plaintiffs' contribution claims against BATO.

## IV. Conclusion

For the reasons set forth above, the Court OVERRULES Bridgestone Americas Tire Operations, LLC's Motion for Summary Judgment, Doc. #1151.

Date: March 29, 2021

WALTER H. RICE
UNITED STATES DISTRICT JUDGE