# EXHIBIT 1

# Expert Report of
# Jeffrey V. Dagdigian, Ph.D.

## Hobart Corporation, et al. vs. The Dayton Power and Light Company, et al.
### USDC Case No. 3:13-cv-115-WHR

**April 7, 2025**                                                      **Project: 24-103**

**Prepared for:**     **Langsam, Stevens, Silver & Hollaender LLP**
1818 Market Street, Suite 3400
Philadelphia, Pennsylvania 19103

**Prepared by:**        Waterstone Environmental, Inc.
2936 E. Coronado Street
Anaheim, California 92806
(714) 414-1122; Fax (714) 414-1166

**Proprietary Notice:**

*This report and its contents are PRIVILEGED AND CONFIDENTIAL INFORMATION: ATTORNEY-CLIENT COMMUNICATION AND ATTORNEY WORK PRODUCT AND OTHER PRIVILEGES ASSERTED. This document should not be duplicated or copied under any circumstances without the express permission of Waterstone Environmental, Inc. The purpose of the report is to allow the client listed above to evaluate the potential environmental liabilities at the Site. Any unauthorized reuse of Waterstone Environmental Inc. reports or data will be at unauthorized user's sole risk and liability.*

# Expert Report of
# Jeffrey V. Dagdigian, Ph.D.

## Hobart Corporation, et al. vs. The Dayton Power and Light Company, et al.
### USDC Case No. 3:13-cv-115-WHR

**April 7, 2025**                                                              **Project: 24-103**

*Prepared by:*



**Jeffrey V. Dagdigian, PhD**
*Managing Principal Environmental Scientist*

Waterstone Environmental, Inc.
2936 E. Coronado Street
Anaheim, California 92806
(714) 414-1122; Fax (714) 414-1166

# Table of Contents

**Section**      **Page**

**1.0 Introduction** ................................................................................................**1**
    1.1    Retention and Assignment ........................................................1
    1.2    Qualifications and Experience ..................................................2
           1.2.1   Recent Cases of Expert Testimony and Publications ...................3
           1.2.2   Licenses and Certifications ..............................................4
           1.2.3   Teaching and Lecturing ..................................................4
    1.3    Basis for Expert Opinions .......................................................4
    1.4    Reliance on Witness and Deposition Testimony ........................5
    1.6    Report Organization ...............................................................8

**2.0 Summary of Opinions** ..............................................................................**10**

**3.0 Project Background Information** ...........................................................**15**
    3.1    Site Description ....................................................................15
           3.1.1   OU1 Description .........................................................15
           3.1.1   Chemicals of Potential Concern ......................................16
    3.2    Site History ..........................................................................16
    3.3    Regulatory Oversight ............................................................17
    3.4    Waste Production and Disposal in the U.S. Before 1980 ............18

**4.0 Hobart Corporation** ................................................................................**20**
    4.1    Hobart Operations ................................................................20
    4.2    General Operations in The Fabricated Metal Industry ...............21
    4.3    Waste from Hobart Operations ...............................................22
    4.4    Hobart Waste Stream Information ..........................................24
    4.5    Opinions Regarding Hobart ...................................................25

**5.0 NCR Corporation** ...................................................................................**26**
    5.1    NCR Operations ...................................................................26
    5.2    General Operations in The Fabricated Metal Industry ...............27
           5.2.1   General Metal Casting Process ......................................27
           5.2.2   General Wastes from Metal Fabrication ...........................32
    5.3    Waste from NCR Operations ..................................................35
    5.4    NCR Waste Stream Information ..............................................36
    5.5    Opinions Regarding NCR .......................................................37

**6.0 Dayton-Walther Corporation** ...............................................................**38**
    6.1    Dayton-Walther Operations ...................................................38
    6.2    General Operations in The Fabricated Metal Industry ...............39
           6.2.1   General Metal Casting Process ......................................39
    6.3    Waste from Dayton-Walther Operations ..................................39
    6.4    Dayton-Walther Waste Stream Information ..............................43
    6.5    Opinions Regarding Dayton-Walther ......................................44

**7.0 Dayton Power & Light** ...........................................................................**45**
    7.1    DPL Operations ....................................................................45

# Table of Contents – Continued

**Section**                                                                                                 **Page**

        7.1.1   DPL Steam and Power Generation ............................................................45
        7.1.2   DPL Transformer Repair Shop ...................................................................46
        7.1.3   DPL Electric Maintenance Service ............................................................46
        7.1.4   DPL Garage/Transportation Department ...................................................47
   7.2     General Operations in Steam and Power Generation ...........................................47
        7.2.1   General Wastes from Power Generation....................................................50
   7.3     General Electric Distribution Operations...............................................................52
        7.3.1   General Wastes from Electric Distribution Operations ...........................53
   7.4     Waste from DPL Operations...................................................................................55
        7.4.1   DPL Ash Wastes from Steam Power Generation .....................................55
        7.4.2   DPL Transformer Repair Shop Waste ......................................................56
        7.4.3   DPL Electric Maintenance Service Waste ................................................57
        7.4.4   DPL Garage/Transportation Department Waste .......................................58
        7.4.5   Other DPL Waste ......................................................................................61

**8.0**    **McCall** ....................................................................................................................**63**
   8.1     MCC Operations .....................................................................................................63
   8.2     General Printing Operations ...................................................................................63
        8.2.1   General Printing Inks ................................................................................64
        8.2.1   General Wastes from Printing Operations ................................................67
   8.3     Waste from MCC Operations .................................................................................68
   8.4     MCC Waste Stream Information .............................................................................73
   8.5     Opinions Regarding MCC ......................................................................................74

**9.0**    **Valley Asphalt Corporation** ................................................................................**75**
   9.1     VA Operations ........................................................................................................75
   9.2     Operations by Other Entities on the VA Property .................................................75
   9.3     General Hot Mix Asphalt Plant Operations...........................................................76
        9.3.1   General Wastes from Hot Mix Asphalt Plant Operations........................77
   9.4     Waste from VA Operations Impacting the VA Property........................................77
   9.5     Waste from Other Entities Impacting the VA Property..........................................79
   9.6     VA Property Waste Stream Information..................................................................82
   9.7     Opinions Regarding VA .........................................................................................83

**10.0**  **Monsanto – Dayton Laboratory** .........................................................................**85**
   10.1   Dayton Laboratory Operations ..............................................................................85
   10.2   General Chemical Laboratory Operations and Wastes Produced...........................88
   10.3   General Chemical Pilot Plant Operations and Wastes Produced............................88
   10.4   Waste from the Dayton Laboratory ........................................................................89
        10.4.1  Wastes from the Dayton Laboratory from 1936 to the Mid-1970s ..........89
        10.4.2  Wastes from the Dayton Laboratory from the Mid-1970s........................90
   10.5   Disposal of Dayton Laboratory Wastes at the SDD ..............................................92
        10.5.1  Testimony on Disposal at SDD.................................................................92
        10.5.2  Buring of Waste from Dayton Laboratory at SDD ...................................94
   10.6   Opinions Regarding Dayton Laboratory................................................................95

# Table of Contents – Continued

| Section | Page |
|---|---|

**11.0 Waste Management of Ohio**............................................................**96**
   11.1   WMO Operations ...........................................................96
   11.2   Waste Transported from WMO Operations at the SDD.....................96
   11.3   Wastes Resulting from Burning Pallets ..................................98
   11.4   Opinions Regarding WMO ..............................................102

**12.0 Sherwin-Williams**................................................................**104**
   12.1   SW Operations ...........................................................104
   12.2   General Paints and Coating Operations ..................................105
          12.2.1  General Manufacturing of Paints and Coatings ...................108
          12.2.2  General Wastes from Paint Production....................................109
   12.3   Waste from SW Operations ..............................................111
   12.4   SW Waste Stream Information ...........................................115
   12.5   Opinions Regarding SW .................................................115

## Figures

1      Site Location Map
2      Site Boundary and Vicinity Map
3      Site Boundary Map

## Appendices

A      Resume of Jeffrey V. Dagdigian, Ph.D.
B      Trial and Deposition Testimony and Work Experience Summary for Jeffrey V. Dagdigian
C      List of Documents Reviewed

## List of Acronyms & Abbreviations

| | |
|---|---|
| 1,1,1-TCA | 1,1,1-Trichloroethane |
| 1,2-DCA | 1,2-Dichloroethane |
| 1,2-DCE | 1,2-Dichloroethene |
| ASAOC | Administrative Settlement Agreement and Order on Consent |
| ATSDR | Agency for Toxic Substances and Disease Registry |
| BTEX | Benzene, toluene, ethylbenzene & xylene |
| BUSTR | Bureau of Underground Storage Tank Regulations |
| CAA | Clean Air Act |
| CEM | Certified Environmental Manager |
| CERCLA | Comprehensive Environmental Response, Compensation, and Liability Act |
| COPCs | Chemicals (Constituents) of Potential Concern |
| CPSC | Consumer Product Safety Commission |
| CRA | Conestoga-Rovers & Associates |
| CWA | Clean Water Act |
| cy | cubic yards |
| Dayton Laboratory | Monsanto – Dayton Laboratory |
| Dayton-Walther | Dayton-Walther Corporation |
| DEQ | Department of Environmental Quality |
| DID | Dayton Industrial Drum |
| DOT | Department of Transportation |
| DPL | Dayton Power & Light |
| EPRI | Electric Power Research Institute |
| FHWA | Federal Highway Administration |
| g/cc | grams per cubic centimeter |
| GHD | GHD Engineering |
| GMR | Great Miami River |
| HAP | Hazardous air pollutants |
| Hobart | Hobart Corporation |
| HRS | Hazard Ranking System |
| HSWA | Hazardous and Solid Waste Amendments |
| ITRC | Interstate Technology Regulatory Council |
| ITW | Illinois Tool Works |

Expert Report of Jeffrey V. Dagdigian, PhD
Hobart Corporation. vs. Dayton Power and Light Company

iv

Waterstone Environmental, Inc.
Project: 24-103

# List of Acronyms & Abbreviations

| | |
|---|---|
| IWD | Industrial Waste Disposal |
| KVA | kilovolt-amperes |
| lbs | pounds |
| LSSH | Langsam, Stevens, Silver & Hollaender, LLP |
| MCC | McCall Corporation |
| MCD | Miami Conservancy District |
| MCHD | Montgomery County Health Department |
| MCL | Maximum Contaminant Level |
| MEK | Methyl ethyl ketone |
| mg/kg | milligrams per kilogram |
| mg/L | milligrams per liter |
| MIBK | Methyl isobutyl ketone |
| MRC | Monsanto Research Corporation |
| MSDS | Material Safety Data Sheet |
| NAC | Nevada Administrative Code |
| NASA | National Aeronautics and Space Administration |
| NCR | National Cash Register Corporation/NCR Corporation |
| NDEP | State of Nevada, Division of Environmental Protection |
| NIOSH | National Institute of Occupational Safety and Health |
| NPL | National Priorities List |
| NTIS | National Technical Information Service |
| NYSERDA | New York State Energy Research and Development |
| ODH | Ohio Department of Health |
| OEPA | Ohio EPA |
| OSHA | Occupational Safety and Health Administration |
| OU1 | Operable Unit 1 |
| OU2 | Operable Unit 2 |
| PAHs | Polynuclear/cyclic aromatic hydrocarbons |
| PCBs | Polychlorinated biphenyls |
| PCDD | Polychlorinated dibenzodioxins |
| PCDF | Polychlorinated dibenzofurans |
| PCE | Tetrachloroethylene |
| PFAS | Per- and polyfluoroalkyl substances |

Expert Report of Jeffrey V. Dagdigian, PhD
Hobart Corporation. vs. Dayton Power and Light Company      v

Waterstone Environmental, Inc.
Project: 24-103

# List of Acronyms & Abbreviations

| | |
|---|---|
| PIC | Products of incomplete combustion |
| ppm | parts per million |
| PRP | Potentially Responsible Party |
| RAP | Recycled/reclaimed asphalt pavement |
| RCRA | Resource Conservation and Recovery Act |
| RI/FS | Remedial Investigation/Feasibility Study |
| SCA | Service Corporation of America |
| SDD | South Dayton Dump |
| SDS | Safety Data Sheet |
| SFM | State Fire Marshall |
| Site | South Dayton Dump and Landfill, Moraine, Ohio |
| SW | Sherwin Williams Company |
| SWDA | Solid Waste Disposal Act |
| t/cy | tons per cubic yard |
| TCA | TCA Environmental, Inc. |
| TCA | Trichloroethane |
| TCE | Trichloroethylene |
| TCLP | Toxicity Characteristic Leaching Procedure |
| TPH | Total petroleum hydrocarbons |
| TSCA | Toxic Substances Control Act |
| UNEP | United Nations Environment Programme |
| U.S. | United States |
| USACE | United States Army Environmental Center |
| USC | University of Southern California |
| USDA | United States Department of Agriculture |
| USDC | United States District Court |
| USEPA | United States Environmental Protection Agency |
| UST | Underground Storage Tank |
| VA | Valley Asphalt Corporation |
| VOC | Volatile Organic Compound |
| w/w | weight per weight |
| Waterstone | Waterstone Environmental, Inc. |
| WMO | Waste Management of Ohio |

# Section 1
# Introduction

## 1.1    Retention and Assignment

I, Jeffrey V. Dagdigian, Ph.D., owner and Managing Principal Environmental Scientist of Waterstone Environmental, Inc. ("Waterstone"), have prepared this expert report at the request of Langsam, Stevens, Silver & Hollaender, LLP ("LSSH"), counsel for Hobart Corporation, Kelsey-Hayes Company, and NCR Corporation ("Plaintiffs"), on behalf of the Plaintiffs in connection with the case titled *Hobart Corporation, et al., vs. The Dayton Power and Light Company, et al*., United States District Court (USDC) Case No. 3:13-cv-115-WHR (the "Lawsuit"), including all counterclaims, cross-claims and third-party complaints related thereto.

The "Site" at issue is primarily the South Dayton Dump and Landfill (SDD) located on approximately 80 acres at 1975 Dryden Road (also known as Springboro Pike) in Moraine, Ohio (see Figure 1).[1,2] However, the Site, as defined by the United States Environmental Protection Agency (U.S. EPA), also includes all nearby areas where hazardous substances, pollutants or contaminants have or may have come to be located from 1975 Dryden Road in Moraine, Montgomery County, Ohio or from former operations at 1975 Dryden road in Moraine, Montgomery County, Ohio.[3,4]

The Site was initially proposed to be placed on the National Priorities List (NPL) by the U.S. EPA in 2004 and is currently identified by the U.S. EPA Facility identification number of OHD980611388.[5] The Site has not been added to the NPL. Chemicals of potential concern (COPCs) at the Site include antimony, arsenic, asbestos, barium, beryllium, cadmium, copper, lead, mercury, methane, polychlorinated biphenyls (PCBs), polynuclear aromatic hydrocarbons (PAHs), pesticides, trichloroethene (TCE), tetrachloroethene (PCE), 1,2-dichloroethene (1,2-DCE), vinyl chloride, and other volatile organic compounds (VOCs).[6]

The current defendants in the Lawsuit are Dayton Power and Light Company; Waste Management of Ohio, Inc; Pharmacia Corporation; Valley Asphalt Corporation; Conagra Grocery Products Co., LLC; and the Sherwin-Williams Company ("Defendants").

I was asked by LSSH to evaluate whether the Plaintiffs and Defendants listed above generated waste containing hazardous substances during the period of SDD's operation or in any other

---

[1] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0504661#bkground

[2] Agency for Toxic Substances and Disease Registry. 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388*. September 30. pg. 4.

[3] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Workplan for Operable Units 1 and 2*. September 20. pg. 1.

[4] U.S. EPA. 2016. *South Dayton Dump & Landfill Superfund Alternative Site, Moraine, Ohio Administrative Settlement Agreement and Order on Consent for Remedial Investigation and Feasibility Study*. June 13. pg. 2 and 4.

[5] Agency for Toxic Substances and Disease Registry. 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388*. September 30. pg. 2.

[6] U.S. EPA. 2012. *South Dayton Dump & Landfill Site Summary/Fact Sheet*. June.

way contributed to the COPCs at the Site and provide opinions based on my evaluation. For the purposes of this report, hazardous substances are the hazardous substances defined by CERCLA Section 101(14). These are chemicals that may cause harmful effects to humans or ecological health.

I understand that Jurgen H. Exner was previously retained by LSSH to serve as an expert for this same assignment; however, due to his retirement, I have been retained to replace him and provide my opinions on this topic.

## 1.2    Qualifications and Experience

I am the current owner of an environmental engineering consulting firm and former Senior Vice President of a national environmental engineering and consulting firm. My formal degrees are in biology (B.S.; USC 1975) and chemistry (PhD; USC 1980) with extensive course work in chemistry and physics which are the basis used in environmental evaluations. I have completed significant course work towards an MBA at California State University, Fullerton. I have spent the vast majority of my over 35-year professional career involved in environmental matters concerning hazardous chemical contamination, especially soil, soil vapor, air and groundwater contamination and determining the source of contaminants in all environmental media as well as the appropriate treatment, cleanup, and disposal options. I have supervised, directed, and reviewed the work of professional chemists, biologists, geologists, hydrogeologists, toxicologists, and engineers.

In my environmental work, I have directed and provided senior oversight for many projects involving subsurface contamination (including chlorinated solvents, fuels, methane, oils, crude oil, heavy metals, PCBs, PAHs, pesticides Polychlorinated dibenzodioxins/furans (PCDD/PCDF), asbestos, salts, and other contaminants) in soil, soil gas, and groundwater; and regularly meet with clients and representatives of various local health care agencies, state environmental agencies and the U.S. EPA to discuss issues related to the extent, source and nature of contamination in soil, soil vapor, air and groundwater, fate and transport of chemicals through the vadose zone and aquifers, cleanup levels, remediation of chemical contamination, and costs related to the cleanup of soil, soil vapor, air and groundwater media. In many of my projects, I am asked to advise on regulatory issues pertaining to the federal Clean Water Act (CWA), the Resource Conservation and Recovery Act (RCRA), the Toxic Substances Control Act (TSCA), the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), as well as applicable Occupational Safety and Health Administration (OSHA) and Department of Transportation (DOT) environmental regulations. My resume is included as Appendix A of this report.

From September 1980 to July 1988, I was employed by Unocal Corporation at their research center (Hartley Research Center) located in Brea, California. From July 1988 to July 1997, I was employed by McLaren/Hart Environmental Engineering, Inc. ("McLaren/Hart"). During my nine years at McLaren/Hart, my responsibilities continued to increase until I was a Senior Vice President of the 700-person firm and in charge of west coast operations. As a Senior Vice

President, I managed hundreds of technical professional staff, including many professional geologists, hydrogeologists, and engineers. During this time, I not only managed these personnel but worked on projects actively as a consultant performing soil and groundwater investigations; developing remediation and clean-up strategies; and implementing those strategies in a manner consistent with my client's needs and regulator's requirements. I routinely reviewed project deliverables for quality and accuracy, and mentored staff.

From July 1997 to December 2012, I was the Co-Owner and Managing Partner of Waterstone. From January 2012 to the present, I have been the sole Owner and Managing Principal of Waterstone. In addition to myself, Waterstone employs a technical staff of 9, including staff members with professional geologist and hydrogeologist certifications, professional engineer licensure, certification as a diplomat of the American Board of Toxicologist, soil scientist, environmental engineers and environmental scientists over whom I am the chief technical scientist and supervisor. I am thoroughly conversant with the fields of environmental geology, hydrogeology, human health risk assessment, and engineering as it relates to my profession and am an expert in investigating and characterizing contamination in soil, soil gas, and groundwater, as well as the remediation and cleanup of those media as well as determining the source of contaminants in all media.

Over my 35 plus years in the environment field, I observed changes and have been involved in projects that demonstrate changes in environmental and waste disposal practices over time. During this time, I have also been involved in projects and evaluated waste production in the textile industry, chemical manufacturing, oil production and refining, power generation, paint and coating manufacturing, asphalt manufacturing, printed circuit board manufacturing, as well as steel and metal fabrication (including metal finishing, anodizing, plating and machining). I have been involved in landfill, recycling and waste disposal projects, including:

➢ BKK Landfill in Los Angeles County;

➢ Greenwaste and Zanker landfills and recycling facilities;

➢ Avalon historic/unpermitted landfilling operations;

➢ Green River Golf Course unpermitted landfill; and

➢ Marina Pacifica unpermitted landfill.


I am being compensated for my work in this case at a rate of $400 per hour plus expenses, for all time expended in connection with this matter.

### 1.2.1 Recent Cases of Expert Testimony and Publications

A summary of Litigation Cases, where I either provided expert deposition and/or courtroom testimony over the last 4 years are provided in Appendix B.

### 1.2.2     Licenses and Certifications

I am a Certified Environmental Manager (CEM) through a qualification process administered by the State of Nevada, Division of Environmental Protection (NDEP). To qualify for this certification, I was required to complete an extensive application documenting the types of projects I had substantial involvement in or had directed. Once my work experience was accepted by NDEP as the proper qualification for the CEM examination, I was required to complete a detailed examination testing my knowledge of geology and hydrogeology, fate and transport of chemicals through environmental media, and Federal environmental laws such as CERCLA, RCRA, the CWA, and TSCA. Applicable environmental regulations in OSHA and DOT were also included in the tested subject matter. The CEM examination is designed to ensure that individuals are qualified to perform environmental consulting activities and have the requisite knowledge and skills to be effective and accurate managers of environmental issues and problems.

Certification by NDEP is designed to ensure an individual is knowledgeable in the management of hazardous substance investigation of a site to determine the source of a release or potential release of a hazardous substance; sampling of air, soil, surface water or groundwater to determine the release of a hazardous substance; response to a release of hazardous substance; cleanup of a release of a hazardous substance; remediation of water or soil contaminated by a hazardous substance; services related to underground storage tanks (USTs); and competence in the tasks relevant to providing these services. Nevada Administrative Code (NAC) 459 requires that any person who provides information, opinion or advice for a fee (or in conjunction with services for which a fee is charged) relating to the services described above must perform those services under the direction and responsible control of a person who is a CEM as approved by NDEP. My CEM designation certifies that I possess the knowledge, training, and experience to act as an environmental consultant for projects concerning the management, release, investigation, sampling, cleanup, and remediation of hazardous substances.

### 1.2.3     Teaching and Lecturing

From 1992 to 2018, I taught a number of environmental courses administered by the University of California, Irvine Extension Program. During that time, I taught *Introduction to Site Characterization and Environmental Auditing* and *Introductory Chemistry of Hazardous Materials* for the University's Environmental Management program. As part of my course curriculums, topics included were environmental geology, hydrogeology, human health risk assessment, engineering as it relates to environmental studies, physical and chemical properties of total petroleum hydrocarbons (TPH) and related fuel compounds, chlorinated solvents, metals, PAHs, pesticides/herbicides; and how to perform and evaluate site characterization investigations for these compounds.

## 1.3     Basis for Expert Opinions

My review of relevant environmental and regulatory agency documents, the history of the Site, general site geology and hydrogeology, previous remedial investigations, documents produced in

Expert Report of Jeffrey V. Dagdigian, PhD                                         Waterstone Environmental, Inc.

Hobart Corporation. vs. Dayton Power and Light Company            4                             Project: 24-103

the litigation, deposition testimony, and other research and documents reviewed in preparing this report, are referenced and summarized in the following sections of this report.

I was asked by LSSH to evaluate whether the Plaintiffs and Defendants listed above generated waste containing hazardous substances during the period of SDD's operation or in any other way contributed to the COPCs at the Site and provide opinions based on my evaluation. For the purposes of this report, hazardous substances are the hazardous substances defined by CERCLA Section 101(14). These are chemicals that may cause harmful effects to humans or ecological health.

In developing my opinions, I have reviewed documents provided by LSSH and evaluated each Plaintiff's and Defendant's operations currently in the Lawsuit. I have based my views on my education and experience of over 35 years in industry and the environmental field, during which I examined sources of waste and engaged in site restoration. I have tested and validated my personal knowledge by reviewing current and historical scientific, technical, and general literature about waste formation and waste management practices in the US. Based on my education, experience, the documents of the case, and the literature review, I have identified wastes produced by the Plaintiffs and Defendants in the Lawsuit and evaluated whether these may have contained hazardous substances.

A list of documents reviewed and depended on for the preparation of this Expert Report is included as Appendix C and these documents are referenced throughout this report.

## 1.4    Reliance on Witness and Deposition Testimony

I have relied on, and incorporated herein as referenced, testimony from depositions from a number of deponents who have provided relevant testimony and information in this case. These witnesses include:

➢ Alan L. Wurstner – Worked at Monsanto Research Corporation (MRC) for 31 years and held positions, research chemist and chief of the emergency brigade.[7]

➢ Bryan Heath – Worked at NCR as a manager of environmental liabilities and technical representative from 2010 to, as the year of his deposition, 2017.[8]

➢ Cecil R. Hunter – Son of Ed Hunter who worked at Doyle Roberson's junk yard located across the street from SDD and grandson of Jessie Collins who operated the bulldozer at the SDD. During the mid-1960s to early 1970s, Mr. Hunter would regularly visit the SDD with his relatives and look for scrap.[9]

➢ Charlie Fields – Worked for Dayton Power & Light from 1962 to, as of the date of the deposition, 2014. Mr. Fields started out as a janitor and then worked as a AC network technician.[10]

---

[7] Wurstner, Alan L. 2013. *Deposition of Alan L. Wurstner*. September 25. pg. 12, 16, and 43.
[8] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. pg. 25-27.
[9] Hunter, Cecil R. 2019. *Deposition of Cecil R. Hunter*. May 14. pg. 13, 17, 27-28, 140, 164, 166, and 282.
[10] Fields, Charles. 2014. *Deposition of Charles Fields*. May 21. pg. 10-12.

➢ Clarence Wall – Worked for Dayton Power & Light from about 1956 to about 2002. Mr. Wall worked at the Service Center in Dayton for about 15 years, starting in 1964 or 1965, as a lineman and then a special purpose equipment operator.[11]

➢ Dan Crago – Director of Quality Control and Environmental for Valley Asphalt.[12]

➢ David A. Grillot - Son of Alcine Grillot, operator of SDD, and nephew to Cyril Grillot, owner of SDD. Mr. Grillot frequently visited the SDD as a child in the 1960s. From 1971 to 1973, he worked at the SDD doing general labor work and operating the air curtain destructor.[13]

➢ Earl Gregory – Worked as NCR's global director of environmental safety and health for about 3.5 years starting in 1999.[14]

➢ Edward Grillot – Worked at SDD from the ages of 8 to 16 and again from the age of 18 to 27. Edward Grillot is the son of Cyril Grillot, one of the owners of the SDD.[15,16]

➢ George E. Morris – Worked at McCall Corporation (MCC) from 1957 to about 1969 and held the following positions: proof press operator, expeditor in the foundry, night production foreman.[17]

➢ Gregory Edsall – Former warehouse manager of the Arbor Blvd. store. Mr. Edsall worked for Sherwin-Williams from 1971 until 1988.[18]

➢ Horace John Boesch, Junior – Worked in an office on SDD property overlooking SDD entrance and is the son of Horace Boesch one of the owners of the SDD.[19]

➢ James Forney – Worked for Waste Management of North America for over 28 years as a remedial projects manager.[20]

➢ James T. McDonald – Worked for Blaylock Landfill as a driver and landfill worker in the 1960s.[21]

➢ James Tharpe – Forked for Dayton Power & Light at their Dryden Road Service Center from approximately 1963 to 1979, and then from 1990 to 2004. Mr. Tharpe started as a garageman, then became an apprentice repairman, then first-class mechanic before moving to the line department in 1965.[22]

➢ John E. Eichstadt – Worked as manager of the Dayton operation for VA starting in the mid-1980s through 1998.[23]

---

[11] Wall, Clarence. 2012. *Deposition of Clarence Wall*. January 17. pg. 9-19.
[12] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 15-17.
[13] Grillot, David A. 2014. *Deposition of David A. Grillot*. May 28. pg. 14, 17-19, 21-23, and 43-44.
[14] Gregory, Earl. 2017. *Deposition of Earl Gregory*. May 5. pg. 14-15.
[15] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 16. pg. 163, 192, and 194-200.
[16] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 17. pg. 566.
[17] Morris, George. 2016. *Deposition of George E. Morris, Jr.* May 4. pg. 9-17.
[18] Edsall, Gregory. 2017. *Deposition of Gregory Edsall*. January 6. pg. 9-12.
[19] Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1. pg. 20, 67, 93-95.
[20] Forney, James. 2017. *Deposition of James Forney*. March 28. pg. 9, 11.
[21] McDonald, James T. 2014. *Deposition of James T. McDonald*. November 12. pg. 16-20.
[22] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 14, 99, 122.
[23] Eichstadt, John E. 2017. *Deposition of John E. Eichstadt*. May 5. pg. 15-17.

- John L. Davis – Worked at Dayton Power & Light driving a tandem truck from 1968 to 1988.[24]

- John L. Wantz – Worked for Dayton-Walther from 1956 to 2000 at the 1366 Miami Chapel Dayton Plant. Mr. Wantz worked in various positions such as a machine shop clerk, supervisor of the machining department, environmental supervisor of the foundry, personnel administrator, and industrial relations manager. He retired from Human Resource Management for the Moraine Division.[25]

- Joseph D. Smart – Was a Container Service truck driver in the mid-1960s for about 3 years.[26]

- Kenneth A. Brown – Has acted as the Hobart representative on the technical committee for the performing parties Hobart Corporation, Kelsey-Hayes, and NCR. [27]

- Marshall W. Patterson – Former SW employee who worked at the 615 Patterson Blvd. store for over 11 years and also at the Arbor Blvd. location. Mr. Patterson worked for SW from 1989 until 2016.[28]

- Michael A. Wendling – Worked at SDD from the age of 20 to 25 but visited SDD from the age of eight. Mr. Wendling is the nephew of SDD owner, Cyril Grillot.[29]

- Michael S. Turner – Worked for Dayton-Walther from 1965 to 2000 at the Moraine Manufacturing Division of Dayton Walther, located at 2490 Arbor Boulevard (Dryden Road). Mr. Turner worked as a machine operator, lift truck driver, maintenance man (machine repair/builder) to foreman to manager, then facility manager.[30]

- Richard Lee Hunter - Son of Edgar Hunter who worked at Doyle Roberson's junk yard located across the street from SDD and grandson of Jessie Collins who operated the bulldozer at SDD. Around the late 1960s, Mr. Hunter would regularly visit the SDD with his relatives and look for scrap.[31]

- Robert Lee Aldredge – Owner and Vice President of Container Service.[32]

- Robert Scott Thomas - Director of Global Environmental Affairs for Sherwin-Williams as of 2017. Mr. Thomas began working for SW in 1988.[33]

- Scott Arentsen – Worked at DP&L from 1980 to 2016 in research and development, field test management, gas supply planning and environmental management.[34]

---

[24] Davis, John L. 2013. *Deposition of John L. Davis*. September 12. pg. 14, 16.
[25] Wantz, John L. 2017. *Deposition of John L. Wantz*. March 21. pg. 10-19.
[26] Smart, Joseph. 2015. *Deposition of Joseph Smart*. April 14. pg. 14-15, 26.
[27] Brown, Kenneth. 2017. *Deposition of Kenneth Brown*. March 14. pg. 27.
[28] Patterson, Marshall William. 2016. *Deposition of Marshall William Patterson.* December 16. pg. 9-10.
[29] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17. pg. 15-25.
[30] Turner, Michael S. 2017. *Deposition of Michael S. Turner*. June 13. pg. 15-28.
[31] Hunter, Richard Lee. 2019. *Deposition of Richard L. Hunter.* April 30. pg. 19, 25, 29, 160, and 247.
[32] Aldredge, Robert L. 2014. *Deposition of Robert Lee Aldredge*. January 8. pg. 26, 36-37.
[33] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 9, 13.
[34] Arentsen, Scott. 2017. *Deposition of Scott Arentsen*. May 15. pg. 23-27.

➢ Stephen Adams – Worked for Hobart at their facilities in Troy, Ohio in the manufacturing division, industrial engineering department, and the safety and environmental divisions.[35]

➢ Thomas D. Beal – Worked for Monsanto for over 30 years. Mr. Beal worked at the Dayton Laboratory as a metrology technician in contract with Wright-Patterson Air Force Base from 1971 to 1981. In 1976, Mr. Beal also became in charge of laboratory waste disposal for MRC.[36]

➢ Thomas Ctvrtnicek – Was a chemical engineer at Monsanto from 1969 to 1992.[37]

➢ Tim Bailey - Former SW employee who worked at many retail locations in Dayton, including the Patterson Blvd. and Arbor Blvd. locations. Mr. Bailey worked for Sherwin-Williams from 1974 until 2015.[38]

➢ Vernon E. Vencill – Worked as a truck driver at IWD and Waste Management from about 1970 to 1995. [39]

➢ William Fournier – Worked for I.W.D as a parts runner and then as a truck driver from 1970 to 1984. Mr. Fournier drove a lugger, roll off, and front-end loader during this time. In 1984, he began working as a route auditor and worked his way up to district general manager until he left I.W.D. in 1998.[40]

➢ Willie Hardy, Jr. – Worked at Dayton Power & Light's Service Center from 1957 to 1991 as a janitor and then electrician.[41]

## 1.6    Report Organization

My summary of opinions is presented in Section 2 of this report. Project background information including a site description, its history, regulatory oversight and a summary regarding the production and disposal of waste in the United States (U.S.) before 1980 is provided in Section 3.

Sections 4 through 12 are each dedicated to one of the Plaintiffs or Defendants in the Lawsuit. I evaluate whether the Plaintiff or Defendant discussed in that section generated waste containing hazardous substances during the period of SDD's operation or in any other way contributed to the COPCs at the Site and I provide my opinions regarding the Plaintiff or Defendant that is discussed in that section. Plaintiffs include Hobart Corporation (Section 4), Kelsey-Hayes Company (Section 5), and NCR Corporation (Section 6).

Defendants include Dayton Power and Light Company (Section 7); Waste Management of Ohio, Inc., as successor to Industrial Waste Disposal Co. Inc., and to Blaylock Trucking and Waste

---

[35] Adams, Stephen. 2017. *Deposition of Stephen Adams*. May 10. pg. 19.
[36] Beal, Thomas. 2014. *Deposition of Thomas Beal*. April 11. pg. 14-16, 52.
[37] Ctvrtnicek, Thomas. 2016. *Deposition of Thomas Ctvrtnicek*. August 25. pg. 18.
[38] Bailey, Tim. 2016. *Deposition of Tim Bailey*. December 16. pg. 10.
[39] Vencill, Vernon E. 2015. *Deposition of Vernon E. Vencill*. April 14. pg. 16-17.
[40] Fournier, William. 2001. *Deposition of William Fournier*. August 16. pg. 11-23.
[41] Hardy, Jr., Willie. 2014. *Deposition Willie Hardy, Jr*. April 2. pg. 14-17.

Removal, and to SCA Services of Ohio, Inc., and to Container Services, Inc. a/k/a Container Service, Inc., and to General Refuse Service, Inc., and to Container Service Co., and to General Sanitation Corporation (Section 8); Monsanto Company, a/k/a Monsanto Research Company a/k/a Pharmacia Corporation (Section 9); Valley Asphalt Corporation (Section 10);  Conagra Grocery Products Co., LLC, as successor to McCall Corp. (Section 11); and the Sherwin-Williams Company (Section 12).

# Section 2
# Summary of Opinions

I have formulated the nine sets of opinions listed below based on my narrative discussion in this report. The footnotes in this report identify the key documents and materials I relied upon to form my opinions. While the footnotes are not intended to provide an exhaustive list of all materials reviewed, they are representative of the evidentiary and scientific basis for my conclusions. My opinions are based on a thorough and comprehensive review of the relevant data, literature, and methodologies, consistent with professional standards in my field. The opinions that follow are based upon this research, my review and study of these documents and all the information provided to me produced or obtained by LSSH in the Lawsuit, and my knowledge, education, training, and experience.

The opinions stated below are my professional opinions and are based on reliable scientific principles, methodologies, and sufficient facts as outlined in this report. It is my opinion, to a reasonable degree of scientific certainty, that these conclusions are true and that, based on my analysis and the available evidence, it is more likely than not that they are correct.

## Hobart Corporation

I have not been asked to, nor do I offer an opinion on whether Hobart disposed of waste at SDD.

*Hobart Opinion 1*. Hobart generated waste during machining and metal-working operations at their Huffman and Torrence facilities.  The waste generated included oils and solvents used during machining, degreasing, and painting.  These wastes contained hazardous substances such as trichloroethane, toluene, xylene, MEK, Stoddard solvent, and heavy metals such as arsenic, aluminum, barium, cadmium, chromium lead, mercury, nickel, selenium, silver, and zinc.

*Hobart Opinion 2*.  Hobart generated electroless copper plating wastes containing hazardous substances copper and formaldehyde.

*Hobart Opinion 3*.  It is my opinion that wastes generated by Hobart would have contained hazardous substances, based on the probable composition of Hobart's waste and the relevant data, testimony and analyses available.

## NCR Corporation

I have not been asked to, nor do I offer an opinion on whether NCR disposed of waste at SDD.

*NCR Opinion 1*.  Wastes generated by NCR included foundry sands and foundry sand waste.  These wastes contained the hazardous substances PAHs and a range of heavy metals such as manganese, chromium, copper, zinc, lead, cadmium, and nickel.

*NCR Opinion 2*.  Wastes generated by NCR included machining wastes including cooling oils, lubricating oils, paint residues, and degreasing residues.  These wastes contained hazardous substances MEK, xylene, toluene, methylene chloride, carbon tetrachloride, Stoddard solvent,

Expert Report of Jeffrey V. Dagdigian, PhD

Hobart Corporation. vs. Dayton Power and Light Company

10

Waterstone Environmental, Inc.

Project: 24-103

tetrachloroethylene, trichloroethylene, and a range of heavy metals. It is likely that some of the cutting oils also contained PCBs.

*NCR Opinion 3*. Wastes generated by NCR included plating wastes containing hazardous substances chromium, zinc, copper, nickel, and cyanide salts.

*NCR Opinion 4.* Wastes generated by NCR included laboratory, pilot plant, and encapsulant manufacturing waste. These wastes contained the hazardous substances toluene, tetrachloroethylene, and PCB.

*NCR Opinion 5.* NCR generated wood waste.

*NCR Opinion 6.* It is my opinion that wastes generated by NCR would have contained hazardous substances, based on the probable composition of NCR's waste and the relevant data and analyses available.

## Dayton-Walther Corporation

I have not been asked to, nor do I offer an opinion on whether Dayton-Walther disposed of waste at SDD.

*Dayton Walther Opinion 1.* Dayton Walther generated foundry slag and sand waste. These wastes contained hazardous substances, PAHs and a range of heavy metals such as manganese, chromium, zinc, lead, cadmium, and nickel.

*Dayton Walther Opinion 2.* Dayton-Walther generated machining wastes including cooling oils and lubricating oils; these wastes contained hazardous substances including a range of heavy metals. Dayton-Walther also generated paint residues; this waste contained hazardous substances MEK, xylene, and toluene. Dayton-Walther also generated degreasing residues from metal parts cleaning; these wastes contained hazardous substances tetrachloroethylene and 1,1,1-trichloroethane.

*Dayton Walther Opinion 3.* It is my opinion that wastes generated by Dayton Walther would have contained hazardous substances, based on the probable composition of Dayton-Walther's waste and the relevant data and analyses available.

## Dayton Power & Light

For each of my opinions for Dayton Power & Light, I have not been asked to, nor do I offer an opinion on whether Dayton Power & Light disposed of waste at SDD.

*DPL Opinion 1.* The ash waste generated by DPL contained hazardous substances such as PAHs and heavy metals such as arsenic, barium, chromium, copper, lead, manganese, and zinc.

*DPL Opinion 2.* Wipes and absorbent waste generated by DPL at the transformer shop contained the hazardous substance PCB.

*DPL Opinion 3.* Fuller's Earth containing transformer fluids generated by DPL contained the hazardous substances PCB and PCDD/PCDF.

*DPL Opinion 4.* Waste such as oil-soaked rags and absorbent generated by DPL likely contained aromatic hydrocarbon and chlorinated hydrocarbon solvent residuals.

***DPL Opinion 5.*** Assuming DPL electric maintenance crews disposed of Waste generated by the DPL electric maintenance crews, including cross-arms, broken poles, insulators, transformer carcasses, capacitors, wires, and soil from the removal of poles, contained hazardous substances PCBs and PCDD/PCDF. It is highly likely that the wastes also contained heavy metals.

***DPL Opinion 6.*** Waste by DPL at its vehicle repair shop, including rags, oil filters, absorbent, and sludge, contained used engine and transmission oils with the hazardous substances of heavy metals such as lead, zinc, copper, chromium, nickel, and cadmium as well as PAHs and likely PCBs.

***DPL Opinion 7.*** Spent cleaning fluids sludge generated by DPL contained hazardous substances TCA, methylene chloride, aromatic hydrocarbons such as xylene, methanol, and methyl isobutyl ketone (MIBK).

***DPL Opinion 8.*** Paint residues and sludge generated by DPL contained hazardous substances, such as heavy metals such as lead, chromium, zinc, cadmium, as well as solvents.

***DPL Opinion 9.*** Waste generated by DPL such as DPL tubes, wire connectors, and insulators contained the hazardous substance lead.

***DPL Opinion 10.*** Creosote-treated poles generated by DPL contained the hazardous substances of phenols and PAHs.

## McCall

For each of my opinions for McCall, I have not been asked to, nor do I offer an opinion on whether McCall disposed of waste at SDD.

***MCC Opinion 1***. MCC printing operations generated waste that contained printing ink, magazines and paper, office trash, cardboard, and wood skids.

***MCC Opinion 2.*** MCC waste contained the following hazardous substances: lead, chromium, cadmium, zinc, copper, selenium, cyanide, barium salts, PAHs, PCBs, benzidine, toluene, TCE, 1,1,1-TCA, and ignitable solvents.

## Valley Asphalt Corporation

For each of my opinions for Valley Asphalt Corporation, I have not been asked to, nor do I offer an opinion on whether Valley Asphalt Corporation disposed of waste at SDD.

***VA Opinion 1.*** Asphalt aggregate generated by VA contained hazardous substances PAHs and heavy metals.

***VA Opinion 2.*** Particulates that were generated by VA from the asphalt plant and controlled by aqueous scrubbers to a settling pond on site highly likely contained hazardous substances PAHs, benzene, toluene, ethylbenzene, xylene, and heavy metals such as arsenic, barium, cadmium, chromium, lead, manganese, mercury, nickel, and selenium.

***VA Opinion 3.*** Laboratory wastes generated by VA contained the hazardous substance TCE.

***VA Opinion 4.*** Assuming VA spilled asphalt, fuel oil, and diesel fuel during its operations, these materials contain hazardous substances such as heavy metals and PAHs, among others.

*VA Opinion 5.* The documentary record indicates that a variety of wastes were placed on the VA property by other companies. These wastes contained many hazardous substances, such as PCBs, benzene, toluene, ethylbenzene, xylene, TCE, PCE, PAHs, chlorobenzene, MEK, and heavy metals such as cadmium, barium, and lead.

## Monsanto

Unless otherwise stated below, for each of my opinions for Monsanto, I have not been asked to, nor do I offer an opinion on whether Monsanto disposed of waste at SDD.

*Monsanto Opinion 1.* The Monsanto Dayton Lab generated a wide variety of wastes for disposal at landfills and incineration as a result of laboratory research and pilot plant production activities. The type and quantity of waste varied over time and was related to (i) the research and development activities occurring at the laboratory and (ii) the size of the organization participating in research activities.

*Monsanto Opinion 2.* Waste generated by the Monsanto Dayton Lab contained hazardous substances typical of those in List 1, among others.

*Monsanto Opinion 3.* Waste generated by the Monsanto Dayton Lab by burning in the 1970s contained hazardous substances, such as methyl ethyl ketone, acetone and other chemicals from List 1.

*Monsanto Opinion 4.* MRC disposed of about 800 lbs of sodium carbonate and alumina at the SDD.

## Waste Management of Ohio

For each of my opinions for Waste Management of Ohio, I have not been asked to, nor do I offer an opinion on whether Waste Management of Ohio disposed of waste at SDD.

*WMO Opinion 1.* MCC printing operations generated waste that contained printing ink, magazines and paper, office trash, cardboard, and wood skids. MCC waste transported by WMO contained hazardous substances lead, chromium, cadmium, zinc, copper, selenium, cyanide, and barium salts. It is highly likely that MCC waste transported by WMO also contained hazardous substances, such as PAH, benzidine, toluene, and ignitable solvents.

*WMO Opinion 2.* WMO transported wood pallets to the SDD for burning in the air curtain burner. Hazardous substances were produced in the combustion process that yielded wood ash containing heavy metal constituents, such as manganese, chromium, copper, lead, and zinc and others listed in Table 11-1.

*WMO Opinion 3.* It is highly likely that emissions from the air curtain burner settled in the immediate vicinity of the burner. It is highly likely that these included hazardous substances PAHs, phenols, and polychlorinated dibenzodioxins and furans (PCDD/PCDF).

### Sherwin-Williams

For each of my opinions for Sherwin-Williams, I have not been asked to, nor do I offer an opinion on whether Sherwin-Williams disposed of waste at SDD.

***SW Opinion 1***. SW generated solvent wastes at its Dayton commercial center. These wastes contained hazardous substances toluene, xylene, MIBK, acetone, aliphatic hydrocarbons, and paint solids. It is highly likely that these solids also contained hazardous substances MEK, PCBs, and heavy metals such as lead, chromium, and zinc.

***SW Opinion 2.*** SW's manufacturing plant produced solvent wastes as well as wastes from obsolete product and customer returns, off-specification materials, spills, filters, pigment containers, drums, other containers, and packaging. Some of these wastes were mixed with general trash. These wastes contained hazardous substances: the various solvents listed in Table 5, PCBs, and a variety of heavy metals from pigments and additives, such as lead, chromium, zinc, strontium, barium, and others.

***SW Opinion 3.*** SW retail stores disposed of wastes such as containers, packaging materials, obsolete product, and office materials which likely contained the same hazardous substances as listed in opinion 2. Assuming SW disposed of this waste at SDD, those wastes contained hazardous substances.

# Section 3
# Project Background Information

## 3.1    Site Description

The Site is primarily the SDD located on approximately 80 acres at 1975 Dryden Road in Moraine, Ohio (see Figure 1); however, the Site, as defined by U.S. EPA, also includes all nearby areas where hazardous substances, pollutants or contaminants have or may have come to be located from 1975 Dryden Road in Moraine, Montgomery County, Ohio or from former operations at 1975 Dryden Road in Moraine, Montgomery County, Ohio.[42]

The Site is located in a heavily industrialized and commercial area southwest of the city of Dayton. The nearest residential area is a mobile home park approximately 150 feet east-southeast of the Site boundary and seven residences south of the Site along East River Road (Figure 3). Light industries and commercial businesses are located along the east and southeast boundaries of the Site on Dryden Road and East River Road. On the north side of Site, there is an asphalt plant. It has been determined through excavations and aerial photos that at least some of this asphalt plant property has been impacted by past SDD landfill operations.[43]

The SDD is a former landfill or disposal area for industrial and municipal waste and includes a 15-acre pond, as well as property now occupied by an operating asphalt plant (Valley Asphalt) and other businesses.[44] According to the U.S. EPA, initial U.S EPA and Ohio Environmental Protection Agency (Ohio EPA) reports indicated that the landfill was 25 acres; however, more recent information indicates the landfill is 80 acres with an estimated 40 acres of the landfill having been built over and/or used for other commercial and industrial purposes.[45]

The Site has been divided by U.S. EPA into two operable units. Operable Unit One ("OU1") includes all areas of the Site potentially used for waste disposal (see Figure 1 and 2) including all media including but not limited to waste, soil, groundwater, leachate, surface water, landfill gas and soil vapor within and beneath the extent of waste. Operable Unit Two ("OU2") includes all areas and media of the Site where Site-related hazardous substances, pollutants or contaminants have come to be located outside of OU1, including but not limited to: surface and subsurface soil, groundwater, landfill gas/soil vapor, surface water, sediment and air.[46]

### 3.1.1    OU1 Description

The OU1 area of the Site is 79.3 acres and is addressed at 1901 through 2153 Dryden Road (sometimes called Springboro Pike) and 2225 East River Road in Moraine, Ohio. The OU1 area

---

[42] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Workplan for Operable Units 1 and 2*. September 20. pg. 1.

[43] Agency for Toxic Substances and Disease Registry. 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388*. September 30. pg. 4.

[44] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0504661#bkground

[45] U.S. EPA. 2012. *South Dayton Dump & Landfill Site Summary/Fact Sheet*. June.

[46] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Workplan for Operable Units 1 and 2*. September 20. pg. 1.

is bordered on the north and west by the Miami Conservancy District (MCD) floodway (part of which is included in the definition of the Site), the Great Miami River (GMR) Recreational Trail and the GMR beyond. On the east, OU1 is bordered by Dryden Road with light industrial facilities beyond. Also east of OU1 is the Dayton Power and Light plant.

On the southeast, OU1 is bordered by residential and commercial properties along East River Road with a residential trailer park beyond, and to the south by undeveloped land with industrial facilities beyond.

Portions of OU1 include areas where municipal, industrial, and residual waste, and construction and demolition debris were disposed. During its operation as an unlicensed dump (i.e., between 1945 and 1968), the area of the Site where waste was deposited is generally referred to as the dump. During its operation as a licensed landfill, the area of the Site where waste was deposited is generally referred to as the landfill. The operator stated that the landfill does not have a liner.[47,48]

### 3.1.1   Chemicals of Potential Concern

The main public health concerns at the Site are: 1) the possibility that on site workers may come into contact with contaminants in the soil; 2) that groundwater contamination could impact local drinking water supplies; and 3) the possibility that chemical contaminants in the groundwater will migrate off-site, vaporize to the soil and enter the indoor air of nearby residences and businesses.[49] The U.S. EPA has identified Site contaminants or COPCs as including the following:[50]

> **Soil** containing metals including lead, copper, antimony, arsenic, barium, beryllium, cadmium and mercury; and organic compounds including PCBs, TCE, PCE, PAHs, PCDD, PCDF and PFAS.

> **Groundwater** containing vinyl chloride, TCE, 1,2-dichloroethene (1,2-DCE), arsenic, lead and other chemicals.

> **Sediment in the water-filled gravel pit** containing PCBs, PAHs and pesticides.

> **Landfill gas** containing methane, TCE and other volatile organic compounds.

> **Indoor air** in many of the buildings over the landfill containing trichloroethene.

## 3.2   Site History

In the 1930s, a portion of the Site was used for agricultural purposes. Sand and gravel pits were excavated at the SDD site after 1935. These pits were filled with a variety of municipal and industrial waste during landfill operations conducted between 1941 and 1996. The SDD operated as an

---

[47] Agency for Toxic Substances and Disease Registry. 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388*. September 30. pg. 4-5.

[48] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Workplan for Operable Units 1 and 2*. September 20. pg. 4.

[49] Agency for Toxic Substances and Disease Registry. 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388*. September 30. pg. 2.

[50] U.S. EPA. 2012. *South Dayton Dump & Landfill Site Summary/Fact Sheet*. June.

unlicensed dump between 1945 and 1968. SDD operated under a solid waste disposal permit issued by Montgomery County Health Department (MCHD). The MCHD permit allowed the disposal of waste in the former gravel pits: solid, inert, and insoluble material such as unregulated foundry sand, slag, glass, and demolition debris. Prior to 1970, the primary disposal practice at the SDD was open burning of vegetation and wood waste and landfilling of the other wastes. Between 1950 and 1970, drummed waste was accepted at the SDD. There are reports that indicate the hazardous waste in addition to municipal waste and construction debris was disposed of at SDD. Reports indicate that between July 1973 and July 1976 drums of hazardous waste were accepted at SDD. In 2000, drums containing hazardous waste were excavated from the southern portion of the Valley Asphalt Plant, in an area now known to have been used for landfilling operations. The landfill contains drums, metal turnings, fly ash, foundry sand, demolition material, wooden pallets, asphalt, paint, paint thinner, oils, brake fluids, asbestos, solvents, transformers and other industrial waste.[51,52] Open burning, landfilling and storage of hazardous waste resulted in soil and groundwater contamination.

As the excavated areas of the site were filled, some of the property was sold and/or leased to businesses including Valley Asphalt and other businesses along Dryden Road and East River Road. The Miami Conservancy District owns the southern part of the site including part of the large quarry pond.[53]

## 3.3    Regulatory Oversight

Ohio EPA and Montgomery County health officials inspected the Site in May 1978 and noted several containers labeled "hazardous". A CERCLA Notification of Hazardous Waste Site Form was submitted in 1981 reporting that industrial waste had been transported to SDD for disposal by IWD, a predecessor of Defendant Waste Management of Ohio, Inc. The U.S. EPA proposed placing the Site on the NPL in 2004 based on its calculation of a Hazard Ranking System (HRS) score of 48.63.[54,55] The HRS is a screening tool used by the U.S. EPA to evaluate the risks to public health and the environment associated with a hazardous waste site. The HRS calculates a score on the potential or a hazardous substance spreading from the site through the air, water, or soil. The U.S. EPA generally places sites with an HRS score of 28.50 or higher on the NPL.[56] The SDD was not placed on the NPL but was instead identified as a Superfund Alternative Approach Site.

The Site is identified by the U.S. EPA under ID# OHD980611388.[57] In 2006, U.S. EPA and four companies voluntarily signed an agreement for U.S. EPA to oversee the companies investigation of the nature and extent of contamination, determination of risks posed by the site to human

---

[51] Agency for Toxic Substances and Disease Registry. 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388*. September 30. pg. 2.

[52] U.S. EPA. 2016. *South Dayton Dump & Landfill Superfund Alternative Site, Moraine, Ohio Administrative Settlement Agreement and Order on Consent for Remedial Investigation and Feasibility Study*. June 13. pg. 6.

[53] U.S. EPA. 2012. *South Dayton Dump & Landfill Site Summary/Fact Sheet*. June.

[54] Agency for Toxic Substances and Disease Registry. 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388*. September 30. pg. 2.

[55] U.S. EPA. 2016. *South Dayton Dump & Landfill Superfund Alternative Site, Moraine, Ohio Administrative Settlement Agreement and Order on Consent for Remedial Investigation and Feasibility Study*. June 13. pg. 7.

[56] https://www.epa.gov/EastAveStudyArea/hazard-ranking-system-hrs

[57] Agency for Toxic Substances and Disease Registry. 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388*. September 30.

health and the environment, and the development of cleanup options. In 2013, three of those four companies (Hobart Corporation, Kelsey-Hayes Company, and NCR Corporation) again voluntarily signed an Administrative Settlement Agreement on Consent ("ASAOC") with U.S. EPA to evaluating vapor intrusion risks from SDD at neighboring businesses. In June 2016, U.S. EPA and those same companies entered into a new ASAOC under which the potentially responsible parties (PRPs) will collect additional samples of soil, groundwater, and sediment to characterize the site, understand the risks to human health and the environment, and develop remedial alternatives to address site risks.[58]

## 3.4     Waste Production and Disposal in the U.S. Before 1980

Virtually every resident, organization, and human activity in the U.S. generates some type of waste. Types of waste that are generated include municipal solid waste, hazardous waste, industrial non-hazardous waste, agricultural and animal waste, medical waste, radioactive waste, construction and demolition debris, extraction and mining waste, oil and gas production waste, fossil fuel combustion waste, and sewage sludge.[59]

As a result of the environmental damage being caused by the waste generated in the U.S. prior to the 1960s, Congress passed the Solid Waste Disposal Act (SWDA) in 1965. The SWDA formed the framework for states to better control the disposal of trash from all sources and set minimum safety requirements for local landfills. Even with SWDA in place, trash still overflowed from landfills and dumps. In the decade between 1950 and 1960, the amount of trash individuals created increased 60 percent.[60]

The U.S. EPA described pollution in the U.S. in the 1960s as "so widespread was pollution from waste that favorite 'swimming holes' were no longer safe for swimming and town well water was no longer safe for drinking. Unsightly dumps marred the countryside and waterways. Dumps not only spoiled the land and the water, but they also were vectors for disease, providing habitats for rats, flies, mosquitoes, and other vermin. They frequently burned or caused extensive damage to surrounding areas."[61] These descriptions by the U.S. EPA regarding the status of pollution that resulted from the inappropriate waste handling and disposal practices in the U.S. in the 1950s and 1960s also generally applies to the decades prior to 1950.

RCRA was signed into law on October 21, 1976, and is the primary law governing the disposal of solid and hazardous waste in the U.S. RCRA was an amendment to the 1965 SWDA, which was the first statute that specifically focused on improving solid waste disposal methods. RCRA was established to address the increasing problems the U.S. faced from the growing volume of municipal and industrial waste. RCRA was amended in November 1984 with the passage of the federal Hazardous and Solid Waste Amendments (HSWA). The HSWA amendments to RCRA required phasing out land disposal of hazardous waste, corrective action for releases, and waste

---

[58] https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0504661#bkground
[59] https://www.epa.gov/report-environment/wastes#:~:text=and%20ecological%20condition.-
,Waste%20Management,migration%2C%20and%20disease%20vector%20hazards.
[60] U.S. EPA. 2002. *25 Years of RCRA: Building on Our Past to Protect Our Future (EPA-K-02-027)*. April. pg. 1.
[61] U.S. EPA. 2002. *25 Years of RCRA: Building on Our Past to Protect Our Future (EPA-K-02-027)*. April. pg. 1.

minimization.[62] RCRA banned open dumping and established a comprehensive national program to encourage source reduction, recycling, and safe disposal of municipal wastes.[63] Modern landfill facilities are engineered with containment systems and monitoring programs while waste management practices prior to RCRA regulations left legacies of contaminated lands.[64]

The U.S. EPA states "the RCRA statute, regulations, and programs were created at a time when we did not know how much waste was produced or what happened to it."[65] Since the passage and implementation of RCRA in the late 1970s and early 1980s, U.S. EPA has endeavored to work side-by-side with other federal agencies, states, tribes, industry, and the public to improve waste minimization, recycling, and waste management. Since that time, businesses, individuals, and organizations have also, due to awareness and due to regulatory requirements, reduced the volume of waste generated, become more careful in handling of waste and generally adhered to the proper/legal disposal of waste.

In addition to RCRA, HSWA, and SDWA, disposal options were also defined by the Clean Air Act (CAA) of 1970, the CWA of 1972, and the TSCA of 1976. The RCRA regulations require documentation of where waste is generated and where it is disposed of. TSCA defined the testing of chemicals and restricted production and use of PCBs. Liability for contaminated sites was defined in CERCLA of 1980 and its amendments in 1986.[66,67,68,69]

---

[62] https://www.epa.gov/rcra/history-resource-conservation-and-recovery-act-rcra

[63] U.S. EPA. 2002. *25 Years of RCRA: Building on Our Past to Protect Our Future (EPA-K-02-027)*. April. pg. 2.

[64] https://www.epa.gov/report-environment/wastes#:~:text=and%20ecological%20condition.-
,Waste%20Management,migration%2C%20and%20disease%20vector%20hazards.

[65] U.S. EPA. 2002. *25 Years of RCRA: Building on Our Past to Protect Our Future (EPA-K-02-027)*. April. pg. i.

[66] Watts, Richard J. 1997. *Hazardous Wastes; Sources, Pathways, Receptors*. pg. 1-42.

[67] Colten, C.E., Skinner, P.N. 1996. *The Road to Love Canal, Managing Industrial Waste before EPA*. pg. 110.

[68] Pankow, J.F., et al. 1996. *Dense Chlorinated Solvents*. pg. 17-45.

[69] Sanjour, W. 2004. *What Did We Know About Hazardous Waste and When Did We Know It*. February 19. pg. 2.

# Section 4
# Hobart Corporation

I was asked by LSSH to evaluate whether Hobart Corporation (Hobart) generated waste containing hazardous substances during the period of SDD's operation. In developing my opinions, I have reviewed documents provided by LSSH and evaluated Hobart operations. I have identified waste produced by Hobart and evaluated whether these may have contained hazardous substances.

## 4.1   Hobart Operations

Hobart manufactured commercial food equipment at two manufacturing and parts distribution facilities in the Dayton area. One Hobart facility was referred to as the Dayton Scale Plant located at 216 Torrence Street in Dayton (Hobart Torrence). The Hobart Torrence facility included office and manufacturing space. The Hobart Torrence facility operated from 1966 to December 1987 when manufacturing was moved to Hillsboro, Ohio and the building was sold. The Hobart Torrence facility operated under the EPA I.D. # of OHD004237434.[70,71,72]

The second Hobart facility was referred to as the Dayton Scale Division located at 448 Huffman Avenue in Dayton (Hobart Huffman). The Hobart Huffman facility contained manufacturing and office space and operated from 1934 until 1982. In 1982, manufacturing ceased, and the Hobart Huffman facility became a parts distribution center until September 1995, when the facility was sold. The Hobart Huffman facility operated under the EPA I.D. # of OHD0071275630.[73,74,75]

Manufacturing at the two Dayton facilities consisted of various kinds of metal working including:[76,77]

> ➢ drilling,
>
> ➢ milling,
>
> ➢ grinding,
>
> ➢ turning,

---

[70] Adams, Stephen C. 2002. *Letter Re: The South Dayton Dump, 1976 Dryden Road (aka) Springboro Pike, Moraine, Ohio General Notice of Potential Liability and Request for Information, CERCLA 104 (e) request*. May 31. pg. 1. (SDD_0567).

[71] Carleton, James J. 1984. *Letter to Patrick H. Gorman, Ohio EPA*. April 16. pg. 1. (SDD_01667).

[72] Brown, Ken. 2015. *Illinois Tool Works (ITW) Letter Response to CERCLA 104€ Information Request*. April 6. pg. 3. (SDD3_00021064).

[73] Adams, Stephen C. 2002. *Letter Re: The South Dayton Dump, 1976 Dryden Road (aka) Springboro Pike, Moraine, Ohio General Notice of Potential Liability and Request for Information, CERCLA 104 (e) request*. May 31. pg. 2. (SDD_0568).

[74] Carleton, James J. 1984. *Letter to Patrick H. Gorman, Ohio EPA*. April 16. pg. 1. (SDD_01667).

[75] Brown, Ken. 2015. *Illinois Tool Works (ITW) Letter Response to CERCLA 104€ Information Request*. April 6. pg. 3. (SDD3_00021064).

[76] Brown, Kenneth. 2017. *Deposition of Kenneth Brown*. March 14. pg. 36-37.

[77] ATEC Environmental Services. 1988. *Environmental Site Assessment Former Hobart Facility Dayton, Ohio*. February 10. pg. 11-14 and Figures 4 through 7. (SDD_00021230-SDD_00021237).

> ➢ assembling

## 4.2    General Operations in The Fabricated Metal Industry

US EPA described the fabricated metal products industry.[78,79,80,81] EPA described the following general production steps in their reviews of the industry before 1990:

> ➢ Melting metal,
>
> ➢ Casting molten metal,
>
> ➢ Forming and cutting,
>
> ➢ Surface preparation of metal,
>
> ➢ Finishing.

Casting of molten metal in molds yields desired metal shapes for further machining.[82] Machinery and machine tools are the basis for modern industrial production and for mass production. Basic machine tools and their functions did not change in principle during the 1930-1996 timeframe, with the exception of computer- and instrument- controlled machinery fabrication that began at the onset of the 1980s.  The basic machining processes include:[83,84,85,86]

> ➢ Turning - A common machining process, typically used to produce shafts, valves, and other round components, which involves rotating a workpiece against a cutting tool to remove material and create cylindrical shapes.
>
> ➢ Milling - A machining process that uses rotary cutters to remove material from a workpiece. Milling machines are used in numerous operations including milling, slotting, and contouring.
>
> ➢ Drilling - A machining process focused on creating holes in metal pieces. It involves using a rotating drill bit to remove material and form cylindrical cavities. Drilling machines can perform simple drilling operations or more complex processes like counterboring, countersinking, and reaming.
>
> ➢ Grinding - A precise machining process that uses an abrasive wheel to remove material and achieve a smooth surface finish. Grinding machines can be manual or automated, providing excellent control over the material removal process.
>
> ➢ Boring - A machining process used to enlarge existing holes or create lateral holes with high accuracy and precision. It involves a rotating cutting tool and moving it along a pre-drilled hole to remove material and achieve the desired diameter.

---

[78] US EPA. 1995. *Profile of the Fabricated Metal Products Industry*. September. pg. 12-20.

[79] US EPA. 1990. *Guides to Pollution Prevention: The Fabricated Metal Products Industry*. July. pg. 5-12.

[80] US EPA. 1995. *Profile of the Iron and Steel Industry*. September. pg. 13-23.

[81] Hayward, Carle R. 1952. *An Outline of Metallurgical Practice*. June. pg. 2, 13-16, 93-95, 607-615, and 640-653.

[82] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 13.

[83] https://www.hlc-metalparts.com/news/types-of-machining-processes-73339966.html

[84] https://www.xometry.com/resources/machining/types-of-machining-processes/

[85] https://pipebends.com/2023/08/essential-guide-to-industrial-metal-machining-processes/

[86] Hayward, Carle R. 1952. *An Outline of Metallurgical Practice*. June. pg. 4, 6, 615, and 640-653.

- ➢ Broaching – A specialized machining process used to create intricate shapes and internal profiles. It involves pushing or pulling a broach tool through a workpiece, which gradually removes material and forms the desired features. Broaching machines are capable of producing keyways, splines, gears, and other complex shapes.

- ➢ Honing – A precision machining process used to improve the surface finish and dimensional accuracy of bores and cylinders. It involves using a rotating abrasive stone to remove material and create a smooth and polished surface.

- ➢ Planing - This method uses linear toolpaths to make cuts and carve off material with a cutting tool.

The machining operations described above use cutting (cooling) fluids such as oils, aqueous oil emulsions, ethylene glycol, and cleaning solvents. Typical solid wastes generated during machining operation include metal chips, metal-bearing cutting fluid sludge, and solvent sludge, all of which generally contain heavy metals. Examples of cleaning fluids used in machining operations include Stoddard solvent, toluene, xylene, acetone, trichloroethene (TCE), and trichloroethane (TCA). Also, acids and bases are used to prepare metal surfaces.[87]

Surface finishing options include plating, galvanizing (zinc), and painting. Plating generates waste plating solutions.[88] US EPA focused on these wastes very early because disposal of them in sewers was decreasing the effectiveness of the municipal activated sludge treatment plants.[89,90] Painting waste generally includes paint solvent, such as methyl ethyl ketone (MEK), acetone, toluene, xylene, and heavy metal-containing sludge.[91]

## 4.3    Waste from Hobart Operations

It is reported that the two Hobart facilities were "sister" plants, and it was common for the two facilities to share various manufacturing processes and resources including the collection of waste streams for disposal.[92,93] Hobart records from 1976 through 1981 list the disposal of solvents, paint waste, and about 4,000 gallons (gal) of electroless copper waste.[94,95]

In 1980, the Huffman and Torrence facilities listed waste according to US EPA waste codes.[96] Hazardous waste from the Hobart facilities was described as mostly F002 1,1,1-Chloroethane (aka 1,1,1-TCA) and F005 Paint Thinner.[97] A F002 waste code corresponds to the RCRA listed

[87] US EPA. 1995. *Profile of the Fabricated Metal Products Industry.* September. pg. 13-16, 22-25.

[88] US EPA. 1995. *Profile of the Fabricated Metal Products Industry.* September. pg. 17-20, 27-28.

[89] US EPA. 1974. *Development Document for Effluent Limitation Guidelines and New Source Performance Standards for the Copper, Nickel, Chromium, and Zinc Segment of the Electroplating Point Source Category.*

[90] US EPA. 1975. *Reclamation of Metal Values from Metal Finishing Waste Treatment Sludges.*

[91] US EPA. 1995. *Profile of the Fabricated Metal Products Industry.* September. pg. 20, 22, 25 and 28.

[92] Carleton, James J. 1984. *Letter to Patrick H. Gorman, Ohio EPA.* April 16. pg. 1. (SDD_01667).

[93] Adams, Stephen C. 2002. *Letter Re: The South Dayton Dump, 1976 Dryden Road (aka) Springboro Pike, Moraine, Ohio General Notice of Potential Liability and Request for Information, CERCLA 104 (e) request.* May 31. pg. 2. (SDD_0568).

[94] Rosell, L.P. 1981. *Waste Vendors and Amounts.* June 1. (SDD_01674).

[95] Rosell, L.P. 1981. *Summary of Wastes from 3/17/76 thru 10/19/81.* June 1. (SDD_01675).

[96] US EPA. 1981. *Notification of Hazardous Waste Site.* June. pg. 1-2. (SDD3_00021300-SDD3_00021303).

[97] Rosell, L.P. 1981. *Hobart Memo to J.J. Carleton Re: Superfund Notification.* June 1. pg. 1. (SDD_01673).

waste described as spent halogenated solvents. A F005 waste code corresponds to the RCRA listed waste described as spent nonhalogenated solvents.[98]

Hobart also produced paint sludge. Leachate analysis of the paint sludge in 1981 showed concentrations of barium, cadmium, mercury, chromium, and hexavalent chromium.[99] Analysis of the synthetic coolants used by Hobart (Discool and Kleen Kool) contained aluminum, chromium, copper, lead, and zinc.[100]

The listing of waste in accordance with EPA hazardous waste codes in 1980 and the analysis of wastes in 1981 described above demonstrates that Hobart was knowledgeable of and in compliance with RCRA which became law in late 1976.

## Hobart Huffman

Hazardous substances that Hobart listed in 1981 as part of its waste for the Hobart Huffman facility included:[101]
- 1,1,1-TCA
- Stoddard solvent
- MEK
- Xylene
- Paint thinner
- Electroless copper
- Heavy metals: arsenic, barium, cadmium, lead, mercury, nickel, selenium, silver, chromium, and aluminum

Other records for the Hobart Huffman facility indicate that the following wastes were generated at the facility:
- 1981[102]
  - 32 cubic yards/week of trash to Koogler-Suburban landfill.
  - 55 gallons/month of solvent-oil liquid for off-site reclaim
  - 30 gallons/month of solvent-paint hazardous liquid for off-site reclaim
  - 30 gallons/month of Chlorothene V.G. liquid for off-site reclaim

## Hobart Torrence

Records for the Hobart Torrence facility indicate that the following regarding waste generated at the facility:

---

[98] Title 40, Code of Federal Regulations, Section 261.31.
[99] Howard Laboratories, Inc. 1981. *Analytical Results*. April 22. (SDD_01676).
[100] Bowser-Morner Testing Laboratories, Inc. 1981. *Laboratory Report*. March 3 and March 10. (SDD_01677-SDD_01678).
[101] US EPA. 1985. *Potential Hazardous Waste Site Preliminary Assessment*. April 10. pg. 2. (SDD_00021206-SDD_00021207).
[102] Rosell, L.P. 1981. *Letter to Ohio EPA and 1981 Industrial Waste Survey*. April 13. pg. 2. (SDD_01671).

- ➢ 1973 to 1980[103,104]
    - ○ 110 gallons/year of 1,1,1 trichloroethane (1,1,1-TCA).
    - ○ 1,1,1-TCA and cutting oil from degreasing.
    - ○ MEK, xylene, and paint.
    - ○ Stoddard solvent and cutting oil from degreasing.
    - ○ Machine tool water based synthetic coolants contaminated with cutting oils and solvents.
    - ○ From June 4, 1973 to July 5, 1976 all waste streams were combined in single drums and an average of 15 drums per month were generated for disposal. The liquid was largely water in the form of machine coolant.
    - ○ After 1976 each waste was placed in separate drums.
    - ○ The waste from Hobart Torance was combined with the waste generated at Hobart Huffman for disposal.
    - ○ Waste was hauled by Joe Sepeck.

- ➢ 1981[105]
    - ○ 110 gallons/year of 1,1,1 trichloroethane.

- ➢ 1981[106]
    - ○ 1 drum per month of Trichlor. (This notation is likely shorthand for 1,1,1 trichloroethane)
    - ○ 1 drum per month of paint solvent.
    - ○ 2 drums per month of a mixture of Stoddard solvent and cutting oil.

- ➢ 1981[107]
    - ○ 8 cubic yards/week of trash to N&N Commercial Waste landfill.
    - ○ 110 gallons/ year of Chlorothene V.G. sludge for off-site reclaim to Solvent Resources Recovery

Although the documents cited above show different nomenclature, it appears that all three are referring to 1,1,1 trichloroethane.

## 4.4    Hobart Waste Stream Information

Our review of the record in this case provided to us includes the following descriptions of wastes purportedly associated with Hobart:

---

[103] Carleton, James J. 1984. *Letter to Patrick H. Gorman, Ohio EPA*. April 16. pg. 1. (SDD_01667).
[104] Rosell, L.P. 1981. *Hobart Memo to J.J. Carleton Re: Superfund Notification*. June 1. pg. 1. (SDD_01673).
[105] Carleton, James J. 1984. *Letter to Patrick H. Gorman, Ohio EPA*. April 16. pg. 1. (SDD_01667).
[106] Rosell, L.P. 1981. *Hobart Memo to J.J. Carleton Re: Superfund Notification*. June 1. pg. 1. (SDD_01673).
[107] Rosell, L.P. 1981. *Letter to Ohio EPA and 1981 Industrial Waste Survey*. April 13. pg. 3. (SDD_01672).

> ➢ Liquid waste described as solvent, paint solvent, stoddard solvent and cutting oil.[108,109,110,111]

> ➢ 5-gallon full drums and 50-gallon sealed drums half-full containing dark blue or purple colored sludge or pasty/runny liquid.[112]

## 4.5    Opinions Regarding Hobart

***Hobart Opinion 1***. Hobart generated waste during machining and metal-working operations at their Huffman and Torrence facilities.  The waste generated included oils and solvents used during machining, degreasing, and painting.  These wastes contained hazardous substances such as trichloroethane, toluene, xylene, MEK, Stoddard solvent, and heavy metals such as arsenic, aluminum, barium, cadmium, chromium lead, mercury, nickel, selenium, silver, and zinc.

***Hobart Opinion 2***.  Hobart generated electroless copper plating wastes containing hazardous substances copper and formaldehyde.

***Hobart Opinion 3***.  It is my opinion that wastes generated by Hobart would have contained hazardous substances, based on the probable composition of Hobart's waste and the relevant data, testimony and analyses available.

---

[108] Rosell, L.P. 1981. *Hobart Memo to J.J. Carleton Re: Superfund Notification*. June 1. pg. 1. (SDD_01673).

[109] Carleton, James J. 1984. *Letter to Patrick H. Gorman, Ohio EPA*. April 16. pg. 2. (SDD_01668).

[110] Adams, Stephen C. 2002. *Letter Re: The South Dayton Dump, 1976 Dryden Road (aka) Springboro Pike, Moraine, Ohio General Notice of Potential Liability and Request for Information, CERCLA 104 (e) request*. May 31. pg. 5. (SDD_0571).

[111] Brown, Ken. 2015. *Illinois Tool Works (ITW) Letter Response to CERCLA 104(e) Information Request*. April 6. (SDD3_00021064).

[112] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17. pg. 15-25, 80, and 122-127.

# Section 5
# NCR Corporation

I was asked by LSSH to evaluate whether NCR Corporation (NCR) generated waste containing hazardous substances during the period of SDD's operation. In developing my opinions, I have reviewed documents provided by LSSH and evaluated NCR operations. I have identified wastes produced by NCR and evaluated whether these may have contained hazardous substances.

## 5.1    NCR Operations

NCR, or National Cash Register, carried out integrated manufacturing of electromechanical cash registers and accounting machines from about 1900 to the early 1970s in a complex of office and manufacturing buildings. The NCR complex was located at 1700 South Patterson Boulevard in downtown Dayton, near the SDD, and operated under the EPA I.D. # of OHD001316090. In 1970, NCR eliminated the integrated business model and turned to electronic equipment.[113,114,115,116]

Before the mid-1970s, major manufacturing was carried out in a number of the NCR buildings as:[117,118,119]

> ➢ Iron and brass (copper/zinc alloy) foundries that molded, ground, sawed, rotoblasted, and polished cut parts.[120] NCR used cupola furnaces.[121]

> ➢ Machine shops for cutting, shaping, and forming metal parts using equipment such as milling machines, lathes, and automatic screw machines.[122]

> ➢ Oil house-presumed to be cleaning and storing of machining fluids.[123]

> ➢ Garage for servicing automobiles including oil changes.[124]

> ➢ Research and development labs for researching new materials and processes and for producing developmental quantities of material for market testing.[125]

> ➢ Plating shops for plating of zinc, copper, nickel, and chromium during finishing of

---

[113] Gregory, Earl. 2017. *Deposition of Earl Gregory*. May 3. pg. 56-57.

[114] US EPA. 2000. *Integrated Data for Enforcement Analysis Action Report*. October 24. pg. 52. (SDD_01437).

[115] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. pg. 167.

[116] National Cash Register Corporation (NCR). 1993. *NCR Response to US EPA Information Request*. May 21. pg. 1. (SDD3_00021583).

[117] NCR. 1993. *NCR Response to US EPA Information Request*. May 21. pg. 2-3. (SDD3_00021584-SDD3_00021585).

[118] NCR. 1992. *NCR Buildings*. September 21. (SDD3_00037363-SDD3_00037377).

[119] NCR. 1973. *Manufacturing Standard*. January 24. pg. 1-13. (SDD3_00037402-SDD3_00037414).

[120] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. pg. 93-94.

[121] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 35-36. (SDD3_00021570).

[122] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 26-28. (SDD3_00021569).

[123] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 39-40. (SDD3_00021571).

[124] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 42-44. (SDD3_00021572).

[125] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. (Exhibit 9/ SDD3_00037868-SDD3_00037931).

metal parts. Heat treatment to harden metal pieces by immersing parts in a hot bath of molten sodium cyanide at high temperatures.[126]

➢ Woodworking building for manufacturing parts of cash registers, molds, and pallets 1972.[127]

➢ A round house for distribution and receipt of parts by rail.[128]

➢ An encapsulation plant for manufacturing carbon-less copy paper emulsions using PCBs.Specifically, Aroclor 1242 was used in the production of NCR carbon-less copy paper.[129,130]

➢ A power plant for providing portions of NCR's electricity, heat, and steam.[131]

➢ Office and maintenance.[132]

Following the mid-1970s, there was a large change in building operations and several buildings were demolished. The Dayton location remained NCR's corporate headquarters with one production facility and one semiconductor plant.[133,134]

## 5.2     General Operations in The Fabricated Metal Industry

See information regarding general operations in the Fabricated Metal Industry provided in Section 4.2.

### 5.2.1   General Metal Casting Process

Metal casting is a process in which molten metal is poured into a mold made of sand, metal, or ceramic to form geometrically complex parts. The metal casting industry makes parts from molten metal according to the specifications of an end user.[135] In 1996, about 13 million tons of castings were produced with a value of about $19 billion.[136] This is a decrease from about 20 million tons of castings in 1972.[137] Castings are made from many metals and metal alloys. A large number of alloying metals can be added to steel to increase strength, heat and corrosion resistance, or machinability. Alloys with aluminum, copper, zinc, lead, tin, nickel, magnesium, and titanium are of primary commercial importance. Copper-zinc (brass), copper-tin (bronze), nickel-copper

---

[126] NCR. 1993. *NCR Response to US EPA Information Request for Valleycrest Landfill*. May 21. pg. 2-3. (SDD3_00021584-SDD3_00021585).

[127] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 33-34. (SDD3_00021570).

[128] Gregory, Earl. 2017. *Deposition of Earl Gregory*. May 3. pg. 79-80.

[129] State of Oregon. 2003. *Fact Sheet: Sources of Polychlorinated Biphenyls.* August 6. Attachment 1, pg. 7.

[130] https://www.sec.gov/Archives/edgar/data/41719/000095012309071858/w76659exv99w1.htm#:~:text=A%20key %20component%20of%20NCR%20paper%20was,a%20solvent%20manufactured%20by%20the%20Monsanto% 20Corporation.

[131] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 33. (SDD3_00021570)

[132] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 39. (SDD3_00021571).

[133] NCR. 1995. *History of NCR Buildings*. August 9. (SDD3_00037378-SDD3_00037386).

[134] NCR. 1993. *NCR Response to US EPA Information Request*. May 21. pg. 1. (SDD3_00021583).

[135] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 13.

[136] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 4, 7.

[137] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 10.

Expert Report of Jeffrey V. Dagdigian, PhD                                          Waterstone Environmental, Inc.

Hobart Corporation. vs. Dayton Power and Light Company          27                                     Project: 24-103

(Monel), nickel-chromium, aluminum-silicon, aluminum-magnesium, and titanium are common nonferrous alloys. Metal casting consists of various operations as shown in illustration 5-1 below.

**Illustration 5-1. Foundry Process Flow & Pollutant Outputs Using Green Sand Molding[138]**



Source: Adapted from Kotzin, Air Pollution Engineering Manual: Steel Foundries, 1992

---

[138] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry.* November 18. pg. 19.

Primary steps in metal casting shown in illustration 5-1 above are described as follows:[139]

1. Making the pattern for the mold out of metal, plastic, wood, or wax. Computer-aided systems provide better dimensional accuracy and consistency than hand methods in the design of patterns.

2. Mold and Core Preparation - During casting, patterns are protected from the hot metal by molds. Molds only replicate the external shape of parts, and cores are placed inside the mold to form internal cavities. Molds and cores use different binders to accommodate the temperature of the molten metal, casting size, type of sand, and alloy. Cores generally use silicon sand and strong chemical binders such as phenolic, furan, and ester resins. The large majority of molds (about 90 % in the US in about 1990) are prepared by the green sand process. Sand (85-95%) is bonded by 4-10 % clay and 2-5 % water. Carbonaceous material (2-10 %) such as finely powdered coal, corn starch, or wood burns off and creates a reducing atmosphere which prevents metal from oxidizing while cooling. Permanent molds and dies, capable of thousands of castings, use clay and sodium silicate coatings to release castings from the molds. The components and terminology of sand molds and cores are shown in Illustration 5-2 below. Since the 1990s, the no-bake sand process has gained importance. This method uses strong chemical binders and a catalyst to form the shell of the mold.

**Illustration 5-2 - Sand Mold and Core Cross Section[140]**



Source: American Foundrymen's Society, 1981

Investment casting, or 'lost wax' casting, uses a pattern that is consumed or 'lost' during casting. The pattern is produced from wax, and a sand slurry is allowed to

---

[139] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 13-38.
[140] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 17.

harden around the wax. The wax is melted or dissolved, which leaves a hard sand shell around a void into which the metal is poured.

Molten metal is fed through the sprue into the mold (see Illustration 5-2 above). After casting, metal hardens in this passage and is removed from the final casting. The runner is the channel through which the metal flows, and the gate reduces the flow rate. The riser denotes a reservoir that is built into the casting mold to prevent cavities due to shrinkage. Metal that hardens in the riser must also be removed after the casting has solidified. Chaplets are small metal spacers to support the mold.

3. Metal Melting. There are five types of furnaces used to melt metal. Four of the furnaces are shown in Illustrations 5-3.1 and 5-3.2 below:

   i. Cupola furnaces use alternating layers of coke and metal to heat and melt iron metal.

   ii. Electric arc furnaces heat iron or steel with carbon electrodes that penetrate the furnace from the side of the furnace.

   iii. Reverberatory furnaces are used for melting large quantities of nonferrous metals. These are melted in refractory-lined saucer hearths by blowing hot air over the metal. Melt runs out in a spout at the top of the saucer.

   iv. Induction furnaces melt ferrous and non-ferrous metals. A strong magnetic field is created by passing an electric current through a coil wrapped around the furnace. The magnetic field creates voltage across the furnace and sends an electric current through the metal. This melting procedure requires cleaner scrap material than other methods but allows precise metallurgical adjustments.

   v. Crucible furnaces (not shown in illustrations 5-3.1 or 5-3.2) melt small amounts of nonferrous metals in a refractory-lined container that is heated in a gas-fired furnace. The molten metal is removed with a ladle or by tipping the crucible.

4. Shakeout, cooling, and handling. Foundries, using sand molding and core making techniques, cool the mold and separate the sand from the metal casting by placing the hot mold on a vibrating grid or conveyor that shakes off the sand.

5. Quenching, finishing, cleaning, and coating. Risers, runners, and sprues of the molding system are removed, the casting is ground and sand blasted, cleaned with solvents and/or acid pickling, and coated with paint or resins or by plating to inhibit oxidation.

### Illustration 5-3.1. Sectional Views of Melting Furnaces[141]



**Cupola**



**Electric Indirect-Arc**



**Induction**

Source: American Foundrymen's Society, 1989

---

[141] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 32.

**Illustration 5-3.2. Sectional Views of Melting Furnaces[142]**



Source: American Foundrymen's Society, 1989

## 5.2.2    General Wastes from Metal Fabrication

Waste streams associated with the general operations of a sand molding foundry (shown in Illustration 5-1 above) include the following:

1. Particulates that accumulated in scrubbers and/or bag housed associated with various process steps.

2. Sand and metal solid waste associated with making a mold and during its use to make a casting.

3. Metal melting generates spent refractory (heat resistant liners in the furnace) and slag. Slag constitutes impurities in the metal, generally metal oxides, that accumulate at the surface of molten metals.

4. Cutting off of metals from casting risers and sprues produces scrap metal, spent tools, and abrasives.

5. Cleaning, finishing, and coating results in aqueous sludge containing solvents or oil and spent solvents, abrasives, and metal particles.

6. Off-spec castings and packaging material is generated during inspection and shipping.

Production of iron and steel generates slag waste on the surface of the molten metal. This material includes heavy metals such as oxides of manganese, chromium, nickel, or cobalt,

---

[142]US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 32.

sulfur, and phosphorous impurities. Particulate emissions that are controlled in baghouses generally contain zinc, lead, and cadmium impurities.[143]

Foundry sands and baghouse dust are large contributors to waste during casting. These materials generally include:

1. Heavy metals that are present in iron and steel raw materials, and

2. Heavy metals that are added as alloying agents to improve the properties of the metal to meet desired functions.

Bag house dust and sand from molds constitute the largest amount of waste from the casting industry. Foundry sand represents about 65-90 % of solid waste from foundries.[144] These wastes generally contain heavy metals characteristic of the metal components that were melted and of the sand binders. Alloys of steel provide desired properties to the machinery parts, such as strength and corrosion-, wear-, and thermal-resistance. Many elements are used to provide desired alloys. Some of these elements are: manganese, silicon, aluminum, nickel, chromium, cobalt, copper, lead, selenium, molybdenum, vanadium, tungsten, tin, zinc, and zirconium.[145] Common metal impurities in waste foundry sand are manganese, zinc, chromium, lead, cadmium, and nickel.[146] Eleven foundry sands consisting of three green sands, three sands with furan/acid binders, four sands using phenolic/ester binders, and one sodium silicate bound sand were analyzed. The green sand samples contained 9-29 mg/kg of PAH (30 % naphthalene) and about 7 mg/kg free phenol.[147]

Organic impurities in waste sand generally comprise trichloroethane (TCA), methanol, xylenes, polyaromatic (polycyclic) hydrocarbons (PAHs), and phenols.[148] These chemicals arise from mold release agents, cleaning fluids, residual binders, or from conversion of organic compounds at high temperatures. Baghouse materials generally contain heavy metals representative of various iron and steel impurities and of alloying metals.[149]

Foundry sand can be recycled internally but generate fines that first must be purged from the system. About 10 % of spent foundry sands were recycled externally if the materials passed leaching criteria established by EPA and the states.[150] Table 5-1 summarizes leachate concentrations found by testing sand and the allowable leachate concentrations in Ohio for use

---

[143] US EPA. 1995. *Profile of the Iron and Steel Industry*. September. pg. 17-21, 24, and 30-32.

[144] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 42.

[145] Hayward, Carle R. 1952. *An Outline of Metallurgical Practice*. June. pg. 141, 523, 627-628.

[146] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 41-42.

[147] Ji, S., et al. 2000. *The Toxic Compounds and Leaching Characteristics of Spent Foundry Wastes*. November 15. pg. 350-351, 357.

[148] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 45.

[149] US EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry*. November 18. pg. 41-42.

[150] US EPA. 2002. *Beneficial Reuse of Foundry Sand: A Review of State Practices and Regulations*. December. pg. 13, 32.

Expert Report of Jeffrey V. Dagdigian, PhD                                         Waterstone Environmental, Inc.

Hobart Corporation. vs. Dayton Power and Light Company          33                           Project: 24-103

of foundry sands for structural fill and backfill.[151] These compositions are illustrative of impurities in waste foundry sands.

**Table 5-1. Leachate Concentrations in Green Sands and Maximum Allowable Leachate (TCLP) Concentrations for Reuse of Foundry Sand in Ohio (in milligrams per liter [mg/L])**

| Pollutant | Green Sand Leachate[152] | Maximum Allowable Leachate Conc. for Reuse in Ohio[153] |
|---|---|---|
| Arsenic | 0.02 | 1.0 |
| Barium | 0.2 | 40 |
| Cadmium | 0.1 | 0.1 |
| Chromium | 0.13 | 2.0 |
| Lead | 0.06 | 1.0 |
| Mercury (µg/L) | 0.16 | 0.04 |
| Selenium | 0.015 | 1.00 |
| Copper | 83 | --- |
| Zinc | 0.13 | --- |
| Phenol | 7.3 | 7.0 |
| Benzene | --- | 1.0 |

Forming and cutting of metal during machining operations uses cutting (cooling) fluids such as oils, aqueous oil emulsions, ethylene glycol, and cleaning solvents. Typical solid wastes generated during this operation include metal chips, metal-bearing cutting fluid sludge, and solvent sludge, all of which generally contain heavy metals. Examples of cleaning fluids used in machining operations include Stoddard solvent, toluene, xylene, acetone, and trichloroethane (TCA). Also, acids and bases are used to prepare metal surfaces.[154]

Surface finishing options include plating, galvanizing (zinc), and painting. Plating generates wastes that contain acids, cyanides, and the metals that are being plated.[155] US EPA focused on these wastes very early because disposal of them in sewers was decreasing the effectiveness of the municipal activated sludge treatment plants.[156,157] Painting waste generally includes paint solvent, such as MEK, acetone, toluene, xylene, and heavy metal-containing sludge.[158]

---

[151] US EPA. 2002. *Beneficial Reuse of Foundry Sand: A Review of State Practices and Regulations*. December. pg. 24.

[152] Ji, S., et al. 2000. *The Toxic Compounds and Leaching Characteristics of Spent Foundry Wastes*. November 15. pg. 357, 362.

[153] US EPA. 2002. *Beneficial Reuse of Foundry Sand: A Review of State Practices and Regulations*. December. pg. 24.

[154] US EPA. 1995. *Profile of the Fabricated Metal Products Industry*. September. pg. 13-16, 22-25.

[155] US EPA. 1995. *Profile of the Fabricated Metal Products Industry*. September. pg. 17-20, 27-28.

[156] US EPA. 1974. *Development Document for Effluent Limitation Guidelines and New Source Performance Standards for the Copper, Nickel, Chromium, and Zinc Segment of the Electroplating Point Source Category*.

[157] US EPA. 1975. *Reclamation of Metal Values from Metal Finishing Waste Treatment Sludges*.

[158] US EPA. 1995. *Profile of the Fabricated Metal Products Industry*. September. pg. 20, 22, 25 and 28.

## 5.3    Waste from NCR Operations

Wastes generated by NCR include the following:

1. Foundry sands and slag, mold release agents.[159,160]

2. Grindings, shavings, and metal chips.[161]

3. Cutting fluids used during machining. About 8,000 gal of contaminated oil and water were disposed by IWD (Industrial Waste Disposal) in the mid-1970s.[162,163] Some NCR cutting fluids contained PCBs.[164]

4. Degreasing fluids. NCR process specifications of the 1960s required degreasing of steel before any finishing steps such as plating, painting, surface treatment, brazing, heat treating, or inspection.[165] Trichloroethene (TCE), one of the primary degreasers, was recycled by distillation.[166] Residues were drained into drums for disposal.[167] Other metal cleaners used were xylol, naphtha, carbon tetrachloride, 1,1,1-TCA and Stoddard solvent.[168,169,170] Used registers were cleaned with TCE and Stoddard solvent. Residues from this cleaning operation also were drained into a disposal drum.[171]

5. Plating wastes. In the 1950s to mid-1960s, C. Lowe transported metal plating wastes, a grey sludge, in 25-gal drums on a daily basis. These wastes may have been acidic and contained chromium and cyanide.[172,173] A 1969 process specification describes disposal of plating solutions, with the exception of cyanide solutions, through storm sewers. These solutions included cleaners, acids, and stripping baths.[174] In 1976, IWD disposed of about 22,500 gallons of plating wastes and in 1977, IWD disposed of 5 drums of zinc plating solution with cyanide.[175,176]

6. Paint wastes. Finishing of metal parts by painting in paint spray booths included zinc phosphate and aluminum chromate primer, methylene chloride, toluene, paint thinner,

---

[159] Gregory, Earl. 2017. *Deposition of Earl Gregory*. May 3. pg. 67-69.

[160] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 35-37. (SDD3_00021570-SDD3_00021571).

[161] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 28, 53-54. (SDD3_00021573).

[162] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. pg. 140.

[163] IWD. 1977. *Invoice #556*. February 28. (SDD3_00023505).

[164] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 132-133. (SDD3_00021575).

[165] NCR. 1966. *Process Specification: Trichloroethylene Degreasing*. June 15. pg. 1. (SDD3_00037394).

[166] NCR. 1993. *NCR Response to US EPA Information Request*. May 21. pg. 2. (SDD3_00021584).

[167] NCR. 1966. *Process Specification: Trichloroethylene Degreasing*. June 15. pg. 2. (SDD3_00037395).

[168] NCR. 1965. *Process Specification: Type and Platen Cleaner*. February 3. (SDD3_00105209).

[169] NCR. 1958. *Process Specification: Type and Platen Cleaner*. February 19. (SDD3_00105224).

[170] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. pg. 108-109.

[171] NCR. 1970. *Process Specification: Ultrasonic Cleaning on Used Registers and Assemblies*. July 15. pg. 1-3. (SDD3_00037390-SDD3_00037392).

[172] US EPA. 2005. *Investigative Activity Report*. May 18. pg. 7-8. (WMO_32128-WMO_32129).

[173] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. pg. 109.

[174] NCR. 1969. *Process Specification: Disposal of Materials Through Storm Sewers*. June 4. (SDD3_00037396-SDD3_00037400).

[175] IWD. 1976. *Invoice #400*. November 30. (SDD3_00023503).

[176] IWD. 1977. *Invoice #1299*. December 31. (SDD3_00023512).

---

and Stoddard solvents. Painting operations also utilized methylene chloride, toluene, paint thinners and Stoddard solvents.[177,178]

7. Motor oils from automobiles.[179]

8. Laboratory and Pilot Plant Wastes. Laboratories and pilot plants use a large number of chemicals and generate relatively small amounts of waste. Toluene and tetrachloroethylene were used extensively in NCR's encapsulation research.[180]

9. Wastes from Encapsulating Emulsion Development and Manufacturing. NCR developed and manufactured microsphere emulsions containing PCB between about 1954 and 1972. Wastes include paper scraps and trimmings coated in the Aroclor 1242-containing emulsions.[181,182,183]

10. Ludox and Barrels of Cement.[184] Ludox is colloidal silica.

11. Wood waste, chips, sawdust, and pallets.[185,186]

## 5.4   NCR Waste Stream Information

Our review of the record in this case provided to us includes the following descriptions of wastes purportedly associated with NCR:

➢ Foundry cores, oily metal shavings, and scrap materials from cash registers.[187,188,189,190]

➢ Plastic and metal cash register parts.[191,192]

➢ Drummed plating wastes described as a grey sludge-like material containing acids and cyanide.[193]

---

[177] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. pg. 113-114.

[178] NCR. 1993. *NCR Response to US EPA Information Request*. May 21. pg. 3. (SDD3_00021585).

[179] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 44. (SDD3_00021572).

[180] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. (Exhibit 9/SDD3_00037874- SDD3_00037875, SDD3_00037879-SDD3_00037881).

[181] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 128-131. (SDD3_00021574).

[182] Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19. (Exhibit 10/SDD3_00042969-SDD3_00042981).

[183] https://www.sec.gov/Archives/edgar/data/41719/000095012309071858/w76659exv99w1.htm#:~:text=A%20key %20component%20of%20NCR%20paper%20was,a%20solvent%20manufactured%20by%20the%20Monsanto% 20Corporation.

[184] NCR. 1993. *NCR Response to US EPA Information Request*. May 21. pg. 8 (SDD3_00021590).

[185] US EPA. 2005. *Investigative Activity Report*. May 18. pg. 9. (WMO_32130).

[186] Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13. pg. 33-34. (SDD3_00021570).

[187] NCR. 2003. *Response of NCR Corporation to the United States Environmental Protection Information Request*. March 18. (SDD_01399-SDD_01400).

[188] Boesch Jr., Horace John. 2006. *Deposition of Horace John Boesch Jr*. February 28. pg. 47, 65-68, and 108-109.

[189] Boesch Jr., Horace John. 2011. *Deposition of Horace John Boesch Jr*. December 1. pg. 20, 60-62, 67-68, 93-95, and 129-134.

[190] Boesch Jr., Horace John. 2005. *Affidavit of Horace John Boesch Jr*. August 25.

[191] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 17. pg. 413-415, 566, and 640.

[192] Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24. pg. 11, 249-251.

[193] US EPA. 2005. *Investigative Activity Report*. May 23. pg. 7-8. (WMO_32128-WMO_32129).

---

> ➢ Half-full 55-gallon drums of plating wastes.[194,195]

## 5.5    Opinions Regarding NCR

***NCR Opinion 1***.  Wastes generated by NCR included foundry sands and foundry sand waste. These wastes contained the hazardous substances PAHs and a range of heavy metals such as manganese, chromium, copper, zinc, lead, cadmium, and nickel.

***NCR Opinion 2***.  Wastes generated by NCR included machining wastes including cooling oils, lubricating oils, paint residues, and degreasing residues.  These wastes contained hazardous substances MEK, xylene, toluene, methylene chloride, carbon tetrachloride, Stoddard solvent, tetrachloroethylene, trichloroethylene, and a range of heavy metals.  It is likely that some of the cutting oils also contained PCBs.

***NCR Opinion 3***.  Wastes generated by NCR included plating wastes containing hazardous substances chromium, zinc, copper, nickel, and cyanide salts.

***NCR Opinion 4***.  Wastes generated by NCR included laboratory, pilot plant, and encapsulant manufacturing waste. These wastes contained the hazardous substances toluene, tetrachloroethylene, and PCB.

***NCR Opinion 5***.  NCR generated wood waste.

***NCR Opinion 6***. It is my opinion that wastes generated by NCR would have contained hazardous substances, based on the probable composition of NCR's waste and the relevant data and analyses available.

---

[194] US EPA. 2005. *Investigative Activity Report.* May 23. pg. 9. (WMO_32130).
[195] NASS. 2005. *Summary of Investigation*. May 23. pg. 9. (SDD3_00157814).

# Section 6
# Dayton-Walther Corporation

I was asked by LSSH to evaluate whether Kelsey-Hayes Company's predecessor, Dayton-Walther Corporation (Dayton-Walther) generated waste containing hazardous substances during the period of SDD's operation. In developing my opinions, I have reviewed documents provided by LSSH and evaluated Dayton-Walther operations. I have identified wastes produced by Dayton-Walther and evaluated whether these may have contained hazardous substances.

## 6.1    Dayton-Walther Operations

Dayton-Walther Corporation, the predecessor of the Kelsey-Hayes Company, operated three facilities in the Dayton, Ohio area during SDD's operation:

1. **Dayton Steel Foundry** - A cast steel foundry and two machine shops at 1366 Miami Chapel Road, sometimes referred to as "The Dayton Steel Foundry," which produced castings for heavy-duty component parts such as brake drums and wheels. Prior to the facility's closing in 1981 or 1983, the foundry contained one molding machine, lines where cores were poured, cooling equipment, a shakeout room, a cleaning room and two electric furnaces. The two machine shops contained cutting machines (Multimatics), drill presses, and lathes (Bullards). The facility then reopened in 1985 or 1986 as "Dayton Casting Center." It had the same physical location, but the mailing address was changed to 1261 Morris Avenue. The foundry was substantially the same, but it changed from a cast steel foundry to a ductile iron foundry. The machine shops were also closed and the one closest to the foundry was converted into a warehouse. The other was leased to Mayo Industries.[196]

   According to Mr. John L. Wantz, who worked for Dayton-Walther from 1956 to 2000, the machine shop machined and finished the assembly of truck wheels and brake drums. After the machine shop was reopened, production included cast axles for trucks and trailer wheels with ductile iron instead of steel.[197] Foundry operations included molding and sand casting of truck wheels. Steel was poured into a sand mold by a ladle, picked up and put onto a conveyor belt, where the newly formed wheels would be shaken to remove sand from the wheel.

2. **Office Building** - A three-story office building at 2800 East River Road, which contained offices and a test laboratory, but no production processes.[198]

3. **Moraine Manufacturing Plant** - A manufacturing plant and machine shop at 2490 Arbor Boulevard, in Moraine, which contained Multimatics, drill presses, assembly

---

[196] *Summary of Information Available to Kelsey Hayes re Dayton Walther Facilities.* (SDD_00744-SDD_00746).
[197] Wantz, John L. 2017. *Deposition of John L. Wantz.* March 21. pg. 11-18, 21-24.
[198] *Summary of Information Available to Kelsey Hayes re Dayton Walther Facilities.* (SDD_00745-SDD_00746).

lines, and painting operations.[199] Operations consisted of machining and assembling wheels and brake drums, as well as disc brakes for heavy vehicles. Materials for machining came from the 1366 Miami Chapel foundry and a Carrolton, Kentucky plant.[200]

## 6.2 General Operations in The Fabricated Metal Industry

See information regarding general operations in the Fabricated Metal Industry provided in Section 4.2.

### 6.2.1 General Metal Casting Process

See information regarding wastes generated during metal fabrication provided in Section 5.2.1.

### 6.2.2 General Wastes from Metal Fabrication

See information regarding the general types of wastes generated during metal fabrication provided in Section 5.2.2.

## 6.3 Waste from Dayton-Walther Operations

Waste generated at the Dayton Steel Foundry and the Moraine Manufacturing Plant are described below.

### *Dayton Steel Foundry*

The following waste streams were produced from operations at the Dayton Steel Foundry:

➢ **Collection dust from foundry operations at the Dayton Plant** - Mr. Wantz testified that the foundry disposed of dust from two dust collectors. The Mikropul dust collector contained dust and smoke produced from the electric furnaces during the metal melting process in the foundry. Additionally, a Pangborn dust collector contained dust from the cleaning room and deposited it into hoppers.[201] These hoppers would be dumped approximately once a day.[202]

➢ **Sludge or wet dust -** Dust was also collected through wet dust collectors, where it would be mixed with water to create a sludge. This sludge was temporarily dumped into a tank and then stored in a pond behind the foundry at Dayton Plant.[203]

➢ **Foundry sand –** For production of wheels at the plant, steel was ladled into a mold comprised of sand then placed on a conveyor belt. While on the conveyor belt, the newly formed wheel was shaken to remove excess foundry sand. Mr. Wantz believed that this

---

[199] *Summary of Information Available to Kelsey Hayes re Dayton Walther Facilities.* (SDD_00745-SDD_00746).
[200] Wantz, John L. 2017. *Deposition of John L. Wantz.* March 21. pg. 27-28.
[201] Wantz, John L. 2017. *Deposition of John L. Wantz.* March 21. pg. 43.
[202] Wantz, John L. 2017. *Deposition of John L. Wantz.* March 21. pg. 56.
[203] Wantz, John L. 2017. *Deposition of John L. Wantz.* March 21. pg. 57-59.

excess sand could have been reused in the foundry to produce additional wheels, or it could have been removed and transported to an offsite collection facility for disposal.[204] Mr. Wantz was under the impression that any sand from the foundry cores was also included in this waste stream.[205]

➢ **Slag from metal melting** – During the metal melting process, impurities rise to the top of the molten metal. The combination of these impurities, also known as slag, is a complex mixture of metallic oxides and silicates, as well as various metallic precipitations.[206,207,208] At the foundry, slag would be scraped off the top and allowed to cool and harden.[209,210] Dayton-Walther would then self-haul the foundry slag offsite for disposal.

➢ **Drummed waste from Isecure core drying process** – For each wheel forged at the Dayton Steel Foundry, there was a center portion of compacted sand, referred to as a foundry core, that the wheel was cast around to form the interior cavity. Historically, these foundry cores were dried with heat, but at some point, the Foundry switched to the Isecure core-drying process. According to Mr. Wantz, there were several machines at the foundry that produced these cores. This process generated a thick, grayish-black "gummy-type" substance" that was stored in 55-gallon drums. Mr. Wantz testified that he witnessed Dayton Foundry employees loading these drums into oversized drums and then into a semitrailer, but he had no further information about the process. After the Foundry reopened as the Dayton Casting Center in 1985 or 1986, foundry cores were no longer produced for operations according to Mr. Wantz.[211]

➢ **Waste coolant oil** – In the machine shop at the plant, there was a central cooling system as well as individual reservoirs in the machines that contained coolant oil that was sprayed onto parts during machining. Mr. Wantz recalled at least one instance where a large tanker truck drained the central cooling system of oil before it was replaced with new oil. He believed that this process was done approximately once a year and that waste coolant oil may have been generated.[212,213]

➢ **Cardboard and paper waste** was generated from assembly line operations at Dayton Plant.[214]

---

[204] Wantz, John L. 2017. *Deposition of John L. Wantz*. March 21. pg. 43-44, 208-209.
[205] Wantz, John L. 2017. *Deposition of John L. Wantz*. March 21. pg. 66-72.
[206] https://www.fhwa.dot.gov/publications/research/infrastructure/structures/97148/ssa1.cfm
[207] https://www.ussteel.com/documents/40705/43680/Steel+Furnace+Slag+SDS.pdf/3f037514-93f2-ce78-2ced-819c3e607670?t=1611015378743
[208] Jonczy, I. 2014. *Diversification of Phase Composition of Metallurgical Wastes after the Production of Cast Iron and Cast Steel*. pg. 481-484.
[209] Wantz, John L. 2017. *Deposition of John L. Wantz*. March 21. pg. 92-95.
[210] *Summary of Information Available to Kelsey Hayes re Dayton Walther Facilities*. (SDD_00745-SDD_00746).
[211] Wantz, John L. 2017. *Deposition of John L. Wantz*. March 21. pg. 73-77, 105.
[212] Wantz, John L. 2017. *Deposition of John L. Wantz*. March 21. pg. 85-89.
[213] *Summary of Information Available to Kelsey Hayes re Dayton Walther Facilities*. (SDD_00745-SDD_00746).
[214] Wantz, John L. 2017. *Deposition of John L. Wantz*. March 21. pg. 41.

## *Moraine Manufacturing Plant*

The following waste streams were produced from operations at the Moraine Manufacturing Plant:

➢ **Metal shavings from machine shop operation** – Metal shavings, also called borings or cuttings, are the residual metals remaining after a part is machined down to the correct size. As such, metal shavings are composed of the same material as the rest of the part.[215] According to Mr. Michael S. Turner, who worked for Dayton-Walther for 35 years, there were approximately 29 machines creating shavings, and machined parts at the Moraine facility were made of different types of metal, including cast steel, cast iron, and nodular/ductile iron. From 1965 until their closure in 2000, gray iron brake drums were also machined at the Moraine facility. Spoke wheels composed of cast steel from the Dayton Foundry were sent to be cut at the Moraine Facility from approximately 1965 to 1986. After 1986, ductile iron wheels were sent to the facility for machining.[216]

Shavings were collected from each machine via a conveyor belt and then deposited into a hopper. Shavings would be slightly damp from cutting fluid comprised of oil and water. Each hopper was roughly 4 ft. x 4 ft. x 3 ft, and approximately two hoppers could be filled with shavings in one 8-hour period from one machine. Hoppers were said to be transported via trucks back to the Portsmouth or Dayton foundries or to a scrap yard such as First Street Recycling or Franklin Iron & Metal in Dayton.[217]

➢ **Hydraulic Oil –** Hydraulic oil was used under pressure in each machine to lubricate the internal mechanisms such as bearings, gears, and pumps. Each Mulitmatic machine contained an approximately 150-gallon internal sump to store the hydraulic oil and would lose around 1 gallon of oil per month. Other machines in the shop such as the Motch or CNC generally used less oil, approximately 35 to 40 gallons.[218] Mr. Turner testified that every three months or so, the hydraulic oil in a machine would become contaminated with cutting oil and need to be cleaned out. The contaminated hydraulic oil would be pumped into a 300- or 400-gallon tank where it would be left to sit. After some time, the cutting oil would separate from the hydraulic oil due to differing densities, and the latter could be drained and reused in the machines.[219] In addition, hydraulic oil would sometimes drain into two subsurface pits in the facility, one connected to the brake drum department and another from the rotor area and wheel department. Both pits contained a pump that transferred fluid into a 5,000-gallon plastic tank located outside of the facility, which would be periodically emptied by Perma-Fix, a waste treatment management service.[220]

➢ **Coolant oil and cutting fluid from the machine shops –** A mixture of oil and water was applied to parts during machining at the Moraine facility. Each machine had its own sump of approximately 200 gallons of cutting fluid, and excess fluid would run off the metal shavings and down the conveyor back into the sump. Cutting fluid would be depleted from the sump as it evaporated during the cutting process or was absorbed into cuttings

[215] Turner, Michael S. 2017. *Deposition of Michael S. Turner*. June 13. pg. 57.
[216] Turner, Michael S. 2017. *Deposition of Michael S. Turner*. June 13. pg. 57-62.
[217] Turner, Michael S. 2017. *Deposition of Michael S. Turner*. June 13. pg. 62-79, 138, and 143.
[218] Turner, Michael S. 2017. *Deposition of Michael S. Turner*. June 13. pg. 83-86.
[219] Turner, Michael S. 2017. *Deposition of Michael S. Turner*. June 13. pg. 65-89.
[220] Turner, Michael S. 2017. *Deposition of Michael S. Turner*. June 13. pg. 93-96.

and castings. Mr. Turner testified that approximately 1,500 gallons of cutting fluid were used at the facility each day.[221] As described above, cutting oil would occasionally get into the hydraulic oil sump in the machines. After the cutting oil was separated from the hydraulic oil, the contaminated cutting oil was pumped into the 5,000-gallon plastic tank located outside of the facility. Similar to hydraulic oil, cutting oil would occasionally drain into the two pits in the facility before being pumped to the 5,000-gallon tank. This tank would be periodically emptied for recycling by Perma-Fix.[222]

➢ **Way lube -** Way lube was used to lubricate the travel of the heads on the Multimatic machines. Mr. Turner testified that the Moraine facility would typically purchase one 55-gallon drum of No. 210 way lube from Allegheny Petroleum in Pennsylvania, and it would last approximately one to two months.[223] The Moraine facility briefly purchased way lube from Unocal Refining as well, and a 1990 material safety data sheet (MSDS) shows that the way lube contained solvent dewaxed residual oil and heavy paraffins.[224] Minimal amounts of way lube would run down the rails of the machine and drain into the subsurface pits in the facility. Liquid from these pits would be pumped to the 5,000-gallon outdoor tank and periodically emptied by Perma-Fix.[225]

➢ **Gear lube –** Gear lube was used at the facility to lubricate the gear boxes of the conveyor belts. Approximately eight to ten ounces of gear lube would be used per gear box, so one 55-gallon drum of gear lube could last around ten years. Each gear box had a seal that could be replaced in the event of a leak.[226]

➢ **Paint filters and paint sludge -** The Moraine facility had five paint booths with hoods and air blowers used to paint parts. Some of the booths had waterfalls, while others had fiberglass mesh screens with filters that would catch any overspray. Filters would be disposed of as regular trash and hauled off by Rumpke. Historically, the facility used oil-based paint and then eventually switched to a water-based paint. These paints were composed of various solvents such as toluene, xylene, and Hi Sol 10 (naphtha).[227,228] Paint was purchased and stored in 300-gallon totes before use. In the paint booths with waterfalls, paint would collect in the bottom of the tank.[229] This sludge was scraped out from the paint booth and collected in drums before being hauled off by Perma-Fix. Approximately two or three barrels would be disposed of every six months.[230] A Perma-Fix waste profile for water-based paint sludge from Dayton Walther included a total halogens concentration of 2,573 ppm. Specifications for two paints used at the facility were provided in a 1983 report on painting operations and worker exposure. The first was a red oxide primer that contained red oxide, calcium carbonate, magnesium silicate, alkyd resin, aromatic naphtha and other driers and additives. Specifications for a non-leafing

---

[221] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 64-74.

[222] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 88-89.

[223] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 96-99.

[224] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 206-207 and Exhibit 25.

[225] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 93-98.

[226] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 99-101.

[227] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. Exhibit 30.

[228] https://www.univarsolutions.com/documents/file/view/code/sds_file/id/20496/?srsltid=AfmBOoo4xeNpt8jEX8G vpr0I1sxPWsvjSXW46J42fdh3Hhy3YHGhXL__

[229] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 101-106, 156, and 234-236.

[230] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 113-116, and 140-141.

aluminum paint containing aluminum paste, alkyd resin, solvents, and driers and stabilizers were also provided.[231]

➢ **"Pit or washer sludge"** - When the maintenance department of the Moraine facility pressure-washed a part, wastewater and sludge would fall into a drain or onto the floor of the maintenance area before draining into a pit. Once the pit was full, the sludge would be dug out and put into a 55-gallon drum. Perma-Fix would haul off this waste approximately once a year.[232] Sludge would also accumulate in the pits from various sediments being tracked into the facility. Rust Industrial would pump the sludge out of the pit and take it to Perma-Fix for disposal.[233] A Perma-Fix waste profile for washer sludge consisting of 60% oil and 40% water from Dayton Walther showed detections of various metals such as silver, cadmium, chromium, copper, iron, zinc, lead, nickel and silicon.[234] The profile also included a total halogens concentration of 425 ppm.

➢ **Degreasing solvents -** The Moraine facility also used a 5-gallon solvent tank in the maintenance area to clean various parts such as gear boxes and bearings. Safety-Kleen provided both the tank and the solvent, which used mineral spirits. The system was self-contained, and the same solvent would be reused until the tank became too dirty. Once this happened, Safety-Kleen would visit the facility to take the dirty solvent and replenish the tank with new solvent.[235] Workers at the Moraine facility would also use handheld spray cans of brake cleaner from Castle Products to clean miscellaneous parts. A 1986 MSDS shows that cans of brake cleaner contained perchloroethylene, also called tetrachloroethylene, and 1,1,1-trichloroethane (1,1,1-TCA).[236]

➢ **Wash water –** Operations at the Moraine facility also included sending parts through a washer before painting. According to Mr. Turner, parts went through a large cabinet containing 200 to 250 gallons of hot water and were sprayed by nozzles for cleaning. Mr. Turner believed that this wash water would also drain into the 5,000-gallon plastic tank outside the facility.[237]

➢ **Wooden pallets and office trash -** Occasionally, broken pieces of wood from pallets or separators would be combined with regular office trash.[238]

## 6.4    Dayton-Walther Waste Stream Information

Our review of the record in this case provided to us includes the following descriptions of wastes purportedly associated with Dayton-Walther:

➢    Foundry sand.[239]

---

[231] Pollution Control Science, Inc. 1983. *Report on NAPTHA Sampling.* July 25. Appendix A. (TURNER_002150-002153).

[232] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 105-106, 113-115.

[233] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 116-118, 223-229.

[234] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 202-204 and Exhibit 11.

[235] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 118-121.

[236] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 202-204 and Exhibit 23.

[237] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 151-153.

[238] Turner, Michael S. 2017. *Deposition of Michael S. Turner.* June 13. pg. 121-122.

[239] Wantz, John L. 2017. *Deposition of John L. Wantz.* March 21. pg. 44-50.

➢ Foundry cores.[240,241,242,243,244,245]

➢ Approximately three or four cubic yards of foundry sand that was usually dry and brownish in color, and it would still be in its form at times. Loads of foundry sand would occasionally include a bad casting made of iron.[246]

➢ Drums of sludge.[247,248]

➢ Burnt cast iron or steel.[249]

➢ Metal products including "wheel stuff."[250]

➢ Oily lathe turnings and cast iron metal scraps from brake drums.[251]

➢ Slag and sand.[252]

## 6.5    Opinions Regarding Dayton-Walther

**Dayton Walther Opinion 1.** Dayton Walther generated foundry slag and sand waste. These wastes contained hazardous substances, PAHs and a range of heavy metals such as manganese, chromium, zinc, lead, cadmium, and nickel.

**Dayton Walther Opinion 2.** Dayton-Walther generated machining wastes including cooling oils and lubricating oils; these wastes contained hazardous substances including a range of heavy metals. Dayton-Walther also generated paint residues; this waste contained hazardous substances MEK, xylene, and toluene. Dayton-Walther also generated degreasing residues from metal parts cleaning; these wastes contained hazardous substances tetrachloroethylene and 1,1,1-trichloroethane.

**Dayton Walther Opinion 3.** It is my opinion that wastes generated by Dayton-Walther would have contained hazardous substances, based on the probable composition of Dayton-Walther's waste and the relevant data and analyses available.

---

[240] Boesch, Jr., Horace John. 2006. *Deposition of Horace John Boesch, Junior*. February 28. pg. 47, 72.
[241] Boesch, Jr., Horace John. 2005. *Affidavit of Horace J. Boesch, Junior*. August 25. pg. 1. (SDD_00381).
[242] Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1. pg. 85.
[243] Boesch, Jr., Horace John. 2014. *Deposition of Horace John Boesch, Junior*. October 23. pg. 85, 106.
[244] Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1. pg. 142-150, 173-174.
[245] Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24. pg. 253.
[246] Grillot, David A. 2014. *Deposition of David A. Grillot*. May 28. pg. 232-233, 249.
[247] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17. pg. 79.
[248] Wendling, Michael A. 2014. *Deposition of Michael A. Wendling*. April 23. pg. 111-113.
[249] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17. pg. 120-122.
[250] Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24. pg. 228-229, 233.
[251] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 44.
[252] Davis, Ray. 1987. *Sworn Statement of Ray Davis*. May 1. pg. 39-40.

# Section 7.0
# Dayton Power & Light

I was asked by LSSH to evaluate whether Dayton Power & Light (DPL) generated waste containing hazardous substances during the period of SDD's operation.  In developing my opinions, I have reviewed documents provided by LSSH and evaluated DPL operations. I have identified wastes produced by DPL and evaluated whether these may have contained hazardous substances.

## 7.1    DPL Operations

DPL was established in 1911 and provided all of Dayton's electric service. In 1925, DPL became a full-service gas, electric, steam and water utility through its acquisition of the Dayton Gas Company and following purchase of the Wilmington Water Company in 1914.[253] DPL operated two electric generating stations, two steam stations, and a service center within 50 miles of the Site. The Frank M. Tait Station, an electric generating station, was in operation as early as 1937.[254] The O.H Hutchings Station, an electric generating station, began construction in 1946 and was located 10 miles south of Dayton. The electric generating stations burned coal to generate steam to drive turbines and generate electricity.[255]

The Longworth Steam Station was built in 1930 and ceased operations in 1994.[256] The Third Street Steam Station was in operation as early as 1966. The steam stations burned coal to provide steam for heating Dayton businesses.[257]

DPL had a major service center across the street from the SDD located at 1900 Dryden Road. The Dryden Road Service Center provided parts and purchasing functions (Stores) and headquarters for the electrical, gas, steam maintenance, and construction service groups that were based there. A transformer repair shop with an oil storage house and a paint booth; a meter repair shop; and an automotive repair shop with two paint booths also were located at the Service Center. Waste disposal was the responsibility of the Stores department or the transportation department.[258]

### 7.1.1    DPL Steam and Power Generation

DPL began using pulverized coal around 1937. The Tait Station had two boilers which used coal. In 1948, the Hutchings Station was built and pulverized coal firing was used exclusively. By 1960, both stations were using powdered coal as a fuel.[259] According to DPL in 1961, the

[253] Dayton Daily News. 2011. *A Brief History of DP&L.* April 20.
[254] The Dayton Power and Light Company. 1964. *A Ten Million Ton Problem*. September. pg. 6. (SDD3_00031324).
[255] Dayton Daily News. 2011. *A Brief History of DP&L.* April 20.
[256] Walsh, Andrew. 2023. *The Longworth Steam Plant: Dayton's Lost Medieval Castle.* December 1.
[257] *DP&L Cinders used in Blockmaking*. pg. 1. (SDD3_031320).
[258] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 36, 58, and 73.
[259] The Dayton Power and Light Company. 1964. *A Ten Million Ton Problem*. September. pg. 6. (SDD3_00031324).

Peabody Coal Mine, located 125 miles east of Dayton, furnished DPL 500,000 tons of coal annually. This was a large portion of the 1.3 million tons of coal used annually at the two generating stations.[260] In 1966, the Tait and Hutchings Stations burned about 2 million tons and the two steam plants, Longworth and Third Street, burned 138,000 tons of coal.[261]

In 1974, DPL burned about 1.8 million tons of coal at its four electric generating stations.[262] DPL used coal from the Appalachian basin of Ohio and West Virginia.[263,264]

### 7.1.2   DPL Transformer Repair Shop

DPL transformers from substations and the pole distribution network were brought to the repair shop at the Dryden Service Center. Willie Hardy Jr. started working for DPL at the Service Center in 1957 as a janitor and then in electric construction until 1991.[265] James E. Tharpe began working for DPL in 1963 to 2004 as a garageman and mechanic.[266] Hardy and Tharpe recalled the operations at the transformer repair shop within the Service Center. The transformer repair shop repaired malfunctioning transformers brought in by service crews, cleaned contaminated transformer fluids, and re-filled transformers with reclaimed transformer fluids from an oil storage tank. The transformer shop was located within the service building. Hardy explained that the oil from the transformers was pumped into tankers and then taken to the oil house where it was hosed into an underground tank. The oil of all the transformers was cleaned and stored at the oil house. New transformers were checked and numbered prior to use.[267,268]

A paint booth was present in the transformer shop. All transformers were painted in the corner of the shop. Older transformers that were still in good condition would be painted, given new numbers, and reused.[269,270]

### 7.1.3   DPL Electric Maintenance Service

A large number of service technicians for maintenance of the DPL electric grid were headquartered at the Dryden Road Service Center. This group was responsible for building new substations, connecting new residences and businesses, and maintaining the existing power distribution network. This activity involved servicing, replacing, and installing pole transformers. Hardy recalls linemen driving green line trucks, some of which had booms.[271]

---

[260] The Dayton Power and Light Company. 1961. *DP&L's Coal Mine*. June. (SDD3_00067675-00067677).
[261] *DP&L Cinders used in Blockmaking*. pg. 1. (SDD3_031320).
[262] Harris, Henry. 1974. *State Says DP&L Using Dirty Coal*. May 30. pg. 1. (SDD3_031319).
[263] The Dayton Power and Light Company. 1961. *DP&L's Coal Mine*. June. (SDD3_00067675-00067677).
[264] The Dayton Power and Light Company. 1967. *Stuart Station Coal Bought in West Va*. April. (SDD3_00067679).
[265] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 14-17.
[266] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 22, 44.
[267] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 45.
[268] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 69-72.
[269] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 61.
[270] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 71.
[271] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 41.

Pole transformers generally reduce the transmission power to suitable residential (110 volt) power needs and are placed on poles near groupings of customers. Pole transformers are in the range of 10-140 KVA (kilovolt-amperes) and are approximately 3 feet tall with an approximate 1-foot diameter. The amount of oil in these transformers is generally 10-40 gallons. Most pole transformers in North America before 1979 contained mineral oil, but small amounts of transformers in sensitive locations were filled with Askarel, a transformer oil that contains PCBs.[272,273,274,275,276]

### 7.1.4   DPL Garage/Transportation Department

DPL operated an extensive vehicle repair, metalworking, and painting shop at the Dryden Service Center. The garage/transportation department repaired and re-painted cars and trucks. Charlie Fields, who worked at DPL from 1962 and as of 2014 as a janitor and an AC network technician, recalled going to the garage several times for repairs and that a paint booth was present in the garage.[277,278]

General activities of vehicle repair shops include:[279,280]

> ➢ Replacement of automotive fluids such as motor oil, transmission and brake fluid, and coolant,

> ➢ Replacement of non-repairable equipment such as brake shoes and pads, shocks, batteries, belts, mufflers, electrical components, water pumps,

> ➢ Repair of fixable components such as brakes, alternators, fuel pumps, carburetors, and power trains. Repairable equipment generally requires cleaning to remove lubricant and grease.

> ➢ Vehicle body repair and re-painting.

## 7.2   General Operations in Steam and Power Generation

Electric power generation utilities use several technologies to generate electric power. Electric power generating plants in the U.S. generally employ steam turbine.[281]

---

[272] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17. pg. 42-44, 90-91.

[273] Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24. pg. 35, 83-87, and 104.

[274] Boesch, Jr., Horace John. 2006. *Deposition of Horace John Boesch, Junior*. February 28. pg. 38, 40, 125, and 129-130.

[275] Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1. pg. 35 and 36.

[276] Grillot, David A. 2014. *Deposition of David A. Grillot*. May 28. pg. 67, 68, and 163.

[277] Fields, Charles. 2014. *Deposition of Charles Fields*. May 21. pg. 62-64.

[278] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 74.

[279] US EPA. 1991. *Guides to Pollution Prevention: The Automotive Repair Industry*. October. pg. 5.

[280] US EPA. 2003. *Consolidated Screening Checklist for Automotive Repair Facilities Guidebook*. October. pg. 8-24.

[281] US EPA. 1997. *Profile of the Fossil Fuel Electric Power Generation Industry*. September. pg. 11-12, 24.

Electric power generated using steam turbines powered by fossil fuel generally consist of four parts: [282]

> ➢ A combustion system that uses fuel to heat water to produce steam.

> ➢ A steam subsystem in the boilers to deliver steam to a steam turbine.

> ➢ A steam turbine to generate electricity.

> ➢ A condensing system to condense the used steam back to water.

In the absence of a turbine, combustion of fuel can heat water to generate steam for heating use without electricity generation.

When coal is the fossil fuel used, it is pulverized and fed to a boiler's burner assembly. Combustion of the coal generates heat as well as exhaust gases and fly- and bottom-ash wastes. The combustion heat is used to generate steam from treated boiler water. Transfer of the high-temperature, high-pressure steam to the steam turbine drives the turbine blades as the steam rushes to the condenser, in the process losing pressure and temperature. Rotation of the turbine shaft in a magnetic field generates electricity. Typically, steam turbines convert about 35 % of the heat of combustion into electricity. About 10 % of the heat escapes through a stack. The remainder, about 55 %, is discharged with the condenser cooling water.[283,284] General process flow diagrams for coal-fired electricity generation are shown in Illustration 7-1 and 7.2 below.

**Illustration 7-1. Generalized Process Diagram for Steam Turbine Electricity Generation**[285]



---

[282] US EPA. 1997. *Profile of the Fossil Fuel Electric Power Generation Industry*. September. pg. 23 and 24.
[283] US EPA. 1997. *Profile of the Fossil Fuel Electric Power Generation Industry*. September. pg. 24.
[284] WE Energies. 2013. *Coal Combustion Products Utilization Handbook*. pg. 9 and 10.
[285] WE Energies. 2013. *Coal Combustion Products Utilization Handbook*. pg. 13.

**Illustration 7-2. Generalized Process Diagram for Coal-Fired Electricity Generation**[286]



Coal itself is a complex combination of organic matter and inorganic mineral matter formed over eons from successive layers of fallen vegetation. Coal is classified by rank according to its progressive alteration in a natural metamorphosis from lignite to anthracite. Coal rank depends on the volatile matter, fixed carbon, inherent moisture, and oxygen, although no single parameter defines a rank. Typically, coal rank increases as the amount of fixed carbon increases and the amount of volatile matter and moisture decreases.[287]

The bituminous coals, the largest group of coals, are characterized by lower fixed carbon and higher volatile matter than anthracite. Their key distinguishing characteristics relate to volatile

---

[286]WE Energies. 2013. *Coal Combustion Products Utilization Handbook.* pg. 15.
[287] US EPA. 1998. *AP 42, Fifth Edition, Volume I Chapter 1: External Combustion Sources.* September. pg. 1.1-1

matter and sulfur content as well as slagging and agglomerating properties. Sub-bituminous coals have higher moisture and volatile matter and lower sulfur content than bituminous coals. They may be used as an alternative fuel in some boilers originally designed to burn bituminous coals.[288] Table 7-1 below shows the usage of each coal rank by utilities in 1997, along with typical ash content.

### Table 7-1. Ash Content and Fuel Usage by Coal-Fired Utilities[289]

| Total | Ash Content | Utility Usage in 1997 (1,000 tons) | Percent of Total Usage |
|-------|-------------|-------------------------------------|------------------------|
| Anthracite | 4 to 19% | 1,013 | < 1% |
| Bituminous | 3 to 32% | 821,823 | 91% |
| Sub-bituminous | 3 to 16% | | |
| Lignite | 4 to 19% | 77,524 | 9% |
| **Total** | | 900,360 | 100% |

DPL used coals from the Appalachian basin of Ohio and West Virginia.[290,291]

## 7.2.1   General Wastes from Power Generation

Major waste streams associated from fossil fuel power are ash.[292] The amount of ash varies with the coal source, between 3-30 % of coal used for combustion.[293] Minor waste streams arise from water treatment, cleaning, and sludge from drains and sumps.

**Fly Ash.** Fly ash is material carried out of the boiler's burner assembly along with the flue gases.[294,295] Fly ash is removed from the plant exhaust gases primarily by electrostatic precipitators or baghouses and secondarily by scrubber systems. It is a very fine, powdery material, composed mostly of silica. It is generally light tan in color and consists mostly of silt-sized and clay-sized glassy spheres. Its specific gravity is about 2-3 grams per cubic centimeter (g/cc), about 2 tons per cubic yard (t/cy).[296] Fly ash generally constitutes 65-80% of the total amount of ash produced during coal combustion.[297]

**Bottom Ash.** Bottom ash is un-combusted material that settles to the bottom of the boiler's burner assembly. It does not melt and remains in the form of unconsolidated ash. It impinges on the

---

[288] US EPA. 1998. *AP 42, Fifth Edition, Volume I Chapter 1: External Combustion Sources.* September. pg. 1.1-1
[289] US EPA. 1999. *Wastes from the Combustion of Fossil Fuels.* March. pg. 3-8.
[290] The Dayton Power and Light Company. 1961. *DP&L's Coal Mine.* June. (SDD3_00067675-00067677).
[291] The Dayton Power and Light Company. 1967. *Stuart Station Coal Bought in West Va.* April. (SDD3_00067679).
[292] Ritter, Stephen K. 2016. *A New Life for Coal Ash.* February 15.
[293] US EPA. 1982. *Development Document for Final Effluent Limitation Guidelines, New Source Performance Standards, and Pretreatment Standards for the Steam Electric Point Source Category.* pg. 132.
[294] US Department of Transportation. 2003. *Coal Fly Ash.* June 13. pg. 1.
[295] USGS. 2015. *Trace Elements in Coal Ash.* May. pg. 1.
[296] US Department of Transportation. 2003. *Coal Fly Ash.* June 13. pg. 54.
[297] US EPA. 1982. *Development Document for Final Effluent Limitation Guidelines, New Source Performance Standards, and Pretreatment Standards for the Steam Electric Point Source Category.* pg. 141.

furnace walls or falls through open grates to an ash hopper at the bottom of the furnace. Physically, bottom ash is typically grey to black in color, is quite angular, and has a porous surface structure.

**Boiler Slag.** Boiler slag is un-combusted material that settles to the bottom of the boiler's burner assembly. Slag forms when operating temperatures exceed ash fusion temperature, leaving a molten ash. The slag remains in a molten state until it is drained from the boiler bottom. When the molten slag comes in contact with the quenching water, it fractures, crystallizes, and forms pellets. This boiler slag material is made up of hard, black, angular particles that have a smooth, glassy appearance. The slag fraction may have to be removed by chiseling, jack-hammering, soot-blowing, or sandblasting.

Bottom ash and slag generally constitutes about 20-35% of the total amount of ash. In the U.S., fly ash, bottom ash, and boiler slag generally were combined and sluiced to impoundments or shipped to landfills. In the impoundments, the wastes were allowed to settle and the supernatant water was allowed to discharge.

Fly and bottom ash generally contain a range of the following heavy metals depending on the coal source: arsenic, antimony, cadmium, chromium, copper, lead, mercury, manganese, molybdenum, thallium, selenium, nickel, silver, strontium, vanadium, uranium, and zinc. Coal ash also contains small amounts of polyaromatic hydrocarbons (PAH) and phenolic compounds.[298,299,300,301,302,303]

PAHs exhibit varying behaviors during and after combustion, influenced by their molecular structures and the specific burning conditions. Low molecular weight PAHs (like naphthalene) contain two to three aromatic rings and are more prone to volatilization due to their higher volatility. During combustion, they can evaporate into the atmosphere, contributing to airborne PAH concentrations. High molecular weight PAHs, comprising of four to six rings, are less volatile and tend to remain in solid residues like ash or soot. The PAHs with four to six rings include fluoranthene, pyrene, chrysene, benzo[a]anthracene, benzo[b]fluoranthene, benzo[k]fluoranthene, benzo[a]pyrene, dibenzo[a,h]anthracene, indeno[1,2,3-cd]pyrene, and benzo[g,h,i]perylene.[304] The seven PAH congeners used to calculate the BaP equivalent all have at least four aromatic rings and have low to very low volatility.[305]

---

[298] US EPA. 1982. *Development Document for Final Effluent Limitation Guidelines, New Source Performance Standards, and Pretreatment Standards for the Steam Electric Point Source Category*. pg. 256-257, and 337.

[299] Ritter, Stephen K. 2016. *A New Life for Coal Ash*. February 15.

[300] Electric Power Research Institute (EPRI). 1987. *Inorganic and Organic Constituents in Fossil Fuel Combustion Residues*. August.

[301] Liu, K., et al. 2000. *Investigation of PAH in Fly Ash from Fluidized Bed Combustion Systems.* pg. 2273.

[302] Zou, D., et al. 2003. *Rapid Analysis of PAHs in Fly Ash Using Thermal Desorption and Fast GC-TOF-MS.* pg. 245.

[303] USGS. 2015. *Trace Elements in Coal Ash.* May. pg. 1.

[304] Ribiero, Joana, et al. 2011. *Polycyclic Aromatic Hydrocarbons (PAHs) in Burning and Non-Burning Coal Waste Piles.* October 30. pg. 106.

[305] ATSDR. 2022. *Guidance for Calculating Benzo(a)pyrene Equivalents for Cancer Evaluations of Polycyclic Aromatic Hydrocarbons.* April 14. pg. 6-7.

PCBs have been detected in coal fly ash, a byproduct of coal combustion in power plants. PCBs are rarely naturally present in coal but can be produced under low combustion temperatures and the presence of chlorine.[306,307,308,309]

## 7.3    General Electric Distribution Operations

The distribution of electricity involves the use of transformers. Transformers are used to increase the voltage of electricity during transmission and decrease the voltage for distribution to customers. Transformers consist of two coils of wire connected magnetically by an iron core. The ratio of voltages is equal to the ratio of turnings in the windings. The copper coil is surrounded by sheets of 0.014-inch-thick steel assembled to leave a final void volume of about 5%. A typical small transformer is composed of about 28% weight per weight (w/w) of the tank container, 23% of core, 12% of coil, 32% of insulating oil, 1% of insulation such as paper around the coil, and about 4% of wooden and plastic support material.[310]

Transformers are generally filled with a dielectric fluid to cool and insulate the electric coils. Common dielectric fluids used in the 1950-1980 timeframe were mineral oil and Askarels, a nonflammable mixture of polychlorinated biphenyls (PCBs) and tri-and tetrachlorobenzenes. PCB oils were generally a fraction of the total dielectric fluid usage in the US, but were used in areas where safety, reliability, and high overload capability was important, such as public and commercial buildings, or in transformers near critical functions such as hospitals, fire stations, and schools.[311,312,313] Aroclors, mixtures of PCBs, likely used in transformers include Aroclor-1242, Aroclor-1254, and Aroclor-1260.[314,315,316,317,318] In 1978, transformers located at the Tait Station contained Pyranol 1470 and Askarel/oil, a combination of Aroclor-1260 and

[306] Li, Zhiyong, et al. 2016. *Characterization of PAHs and PCBs in Fly Ashes of Eighteen Coal-Fired Power Plants.* November 2. pg. 3182-3184.

[307] Chen, Yi. 2024. *A Comprehensive Review of Toxicity of Coal Fly Ash and its Leachate in the Ecosystem.* January 2. pg. 6.

[308] Nguyen, Thi Hue, et al. 2015. *Polychlorobenzenes and Polychlorinated Biphenyls in Ash and Soil from Several Industrial Areas in North Vietnam: Residue Concentrations, Profiles and Risk Assessment.* May 30.

[309] Jiang, Xiaoxu, et al. 2015. *Formation of Polychlorinated Biphenyls on Secondary Copper Production Fly Ash: Mechanistic Aspects and Correlation to Other Persistent Organic Pollutants.* September 16. pg. 5.

[310] Rouse, T.O., Raymond, C.T., Fessler, W.A. 1989. *PCB Residues in Transformer Carcasses.* August. pg. 4-3 and 4-4.

[311] US EPA. 1976. *PCBs in the US: Industrial Use and Environmental Distribution.* February 25. pg. 4-7.

[312] US EPA. 1979. *Assessment of the USE of Selected Replacement Fluids for PCBs in Electrical Equipment.* pg. 1, 12.

[313] United Nations Environment Programme (UNEP). 1999. *Guidelines for the Identification of PCBs and Materials Containing PCBs.* August. pg. 1.

[314] State of Oregon. 2003. *Fact Sheet: Sources of Polychlorinated Biphenyls.* August 6. Attachment 1.

[315] Ouw, H.K., Simpson, G.R., Siyali, D.S. 1976. *Use and health effects of Aroclor 1242, a polychlorinated biphenyl, in an electrical industry.* July-August. pg. 189.

[316] Shimadzu Corporation. 2022. *Fast Analysis of Polychlorinated Biphenyls (PCBs) as Aroclors in Transformer Oil with the Nexis GC-2030 Gas Chromatograph Equipped with the AOC-30i Autosampler.* August 2022. pg. 1.

[317] Shin, S.K., Kim, T.S. 2006. *Levels of polychlorinated biphenyls (PCBs) in transformer oils from Korea.* April 20. pg. 1521.

[318] Agency for Toxic Substances and Disease Registry. 1989. *Toxicological Profile for Selected PCBs (Aroclor-1260, -1254, -1248, -1242, -1232, -1221, and -1016).* June. pg. 93.

trichlorobenzene.[319] Pyranol was also used in control devices at the Hutchings Station prior to 1976, when it was replaced with Dow Corning 200, which contained lower concentrations of PCBs. Testing of fluids in control devices conducted in 1979 showed detection of PCBs ranging from 18.1 to 2,618 ppm. Chromatograms revealed several peaks in Aroclor-1260 although all components could not be identified.[320] Transformer sampling performed in 1981 at various DPL locations revealed detections of Aroclor-1260.[321]

Transformer performance is affected by degradation of dielectric fluids, gas formation, air and water intrusion, or high thermal load. Excess heat can burn out insulation or cause short-circuits in the windings. Transformers become obsolete at a rate of 1-2% per year and fail at about 0.2% per year. Such transformers are taken out of service and are generally returned to a transformer service shop. When the dielectric fluid properties affect the performance of the transformer, the transformer can be re-filled with new transformer fluid in the field. If the malfunction is sufficiently serious, the transformer can be brought to a transformer repair shop, repaired, and re-filled with new fluid. Repair of the transformer requires draining the oil and dismantling the coil and core. The void spaces, insulation, and support structures retain generally about 10-20% of the fluid even after the transformer is drained. Therefore, when a transformer is re-filled, a portion of the original fluid is retained and mixes with the new fluid.[322,323]

### 7.3.1   General Wastes from Electric Distribution Operations

In 1976, TSCA mandated that PCB production cease and that its use be discontinued by 1979. At this time, PCBs could still be kept in closed systems. PCB containing oil then was to be replaced when a transformer or capacitor reached its useful life or had to be taken out of service for repair. The transformer service industry disposed of about 100,000 pounds (lbs) per year of solid waste to landfills before these regulations took effect.[324, 325]

Many of the mineral oil transformers used in the US and Canada contained PCBs. Niagara Mohawk tested 175,000 of its pre-1979 pole transformers upon their retirement and found that 7% contained >50 milligrams per kilogram (mg/kg) of PCB and an additional 1% contained >500 mg/kg PCB.[326]

In the early 1980s Ontario Hydro reported that its transformers contained 1,000 tons of Askarel and 10,000 tons of PCB-contaminated mineral oil.[327]

---

[319] Monsanto Chemical Company. *Askarel Inspection and Maintenance Guide.* pg. 3.

[320] The Dayton Power and Light Company. 1979. *Subject: PCB.* November 12. (DP&LIII-010073- DP&LIII-010075).

[321] The Dayton Power and Light Company. 1981. *SUBJECT: Interim Measures Test Results.* November 11. (DP&L_0007525- DP&L_0007528).

[322] US EPA. 1976. *PCBs in the US: Industrial Use and Environmental Distribution*. February 25. pg. 98.

[323] US EPA. 1979. *Assessment of the USE of Selected Replacement Fluids for PCBs in Electrical Equipment*. pg. 15.

[324] US EPA. 1976. *PCBs in the US: Industrial Use and Environmental Distribution*. February 25. pg. 98.

[325] US EPA. 1979. *Assessment of the USE of Selected Replacement Fluids for PCBs in Electrical Equipment*. pg. 3.

[326] Panero, M., et al. 2005. *Pollution Prevention and Management Strategies for Polychlorinated Biphenyls in the New York/New Jersey Harbor*. February. pg. 49.

[327] Gonzalez, Luciano A. *Transformers with PCB-contaminated Mineral Oil: Myth or Reality.*

In 1998 and 2006, the Elizabethton Electric System in Tennessee reported that 25-32% of its distribution transformers contained PCB above 50 mg/kg, the regulatory definition of PCB-contaminated oil.[328]

In 1992, the US Army commissioned a study of the transformer system at a base in Massachusetts. They identified many leaks of pole transformers ranging from staining around drain plugs to soil staining below the transformer. They also observed total failures with transformer collapse to the ground. About 225 transformers (31%) out of 719 pole transformers at the base contained >2 mg/kg of PCB.[329].

In 2008, almost 30 years after the implementation of TSCA, an ice storm in Massachusetts resulted in 112 releases of transformer fluids by fallen pole transformers. Of these, 30% contained PCB at > 2 mg/kg.[330]

When PCB are exposed to high temperatures, toxic polychlorinated dibenzofurans (PCDF) and polychlorinated dibenzodioxins (PCDD) are formed. Catastrophic failures of transformers and capacitors from thermal overloads or arcing occurred world-wide in the 1980s. In these cases, the soot from the thermal degradation of PCB transformers contained large amounts of PCDF and PCDD. In these cases, the 2,3,7,8-TCDD-equivalents in soot ranged from >300 to > 124,000 ng/m$^2$.[331]

Another component of electric storage and distribution involves capacitors. Before 1979, 95% of capacitors contained PCB.[332] Until about 1981, no incinerators were permitted for destruction of capacitors. Consequently, capacitors routinely were disposed of in landfills before that time.[333] In 1975, DPL had about 120,000 transformers containing from three to several thousand gallons of fluid in its system. DPL also had 14,915 high-voltage capacitors containing PCBs. Aroclors likely used in capacitors include Aroclor-1016, Aroclor-1221, Aroclor-1242, Aroclor-1248, Aroclor-1254, and Aroclor-1260.[334,335,336] A list of capacitor liquids from 1978 included PCB-containing askarels such as Pyranol, Inerteen, Elemex, Diaclor, Chlorextol, Noflamol, and Saf-T-Kuhl.[337] These are a combination of Aroclor-1260 and trichlorobenzene.[338]

---

[328] Gonzalez, Luciano A. *Transformers with PCB-contaminated Mineral Oil: Myth or Reality.*

[329] U.S. Army Environmental Center (USACE). 1995. *Final Transformer Study Report (AREEE 66) Base Realignment and Closure Environmental Evaluation*. pg. A-1 through A-23.

[330] Barroso, Jason J., et al. 2010. *The Ice Storm of 2008 and Emergency Response Coordination Throughout Western and Central Massachusetts*. pg. 275-277.

[331] Wade, R.L., Woodyard, J.P. 1987. *Sampling and Decontamination Methods for Buildings Contaminated with Polychlorinated Dibenzodioxins*. pg. 372.

[332] US EPA. 1976. *PCBs in the US: Industrial Use and Environmental Distribution*. February 25. pg. 226.

[333] US EPA. 1979. *Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions, Storage and Disposal.* 40 CFR 761.60. May 31. pg. 2.

[334] State of Oregon. 2003. *Fact Sheet: Sources of Polychlorinated Biphenyls.* August 6. Attachment 1.

[335] Ouw, H.K., Simpson, G.R., Siyali, D.S. 1976. *Use and health effects of Aroclor 1242, a polychlorinated biphenyl, in an electrical industry.* July-August. pg. 189.

[336] Monsanto Chemical Company. 1962. *The Aroclor Compounds.* May. pg. 8-11.

[337] 1978. *Subject: Identifying PCB and Non-PCB Liquids Used in Capacitors.* April 11. (DP&LIII_007675).

[338] Monsanto Chemical Company. *Askarel Inspection and Maintenance Guide.* pg. 3.

## 7.4 Waste from DPL Operations

DPL generated waste during the operations taking place at the steam and power stations and the Service Center. Fly and bottom ash were produced during the burning of coal for electricity and heat generation. Waste associated with the maintenance, repair, and painting of transformers and DPL vehicles were produced at the Service Center. According to deposition testimonies from former employees of DPL and SDD, DPL was a longtime customer of and frequently disposed of waste at SDD.

### 7.4.1 DPL Ash Wastes from Steam Power Generation

In 1964, the Tait and Hutchings stations produced about 160,000 tons per year of fly ash.[339] Based on 1966 coal usage at the two generating plants, the amount of fly ash is approximately 8% and approximately 11 % for total ash. These percentages are generally consistent with ash contents of various coals and an average ash content of US coals in 1975 of 13.5%.[340, 341] Fly and bottom ash were stored in pits at the plants. As these pits filled up, ash was disposed of at alternate sites.[342]

A few analyses of DPL fly ash were carried out with the intent of showing that the ash met regulatory criteria for ash disposal and reuse. Analyses of the solid and of the leachate from DPL fly ash are generally in agreement with the range of constituents found in other fly ash in the US.

**Table 7-2** shows the metal content of Hutchins Station ash from the East Pond in 1997 and from a recent study by the US Geological Survey on fly ash from coal in the Appalachian Basin.[343,344] Leachates of the Hutchins Station material varied over time and with sample source. In 1998, leachates of arsenic, cadmium, chromium, and lead were <0.8, <0.06, <0.09, and <0.2 mg/L, respectively. Leachates in material from the DPL Longworth Station in 1983 were 0.003, 0.04, 0.54, and 0.04 mg/L for arsenic, cadmium, chromium and lead, respectively.[345] Metal concentrations in the leachates were generally below safe drinking water levels but occasionally exceeded safe drinking water concentrations for arsenic. The concentrations of trace constituents in coal combustion ash vary and depend on the impurities in the type of coal, burning conditions, and ash collection methods. Leaching studies on fly ash from coals from the Appalachian basin by USGS found aqueous arsenic concentrations about 8-14 times the EPA maximum contaminant level (MCL) for arsenic in drinking water (10 µg/L).[346]

---

[339] The Dayton Power and Light Company. 1964. *A Ten Million Ton Problem*. September. pg. 6. (SDD3_00031324).

[340] *DP&L Cinders used in Blockmaking*. pg. 1. (SDD3_031320).

[341] US EPA. 1999. *Wastes from the Combustion of Fossil Fuels.* March. pg. 3-7.

[342] *Expansion and Reconstruction for 1961*. (SDD3_00031312).

[343] Belmonte Park Environmental Laboratories. 1998. *Test Results By Sample*. January 7. (SDD3_0012660/ DP&L_0002087).

[344] USGS. 2015. *Trace Elements in Coal Ash.* May. pg. 3.

[345] Howard Laboratories Inc. 1983. *Results By Sample*. April 20. (SDD_00213).

[346] USGS. 2015. *Trace Elements in Coal Ash.* May. pg. 3.

**Table 7-2. Metal Concentrations in Various Ash Samples (in mg/kg)**

| Metal | Hutchins Pond Ash-1997[347] | USGS-2015[348] |
|---|---|---|
| arsenic | 18 | 100-450 |
| barium | 200 | |
| cadmium | <1 | 2-6 |
| chromium | 15 | 60-200 |
| copper | 51 | 200-300 |
| lead | 15 | |
| manganese | 61 | |
| mercury | <0.1 | |
| nickel | | 100-120 |
| selenium | <10 | 3-25 |
| vanadium | | 250-500 |
| zinc | 18 | |

***DPL Opinion 1.*** The ash waste generated by DPL contained hazardous substances such as PAHs and heavy metals such as arsenic, barium, chromium, copper, lead, manganese, and zinc.

### 7.4.2  DPL Transformer Repair Shop Waste

During the repair of transformers and restoration of dielectric fluids, five types of wastes were generated:

1. Oil-contaminated rags and wipes from cleaning the outside surfaces of transformers and the inside core and coil of transformers requiring repair. These were placed in the general trash.[349, 350]

2. Solvent residues from degreasing of transformer innards.[351]

3. Residuals from spill cleanup. Adding sufficient absorbing material to spills was common practice. The mixture was swept up or shoveled into containers and disposed of in the general trash dumpsters on site.[352] These were taken to the SDD as common practice.[353]

4. Gas, water, and chemical impurities in transformer fluid were removed by pumping the fluid through a filter containing Fullers Earth, a common purification method for oils of all types. When the filter had reached its capacity for adsorbing impurities, it was shoveled into trucks and disposed of in the SDD until the implementation of PCB regulation in the 1979.[354] The

---

[347] Belmonte Park Environmental Laboratories. 1998. *Test Results By Sample*. January 7. (SDD3_0012660/DP&L_0002087).

[348] USGS. 2015. *Trace Elements in Coal Ash.* May. pg. 3.

[349] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 76-79.

[350] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 87-89.

[351] Tharpe, James E. 2012. *Deposition of James E. Tharpe*. January 17. pg. 70.

[352] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 87-89.

[353] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 33-34.

[354] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 48-54.

saturated Fullers Earth is estimated to contain about 6-20% of oil.[355,356]
Mineral oil and PCB transformers were repaired in the same facility. Trace levels of each type of dielectric fluid thus often found their way into transformers of the other type. For many years such contamination attracted no attention because it did not affect the performance of a specific dielectric in its designed use.[357,358]

5. Damaged transformers that could not be repaired. Generally, these were taken by a recycler for metal value.[359,360]

***DPL Opinion 2.*** Wipes and absorbent waste generated by DPL at the transformer shop contained the hazardous substance PCB.

***DPL Opinion 3.*** Fuller's Earth containing transformer fluids generated by DPL contained the hazardous substances PCB and PCDD/PCDF.

***DPL Opinion 4.*** Waste such as oil-soaked rags and absorbent generated by DPL likely contained aromatic hydrocarbon and chlorinated hydrocarbon solvent residuals.

### 7.4.3 DPL Electric Maintenance Service Waste

Waste generated during DPL electric maintenance service operations included:

➢ Cross-arms, broken poles, insulators, transformer carcasses, wires, capacitors and copper windings.[361,362, 363,364]
➢ Broken transformers.[365,366]

[355] GE Energy Services Industrial. 2009. *Protecting the Environment and Your Operation by Innovative Transformer Reconditioning Process.*
[356] Ellis, Carleton. 1931. *Recovery of Oil from Spent Fuller's Earth.* October 20. pg. 1.
[357] Brown, J. F., et al. 1981. *Chemical Destruction of Polychlorinated Biphenyl in Transformer Oil.* pg. 1.
[358] UNEP. 1999. *Guidelines for the Identification of PCBs and Materials Containing PCBs.* August. pg. 2-13.
[359] Tharpe, James E. 2012. *Deposition of James E. Tharpe.* January 17. pg. 99-102.
[360] Tharpe, James E. 2014. *Deposition of James E. Tharpe.* December 11. pg. 124.
[361] Tharpe, James E. 2012. *Deposition of James E. Tharpe.* January 17. pg. 39, 40, 46, 47, and 100-103.
[362] Wall, Clarence. 2012. *Deposition of Clarence Wall.* January 17. pg. 41-46, and 90.
[363] Grillot, Edward. 2012. *Deposition of Edward Grillot.* April 24. pg. 35, 36, and 213-219.
[364] Boesch, Jr., Horace John. 2006. *Deposition of Horace John Boesch, Junior.* February 28. pg. 40,41, 46, and 129-136.
[365] Hunter, Richard Lee. 2019. *Declaration of Richard Lee Hunter.* April 3. pg. 2.
[366] Hunter, Richard Lee. 2019. *Deposition of Richard Lee Hunter.* April 30. pg. 82-90.

➢ Transformers, poles, soil, cross-arms, and insulators.[367,368,369,370,371,372,373, 374,375]

In 1981, DPL transformer samples were analyzed for PCBs. A total of 451 samples were collected and forwarded to the lab. Results show that of 394 samples, 101 samples were above 50 parts per million (ppm) and 9 samples were above 100 ppm.[376]

***DPL Opinion 5.*** Assuming DPL electric maintenance crews disposed of Waste generated by the DPL electric maintenance crews, including cross-arms, broken poles, insulators, transformer carcasses, capacitors, wires, and soil from the removal of poles, contained hazardous substances PCBs and PCDD/PCDF. It is highly likely that the wastes also contained heavy metals.

### 7.4.4   DPL Garage/Transportation Department Waste

Waste generated during DPL garage/transportation operations included:[377,378]

➢ Vehicle repair shop spill residue accumulated in drains.

➢ Waste from the garage paint booth including old filters.

➢ Rags for wiping up equipment or small spills in the repair and transformer shop.

In the 1980s, DPL generated F001 listed wastes consistent with chlorinated solvents in degreasing, F002 wastes from spent chlorinated solvents, F003 waste of non-halogenated solvents such as xylene or ketones, F004 wastes containing cresols and various solvents, F005 wastes (non-halogenated solvents such as toluene), and F017 wastes consisting of paint sludge.[379] In 1980, DPL generated oil waste, painting waste, degreasing waste, oily solids (oil filters), used towels, antifreeze, and PCB wastes.[380,381,382] Similar wastes were generated at other

---

[367] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17. pg. 42-44, 90, and 91.

[368] Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24. pgs. 35, 83-87, and 104.

[369] Boesch, Jr., Horace John. 2006. *Deposition of Horace John Boesch, Junior*. February 28. pg. 38, 126, and 130.

[370] Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1. pg. 35 and 36.

[371] Grillot, David A. 2014. *Deposition of David A. Grillot*. May 28. pgs. 67,68, and 163.

[372] Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24. pgs. 35,36, and 213-219.

[373] Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1. pg. 20, 67, 93-95.

[374] Boesch, Jr., Horace John. 2006. *Deposition of Horace John Boesch, Junior*. February 28. pg. 40, 41, 46, and 129-136.

[375] Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1. pg. 36 and 110.

[376] DPL. 1981. *Interim Measure Test Results.* November 11. (DP&L 0007525-DP&L 0007528)

[377] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 32-37, and 100-103.

[378] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 87-89.

[379] Hall, Georgene A. 1980. *US EPA 3010 Notification of Hazardous Waste Activity Forms*. August. (SDD_00026308- SDD_00026353).

[380] DPL. 1980. *Potential Small Generator Evaluation Form.* August 19. (DPL1112HC000173-4)

[381] Transportation Department. 1980. *Potential Small Generator Evaluation Form*. March 19. (DPL1112HC000176-DPL1112HC000178).

[382] Oil Reclaiming House. *Attachment A.* (DPL1112HC00089).

DPL facilities. The operations at the garage/transportation department generate a large variety of wastes consistent with the following:[383]

1. Engine oils are mixtures of aliphatic and aromatic petroleum hydrocarbons with additives such as corrosion inhibitors. Used engine oils accumulate chemical components from corrosion of the engine and from absorption of blow-by exhaust from combustion of fuel. Toxic components that accumulate in used oil are heavy metals such as lead, zinc, copper, chromium, nickel, and cadmium and a variety of PAH.[384]

   According to a study by Elena Dominguez-Rosario and John Pichel, samples of used motor oil from 1975 and 1977, within the late timeframe of SDD operations, contained metals, which are hazardous substances, at high concentrations.[385] US EPA reported a more extensive analysis of metals and aromatic hydrocarbons than used oils sampled before 1983.[386] Some of the results are shown in **Table 7-3**.

**Table 7-3. Contaminants in Engine Oils (all units in parts per million [ppm])**

| Component | 1975 | 1977 | US EPA 1984 |
|---|---|---|---|
| Arsenic | | | 17 |
| Barium | | | 132 |
| Cadmium | | | 3 |
| Chromium | 21 | 24 | 28 |
| Lead | 7,500 | 13,900 | 644 |
| Zinc | | 2,500 | 580 |
| Copper | 17 | 56 | |
| Benzene | | | 961 |
| Toluene | | | 2,200 |
| Xylene | | | 3,386 |
| Naphthalene | | | 475 |
| Benzo[a]anthracene | | | 71 |
| Benzo[a]pyrene | | | 25 |

Tetraethyl lead was present as an anti-knock material in gasoline till the mid-1970s at concentrations of about 4 %. These concentrations decreased to about 0.1 % in the mid-1980s.[387] This decrease of lead in fuel is reflected in the oil analyses of 1975 and 1977 relative to the data from the US EPA report in 1984.

EPA also reported that 18 % (142/753) of used oil samples contained PCBs at a mean concentration of 109 ppm.[388] Similarly, ATSDR reports that 17 % (4/24) of used

[383] Fields, Charlie. 2014. *Deposition of Charlie Fields*. May 21. (Exhibit A).

[384] US Department of Health and Human Services, ATSDR. 1997. *Toxicological Profile for Used Mineral-Based Crankcase Oil. September*. pg. 9 and 34.

[385] Dominguez-Rosado, E., et al. 2003. *Chemical Characterization of Fresh, Used, and Weathered Motor Oil via GC/MS, NMR, and FTIR Techniques*. pg. 115.

[386] US EPA. 1984. *Composition and Management of Used Oil Generated in the US*. September. pg. 1-12.

[387] US Department of Health and Human Services, ATSDR. 1997. *Toxicological Profile for Used Mineral-Based Crankcase Oil. September*. pg. 79.

[388] US EPA. 1984. *Composition and Management of Used Oil Generated in the US*. September. pg. 1-12 and 1-25.

transmission fluids contained PCB at 7-65 ppm, with the statement that before 1983, PCB were present in transmission fluids to control swelling of rubber seals.[389]

2. Oil filters. In 1992, 400 million oil filters were used in the US. Each contained about 10 to 16 ounces of used oil and could contain tin and lead depending on the type of filter.[390]

3. Used antifreeze consists of ethylene glycol and contaminants such as benzene, toluene, lead, zinc, arsenic, mercury, and copper accumulated from the cooling system.[391]

4. Brake fluid consists of polyglycol ethers and corrosion inhibitors. Used brake fluid contains lead and other corrosion products such as copper and asbestos dust. It also can contain solvent used in cleaning and flushing the braking system. These solvents generally are chlorinated solvents such as trichloroethane and methylene chloride but also can be Stoddard solvent, a petroleum distillate containing 10-20 % aromatic hydrocarbons such as alkyl-substituted benzene and toluene (ethyltoluene), naphthalene, and other polyaromatic compounds.[392]

5. Lead/acid batteries containing sulfuric acid and lead.[393]

6. Paint residues.[394] Residues from used paint, residual paint, stripped paint from grinding or sanding contain organic solvents and heavy metals such as lead, chromium, zinc, cadmium, and other paint pigments.[395] Paint residues also remain in air filters from paint spray booths.[396]

7. Spent solvents from degreasing and cleaning of equipment. These wastes consist of sludges or concentrates of trichloroethane, methylene chloride, aromatic hydrocarbons such as xylene, toluene, methanol, and methyl isobutyl ketone (MIBK). Degreasing of oily machine parts often involved aliphatic and aromatic hydrocarbons. In the 1960-1980 period, chlorinated solvents began to be used more extensively than Stoddard solvent or other hydrocarbons. For example, industrial production of trichloroethane (TCA), a pollutant in DPL's list of wastes, increased by a factor of about 8 during this time period.[397,398]

8. Shop cleanup wastes. Rags or towels are often used to clean up small spills of oil or solvent and to wipe grease from parts being repaired. Dirty rags are usually disposed of in the general trash. Absorbent is used to absorb larger spills of material and is also disposed of in the general trash. In 1991, most automotive shops drained fluids onto floors instead of drip

[389] US Department of Health and Human Services, ATSDR. 1997. *Toxicological Profile for Used Mineral-Based Crankcase Oil. September.* pg. 84.
[390] US EPA. 1994. *Environmental Regulations and Technology Managing Used Motor Oils.* pg. 46.
[391] US EPA. 1991. *Guides to Pollution Prevention: The Automotive Repair Industry.* October. pg. 6.
[392] US Department of Health and Human Services, ATSDR. 1995. *Toxicological Profile for Stoddard Solvent.* June. pg. 2 and 9.
[393] US EPA. 1991. *Guides to Pollution Prevention: The Automotive Repair Industry.* October. pg. 5.
[394] US EPA. 1991. *Guides to Pollution Prevention: The Automotive Refinishing Industry.* October. pg. 13.
[395] IARC. 1989. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans - Some Organic Solvents, Resin Monomers and Related Compounds, Pigments and Occupational Exposures in Paint Manufacture and Painting.* pg. 371-374.
[396] Tharpe, James E. 2014. *Deposition of James E. Tharpe.* December 11. pg. 100-103.
[397] Pankow, J.F., et al. 1996. *Dense Chlorinated Solvents.* pg. 7-10.
[398] US EPA. 2025. *Hazardous Wastes from Non-Specific Sources.* March 12.

pans.[399] The liquids were flushed into drains leading to sumps or absorbed with sawdust or clays. Material flushed into drains and the sump then required periodic cleanout. Contaminants in the sludges or absorbent reflect contaminants in the spilled liquids.[400, 401]

9. Fluids from metal machining, such as cutting oils and degreasing solvents.[402]

10. Metals chips from metal-working or disposed parts including mercury-containing material from thermostats.[403]

11. Tires.[404, 405]

12. Air conditioning fluid wastes, primarily chlorofluorocarbons.[406]

**DPL Opinion 6.** Waste by DPL at its vehicle repair shop, including rags, oil filters, absorbent, and sludge, contained used engine and transmission oils with the hazardous substances of heavy metals such as lead, zinc, copper, chromium, nickel, and cadmium as well as PAHs and likely PCBs.

**DPL Opinion 7.** Spent cleaning fluids sludge generated by DPL contained hazardous substances TCA, methylene chloride, aromatic hydrocarbons such as xylene, methanol, and methyl isobutyl ketone (MIBK).

**DPL Opinion 8.** Paint residues and sludge generated by DPL contained hazardous substances, such as heavy metals such as lead, chromium, zinc, cadmium, as well as solvents.

### 7.4.5    Other DPL Waste

Michael Wendling and David Grillot describe lead from DPL tubes, wire connectors, or insulators being dumped at the SDD. Kenny Grillot, brother of Cyril Grillot, collected copper, lead, brass, and aluminum. Mr. Grillot and Mr. Wendling recalled Uncle Kenny Grillot melting the lead down into ingots on a hot plate.[407, 408, 409]

DPL used creosote-treated poles in their electric distribution network. According to Mr. Tharpe that worked at DPL, creosote sometimes spurted out of the poles when holes were drilled. Creosote contains a variety of phenolic compounds and PAH.[410]

DPL generated waste materials such as broken poles, large amounts of bad wires, broken reels, ceramic capacitors and resistors, and rusted metal. The Service Center had a DPL dump truck

[399] US EPA. 1991. *Guides to Pollution Prevention: The Automotive Repair Industry*. October. pg. 37.
[400] Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11. pg. 76-79.
[401] Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2. pg. 87-89.
[402] US EPA. 1991. *Guides to Pollution Prevention: The Automotive Refinishing Industry*. October. pg. 28.
[403] US EPA. 2025. *Mercury in Consumer Products*. March 6. pg. 3 and 4.
[404] US EPA. 1991. *Guides to Pollution Prevention: The Automotive Repair Industry*. October. pg. 5 and 6.
[405] NASS. 2005. *Draft Copy Summary of Investigation*. May 23. pg. 7.
[406] US EPA. 2025. *Refrigerant Safety*. March 12. pg. 3.
[407] Grillot, David A. 2014. *Deposition of David A. Grillot*. May 28. pg. 74-76.
[408] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17. pg. 27 and 43.
[409] Wendling, Michael A. 2014. *Deposition of Michael A. Wendling*. April 23. pg. 38 and 111.
[410] Tharpe, James E. 2012. *Deposition of James E. Tharpe*. January 17. pg. 57, 64, and 65.

make two trips daily to deliver debris to the county incinerator and the dumps. The big items were placed in a 30 cubic yard dumpster provided by Container Service. Container Service also serviced eight other DPL locations with either three or six cubic yard dumpsters.[411]

Joseph D. Smart was a trash truck driver for IWD beginning in 1966. Smart describes picking up of two loads of wood skids from DPL in approximately 1972 to 1973.[412,413]

Gary Woolery worked for IWD as a driver between 1977 and the late 1980s or early 1990s. He stated that he had picked up waste from DPL consisting of ground up tires, skids, and sludge.[414]

**DPL Opinion 9.** Waste generated by DPL such as DPL tubes, wire connectors, and insulators contained the hazardous substance lead.

**DPL Opinion 10.** Creosote-treated poles generated by DPL contained the hazardous substances of phenols and PAHs.

---

[411] DP&L Forward. 1972. *Spring Activity at DP&L.* April. Volume 39, Number 5. pg. 2.
[412] NASS. 2005. *Draft Copy Summary of Investigation.* May 23. pg. 7.
[413] Smart, Joseph D. 2015. *Deposition of Joseph D. Smart.* April 14. pg. 14, 19-32, and 92-98.
[414] NASS. 2005. *Draft Copy Summary of Investigation.* May 23. pg. 7.

# Section 8.0
# McCall

I was asked by LSSH to evaluate whether McCall Corporation (MCC) generated waste containing hazardous substances during the period of SDD's operation. In developing my opinions, I have reviewed documents provided by LSSH and evaluated MCC operations. I have identified wastes produced by MCC and evaluated whether these may have contained hazardous substances.

## 8.1    MCC Operations

The MCC printing plant was built in 1923. The plant was located at 2219 McCall Avenue in Dayton, OH. The plant was one story high and approximately 400,000 square feet. By the early 1960s, MCC was printing everything from dress patterns to nearly 50 different magazines. The plant operated 24 hours a day and seven days a week. In 1975, the Dayton Printing Division of MCC was sold to The Charter Company. The plant became known as Dayton Press and ceased operations in 1982.[415,416]

## 8.2    General Printing Operations

The printing industry applies chemicals such as ink, coatings, and solvents to paper and other materials. [417] Printing is a very large, economically important, and diverse industry that has continually evolved and changed over its long history. [418] For example, letterpress printing was dominant before about 1960 but was replaced slowly by lithography and offset printing in the 1960-1980s.[419,420,421] Color printing was employed primarily in premium publications, but use of color in newspapers and magazines increased through the 1960s and 1970s. The National Geographic Magazine printed millions of their copies in the 1950s and 1960s by the four-color process letterpress, until 1978 when they switched to rotogravure.[422] By 1993, more than ninety-seven percent of North American newspapers printed some of their news pages in color. [423] In the 1960s, newspaper printing required about 1 lb. of ink per 500 newspapers, or approximately 0.028 g of ink per printed page of an average-sized newspaper.[424]

---

[415] Dalton, Curt. 2015. *Gem City Jewel: Largest Magazine Printer Under One Roof.* March 19.

[416] Knowles, Leo A. 2015. *Defendant, Conagra Grocery Products Company, LLC's Supplemental Answers to Plaintiffs' Interrogatories and Request for Production of Documents.* April 3.

[417] US EPA. 1975. *Environmental Aspects of Chemical Use in Printing Operations*. September 22. pg. 5.

[418] Kirk-Othmer. 1963. *Printing Processes*. Vol. 16. pg. 495-496, 537-540.

[419] US EPA. 1990. *Guides to Pollution Prevention: Commercial Printing Industry*. August. pg. 5.

[420] Encyclopedia Britannica. 2013. *Letterpress Printing.* October 30. pg. 1.

[421] US EPA. 1995. *Sector Notebook: Profile of the Printing and Publishing Industry*. September. pg. 21.

[422] https://printinghistory.org/demise-process-color-letterpress-national-geographic/

[423] Glaberson, William. 1993. *The Media Business; Newspapers' Adoption of Color Nearly Complete.* May 31. pg. 2-3.

[424] Askew, R.F. 1969. *Printing Ink Manual.* pg. 405.

In the case of letterpress printing, ink is transferred directly to paper from an inked image surface that is raised slightly above the rest of the imaging plate. Letterpress printing was the primary method for printing newspapers before it was overtaken by lithographic printing.[425] In the early 1970s, lithographic printing represented about 55% of the business and grew at about 12% per year from 1963 to 1972, while letterpress printing represented about 35% of the printing business and grew at about 2.5% per year. [426] In the case of offset lithography printing, ink is transferred from an image part of the plate that is at the same level as the non-imaging area. The non-imaging part of the plate is wet by water and only the imaging portion accepts ink. The ink from the plate is then transferred to a rubber sheet and from the rubber sheet to the paper.[427] A third type of printing, gravure printing, generally was used in high quality printing such as magazines. Gravure printing in the early 1970s represented about 8% of the printing business with an annual growth rate of about 11% from 1963 to 1972.[428] In gravure printing, ink in an ink tray is applied to a recessed image carrier. Excess ink is scraped off the non-image area with a thin doctor blade, and ink in the recesses is transferred to the paper.[429,430]

Multi-color printing requires printing with four successive plates. During this procedure, the four primary colors are applied successively. In printing parlance, these colors are denoted as CMYK, cyan (blue), magenta (red), yellow, and K (black). The first plate applies yellow to the paper, the second applies red, the third applies blue, and the final plate applies black. This method is also referred to as four-color printing.[431,432,433] If only one color is desired, a procedure called spot coloring is used. Spot color is generated in a single run with a single plate by using a pure or premixed color. For example, a particular shade of orange can be generated by mixing red, yellow, and white inks and applying the mixture to one plate for one run.[434] Before about 1970, color printing in newspapers, aside from circulars and comics, was a small percentage of overall newspaper production.[435]

### 8.2.1   General Printing Inks

Printing ink is a mixture of coloring matter dispersed or dissolved in a vehicle or carrier. Such a mixture forms a fluid or paste that can be transferred to a substrate and dried.[436,437,438] The major

---

[425] US EPA. 1975. *Environmental Aspects of Chemical Use in Printing Operations*. September 22. pg. 9, 20, 23.
[426] US EPA. 1975. *Environmental Aspects of Chemical Use in Printing Operations*. September 22. pg. 20, 23.
[427] Leach, R.H. 1988. *The Printing Ink Manual*. pg. 20.
[428] US EPA. 1975. *Environmental Aspects of Chemical Use in Printing Operations*. September 22. pg. 20, 23.
[429] US EPA. 1995. *Sector Notebook: Profile of the Printing and Publishing Industry*. September. pg. 13-17, 21-22.
[430] Leach, R.H. 1988. *The Printing Ink Manual*. pg. 11-36.
[431] US EPA. 1990. *Guides to Pollution Prevention: Commercial Printing Industry*. August. pg. 10.
[432] Leach, R.H. 1988. *The Printing Ink Manual*. pg. 86.
[433] Morris, George. 2016. *Deposition of George E. Morris, Jr*. May 4. pg. 39.
[434] Leach, R.H. 1988. *The Printing Ink Manual*. pg. 14-15.
[435] Morris, George. 2016. *Deposition of George E. Morris, Jr*. May 4. pg. 33, 38-39.
[436] Burachinsky, B. 1980. *Inks*. Vol. 13. pg. 374.
[437] Kirk-Othmer. 1963. *Inks*. Vol. 11. pg. 611.
[438] Hopmeier, A.PG. 1969. *Survey of Pigments*. pg. 157.

components include drying oils, resin, varnish, shellac, pigments, and many specialty additives. Printing inks can be either waste- or oil-based. [439]

Ink formulation adjusts the amount of pigment, extender, and solvent to achieve the desired color strength. Color depends on a large number of chemical and physical properties and is described by several terms: Hue refers to the kind of color (blue, red, etc.), strength denotes the intensity of color, and purity reflects brightness or darkness. Many pigments, organic dyes, and toners are used to provide color to ink. [440]

Some common pigments used in the 1950-1970 timeframe were:

➤ Black - carbon black. Carbon black contains carbon and other chemicals such as up to about 0.1 % PAH. [441,442]

➤ White - titanium dioxide, zinc sulfide, zinc oxide used to lighten color. [443] Transparent pigments such as magnesium carbonate or blanc fixe (barium sulfate) reduce color strength and change rheology of inks. [444]

➤ Yellow - lead chromate, cadmium sulfide, yellow lakes, Hansa yellows. [445]

➤ Blue - iron blue (ferric ferrocyanide), copper phthalocyanine. [446]

➤ Red - cadmium sulfide/cadmium selenide mixtures, barium lithol red. [447]

Toners are full strength undiluted pigments or dyes used to strengthen tinctorially weak pigments. Blue toner is added to black ink to provide the desired blackness. [448] Vehicles or dispersants for inks comprise a range of mineral oil, hydrocarbon solvents, and setting agents. In general, inks have comparable compositions with varying constituents and viscosities. Letterpress inks are viscous pastes using vehicles that are oil and varnish based. They generally contain resins and dry by the oxidation of the vehicle. Lithographic or off-set inks are also viscous inks with a varnish-based vehicle, however the pigment content is higher than in letterpress inks because it is applied in thinner films. [449] Tables 8-1 and 8-2 illustrate some representative compositions of letterpress and lithographic inks in use before 1980. [450]

[439] US EPA. 1975. *Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Oil Base Solvent Wash Subcategories of the Paint Formulating and the Ink Formulating Point Source Category.* July. pg. 15-16.

[440] Burachinsky, B. 1980. *Inks.* Vol. 13. pg. 375-379.

[441] Donnet, J. 1993. *Carbon Black: Science and Technology.* pg. 2, 11, 71.

[442] IARC. 1984. *ARC Monographs on the Evaluation of the Carcinogenicity Risk of Chemicals to Humans.* pg. 31, 36-37.

[443] Burachinsky, B. 1980. *Inks.* Vol. 13. pg. 377.

[444] Kirk-Othmer. 1963. *Inks.* Vol. 11. pg. 614.

[445] Hopmeier, A.PG. 1969. *Survey of Pigments.* pg. 166.

[446] Hopmeier, A.PG. 1969. *Survey of Pigments.* pg. 168.

[447] Kirk-Othmer. 1963. *Inks.* Vol. 11. pg. 615.

[448] Burachinsky, B. 1980. *Inks.* Vol. 13. pg. 377, 383.

[449] US EPA. 1979. *Development Document for Effluent Limitation Guidelines and Standards for the Ink Formulating Point Source Category.* pg. 10.

[450] Burachinsky, B. 1980. *Inks.* Vol. 13. pg. 383.

**Table 8-1. Example of Ink Composition for Letterpress Newsprint[451]**

| Component | Approximate Percentage |
|---|---|
| Carbon black | 10-15 |
| Induline toner (blue) | 2-3 |
| Mineral oil | 67-85 |
| Low viscosity mineral oil | 3-5 |

**Table 8-2. Example of Ink Composition for Quick-Set Litho Black[452]**

| Component | Approximate percentage |
|---|---|
| Carbon black | 16-18 |
| Alkali blue toner | 4-6 |
| Phenolic resin-oil (HC solvent 280 º C) | 58-63 |
| Linseed oil or alkyd | 6-10 |
| Cobalt linoleate | 2 |
| Aliphatic HC solvent (280º C) | 5-10 |

Gravure inks contain the same pigments, toners, and dyes as inks for letterpress and offset methods but are generally of lower viscosity and dry by evaporation of highly volatile solvents.[453] Heat set inks used in lithography and letterpress generally contain 30 to 40 percent solvents, while Gravure and flexographic inks contain up to 60 percent low-boiling solvent.[454] Some typical solvents used in gravure printing are listed by Burachinsky. These include aliphatic and aromatic hydrocarbons such as hexane and toluene, alcohols, esters, ketones, glycol ethers, and nitroparaffins.[455]

In the 1970s, finished inks generally were packaged in metal or plastic cans of 0.5, 1, 2, or 5 kg, in metal or plastic pails of 2, 3, and 5 gallons, or in 30- or 50-gallon metal or fiber drums. For larger users, fluid inks (news or gravure) generally were delivered in tank cars.[456] Some manufacturers provided ink in tubes or cartridges for greater economy.[457,458,459,460,461,462]

For greater versatility and ease of use in mixing desired tones and shades of a particular color, pigment manufacturers offered pigments as color concentrates of 35-65% pigment and full-strength toners.[463]

[451] Burachinsky, B. 1980. *Inks*. Vol. 13. pg. 383.
[452] Burachinsky, B. 1980. *Inks*. Vol. 13. pg. 383.
[453] US EPA. 1979. *Development Document for Effluent Limitation Guidelines and Standards for the Ink Formulating Point Source Category*. pg. 11.
[454] US EPA. 1975. *Environmental Aspects of Chemical Use in Printing Operations*. September 22. pg. 6.
[455] Burachinsky, B. 1980. *Inks*. Vol. 13. pg. 387-838.
[456] Burachinsky, B. 1980. *Inks*. Vol. 13. pg. 383.
[457] The Kelsey Company. 1946. *Kelsey Printers' Supply Book*. pg. C-7.
[458] American Ink Maker. 1967. *Van Son Holland Commerates 95th Anniversary*.
[459] https://www.briarpress.org/44379
[460] https://nagraph.com/ink.html
[461] https://excelsiorpress.tiiny.site/forsale/inkintubes/index.html
[462] https://www.briarpress.org/41718
[463] Burachinsky, B. 1980. *Inks*. Vol. 13. pg. 377.

### 8.2.1    General Wastes from Printing Operations

A large number of aqueous and air emissions are generated during printing in addition to solid wastes. In general, the types of wastes are similar for the three major types of printing, letterpress, lithographic printing, and gravure. US EPA lists common wastes from the imaging, platemaking, printing, and finishing processes of printing in their 1995 Sector Notebook.[464] Table 8-3 lists some of the typical wastes for the three printing processes.

**Table 8-3. Wastes Generated from Letterpress, Lithography, and Gravure Printing[465]**

| Process | Letterpress | Lithography | Gravure |
|---------|-------------|-------------|---------|
| Imaging | Used film, spent developer and fixer, scrap paper, solvents and rags from cleaning, used containers | Used film, spent developer and fixer, scrap paper, solvent and rags from cleaning, used containers | Used film, scrap paper, waste processing solution, solvent and rags from cleaning, used containers |
| Platemaking/ Cylinder Making | Used molds and plates, waste plate developer solution | Used plates, spent developer | Used cylinders, waste acid etching solution |
| Printing | Waste inks, startup paper, cleaning solvents | Fountain solution, waste inks, startup paper, solvent and rags from cleaning | Waste solvent-based ink, startup paper, solvent and rags from cleaning |
| Finishing | Reject prints and edges from trimming, waste issues and boxes | Reject prints and edges from trimming, waste issues and boxes | Reject prints and edges from trimming, waste issues and boxes |

Waste ink is ink in a printing reservoir that has become too thick by accumulated paper dust. Unused ink is residual ink in an ink reservoir that was not used in a run, residual ink in containers, or out-of-date materials. Both waste ink and unused ink may contain chromium, barium, and lead content as well as various solvents. Spent organic solvents or waste ink contaminated with cleaning solvents may contain trichloroethylene, methylene chloride, 1,1,1-trichloroethane, carbon tetrachloride, 1,1,2-trichloroethane, 1,2,3-trifluoroethane, chlorobenzene, xylene, acetone, methanol, MEK, toluene, carbon disulfide, or benzene.[466,467]

Trichloroethylene (TCE) and 1,4-dioxane were used as components of printing inks and paints. Since the 1950s, 1,4-dioxane was used either as a solvent or in conjunction with 1,1,1-trichloroethane (1,1,1-TCA). It was also present in the resins used to make paints and in paint strippers, fabric dyes, and some felt tip pens. TCE was used as a solvent for a paraffin-synthetic resin mixture used for processing paper and as an ingredient in printing inks. It was used to clean cylinders and type. In the U.K., TCE was sprayed onto a film running over rollers

---

[464] US EPA. 1995. *Sector Notebook: Profile of the Printing and Publishing Industry*. September. pg. 26-27, 29.
[465] US EPA. 1995. *Sector Notebook: Profile of the Printing and Publishing Industry*. September. pg. 26-27, 29.
[466] US EPA. 1995. *Sector Notebook: Profile of the Printing and Publishing Industry*. September. pg. 26-27, 29.
[467] US EPA. 1998. *RCRA In Focus – Printing*. January. pg. 8.

of a printing machine in a mixture with other solvents.[468,469,470]

Additional waste streams are produced during the pre-press, press, and post-press operations. Pre-press operations involve image making, such as typesetting and photo developing, and plate and screen making. Typical pre-press waste streams include photographic chemicals, paper and films, silver, solid wastes, outdated material and chemicals, damaged or used plates and screens, wastewaters containing acids, alkalis, solvents, plate coatings, developers, screen emulsions, and rinse water. During press operations, or printing, the image is transferred to a substrate of paper or some other material. Typical waste streams include inks, substrate, cleaning solutions, and in the case of lithography, fountain solutions. Post-press operations are the final steps in making a printed product that may involve folding, trimming, binding, laminating and embossing. Typical waste streams include scrap substrate from trimming, rejects from finishing operations, and VOCs released from adhesives.[471]

## 8.3    Waste from MCC Operations

George Morris worked as a proof press operator from in 1957 to about 1969 and later became an expeditor in the foundry and a night production foreman at MCC. Mr. Morris was a mechanical superintendent in the early 1970s, production manager in the late 1970s and early 1980s, and retired in 1992. During his time as an MCC employee, Mr. Morris made and cleaned letter press plates.[472]

During the process of cleaning the proof press and plates, a solvent was brushed onto the plates and rollers then the ink was cleaned off and dried with a rag. Mr. Morris recalled using kerosene to clean the press cylinders and press rollers. The kerosene was stored in small cans. The soiled rags were placed in a metal container designated for rags. The rags were made of red or gray cloth. Waste paper and proof presses went into the trash can. The rags were sent to commercial laundry.[473] In 1975, the National Institute for Occupational Safety and Health (NIOSH) completed an evaluation of employee exposures to air contaminants in the Letterpress Room of the MCC printing plant. Based on site visits in 1973 and 1974, MCC employees were observed using both kerosene and Ottoson No. 9 solvent, a combination of 1,1,1-TCA and petroleum distillates (naphtha), to clean press rollers, ink wells, etc. These solvents were hand applied to the press with rags and were also applied to the web before being run through the press.[474] Based on this description, along with Mr. Morris' deposition, it is likely that MCC generated solvent-containing waste rags, solvent-containing waste web material, and empty containers containing small amounts of unused 1,1,1-TCA and naphtha.

[468] Interstate Technology Regulatory Council (ITRC). 2021. *History of Use and Potential Sources: 1,4-Dioxane*. February. pg. 3.

[469] https://inchem.org/documents/ehc/ehc/ehc50.htm

[470] Bakke, Berit, Stewart, Patricia A., Waters, Martha A. 2007. *Uses of and Exposure to Trichloroethylene in U.S. Industry: A Systematic Literature Review.* November 02. pg. 384.

[471] US EPA. 1995. *Sector Notebook: Profile of the Printing and Publishing Industry*. September. pg. 47-50.

[472] Morris, George. 2016. *Deposition of George E. Morris, Jr.* May 4. pg. 9-11 and 18.

[473] Morris, George. 2016. *Deposition of George E. Morris, Jr*. May 4. pg. 18-21, 23-24, and 47.

[474] National Institute for Occupational Safety and Health (NIOSH). 1975. *Health Hazard Evaluation Determination Report No. 73-68-18, McCall Printing Company, Dayton, Ohio.* April. pg. 2-3, 5-6.

The 1975 NIOSH report also stated that TCE was used in the Letterpress room to soften the glue coated starter of new rolls of paper as they were fed into the press. One employee used a 1 or 2 second spray of TCE every 35 minutes throughout the shift.[475] MCC likely generated empty waste containers with small amounts of unused TCE as well as solvent-containing waste rags or absorbents used in the management of spills or leaks.

During production, there was a large white roll of paper that fed the press and would occasionally break. This is called a web break, and the waste would be cleaned out of the press and then baled. The bales were about three or four feet by three or four feet and were placed at the back dock until they were picked up.[476]

Spot color ink was delivered to the newspaper building in five-gallon buckets, also called kits, and 55-gallon barrels. According to the 1975 NIOSH report, inks with lead containing pigments were used at the plant and detected in airborne dust sampling conducted at the facility.[477] Mr. Morris observed some of the 55-gallon barrels being used to put waste ink in and then hauled off. Black ink was delivered in bulk by a tank truck and pumped into two 2,500-gallon holding tanks that were in the subbasement. Waste paper from newspapers were placed in a dumpster, about 10 or 12 feet by 10 or 12 feet and six or eight feet deep, at the back dock and would be hauled away when full. [478]

After printing, oven dryers were utilized to evaporate any excess ink vehicle or solvent from the paper prior to folding. Testing of concentrated "oven smoke" in 1974 by NIOSH found over fifty resolved and unresolved gas chromatogram peaks including aromatics, alkanes, alcohols, and chlorinated solvents.[479]

A filtration system and commercial ink reclaiming system were installed by the early 1980s. The ink was manually poured though the screens of the filtration system and considerably reduced the amount of waste oil. The reclaiming system took all of the ink, both black and color. It was a large tank which agitated and heated the ink. At this time, MCC was using direct lithology printing, which included a fountain solution, and offset printing.[480]

Joseph Smart, a truck driver for Container Services, hauled waste from the MCC facility for approximately a year in the mid-1960s.[481] Waste hauled off included general office waste, magazines, and other compacted waste, as well as five-gallon ink buckets and pallets.[482] MCC had a compactor at the facility that would compact the magazines and other trash. Once full, Mr. Smart would haul the waste off. Similarly, empty ink buckets would be placed in a forty-yard open-top

---

[475] National Institute for Occupational Safety and Health (NIOSH). 1975. *Health Hazard Evaluation Determination Report No. 73-68-18, McCall Printing Company, Dayton, Ohio*. April. pg. 2-3, 5-6.
[476] Morris, George. 2016. *Deposition of George E. Morris, Jr*. May 4. pg. 18-21 and 25-27.
[477] National Institute for Occupational Safety and Health (NIOSH). 1975. *Health Hazard Evaluation Determination Report No. 73-68-18, McCall Printing Company, Dayton, Ohio*. April. pg. 3, 5-6.
[478] Morris, George. 2016. *Deposition of George E. Morris, Jr*. May 4. pg. 37-42 and 49-50.
[479] National Institute for Occupational Safety and Health (NIOSH). 1975. *Health Hazard Evaluation Determination Report No. 73-68-18, McCall Printing Company, Dayton, Ohio*. April. pg. 2-3, 7.
[480] Morris, George. 2016. *Deposition of George E. Morris, Jr*. May 4. pg. 58-61.
[481] Smart, Joseph. 2015. *Deposition of Joseph D. Smart*. April 14. pg. 14, 19, and 24.
[482] Smart, Joseph. 2015. *Deposition of Joseph D. Smart*. April 14. pg. 20 and 83-84.

container and then Mr. Smart would take those to a landfill when it was full, approximately every other day. Ink buckets were 99% percent empty when hauled off, but some ink still remained in the bottom and was not fully dry. Mr. Smart testified that ink buckets were also put into another container with a semi-truck that was not owned by Container Services, and he was not aware who disposed of that waste.[483] Pallets and skids would be loaded into a skid box and then dumped into the Container Services container before being hauled off to the landfill by Mr. Smart.[484]

In 1973, MCC described a typical composition of printing inks.[485] Table 8-4 illustrates some of these components.

**Table 8-4. Typical Printing Ink Composition for Offset Color Inks (Percent)**

| Component | Yellow | Red | Blue | Black |
|---|---|---|---|---|
| Solvent (Ink Oil) | 46.8 | 44.4 | 48.0 | 43.8 |
| Resin | 40.7 | 37.9 | 37.7 | 34.6 |
| Polyethene | 2.2 | 2.4 | 2.5 | 2.4 |
| Microwax | 1.0 | 1.2 | 2.0 | 1.2 |
| Benzidine | 9.4 | | | |
| Litho Rubine | | 10.2 | | |
| Red Lake C | | 3.9 | | |
| Phthalocyanine | | | 9.9 | |
| Carbon | | | | 15.0 |
| Alkali Blue | | | | 3.0 |

PCBs have been known to be found in paint and printing ink from both Aroclor sources, whose congeners are commercially produced, and non-Aroclor sources, whose congeners are produced as byproducts in various chemical processes. Historically, PCBs were commercially manufactured and used in printing inks and paint as drying oils (resins) and plasticizers before their ban in 1979.[486,487,488,489] Aroclors likely used in printing inks include Aroclor-1242, Aroclor-1254, Aroclor-1260, Aroclor-1262, Aroclor-4465, and Aroclor-5460.[490,491,492] PCBs found in paints and inks originating from non-Aroclor sources are a byproduct of pigment manufacturing.[493,494] Azo pigments and, additionally, phthalocyanine pigments are the most important groups of synthetic colorants with a wide range of uses.[495] Synthetic organic pigments have been manufactured for

[483] Smart, Joseph. 2015. *Deposition of Joseph D. Smart.* April 14. pg. 20-23, 97.

[484] Smart, Joseph. 2015. *Deposition of Joseph D. Smart.* April 14. pg. 83-84.

[485] Carmichael, W. 1973. *Letter to Container Service Co. Inc. from the McCall Printing Company, Dayton Division RE: Contents of Dirty Ink Pails.* December 21. pg. 1-2. (WMO_32140-WMO_32141).

[486] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2822.

[487] Jahnke, J.C., Hornbuckle, K.C. 2019. *PCB Emissions from Paint Colorants.* May 7. pg. 1-3.

[488] U.S. Army Corps of Engineers. 2012. *Public Works Technical Bulletin 2001-1-126,* PCBs in Caulk and Paint. December 31. Appendix A, pg. A-3, Figure A-6, Table A-1.

[489] Kodavanti, P.R.S., Loganathan, B.G. 2019. *Biomarkers in Toxicology, Chapter 28 - Polychlorinated Biphenyls, Polybrominated Biphenyls, and Brominated Flame Retardants.* pg. 501.

[490] Monsanto Chemical Company. 1957. *Aroclor, resins and plasticizers for chlorinated rubber.* May. pg. 6, 10.

[491] State of Oregon. 2003. *Fact Sheet: Sources of Polychlorinated Biphenyls.* August 6. Attachment 1.

[492] Monsanto Chemical Company. 1962. *The Aroclor Compounds.* May. pg. 22.

[493] Trumbull, K. 2022. *PCBs in Washington State Products: Printing Inks, 2021.* July. pg. 3-4, 12.

[494] Vincent, M. 2020. *PCB-11 and its Presence in the Environment.* November. pg. 1-3, 18-19.

[495] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823.

over 150 years, and many early pigments are azo containing, such as Red Lake C and lithol rubine.[496] Phthalocyanine blue and green were synthesized in the 1930s.[497]

PCB 11 is an example of an inadvertently produced PCB congener found in pigments, principally diarylide pigments.[498,499] Diarylide pigments belong to the azo category of pigments, which make up most orange, red, and yellow pigments.[500] PCB 11 was identified as a byproduct of 3,3'-dichlorobenzidine which is used in yellow pigments.[501] PCB 11 has been detected in various commercial goods where these pigments are used, such as newspapers and magazines.[502] Studies have shown the presence of PCBs not only in diarylide pigments but also in other azo pigments as well as phthalocyanine pigments, the most widely used blue and green pigments in paint and printing inks.[503] Today's commercially available pigments are chemically identical to those produced historically and contain PCBs as their historical predecessors did.[504] Concentrations and profiles of PCBs can vary greatly across pigment types, with observed PCB levels ranging from lower than detection limits to several hundred parts per million.[505] Lastly, PCB congeners of all chlorination levels have been found in pigments used in inks and paints.[506,507,508]

In 1975, the MCC printing plant was sold to The Charter Company and was subsequently rebranded as Dayton Press. Dayton Press reported its business as printing magazines and periodicals using letterpress, lithography, and gravure printing. Based on the assets purchase agreement, MCC leased equipment in the plant to The Charter Company for a term of five years, and at the expiration of such term, The Charter Company had the opportunity to purchase the equipment. Purchased assets included all property, manufacturing plants and facilities, warehouses, machinery and equipment (other than those leased), spare parts, supplies, inventories of raw materials, work-in-progress and finished goods, and more.[509] Dayton Press operated until May

---

[496] Lomax, S.Q., Lomax, J.F. 2019. *The Synthesis Characterization of Historical Novel Azo Pigments: Implication for Conservation Science.* December 3. pg.1.

[497] https://chrysler.org/the-history-of-art-in-color-modern/#_edn8

[498] Vincent, M. 2020. *PCB-11 and its Presence in the Environment.* November. pg. 1-3, 18-19.

[499] Trumbull, K. 2022. *PCBs in Washington State Products: Printing Inks, 2021.* July. pg. 12-13.

[500] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823.

[501] Jahnke, J.C., Hornbuckle, K.C. 2019. *PCB Emissions from Paint Colorants.* May 7. pg. 2.

[502] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823.

[503] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823-2824.

[504] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2826.

[505] Anh, H.Q., Watanabe, I., Minh, T.B., Takahashi. 2021. *Unintentionally produced polychlorinated biphenyls in pigments: An updated review on their formation, emission sources, contamination status, and toxic effects.* February 10. pg. 1-3.

[506] Jahnke, J.C., Hornbuckle, K.C. 2019. *PCB Emissions from Paint Colorants.* May 7. pg. 2.

[507] Anh, H.Q., Watanabe, I., Minh, T.B., Takahashi. 2021. *Unintentionally produced polychlorinated biphenyls in pigments: An updated review on their formation, emission sources, contamination status, and toxic effects.* February 10. pg. 1-3.

[508] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823-2824.

[509] 1975. Assets Purchase Agreement. June 2. pg. 1-4. (CGPC 000027-CGPC 000062).

---

1982 when manufacturing operations at the plant were phased out. In their Ohio EPA Hazardous Waste Report for 1981, Dayton Press reported the following types of wastes:[510]

➢ Mixed ink (from letterpress and offset printing operations) - EPA D005 (barium) and D007 (chromium) wastes

➢ Screened mixed ink wastes from recycling operations (ink manufacturing and printing operations) - EPA D005 (barium), D007 (chromium), and D008 (lead) wastes

➢ Ink manufacturing refuse (used filter cartridges, plastic, drum liners) - EPA D005 (barium), D007 (chromium), and D008 (lead) wastes

➢ Gravure ink washings (rotogravure printing) - EPA D005 (barium), D007 (chromium), and D008 (lead) wastes

➢ Spoiled and/or contaminated adhesive waste (magazine binding operations) - EPA D001 waste (ignitable waste)

➢ Used Nylon wash (4 % solution of Nylon in ethanol) - EPA D001 waste (ignitable waste)[511]

In their 1980 and revised 1981 US EPA TSD Facility Permit Application, Dayton Press also reported the following waste:[512,513]

➢ F001 waste (spent halogenated solvents used in degreasing)

➢ D001 waste (ignitable waste),

➢ D002 waste (corrosive waste),

➢ D005 waste (barium),

➢ D007 waste (chromium), and

➢ D008 (lead).[514]

In July 1982, Pollution Control Science, Inc., who was retained by Dayton Press, certified that the hazardous waste storage facility operating at 2219 McCall Street had completed closure. Industrial Waste Bills of Ladings included in the letter of certification identified the following waste that was removed from the facility:

➢ 36 drums of cement liquid, N.O.S.,

---

[510] Fregmen, Robert D. 1982. *Ohio EPA Hazardous Waste Report, Dayton Press Inc.* April 6. pg. 2-3. (SDD3_0020423-SDD3_0020425).

[511] US EPA. 2024. *Defining Hazardous Waste: Listed, Characteristic and Mixed Radiological Wastes*. December 17.

[512] Spence, William B. 1980. *US EPA, Dayton Press TSD Facility Permit Application.* November 19. pg. 3-6. (SDD3_00020479- SDD3_00020484).

[513] Spence, William B. 1981. *US EPA, Dayton Press TSD Facility Permit Application.* October 29. pg. 5-8. (SDD3_00020434- SDD3_00020441).

[514] US EPA. 2024. *Defining Hazardous Waste: Listed, Characteristic and Mixed Radiological Wastes.* December 17.

- 17 drums of D005 (barium), D007 (chromium), & D008 (lead) waste,

- 11 drums of D005 (barium), D007 (chromium), & D008 (lead) waste,

- 10 drums of D005 (barium), D007 (chromium), & D008 (lead) waste,

- 1 drum of waste ink, and

- 2 drums of 1,1,1-trichloroethane.[515]

In June 1984, Dayton Press identified additional waste material during the process of clearing the plant and removing machinery. The wastes generated by Dayton Press' operations are consistent with wastes expected from printing operations and are likely similar to wastes generated while MCC operated the plant. The following waste was reported by Dayton Press:[516]

- PCB -UN 2315 – Eight large capacitors with PCB labels, a 35-gallon steel drum of General Electric Pyranol, an insulating liquid containing PCBs, and a 55-gallon drum of unknown fluid containing Aroclor-1242

- D001 waste (ignitable waste) – waste solvents including methylene chloride, mineral spirits, and toluene, and waste ink

- D002 waste (corrosive waste) – blackening salts, waste hydrochloric acid, sulfuric acid, and sodium hydroxide, paint stripper, waste paint, and fountain solution

- D003 waste (reactive waste) – blackening salts, chromic acid[517]

- Various nonhazardous wastes

## 8.4    MCC Waste Stream Information

Our review of the record in this case provided to us includes the following descriptions of wastes purportedly associated with MCC:

- Ink and skids with ink.[518,519]

- MCC magazines and 55-gallon barrels of thick ink-like sludge.[520,521]

- Paper and 55-gallon drums of ink and paint thinner..[522,523,524]

---

[515] Hayden, Phillip L. 1982. *Subject: Letter of Certification, Closure of Hazardous Waste Storage Facility, Dayton Press, Inc.* July 21.

[516] Q Source Engineering, Inc. 1985. *Subject: Dayton Press, Inc., Hazardous Waste Storage Permit No. D5-57-0442.* January 5. pg. 1, Tables 1 and 2. (SDD_00020321, SDD_00020336-SDD_00020349).

[517] US EPA. 2024. *Defining Hazardous Waste: Listed, Characteristic and Mixed Radiological Wastes.* December 17.

[518] Grillot, David A. 2016. *Declaration of David A. Grillot.* June 7.

[519] Grillot, Edward. 2012. *Deposition of Edward Grillot.* April 24. pg. 124-126.

[520] Wendling, Michael A. 2016. *Declaration of Michael A. Wendling.* May 30.

[521] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling.* July 17. pg. 65

[522] Hunter, Cecil R. 2019. *Deposition of Cecil R. Hunter.* May 14. pg. 36-53, 73, and 177-181.

[523] Hunter, Cecil R. 2019. *Declaration of Cecil R. Hunter.* March 25. pg. 1-2.

[524] Hunter, Cecil R. 2019. *Declaration of Cecil R. Hunter.* April 25. pg. 1-2.

➢ Burnable wastes, garbage, non-burnable wastes, and putrescible materials.
[525,526,527,528,529,530]

➢ Waste magazines, paper, cardboard, office trash, ink tubes, and skids. [531,532,533]

## 8.5   Opinions Regarding MCC

*MCC Opinion 1*. MCC printing operations generated waste that contained printing ink, magazines and paper, office trash, cardboard, and wood skids.

*MCC Opinion 2*. MCC waste contained the following hazardous substances: lead, chromium, cadmium, zinc, copper, selenium, cyanide, barium salts, PAHs, PCBs, benzidine, toluene, TCE, 1,1,1-TCA, and ignitable solvents.

---

[525] South Dayton Dump. 1968. *Application for Refuse Disposal Permit*. April 10. (SDD3_0014924-SDD3_0014925).

[526] South Dayton Dump. 1968. *Application for Refuse Disposal Permit*. (SDD3_0014921-SDD3_0014922).

[527] South Dayton Dump. 1969. *Application for Refuse Disposal Permit*. May 13. (SDD3_0014927-SDD3_0014928).

[528] South Dayton Dump. 1970. *Application for Refuse Disposal Permit*. March 10. (SDD3_0014930-SDD3_0014933).

[529] South Dayton Dump. 1971. *Application for Refuse Disposal Permit*. April 1. (SDD3_0014935-SDD3_0014936).

[530] South Dayton Dump. 1972. *Application for Refuse Disposal Permit*. April 1. (SDD3_0014943-SDD3_0014944, SDD3_0014948-SDD3_0014949).

[531] Grillot, Edward. 2016. *Deposition of Edward Grillot*. December 9. pg. 801-805.

[532] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 17. pg. 306, 315-316, and 325-326.

[533] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 16. pg. 44-47.

# Section 9.0
# Valley Asphalt Corporation

I was asked by LSSH to evaluate whether Valley Asphalt Corporation (VA) generated waste containing hazardous substances during the period of SDD's operation or in any other way contributed to the COPCs at the Site. In developing my opinions, I have reviewed documents provided by LSSH and evaluated VA operations. I have identified wastes produced by VA and evaluated whether these may have contained hazardous substances.

## 9.1    VA Operations

The VA property is located within the Site as shown in Figure 3. VA produces hot mix asphalt that is used for pavement purposes such as roadway construction, airport paving, driveways, and more. VA has operated a batch, hot-mix asphalt plant in a northern section of SDD, identified as parcel 5054, from 1956 to the present.[534] VA operations have also encroached onto neighboring parcel 5177.[535] The VA facility currently contains an approximately 100 ft. x 100 ft. asphalt plant, an emission control building (Building 4), three storage silos, and multiple aboveground storage trailers. The facility historically contained at least six additional buildings with office, manufacturing, and laboratory space, but the buildings were demolished due to vapor intrusion.[536,537,538]

## 9.2    Operations by Other Entities on the VA Property

VA purchased parcel 5054 in 1993. In addition to VA, the following tenants also operated on the parcel and contributed to contamination of the site[539]:

> ➢ The "Cinn Dump" accepted waste material, including car bodies, in the 1920s/1930s and may have been present since the turn of the century.[540,541,542] By 1936, the Cinn Dump had been filled and closed. After the land was transferred to Cyril Grillot in 1951, material was excavated from the dump for the purpose of salvaging metal. The

---

[534] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 23-27.

[535] Conestoga-Rovers & Associates (CRA). 2014. *Memorandum - RE: Site History: South Dayton Dump and Landfill, Moraine, Ohio (Site).* August 27. pg. 18. (SDD3_00024026-SDD_00024075).

[536] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 50-58.

[537] Roux Associates, Inc. 2018. *Expert Report on Valley Asphalt's Liability and Allocation of Vapor Intrusion Response Action Costs.* May 18. pg. 19.

[538] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Work Plan for Operable Units 1 and 2.* September 20. pg. 34-35.

[539] CRA. 2014. *Memorandum - RE: Site History: South Dayton Dump and Landfill, Moraine, Ohio (Site).* August 27. pg. 8-18. (SDD3_00024026-SDD_00024075).

[540] Boesch, Jr., Horace J. 2011. *Deposition of Horace J. Boesch, Jr.* December 1. pg. 27-29.

[541] Boesch, Jr., Horace J. 2011. *Deposition of Horace J. Boesch, Jr.* October 23. pg. 16-17.

[542] Boesch, Jr., Horace J. 2006. *Deposition of Horace J. Boesch, Jr.* February 28. pg. 15-16, 24.

remaining material was placed back in the dump and re-covered.[543,544]

➢ SDD also filled portions of the VA parcel following excavations associated with the Broadway Sand and Gravel quarry operations. It is believed that the parcel was backfilled primarily with ash and other non-combustible debris.[545]

➢ Beginning in approximately 1957, Ottoson Solvents emptied and reconditioned used chemical drums on the VA parcel. Ottoson Solvents operated on the parcel for approximately 10 to 15 years.[546]

➢ From approximately 1951 to 1993, Doyle's Auto Parts salvaged automobiles on the southern portion of the VA property.[547,548,549, 550,551,552]

➢ Dayton Recycling operated on the VA parcel for an unknown period of time. Their operations included recycling for glass, aluminum, construction materials, and other various items. In 1991, four USTs were removed from their facility.

## 9.3    General Hot Mix Asphalt Plant Operations

Production of paving material, commonly called asphalt, is a world-wide industry. The material for paving roads and other surfaces consists of a heated mixture of crushed stone aggregate, sand, and about 5-8% asphalt.[553,554] In a batch-mix hot asphalt plant, aggregate is dried in a rotary drier at 121-177º C. The dried material is screened, classified, and stored in hot hoppers. Weighed amounts of aggregate and hot asphalt at 135-165º are mixed together in a mixing device such as a pug mill. The mixed material is then transferred to trucks or silos.

Over 90% of asphalt in the US is derived from crude oil. Generally, low-boiling components of oil such as gasoline, kerosene, and diesel fuel are removed by distillation. Higher-boiling constituents of oil, such as oils and waxes, are then removed from the oil by vacuum distillation. Properties of the non-distilled asphalt are controlled by the amount of distillate that has been removed. Asphalt consists of a wide range of asphaltenes, resins, and oils.

[543] CRA. 2014. *Memorandum - RE: Site History: South Dayton Dump and Landfill, Moraine, Ohio (Site).* August 27. pg. 8-18. (SDD3_00024026-SDD_00024075).

[544] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Work Plan for Operable Units 1 and 2.* September 20. pg. 11.

[545] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 21. (SDD3_00015123-SDD_00015993).

[546] CRA. 2014. *Memorandum - RE: Site History: South Dayton Dump and Landfill, Moraine, Ohio (Site).* August 27. pg. 12. (SDD3_00024026-SDD_00024075).

[547] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 9, 23, 52. (SDD3_00015123-SDD_00015993).

[548] Boesch, Jr., Horace J. 2006. *Deposition of Horace J. Boesch, Jr.* February 28. pg. 28-29.

[549] Boesch, Jr., Horace J. 2011. *Deposition of Horace J. Boesch, Jr.* December 1. pg. 55-56, 71, and 79.

[550] Grillot, Edward. 2012. *Deposition of Edward Grillot.* April 24. pg. 24-27.

[551] Grillot, Edward. 2013. *Deposition of Edward Grillot.* December 16. pg. 35-41.

[552] Grillot, Edward. 2013. *Deposition of Edward Grillot.* December 17. pg. 473-478, 499.

[553] US EPA. 2000. *Hot Mix Asphalt Plants, Emission Assessment Report.* December. pg. 9.

[554] Arnold, Terence S. 2017. *US Department of Transportation, Federal Highway Administration - What's in Your Asphalt?* September.

### 9.3.1    General Wastes from Hot Mix Asphalt Plant Operations

Among the specific hazardous components that have been identified in asphalt are polycyclic aromatic hydrocarbons (PAH) and trace metals present in the oil source.[555,556,557] Trace metals consistently present in crude oils include vanadium, nickel, copper, cobalt, chromium, manganese, and lead.[558,559] Recycling or storage of recycled/reclaimed asphalt pavement (RAP) poses a potential environmental risk due to the release of trace metals such as cadmium, chromium, copper, nickel, lead, and zinc, as well as PAHs, into groundwater and soil.[560,561] Concern over potential pollutant leaching from RAP stems from various sources including the asphalt itself, sealcoats, brake and tire wear, vehicle exhaust and any other chemicals that come into contact with asphalt from road traffic.[562,563] Rainwater may leach chemicals from RAP material either during handling or stockpiling.[564]

In addition, hazardous air pollutants (HAP) such as PAH, benzene, toluene, ethylbenzene, xylene and arsenic, barium, cadmium, chromium, lead, manganese, mercury, nickel, and selenium have been identified in hot mix asphalt plants.[565] US EPA reports wastes and emissions resulting from spills or incomplete control of vapor or particulate components.[566,567] Emissions from the aggregate drier are the chief source of pollution in asphalt hot-mix operation. Air emissions are typically controlled either by scrubbers or baghouses.[568,569]

## 9.4    Waste from VA Operations Impacting the VA Property

The VA plant operations included drying aggregate consisting of stone, sand, and limestone in a 40-ft. long rotary drier with a diameter of about 9 ft.  The hot aggregate then enters a hot elevator, is mixed with approximately 5% hot asphalt at about 204° in a pug mill, and the final step is to transfer the asphalt aggregate to a truck or to silos.[570] Prior to 1993, particulates generated from the asphalt plant were controlled by aqueous scrubbers that discharged to a settling pond on site.

[555] US EPA. 1973. *Atmospheric Emissions from the Asphalt Industry*. December. pg. 4-6.

[556] US EPA. 2000. *Hot Mix Asphalt Plants, Emission Assessment Report*. December. pg. 1 and Tables 1-12.

[557] Fernandes, P.R., et al. 2009. *Evaluation of Polycyclic Aromatic Hydrocarbons in Asphalt Binder Using Matrix Solid-Phase Dispersion and Gas Chromatography*. October 1. pg. 789-793.

[558] Bell, Kenneth G. 1960. *Uranium and Other Trace Elements in Petroleums and Rock Asphalts*. pg. 45.

[559] Ali, Mohammad Farhat. 2006. *A Review of Methods for the Demetallization of Residual Fuel Oils*. July.

[560] Yang, Q., et al. 2020. *Environmental Impacts of Reclaimed Asphalt Pavement on Leaching of Metals into Groundwater*. pg. 1-2.

[561] Legret, M., et al. 2005. *Leaching of Heavy Metals and Polycyclic Aromatic Hydrocarbons from Reclaimed Asphalt Pavement*. pg. 3675-3676.

[562] Mahler, B.J., et al. 2014. *Concentrations of Polycyclic Aromatic Hydrocarbons (PAHs) and Azaarenes in Runoff from Coal-Tar- and Asphalt-Sealcoat Pavement*. May. pg. 81-82.

[563] Van Metre, P.C., et al. 2006. *Parking Lot Sealcoat: A Major Source of Polycyclic Aromatic Hydrocarbons (PAHs) in Urban and Suburban Environments*. January. pg. 1-3.

[564] Legret, M., et al. 2005. *Leaching of Heavy Metals and Polycyclic Aromatic Hydrocarbons from Reclaimed Asphalt Pavement*. pg. 3675-3676, 3684.

[565] US EPA. 2000. *Hot Mix Asphalt Plants, Emission Assessment Report*. December. Section 2, Tables 1-12.

[566] US EPA. 1973. *Atmospheric Emissions from the Asphalt Industry*. December.

[567] US EPA. 2000. *Hot Mix Asphalt Plants, Emission Assessment Report*. December.

[568] US EPA. 1973. *Atmospheric Emissions from the Asphalt Industry*. December. pg. 9-16.

[569] US EPA. 2000. *Hot Mix Asphalt Plants, Emission Assessment Report*. December. pg. 9-10.

[570] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 26, 76-85.

Dust from the scrubbers was settled in the pond and there was no discharge to the Great Miami River. Mr. Dan Crago, the Director of Quality Control and Environmental for VA, testified in his deposition that predating baghouses, water would be used to trap dust, and then the dust would be extracted from the water before being recycled back into the aggregate mix. Mr. Crago was not directly aware of this technology being used at VA but assumed it was.[571] These scrubbers were upgraded in 1974 due to VA emitting more than permissible amounts of particulate matter from the site.[572,573] Since 1993, particulate emissions have been controlled in a 10 x 40 x 15 ft. baghouse. In recent VA operations, a venting system collects dust from the rotary drier and transports it to the baghouse.

The VA plant also contains a large asphalt pile consisting mainly of recycled asphalt pavement (RAP) from close proximity offsite sources. The pile is mostly located on the southern portion of the VA property and a portion of Lot 5177 to the south of the VA property.[574] According to Mr. Crago's deposition in 2017, the piles had reached 30-35 feet in height and mainly consisted of pre-existing asphalt surface or base that have been removed prior to new construction. The RAP might come from projects that are not controlled by VA and might not be original VA asphalt either. No chemical testing was performed by VA on RAP that is received. In addition to RAP from offsite sources, approximately five to ten gallons of asphalt aggregate are cleaned out of the plant each day and added to the RAP piles. Mr. Crago testified that the asphalt pile was already in existence when he joined VA in 1993, and he believed that the asphalt pile had generally grown over the years. He also testified that the RAP is continuously recycled through the plant and is only stored onsite for a short period of time.[575]

VA plant operations also include the testing of asphalt with the use of solvents. VA performs a variety of asphalt tests including the quality sampling of hot mix asphalt batches. Asphalt testing used to occur in a laboratory operated in the former building five before its demolition. It is now conducted in a trailer onsite. To test the asphalt, a sample of the hot mix asphalt is added to a centrifuge with solvent, and the spent solvent is poured into a five-gallon plastic receptacle afterwards. VA likely used both trichloroethylene (TCE) and d-Limonene, an orange-based solvent for testing.[576] The use of TCE for asphalt testing was standard practice as early as 1998 and as late as 1998.[577,578,579] According to Mr. Crago, VA did not have a written procedure for the disposal of TCE. TCE was typically brought back from VA locations to the main office in Cincinnati for disposal; however, no documentation is available showing this practice was used at the VA location in Dayton.[580] As a general practice in the US, solvent was recycled

---

[571] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 26, 104-105.

[572] *Wright State University Library, Special Collections, DDN/JH Clippings File, 47A – Valley Asphalt Corp.* pg. 3-5. (SDD3_00025368-SDD_00025370).

[573] Ohio EPA. 1985. *Preliminary Assessment File, Valley Asphalt Corporation.* November 18. pg. 3, 8, and 12. (SDD3_00025242-SDD_000252526).

[574] Roux Associates, Inc. 2018. *Expert Report on Valley Asphalt's Liability and Allocation of Vapor Intrusion Response Action Costs.* May 18. pg. 34.

[575] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 64-73.

[576] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 112-122.

[577] Lewis, M., Silver, L. 2017. *RE: Hobart Corporation, et al. v. DP&L, et al, Case No. 3:13-cv-115 (U.S. D.C., S.D. Ohio); Valley Asphalt Discovery.* (SDD3_00118576-SDD_00118577).

[578] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 115-118.

[579] Eichstadt, John E. 2017. *Deposition of John E. Eichstadt.* May 5. pg. 26-39.

[580] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 122-123.

infrequently before about 1970. Rather, solvents from laboratory processes were often poured onto the ground.[581] Mr. John E. Eichstadt, manager of the Dayton operation for VA, was also unaware of the quantity of TCE used at the plant and its disposal method.[582] During current operations, this solvent waste is sent for disposal or recycled through a distillation process.[583].

The VA plant has two asphalt tanks, as well as fuel tanks for diesel fuel and fuel oil with recycled oil.[584] The VA operation currently stores approximately three to four 55-gallon drums of oil and grease for lubrication and plant maintenance.[585] Empty drums are sent off for disposal. Waste from such fluids generally contains heavy metals from corrosion and wear.[586,587]

## 9.5    Waste from Other Entities Impacting the VA Property

### Cinn Dump:

On an approximately 10-acre portion of the far north end of the site, Charlie Cinn operated a dump, Cinn Dump, from approximately the turn of the century to the 1920s or 1930s.[588] The Cinn Dump reportedly accepted ash, non-combustibles, and putrescible waste on parcels 5054 and 5171. Mr. Horace J. Boesch, Junior testified that used automobiles, metal car parts, and iron had been buried at Cinn Dump. In 1951, Cyrill Grillot decided to excavate Cinn Dump in order to salvage the metal buried there.[589,590] Wastes from automobiles contain various fluids such as oil, gasoline, or coolant that are contaminated with heavy metals.[591,592] These heavy metals can leach into the soil beneath.[593]

### SDD:

Excavation associated with the Broadway Sand and Gravel quarry operations at SDD appear to have begun along the southern portion of the VA parcel in the 1940s. As the excavation moved further south onto parcel 5177, evidence of filling in the previously excavated area is evident in aerial photographs. A tax map with handwritten notes attributed to Alcine Grillot suggests that the southern portion of the VA parcel was backfilled primarily with ash and other non-

---

[581] Maryland Department of the Environment. 2009. *Facts about Western Regional Lab, SHA (Non-Master List Site)*. March. (SDD3_00024128-SDD_00024129). pg. 1.
[582] Eichstadt, John E. 2017. *Deposition of John E. Eichstadt*. May 5. pg. 26-30.
[583] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 121.
[584] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 97.
[585] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 110.
[586] Motshumi, J. Diphare, et al. 2013. *A Review of Waste Lubricating Grease Management.* August 25-26. pg. 131-132.
[587] Jafari, Ahamd Jonidi, et al. 2015. *Analysis and Comparison of Used Lubricants, Regenerative Technologies in the World.* August 29. pg. 180-181.
[588] CRA. 2014. *Memorandum - RE: Site History: South Dayton Dump and Landfill, Moraine, Ohio (Site).* August 27. pg. 9. (SDD3_00024026-SDD_00024075).
[589] Boesch, Jr., Horace J. 2006. *Deposition of Horace J. Boesch, Jr.* February 28. pg. 24-25.
[590] Boesch, Jr., Horace J. 2011. *Deposition of Horace J. Boesch, Jr.* December 1. pg. 27-29.
[591] Rauckyte, T., et al. 2006. *Determination of Heavy Metals and Volatile Aromatic Compounds in Used Engine Oils and Sludges.* March.
[592] US EPA. 1999. *Antifreeze Recycling.* November. pg. 1.
[593] Iwegbue, C.M.A., et al. 2006. *Characteristic Levels of Heavy Metals in Soil Profiles of Automobile Mechanic Waste Dumps in Nigeria.* June.

combustible debris. During the initial years of operations, SDD mainly operated as a burn dump, with open burning of vegetation, wooden pallets, and combustible waste material, with landfilling as a secondary activity. Therefore, the primary backfill material was likely ash and residue from these burning operations, as well as non-combustible debris including municipal solid waste, industrial solid waste, construction and demolition debris, or residual waste. This was generally consistent with CRA's visual observations during their 2008 Test Pit and Test Trench Investigation.[594]

### *Ottoson Solvents:*

From approximately 1957 to the early 1970s, Ottoson Solvents, operated by Dean Ottoson, reconditioned used chemical drums, likely having contained alcohol or petroleum solvents, in Building 2 of the VA parcel. [595,596] Ottoson would first empty residual liquids from the used drums into a drum and then clean the empty drums by flushing the interior with solvent. Once the residual waste liquid consolidation drum was full, Ottoson would cap it and bury it on the parcel.[597] Mr. Boesch Jr. recalled one incident where he observed Ottoson burying a drum on the parcel with a backhoe.[598] Mr. Boesch Jr. also recalled a conversation with Doyle Roberson from the adjacent Doyle's Auto Salvage property described below, where Mr. Roberson complained that Ottoson was dumping on his ground. Mr. Boesch Jr. took that to mean that Ottoson was also dumping solvents directly into the ground in 1961-1962.[599] Occasionally, Ottoson would also dispose of empty drums at SDD, if they were too rusty or unusable.[600]

In 2000, a number of drums were unearthed by VA near the former Ottoson Solvents building (Quonset hut) during the trenching excavation for a new water line. Mr. Crago testified that during the excavation, some of the drums were knocked over or punctured, while others remained upright.[601] Mr. Boesch Jr. observed approximately four 50-gallon drums in varying states of decay lying in the trench. Based on laboratory analysis, these drums contained cadmium, lead, barium, PCB, benzene, toluene, ethylbenzene, xylene, trichloroethane (TCA), and trichloroethylene (TCE), chlorobenzene, and methyl ethyl ketone (MEK).[602,603,604] TCA Environmental was retained by VA to remove the drums and stockpile the impacted soil. A total of five drums containing solid material were removed and disposed of as characteristic hazardous waste, and a total of 2,217 tons of VOC-impacted, non-hazardous soil was

[594] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 21. (SDD3_00015123-SDD_00015993).

[595] Ottoson, Dean C. 1959. *Patent US2896643 – Cleaning Equipment.* July 28. (SDD3_00025271-SDD_00025275).

[596] Roux Associates, Inc. 2018. *Expert Report on Valley Asphalt's Liability and Allocation of Vapor Intrusion Response Action Costs.* pg. 45.

[597] Boesch, Jr., Horace J. 2006. *Deposition of Horace J. Boesch, Jr.* February 28. pg. 55-56.

[598] Boesch, Jr., Horace J. 2006. *Deposition of Horace J. Boesch, Jr.* February 28. pg. 80-93.

[599] Boesch, Jr., Horace J. 2011. *Deposition of Horace J. Boesch, Jr.* December 1. pg. 65-67, 180-186.

[600] Boesch, Jr., Horace J. 2011. *Deposition of Horace J. Boesch, Jr.* December 1. pg. 66-67.

[601] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 125-127.

[602] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 22-23. (SDD3_00015123-SDD_00015993).

[603] CRA. 2006. *Preliminary Remedial Action Objectives Technical Memorandum, South Dayton Dump and Landfill Site, Moraine, Ohio.* September. pg. 35-36. (SDD3_00023940-SDD_00024025).

[604] TCA Environmental, Inc. 2000. *Environmental Remediation Report.* September 5. pg. 1-4, Appendix C. (SDD3_00025276-SDD_00025363).

removed.[605] In 2008, CRA removed one additional drum during their Test Pit and Test Trench Investigation. They identified TCLP hazardous waste materials, benzene and lead, in a sample from the buried drum. The drum was removed and sent for offsite disposal. CRA's geophysical investigation also identified an anomaly in the area of the drum removal that could represent an additional drum(s).[606]

### Doyle's Auto Salvage/Auto Parts

From approximately 1951 to 1993, Doyle Roberson salvaged automobiles on the southern portion of the VA property. [607,608,609,610] Mr. Crago testified that there were old automobiles behind VA with oil fluids leaking or being dumped out.[611] Mr. Edward Grillot, who worked at Doyle Auto Salvage, testified that workers at the yard would either puncture the gasoline tank or would light cars on fire to burn off the fluid. Workers would also drain the transmission fluid and motor oil straight into the ground. The remaining car would then be burned before it was picked up for salvage. Mr. Grillot testified that cars would come in every hour and believed that the maximum number of cars on the site at any one time was approximately 500.[612,613] US EPA also noted dark-toned staining throughout the auto salvage yard in aerial photographs beginning in September 1970, through the 1970s, ending prior to May 1981.[614] Prior to their banning in 1979, PCBs were used extensively in many applications including automotive brake fluid and oil used in motors and hydraulic systems.[615,616] Therefore, fluids leaking from vehicles in the auto salvage yard could have contributed to heavy metal, PCB, or PAH contamination on the site.[617,618,619] Mr. Grillot also testified that he observed tires and debris during a visit to SDD before his deposition testimony in 2012. He believed that the tires and debris could have come from Doyle's Auto Parts or from other loads that were dumped at SDD.

[605] CRA. 2006. *Preliminary Remedial Action Objectives Technical Memorandum, South Dayton Dump and Landfill Site, Moraine, Ohio.* September. pg. 35-36. (SDD3_00023940-SDD_00024025).

[606] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Work Plan for Operable Units 1 and 2.* September 20. pg. 22-23.

[607] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 163-164.

[608] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 23, 52. (SDD3_00015123-SDD_00015993).

[609] CRA. 2006. *Preliminary Remedial Action Objectives Technical Memorandum, South Dayton Dump and Landfill Site, Moraine, Ohio.* September. pg. 11. (SDD3_00023940-SDD_00024025).

[610] Boesch, Jr., Horace J. 2006. *Deposition of Horace J. Boesch, Jr.* February 28. pg. 27-29.

[611] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 164-165, 195.

[612] Grillot, Edward. 2013. *Deposition of Edward Grillot.* December 16. pg. 37-39.

[613] Grillot, Edward. 2013. *Deposition of Edward Grillot.* December 17. pg. 473-478, 499.

[614] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Work Plan for Operable Units 1 and 2.* September 20. pg. 11.

[615] https://www.epa.gov/system/files/documents/2022-04/pcbs_in_used_oil_fact_sheet_corrected2.pdf

[616] https://www.oregon.gov/deq/FilterDocs/ph-SourcePCBs.pdf

[617] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 52. (SDD3_00015123-SDD_00015993).

[618] Rauckyte, T., et al. 2006. *Determination of Heavy Metals and Volatile Aromatic Compounds in Used Engine Oils and Sludges.* March.

[619] Iwegbue, C.M.A., et al. 2006. *Characteristic Levels of Heavy Metals in Soil Profiles of Automobile Mechanic Waste Dumps in Nigeria.* June.

### *Dayton Recycling*

Dayton Recycling's operations on Parcel 5054 lasted for an unknown period of time and included recycling for glass, aluminum, and construction materials. Dayton Recycling had four USTs removed from its facility in February 1991. An underground tank permit application was initially filed by Cyril Grillot, and an inspection noted that two of the tanks were rusted and pitted, while a third showed slight pitting. Odor and discoloration in the tank cavity were also observed.[620] Although Cyril Grillot was listed as the owner, he reportedly did not install or use the tanks.[621] Two of the four steel tanks had 4,000-gallon capacities, with one containing waste oil and the other containing gasoline. The other two steel tanks had 3,000-gallon capacities, with one containing diesel fuel and the other containing kerosene. The USTs were located to the south and to the west of the southwest corner of the Quonset hut building.[622] The closure logbook from the removal stated that the USTs were installed into a "landfill-type" excavation on parcel 5054, and the removal process exposed visual evidence of foundry sand, brick, and bottles.[623,624] Following the tank removal, subsequent excavation of soil was completed in April 1991 due to the presence of benzene, toluene, ethylbenzene, and xylene(BTEX) and total petroleum hydrocarbons(TPH) in confirmation soil samples.[625] A suspected release report was subsequently submitted to the Moraine Fire Department by Neil R. Bales, who was contracted by Cyril Grillot.[626] After excavation, the State Fire Marshall, Bureau of Underground Storage Tank Regulations (SFM, BUSTR) issued a letter regarding no further action was necessary at the site, despite BTEX and TPH detections in soil samples following the excavation.[627]

## 9.6    VA Property Waste Stream Information

In addition to waste generated on the VA parcel, our review of the record provided to us in this case includes the following descriptions of wastes purportedly associated with VA:

[620] 1991. *Underground Tank Permit Application, Dayton Recycling.* February 12. pg. 1-2. (SDD3_00023538-SDD3_00023539).

[621] Bales, Neil R. 1991. *Underground Storage Tank Closure Report, Dayton Recycling.* April 16. pg. 5. (SDD3_00023544).

[622] GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Work Plan for Operable Units 1 and 2.* September 20. pg. 12.

[623] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 23. (SDD3_00015123-SDD_00015993).

[624] Bales, Neil R. 1991. *Suspected Release Report, Dayton Recycling.* April 24. (SDD3_00023534-SDD3_00023566).

[625] Bales, Neil R. 1991. *Underground Storage Tank Closure Report, Dayton Recycling.* April 16. (SDD3_00023540-SDD3_00023560).

[626] Bales, Neil R. 1991. *Suspected Release Report, Dayton Recycling.* April 24. pg. 2-3. (SDD3_00023535-SDD3_00023536).

[627] Ohio Department of Commerce, Division of State Fire Marshal, Bureau of Underground Storage Tank Regulations. 1992. *RE: Dayton Recycling, 1905 Dryden Road., Moraine, OH 45439, Montogomery County, Incident #5710922-00.* December 15. pg. 2. (SDD3_00023562).

➢ Plant residuals and used/recycled blacktop.[628,629,630,631]

➢ Cinn Dump - ash, non-combustibles, and putrescible waste as well as used automobiles, metal car parts, and iron.[632,633,634]

➢ SDD - ash and other non-combustible debris.[635]

➢ Ottosen Solvents – drums with hazardous substances cadmium, lead, barium, PCB, benzene, toluene, ethylbenzene, xylene, trichloroethane (TCA), and trichloroethylene (TCE), chlorobenzene, and methyl ethyl ketone (MEK).[636,637,638]

➢ Doyle's Auto Salvage/Auto Parts – gasoline and other fluids, including motor oil, transmission and brake fluid, associated with automobiles.[639,640,641]

➢ Dayton Recycling - BTEX and TPH likely associated with former waste oil, gasoline, diesel fuel and kerosene USTs.[642,643,644]

## 9.7    Opinions Regarding VA

***VA Opinion 1.***  Asphalt aggregate generated by VA contained hazardous substances PAHs and heavy metals.

***VA Opinion 2.***  Particulates that were generated by VA from the asphalt plant and controlled by aqueous scrubbers to a settling pond on site highly likely contained hazardous substances PAHs, benzene, toluene, ethylbenzene, xylene, and heavy metals such as arsenic, barium, cadmium, chromium, lead, manganese, mercury, nickel, and selenium.

[628] Wendling, Michael A. 2014. *Deposition of Michael A. Wendling.* April 23. pg. 193-196.

[629] Wendling, Michael A. 2014. *Deposition of Michael A. Wendling.* April 23. pg. 77-80, 196.

[630] Wendling, Michael A. 2014. *Deposition of Michael A. Wendling.* April 23. pg. 77-80.

[631] Grillot, David A. 2014. *Deposition of David A. Grillot.* May 28. pg. 108-110.

[632] CRA. 2014. *Memorandum - RE: Site History: South Dayton Dump and Landfill, Moraine, Ohio (Site).* August 27. pg. 9. (SDD3_00024026-SDD_00024075).

[633] Boesch, Jr., Horace J. 2006. *Deposition of Horace J. Boesch, Jr.* February 28. pg. 24-25.

[634] Boesch, Jr., Horace J. 2011. *Deposition of Horace J. Boesch, Jr.* December 1. pg. 27-29.

[635] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 21. (SDD3_00015123-SDD_00015993).

[636] CRA. 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June. pg. 22-23. (SDD3_00015123-SDD_00015993).

[637] CRA. 2006. *Preliminary Remedial Action Objectives Technical Memorandum, South Dayton Dump and Landfill Site, Moraine, Ohio.* September. pg. 35-36. (SDD3_00023940-SDD_00024025).

[638] TCA Environmental, Inc. 2000. *Environmental Remediation Report.* September 5. pg. 1-4, Appendix C. (SDD3_00025276-SDD_00025363).

[639] Crago, Dan. 2017. *Deposition of Dan Crago, P.E.* February 15. pg. 164-165, 195.

[640] Grillot, Edward. 2013. *Deposition of Edward Grillot.* December 16. pg. 37-39.

[641] Grillot, Edward. 2013. *Deposition of Edward Grillot.* December 17. pg. 473-478, 499.

[642] Bales, Neil R. 1991. *Underground Storage Tank Closure Report, Dayton Recycling.* April 16. (SDD3_00023540-SDD3_00023560).

[643] Bales, Neil R. 1991. *Suspected Release Report, Dayton Recycling.* April 24. pg. 2-3. (SDD3_00023535-SDD3_00023536).

[644] Ohio Department of Commerce, Division of State Fire Marshal, Bureau of Underground Storage Tank Regulations. 1992. *RE: Dayton Recycling, 1905 Dryden Road., Moraine, OH 45439, Montogomery County, Incident #5710922-00.* December 15. pg. 2. (SDD3_00023562).

***VA Opinion 3.*** Laboratory wastes generated by VA contained the hazardous substance TCE.

***VA Opinion 4.*** Assuming VA spilled asphalt, fuel oil, and diesel fuel during its operations, these materials contain hazardous substances such as heavy metals and PAHs, among others.

***VA Opinion 5.*** The documentary record indicates that a variety of wastes were placed on the VA property by other companies. These wastes contained many hazardous substances, such as PCBs, benzene, toluene, ethylbenzene, xylene, TCE, PCE, PAHs, chlorobenzene, MEK, and heavy metals such as cadmium, barium, and lead.

# Section 10.0
# Monsanto – Dayton Laboratory

I was asked by LSSH to evaluate whether Monsanto – Dayton Laboratory (Dayton Laboratory) generated waste containing hazardous substances during the period of SDD's operation. In addition, I have identified wastes produced by Dayton Laboratory and evaluated whether these may have contained hazardous substances. In developing my opinions, I have reviewed documents provided by LSSH and evaluated Dayton Laboratory operations.

## 10.1   Dayton Laboratory Operations

The Dayton Laboratory was the corporate research laboratory for Monsanto from 1936 to 1960 and was located at 1515 Nicholas Road in Dayton, Ohio.[645,646,647] The 20-acre site, consisting of 10 buildings, was bought from Thomas & Hochwalt Laboratories and named the Central Research Department.[648] During this period, the staffing level increased from about 50 to over 200 personnel.[649] In the chemical laboratory, synthesis of new chemicals, the testing of processes for producing these chemicals, and analytical procedures and their development were carried out.[650] Facilities at the site regarded environmental control, polymer and organic synthesis, plastics and rubber processing, metals and ceramics processing, physical sciences and more.[651] Promising new chemicals and materials, or chemicals from other Monsanto research laboratories, were produced in larger quantities for market testing and for the evaluation of chemical process scale up parameters starting in 1938.[652] In 1954, pilot plant facilities were expanded in Building 20 of the Dayton Laboratory.[653] Some of the projects and products at the Dayton Laboratory, from the 1936 to 1960 timeframe, include:[654,655,656,657,658,659]

➢   PCBs

---

[645] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 1, 4. (SDD3_00031987, SDD3_00031990).

[646] Forrestal, Dan. 1977. *The Story of Monsanto: Faith, Hope and $5,000*. pg. 86. (SDD3_00032931).

[647] Dames & Moore. 1992. *Phase I Report: Environmental Baseline Survey*. November 5. pg. 2. (MONS01453).

[648] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 1, 4. (SDD3_00031987, SDD3_00031990).

[649] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 5. (SDD3_00031991).

[650] Monsanto Chemical Company. 1956. *Monsanto Annual Report*. pg. 8. (SDD_00032917).

[651] Monsanto Research Corporation. *Capability*. pg. v and 19-48. (MONS00005, MONS00027-MONS00054).

[652] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 5. (SDD3_00031991).

[653] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 5. (SDD3_00031991).

[654] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 5. (SDD3_00031991).

[655] Monsanto Chemical Company. 1952. *Monsanto Annual Report*. pg. 26-27. (SDD3_00032911-SDD3_00032912).

[656] Monsanto Chemical Company. 1953. *Monsanto Annual Report*. pg. 22. (SDD_00032914).

[657] Forrestal, Dan. 1977. The Story of Monsanto: *Faith, Hope and $5,000*. pg. 86, 96, 105, and 122. (SDD3_00032931, SDD3_00032934-SDD3_00032935, SDD3_00032939).

[658] Monsanto Chemical Company. 1947. *Monsanto Annual Report*. (SDD3_00032906).

[659] Monsanto Agricultural Group. 1992. *Chemical Storage Information*. May 7. pg. 5. (MONS_01442).

- ➢ All Laundry Detergent (Non-sudsing detergents)
- ➢ Acrylonitrile process development
- ➢ Acrylic latex paints
- ➢ Acrilan fibers
- ➢ Styrene polymers
- ➢ Vinyl chloride polymers
- ➢ Acrylonitrile polymers
- ➢ Nylon processing
- ➢ Plasticizer formulation
- ➢ Silicone- and gallium arsenide semiconductors
- ➢ Insecticides (Agent Orange, 2,4,5-T, DDT, Roundup (glyphosate-based herbicide), Alachlor
- ➢ Phenol/formaldehyde polymers
- ➢ Antifoams and surfactants
- ➢ Specialty rubber and plastics
- ➢ Titanium extraction and production.

These activities involved a large number of different chemical reagents, catalysts, solvents, and many separation and purification methods such as extraction, crystallization, filtration, or distillation.[660]

In 1960, corporate Monsanto research was transferred to St. Louis, Missouri. The Dayton Laboratory continued to operate as a subsidiary, Monsanto Research Corporation (MRC) until 1986, when it changed organizationally to the Monsanto Agriculture department. Between 1960-1982, about 200 people were employed carrying out contract research and development for government agencies such as NASA, the Department of Defense, and for other organizations.[661,662,663,664] Some of the activities included:[665,666,667,668,669]

- ➢ Bonding graphite to resins (aerospace)
- ➢ Manufacture and marketing of radioisotopes
- ➢ Foams for dust suppression
- ➢ Air pollution reduction

[660] Monsanto Research Corporation. *Capability*. pg. 21-40. (MONS00027- MONS00046).
[661] Monsanto Research Corporation. *Capability*. pg. iii-iv, 1-2. (MONS00003-MONS00004, MONS00007-MONS00008).
[662] Wurstner, Alan L. 2013. *Deposition of Alan L. Wurstner*. September 25. pg. 13-14.
[663] Ctvrtnicek, Thomas. 2016. *Deposition of Thomas Ctvrtnicek*. August 25. pg. 23-25.
[664] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 5-7. (SDD3_00031991-SDD3_00031993).
[665] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 5-6. (SDD3_00031991-SDD3_00031992).
[666] Monsanto Research Corporation. *Capability*. pg. 1, 12-15. (MONS00007, MONS00018-MONS00021).
[667] Monsanto Chemical Company. 1968. *Monsanto Annual Report*. pg. 10. (SDD3_00032919).
[668] Monsanto Chemical Company. 1973. *Monsanto Annual Report*. pg. 16. (SDD3_00032925).
[669] Dames & Moore. 1992. *Phase I Report: Environmental Baseline Survey*. November 5. pg. 11, 26. (MONS01462, MONS01477).

➢ Fire safety and synthesis of flame retardants
➢ Synthesis and production of developmental quantities of anti-cancer drugs for NIOSH
➢ Herbicides
➢ Melamine/formaldehyde resins
➢ Bisphenol-A and bromination reactions
➢ Dioxin analyses
➢ Battery separator films
➢ Solar energy materials.

During this period, the Dayton Laboratory continued to operate the pilot plant to produce a large variety of developmental quantities of materials for Monsanto products.[670]

List 1 shows some of the common organic chemicals present during the 1930s to about 1981, based on the storage listing and the descriptions of research and development at the Dayton laboratory site.[671,672,673,674]

### List 1.  Some Common Organic Chemicals in Use at the Dayton Laboratory Site from the 1930s to about 1981

➢ Acetone
➢ Acetonitrile
➢ Acrylonitrile
➢ Acrylamide
➢ Adipic acid
➢ Benzene
➢ Butanol
➢ Chloroform
➢ Cyclohexane

➢ Ethyl benzene
➢ Formaldehyde
➢ Herbicides
➢ Hexane/heptane
➢ Kerosine
➢ Methanol
➢ Methyl ethyl ketone
➢ Methylene chloride

➢ Phenol
➢ PCDD/PCDF
➢ PCBs
➢ Radiocarbon
➢ Styrene
➢ Toluene
➢ Vinyl chloride
➢ Xylene

A variety of inorganic chemicals such as gallium arsenide, hydrochloric acid, sulfuric acid, sodium hydroxide, sodium hydride, hydrazine, hydrogen peroxide, and potassium carbonate also were used at the Dayton Laboratory, commensurate with common chemical laboratory and process

---

[670] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 6. (SDD3_00031992).

[671] Monsanto Agricultural Group. 1992. *Chemical Storage Information*. May 7. pg. 3-6. (MONS_01440-MONS_01443).

[672] Monsanto Research Corporation. *Capability*. pg. 12-15. (MONS00018-MONS00021).

[673] Forrestal, Dan. 1977. *The Story of Monsanto: Faith, Hope and $5,000*. pg.184. (SDD3_00032947)

[674] Dames & Moore. 1992. *Phase I Report: Environmental Baseline Survey*. November 5. (MONS01514-MONS01517).

operations.[675,676,677]

## 10.2   General Chemical Laboratory Operations and Wastes Produced

Activities in academic and industrial chemical laboratories during the twentieth century were generally similar and generated a wide variety of waste types commensurate with the type of research. The most common laboratory wastes from general chemical research are:[678,679]

> ➢ Spent solvents
>
> ➢ Unused or unusable reagents
>
> ➢ Acids and alkali's
>
> ➢ Reaction products
>
> ➢ Ignitable paints and other ignitable waste
>
> ➢ Test samples
>
> ➢ Contaminated materials, glassware, paper, plastic products, and personal protective equipment.

## 10.3   General Chemical Pilot Plant Operations and Wastes Produced

According to the National Technical Information Service (NTIS), pilot plants evaluate a chemical's production process before the construction of its full-scale manufacturing.[680] Pilot plants serve as a prototype to the final chemical plant unit and are essential for collecting experimental design data before large-scale production. The pilot plant trial period can also be utilized for modeling by constructing a smaller version of an existing plant and studying its change in parameters to better understand the plant's performance and efficiency.[681]

Wastes are formed from normal chemical processing operations and are dependent on the type of processes carried out in the pilot phase. During chemical reactions, the desired product is formed concurrently with by-products.[682] In order to achieve the desired product purity, separation and purification steps are almost always necessary during chemical manufacture or pilot plant

[675] Monsanto Agricultural Group. 1992. *Chemical Storage Information*. May 7. pg. 3-6. (MONS_01440-MONS_01443).

[676] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9. pg. 5. (SDD3_00031991).

[677] Dames & Moore. 1992. *Phase I Report: Environmental Baseline Survey*. November 5. (MONS01514-MONS01517).

[678] https://www.epa.gov/hwgenerators/typical-wastes-generated-industry-sectors

[679] US EPA. 1989. *Report to Congress: Management of Hazardous Wastes from Educational Institutions*. April. pg. D-61.

[680] NTIS. 1973. *Solid Waste Management in the Industrial Chemical Industry*. pg. 66.

[681] Johnstone, Robert E. 1957. *Pilot Plants, Models, and Scale-up Methods in Chemical Engineering*. pg. 5.

[682] https://elchemy.com/blogs/chemical-market/a-quick-walk-through-a-chemical-production-plant-machinery-procedures-more

operation. These steps may include crystallization, extraction, adsorption, filtration and distillation that serve to remove impurities from raw materials, products and by-products and result in waste streams.[683] Due to experimentation in the pilot phase, pilot plants may generate various off-specification waste resulting from undesirable outcomes and side reactions.[684]

Common chemical process wastes are listed as follows:[685]

- ➢ Sludge
- ➢ Filter residues including filter media
- ➢ Tars such as still bottoms or distillation residue
- ➢ Off-specification products
- ➢ Fly ash
- ➢ Spent solvents

Non-process solid wastes from a typical chemical plant include combustible waste such as cardboard, paper, wood and plastic, noncombustible waste such as glass, concrete and brick, and metal waste.[686]

## 10.4   Waste from the Dayton Laboratory

### 10.4.1  Wastes from the Dayton Laboratory from 1936 to the Mid-1970s

Sparse documentation exists regarding Dayton Laboratory's wastes from 1936 to 1975. During this period, some of the laboratory materials and chemical wastes were disposed of in on-site landfills. Identified waste include:[687,688,689]

- ➢ Formaldehyde
- ➢ Copper cyanide
- ➢ Calcium chloride
- ➢ Yttrium oxide

- ➢ Radiocarbon
- ➢ Arsenic compounds
- ➢ Polonium-210
- ➢ Polonium-210 contaminated hardware

- ➢ Detergent and foam stabilizers
- ➢ Herbicides
- ➢ Scrapped reaction products
- ➢ Labware/glassware.

---

[683] National Research Council. 1998. *Separation Technologies for the Industries of the Future*. pg. 6, 13.
[684] NTIS. 1973. *Solid Waste Management in the Industrial Chemical Industry*. pg. 66.
[685] NTIS. 1973. *Solid Waste Management in the Industrial Chemical Industry*. pg. 52-56.
[686] NTIS. 1973. *Solid Waste Management in the Industrial Chemical Industry*. pg. 48-52.
[687] Monsanto Dayton Plant. *Visual Site Inspection*. pg. 1-5. (MONS01406-MONS01410).
[688] Monsanto Research Corporation. 1983. *An Account of On-Site Burial Locations*. (MONS01840).
[689] EPA. 1981. *Notification of Hazardous Waste Site*. (SDD3_00033037).

*Testimony from Joseph Smart – 1960s*

Mr. Joseph Smart, who worked for a few years at Container Service as a truck driver in the mid-1960s, recalled hauling waste from Monsanto, including skids and paper.[690]

## 10.4.2  Wastes from the Dayton Laboratory from the Mid-1970s

Documentation for disposal of laboratory and pilot plant wastes began to be prepared around the mid-1970s. The following examples of waste generated by MRC, during the 1975 to 1981 timeframe, provide insight into MCR waste before that period.

*Interview from Jerry Booher – 1964 - 1979*

Mr. Jerry Booher drove trucks for Container Service from 1964 to 1979 and remembered picking up waste from Monsanto during that time frame. Pickups were from three 4-cubic yard containers and two 2-cubic yard containers located at the Dayton Laboratory site and occurred once or twice per day. The 2-cubic yard containers generally held a white, odorless powder in gallon jars or plastic containers. Mr. Booher stated the powder to be a flammable hazard and recalled multiple occasions of their trucks catching on fire if the powder reacted with water. [691]

According to a 1983 table of disposal sites used by Monsanto, the following types of wastes were disposed of at off-site landfills[692] in the 1970s:

➢ Acrylic acid mix polymer scrap, 20,000 kg
➢ Off-grade and solvent from acrylic resin, some lab chemicals, 50,000 kg
➢ Lab organic chemicals in drums, 180 kg
➢ Inorganic chemicals in sacks, 360 kg
➢ Scrap, lab chemicals in cans and drums, 15,000 kg

MCR also sent waste solvents and other laboratory wastes to various incinerators.[693]

*Testimony from Thomas Beal - 1979*

In 1979, Mr. Thomas Beal, who worked for Monsanto for over 30 years, shipped three 55-gal drums of laboratory waste containing glass, paper, protective clothing, contaminated labware,

---

[690] Smart, Joseph D. 2015. *Deposition of Joseph D. Smart*. April 14. pg. 14, 26, 42-43, and 80.
[691] Orion Management International. 1991. *Confidential Investigative Memorandum*. October 20. pg. 24-25. (CCR000287-CCR000288).
[692] Monsanto Research Corporation. 1983. *An Account of Off-Site Chemical Waste Landfills*. (MONS01838).
[693] Monsanto Research Corporation. 1983. *An Account of Chemical Waste Incineration*. (MONS01839).

hexane, motor oil, methylene chloride, alumina, pentachlorophenol, and dioxins to a landfill.[694,695,696]  It is unknown in what time frame this quantity was accumulated.

In 1979, IWD listed the following types of wastes from MRC:[697]

> ➢ Photo-processing waste
> ➢ Flammable solvents
> ➢ Chlorinated solvents
> ➢ Paint waste
> ➢ Oil/water
> ➢ Chromic acid
> ➢ Cyanide.

In the same year, records also showed MRC disposing of the following wastes:[698,699,700,701,702]

> ➢ Resin, 9 drums
> ➢ Solvent Sludge, 10 drums
> ➢ Still bottoms, 2 drums
> ➢ Styrene monomer, 37 drums
> ➢ Polystyrene, 21 drums

In 1981, an MRC application for an EPA Hazardous Waste Permit included the following types and quantities of hazardous waste generated yearly at the site:[703,704,705,706]

| Code | Quantity, lbs | Types of Chemicals in Waste Code |
|------|---------------|----------------------------------|
| **F002** | 15,000 | Methylene chloride, PCE, TCE, TCA, freons, chlorobenzene, dichlorobenzene, still bottoms |
| **F003** | 25,000 | Xylene, acetone, ethyl acetate, ethylbenzene, ether, MIBK, butanol, methanol, cyclohexanone |
| **F005** | 75,000 | Toluene, MEK, carbon disulfide, isobutanol, pyridine |

[694] Newco Chemical Waste Systems of Ohio, Inc. 1979. *Waste Product Record*. November 21. (MONS01875).
[695] Beal, Thomas D. 2014. *Deposition of Thomas D. Beal*. April 11. pg. 16, 20.
[696] Beal, Thomas D. 2024. *Deposition of Thomas D. Beal*. April 4. pg. 21, 58-60.
[697] IWD Liquid Waste, Inc. *Customer List – Confidential*. (SDD3_00032959).
[698] Tremont City Landfill. 2001. *Barrel Fill Waste In List*. November 13. pg. 39. (SDD3_00032961).
[699] IWD. 1979. *Cell Report*. December 5. (SDD3_00032952).
[700] IWD. 1979. *Cell Report*. July 27. (SDD3_00032954).
[701] IWD. 1979. *Cell Report*. November 14. (SDD3_00032956).
[702] IWD. 1979. *Cell Report*. October 26. (SDD3_00032957).
[703] US EPA. 1981. *Hazardous Waste Permit Application*. December 28. (MONS01258-MONS01259).
[704] Monsanto Company. 1984. *Hazardous Waste Management Permit Conditions*. August 9. pg. 11. (SDD3_00031977).
[705] Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: Solid and Hazardous Waste Control*. December 9. pg. 8. (SDD3_00032044).
[706] Dames & Moore. 1992. *Phase I Report: Environmental Baseline Survey*. November 5. pg. 11. (MONS01462).

| Lab Wastes | 14,000 | D001(ignitable), D002 (corrosive), D003 (reactive), EP toxicity, chemical standards |
|---|---|---|
| D001 | 22,100 | Ignitable (such as ethanol) |
| D003 | 50 | Reactive (such as thionyl chloride) |

## 10.5    Disposal of Dayton Laboratory Wastes at the SDD

Below is a discussion regarding disposal of waste from Dayton Laboratory at the SDD.

### 10.5.1   Testimony on Disposal at SDD

Testimony regarding the disposal of waste from Dayton Laboratory at the SDD is summarized below.

*Testimony from Horace John Boesch Jr. – 1947-1954 and 1960-1967*

Horace John Boesch Jr. testified that Monsanto trucks disposed of waste at the SDD, from 1947-1954, during the times that he scavenged for waste at the dump, and from 1960-1967, when he had a real estate office at the entrance of the SDD and observed truck traffic. He noted that Monsanto trucks were green, would come to SDD at least once a week, and would bring in plastic residue and cardboard containers with metal tops.[707,708]

*Grillot Family Testimony*

In their deposition testimonies, Edward Grillot and David Grillot remembered that Monsanto dumped at the site.[709,710]

*MRC Waste Organic Chemical Burning at SDD in 1977*

Mr. Alan Wurstner, who worked at MRC as a research chemist and later, the Chief of Emergency Brigade, testified that George Richardson, an organic chemist at MRC, burned chemicals from MRC in a pit at the SDD. Mr. Wurstner obtained a permit for the two-day burn, which consisted of partially filled bottles of mostly organic chemicals that came from one room adjacent to Building 1 of the Dayton Lab.[711]

Mr. Thomas Beal, who first worked for Monsanto on a contract basis and then became in charge of laboratory waste disposal for MRC around 1976, also participated in the burning

---

[707] Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1. pg. 25-27, 44, 57, and 93-94.
[708] Boesch, Jr., Horace John. 2005. *Affidavit of Horace J. Boesch*, Jr. August 25. (Exhibit 1).
[709] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 17. pg. 433-435.
[710] Grillot, David A. 2014. *Deposition of David A. Grillot*. May 28. pg. 104.
[711] Wurstner, Alan L. 2013. *Deposition of Alan L. Wurstner*. September 25. pg. 16, 40-46, 60.

incident with Richardson at the SDD.[712] According to his deposition, Mr. Beal was responsible for applying for an open burning permit for the burning of miscellaneous chemicals at the SDD in the 1970s.[713,714,715] The burn was a four day operation and utilized an air curtain destructor unit. On day one, Mr. Beal prepared for the burn at SDD with the contractor, Earl D. Creager, by creating a 400 $ft^3$ pit, placing a boulder inside and setting up the air curtain destructor. On the second and third day, Mr. Beal and Mr. Richardson brought a set of three to four 55-gallon drums each day to the SDD, packed with 2-ounce to 1-liter sized glass bottles filled with chemicals that were prepared a week or two in advance. Pallets provided by the SDD were placed into the pit with the boulder, and once the fire was started, Mr. Beal and Mr. Richardson would throw the glass bottles at the boulder to break the glass and burn the chemicals. An employee from Earl D. Creager was present during the burning, operating the air curtain destructor. On the final day, the air curtain destructor was shut down and the pit was backfilled. In deposition testimony, Beal stated that Monsanto was cleaning out their chemical storeroom and that most of the chemicals consisted of liquid, organic laboratory chemicals such as methanol, acetone, and methyl ethyl ketone. Mr. Beal also testified that the intent of the air curtain destructor operation was to prevent pollution, however Beal admitted that it did not have 100% efficiency.[716,717]

An account of chemical waste incineration lists an opening burning of laboratory waste chemicals of large variety and reactive inorganic metals at a "city dump site in Moraine, Ohio" occurring in 1976 or 1977.[718] Beal testified that he believed this listed open burning incident could refer to his burning of chemicals at the SDD with Mr. Richardson.[719]

Mr. Beal remembered being told of another burn having been carried out at the SDD before 1973.[720]

*MRC Disposal of Inorganics at SDD*

MRC also disposed of about seven to eight 100-lb bags of inorganics (sodium carbonate and alumina) at the SDD in 1976-1977.[721]

---

[712] Monsanto Research Corporation. 1977. *Handling Dayton Laboratory Waste Chemicals*. May 9. pg. 2. (MONS01843).

[713] Montgomery County Ohio General Health District. *Open Burning Permit*. (MONS01859).

[714] Beal, Thomas D. 2024. *Deposition of Thomas D. Beal*. April 4. pg. 24-25 and 50.

[715] Maier, Bruno E. 1977. *Permit Letter to MRC*. January 13. MONS01870.

[716] Beal, Thomas D. 2014. *Deposition of Thomas D. Beal*. April 11. pg. 20-37 and 52.

[717] Beal, Thomas D. 2024. *Deposition of Thomas D. Beal*. April 4. pg. 25-27, 31-48, 72-75, and 77.

[718] Monsanto Research Corporation. 1983. *An Account of Chemical Waste Incineration*. (MONS01839).

[719] Beal, Thomas D. 2024. *Deposition of Thomas D. Beal*. April 4. pg. 62.

[720] Beal, Thomas D. 2014. *Deposition of Thomas D. Beal*. April 11. pg. 33-34.

[721] Monsanto Research Corporation. 1983. *An Account of Off-Site Chemical Waste Landfills*. (MONS01838).

## 10.5.2 Buring of Waste from Dayton Laboratory at SDD

During the 1970s, glass containers holding a variety of chemicals from historical activities were burned in a pit at the SDD by Dr. Richardson, assisted by either Mr. Wurstner or Mr. Beal. In the process of burning the chemicals, Monsanto personnel broke the glass containers, allowing the chemicals to escape and make their way into the burn area soil or into the burner.

Chemicals burned in the "open" have no chance of complete combustion as there is no way to engineer the proper conditions for combustion. A portion of these chemicals may burn but a significant portion will migrate into the surrounding environment and contaminate soil, soil gas, and groundwater. The chemicals are unlikely to burn completely and will likely produce by-products of incomplete combustion that will be absorbed into the soil or be released into the air. Particulates that are released into the air will travel a short distance and be deposited on the ground and volatiles will move in the air near to the ground and either fall to the ground or be carried away with air movement based on their relative density.

Air curtain incinerators are similarly unable to achieve complete combustion of chemicals as they are not intended for burning chemicals. Generally, these types of incinerators are used for burning wood and brush, not chemicals.

It is highly likely that a large portion of the chemicals that were placed into the burner were not destroyed but were deposited in the immediate vicinity of the burn site as unburned or partially oxidized by-products.

Complete oxidation of organic chemicals requires high temperatures (800 - 1,200 °C), excess oxygen, appropriate mixing, and proper residence times.[722] Generally, residence times of about 1-2 sec achieve complete destruction and minimize products of incomplete combustion, one of the most notorious of which are polychlorinated dibenzodioxins and furans (PCDD/PCDF).[723,724,725,726]

As the chemicals become exposed to the wood fire in the air curtain burner, they volatilize instantaneously. The expanding gases push the chemicals out of the flame envelope and potentially out of the incinerator. The air curtain cools the temperature of the gas very rapidly causing a portion of the chemical to not be oxidized. In the presence of chlorine, incomplete combustion leading to PCDD/PCDF may also occur.[727] Chemicals in the gas phase leaving the burner likely adsorb on particulates or coalesce in small aerosol droplets. Because the air curtain

---

[722] McFee, J., et al. *Incineration Systems*. pg. 4.1-5.

[723] McFee, J., et al. *Incineration Systems*. pg. 4.1-6.

[724] Tsang, W., Shaub, W. *Chemical Processes in the Incineration of Hazardous Materials*. pg. 58.

[725] Senkan, Selim M. *Combustion Characteristic of Chlorinated Hydrocarbons*. pg. 66-67.

[726] Taylor, P.H., Dellinger, B. 1990. *Development of a Thermal Stability Based Ranking of Hazardous Organic Compound Incinerability*. pg. 316-328.

[727] Bumb, R., et.al. 1980. *Trace Chemistries of Fire: A Source of Chlorinated Dioxins*. pg. 385.

burner has no stack, as incinerators do to disperse the off-gases, there is little air dispersion of emissions from the air curtain burner and they deposit in the general vicinity of the incinerator.

It is highly likely that a large portion of the chemicals that were placed into the burner were not destroyed but were deposited in the immediate vicinity of the burn site as unburned or partially oxidized by-products. It is also possible that in the presence of chlorine, incomplete combustion leading to the formation of PCDD/PCDF occurred during incineration of organic chemicals from the Monsanto Dayton Lab.

## 10.6   Opinions Regarding Dayton Laboratory

*Monsanto Opinion 1*.  The Monsanto Dayton Lab generated a wide variety of wastes for disposal at landfills and incineration as a result of laboratory research and pilot plant production activities.  The type and quantity of waste varied over time and was related to (i) the research and development activities occurring at the laboratory and (ii) the size of the organization participating in research activities.

*Monsanto Opinion 2.*  Waste generated by the Monsanto Dayton Lab contained hazardous substances typical of those in List 1, among others.

*Monsanto Opinion 3*.  Waste generated by the Monsanto Dayton Lab by burning in the 1970s contained hazardous substances, such as methyl ethyl ketone, acetone and other chemicals from List 1.

*Monsanto Opinion 4*.  MRC disposed of about 800 lbs of sodium carbonate and alumina at the SDD.

# Section 11.0
# Waste Management of Ohio

I was asked by LSSH to evaluate whether Waste Management of Ohio (WMO) generated waste containing hazardous substances during the period of SDD's operation. In developing my opinions, I have reviewed documents provided by LSSH and evaluated WMO operations. I have identified wastes transported by WMO and its predecessors and evaluated whether these may have contained hazardous substances.

## 11.1 WMO Operations

WMO, and its predecessors, Industrial Waste (IWD), General Refuse, and Container Services, was an industrial trash hauler and contracted with businesses in the Dayton area to collect, transport, and dispose of waste. Their business operation was located about less than a half a mile from the SDD.[728]

Container Services was owned by Larry Brannon, Robert Aldredge, and Howard Aldredge. Robert and Howard Aldredge were brothers. Together, they also owned a landfill on Guthrie Road. Robert Aldredge sold Container Services to Service Corporation of America (SCA) which sold to Waste Management.[729,730]

IWD was owned by Tom Danis. Danis owned landfills in the South Dayton area including Cardington Road, Pinnacle Road, and Valleycrest on Valley Street. Cardington Road was open until about 1980, and Pinnacle Road was opened following the closure. Danis also acquired Blaylock Trucking in the early 1970s.[731]

The SDD is listed as a disposal site for Industrial Waste Disposal Co. Inc. in 1981.[732]

## 11.2 Waste Transported from WMO Operations at the SDD

WMO, then Container Service, disposed of wood pallets from Chrysler Corporation at the SDD from about 1970 to about 1975. According to Robert Aldredge, the wood from Chrysler was contained in a 30-yard box, and was hauled to the burner at Grillot's dump approximately three times per week. The wood included skids and long tubing boxes. Aldredge helped build the first and second incinerators at the Grillot's dump.[733,734]

---

[728] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 16. pg. 222.
[729] Aldredge, Robert L. 2014. *Deposition of Robert Lee Aldredge*. January 8. pg. 26 and 33.
[730] Forney, James. 2017. *Deposition of James Forney*. March 28. pg. 18.
[731] Vencill, Vernon E. 2015. *Deposition of Vernon E. Vencill*. April 14. pg. 25, 46, and 56-58.
[732] U.S. Environmental Protection Agency (US EPA). 1981. *Notification of Hazardous Waste Site*. June 15. (DP&L_0000181-0000183).
[733] Forney, James. 2017. *Deposition of James Forney*. March 28. pg. 40, 48, 49, 54, 71-73, and 190.
[734] Aldredge, Robert L. 2014. *Deposition of Robert Lee Aldredge*. January 8. pg. 26, 49, 56, 59-66, 73, 98, 203, and 204.

Joseph D. Smart was a trash truck driver at Container Service beginning in the mid-60s for approximately three years. Smart also worked as a truck driver for IWD and Waste Management. Smart recalls MCC, the magazine printing company described in Section 8 of this report, being a customer of Container Services. The waste from MCC included trash, magazines, and 5-gallon metal ink buckets. The buckets that formerly held ink were almost empty but did contain some residual ink at the bottom. These nearly empty buckets were placed in a forty-yard open top bin and transported to the landfill. While working for IWD, Smart describes disposing of two loads of wood skids from Dayton Power and Light (or DPL described in Section 7 of this report) at the SDD in approximately 1972 to 1973.[735]

Vernon E. Vencill worked as a truck driver for IWD and Waste Management from about 1970 to 1995. Vencill describes disposing of a load of construction debris from DPL at the SDD in about 1972-1973.[736]

Edward Grillot, who also worked for Container Service for some time, describes WMO predecessor companies bringing wood and wastes from MCC to the SDD. Those predecessor companies include Container Service and Blaylock Trucking. Edward recalls all of the Container Service drivers having keys to the SDD and were able to come at night. Edward indicated that waste of MCC was brought to the SDD by Container Service as frequently as once per day with full dumpsters. The trucks had a logo or writing indicating that they were Container Service trucks. The trucks brought in pallets and skids, cardboard, paper waste, and ink cartridges and tubes.[737,738,739]

David Grillot stated that Container Service hauled many of the pallets burned in the air curtain destructor. Chrysler and Delco Moraine were the source of many of the pallets hauled by Container Service.[740]

Cecil Hunter visited the South Dayton Dump regularly during the 1970s. His father worked as a mechanic at Doyle's Auto Yard located adjacent to the dump. Cecil Hunter and his brother, Richard, took him to the dump to go scrapping for various materials from approximately 1964 or 1965 into the early 1970s. He was there almost every day he was not in school. Mr. Hunter witnessed Container Service trucks bringing waste from McCall, consisting of magazine paper and 55-gallon drums containing ink and paint thinner, to the SDD. He stated that the trucks had "Container Service" displayed on various parts of the trucks and that the trucks were dark colored. Several of Mr. Hunter's family members, including cousins, uncles, and a brother-in-law, drove trucks for Container Service. He saw Container Service trucks being stored in an area adjacent to the gravel pit near the SDD.[741]

Mr. Richard Hunter spent several summers going to the SDD daily from approximately 1964 to 1969. Richard Hunter recalled three of his family members, Lucien Hunter, Corbin Collins, and

[735] Smart, Joseph D. 2015. *Deposition of Joseph D. Smart*. April 14. pg. 14, 19-32, and 92-98.
[736] Vencill, Vernon E. 2015. *Deposition of Vernon E. Vencill*. April 14. pg. 16, 17, 20-22, 55, and 59.
[737] Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24. pg. 124, 125, and 232.
[738] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 16. pg. 44-47.
[739] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 17. pg. 309, 315-336, and 411-413.
[740] Grillot, David A. 2020. *Declaration of David A. Grillot*. January 11. pg. 1.
[741] Hunter, Cecil R. 2019. *Declaration of Cecil R. Hunter*. April 25. pg. 1 and 2.

Greg Lee, working for Container Service. He described that every now and then 30-yard dumpsters would be brought to the dump. The trucks were green and blue and had a box on the back of it. His grandfather told him that "Container Service" was on the side of the trucks.[742]

## 11.3   Wastes Resulting from Burning Pallets

I have been informed by counsel that judgment has been entered in favor of WMO to the extent of Container Services' ownership and operation of the air curtain burner, and so I understand that my opinions regarding the air curtain burner may not be allowed at trial.  I will be able to testify on my opinions about the air curtain destructor if circumstances change.  I set them forth here for the additional reason that I want to maintain consistency with Dr. Exner's opinions on the air curtain burner, the substance of which I agree with.

Pallets are manufactured generally with low-grade and readily available wood, primarily Southern pine and oak.[743]  Disposing of wood pallets at landfills is inefficient because of the large volume of space that they consume. Alcine Grillot and Larry Brannon built two air curtain burners at the SDD in 1970 with the assistance of Robert Aldredge.  Air curtain burners are generally used for burning wood and brush. This burner, also called a destructor, had a permit to burn wood from 1970 to about 1986.[744,745,746,747]

David Grillot operated the air curtain destructor from 1971 to 1973. In David's 2020 declaration, he stated that the air curtain destructor burned mostly pallets during his operation. All of the pallets had nails in them. Plywood and occasionally broken cabinets were also burned. The ash in the destructor was scooped out by front-end loader or bulldozer about every three to four months. By that point the ash would be about three to five feet high and remains of nails were present in the ash.[748]

In Edward's 2020 declaration, he stated that skids in good condition were stored in "Skid Row" at the dump and were reclaimed and sold for reuse. The skids that could not be fixed or repaired were burned in the air curtain destructor. Most of these skids had stains of paint or oil on them as well as nails or other fasteners. The ash remaining after the skids were burned were bulldozed by Edward and Alcine Grillot and dumped elsewhere at the dump. The ash contained remnants of the nails burned with the skids. Other wood occasionally burned in the destructor included plywood and spindles.[749]

[742] Hunter, Richard Lee. 2019. *Deposition of Richard L. Hunter.* April 30. pg. 35, 138, 169, and 266-270.

[743] U.S. Department of Agriculture (USDA) Forest Service. 1971. *Wood Pallet Manufacturing*. FPL-0213. pg. 9.

[744] Aldredge, Robert L. 2014. *Deposition of Robert Lee Aldredge*. January 8. pg. 47-52, and 64-69.

[745] Montgomery County Combined General Health District. 1970. *Air Curtain Destructor Moraine Recycling, Inc.* October 23. (SDD300026072-SDD300026073).

[746] Montgomery County Health District. 1970. *Solid Waste Disposal Site South Dayton Dump & Landfill, 1975 Springboro Road, Dayton, Ohio.* August 14. (SDD01679-SDD01684).

[747] Regional Air Pollution Control Agency. 1986. *Letter in Reference to Open Burning at South Dayton Landfill.* April 24. (SDD_00120).

[748] Grillot, David A. 2020. *Declaration of David A. Grillot.* January 11. pg. 1 and 2.

[749] Grillot, Edward. 2020. *Declaration of Edward Grillot.* January 10. pg. 1 and 2.

Combustion of wood generates hazardous substances in ash and in air emissions containing products of incomplete combustion.  Wood consists of the following major elements: carbon, hydrogen, nitrogen, calcium, potassium, sodium, magnesium, manganese, iron, and aluminum. Wood also contains minor elements of the following elements: arsenic, cadmium, chromium, copper, nickel, zinc, lead, and mercury.[750]

The amount of ash resulting from burning wood varies greatly with the type of wood, where it is grown, and temperature of combustion.  The amount of ash that is produced ranges from 1-10 % (w/w).  The general composition of wood and of ash after burning is illustrated in Table 11-1.[751,752]

**Table 11-1.  Illustrative Wood and Ash Compositions (in mg/kg)**

| Element | Wood, NYSERDA | Ash, U. of Georgia |
|---|---|---|
| Chloride | 28 | |
| Sodium | 34 | 1,900 |
| Potassium | 840 | 26,000 |
| Calcium | 1,180 | 150,000 |
| Magnesium | 216 | 10,000 |
| Aluminum | 68 | 16,000 |
| Manganese | 98 | 10,000 |
| Iron | 64 | 8,400 |
| Arsenic | 0.06 | 6 |
| Cadmium | 0.01 | 3 |
| Chromium | 1.3 | 57 |
| Cobalt | 0.05 | |
| Copper | 1.5 | 70 |
| Nickel | 0.6 | 20 |
| Lead | 0.4 | 65 |
| Mercury | 0.001 | 1.9 |
| Barium | 19 | |
| Zinc | 7.1 | 233 |

The data shows that most metals present in wood are concentrated in the ash after combustion. Metal concentration in ash increases if the wood is contaminated, such as from use of recycled or painted wood.[753]  Wood is often preserved by treating with creosote, copper arsenates, or pentachlorophenol.  When treated wood is burned, increased amounts of arsenic, copper, and chromate are present in the ash.[754]

Incomplete combustion occurs during open burning and in air curtain burners. Air curtain burners use a blower to generate a curtain of air in an attempt to enhance combustion taking place in a trench or a rectangular shaped, open topped refractory box. As a result of inefficient

[750] New York State Energy Research and Development Authority (NYSERDA). 2013. *Elemental Analysis of Wood Fuels*. Report 13-13. June. pg. ES-2, 4, and 5.
[751] NYSERDA. 2013. *Elemental Analysis of Wood Fuels*. Report 13-13. June. pg. 4 and 37.
[752] University of Georgia. 2002. *Best Management Practices for Wood Ash as Agricultural Soil Amendments*. Cooperative Extension Bulletin 1142. pg. 3.
[753] NYSERDA. 2013. *Elemental Analysis of Wood Fuels*. Report 13-13. June. pg. 41-44.
[754] US EPA. 1984. *Characterization of Emissions from the Combustion of Wood and Alternative Fuels in a Residential Woodstove*. EPA-600/S7-84-094. November. pg. 2 and 5

combustion, chemicals and small particulates are released. The primary advantage of an air curtain burner relative to open burning is the increased rate of combustion and the reduced generation of visible smoke.[755,756] Emissions from wood-burning air curtain burners included fourteen PAH compounds, benzene, acetone, toluene, xylene, styrene, and phenol.[757,758]

Emissions from combustion processes arise from inefficient combustion that form products of incomplete combustion. Efficiency of combustion depends on three main factors of the combustion chamber: temperature, residence time of the waste material in the combustion chamber, and turbulent mixing of the waste material. Thermal destruction of most organic compounds occurs at temperatures between 1,100 and 1,200°F. The majority of hazardous waste incinerators are operated at temperatures that range from 1,200 to 3,000°F in the burning zone. To achieve thermal destruction, residence time usually ranges from 30 to 90 minutes for solid waste and 0.5 to 2.0 seconds for liquid waste. Turbulent mixing is important because the waste and fuel must contact the combustion gases if complete combustion is to occur. Sufficient oxygen must be present and is supplied as ambient air or as pure oxygen through an injection system.[759]

The combustion temperature plays a significant role in the formation of polychlorinated dibenzodioxins and furans (PCDD/PCDF) as they are formed due to incomplete combustion. In order to destroy PCDD/PCDFs or prevent their formation, the combustion efficiency must be high. PCDD/PCDFs are formed due to incomplete combustion when combustion temperature drops below 800°C. To achieve complete combustion, the temperature should range between 850 and 1000°C if the combustion chamber is to destroy the carbonaceous particles. For a combustion zone with a temperature of 800°C, a residence time of 2 seconds is recommended, while for 1000°C, a residence time of 1 second is recommended. For complete combustion and complete destruction, a 3 to 6% (v/v) excess of oxygen is recommended.[760]

[755] US EPA. 1996. *Evaluation of Emissions from the Open Burning of Land-Clearing Debris.* US EPA- 600/R-96-128. October. pg. 1.

[756] Schapiro, Alan. 2002. *The Use of Air Curtain Destructors for Fuel Reduction.* June.

[757] US EPA. 1996. *Evaluation of Emissions from the Open Burning of Land-Clearing Debris.* US EPA- 600/R-96-128. October. pg. 16 and 18.

[758] US EPA. 1998. *Products of Incomplete Combustion from Direct Burning of Pentachlorophenol-treated Wood Wastes.* EPA/600/SR-98/013. pg. 3.

[759] US EPA. 1998. *On-Site Incineration: Overview of Superfund Operating Experience.* March. pg. 5.

[760] Themba, N., Sibali, L., Chokwe, T. 2023. *A Review on The Formation And Remediations of Polychlorinated Dibenzo P-Dioxins and Dibenzo-Furans (PCDD/Fs) During Thermal Processes with a Focus on MSW Process.* August 7. pg. 2126 and 2127.

**Illustration 11-1: Incineration Process**[761]



Chemicals formed or present in the wood fire volatilize and escape the flame envelope. The air curtain cools the temperature of the gas very rapidly, and a portion of the chemical may not be oxidized. In the presence of chlorine, incomplete combustion leading to PCDD/PCDF may also occur.[762,763,764,765]

Pallets use fasteners such as nails and staples to securely hold the wooden components together and ensure structural stability. Nails used for pallet construction were typically hardened steel or galvanized steel. The steel nails are typically composed of iron, manganese, and other trace metals. The galvanized coating is made up of primarily zinc. When heated to high temperatures,

[761] Themba, N., Sibali, L., Chokwe, T. 2023. *A Review on The Formation And Remediations of Polychlorinated Dibenzo P-Dioxins and Dibenzo-Furans (PCDD/Fs) During Thermal Processes with a Focus on MSW Process.* August 7. pg. 2126.

[762] US EPA. 1998. *Products of Incomplete Combustion from Direct Burning of Pentachlorophenol-treated Wood Wastes.* EPA/600/SR-98/013. pg. 4.

[763] US EPA. 1984. *National Dioxin Study Tier 4-Combustion Sources.* EPA-450/4-84-014b. December. pg. 2.

[764] Bumb, R. et.al. 1980. *Trace Chemistries of Fire: A Source of Chlorinated Dioxins.* Science, Volume 210. October 24. pg. 2.

[765] Themba, N., Sibali, L., Chokwe, T. 2023. *A Review on The Formation And Remediations of Polychlorinated Dibenzo P-Dioxins and Dibenzo-Furans (PCDD/Fs) During Thermal Processes with a Focus on MSW Process.* August 7. pg. 2126 and 2127.

zinc oxide may be generated.[766,767] The melting point of the steel core of the nail is approximately 1,370 to 1,530°C while the zinc layer melts at around 419°C.[768] Fasteners remaining after incineration likely had the zinc layer removed and therefore are more prone to corrosion in soil .The remaining corroding nail can release iron oxides, lead, cadmium and other metals byproducts into the soil.[769]

Almost all pallets are assembled with nails or staples. Bolted assemblies lack rigidity and are expensive. Adhesive bonded pallets lack needed impact resistance. In 1965, pallets with plywood decks were used due to their resistance to splitting, high impact and puncture resistance, continuity and smoothness, rigidity, and light weight. Composite board, flakeboard, and fiberboard were also used for pallet decks due to their comparable advantages of plywood. Urea-formaldehyde and phenol-formaldehyde resins are regularly used in the manufacture of plywood, particle board, and medium-density fiberboard.[770]

When urea-formaldehyde and phenol-formaldehyde resins are burned, they decompose and release toxic gases and hazardous byproducts. Urea-formaldehyde resin breaks down at high temperatures, emitting formaldehyde, ammonia, carbon monoxide, nitrogen oxides, and smoke containing carbon-based particulates. Similarly, phenol-formaldehyde resin, though more thermally stable, decomposes to release light hydrocarbons, formaldehyde, phenols, aldehydes, ketones, ethers, oxygen-containing heterocycles, and fused ring compounds. The combustion of both resins produces soot and tar-like residues that contribute to air pollution.[771,772]

Staining from substances such as paint or oil was present on the pallets.[773] When paint is burned, it can produce hazardous air pollutants such as benzene, methylene chloride, perchloroethylene, lead, methyl ethyl ketone, and dioxins.[774] Burning petroleum-based oils releases a variety of harmful substances into the environment. The combustion process produces gases such as carbon dioxide, carbon monoxide, sulfur dioxide, nitrogen oxides, volatile organic compounds like benzene, and polycyclic aromatic hydrocarbons.[775]

## 11.4   Opinions Regarding WMO

***WMO Opinion 1.*** MCC printing operations generated waste that contained printing ink, magazines and paper, office trash, cardboard, and wood skids.  MCC waste transported by WMO contained hazardous substances lead, chromium, cadmium, zinc, copper, selenium,

---

[766] USDA. 1971. *Wood Pallet Manufacturing.* pg. 20-23.

[767] Tree Island Industries. 2017. *Safety Data Sheet, Steel Wire Nails, Zinc Coated.* December 5. pg. 1-3.

[768] Misumi Mech Lab. 2025. *Galvanized Steel and Its Uses.* February 24. pg. 2.

[769] Denison, Irving A., Romanoff, Melvin. 1952. *Corrosion of Galvanized Steel in Soils.* November. pg. 301.

[770] Koch, Peter. 1985. *Utilization of Hardwoods Growing on Southern Pine Sites*. October. pg. 2609, 2626-2629, 2747, and 3210.

[771] Alajbeg, A. 1985. *Products of Non-Flaming Combustion of Phenol-Formaldehyde Resin Foam*. November 1. pg. 255.

[772] Feng, Y., et al. 2012. *The Influence of Urea Formaldehyde Resins on Pyrolysis Characteristics and Products of Wood-Based Panels*. pg. 4602.

[773] Grillot, Edward. 2020. *Declaration of Edward Grillot.* January 10. pg. 1 and 2.

[774] South Dakota Department of Agriculture & Natural Resources. 2005. *Chemicals Released During Open Burning.* December 12. pg. 3.

[775] World Health Organization. 2022. *Deliberate Events: Chemical Release and Oil Fires.* April 14.

cyanide, and barium salts. It is highly likely that MCC waste transported by WMO also contained hazardous substances, such as PAH, benzidine, toluene, and ignitable solvents.

***WMO Opinion 2.*** WMO transported wood pallets to the SDD for burning in the air curtain burner. Hazardous substances were produced in the combustion process that yielded wood ash containing heavy metal constituents, such as manganese, chromium, copper, lead, and zinc and others listed in Table 11-1.

***WMO Opinion 3.*** It is highly likely that emissions from the air curtain burner settled in the immediate vicinity of the burner. It is highly likely that these included hazardous substances PAHs, phenols, and polychlorinated dibenzodioxins and furans (PCDD/PCDF).

# Section 12.0
# Sherwin-Williams

I was asked by LSSH to evaluate whether Sherwin Williams Company (SW) generated waste containing hazardous substances during the period of SDD's operation. In developing my opinions, I have reviewed documents provided by LSSH and evaluated SW operations. I have identified wastes produced by SW and evaluated whether these may have contained hazardous substances.

## 12.1 SW Operations

During SDD's operating years, SW owned and operated a manufacturing plant, distribution center, commercial store, and various retail stores in the Dayton area. Until its closure in 1977, the manufacturing plant, located at 452 East Third Street, Dayton, produced paints and coatings.[776,777] The distribution center, located north of Miami River at 3975 Dayton Park, stored and distributed automotive paint and products. The distribution center consisted of a main storage building, drum storage building, and office.[778,779,780] SW had one commercial store with a storefront, warehouse, and blending room, located at 2390 Arbor Boulevard, that supplied paint to large contractors and retail stores in Dayton.[781,782] There were over 10 retail stores in the Dayton area, including one located at 615 South Patterson Boulevard.[783,784]

According to Mr. Robert Scott Thomas, who has worked for SW since 1988 and was the director of global environmental affairs at the time of his deposition in 2017, SW products in 2017 were similar to those of the 1940s.[785] Mr. Thomas described the following products sold by SW:[786]

 ➢ Architectural coatings for the interior and exterior of buildings.

 ➢ Industrial maintenance products applied to bridges and other structures.

 ➢ Product finishes for manufactured products such as furniture, cabinets, and tables.

 ➢ Automotive products for vehicle repair or aesthetic.

 ➢ Specialty coatings, such as powder coatings that require heat to fuse to metal.

---

[776] Gallagher Sharp. 2015. *Letter Re. Hobart Corp., et al. v. The Dayton Power & Light Co., et al*. April 20. pg. 2.
[777] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 133.
[778] NUS Corporation. 1988. *Site Investigation Evaluation and Summary*. October 28. pg. 1-3. (SW-000100).
[779] Sherwin Williams. 2016. *Responses of the Sherwin Williams Company to Defendant Dayton Power and Light Company's First Set of Interrogatories to Sherwin-Williams*. November 23. pg. 10.
[780] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 154.
[781] Sherwin Williams. 2016. *Responses of the Sherwin-Williams Company to Defendant Dayton Power and Light Company's First Set of Interrogatories to Sherwin-Williams*. November 23. pg. 8-9.
[782] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 50-52, 153.
[783] Patterson, Marshall William. 2016. *Deposition of Marshall William Patterson*. December 16. pg. 9.
[784] Sherwin Williams. 2016. *Responses of the Sherwin-Williams Company to Defendant Dayton Power and Light Company's First Set of Interrogatories to Sherwin-Williams*. November 23. pg. 8-9.
[785] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 9, 13, 43, and 74-75.
[786] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 43-45.

---

> ➢ Aerosol coatings.

> ➢ Caulks and adhesives.

## 12.2 General Paints and Coating Operations

Decoration and protection of materials and surfaces has led to a large variety of coating products.[787] Major categories of coatings include paints, primers, varnishes, and lacquers. Paint generally refers to a pigmented liquid composition that converts to an opaque solid film after application as a thin film.[788] Primers are the first coating for a material. Varnishes constitute transparent coatings. Lacquers are clear or pigmented coatings that dry by solvent evaporation only, as opposed to other coatings that dry by evaporation, oxidation, and polymerization of constituents.[789]

These paints and coatings usually consist of the following major components:[790]

> ➢ Pigments,

> ➢ solvents (organic solvents or water),

> ➢ binders, and

> ➢ a range of additives such as fillers, plasticizers, and antimicrobials.

Pigments are finely ground, insoluble organic and inorganic powders that contribute opacity, color, durability, and consistency to paint.[791] Organic pigments from natural sources have been used for centuries, but inorganic or synthetic pigments are mainly used today.[792] Color pigments, heavy metal compounds or organic pigments add color to the paint and coatings. In the 1970s and 1980s, health concerns led to a reduction of heavy metal-containing pigments (for example, lead, chromium, cadmium) in paints.[793,794,795] Paint is a dispersion of pigment in a liquid. The liquids used in paint consist of a volatile solvent and a non-volatile portion called the binder. The volatile solvent portion of paint may be water or an organic solvent. Solvents in paint also act as a thinner used to reduce the viscosity of paint.[796] The binder portion of paint may be resins or

---

[787] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 32.

[788] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 253.

[789] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 252-255.

[790] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 55.

[791] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 86.

[792] https://www.britannica.com/technology/pigment

[793] US Consumer Product Safety Commission (CPSC). 1977. *CPSC Announces Final Ban on Lead-Containing Paint.* September 2.

[794] Occupational Safety and Health Administration (OSHA). 2004. *Cadmium.* pg. 3-5.

[795] Becker, Edward R. 2002. *Public Citizen Health Research Group v. Chao, Opinion of the Court.* December 24. Section I. Facts and Procedural Posture.

[796] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 86, 255.

oils. Binders, which bind pigment particles and other additives together, are resins of a wide range of low-and high-molecular weight natural and synthetic polymers. Binders include cellulose derivatives, acrylic, and vinyl.[797]

**Tables 12-1 through 12-4** illustrate examples of coating compositions for various formulations from the early 1970s.  The compositions show a portion of the variability in paint formulations.

**Table 12-1  Typical Solvent-Thinned Paint Formulation[798]**

| Material | Weight Percent |
|---|---|
| **Pigment**      Titanium dioxide | 29 |
| **Solvent**      Mineral spirits | 15 |
| **Resin**    Long oil, tall oil alkyd | 52 |
| **Additives** | |
| 6 % cobalt naphthenate | <1 |
| 4 % calcium naphthenate | <1 |
| 6 % zirconium drier catalyst | 1 |
| suspension and flow agent | <1 |
| antiskinning agent | <1 |

**Table 12-2  Typical Lacquer Formulation[799]**

| Material | Weight Percent |
|---|---|
| **Film-Forming Material** | 22 |
| Nitrocellulose | 5 |
| Alkyd resin | |
| **Plasticizer**      Tricresyl phosphate | 11 |
| **Solvents** | 6 |
| Methyl ethyl ketone | 6 |
| Methyl isobutyl ketone | 3 |
| Butyl alcohol | 3 |
| Isopropyl alcohol | |
| **Diluents** | 33 |
| Toluene | 11 |
| Acetone | |

**Table 12-3  Typical Industrial Baking Enamel[800]**

| Material | Weight Percent |
|---|---|
| Titanium dioxide | 28 |
| Alkyd resin, 50 % solids | 42 |
| Urea resin, 50 % solids | 14 |
| Xylene | 16 |

---

[797] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 89.

[798] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 67, Figure 4.

[799] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 74, Figure 8.

[800] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 76, Figure 10.

**Table 12-4  Fast Baking Brown Oxide Primer[801]**

| Material | Weight Percent |
|---|---|
| Brown iron oxide | 44 |
| Modified phenolic varnish - phenolic resin, tung oil, linseed oil, mineral spirits | 42 |
| Urea resin, 60 % solids | 6 |
| VM and P naphtha (Varnish Maker's and Painter's Naphtha) | 6 |
| 6 % manganese naphthenate | 1 |
| 24 % lead naphthenate | 1 |

**Table 12-5  1972 Paint Industry Partial Pigment, Resin, & Drying Oil Use Estimate[802]**

| Material | | Million lbs/year |
|---|---|---|
| **Pigments** | Zinc Dust | 28.6 |
| | Lead compounds | 13.9 |
| | Titanium dioxide | 620 |
| | Zinc oxide (incl leaded) | 22.9 |
| | Carbon black | 6.1 |
| | Chrome yellow | 29.1 |
| | Zinc and strontium chromate | 8.0 |
| | Copper and cuprous oxide | 3.5 |
| | Aluminum pastes and powders | 11.0 |
| **Resins** | Natural resins | 2.5 |
| | Acrylics | 51.8 |
| | Alkyds | 211 |
| | Epoxy resins and | 76.11 |
| | esters Maleic resins | 7.3 |
| | Phenolics | 9.8 |
| | Polyurethanes | 13.0 |
| | Urea/melamine | 16.5 |
| | Vinyls | 13.9 |
| | Asphalt/coal tar pitch | 64.7 |
| **Drying oils** | Tung oil | 15.2 |
| | Linseed  oil | 88.6 |
| | Soybean oil | 62.2 |
| | Tall oil (fatty acids) | 46.9 |
| **Solvents** | Toluene | 52.7 |
| | Mineral spirits and aliphatic hydrocarbons | 114 |
| | Xylene | 66.9 |
| | Other aromatic hydrocarbons | 44.4 |
| | Acetone | 135 |
| | Methyl ethyl ketone (MEK) | 145 |
| | Methyl isobutyl ketone (MIBK) | 57.8 |
| | Butyl acetate | 65.4 |
| | Other esters | 54.9 |

---

[801] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 76, Figure 10.

[802] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 87-94, Tables 15, 16, 17, 18.

### 12.2.1 General Manufacturing of Paints and Coatings

Manufacturing methods used between 1940 and 1990 are similar to those used today. Paint was manufactured by blending the appropriate constituents in discrete production batches. Equipment consisted generally of both stationery and mobile tanks, mixers, pumps, and filters. Portable tanks generally were used for batch sizes ranging from 10-550 gallons (gal), while stationary tanks were used for larger batches ranging from 1,000-3,000 gal. High-volume pigments, for example white pigments such as titanium dioxide, generally were received in fiber drums. Other high-volume pigments, for example some chrome yellows, were shipped in 55-gal drums. Other pigments were received in bags. The production of paint begins with the grinding and dispersal of pigments. In a roll mill or sawmill, pigments are ground to a desired particle size and then blended with small quantities of solvent and resin to create a uniform dispersion. This primary dispersion occurs in batches of 30 to 55 gallons. This mixture can be passed through the mill up to three times to achieve the desired degree of dispersion. The mixture is then collected in another container and sent to a let-down tank for the next step in production. The let-down step consists of filling the mixing tank with the dispersion along with solvents, plasticizers, and other additives. These contents are mixed with high-shear, vari-speed mixers in portable tanks and with low-speed mixers in stationary tanks. When the tank contents attain the desired properties, the mixture is filtered through bags, cartridge filters, or vibrating screens and finally dispensed into containers for distribution.[803]

PCBs have been known to be found in paint and printing ink from both Aroclor sources, whose congeners are commercially produced, and non-Aroclor sources, whose congeners are produced as byproducts in various chemical processes. Historically, PCBs were commercially manufactured and used in printing inks and paint as drying oils (resins) and plasticizers before their ban in 1979.[804,805,806] Aroclors likely associated with paint include Aroclor-1242, Aroclor-1248, Aroclor-1254, Aroclor-1260, Aroclor-1262, Aroclor-4465, and Aroclor-5460.[807,808,809,810] PCBs found in paints and inks originating from non-Aroclor sources are a byproduct of pigment manufacturing.[811,812] Azo pigments and, additionally, phthalocyanine pigments are the most important groups of synthetic colorants with a wide range of uses.[813] Synthetic organic pigments

---

[803] US EPA. 1990. *Guides to Pollution Prevention: The Paint Manufacturing Industry*. June. pg. 47.

[804] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments*. November 16. pg. 2822.

[805] Jahnke, J.C., Hornbuckle, K.C. 2019. *PCB Emissions from Paint Colorants*. May 7. pg. 1-3.

[806] U.S. Army Corps of Engineers. 2012. *Public Works Technical Bulletin 2001-1-126*, PCBs in Caulk and Paint. December 31. Appendix A, pg. A-3, Figure A-6, Table A-1.

[807] State of Oregon. 2003. *Fact Sheet: Sources of Polychlorinated Biphenyls*. August 6. Attachment 1.

[808] Monsanto Chemical Company. 1957. *Aroclor, resins and plasticizers for chlorinated rubber.* May. pg. 8-10.

[809] U.S. Army Corps of Engineers. 2012. *Public Works Technical Bulletin 2001-1-126*, PCBs in Caulk and Paint. December 31. Appendix A, pg. A-9-A-10, Tables A-1, A-2.

[810] Monsanto Chemical Company. 1962. *The Aroclor Compounds*. May. pg. 27-33.

[811] Trumbull, K. 2022. *PCBs in Washington State Products: Printing Inks, 2021*. July. pg. 3-4, 12.

[812] Vincent, M. 2020. *PCB-11 and its Presence in the Environment*. November. pg. 1-3, 18-19.

[813] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments*. November 16. pg. 2823.

---

have been manufactured for over 150 years, and many early pigments are azo containing, such as Red Lake C and lithol rubine.[814] Phthalocyanine blue and green were synthesized in the 1930s.[815]

PCB 11 is an example of an inadvertently produced PCB congener found in pigments, principally diarylide pigments.[816,817] Diarylide pigments belong to the azo category of pigments, which make up most orange, red, and yellow pigments.[818] PCB 11 was identified as a byproduct of 3,3'-dichlorobenzidine which is used in yellow pigments.[819] Studies have shown the presence of PCBs not only in diarylide pigments but also in other azo pigments as well as phthalocyanine pigments, the most widely used blue and green pigments in paint and printing inks.[820] Today's commercially available pigments are chemically identical to those produced historically and contain PCBs as their historical predecessors did.[821] Concentrations and profiles of PCBs can vary greatly across pigment types, with observed PCB levels ranging from lower than detection limits to several hundred parts per million.[822] One study performed in 2009 tested paint pigments purchased from Sherwin Williams in Iowa City, Iowa. PCBs were found in azo pigments and phthalocyanine pigments ranging up to 100 ppb.[823] Lastly, PCB congeners of all chlorination levels have been found in pigments used in inks and paints.[824,825,826]

## 12.2.2 General Wastes from Paint Production

The manufacturing of solvent-based paints from 1940 to 1990 generated the following waste streams:

1. **Solvent from cleaning equipment** - Production in batch equipment required frequent changes in the type of paint manufactured according to customer demand. Equipment was flushed and rinsed with solvents to prevent cross-contamination and buildup of paint residues on the mixers and on the walls of pipes and vessels. If possible, solvent rinses

---

[814] Lomax, S.Q., Lomax, J.F. 2019. *The Synthesis Characterization of Historical Novel Azo Pigments: Implication for Conservation Science.* December 3. pg.1.

[815] https://chrysler.org/the-history-of-art-in-color-modern/#_edn8

[816] Vincent, M. 2020. *PCB-11 and its Presence in the Environment.* November. pg. 1-3, 18-19.

[817] Trumbull, K. 2022. *PCBs in Washington State Products: Printing Inks, 2021.* July. pg. 12-13.

[818] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823.

[819] Jahnke, J.C., Hornbuckle, K.C. 2019. *PCB Emissions from Paint Colorants.* May 7. pg. 2.

[820] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823-2824.

[821] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2826.

[822] Anh, H.Q., Watanabe, I., Minh, T.B., Takahashi. 2021. *Unintentionally produced polychlorinated biphenyls in pigments: An updated review on their formation, emission sources, contamination status, and toxic effects.* February 10. pg. 1-3.

[823] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823.

[824] Jahnke, J.C., Hornbuckle, K.C. 2019. *PCB Emissions from Paint Colorants.* May 7. pg. 2.

[825] Anh, H.Q., Watanabe, I., Minh, T.B., Takahashi. 2021. *Unintentionally produced polychlorinated biphenyls in pigments: An updated review on their formation, emission sources, contamination status, and toxic effects.* February 10. pg. 1-3.

[826] Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments.* November 16. pg. 2823-2824.

---

were minimized by manually cleaning equipment with scrapers and squeegees or by using the solvent rinseate in a future batch.  In other cases, the solvent rinseate could be reclaimed on site or sent to a contract reclaimer who could process and return the solvent for reuse.[827,828] Solvent rinseate generally contained a solids content of up to 10% of pigments, additives, and resins.  Used solvents could also contain a wide range of aliphatic, aromatic, and halogenated hydrocarbons, alcohols, ketones and esters.[829] In 1974, an estimated 40 million liters of waste solvent was generated by the paint industry in the US. Approximately 34 % of this solvent was recycled by distillation while the remaining solvent was sealed in drums and sent to landfills.[830]

2. **Obsolete product and customer returns**  -  This waste stream includes products no longer produced or marketed, as well as unused or spoiled products returned by customers. These products were generally blended or re-worked as much as possible, but still generated waste because recovery was often not practical.[831]

3. **Off-specification product**  -  These products resulted from the mixing of wrong, off-specification, or soiled ingredients, or from contamination due to improper cleaning of equipment.  Re-work was attempted when possible, but some material needed to be disposed of.[832,833]

4. **Spills in the production area**  -  Spills were generally absorbed with rags, saw dust, or another absorbent material. Workers would then sweep or shovel the resulting mixture into containers for disposal at off-site landfills.[834,835]

5. **Filter bags and cartridges**  –  The filtering of paint during the production process generates used filter bags and cartridges that contained residual solvents and pigments. Spent filter bags and cartridges were generally disposed of in landfills.[836]

6. **Raw materials packaging** – Individual components of paint and coatings were delivered to a paint plant in paper bags, pails, drums, pallets, etc. While the packaging material itself was not hazardous, there was a potential hazard from any residual amounts of product on the packaging. It has been estimated and confirmed that 28-56 grams of residual pigment were retained in 23-kilogram paper bags at time of disposal.

[827] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 85-86.
[828] US EPA. 1990. *Guides to Pollution Prevention: The Paint Manufacturing Industry*. June. pg. 47-52.
[829] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 189-190.
[830] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 23, 108, and 190.
[831] US EPA. 1990. *Guides to Pollution Prevention: The Paint Manufacturing Industry*. June. pg. 53.
[832] US EPA. 1990. *Guides to Pollution Prevention: The Paint Manufacturing Industry*. June. pg. 53.
[833] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 102.
[834] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 102, Table 68.
[835] US EPA. 1990. *Guides to Pollution Prevention: The Paint Manufacturing Industry*. June. pg. 53.
[836] US EPA. 1990. *Guides to Pollution Prevention: The Paint Manufacturing Industry*. June. pg. 53, 57-58.

When the residual material was classified as hazardous, the entire portion of the waste stream was potentially hazardous and typically sent to landfills.[837]

7. **Dust from air pollution control** – Air pollution control in paint plants usually consists of an air filter that collects dust from the emptying of raw materials, such as pigments, during production. As such, this dust can be a combination of both non-hazardous and hazardous material depending on the plant's raw material usage.[838]

8. **Sludges from water pollution control** – Water pollution control in paint plants typically consists of wastewater sedimentation, sometimes in combination with a flocculant. The wastewater treated is usually generated during the production of water-thinned paints. Compared to solvent-thinned paints, water-thinned paints generally contain fewer hazardous materials, however, sludges are still potentially hazardous wastes due to pigments containing heavy metals and resins.[839]

## 12.3   Waste from SW Operations

*SW Dayton Manufacturing Plant*

In his deposition testimony, Mr. Thomas described the general manufacturing process of SW paint products at the SW Dayton Plant. SW utilized a high-speed disperser to mix resin, pigment and solvents. The mixture was then placed in a thin-and-shade tank to add more solvent and to convert it from a paste into a liquid. The paint mixture was then placed in metal and plastic paint containers of various sizes (pint, quart, 1-gallon, 5-gallon, 55-gallon) for final packaging and distribution.[840,841] From 1972 to 1973, SW's Dayton manufacturing plant produced lacquers, varnishes, and Super Kem-Tone, and manufactured about 3,700,000 gallons of paint.[842,843,844] Mr. Thomas also addressed SW's use of paint thinners and their manufacturing and purchasing of them. Paint thinners were both sold as retail products and used in facility operations at the Dayton manufacturing plant to clean equipment.[845] SW primarily bought and distributed paint thinners from a third-party; however, there were cases where SW blended their own and sold them as products. Based on the commonalties between SW production facilities and typical paint industry operations, it is likely that the Dayton manufacturing plant generated waste that was consistent with the general paint industry at the time. This includes the waste streams discussed in Section 12.2.2 including solvent from equipment cleaning, obsolete product and customer returns,

---

[837] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 84-85, Table 67.

[838] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 83.

[839] US EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings*. pg. 83.

[840] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 75-76.

[841] Edsall, Gregory. 2017. *Deposition of Gregory Edsall*. January 6. pg. 14-16.

[842] *Sherwin Williams Employee List*. (SW001875-SW001876).

[843] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 124, 132.

[844] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. (Exhibit 3).

[845] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 45-49.

off-specification material, spills in the production area, filter bags and cartridges, raw materials packaging, dust from air pollution control, and sludges from water pollution control.

Wastes from items 4 through 7 listed in Section 12.2.2 generally were disposed of in the solid waste dumpsters at each facility.

In addition, Mr. Thomas testified that waste from a manufacturing facility would include both solid and liquid waste. Types of solid waste included cardboard and general trash, dust from dust collectors, empty raw material containers, and any solids generated from treating wash water. Mr. Thomas also testified that raw material containers likely contained residue of the material they stored, such as paint or solvent. Since SW historically used pigments with hazardous ingredients, it is possible that the solid waste generated also contained hazardous ingredients. Depending on the characteristics of the solid waste, it would potentially be disposed of in the dumpster or in a drum. For example, flocculent or solids from treating wash water might be segregated and disposed of separately.[846]

Types of liquid waste generated from SW operations include non-hazardous liquid such as wash water for latex products or hazardous liquid such as solvent waste. As noted above, Mr. Thomas testified that spent solvent was likely containerized in a drum. When asked about off-specification products, Mr. Thomas stated that solvent-based products were typically fuel blended or recycled when possible, and the waste likely would have been transported in drums or in bulk. However, there were no records for waste disposal from the SW Dayton manufacturing facility.[847]

_SW Distribution Center_

The automotive distribution center that operated between 1978 and 1987 sold representative paint product compositions consisting of various solvents (toluene, xylene, butanol, MEK, MIBK), resins (epoxy and hexamethylene diisocyanate polymers), and pigments (titanium dioxide, zinc chromate).[848,849,850] The SW distribution center stored an estimated 1.5 million gallons of paints, thinners, and other related products prior to the fire on May 27, 1987 and its subsequent closure.[851]

Mr. Thomas testified that the burning of this product led to a release of hazardous materials into the soil and groundwater.[852] Analyses after the fire showed water holding tanks containing acetone, MEK, methyl isobutyl ketone (MIBK), ethylbenzene, xylene, and chlorinated

---

[846] Thomas, Robert Scott. 2017. _Deposition of Robert Scott Thomas_. March 30. pg. 77-80.
[847] Thomas, Robert Scott. 2017. _Deposition of Robert Scott Thomas_. March 30. pg. 77-80.
[848] ACME Automotive Finishes. 1985. _Material Safety Data Sheets 1985A Supplement_. October. (SW-000228-SW000242).
[849] Thomas, Robert Scott. 2017. _Deposition of Robert Scott Thomas_. March 30. pg. 47-48, 64-65, and 157.
[850] Big Rogers. 1985. _Material Safety Data Sheets 1985A Supplement._ (SW-000243-SW-000258).
[851] NUS Corporation. 1988. _Site Investigation Evaluation and Summary_. October 28. pg. 1-1. (SW-000098).
[852] Thomas, Robert Scott. 2017. _Deposition of Robert Scott Thomas_. March 30. pg. 158-170.

solvents.[853,854] Composite samples of shredded metal debris from paint cans and other objects were also analyzed, and the results showed that the samples contained barium, arsenic, chromium, and lead.[855] Groundwater at the SW site contained heavy metals such as arsenic, cadmium, chromium, lead, copper, mercury, nickel, selenium, and zinc consistent with pigment compositions.[856,857]

### SW Arbor Blvd. Commercial Store

The SW commercial store at 2390 Arbor Boulevard began operations around 1974 and sold architectural, chemical coating, and industrial paints.[858,859] Blending processes also occurred at the store for color adjustments or tinting services. Paints were likely blended in either the drum itself or in a 180-gallon tank, and these processes generated spent paint thinner or solvent. SW primarily bought and distributed paint thinners from a third-party; however, there were cases where SW blended their own and sold them as products.

Mr. Gregory Edsall, the former warehouse manager of the Arbor Blvd. store, testified that empty paint or paint thinner drums from the Arbor Blvd. location were sold to Dayton Industrial Drum (DID) on Radio Road. Starting in approximately 1982, solvent waste from the Arbor Blvd. facility was sent for recycling. The facility reportedly sent used solvent to various companies throughout their operational period including Solvent Resource Recovery, Safety-Kleen, Chemical Waste Management, and Hazmat Environment.[860,861] In 1983, SW reportedly generated twenty 55-gallon drums per year of waste flammable solvent with the following estimated composition[862]:

> Acetone: 1-2 %
> MIBK: 1-2 %
> n-Propyl acetate: 1-2 %
> Toluene: 3-10 %
> Xylene: 60 – 70 %
> Aliphatics: 20-40 %
> Paint solids: 5-10 %

[853] NUS Corporation. 1988. *Site Investigation Evaluation and Summary*. October 28. pg. 5-2. (SW-000143).

[854] NUS Corporation. 1988. *Site Investigation Evaluation and Summary*. October 28. pg. A-1 through A-3. (SW-000172-SW-000174).

[855] 1987. *Eastside Debris Analytical Results*. June 15. (SW-000263).

[856] NUS Corporation. 1988. *Site Investigation Evaluation and Summary*. October 28. pg. A-32 through A-34. (SW-000203-SW000205).

[857] NUS Corporation. 1988. *Site Investigation Evaluation and Summary*. October 28. pg. 5-25. (SW-000166).

[858] Edsall, Gregory. 2017. *Deposition of Gregory Edsall*. January 6. pg. 10-11.

[859] McConnell, Donald J. 1994. *Re: Request for Information for the North Sanitary Landfill, Valleycrest, Dayton, Ohio*. August 23. pg. 1.

[860] Edsall, Gregory. 2017. *Deposition of Gregory Edsall*. January 6. pg. 19-28, 31-41, 49, 54-55.

[861] McConnell, Donald J. 1994. *Re: Request for Information for the North Sanitary Landfill, Valleycrest, Dayton, Ohio*. August 23. pg. 1. (SDD3_00017570-SDD3_00017571).

[862] Waste Management, Inc. 1983. *Generator's Waste Material Profile Sheet*. (SW 000080).

These types of solvents and residual solids are consistent with solvents typically used in paint formulations and in cleaning of vessels, containers, and spray equipment.[863] The abovementioned 1994 letter also states that the facility generated 55 to 100 gallons of used solvent per month.

Mr. Tim Bailey, a former SW employee who worked at many retail locations in Dayton, also testified that one to two drums of waste paint thinner or solvent were picked up by Safety-Kleen every month from the Arbor Blvd. facility from approximately 1993 to 1999.[864] According to Mr. Edsall, other waste, such as scrapings from the 180-gallon tank or hardened paint, was sometimes combined into 55-gallon drums of waste solvent. These wastes were sampled for waste characterization and then would be loaded into overpacked drums for transportation. Additionally, the blending process likely resulted in partially used containers of paint or paint products. Mr. Thomas testified that the remnants of these products were either sold to customers or containerized with the waste solvent and sent for processing.[865]

Other waste, such as office trash, empty paint cans, cardboard, was disposed of in a dumpster behind the store.[866] SW hired various companies to empty the dumpster, including IWD, Laidlaw, Blaylock, and Koogler Suburban Waste Haulers.[867] Mr. Thomas also testified that SW stores likely had waste from small spills, damaged containers, and solvent-containing rags from cleanup.[868,869]

### Retail Stores

According to Mr. Bailey, retail stores sold the same type of materials as commercial centers.[870] Mr. Bailey stated that the differences in the materials sold were the sizes of the products and that commercial stores sold also industrial maintenance coatings and chemical coatings.[871]

Mr. Marshall W. Patterson, who worked at the 615 Patterson Blvd. store for over 11 years, also testified that operations were very similar to the Arbor Blvd. commercial store. Paint and equipment was sold at the Patterson Blvd. store, and there was a warehouse on the property used to store paint. Mr. Patterson testified that paint thinner was purchased in 1-gallon and 5-gallon buckets[872]. Similar to commercial stores but on a smaller scale, retail stores likely had waste from small spills, damaged containers, and solvent-containing rags from cleanup.[873,874]

[863] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 146-151.
[864] Bailey, Tim. 2016. *Deposition of Tim Bailey*. December 16. pg. 22-25.
[865] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 188-193.
[866] Bailey, Tim. 2016. *Deposition of Tim Bailey*. December 16. pg. 26.
[867] Edsall, Gregory. 2017. *Deposition of Gregory Edsall*. January 6. pg. 19-28, 31-41, 49, 54-55.
[868] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 50-61.
[869] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 45-54.
[870] Bailey, Tim. 2016. *Deposition of Tim Bailey*. December 16. pg. 10-18.
[871] Bailey, Tim. 2016. *Deposition of Tim Bailey*. December 16. pg. 18.
[872] Patterson, Marshall William. 2016. *Deposition of Marshall William Patterson*. December 16. pg. 22.
[873] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 50-61.
[874] Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30. pg. 45-54.

## 12.4    SW Waste Stream Information

Our review of the record provided to us in this case includes the following descriptions of wastes purportedly associated with SW:

> ➢ 1- and 5-gallon buckets of paint, paint cans and lids, skids, boxes, pallets, and 55-gallon drums containing paint, paint residue, and paint thinner..[875,876]

> ➢ Drums and cans of paint in sizes of 1-gallon, 5-gallon and a quart.[877,878]

## 12.5    Opinions Regarding SW

*SW Opinion 1*. SW generated solvent wastes at its Dayton commercial center. These wastes contained hazardous substances toluene, xylene, MIBK, acetone, aliphatic hydrocarbons, and paint solids. It is highly likely that these solids also contained hazardous substances MEK, PCBs, and heavy metals such as lead, chromium, and zinc.

*SW Opinion 2.* SW's manufacturing plant produced solvent wastes as well as wastes from obsolete product and customer returns, off-specification materials, spills, filters, pigment containers, drums, other containers, and packaging. Some of these wastes were mixed with general trash. These wastes contained hazardous substances: the various solvents listed in Table 5, PCBs, and a variety of heavy metals from pigments and additives, such as lead, chromium, zinc, strontium, barium, and others.

*SW Opinion 3.* SW retail stores disposed of wastes such as containers, packaging materials, obsolete product, and office materials which likely contained the same hazardous substances as listed in opinion 2. Assuming SW disposed of this waste at SDD, those wastes contained hazardous substances.

---

[875] Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 16. pg. 32, 118-128, and 132.
[876] Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24. pg. 160-161.
[877] Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17. pg. 15-25, 128-131.
[878] Wendling, Michael A. 2014. *Deposition of Michael A. Wendling*. April 23. pg. 21-22, 54-57, 116-124, 243-247, and 261-263.

# Figures



**South Dayton Dump**
1975 Dryden Rd
Dayton, OH 45439

| | Legend | NORTH | **Figure 1**<br>**Site Location Map** |
|---|---|---|---|

WATERSTONE
ENVIRONMENTAL, INC.
2936 E. CORONADO ST.
ANAHEIM, CALIFORNIA 92806

| Drawn By: MD/GL | Project No: 24-103 |
|---|---|
| Approved By: JVD | Date: 03/07/2025 |

Approximate Scale
0    1/2 mile    1 mile

**Figure 1**
**Site Location Map**

1975 Dryden Road
Moraine, Ohio 45439



SITE (OU1)

Legend



Approximate
Site/OU1
Boundary



NORTH

Approximate Scale

0        1,500        3,000



**WATERSTONE
ENVIRONMENTAL, INC.**
2936 E. CORONADO ST.
ANAHEIM, CALIFORNIA 92806

| Drawn By: MD/GL | Project No.: 24-103 |
|---|---|
| Approved By: JVD | Date: 04/02/2025 |

**Figure 2
Site Vicinity Map**

1975 Dryden Road
Moraine, Ohio 45439



GREAT MIAMI RIVER

DRYDEN ROAD

VALLEY ASPHALT

SOUTH DAYTON DUMP

TRENCH

DAYTON POWER & LIGHT

GRAVEL PIT

RESIDENTIAL & COMMERCIAL

MOBILE PARK HOME

EAST RIVER ROAD



**Waterstone Environmental, Inc.**
2936 E. Coronado St.
Anaheim, California 92806

| Drawn By: MD/GL | Project No.: 24-103 |
| Approved By: JVD | Date: 03/07/2025 |

Legend

Approximate Site/OU1 Boundary



NORTH

Approximate Scale



0    1/2 mile    1 mile

**Figure 3**
**Site Boundary Map**

1975 Dryden Road
Moraine, Ohio 45439

**Appendix A**

**Resume of Jeffrey V. Dagdigian, Ph.D.**

# Jeffrey V. Dagdigian, Ph.D.
## *Managing Principal Environmental Scientist*
### Waterstone Environmental, Inc.

Dr. Jeffrey V. Dagdigian is the owner of Waterstone and is Waterstone's lead environmental scientist. Dr. Dagdigian holds a Ph.D. in chemistry and has over 33 years of experience in the evaluation, assessment, remediation, restoration and/or mitigation of real property with impact to the subsurface by chemical compounds. Based on his lengthy career as an environmental scientist, Dr. Dagdigian is frequently retained as an expert witness for litigated matters. He also performs other aspects of litigation support including release timing, responsible party identification, cost allocation and damage calculations. To perform complex calculations or evaluate probabilities, Dr. Dagdigian prepares his own models that are tailored to address specific issues in a litigated case or environmental problem and uses commercially-available models to evaluate contaminant transport in the subsurface. In addition, Dr. Dagdigian has decades of experience in performing site assessments, subsurface site characterizations, remedial planning and costing, evaluation of industrial processes, forensic chemical analysis of contaminants, environmental site restoration, waste minimization, remediation, and wastewater treatment process evaluation. Dr. Dagdigian's reputation as an experienced expert witness has caused him to be chosen as the testifying expert for the US government and by large corporations where millions to billions of dollars in claims or damages are at stake. For over 20 years, Dr. Dagdigian has been a part-time instructor for environmental programs at the University of California, Irvine. In this role, Dr. Dagdigian develops and teaches courses addressing environmental issues related to chemistry, environmental due diligence, site characterization, remediation and cleanup standards, regulatory compliance and innovative technologies related to site assessment and remediation primarily for the continuing education of currently employed environmental professionals.

## Education

➢ Graduate Course Work for MBA Program, California State University – Fullerton, 1981-1985

➢ Ph.D., Chemistry, University of Southern California, 1980

➢ B.S., Biology, University of Southern California, 1975

## Capabilities

➢ Expert Witness and Litigation Support Services

➢ Forensic Chemical Analysis and Chemical Fate and Transport

➢ CERCLA Cost Allocation

➢ Model Construction for Costing, Plume Migration, and Probability Analysis

➢ Site Assessment and Remediation

➢ Remedial Action and Damages Costing

➢ Clean up Level Calculation and Agency Negotiation

➢ Government Agency Liaison

➢ Industrial Process and Chemical Use Evaluation for RCRA and CERCLA Compliance

➢ Due Diligence and Phase I Environmental Assessments

➢ Hazardous Materials and Air Resources Management

➢ Environmental Compliance and Business Acquisition Audits

➢ Industrial Process and Chemical Use Evaluation for Waste Minimization

➢ Wastewater Treatment Systems

### <u>Key Projects</u>

***Expert Witness and Litigation Support Services***

- ➢ Dr. Dagdigian was retained by counsel as an expert witness for two separate operators of a former circuit board manufacturing facility in Santa Ana, California. The former circuit board manufacturing facility, which had multiple operators, was responsible for a release of 1,1,1-TCA to soil and groundwater beneath the facility that was alleged to be threating an Orange County Water District production well. The 1,1,1-TCA release had degraded to 1,1-DCE and 1,1-DCA, and also contained a solvent stabilizer 1,4-dioxane. To complicate matters, the 1,1,1-TCA release was comingled with a separate 1,1,1-TCA and TCE release from an upgradient offsite source and a separate offsite downgradient TCE plume. Through in-depth evaluation of existing Site assessment and remediation data for the Site which were conducted at the direction of the California Regional Water Quality Control Board Santa Ana Region, and half-life calculations for abiotic degradation of 1,1,1-TCA, Dr. Dagdigian was able to prove that the 1,1,1-TCA release occurred during the operation by a third operator and that neither of the two defendants could have been responsible for the releases. By calculating the mass of the dissolved phase chlorinated solvent groundwater plume for multiple chemicals of concern over multiple time frames, Dr. Dagdigian was also able to demonstrate that the 1,1,1-TCA, 1,1-DCE, 1,1-DCA, and 1,4-Dioxane dissolved phase groundwater plumes were stable and naturally attenuated, and as such they were not a threat to the Orange County Water District production well in question. In addition, to determining the source and timing of contamination, Dr. Dagdigian prepared a cost allocation for the subject site distributing the Orange County Water District investigation costs among the PRPs.

- ➢ Dr. Dagdigian was retained by counsel to represent Union Oil regarding insurer coverage issues. Dr. Dagdigian determined through modeling and probabilistic analysis the time frame during which the Guadalupe Oil Field was impacted by diluent releases that occurred sometime during production activities. A careful review of the existing data established the ages of each potential source area of petroleum hydrocarbon compounds. This included documenting the date of installation and date of removal, abandonment, or mitigation of any possible source areas including but not limited to all aboveground storage tanks, sumps, wellheads, and piping including couplings and repaired lines. It also included reviewing any reported spills from trucking and reported leaks from any of the above or other source areas. Dr. Dagdigian prepared a detailed allocation of costs attributable to the numerous insurers based on the time of the policy, self-insured retentions, and maximum policy limits. The analysis included Monte Carlo probabilistic analysis of the release times to support the times of the releases and thus the effected insurer policies.

- ➢ Dr. Dagdigian was retained by a plaintiff property owner of 200+ acres against a tenant oil exploration and extraction company. The case was filed to enforce lease requirements that the oil company return the property to clean and safe conditions following oil production activities. The case involved evaluating over 100 areas of concern via the collection of soil samples, calculating costs associated with 1) remediating soil impacted as a result of oil exploration and storage (determined to be 180,000 tons); 2) the removal of oilfield infrastructure (roads, well pads, wells, well vaults, tanks, tank foundations, secondary containment berms, piping, heater treaters, etc.); 3) regrading the property to pre-lease grade; and 4) regulatory oversight, permitting, reporting

and closure.  Based on Dr. Dagdigian's environmental assessment and remediation calculations, the defendant settled the case before trial and was compelled to perform the required cleanup.

➤ Dr. Dagdigian was retained by an electroplating company to evaluate of the nature, extent, and source of contamination of the Santa Anita Industrial Park located at 4923 to 4973 Santa Anita Avenue in Temple City, CA 91820. Dr. Dagdigian was asked to perform the following tasks: (i) review historical environmental reports and related information; (ii) identify the chemicals of potential concern; (iii) establish appropriate cleanup goals for soil, groundwater, and soil vapor; (iv) evaluate potential technologies and procedures for performing site remediation; (v) evaluate remediation costs provided by the environmental consultant; (vi) determine whether the remedial actions were consistent with the NCP; and prepare a CERCLA cost allocation between the involved past and current owners and a number of tenants. Dr. Dagdigian evaluated and used each of the six Gore factors to allocate responsibility among the parties.

➤ For a confidential client, Dr. Dagdigian was the lead expert witness for the plaintiffs in a case involving contamination of a 600 acre commercial/light industrial park by releases of jet fuel, leaded gasoline, unleaded gasoline, and various refinery intermediates. Three entities (two pipeline companies and large oil refinery) were involved in the releases of the above materials, which eventually resulted in six groundwater plumes, which were commingled in various locations on the property. Among other demands, the plaintiffs asked for cleanup costs and full indemnification from future liabilities. Dr. Dagdigian was responsible for reviewing existing site characterization data produced by a variety of consultants for various clients, integrating the all site characterization data into a single database, developing and implementing an expedited sampling program, which allowed for determination of the extent of contamination and an allocation to the responsible parties. In addition, Dr. Dagdigian was responsible for preparing and defending in court a remedial action plan and corresponding remedial cost estimates. As a result of Dr. Dagdigian's efforts, two of the defendants settled out of court meeting the plaintiff's demands and with respect to the third defendant, the jury found in favor of the plaintiff.

➤ Tricor Refining, LLC, etc. v. Crompton Corporation, etc.; Kern County Superior Court Case No. S-1500-CV-252296-SPC. In this case, Dr. Dagdigian served as the sole expert witness for Tricor Refining, LLC. Dr. Dagdigian provided opinions regarding the extent and nature of soil, soil gas, and groundwater contamination beneath the Golden Bear Refinery located in Oildale, California. These opinions were based on a multi-year investigation of the refinery Dr. Dagdigian directed which included hundreds of borings and samples collected in both soil and groundwater beneath the refinery. In addition, Dr. Dagdigian opined on the fate and transport of the various chemicals through various media using chemical, geological, and hydrogeological principles. This portion of his testimony was aimed at showing areas of contamination that needed remediation and the potential migratory paths for contaminants currently impacting the soil and groundwater. Finally, Dr. Dagdigian developed health-based cleanup levels for all of the chemicals of concern and provided the Court with his detailed engineering plans for the cleanup and remediation of contaminated soil beneath the refinery. Based on his remediation plans, Dr. Dagdigian testified that the cleanup cost for the entire refinery would be $29.5 million. This estimate was based on a detailed engineering cost estimate, prepared by me, which totaled remedial costs for every area of the refinery that was contaminated. The costs included installation of several vapor extraction systems to remove volatile vapors in the soil gas, excavation of contaminated soil beneath various operating units within the refinery, installation of various shoring systems and the removal of and re-installation of various operating units and tanks within the refinery.

➢ Dr. Dagdigian was retained by counsel for a Responsible Party in the Portland Harbor Superfund Site, evaluated factors potentially effecting incidental formation of polychlorinated dibenzo-p-dioxins (CDDs) and polychlorinated dibenzofurans (CDFs) in chlorate/chlorine reactors at a former manufacturing facility. Water and sediments along Portland Harbor are contaminated with many hazardous substances, including heavy metals, polychlorinated biphenyls (PCBs), polynuclear aromatic hydrocarbons (PAH), dioxin, and pesticides. The facility operated from 1941 to 2001 and manufactured chlorine, DDT, ammonia and orthosilicates.  Dr. Dagdigian identified process variables and materials of construction of the chlorate cells which potentially may have impacted or promoted the formation of CDDs/CDFs. Dr. Dagdigian prepared an expert report that presented the potential mechanisms of CDD/CDF formation in both thermal (e.g. waste incineration) and wet chemistry settings. The evidence showed that based on the materials used, the construction of the chlorate cells, and the operating conditions would not have attributed to the formation of CDDs or CDFs.

➢ Dr. Dagdigian was retained as an expert witness by counsel for a machine shop that made airplane parts named as a potentially responsible party in the San Gabriel Valley Puente Valley Operable Unit.  This is an area with groundwater impact by TCE, PCE, and 1,4-dioxane among other chemicals.  Dr. Dagdigian performed a historical investigation and additional investigations he designed to show that the client did not contribute to the groundwater plume in the Superfund. Dr. Dagdigian presented his conclusions to the  Puente Valley Superfund Group and the judge in charge showing:  (i) the client never used the chemicals of concern, (ii)  the chemicals of concern were not found in soil matrix on the client's property, (iii) groundwater contamination from up-gradient sites had impacted groundwater beneath client's property, (iv) groundwater contamination is responsible for low concentrations of halogenated volatile organic compounds in soil gas on the client's property, and (v) owners and operators of properties responsible for up-gradient groundwater contamination have not been named as potentially responsible parties (PRPs).  This presentation resulted in the client receiving a *de minimus* settlement offer.

➢ Dr. Dagdigian was retained by counsel for a food manufacturer named as a responsible party (RP) for the Omega Chemical Superfund Site in Whittier, California.  The Omega facility was a solvent and refrigerant recycler that operated from approximately 1976 to 1991. The facility was identified as a Superfund Site following the discovery of extensive soil and groundwater contamination of numerous chemicals including trichloroethene (TCE), tetrachloroethene (PCE), Freon and 1,4-dioxane with a groundwater plume approximately four miles in length. Dr. Dagdigian performed a comparative study of plume chemicals against his client's chemical use and storage history and prepared an expert report indicating that the chemicals were dissimilar and recommending that counsel request the client's removal from the RP Group or be provided a reasonable *de minimus* settlement amount.  The client was named a PRP as a result of having shipped significant volumes of food-grade isopropyl alcohol (IPA) to the facility for disposal in the 1990s, even though IPA is not a chemical of concern in the Superfund and Superfund investigation and remediation did not address IPA. The report presented technical arguments for the client's removal from the RP group and results from Dr. Dagdigian's work are pending.

➢ Dr. Dagdigian was contracted by the United States Department of Justice (DOJ) to testify as the lead expert for a civil enforcement action against a United States Department of Energy (DOE) contractor pertaining to groundwater contamination.  The subject facility, a now privatized nuclear enrichment facility formerly operated by the DOE. Dr. Dagdigian was tasked with identifying the specific sources of contamination and routes of migration that resulted in multiple

plumes of groundwater contamination that extend for several miles, eventually impacting the down-gradient surface waters of the Ohio River. Dr. Dagdigian prepared a chemical fate and transport model that demonstrated the release of chemicals from specific chemical process, the migration route of that release through a network of subsurface utilities and structures, and the continued subsurface migration, both free-phase and dissolved-phase, through the hydrogeologic environment. Dr. Dagdigian evaluated reports of chemical and geological data pertinent to the presence or absence of specific chemicals within the facility infrastructure, surface waters, soil, soil vapor, and groundwater; and other facility records (including unit operation and maintenance records), facility maps and plans (including a 50-year series of subsurface utility engineering as-builts), aerial photographs, and any other available records or data pertaining to the location and function of facilities that may have utilized or been a pathway for the migration of contaminants. .

➢ Dr. Dagdigian was retained by counsel to conduct a Potentially Responsible Party (PRP) search in a heavily industrialized area of Los Angeles. The first step was to conduct research to understand which industries and industrial activities presently or historically emitted the chemicals of concern (COCs). Using scientific articles, industry publications, regulatory publications, and other guidance documents 16 industrial operations were identified as potential emitters. The second step in the process involved a review of geocoded Sanborn maps from various decades viewed in a GIS viewing program (Arcviewer and Google Earth) to identify businesses as PRP. The effort resulted in the identification of 551 industrial facilities and/or operations within the approximately 2 mile radius evaluated.

➢ Provided litigation support to the Department of Justice (DOJ) in their case against a chemical manufacturing facility in Utah. A site visit was conducted to evaluate chemical manufacturing and solvent recycling equipment and to obtain process documents for review. It was determined and documented that the facility was not storing chemical manufacturing intermediates or recycling solvents in compliance with regulatory limitations but instead speculatively accumulating and over 3,000 drums of hazardous waste stored at the facility and in essence operating as an unpermitted RCRA hazardous waste storage facility. Using the expert report prepared by Dr. Dagdigian, the DOJ obtained a court order that required operations to cease, $100,000 in penalties for violations, and is entitled to collect up to $900,000 for the Superfund removal action conducted by the EPA.

➢ Dr. Dagdigian was retained by counsel for an electronics manufacturer in Santa Ana, CA who had been named as a defendant in the Orange County Water District vs. Radioshack Corporation and Universal Circuits, Inc. et al.; Case No. 30-2008-00078246-CU-TT-CXC; Superior Court of the State of California, Regarding Halogenated Hydrocarbon Groundwater Contamination in Orange County.  Plaintiffs claimed that the client had contributed to groundwater contamination by one or more of the following volatile organic compounds: TCE, PCE, 1,1- DCE, 1,1,1-TCA, and 1,1-DCA.  Dr. Dagdigian prepared a comprehensive study of the chemical use and history of the client and all prior tenants on the property, prepared an expert report, and provided deposition testimony indicating that the client did not contribute to the groundwater contamination. Subsequently, claims against the client were dropped by the plaintiff.

➢ Representing a steel manufacturer as defendant, Dr. Dagdigian was deposed regarding the storm water pollution prevention plan that was developed pursuant to federal regulations under his supervision. Stormwater from the client's plant had migrated to a neighboring chemical manufacturer's property. Dr. Dagdigian testified regarding the methodology of the storm water

plan he developed for the client and he provided detailed testimony regarding whether lead could be present in the client's stormwater, the migration properties of lead in general and whether it was possible for lead to migrate onto the plaintiff's property via stormwater. Dr. Dagdigian also provided expert testimony regarding the type of cleanup that would be required if remediation was necessary.

➤ Dr. Dagdigian was retained by counsel to represent a tire-to-energy generation plant where a lightening fire had caused melting of several million automobile and heavy equipment tires. Fire fighting was performed for months and fire fighting fluids mixed with the melted tires caused contamination of several storm water ponds at the site. Chemicals of concern included polynuclear aromatic hydrocarbons, petroleum hydrocarbons, metals, and solvents. The project involved the review of the environmental damage the fire had caused and the identification of the major source of potential contamination to groundwater. This project was overseen by the Department of Toxic Substances Control (lead agency), State of California Attorney General, the Regional Water Quality Control Board, and the Integrated Waste Management Board. Dr. Dagdigian directed and strategized the procedures for a Characterization Plan and Removal Action Workplan that was compliant with the National Contingency Plan and worked with counsel to interface with all oversight agencies to remove 7,000 tons of sludge material from the largest collection pond. A large number of confirmation sample analysis results were coordinated to ensure compliance with very low cleanup levels. Dr. Dagdigian directed all aspects of the project including characterization sampling, the removal action, confirmation sampling, data interpretation, compliance, and validation and preparation of the final report which was approved by the oversight agencies. Based on the work performed, no charges were brought against the client who later settled with the state for an undisclosed sum.

➤ Representing the plaintiff regarding litigation over a remediation technology, Dr. Dagdigian testified about the remediation method used to remove a variety of chemicals from impacted soil. Dr. Dagdigian's testimony provided detailed information regarding the use of low temperature thermal desorption including a discussion of the types of chemicals it can remove, how each chemical reacts with the low temperature, and the byproducts of the chemical reaction created by the low temperature method. Dr. Dagdigian's testimony included a discussion of the pilot tests run and an explanation of chemical boiling points and how boiling points are used to determine the efficiency of the low temperature remediation method with the types of chemicals that existed onsite.

➤ For a major aerospace client as defendant, Dr. Dagdigian was deposed regarding the client's management of Material Safety Data Sheet (MSDS) information system. Dr. Dagdigian provided an explanation of the MSDS system that was developed for the client under his supervision including an explanation regarding the type of chemical and technical information contained in the MSDS system. Dr. Dagdigian provided specific information regarding Proposition 65-listed chemicals and chemicals listed under AB2588 (Toxic Hot Spots). Dr. Dagdigian's testimony was used to provide a strong defense for the client which included a detailed explanation of how all mixtures of chemicals could be traced to individual chemical compounds in the client's MSDS system, how to use the MSDS system to trace all Proposition 65 chemicals automatically, and how the client uses the MSDS system to monitor manufacturing activities where Proposition 65 chemicals are used.

➢ Dr. Dagdigian testified in a bench trial on behalf of Defendant Kemira Water Solutions, Inc. ("KWS") (ECF Case: 11-cv-1686 (KBF) (KNF)) in US Federal Court. Dr. Dagdigian was retained by counsel for KWS to provide opinions regarding the response and clean-up actions taken by Plaintiff APL CO. PTE. LD. ("APL") with respect to two shipments of ferrous chloride crystals which leaked while on board trans-Pacific container ships and caused the need for a lengthy and costly cleanup at two sites in the Port of Los Angeles. Dr. Dagdigian was also asked to advise on regulatory issues pertaining to various environmental statutes and regulations, including the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA") and the application of the National Contingency Plan ("NCP") for cost recovery under CERCLA.

➢ Dr. Dagdigian was retained by counsel for the property owner of a strip mall in Las Vegas, Nevada that had a dry cleaning tenant that caused PCE soil and groundwater contamination. Dr. Dagdigian designed the investigation, feasibility study and remedial action plan for the dry cleaner. The investigation was accelerated because the dry cleaner was situated immediately adjacent to a residential area. Investigation results showed a PCE plume in soil and groundwater extending from the strip mall to the residential area. A feasibility study was conducted and using the results of a cost benefit analysis, the Nevada Department of Environmental Protection (NDEP) approved a remedial action plan which was limited to onsite removal of impacted soil and groundwater.

➢ Dr. Dagdigian was retained by counsel for a bulk fuel shipping/distribution terminal in northern California. He served as expert witness for the defendant against claims by neighboring residents that concentrations of benzene were present in the indoor air of their homes as a result of vapor intrusion from impacted groundwater. Dr. Dagdigian designed and directed the evaluation of a commingled groundwater plume of petroleum hydrocarbons from the defendant's facility and chlorinated solvents (PCE and TCE) originating from a neighboring facility. Although PCE and TCE were present in the groundwater beneath the residential neighborhood, additional groundwater sampling was performed which showed that benzene was not. A study of historical records revealed an additional possible source in the form of a fuel UST in the former railroad right-of-way that other parties in the litigation had not discovered. The presence of the UST was confirmed by excavation. Dr. Dagdigian prepared an expert report and provided deposition testimony on behalf of the defendant which resulted in a favorable settlement.

➢ Dr. Dagdigian was retained as an expert witness by counsel for a retail shopping center in Cerritos, CA that was underlain by a large PCE/TCE groundwater plume that included elevated groundwater concentrations suggesting the presence of DNAPL. The property formerly housed an automobile repair facility and in recent years a tenant dry cleaning facility. Dr. Dagdigian evaluated all historical areas of concern to identify potential source areas that included video inspections of the public sewer system adjacent to the property. Dr. Dagdigian also developed a sampling plan to collect multi-depth groundwater samples in the immediate area of the sewer. This information together with the existing groundwater data was input into a GIS model and 3D animation was used to conclude the release point of PCE/TCE was from the public sewer. Dr. Dagdigian performed a forensic analysis of all potential sources onsite and offsite, evaluated chemical fate and transport and testified in court on behalf of the plaintiff to show that the solvents originated from the sewer within the public right-of-way that had migrated from offsite onto the property. Dr. Dagdigian prepared a summary of past and estimated future response

costs for assessment and remediation of the groundwater plume. Dr. Dagdigian's testimony resulted in a favorable settlement for the client.

➢ Dr. Dagdigian was retained by counsel for a former aerospace manufacturing facility in Redondo Beach to evaluate environmental liabilities associated with an existing groundwater plume. The site contained 4 groundwater plumes that were commingled and contaminated with TCE, PCE, TCA, DCE, and hexavalent chromium. The purpose of Dr. Dagdigian's evaluation was to facilitate the sale of the property and estimate the cost for future assessment/remediation for insurance purposes. The property was redeveloped in the 1990s as a retail shopping center, the responsible party was no longer financially viable, and no environmental work had been performed for approximately five years. Dr. Dagdigian performed a study to identify historical source areas and areas of known contamination which was used to evaluate the effectiveness of previous remediation efforts including soil vapor extraction and groundwater pump and treat. Sampling of the existing groundwater well network was performed to assess the current conditions. A report was prepared which recommended a proposed scope of work, estimated schedule and costs to achieve site closure from the RWQCB. Work continued on behalf of the buyer, which included performing offsite groundwater sampling to further evaluate the extent of the groundwater plumes. A neighboring dry cleaning facility was identified as a likely contributing source of PCE to groundwater in a portion of the site forming a commingled plume together with petroleum hydrocarbons from a neighboring gasoline service station. Data indicates that closure can be achieved by monitored natural attenuation.

➢ Dr. Dagdigian was retained as an expert by a defendant oil production company to evaluate alleged chemical exposure to a resident leasing a house within an oil field. The plaintiff claimed health effects due to oil company operations. Dr. Dagdigian was retained to determine whether air contaminants alleged to be present and the source of health effects were i) from household or other products present at the residence; ii) present in concentrations which could result in acute or chronic health affects; iii) present in air from oil field extraction, storage and refining activities. Waterstone reviewed opposing expert depositions and provided counsel information related to errors in plaintiff's method of sample collection and data analysis that resulted in inaccurate conclusions. Waterstone collected air samples, performed a bench scale study, and showed that air contaminants inside the residential structure did not match air contaminants in the area of the oil field extraction activities, storage tanks, or refining activities. Dr. Dagdigian's conclusions indicated that there were no chemical concentrations inside the residence that were related to oil production activities.

➢ Dr. Dagdigian was retained as an expert witness for the City of Avalon in defending against contamination claims by Long Beach Unified School District related to arsenic, lead, PAHs, and dioxins/furans at a school campus. The contamination was linked to historical operations of a manufactured gas plant (MGP) and a suspected burn dump. The MGP, operating from 1920 to 1941, used crude oil and later LPG, producing waste materials such as lampblack and PAHs. Investigations found MGP-related debris and ash, as well as evidence suggesting historical incineration and grading activities contributed to soil impacts. Dr. Dagdigian analyzed the contamination's nature, extent, and sources, preparing multiple expert reports. The City of Avalon settled during trial.

***Forensic Chemical Analysis***

As a Ph.D. chemist, Dr. Dagdigian has been retained frequently to perform forensic chemical analysis. Dr. Dagdigian uses environmental forensics to develop a clearer understanding of the source(s) of the chemical contaminants, the time since chemical release, and how chemicals have moved through the environment. Dr. Dagdigian uses his understanding of chemistry and physics and how chemicals interact

in the environment. Additionally, Dr. Dagdigian has used forensic analysis to support responsible party allocations in situations involving commingled plumes, track the fate and transport of the chemicals in the environment, and determine the extent to which remediation has successfully removed chemical mass from the environment.

> ➤ Dr. Dagdigian was the lead expert witness in a case involving petroleum hydrocarbon contamination of commercial/industrial park from an inter-refinery pipeline used by one oil refinery versus contamination from a second oil refinery located adjacent to the commercial/industrial park. Dr. Dagdigian performed an exhaustive forensic analysis using soil, soil vapor, groundwater and free product data to demonstrate the source of soil and groundwater contamination on the property. In addition to the traditional environmental analyses typically performed on these media, a more focused forensic analysis was performed. For the contaminated soil and free product media, this additional forensic analysis included full PIANO fingerprinting, stable isotope analysis, GC/FID analysis, full fuel oxygenate analysis, and lead alkyl analysis. For the vapor phase media, forensic chemical analysis included vapor flux rate studies and full GC/MS characterization of the vapors. The types and concentrations of the fuel oxygenates and lead alkyls allowed Dr. Dagdigian to demonstrate that the contamination was caused by a release of leaded gasoline and aviation fuel which had been produced between 1960 to 1980. In addition, several marker chemicals were identified in the groundwater, which confirmed the source as the inter-refinery pipeline and not the adjacent oil refinery.

> ➤ Dr. Dagdigian was retained as the environmental expert in a case involving a commingled gasoline plume from two nearby gasoline stations. The case involved determining whether the gasoline plumes were in fact commingled and, if they were commingled, allocation of remediation costs to each responsible party. Dr. Dagdigian performed a forensic analysis on the free product to determine whether the free product found on the subject gasoline station came from the nearby gasoline station. This forensic evaluation included full PIANO fingerprinting, stable isotope analysis, GC/FID analysis, full fuel oxygenate analysis, and lead alkyl analysis. Evaluation of the rate of evaporation of the volatile components and water washing and biodegradation of selected components were incorporated into the forensic analysis to demonstrate that the plume from the nearby gasoline station had indeed impacted the subject gasoline station. The analysis also showed that approximately 80% of the groundwater contamination on the subject gasoline was the result of a release from the neighboring gasoline station.

> ➤ Dr. Dagdigian has successfully used his extensive knowledge of chemistry to negotiate innovative and cost-effective remediation measures with the Regional Water Quality Control Board regarding Freon and acetone impact in groundwater at a former paint manufacturing company. By developing a conceptual model describing how different chemicals are retained by soils, chemical vapor pressures, and the chemical behavior of acetone and Freon in vapor, soil, and groundwater, Dr. Dagdigian negotiated a single episode of groundwater extraction in place of a lengthy pump and treat or air sparging system for the client.

### Chemical Fate and Transport

> ➤ Dr. Dagdigian proposed a conceptual model for the movement of various metals through soil including Chromium VI, nickel, lead, zinc, and copper to support closure of a facility leased by a major chemical manufacturer. He explained the nature of the molecular size and properties of the metals and how they migrate in soil and groundwater. The presentation of this conceptual model to the California EPA Department of Toxic Substances Control proved that deep groundwater was not affected by metals and the site received closure under the Department's Voluntary Cleanup Program.

➢ Dr. Dagdigian used his conceptual modeling experience and understanding of chemical behavior in the subsurface to provide evidence that polynuclear aromatic hydrocarbons (PAHs) had not been fully addressed by a prior gas utility site owner. Dr. Dagdigian presented a conceptual model illustrating the migration of PAHs in soil and groundwater and provided a prediction of where the PAHs migrated by providing an explanation of PAH migration rates, solubility, volatility and methods of PAH movement in the environment. The results of Dr. Dagdigian's presentation caused the prior owner to expand its characterization of the site, increase the remediation efforts, and perform a more complete cleanup. The original remediation estimate, which included the removal of 7,000 tons of soil, was revised to the removal of 17,000 tons of soil based on the conceptual model.

➢ Dr. Dagdigian was retained by the County of Los Angeles to provide his understanding of chemical transportation and degradation in groundwater beneath a former landfill to devise an approach for appropriate remediation. The former Class II landfill operated from the late 1940s-1950s and accepted an estimated total of 3 to 5 million tons of waste including inert solid fill (e.g., rock, concrete, and earth), household and commercial refuse (e.g., paper wood, rubber shrubbery, and paint sludge), garbage (e.g., animal and vegetable products), and liquids and semi-liquids (e.g., drilling muds and printer's ink). The landfill was unlined and encompassed over 275 acres of property.

Dr. Dagdigian prepared a conceptual 3-D model presenting the migration and distribution of contaminants onsite and upgradient of the landfill within multiple water-bearing zones (aquifers) beneath the landfill and how characteristics analyzed show evidence of a large off-site upgradient source area. Dr. Dagdigian evaluated chemical trends in on-site and off-site portions of the contaminant plume, as well as shallow and deep groundwater conditions. It was evident that the anerobic conditions of the landfill present a reducing environment which enhances the natural degradation of chlorinated solvents present in the contaminant plume. The presentation of this conceptual model to the California EPA Department of Toxic Substances Control showed evidence that groundwater contamination was largely attributable to an off-site source entering the landfill within deeper aquifers and that monitored natural attenuation is the preferred alternative for site remediation.

### *Site Assessment and Remediation*

➢ Dr. Dagdigian was retained to complete soil and groundwater investigations associated with a former plating facility in Carson, California. The soil and groundwater at the facility were impacted with tetrachloroethene (PCE) from operation of a former metals degreasing unit (solvent degreaser). Groundwater beneath the site was impacted by PCE and hexavalent chromium (Cr+6) from an unknown release associated with shop operations. Dr. Dagdigian supervised soil remediation via excavation to remove impacted soil beneath the former solvent degreaser area. Groundwater investigations included vertical characterization of PCE and other contaminants within the first aquifer utilizing a cone penetration testing rig and multi-depth Hydropunch sampling. Additionally, discrete sampling was conducted throughout a 50-foot thick shallow water bearing zone and collection of the groundwater from a deeper regional aquifer (Gardena Aquifer). Subsequent groundwater investigations included offsite installation of triple nested groundwater monitoring wells to monitor water quality in the top, middle and multi-bottom portions of the impacted shallow water bearing zone. An interim remedial action plan was submitted to the LARWQCB, which contained a containment/barrier approach to limit further migration of the PCE plume utilizing in-well air-stripping wells and in situ chemical oxidation to reduce the chemical mass in the highest concentrations portion of the plume. Site pilot testing of remedial technologies and additional plume characterization will be conducted prior to

implementation of a full scale multi-approach remedial system(s) on and offsite in the near future.

➢ Dr. Dagdigian was retained to perform a groundwater investigation of a former nuclear testing site in Goleta, California under the oversight of the Central Coast Regional Water Quality Control Board. TCE-contaminated groundwater was discovered in shallow groundwater beneath the property. Dr. Dagdigian performed historical research using several sources and implemented an intensive groundwater sampling program.  The results indicated that a neighboring property owner was wholly responsible for the TCE plume.

➢ Dr. Dagdigian was retained to perform a groundwater investigation in the City of Commerce under the oversight of the Department of Toxic Substances Control (DTSC). PCE and TCE contaminated soil and groundwater was discovered beneath a former vapor degreaser area (VDA) on the property which was a former pipe and tube manufacturing facility.  Following the removal of the VDA and subsequent remediation by excavation of the shallow soil, a "No Further Action" letter was issued regarding the soil issues. Dr. Dagdigian was able to successfully establish, through historical research, evaluation of previously collected subsurface data, and an intensive soil and groundwater sampling program, both the extent of impacted groundwater and the geometry of the underlying perched aquifer and aquiclude.  This lead to a series of meetings with DTSC project managers, as well as geologists from the Geological Services Unit (GSU), to establish both a revised conceptual site model of the complex subsurface geology and a final approach towards site closure which included monitored natural attenuation (MNA) coupled with groundwater monitoring activities utilizing low-flow purging and sampling techniques.

➢ Dr. Dagdigian directed a site investigation which included the collection and analysis of the following soil vapor, soil, and groundwater samples:

  ▪ Collection and analysis of 127 soil vapor samples

  ▪ Collection and analysis of 126 soil samples from 79 locations

  ▪ Collection and analysis of 189 water samples from 113 locations; of these, 94 samples were collected from deeper saturated zones beneath the Property

  ▪ Interpretation of subsurface geology and identification of six discrete groundwater flow zones within 60 feet of surface from the installation and description of 30 deep borings, seven of which were continuously cored.

Dr. Dagdigian's Phase II investigation led to the identification of two areas of concern on the site. One area consisted of soil and groundwater contamination was clearly the result of onsite sources. This area was remediated by excavation. The second area was the result of offsite sources. Waterstone prepared a document clearly showing the path of migration from offsite sources and supported all hypotheses with information from several flow zones from beneath the property. Following remediation of the onsite area, the RWQCB closed the site without further remediation, prepared letters ordering additional work from offsite sources, and permitted our client to abandon all groundwater monitoring wells on the site.

As a result of the investigation, remediation, and negotiation of closure directed by Dr. Dagdigian, our client was able to sell the property at full market price less than 1.5 years following the initiation of the original investigation. Waterstone has performed litigation support services that allowed the client to recoup 50% of the costs of performing the Phase II investigation and remediation from the responsible parties of the offsite source of contamination.

➢ Dr. Dagdigian was retained to evaluate environmental issues associated with a large paint manufacturing facility included a spray paint canning operation. Freon, chloroform, and carbon tetrachloride were contaminants of concern in vapor. Dr. Dagdigian studied the movement and pattern of contaminant transport and provided evidence that these compounds in soil vapor would naturally attenuate.  The oversight agency agreed and no further action was required for Freon.

### Wastewater Treatment Systems

➢ Designed a wastewater treatment facility for treating metal plating wastes at a major southern California aerospace facility.

➢ Managed the design and start-up of five wastewater treatment facilities for a large U.S. battery manufacturer to remove lead, copper, and zinc metals.

➢ Managed the design and start-up of three wastewater treatment facilities for plating operations of several aerospace fastener manufacturers. These wastewater treatment facilities included heavy metal removal, chrome reduction, cyanide oxidation chemistry, and process engineering.

➢ Managed the environmental audit, facility design, and facility start-up of two wastewater treatment facilities for an electrical connector manufacturer. These wastewater treatment facilities included heavy metal removal, chrome reduction, cyanide oxidation chemistry and process engineering.

➢ Modified cyanide treatment systems for several electroplaters from single-phase chlorine systems to dual-phase hypochlorite treatment systems.

### Property Transaction Environmental Assessments

➢ Principal-in-Charge of the Phase I environmental assessment and site characterization of a chemical facility in southern California undergoing closure. Previous site uses included the production of clay adsorbent for petroleum refining, the manufacture of acid-leached clays used for purifying cooking oils, fuels, and other similar materials, and the production of fluid cracking catalyst and zeolites. Elements of the project include identification of historical chemical use/storage areas; site inspection; soil and groundwater investigation to determine any chemical impact to the site; and evaluation of remedial options.

➢ Principal-in-Charge of a fast-track environmental assessment program conducted under attorney-client privilege. Oversaw a team of assessors who reviewed over 90 Phase I assessments, conducted 48 neighboring property assessments and nine Phase I assessments, and assessed potential remediation costs within a six-week period. Tabular summaries of results were successfully used by the client in negotiations with the property seller.

➢ Provided oversight for the review of a Phase I environmental assessment of three ski areas for a potential buyer. Provided comments and recommendations, developed potential cleanup costs, and evaluated landslide and mining waste reports.

➢ Principal-in-Charge of a due diligence investigation of 215 Alpha Beta grocery store facilities. The project involved site inspections, underground tank research, groundwater data research, ranking the potential impact from neighboring "listed" sites, and soil sampling at facilities with potential hazardous materials impact. Created a database for managing the information collected during the investigation. The database produced issue-specific (i.e., underground storage tanks, historical property usage, etc.) and site-specific reports. The client received bi-weekly status reports, and a final report, which was issued eight weeks following commencement of the project.

➢ Principal-in-Charge of multi-site environmental assessment of industrial, retail, and undeveloped properties located in California, Arizona, Colorado, and Oregon on behalf of a national real estate corporation. The 72 properties, ranging in size from two to 300-acres, and buildings on the properties, up to 400,000 square feet in size, were assessed in a five-week period for evidence of potential on-site soil and groundwater contamination and asbestos-containing materials (ACM). The assessments combined review of regulatory agency files, field inspections, and site specific soil sampling programs, and proposed to evaluate the presence of contamination at 25 of the properties.

- ➢ Developed the methodology for performing assessments of 419 retail, commercial, industrial, research & development, office, and residential properties in the midwest and western United States for a major California developer. Orchestrated the activities of a 3-office team to complete property file reviews, agency research, and site inspections for 275 of the properties. Final deliverable included a 15-volume, 3-inch binder set of reports, and three volumes of summaries and matrices.

- ➢ Project Director for a property transaction environmental assessment of 15 properties for Young's Market, a food and liquor distributor. Provided both Phase I and Phase II services.

- ➢ Project Director for the environmental assessment of 25 light industrial and warehouse facilities in a business park that is located within a National Priorities List (NPL) Superfund area. The purpose of the investigation was to evaluate the impact of the regional groundwater contamination on the subject site, and to assess the likelihood that activities currently or formerly conducted at the subject facilities and/or neighboring facilities impacted soil or groundwater underlying the subject property.

- ➢ Project Manager for a property transaction environmental assessment for Trammell Crow, a major national development company. Provided Phase I, Phase II, and asbestos sampling services for 66 properties located in the Western United States. The project was completed within six weeks, in conjunction of Jones, Day, Reavis & Pogue, a national law firm.

- ➢ Project Manager for a property transaction environmental assessment of a 900-acre oil and gas field located in southern California. The site originated in the 1920's, and included a natural gas plant, a wastewater treatment facility, a facility support yard, 300 oil wells, 95 tank farms, 51 sumps/pits, 17 catch basins, and 57 potential disposal sites. The project entailed the visual inspection and documentation of the condition of each well, tank farm, and sump; verification of the presence of each potential disposal site; inspection of the gas plant, support yard and wastewater treatment facilities; a historical records search; review of aerial photographs and company files; plotting of site observations on area maps; and preparation of final report.

### Environmental Compliance Audits

- ➢ Principal-in-Charge of an environmental health and safety compliance audit of a major airline jet engine refurbishing facility in southern California. Facility operations included metal plating and machining, parts cleaning, abrasive blasting, welding, engine testing, and painting and dye penetration testing. The facility was evaluated through inspection, review of files, and personnel interviews. A single report was prepared that documented the facility's environmental compliance status with federal, state, and local regulations regarding hazardous waste and hazardous substance management, water quality and air emissions control, underground storage tank management, and health and safety compliance.

- ➢ Principal-in-Charge of a property acquisition environmental compliance audit of five corrugated manufacturing facilities in southern California. Project involved the evaluation of potential chemical impact to the property from operations conducted at each facility, and the environmental compliance status of each facility. Documented findings and provided recommendations and associated costs for each facility to achieve compliance.

- ➢ Project Manager for an environmental audit for a major cement manufacturer. The facility audited contained cement quarry, cement kiln, and cement packaging operations. Performed audit of environmental record keeping to ensure completion of proper reports, and designed a system for continued compliance.

- ➢ Project Manager retained by counsel to prepare Phase I Environmental Site Assessment Reports for a group of seven properties located throughout northern California which were developed with existing or historical landfills, recycling centers, waste processing facilities, waste transfer

facilities, composting operations, and operation yards. Landfill operations included acceptance of both municipal and hazardous wastes. Each property was evaluated based on current and historical operations, environmental database listings and agency records, waste and fuel storage operations, wastewater and stormwater management, a physical site inspection to understand current operations, and existing monitoring data.

### *Waste Minimization*

➤ Principal-in-Charge of Hazardous Waste Source Reduction and Management Review Act of 1989 (SB14) compliance project for a major oil corporation's lube plant and terminal facility in southern California. Evaluated the hazardous waste generating processes at the lube plant and terminal and prepared a Hazardous Waste Management Performance Report and Report Summary, and Source Reduction Evaluation Review, Plan, and Plan Summary within a six-week period. Tasks included performing facility inspections and document review to estimate the total quantity of hazardous waste generated for the reporting year; identifying, evaluating, and selecting source reduction measures for each routinely generated hazardous waste stream; addressing the effectiveness of each selected measure in reducing hazardous waste and releases to all media; and preparing a timetable for implementing selected measures.

➤ Principal-in-Charge of SB14 project for an aluminum can manufacturing and aluminum extrusion facility. Project required the completion of a source reduction evaluation plan, waste management report, and related summaries. Oversaw data collection and review; identification and documentation of waste generating operations and past source reduction measures; and identification, evaluation, selection, and documentation of source reduction measures.

➤ Conducted a waste minimization audit of an aerospace plating facility, which reduced dragout by 40 percent and water usage by 50 percent with no impact on product quality or major capital expense.

➤ Conducted a source reduction program at a southern California aerospace metal finishing facility to meet pre-treatment requirements.

➤ Performed water and chemical mass balance studies for numerous plating shops to investigate wastewater treatment problems and waste minimization opportunities.

### *Air Resources Management*

➤ Project Manager on several AB 2588 Toxics "Hot Spots" Emission inventory plans and reports throughout southern California.

➤ Project Manager for an Emission Inventory Plan for a circuit board manufacturer. Prepared Emission Inventory Plan; inventoried all chemicals emitted from the plant, which came under jurisdiction of AB 2588; developed methods to calculate emissions of those chemicals; designed and completed flow diagrams to describe how the chemicals were used and emitted.

➤ Managed the "Hot Spots" (AB 2588) evaluation of regulated chemicals for large semi-conductor electronics manufacturing firm within a 5 week time frame. Facility evaluation involved emissions from five buildings.

➤ Project Manager for review of an Emission Inventory Plan provided by another consultant for a major aerospace client. Reviewed the plan and prepared a critique for review by the client.

➤ Project Manager for an Emission Inventory Plan for a major aerospace manufacturing facility. Prepared an Emission Inventory Plan; inventoried all chemicals emitted from the plant, which came under jurisdiction of AB 2588; developed methods to calculate emissions of those chemicals; designed and completed flow diagrams to describe how the chemicals were used and emitted.

### *Accelerated Site Investigation and Closure*

➢ Principal-In-Charge for a comprehensive Phase II investigation associated with potential environmental issues created by the historical use of approximately 20 properties as retail paint stores. The goal of the environmental work performed on these sites was to evaluate all potential environmental issues to prepare each parcel for sale as part of liquidation proceedings for a large portfolio. An additional stipulation was to minimize the future liability of the client by performing comprehensive, exhaustive investigation of all potential environmental issues for each property.

Investigations were performed by collecting samples of soil vapor, soil, and groundwater using hand auger, hollow stem auger, geoprobe, dual wall casing, and cone penetrometer methods. Dr. Dagdigian negotiated closure with several different agencies including the California Regional Water Quality Control Board, the California Department of Toxic Substances Control, the County of San Diego Hazardous Materials Management Division, the Alameda County Department of Environmental Health, and various local oversight agencies such as city Fire Departments.

➢ As Principal-In-Charge, supervised Phase II sampling on a 33 acre oil field parcel where gas plant operations, oil production, and crude oil storage have been performed since 1902. Used Phase II data to prepare remediation cost calculations for the purposes of transferring the property to a new owner.

➢ As Principal-In-Charge for a southern California oil production company, oversaw the Phase II investigation, risk assessment activities, and preparation and implementation of a remedial action plan to remove 1100 cubic yards of soil from a site where oil production activities had been performed since the 1920's. First sampling through final closure report was performed in less than 3 months to meet a client-mandated deadline for marketing the property.

➢ For a Southern California home builder, participated in the design and implementation of an accelerated remediation of a former oilfield property where the discovery of sump materials stopped construction of homes in three different areas. Disposal of thousands of cubic yards of soil to the former oil operator's bioremediation cell was required within a one week timeframe to allow the building schedule to resume as planned. After all visible contamination was removed and confirmation samples were collected, the resultant data was used in a risk assessment for the site. Dr. Dagdigian then negotiated the accelerated issuance of a site closure letter with the Los Angeles Region of the Regional Water Quality Control Board.

➢ Principal-In-Charge for the Phase I Environmental Assessment of a warehouse property formerly owned by a large oil company. Air photo review revealed that a large ponded area had existed on the property for many years during the time it was owned by the oil company. Subsequent sampling of this potential environmental issue indicated that diesel range hydrocarbons existed in this area. Dr. Dagdigian oversaw the lateral and vertical extent sampling and oversaw a risk assessment, which indicated that the area posed no threat to human health and the environment or groundwater. Dr. Dagdigian's personnel determined that the Voluntary Cleanup Program administered by the California Department of Toxic Substances Control was the appropriate route to the timeliest environmental closure of the site.

➢ Due to a very strict escrow deadline on this property, Waterstone personnel involved local city officials to assist in negotiations with the Department of Toxic Substances Control to speed closure. Waterstone personnel were successful in negotiating a full site closure from the

Department of Toxic Substances Control in 12 business days, allowing the sale to be consummated. According to Department of Toxic Substances Control personnel, this was the most accelerated timeline for closure under its Voluntary Cleanup Program to date at that time.

The client retained Dr. Dagdigian to provide environmental assessment, remedial investigation, remediation, and supervision of risk assessment activities to negotiate environmental closure of the site so that the property could be returned to the owner without future liability to the client. An accelerated investigation/remediation was performed to allow the client to return the property to its owners in 10 months, far ahead of the 1.5 to 2 years customarily required by agency guidelines. After submittal of this site closure report to the Department of Toxic Substances Control under its Voluntary Cleanup Program, a 'No Further Action' decision was received for metals-impacted soil at the facility.

➢ As Principal-In-Charge, Dr. Dagdigian conducted a remedial investigation of soil and groundwater and remediation cost estimate for a bankrupt paint manufacturing facility. In the 1950s and 1960s this facility was the largest paint producer in the western United States. A large tank farm of raw materials was located on the facility and consisted of over 50 aboveground tanks, and approximately 12 former underground storage tank locations along with hundreds of linear feet of associated product lines leading into manufacturing areas. Manufacturing areas included solvent-based paint production, water-based paint production, aerosol paint packaging, and the manufacture of lacquers and thinners.

➢ Dr. Dagdigian supervised the collection and analysis of approximately 100 soil vapor samples, and 50 soil samples from over 120 sampling locations on the property. Areas of chemical impact identified through this investigation were further investigated to provide lateral and vertical extent characterization. Dr. Dagdigian is in the process of completing a Preliminary Endangerment Assessment (which includes risk assessment) for the property prior to submittal of this case into the Voluntary Cleanup Program with the California Department of Toxic Substances Control.

### *Computer Programming and Modeling*

➢ Designed and wrote a chemical mass balance model to demonstrate that oil field wastewater had contaminated three aquifers used for drinking and agricultural irrigation water. The model was presented in deposition and jury trial testimony and the client was awarded damages based on Dr. Dagdigian's testimony.

➢ Designed and wrote a computer program to model wastewater treatment facility operations. The program took wastewater stream input data and performed mass balance type calculations; performed engineering design basis calculations; determined future chemical use rates; and determined capital and O&M costs.

➢ Designed and co-wrote a database software system to manage MSDS's, associated chemical manufacturers and contacts, associated CAS chemical components, and physical properties of chemicals and MSDS's. The software system also performed air emission calculations and was able to receive input into a laws database and determine which MSDS's were affected by various environmental legislation. The program tracked the locations of all chemicals used, as well as the source points at which air emissions left the facility. The program utilized chemical emission locations and chemical physical properties to calculate air emissions using various models that are pre-programmed into the system. Users are able to easily create reports that manipulate all of the above information.

**Professional Affiliations**

American Electroplaters and Surface Finishers Society
American Chemical Society

**Specialized Training and Certifications**

Certified Electroplater/Finisher

**Publications**

A. M. Holbrow, A. Keller, J. V. Dagdigian, C. Amantea, "Identifying Potential Liabilities Associated with Business Transactions," Journal of Environmental Law. May/June 1994.

M. McCullough, J. Dagdigian, A. Holbrow, R. Seguy, and R. Currie, "Implementing a Regulatory Compliance Program for Air Toxics, " in Proceedings of A&WMA Specialty Conference on New Hazardous Air Pollutant Laws and Regulations: Their Impact on Industry. Government and the Public, Air & Waste Management Association, 1992.

M. L. McCullough, J. V. Dagdigian, R. A. Seguy, and C. V. Vukmanic, "An Essay on Waste Source Reduction through Conservation of Process Power and Water," in Proceedings of Minimization and Recycling of Industrial and Hazardous Waste '92, Hazardous Materials Control Research Institute, 1992.

M. L. McCullough, J.V. Dagdigian, and M.L. Walker, "Responding to Findings of Violation and Orders Pursuant to the Clean Water Act," in Proceedings of the 1992 Industrial Environmental Association Annual Conference," Industrial Environmental Association, 1992.

M.L. McCullough, J.V. Dagdigian, and A.M. Holbrow, "Developing Air Compliance Programs," in Proceedings of the 1992 Industrial Environmental Association Annual Conference," Industrial Environmental Association, 1992.

M. L. McCullough, J. V. Dagdigian, and C. N. Parris, "Evaluating Soil Washing for Removing Petroleum Hydrocarbon and Metals Contamination," in Proceedings of Superfund '92, Hazardous Materials Control Research Institute, 1992.

M. L. McCullough and J. V. Dagdigian, "Evaluating Regulatory Issues and Emission Control Equipment for Air Toxics Applications, "Remediation, Vol. 2, No. 4: 15-38.

M. L. McCullough, and J. V. Dagdigian, "Evaluation of Remedial Options for Treatment of Heavy Metal and Petroleum Hydrocarbon Contaminated Soil, "Remediation, Vol. 3, No. 2: 1-30.

M. L. McCullough, J. V. Dagdigian, and M. L. Walker, "Responding to a Finding of Violation of Order Under the Clean Water Act," Environmental Regulation, Vol. 3, No. 3: 1-12.

M. L. McCullough, J. V. Dagdigian, A. M. Holbrow, "Developing Air Compliance Plans," presented at the Eighth Annual EA Environmental Compliance Conference, San Diego, CA, August 1992.

## Professional Instruction

Between 1992 and 2017, Dr. Dagdigian taught classes for the University of California, Irvine, Extension Program for Environmental Management including:

> ➢ *Introduction to Site Characterization and Environmental Auditing*

> ➢ *Introductory Chemistry of Hazardous Materials*

> ➢ *Environmental Management.*

**Appendix B**

**Trial and Deposition Testimony and Work Experience
Summary for Jeffrey V. Dagdigian**

# Appendix B
# Trial and Deposition Testimony
# for Jeffrey V. Dagdigian Ph.D.

1.     May 2023, Deposition Testimony on behalf of City of Avalon, *Long Beach Unified School District v. Santa Catalina Island Company,* Defendant, Case No. 2:19-cv-01139-MEMF-AS, United States District Court for the Central District of California.

2.     September 2022, Deposition Testimony on behalf of Occidental Chemical Company, *L.A. Terminals, Inc. v. City of Los Angeles, et al.,* Defendant, Case No. 2:18-CV-06754-MWF-PVC, United States District Court for the Central District of California.

3.     July 2022, Deposition Testimony on behalf of Barclay Hollander Corporation, *Shell Oil Company v. Barclay Hollander Corporation, et al.*, Plaintiff, Case NO. Superior Court of the State of California for the County of Los Angeles.

4.     February 2022, Deposition Testimony on behalf of Liedos Corporation, *D.S.A. Properties, L.P., Plaintiff v. Micro Instrument Co., Inc., et. al.*, Defendant, Case No. SC126972, Superior Court of the State of California for the County of Los Angeles.

5.     January 2022, Trial Testimony on behalf of RadioShack Corporation, *Orange County Water District, Plaintiff, vs. Sabic Innovative Plastics, US, LLC, et al.,* Defendants, Case No. 30-2008-00078246 CU-TT-CXC, Superior Court of the State of California for the County of Orange.

# Appendix C

# List of Documents Reviewed

# Appendix C
## Documents Relied Upon

1973. *Suggested Change In Dump Payment*. August 1.

1975. *Assets Purchase Agreement*. June 2.

1978. *Subject: Identifying PCB and Non-PCB Liquids Used in Capacitors.* April 11.

1987. *Eastside Debris Analytical Results*. June 15.

1991. *Underground Tank Permit Application, Dayton Recycling*. February 12.

ACME Automotive Finishes. 1985. *Material Safety Data Sheets 1985A Supplement*. October.

Adams, Stephen C. 2002. *Letter Re: The South Dayton Dump, 1976 Dryden Road aka) Springboro Pike, Moraine, Ohio General Notice of Potential Liability and Request for Information, CERCLA 104 (e) request*. May 31.

Adams, Stephen. 2017. *Deposition of Stephen Adams*. May 10.

Agency for Toxic Substances and Disease Registry. 1989. *Toxicological Profile for Selected PCBs (Aroclor-1260, -1254, -1248, -1242, -1232, -1221, and -1016).* June.

Agency for Toxic Substances and Disease Registry (ATSDR). 2008. *Public Health Assessment for South Dayton Dump & Landfill, Moraine, Montgomery County, Ohio, EPA Facility ID: OHD980611388.* September 30.

Agency for Toxic Substances and Disease Registry (ATSDR). 2022. *Guidance for Calculating Benzo(a)pyrene Equivalents for Cancer Evaluations of Polycyclic Aromatic Hydrocarbons*. April 14.

Alajbeg, A. 1985. *Products of Non-Flaming Combustion of Phenol-Formaldehyde Resin Foam*. November 1.

Aldredge, Robert L. 2014. *Deposition of Robert Lee Aldredge*. January 8.

Ali, Mohammad Farhat. 2006. *A Review of Methods for the Demetallization of Residual Fuel Oils*. July.

American Ink Maker. 1967. *Van Son Holland Commerates 95th Anniversary*.

Anh, H.Q., Watanabe, I., Minh, T.B., Takahashi. 2021. *Unintentionally produced polychlorinated biphenyls in pigments: An updated review on their formation, emission sources, contamination status, and toxic effects.* February 10.

Arentsen, Scott. 2017. *Deposition of Scott Arentsen*. May 15.

Arnold, Terence S. 2017. *US Department of Transportation, Federal Highway Administration - What's in Your Asphalt?* September.

Askew, R.F. 1969. *Printing Ink Manual*.

ATEC Environmental Services. 1988. *Environmental Site Assessment Former Hobart Facility Dayton, Ohio*. February 10.

## Appendix C – Documents Relied Upon

Bailey, Tim. 2016. *Deposition of Tim Bailey*. December 16.

Bakke, Berit, Stewart, Patricia A., Waters, Martha A. 2007. *Uses of and Exposure to Trichloroethylene in U.S. Industry: A Systematic Literature Review*. November 2.

Bales, Neil R. 1991. *Suspected Release Report, Dayton Recycling*. April 24.

Bales, Neil R. 1991. *Underground Storage Tank Closure Report, Dayton Recycling*. April 16.

Barroso, Jason J., et al. 2010. *The Ice Storm of 2008 and Emergency Response Coordination Throughout Western and Central Massachusetts*.

Beal, Thomas D. 2014. *Deposition of Thomas D. Beal*. April 11.

Beal, Thomas D. 2024. *Deposition of Thomas D. Beal*. April 4.

Becker, Edward R. 2002. *Public Citizen Health Research Group v. Chao, Opinion of the Court. December 24. Section I. Facts and Procedural Posture*.

Bell, Kenneth G. 1960. *Uranium and Other Trace Elements in Petroleums and Rock Asphalts*.

Belmonte Park Environmental Laboratories. 1998. *Test Results By Sample*. January 7.

Big Rogers. 1985. *Material Safety Data Sheets 1985A Supplement*.

Boesch, Jr., Horace John. 2005. *Affidavit of Horace J. Boesch, Junior*. August 25.

Boesch, Jr., Horace John. 2006. *Deposition of Horace John Boesch, Junior*. February 28.

Boesch, Jr., Horace John. 2011. *Deposition of Horace John Boesch, Junior*. December 1.

Boesch, Jr., Horace John. 2014. *Deposition of Horace John Boesch, Junior*. October 23.

Bowser-Morner Testing Laboratories, Inc. 1981. *Laboratory Report*. March 3 and March 10.

Brown, J. F., et al. 1981. *Chemical Destruction of Polychlorinated Biphenyl in Transformer Oil*.

Brown, Ken. 2015. *Illinois Tool Works (ITW) Letter Response to CERCLA 104€ Information Request*. April 6.

Brown, Kenneth. 2017. *Deposition of Kenneth Brown*. March 14.

Bumb, R. et.al. 1980. *Trace Chemistries of Fire: A Source of Chlorinated Dioxins. Science, Volume 210*. October 24.

Burachinsky, B. 1980. *Inks*. Vol. 13.

Carleton, James J. 1984. *Letter to Patrick H. Gorman, Ohio EPA*. April 16.

Carmichael, W. 1973. *Letter to Container Service Co. Inc. from the McCall Printing Company, Dayton Division RE: Contents of Dirty Ink Pails.* December 21.

Chen, Yi. 2024. *A Comprehensive Review of Toxicity of Coal Fly Ash and its Leachate in the Ecosystem*. January 2.

Colten, C.E., Skinner, P.N. 1996. *The Road to Love Canal, Managing Industrial Waste before EPA*.

## Appendix C – Documents Relied Upon

Conestoga-Rovers & Associates (CRA). 2006. *Preliminary Remedial Action Objectives Technical Memorandum, South Dayton Dump and Landfill Site, Moraine, Ohio*. September.

Conestoga-Rovers & Associates (CRA). 2011. *Streamlined Remedial Investigation and Feasibility Study Report for Operable Unit One (OU1), South Dayton Dump and Landfill, Moraine, Ohio.* June.

Conestoga-Rovers & Associates (CRA). 2014. *Memorandum - RE: Site History: South Dayton Dump and Landfill, Moraine, Ohio (Site)*. August 27.

Crago, Dan. 2017. *Deposition of Dan Crago, P.E*. February 15.

Ctvrtnicek, Thomas. 2016. *Deposition of Thomas Ctvrtnicek*. August 25.

Dalton, Curt. 2015. *Gem City Jewel: Largest Magazine Printer Under One Roof*. March 19.

Dames & Moore. 1992. *Phase I Report: Environmental Baseline Survey*. November 5.

Davis, John L. 2013. *Deposition of John L. Davis*. September 12.

Davis, Ray. 1987. *Sworn Statement of Ray Davis*. May 1.

Dayton Daily News. 2011. *A Brief History of DP&L*. April 20.

Denison, Irving A., Romanoff, Melvin. 1952. *Corrosion of Galvanized Steel in Soils*. November.

Dominguez-Rosado, E., et al. 2003. *Chemical Characterization of Fresh, Used, and Weathered Motor Oil via GC/MS, NMR, and FTIR Techniques*.

Donnet, J. 1993. *Carbon Black: Science and Technology*.

*DP&L Cinders used in Blockmaking.*

DP&L Forward. 1972. *Spring Activity at DP&L*. April.

DPL. 1980. *Potential Small Generator Evaluation Form*. August 19.

DPL. 1981. *Interim Measure Test Results.* November 11.

Edsall, Gregory. 2017. *Deposition of Gregory Edsall*. January 6.

Eichstadt, John E. 2017. *Deposition of John E. Eichstadt*. May 5.

Electric Power Research Institute (EPRI). 1987. *Inorganic and Organic Constituents in Fossil Fuel Combustion Residues.* August.

Ellis, Carleton. 1931. *Recovery of Oil from Spent Fuller's Earth*. October 20.

Encyclopedia Britannica. 2013. *Letterpress Printing*. October 30.

*Expansion and Reconstruction for 1961.*

Feng, Y., et al. 2012. *The Influence of Urea Formaldehyde Resins on Pyrolysis Characteristics and Products of Wood-Based Panels.*

Fernandes, P.R., et al. 2009. *Evaluation of Polycyclic Aromatic Hydrocarbons in Asphalt Binder Using Matrix Solid-Phase Dispersion and Gas Chromatography*. October 1.

Fields, Charles. 2014. *Deposition of Charles Fields*. May 21.

## Appendix C – Documents Relied Upon

Forney, James. 2017. *Deposition of James Forney*. March 28.

Forrestal, Dan. 1977. *The Story of Monsanto: Faith, Hope and $5,000.*

Fournier, William. 2001. *Deposition of William Fournier.* August 16.

Fregmen, Robert D. 1982. *Ohio EPA Hazardous Waste Report, Dayton Press Inc*. April 6.

Gallagher Sharp. 2015. *Letter Re. Hobart Corp., et al. v. The Dayton Power & Light Co., et al.* April 20.

GE Energy Services Industrial. 2009. *Protecting the Environment and Your Operation by Innovative Transformer Reconditioning Process.*

GHD. 2017. *Remedial Investigation/Feasibility Study (RI/FS) Work Plan for Operable Units 1 and 2*. September 20.

Glaberson, William. 1993. *The Media Business; Newspapers' Adoption of Color Nearly Complete*. May 31.

Gonzalez, Luciano A. *Transformers with PCB-contaminated Mineral Oil: Myth or Reality.*

Gregory, Earl. 2001. *Deposition of Earl Gregory*. September 13.

Gregory, Earl. 2017. *Deposition of Earl Gregory*. May 3.

Grillot, David A. 2014. *Deposition of David A. Grillot*. May 28.

Grillot, David A. 2016. *Declaration of David A. Grillot*. June 7.

Grillot, David A. 2020. *Declaration of David A. Grillot*. January 11.

Grillot, Edward. 2012. *Deposition of Edward Grillot*. April 24.

Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 16.

Grillot, Edward. 2013. *Deposition of Edward Grillot*. December 17.

Grillot, Edward. 2016. *Declaration of Edward Grillot*. May 4.

Grillot, Edward. 2016. *Deposition of Edward Grillot*. December 9.

Grillot, Edward. 2020. *Declaration of Edward Grillot*. January 10.

Hall, Georgene A. 1980. *U.S. EPA 3010 Notification of Hazardous Waste Activity Forms.* August.

Hardy, Jr., Willie. 2014. *Deposition of Willie Hardy, Jr*. April 2.

Harris, Henry. 1974. *State Says DP&L Using Dirty Coal.* May 30.

Hayden, Phillip L. 1982. *Subject: Letter of Certification, Closure of Hazardous Waste Storage Facility, Dayton Press, Inc*. July 21.

Hayward, Carle R. 1952. *An Outline of Metallurgical Practice*. June.

Heath, Bryan. 2017. *Deposition of Bryan Heath*. April 19.

Hopmeier, A. 1969. *Survey of Pigments.*

## Appendix C – Documents Relied Upon

Howard Laboratories, Inc. 1981. *Analytical Results*. April 22.

Howard Laboratories, Inc. 1983. *Results By Sample*. April 20.

Hu, D., Hornbuckle, K.C. 2009. *Inadvertent Polychlorinated Biphenyls in Commercial Paint Pigments*. November 16.

Hunter, Cecil R. 2019. *Declaration of Cecil R. Hunter*. April 25.

Hunter, Cecil R. 2019. *Declaration of Cecil R. Hunter*. March 25.

Hunter, Cecil R. 2019. *Deposition of Cecil R. Hunter*. May 14.

Hunter, Richard Lee. 2019. *Declaration of Richard Lee Hunter*. April 3.

Hunter, Richard Lee. 2019. *Deposition of Richard Lee Hunter*. April 30.

IARC. 1984. *ARC Monographs on the Evaluation of the Carcinogenicity Risk of Chemicals to Humans.*

IARC. 1989. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans - Some Organic Solvents, Resin Monomers and Related Compounds, Pigments and Occupational Exposures in Paint Manufacture and Painting.*

Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: General Plant Information*. December 9.

Industrial & Environmental Analysts, Inc. 1991. *Environmental Assessment Manual: Solid and Hazardous Waste Control.* December 9.

Interstate Technology Regulatory Council (ITRC). 2021. *History of Use and Potential Sources: 1,4-Dioxane*. February.

IWD Liquid Waste, Inc. *Customer List – Confidential.*

IWD. 1976. *Invoice #400*. November 30.

IWD. 1977. *Invoice #1299*. December 31.

IWD. 1977. *Invoice #556*. February 28.

IWD. 1979. *Cell Report*. December 5.

IWD. 1979. *Cell Report*. July 27.

IWD. 1979. *Cell Report*. November 14.

IWD. 1979. *Cell Report*. October 26.

Iwegbue, C.M.A., et al. 2006. *Characteristic Levels of Heavy Metals in Soil Profiles of Automobile Mechanic Waste Dumps in Nigeria*. June.

Jafari, Ahamd Jonidi, et al. 2015. *Analysis and Comparison of Used Lubricants, Regenerative Technologies in the World.* August 29.

Jahnke, J.C., Hornbuckle, K.C. 2019. *PCB Emissions from Paint Colorants.* May 7.

Ji, S., et al. 2000. *The Toxic Compounds and Leaching Characteristics of Spent Foundry Wastes.* November 15.

## Appendix C – Documents Relied Upon

Jiang, Xiaoxu, et al. 2015. *Formation of Polychlorinated Biphenyls on Secondary Copper Production Fly Ash: Mechanistic Aspects and Correlation to Other Persistent Organic Pollutants*. September 16.

Johnstone, Robert E. 1957. *Pilot Plants, Models, and Scale-up Methods in Chemical Engineering.*

Jonczy, I. 2014. *Diversification of Phase Composition of Metallurgical Wastes after the Production of Cast Iron and Cast Steel.*

Kirk-Othmer. 1963. *Inks*. Vol. 11.

Kirk-Othmer. 1963. *Printing Processes*. Vol. 16.

Knowles, Leo A. 2015. *Defendant, Conagra Grocery Products Company, LLC's Supplemental Answers to Plaintiffs' Interrogatories and Request for Production of Documents*. April 3.

Koch, Peter. 1985. *Utilization of Hardwoods Growing on Southern Pine Sites*. October.

Kodavanti, P.R.S., Loganathan, B.G. 2019. *Biomarkers in Toxicology, Chapter 28 - Polychlorinated Biphenyls, Polybrominated Biphenyls, and Brominated Flame Retardants.*

Leach, R.H. 1988. *The Printing Ink Manual.*

Legret, M., et al. 2005. *Leaching of Heavy Metals and Polycyclic Aromatic Hydrocarbons from Reclaimed Asphalt Pavement.*

Lemieux, P.M. 1997. *Evaluation of Emissions from the Open Burning of Household Waste in Barrels.*

Lewis, M., Silver, L. 2017. *RE: Hobart Corporation, et al. v. DP&L, et al, Case No. 3:13-cv-115 (U.S. D.C., S.D. Ohio); Valley Asphalt Discovery.*

Li, Zhiyong, et al. 2016. *Characterization of PAHs and PCBs in Fly Ashes of Eighteen Coal-Fired Power Plants.* November 2.

Liu, K., et al. 2000. *Investigation of PAH in Fly Ash from Fluidized Bed Combustion Systems.*

Lomax, S.Q., Lomax, J.F. 2019. *The Synthesis Characterization of Historical Novel Azo Pigments: Implication for Conservation Science.* December 3.

Lutes, C.C., Kariher, P.H. 1996. *Evaluation of Emissions from the Open Burning of Land-Clearing Debris.* October.

Mahler, B.J., et al. 2014. *Concentrations of Polycyclic Aromatic Hydrocarbons (PAHs) and Azaarenes in Runoff from Coal-Tar- and Asphalt-Sealcoat Pavement*. May.

Maier, Bruno E. 1977. *Permit Letter to MRC*. January 13.

Maryland Department of the Environment. 2009. *Facts about Western Regional Lab, SHA (Non-Master List Site)*. March.

McConnell, Donald J. 1994. *Re: Request for Information for the North Sanitary Landfill, Valleycrest, Dayton, Ohio.* August 23.

McDonald, James T. 2014. *Deposition of James T. McDonald*. November 12.

## Appendix C – Documents Relied Upon

McFee, J., et al. *Incineration Systems*.

Misumi Mech Lab. 2025. *Galvanized Steel and Its Uses.* February 24.

Monsanto Agricultural Group. 1992. *Chemical Storage Information*. May 7.

Monsanto Chemical Company. *Askarel Inspection and Maintenance Guide.*

Monsanto Chemical Company (MCC). 1947. *Monsanto Annual Report.*

Monsanto Chemical Company (MCC). 1952. *Monsanto Annual Report.*

Monsanto Chemical Company (MCC). 1953. *Monsanto Annual Report.*

Monsanto Chemical Company (MCC). 1956. *Monsanto Annual Report.*

Monsanto Chemical Company (MCC). 1957. *Aroclor, resins and plasticizers for chlorinated rubber.* May.

Monsanto Chemical Company (MCC). 1962. *The Aroclor Compounds.* May.

Monsanto Chemical Company (MCC). 1968. *Monsanto Annual Report.*

Monsanto Chemical Company (MCC). 1973. *Monsanto Annual Report.*

Monsanto Company. 1984. *Hazardous Waste Management Permit Conditions*. August 9.

Monsanto Dayton Plant. *Visual Site Inspection*.

Monsanto Research Corporation (MRC). 1977. *Handling Dayton Laboratory Waste Chemicals.* May 9.

Monsanto Research Corporation (MRC). 1983. *An Account of Chemical Waste Incineration*.

Monsanto Research Corporation (MRC). 1983. *An Account of Off-Site Chemical Waste Landfills*.

Monsanto Research Corporation (MRC). 1983. *An Account of On-Site Burial Locations*.

Monsanto Research Corporation (MRC). *Capability.*

Montgomery County Combined General Health District. 1970. *Air Curtain Destructor Moraine Recycling, Inc*. October 23.

Montgomery County Health District. 1970. *Solid Waste Disposal Site South Dayton Dump & Landfill, 1975 Springboro Road, Dayton, Ohio*. August 14.

Montgomery County Ohio General Health District. *Open Burning Permit*.

Morris, George. 2016. *Deposition of George E. Morris, Jr*. May 4.

Motshumi, J. Diphare, et al. 2013. *A Review of Waste Lubricating Grease Management*. August 25-26.

NASS. 2005. *Draft Copy Summary of Investigation.* May 23.

NASS. 2005. *Summary of Investigation*. May 23.

National Institute for Occupational Safety and Health (NIOSH). 1975. *Health Hazard Evaluation Determination, Report No. 73-68-187, McCall Printing Company, Dayton, Ohio*. April.

## Appendix C – Documents Relied Upon

National Research Council. 1998. *Separation Technologies for the Industries of the Future.*

NCR. 1958. *Process Specification: Type and Platen Cleaner*. February 19.

NCR. 1965. *Process Specification: Type and Platen Cleaner*. February 3.

NCR. 1966. *Process Specification: Trichloroethylene Degreasing*. June 15.

NCR. 1969. *Process Specification: Disposal of Materials Through Storm Sewers*. June 4.

NCR. 1970. *Process Specification: Ultrasonic Cleaning on Used Registers and Assemblies*. July 15.

NCR. 1973. *Manufacturing Standard*. January 24.

NCR. 1992. *NCR Buildings*. September 21.

NCR. 1993. *NCR Response to U.S. EPA Information Request*. May 21.

NCR. 1995. *History of NCR Buildings*. August 9.

NCR. 2003. *Response of NCR Corporation to the United States Environmental Protection Information Request*. March 18.

New York State Energy Research and Development Authority (NYSERDA). 2013. *Elemental Analysis of Wood Fuels.* Report 13-13. June.

Newco Chemical Waste Systems of Ohio, Inc. 1979. *Waste Product Record*. November 21.

Nguyen, Thi Hue, et al. 2015. *Polychlorobenzenes and Polychlorinated Biphenyls in Ash and Soil from Several Industrial Areas in North Vietnam: Residue Concentrations, Profiles and Risk Assessment*. May 30.

NTIS. 1973. *Solid Waste Management in the Industrial Chemical Industry*.

NUS Corporation. 1988. *Site Investigation Evaluation and Summary*. October 28.

Occupational Safety and Health Administration (OSHA). 2004. *Cadmium.*

Ohio Department of Commerce, Division of State Fire Marshal, Bureau of Underground Storage Tank Regulations. 1992. *RE: Dayton Recycling, 1905 Dryden Road., Moraine, OH 45439, Montogomery County, Incident #5710922-00*. December 15.

Ohio EPA. 1985. *Preliminary Assessment File, Valley Asphalt Corporation*. November 18.

Oil Reclaiming House. *Attachment A.*

Orion Management International. 1991. Confidential Investigative Memorandum. October 20.

Ottoson, Dean C. 1959. *Patent US2896643 – Cleaning Equipment*. July 28.

Ouw, H.K., Simpson, G.R., Siyali, D.S. 1976. *Use and health effects of Aroclor 1242, a polychlorinated biphenyl, in an electrical industry.* July-August.

Panero, M., et al. 2005. *Pollution Prevention and Management Strategies for Polychlorinated Biphenyls in the New York/New Jersey Harbor*. February.

## Appendix C – Documents Relied Upon

Pankow, J.F., et al. 1996. *Dense Chlorinated Solvents*.

Patterson, Marshall William. 2016. *Deposition of Marshall William Patterson*. December 16.

Pollution Control Science, Inc. 1983. *Report on NAPTHA Sampling.* July 25.

Q Source Engineering, Inc. 1985. *Subject: Dayton Press, Inc., Hazardous Waste Storage Permit No. D5-57-0442.* January 5.

Rauckyte, T., et al. 2006. *Determination of Heavy Metals and Volatile Aromatic Compounds in Used Engine Oils and Sludges*. March.

Regional Air Pollution Control Agency. 1986. *Letter in Reference to Open Burning at South Dayton Landfill*. April 24.

Ribiero, Joana, et al. 2011. *Polycyclic Aromatic Hydrocarbons (PAHs) in Burning and Non-Burning Coal Waste Piles*. October 30.

Ritter, Stephen K. 2016. *A New Life for Coal Ash*. February 15.

Rosell, L.P. 1981. *Hobart Memo to J.J. Carleton Re: Superfund Notification*. June 1.

Rosell, L.P. 1981. *Letter to Ohio EPA and 1981 Industrial Waste Survey*. April 13.

Rosell, L.P. 1981. *Summary of Wastes from 3/17/76 thru 10/19/81*. June 1.

Rosell, L.P. 1981. *Waste Vendors and Amounts*. June 1.

Rouse, T.O., Raymond, C.T., Fessler, W.A. 1989. *PCB Residues in Transformer Carcasses*. August.

Roux Associates, Inc. 2018. *Expert Report on Valley Asphalt's Liability and Allocation of Vapor Intrusion Response Action Costs*. May 18.

Sanjour, W. 2004. *What Did We Know About Hazardous Waste and When Did We Know It.* February 19.

Schapiro, Alan. 2002. *The Use of Air Curtain Destructors for Fuel Reduction*. June.

SDD. 1969. *Application for Refuse Disposal Permit*. May 13.

SDD. 1970. *Application for Refuse Disposal Permit*. March 10.

SDD. 1971. *Application for Refuse Disposal Permit*. April 1.

SDD. 1972. *Application for Refuse Disposal Permit.* April 1.

Senkan, Selim M. *Combustion Characteristic of Chlorinated Hydrocarbons*.

*Sherwin Williams Employee List*.

Sherwin Williams. 2016. *Responses of the Sherwin-Williams Company to Defendant Dayton Power and Light Company's First Set of Interrogatories to Sherwin-Williams*. November 23.

Shimadzu Corporation. 2022. *Fast Analysis of Polychlorinated Biphenyls (PCBs) as Aroclors in Transformer Oil with the Nexis GC-2030 Gas Chromatograph Equipped with the AOC-30i Autosampler.* August 2022.

## Appendix C – Documents Relied Upon

Shin, S.K., Kim, T.S. 2006. *Levels of polychlorinated biphenyls (PCBs) in transformer oils from Korea.* April 20.

Smart, Joseph D. 2015. *Deposition of Joseph D. Smart*. April 14.

South Dakota Department of Agriculture & Natural Resources. 2005. *Chemicals Released During Open Burning*. December 12.

South Dayton Dump (SDD). 1968. *Application for Refuse Disposal Permit*. April 10.

Spence, William B. 1980. *U.S. EPA, Dayton Press TSD Facility Permit Application*. November 19.

Spence, William B. 1981. *U.S. EPA, Dayton Press TSD Facility Permit Application*. October 29.

State of Oregon. 2003. *Fact Sheet: Sources of Polychlorinated Biphenyls.* August 6.

*Summary of Information Available to Kelsey Hayes re Dayton Walther Facilities.*

Taylor, P.H., Dellinger, B. 1990. *Development of a Thermal Stability Based Ranking of Hazardous Organic Compound Incinerability*.

TCA Environmental, Inc. 2000. *Environmental Remediation Report*. September 5.

Tharpe, James E. 2012. *Deposition of James E. Tharpe*. January 17.

Tharpe, James E. 2014. *Deposition of James E. Tharpe*. December 11.

The Dayton Power and Light Company. 1961. *DP&L's Coal Mine*. June.

The Dayton Power and Light Company. 1964. *A Ten Million Ton Problem*. September.

The Dayton Power and Light Company. 1967. *Stuart Station Coal Bought in West Va*. April.

The Dayton Power and Light Company. 1979. *Subject: PCB.* November 12.

The Dayton Power and Light Company. 1981. *SUBJECT: Interim Measures Test Results.* November 11.

The Dayton Power and Light Company. 2002. *The Dayton Power and Light Company's Response to U.S. EPA's Information Request for the South Dayton Dump Site*. September 11.

The Kelsey Company. 1946. *Kelsey Printers' Supply Book.*

Themba, N., Sibali, L., Chokwe, T. 2023. *A Review on The Formation And Remediations of Polychlorinated Dibenzo P-Dioxins and Dibenzo-Furans (PCDD/Fs) During Thermal Processes with a Focus on MSW Process*. August 7.

Thomas, Robert Scott. 2017. *Deposition of Robert Scott Thomas*. March 30.

Title 40, Code of Federal Regulations, Section 261.31.

Transportation Department. 1980. *Potential Small Generator Evaluation Form*. March 19.

Tree Island Industries. 2017. *Safety Data Sheet, Steel Wire Nails, Zinc Coated.* December 5.

Tremont City Landfill. 2001. *Barrel Fill Waste In List.* November 13.

Trumbull, K. 2022. *PCBs in Washington State Products: Printing Inks, 2021.* July.

## Appendix C – Documents Relied Upon

Tsang, W., Shaub, W. *Chemical Processes in the Incineration of Hazardous Materials.*

Turner, Michael S. 2017. *Deposition of Michael S. Turner*. June 13.

U.S. Army Corps of Engineers. 2012. *Public Works Technical Bulletin 2001-1-126, PCBs in Caulk and Paint.* December 31.

U.S. Army Environmental Center (USACE). 1995. *Final Transformer Study Report (AREEE 66) Base Realignment and Closure Environmental Evaluation.*

U.S. Consumer Product Safety Commission (CPSC). 1977. *CPSC Announces Final Ban on Lead-Containing Paint*. September 2.

U.S. Department of Agriculture (USDA) Forest Service. 1971. *Wood Pallet Manufacturing*. FPL-0213.

U.S. Department of Agriculture. 1971. *Wood Pallet Manufacturing*.

U.S. Department of Health and Human Services, ATSDR. 1995. *Toxicological Profile for Stoddard Solvent*. June.

U.S. Department of Health and Human Services, ATSDR. 1997. *Toxicological Profile for Used Mineral-Based Crankcase Oil.* September.

U.S. Department of Transportation. 2003. *Coal Fly Ash*. June 13.

U.S. Environmental Protection Agency (U.S. EPA). 1981. *Notification of Hazardous Waste Site. June 15.*

U.S. EPA. 1973. *Atmospheric Emissions from the Asphalt Industry*. December.

U.S. EPA. 1974. *Development Document for Effluent Limitation Guidelines and New Source Performance Standards for the Copper, Nickel, Chromium, and Zinc Segment of the Electroplating Point Source Category*.

U.S. EPA. 1975. *Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Oil Base Solvent Wash Subcategories of the Paint Formulating and the Ink Formulating Point Source Category*. July.

U.S. EPA. 1975. *Environmental Aspects of Chemical Use in Printing Operations*. September 22.

U.S. EPA. 1975. *Reclamation of Metal Values from Metal Finishing Waste Treatment Sludges*.

U.S. EPA. 1976. *Assessment of Industrial Hazardous Waste Practices, Paint and Allied Products Industry, Contract Solvent Reclaiming Operations, and Factory Application of Coatings.*

U.S. EPA. 1976. *PCBs in the US: Industrial Use and Environmental Distribution*. February 25.

U.S. EPA. 1979. *Assessment of the USE of Selected Replacement Fluids for PCBs in Electrical Equipment.*

U.S. EPA. 1979. *Development Document for Effluent Limitation Guidelines and Standards for the Ink Formulating Point Source Category*.

U.S. EPA. 1979. *Polychlorinated Biphenyls (PCBs) Manufacturing, Processing, Distribution in Commerce, and Use Prohibitions, Storage and Disposal*. 40 CFR 761.60. May 31.

## Appendix C – Documents Relied Upon

U.S. EPA. 1981. *Hazardous Waste Permit Application*. December 28.

U.S. EPA. 1981. *Notification of Hazardous Waste Site*.

U.S. EPA. 1981. *Notification of Hazardous Waste Site*. June.

U.S. EPA. 1982. *Development Document for Final Effluent Limitation Guidelines, New Source Performance Standards, and Pretreatment Standards for the Steam Electric Point Source Category.*

U.S. EPA. 1984. *Characterization of Emissions from the Combustion of Wood and Alternative Fuels in a Residential Woodstove*. EPA-600/S7-84-094. November.

U.S. EPA. 1984. *Composition and Management of Used Oil Generated in the US*. September.

U.S. EPA. 1984. *National Dioxin Study Tier 4-Combustion Sources*. EPA-450/4-84-014b. December.

U.S. EPA. 1985. *Potential Hazardous Waste Site Preliminary Assessment*. April 10.

U.S. EPA. 1989. *Report to Congress: Management of Hazardous Wastes from Educational Institutions*. April.

U.S. EPA. 1990. *Guides to Pollution Prevention: Commercial Printing Industry*. August.

U.S. EPA. 1990. *Guides to Pollution Prevention: The Fabricated Metal Products Industry*. July.

U.S. EPA. 1990. *Guides to Pollution Prevention: The Paint Manufacturing Industry*. June.

U.S. EPA. 1991. *Guides to Pollution Prevention: The Automotive Refinishing Industry*. October.

U.S. EPA. 1991. *Guides to Pollution Prevention: The Automotive Repair Industry*. October.

U.S. EPA. 1994. *Environmental Regulations and Technology Managing Used Motor Oils*.

U.S. EPA. 1995. *Profile of the Fabricated Metal Products Industry*. September.

U.S. EPA. 1995. *Profile of the Iron and Steel Industry*. September.

U.S. EPA. 1995. *Sector Notebook: Profile of the Printing and Publishing Industry*. September.

U.S. EPA. 1996. *Evaluation of Emissions from the Open Burning of Land-Clearing Debris*. U.S. EPA- 600/R-96-128. October.  1.

U.S. EPA. 1997. *Profile of the Fossil Fuel Electric Power Generation Industry*. September.

U.S. EPA. 1998. *AP 42, Fifth Edition, Volume I Chapter 1: External Combustion Sources.* September.

U.S. EPA. 1998. *EPA Sector Notebook: Profile of the Metal Casting Industry.* November 18.

U.S. EPA. 1998. *On-Site Incineration: Overview of Superfund Operating Experience*. March.

U.S. EPA. 1998. *Products of Incomplete Combustion from Direct Burning of Pentachlorophenol-treated Wood Wastes.* EPA/600/SR-98/013.

U.S. EPA. 1998. *RCRA In Focus – Printing.* January.

U.S. EPA. 1999. *Antifreeze Recycling.* November.

## Appendix C – Documents Relied Upon

U.S. EPA. 1999. *Wastes from the Combustion of Fossil Fuels*. March.

U.S. EPA. 2000. *Hot Mix Asphalt Plants, Emission Assessment Report*. December.

U.S. EPA. 2000. *Integrated Data for Enforcement Analysis Action Report*. October 24.

U.S. EPA. 2002. *25 Years of RCRA: Building on Our Past to Protect Our Future (EPA-K-02-027)*. April.

U.S. EPA. 2002. *Beneficial Reuse of Foundry Sand: A Review of State Practices and Regulations.* December.

U.S. EPA. 2003. *Consolidated Screening Checklist for Automotive Repair Facilities Guidebook*. October.

U.S. EPA. 2005. *Investigative Activity Report*. May 23.

U.S. EPA. 2012. *South Dayton Dump & Landfill Site Summary/Fact Sheet*. June.

U.S. EPA. 2016. *South Dayton Dump & Landfill Superfund Alternative Site, Moraine, Ohio Administrative Settlement Agreement and Order on Consent for Remedial Investigation and Feasibility Study.* June 13.

U.S. EPA. 2024. *Defining Hazardous Waste: Listed, Characteristic and Mixed Radiological Wastes*. December 17.

U.S. EPA. 2025. *Hazardous Wastes from Non-Specific Sources.* March 12.

U.S. EPA. 2025. *Mercury in Consumer Products*. March 6.

U.S. EPA. 2025. *Refrigerant Safety*. March 12.

UNEP. 1999. *Guidelines for the Identification of PCBs and Materials Containing PCBs*. August.

United Nations Environment Programme (UNEP). 1999. *Guidelines for the Identification of PCBs and Materials Containing PCBs*. August.

University of Georgia. 2002. *Best Management Practices for Wood Ash as Agricultural Soil Amendments. Cooperative Extension Bulletin 1142*.

USGS. 2015. *Trace Elements in Coal Ash*. May.

Van Metre, P.C., et al. 2006. *Parking Lot Sealcoat: A Major Source of Polycyclic Aromatic Hydrocarbons (PAHs) in Urban and Suburban Environments*. January.

Vencill, Vernon E. 2015. *Deposition of Vernon E. Vencill*. April 14.

Vincent, M. 2020. *PCB-11 and its Presence in the Environment.* November.

Wade, R.L., Woodyard, J.P. 1987. *Sampling and Decontamination Methods for Buildings Contaminated with Polychlorinated Dibenzodioxins*.

Wall, Clarence. 2012. *Deposition of Clarence Wall*. January 17.

Walsh, Andrew. 2023. *The Longworth Steam Plant: Dayton's Lost Medieval Castle*. December 1.

Wantz, John L. 2017. *Deposition of John L. Wantz*. March 21.

## Appendix C – Documents Relied Upon

Waste Management, Inc. 1983. *Generator's Waste Material Profile Sheet*.

Watts, Richard J. 1997. *Hazardous Wastes; Sources, Pathways, Receptors*.

WE Energies. 2013. *Coal Combustion Products Utilization Handbook*.

Wendling, Michael A. 2012. *Deposition of Michael A. Wendling*. July 17.

Wendling, Michael A. 2014. *Deposition of Michael A. Wendling*. April 23.

Wendling, Michael A. 2016. *Declaration of Michael A. Wendling*. May 30.

World Health Organization. 2022. *Deliberate Events: Chemical Release and Oil Fires*. April 14.

*Wright State University Library, Special Collections, DDN/JH Clippings File, 47A – Valley Asphalt Corp*.

Wurstner, Alan L. 2013. *Deposition of Alan L. Wurstner*. September 25.

Yang, Q., et al. 2020. *Environmental Impacts of Reclaimed Asphalt Pavement on Leaching of Metals into Groundwater*.

Zou, D., et al. 2003. *Rapid Analysis of PAHs in Fly Ash Using Thermal Desorption and Fast GC-TOF-MS*.

**Websites:**

https://chrysler.org/the-history-of-art-in-color-modern/#_edn8

https://cumulis.epa.gov/supercpad/SiteProfiles/index.cfm?fuseaction=second.Cleanup&id=0504661#bkground

https://elchemy.com/blogs/chemical-market/a-quick-walk-through-a-chemical-production-plant-machinery-procedures-more

https://excelsiorpress.tiiny.site/forsale/inkintubes/index.html

https://inchem.org/documents/ehc/ehc/ehc50.htm

https://nagraph.com/ink.html

https://pipebends.com/2023/08/essential-guide-to-industrial-metal-machining-processes/

https://printinghistory.org/demise-process-color-letterpress-national-geographic/

https://www.briarpress.org/41718

https://www.briarpress.org/44379

https://www.britannica.com/technology/pigment

https://www.epa.gov/EastAveStudyArea/hazard-ranking-system-hrs

https://www.epa.gov/hwgenerators/typical-wastes-generated-industry-sectors

https://www.epa.gov/rcra/history-resource-conservation-and-recovery-act-rcra

## Appendix C – Documents Relied Upon

https://www.epa.gov/report-environment/wastes#:~:text=and%20ecological%20condition.-
,Waste%20Management,migration%2C%20and%20disease%20vector%20hazards.

https://www.epa.gov/system/files/documents/2022-
04/pcbs_in_used_oil_fact_sheet_corrected2.pdf

https://www.fhwa.dot.gov/publications/research/infrastructure/structures/97148/ssa1.cfm

https://www.hlc-metalparts.com/news/types-of-machining-processes-73339966.html

https://www.oregon.gov/deq/FilterDocs/ph-SourcePCBs.pdf

https://www.sec.gov/Archives/edgar/data/41719/000095012309071858/w76659exv99w1.htm#:~
:text=A%20key%20component%20of%20NCR%20paper%20was,a%20solvent%20manufac
tured%20by%20the%20Monsanto%20Corporation.

https://www.univarsolutions.com/documents/file/view/code/sds_file/id/20496/?srsltid=AfmBOo
o4xeNpt8jEX8Gvpr0I1sxPWsvjSXW46J42fdh3Hhy3YHGhXL__

https://www.ussteel.com/documents/40705/43680/Steel+Furnace+Slag+SDS.pdf/3f037514-
93f2-ce78-2ced-819c3e607670?t=1611015378743

https://www.xometry.com/resources/machining/types-of-machining-processes/