# EXHIBIT 1

Page 1

1           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
2                   WESTERN DIVISION
3    HOBART CORPORATION, et      )
     al.,                        )
4                                )
                    Plaintiffs,  )
5                                )
        vs.                      )  No. 3:13-cv-00115-WHR
6                                )
     THE DAYTON POWER AND        )
7    LIGHT COMPANY, et al.,      )
                                 )
8                   Defendants.  )
9           The deposition of CHRISTOPHER M.
10   WITTENBRINK, called for examination, pursuant to
11   the Federal Rules of Civil Procedure of the United
12   States District Courts pertaining to the taking of
13   depositions, taken before YVETTE BIJARRO-RODRIGUEZ,
14   CSR No. 084-003734, a Certified Shorthand Reporter
15   within and for the County of Cook and State of
16   Illinois, at 10 South LaSalle Street, Suite 3600,
17   Chicago, Illinois, on the 5th day of November,
18   2025, at 9:30 a.m.
19
20
21
22
23   REPORTED BY:  YVETTE BIJARRO-RODRIGUEZ, CSR
24   LICENSE NO.:  084-003734

APPEARANCES:

LANGSAM STEVENS SILVER & HOLLAENDER LLP
1818 Market Street
Suite 2430
Philadelphia, Pennsylvania 19103
BY: MR. DAVE ROMINE
(215) 732-3255
dromine@lssh-law.com

On behalf of the Plaintiffs;

NIJMAN FRANZETTI LLP
10 South LaSalle Street
Suite 3600
Chicago, Illinois 60603
BY: MS. JENNIFER T. NIJMAN
- AND -
MS. KRISTEN LAUGHRIDGE GALE
(312) 251-5250
jn@nijmanfranzetti.com
kg@nijmanfranzetti.com

- AND -

BRICKER GRAYDON LLP
100 South Third Street
Columbus, Ohio 43215
BY: MR. FRANK L. MERRILL
(VIA ZOOM)
(614) 227-8871
fmerrill@brickergraydon.com

On behalf of the Defendant The Dayton Power & Light Company;

APPEARANCES (CONTINUED):

EASTMAN & SMITH LTD.
250 Civic Center Drive
Suite 280
Columbus, Ohio 43215
BY: MR. TODD LONG
(VIA ZOOM)
(614) 564-1445
talong@eastmansmith.com

On behalf of the Defendant Conagra Grocery Products Company, LLC;

TUCKER ELLIS LLP
175 Third Street
Suite 520
Columbus, Ohio 43215
BY: MR. JOSEPH P. KONCELIK
(VIA ZOOM)
(614) 358-9717
joseph.koncelik@tuckerellis.com

On behalf of the Defendant Valley Asphalt.

* * * *

I N D E X

| WITNESS | PAGE |
|---|---|
| CHRISTOPHER M. WITTENBRINK | |
| Direct Examination By Mr. Romine....... | 6 |

E X H I B I T S

| WITTENBRINK EXHIBIT | PAGE |
|---|---|
| Exhibit No. 1........................... | 6 |
| Exhibit No. 2........................... | 43 |
| Exhibit No. 3........................... | 46 |

REPORTER'S NOTE: All quotations from exhibits are reflected in the manner in which they were read in the record and do not necessarily reflect exact quotes from the source documents nor necessarily match punctuation.

MR. ROMINE: Good morning, everybody. We're here for the deposition of Christopher Wittenbrink and we are on the record but the witness has not been sworn yet. I would ask people on the link to identify themselves, please.

MR. MERRILL: Frank Merrill with Bricker Graydon representing Defendant The Dayton Power & Light Company.

MR. LONG: This is Todd Long with Eastman & Smith representing Conagra Grocery Products Company, LLC.

MR. KONCELIK: Joe Koncelik, Tucker Ellis, representing Defendant Valley Asphalt.

MR. ROMINE: Is that everybody?

(No response.)

MR. ROMINE: Right now Counsel for the witness has asked that the video not be on at least for the time being so we're on telephonic now. It's basically an audio deposition.

(Witness sworn at 9:36 a.m.)

THE WITNESS: Yes.

THE REPORTER: Thank you, sir.

MS. NIJMAN: And let me just also confirm for the record that this is not a video

Page 6

1  deposition. It's not being recorded.
2  WHEREUPON:
3          CHRISTOPHER M. WITTENBRINK,
4  called as a witness herein, having been first duly
5  sworn, was examined and testified as follows:
6          DIRECT EXAMINATION
7  BY MR. ROMINE:
8      Q.  Good morning, Mr. Wittenbrink.
9      A.  Good morning.
10     Q.  I know you've had your deposition taken
11  a number of times so I'm going to dispense with
12  some of the instructions, if that's okay?
13     A.  Yes.
14     Q.  I do want to get into your most recent
15  report. So for those of you on the line, I'm
16  marking Mr. Wittenbrink's "Rebuttal Expert Report"
17  dated October 2025 as Exhibit No. 1.
18          (Wittenbrink Deposition Exhibit
19           No. 1 was marked for
20           identification.)
21  BY MR. ROMINE:
22     Q.  Mr. Wittenbrink, have you seen Exhibit 1
23  before?
24     A.  Yes.

Page 7

1      Q.  What is it?
2      A.  This is a copy of my rebuttal report in
3  this matter that I prepared and submitted last
4  month, October 2025.
5      Q.  In the case Hobart Corporation, et al.,
6  versus The Dayton Power & Light Company, et al?
7      A.  Yes.
8      Q.  If I could ask you to turn briefly to
9  Attachment A, which is your CV, is this an accurate
10  and up-to-date copy of your CV?
11     A.  Yes.
12     Q.  Is there anything that you know of that
13  you would like to add to your CV that's not on it
14  as we sit here today?
15     A.  No.
16     Q.  Is Cecil Hunter as credible as Robert
17  Aldredge?
18          MS. NIJMAN:  Objection, foundation.
19  BY THE WITNESS:
20     A.  I didn't evaluate Cecil Hunter for
21  credibility, so I don't know. I can't answer that.
22  BY MR. ROMINE:
23     Q.  You don't have an opinion as to whether
24  Cecil Hunter is as credible as Robert Aldredge?

Page 8

1      A.  No.
2      Q.  I'm assuming these answers are going to
3  be the same. I'm just going to go through the
4  list.
5          Is Cecil Hunter as credible as
6  Joseph Smart?
7          MS. NIJMAN:  Objection, same objection,
8  foundation.
9  BY THE WITNESS:
10     A.  Counsel, I didn't consider the
11  credibility of any witness.
12  BY MR. ROMINE:
13     Q.  So you have no opinion as to the
14  credibility of Cecil Hunter as compared to Joseph
15  Smart?
16          MS. NIJMAN:  Asked and answered.
17  BY THE WITNESS:
18     A.  No.
19  BY MR. ROMINE:
20     Q.  Is Cecil Hunter as credible as Richard
21  Fahrenholz?
22  BY THE WITNESS:
23     A.  Again, I didn't make any credibility
24  determination regarding any witness.

Page 9

1  BY MR. ROMINE:
2      Q.  So you have no opinion as to whether
3  Cecil Hunter is as credible as Richard Fahrenholz?
4          MS. NIJMAN:  Asked and answered.
5  BY THE WITNESS:
6      A.  I did not do that, consider credibility
7  at all. That's not my role. That's the role for
8  the Court.
9  BY MR. ROMINE:
10     Q.  Fair enough.
11          Is Cecil Hunter as credible as
12  James Forney?
13          MS. NIJMAN:  Same objection.
14  BY THE WITNESS:
15     A.  That would be for the Court to
16  determine. I didn't look at credibility.
17  BY MR. ROMINE:
18     Q.  So you have no opinion on that issue?
19     A.  No.
20     Q.  Is Richard Hunter as credible as Robert
21  Aldredge?
22          MS. NIJMAN:  Same objection.
23  BY THE WITNESS:
24     A.  Again, that would be for the Court to

3 (Pages 6 - 9)

Page 10

1  determine.
2  BY MR. ROMINE:
3      Q.   You have no opinion on that issue?
4      A.   No.
5      Q.   Is Richard Hunter as credible as Joseph
6  Smart?
7      A.   I didn't make any credibility
8  determinations.  That's not my role.
9      Q.   So you have no opinion on that issue?
10     A.   I do not.
11     Q.   Is Richard Hunter as credible as Richard
12  Fahrenholz?
13     A.   I didn't make any credibility
14  determinations.  So, no, I don't have an opinion on
15  that.
16  BY MR. ROMINE:
17     Q.   Okay.  Is Richard Hunter as credible as
18  James Forney?
19         MS. NIJMAN:  Asked and answered.  He's
20  now stated several times he has no opinion on
21  credibility of any witness.
22  BY THE WITNESS:
23     A.   I didn't make any credibility
24  determination.

Page 11

1  BY MR. ROMINE:
2      Q.   So you have no opinion on that issue?
3      A.   No.
4      Q.   Your opinion is based on the testimony
5  of Aldredge, Fahrenholz, and Forney, correct?
6      A.   Yes, it is.
7      Q.   You discredit the testimony of Cecil and
8  Richard Hunter, correct?
9      A.   That's inaccurate.
10     Q.   You say that their testimony is and by
11  "their" I say -- you say that the testimony of
12  Cecil and Richard Hunter is inconsistent with other
13  testimony in the case, correct?
14         MS. NIJMAN:  Objection, asking the
15  question without foundation in the report.
16  BY THE WITNESS:
17     A.   I did say that in my prior report and
18  it's also inconsistent and I found that in the
19  current report.
20  BY MR. ROMINE:
21     Q.   On what basis do you find that it's
22  inconsistent with other evidence in this report?
23     A.   So specifically, which person are you
24  talking about?

Page 12

1      Q.   If you turn to Page 6 of your report, in
2  the paragraph close to the middle of the page,
3  there's a sentence that says, "Overall, I found the
4  testimony inconsistent with prior deponents on this
5  issue as cited in my 2018 report."
6          Do you see that?
7      A.   Yes.
8      Q.   When you say "the testimony," you're
9  referring to the testimony of Cecil Hunter and
10  Richard Hunter, correct?
11     A.   In this report, yes.
12     Q.   And so you in your opinion, you chose to
13  value the opinions of the prior deponents, as you
14  say, over the testimony of Cecil Hunter and Richard
15  Hunter?
16         MS. NIJMAN:  Objection,
17  mischaracterizes.
18  BY THE WITNESS:
19     A.   I believe that's a statement.
20  BY MR. ROMINE:
21     Q.   But your opinion is consistent with the
22  testimony of Aldredge, correct?
23         MS. NIJMAN:  Objection, foundation.
24

Page 13

1  BY THE WITNESS:
2      A.   In what regard?
3  BY MR. ROMINE:
4      Q.   The fact that in your opinion that
5  Container Services didn't haul McCall's waste
6  services to the site?
7      A.   That is my opinion, and Robert Aldredge
8  stated that in his deposition.
9      Q.   Right.
10         So why did you choose to believe
11  Robert Aldredge and not Cecil Hunter?
12         MS. NIJMAN:  Objection to the statement
13  "believe."
14  BY THE WITNESS:
15     A.   It wasn't an issue of belief.
16  BY MR. ROMINE:
17     Q.   Why is your opinion consistent with
18  Mr. Aldredge's and not with the Hunter brothers?
19     A.   It was based on my analysis of the
20  information consistent with how I would typically
21  look at a site nexus analysis, which we discussed
22  and I stated prior in my 2018 report.
23     Q.   But how did you come to the conclusion
24  that Mr. Aldredge was correct and Mr. Hunter was

4 (Pages 10 - 13)

Page 14

not correct -- or the Hunter brothers were not correct?
MS. NIJMAN: Objection, misstates the opinion.
BY THE WITNESS:
A. I didn't conclude that they were correct. I just looked at what they had said and evaluated it based upon the approach that I outlined in my 2018 report.
BY MR. ROMINE:
Q. So you didn't come to the conclusion that Mr. Aldredge was correct?
A. I came to the conclusion that Mr. Aldredge's testimony is consistent with other deponents and it's consistent with other documents that are available for the site and looked at the reliability of that information.
Q. Is Mr. Aldredge correct?
MS. NIJMAN: Objection, asked and answered.
BY THE WITNESS:
A. Yeah, that wasn't a finding that I made. It was looking at the reliability of the information.

Page 15

BY MR. ROMINE:
Q. Do you have an opinion as to whether Mr. Aldredge's testimony was correct or not?
A. No.
Q. Are you rendering an opinion as to the credibility of any witness?
MS. NIJMAN: Objection, asked and answered three times.
BY THE WITNESS:
A. No, I haven't made any credibility determination. That's domain of the Court.
BY MR. ROMINE:
Q. If I could ask you to turn to Page 1 of your report, please.
I'm going to focus now for the time being on the last paragraph and I'm going to read the second sentence. "I have conducted forensic historical analyses and allocation analyses for CERCLA or state-lead environmental sites on more than fifty different engagements."
Do you see that?
A. Yes.
Q. Is that correct?
A. I believe so, yes.

Page 16

Q. Is this report here an allocation analysis?
A. The 2018 report?
Q. 2025.
A. Oh, excuse me, 2025. No, there's no allocation analysis here.
Q. Is it a forensic historical analysis?
A. I would say that it has aspects of forensic historical analysis, yes.
Q. Does it have any aspects to it that are not forensic historical analysis?
A. I'm not sure. I haven't thought of it that way.
Q. If I could ask you to turn to Page 1 of your CV, Attachment A.
In the final sentence or the final part of the paragraph "Professional Profile," "Mr. Wittenbrink has provided allocation analyses in connection with over 50 matters for sites located throughout the United States."
Do you see that?
A. Yes.
Q. Is that accurate?
A. I believe so.

Page 17

Q. So I guess my question is: In your CV, you talk about allocation analyses and on Page 1 you talk about allocation analyses and forensic historical analyses.
So my question to you is: How many engagements have you had that involve forensic historical analysis?
A. Versus solely allocation analysis?
Q. Either/or.
A. I don't know that I made that distinction to a degree where I could answer that question. They often overlap. They usually overlap where you look at historical information. That's what allocation is trying to do.
Q. Are there any -- but this 2025 report is not allocation. It's forensic historical analysis, correct?
MS. NIJMAN: Objection, misstates testimony.
BY THE WITNESS:
A. Yeah. This 2025 report was a rebuttal of opinions that were provided by your clients, so in the context of their findings related to historical information or other information related

Page 18

1  to my clients.
2  BY MR. ROMINE:
3      Q.   But would you characterize it as a
4  forensic historical analysis?
5          MS. NIJMAN:  Objection, asked and
6  answered.
7  BY THE WITNESS:
8      A.   I think it has aspects of that certainly
9  because you're looking at historical information,
10 yes.
11 BY MR. ROMINE:
12     Q.   Have there been other engagements where
13 you did forensic historical analysis but you didn't
14 do allocation?
15     A.   Yes.
16     Q.   Like how many roughly?
17     A.   Dozens.
18     Q.   If we look at your representative --
19 allocation related -- services project experience,
20 can you identify for me some projects where you did
21 forensic historical analysis but not allocation?
22     A.   Yes, I can.
23     Q.   Just tell me a couple.
24     A.   Well, the first one that jumps out is

Page 19

1  the one I did on behalf of NCR, Georgia Pacific v.
2  NCR, where I looked at historical information
3  related to paper mills, paper-brook operations and
4  testified at trial, a couple different trials for
5  that.  There was -- I did not provide an allocation
6  on that.
7      Q.   So that was Georgia Pacific versus NCR?
8      A.   Yes.
9      Q.   Okay.  Any others?
10     A.   Yeah.  The Gulfco Marine Site, that's on
11 Page 3 in the middle of the page.  We developed
12 site nexus packages for the clients and we
13 submitted that which would be forensic historical
14 information.  We submitted that to EPA.
15     Q.   Did that -- sticking with that for a
16 moment, was that a litigation assignment?
17     A.   I don't recall that it was.  I don't
18 know.
19     Q.   I mean, did you give a deposition in
20 that case?
21     A.   No, I did not.
22     Q.   Or trial testimony?
23     A.   There was no trial testimony, no.  So
24 most all of these, if you read the descriptions,

Page 20

1  and I'm just glancing through, but they include,
2  you know, review of information in preparation of
3  an allocation.
4      Q.   And when you say you reviewed
5  information in preparation for an allocation, does
6  that mean you were conducting in part a forensic
7  historical analysis?
8      A.   Typically looking at historical
9  information.
10     Q.   But other than --
11     A.   The Tulalip site on the last page,
12 Page 7, that was also one.  That was review of
13 information submitted to the EPA.
14     Q.   You're talking now -- I guess it would
15 be Page 7 of your CV?
16     A.   Yeah.
17     Q.   In re: Tulalip Landfill Superfund Site?
18     A.   Um-hum.
19     Q.   And that was a forensic historical
20 analysis but not an allocation?
21     A.   Yeah.  We didn't do an allocation on
22 that assignment.
23     Q.   And again, was that a litigation
24 assignment?

Page 21

1      A.   I don't know.  I don't think so.
2      Q.   Did you testify at deposition in that
3  case?
4      A.   No.
5      Q.   Did you testify at trial?
6      A.   No.
7          MS. NIJMAN:  I'm going to object to any
8  additional questions as we keep going.  I'm trying
9  to give some leeway on this, but this question on
10 these older cases on his CV and the term "forensic
11 analysis" was in his prior report.  He was highly
12 just deposed on his background in that expert
13 report and deposition in 2018.
14         And to the extent this is a
15 duplication of that information, you had an
16 opportunity in 2018.  So if we're going to continue
17 on this path of repeating 2018, we will have to
18 call the judge.
19         MR. ROMINE:  Mr. Wittenbrink submitted
20 an allocation in 2018.  This is the first time he
21 submitted a forensic historical analysis, and he
22 has new information on this one.
23         MS. NIJMAN:  That is incorrect, but I'm
24 telling you my opinion and my objection.

6 (Pages 18 - 21)

Page 22

1      MR. ROMINE: Thank you for your opinion.
2  BY MR. ROMINE:
3      Q.   What is forensic historical analysis?
4      MS. NIJMAN: Same objection.
5  BY THE WITNESS:
6      A.   I use that term to describe the review
7  of information that is associated with a site, so
8  it could be documents, maybe testimony, typically
9  documents, historical information to try to re --
10 to try to put into context activities that may have
11 taken place, and ultimately, that information is
12 typically used for allocation, not always but
13 typically.
14 BY MR. ROMINE:
15     Q.   Did Dr. Stradling conduct forensic
16 historical analysis?
17     A.   Per my description, yes, I think he did.
18 He provided some historical information and looked
19 at different documents.  I think that's what he
20 did.
21     Q.   Would you say that he conducted -- put
22 aside the word "forensic" for a moment.
23          Would you say that he conducted
24 historical analysis?

Page 23

1      A.   I think that's his description.
2      Q.   But do you think he did?
3      A.   Well, I think he reviewed historical
4  information, yes.
5      Q.   Do you think that he conducted
6  historical analysis?
7      A.   He think he thinks he did, and I think
8  he reviewed historical information, yes.
9      Q.   Do you have any opinion on whether or
10 not Dr. Stradling did historical analysis?
11     A.   I think I opined in my October 2025
12 report that his review was limited, so to the
13 degree it was analysis, you know, I don't know.  I
14 didn't characterize it as such.
15     Q.   But I'm asking you to characterize it
16 now.
17     A.   Yeah, I haven't thought of it that way.
18     Q.   You haven't thought of it as a
19 historical analysis?
20     A.   No.  I thought it more of a review of
21 history is what he had done.
22     Q.   Okay.  What is the difference between
23 forensic historical analysis and other kinds of
24 historical analysis?

Page 24

1      A.   I think that the term "forensic" simply
2  refers to review of historical information trying
3  to piece it together to try to understand in
4  context what may have taken place at a certain
5  point in time.
6      Q.   Is that different from plain old
7  historical analysis?
8      A.   I don't know.  I'm not a historian.
9      Q.   Are you an expert in historical
10 analysis?
11     A.   Historical analysis?  I've opined on a
12 number of issues related to site-specific
13 considerations.  So as a historian, I've never said
14 I was a historian.
15     Q.   Are you an expert in forensic historical
16 analysis?
17     A.   I believe that is a related and
18 necessary component of my expertise, yes.
19     Q.   So your answer is, "yes, you are an
20 expert in forensic historical analysis"?
21     A.   I believe so.
22     Q.   Did you take any coursework in forensic
23 historical analysis?
24     MS. NIJMAN:  Object to foundation.

Page 25

1  BY THE WITNESS:
2      A.   No, I'm not aware of any courses I took
3  in that regard.
4  BY MR. ROMINE:
5      Q.   Does any college or university grant a
6  degree in forensic historical analysis?
7      A.   I do not know.
8      Q.   Have you ever worked in a dump?
9      A.   I visited a dump many times.
10     Q.   Have you ever worked in a dump as part
11 of -- participating in dump functions?
12     A.   Yes.
13     Q.   What was that?
14     A.   Well, I operated and owned a roll-off
15 company.
16     Q.   And by "roll-off" do you mean a
17 container or a dumpster that rolls off a truck?
18     A.   Yes.
19     Q.   And where was that?
20     A.   It was in Grand County, Colorado.
21     Q.   When was that approximately?
22     A.   Approximately 2000 to 2005.
23     Q.   What was name of the company?
24     A.   Red Dog Disposal.

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 26

1    Q.   Red Dog Disposal?
2    A.   Yes, sir.
3    Q.   Does Red Dog Disposal still exist, the
4  business?
5    A.   No.
6    Q.   And what kind of business did Red Dog
7  Disposal do?
8    A.   It was a roll-off company that provided
9  roll-off services to the construction industry in
10  Grand County.
11    Q.   So could you describe what roll-off
12  services were at the time that you were running Red
13  Dog Disposal?
14    A.   I can.
15    Q.   Sure, please.
16    A.   The customers were primarily home
17  builders and we would deliver a roll-off container
18  to the project site.  When it was full, we would
19  get a call, we would pick it up and transport it to
20  the landfill, dump it at the landfill, provided
21  they need a replacement box -- typically they
22  did -- until the project was complete and that was
23  the service.
24    Q.   Okay.  How many landfills did you use

Page 27

1  when you were running Red Dog Disposal?
2    A.   One.
3    Q.   Which landfill was that?
4    A.   It was the Grand County landfill.
5    Q.   Grand County landfill?
6    A.   Yes.
7    Q.   Did you have any ownership in the Grand
8  County Landfill?
9    A.   It was owned by the county.
10    Q.   Okay.  Did you have any ownership in the
11  builders, in your customers?
12    A.   No.
13    Q.   So would it be fair to say that the type
14  of waste that you -- not you but Red Dog Disposal
15  hauled was what we call "construction and
16  demolition waste"?
17    A.   Generally, that's correct.  There were a
18  few exceptions.
19    Q.   And what were the exceptions?
20    MS. NIJMAN:  I'm going to again raise
21  the objection that this is old information.  If you
22  had wanted to ask these questions, you had that
23  opportunity in 2018, and if we continue going
24  through old information, we will have to call the

Page 28

1  judge on relitigating this entire expert's
2  deposition.
3  BY MR. ROMINE:
4    Q.   Go ahead.
5    A.   Other types -- for example, I remember a
6  few loads of horse manure.  It's a pretty rural
7  community.
8    Q.   At that time, were you required to
9  dispose of the waste in the Grand County landfill?
10    A.   Yes.  That was the sole disposal option.
11    Q.   And you mentioned, I think, that the
12  years -- were you the hundred percent owner of Red
13  Dog Disposal?
14    A.   No.
15    Q.   It sounds like you had some kind of
16  management role in Red Dog Disposal?
17    A.   I was a manager of the LLC.  There were
18  two managers/owners.
19    Q.   Two manager/owners?
20    A.   Um-hum.
21    Q.   So there was another guy who also was a
22  manager and also was -- had some kind of equity
23  interest?
24    A.   Yes.

Page 29

1    Q.   Who was the other guy?
2    A.   Mr. Donald.
3    Q.   So you had a -- you worked for and -- in
4  Red Dog Disposal, you said it was 2000 to 2005
5  approximately?
6    A.   Yes.
7    Q.   Do you have any other experience in the
8  waste disposal industry?  And I want to set aside
9  for the moment your consulting work that you've
10  already talked about here.
11    A.   Not that I can think of at this moment.
12    Q.   Okay.  I want to switch gears here for a
13  little bit and ask you to turn to your report on
14  Page 3.
15    If I could just ask you to read the
16  last paragraph, first sentence to yourself.  I'm
17  not going to read it aloud.
18    A.   The paragraph beginning "Dr. Stradling's
19  opinion"?
20    Q.   Correct.
21    MS. NIJMAN:  The last sentence starting
22  with "thus" or the whole paragraph?
23    MR. ROMINE:  Just the one sentence
24  beginning with "Dr. Stradling's opinion."

Page 30

1     MS. NIJMAN: The first sentence, okay.
2  BY THE WITNESS:
3     A.  Okay.  I've read the first sentence.
4  BY MR. ROMINE:
5     Q.  So you're saying here that
6  Dr. Stradling's description of SDD could apply to
7  many cities and dumps during that time period?
8     MS. NIJMAN: Object to
9  mischaracterization.
10 BY THE WITNESS:
11    A.  I'm sorry.  Could you state the
12 question?  That's --
13 BY MR. ROMINE:
14    Q.  Sure.
15       Maybe I'll have to read the whole
16 thing.  If you look at the first line, is that --
17 should that be SDD?
18    A.  Yes, that's a typographical error.
19    Q.  No problem.
20       So "Dr. Stradling's opinion," and
21 then you quote him, "that SDD is ideally situated
22 geographically, politically, and commercially to
23 operate as an uncontrolled dump in the 1940s to the
24 late 1960s..."

Page 31

1       And here you're quoting
2  Dr. Stradling, correct?
3     A.  Correct.
4     Q.  And you're saying regarding that opinion
5  of Dr. Stradling, it's a generic description, which
6  could apply to many cities and dumps during that
7  time period.
8       Are you with me so far?
9     A.  Yes.
10    Q.  Okay.  Is that a true statement though?
11    A.  That the quoted language is generic?
12    Q.  No.  Is the quoted language true?
13    A.  Oh, is it accurate --
14    Q.  Yeah.
15    A.  -- in terms of its generic description?
16    Q.  Yes.
17    A.  Yes.
18    Q.  What other cities and dumps could this,
19 Dr. Stradling's opinion, apply to?
20    A.  I don't know that I've made a list or
21 conceptualized it, but based on my experience,
22 uncontrolled dumps that are involved in these types
23 of superfund matters have a similar history.
24    Q.  Can you name one?

Page 32

1     A.  I think like the Krejci landfill in
2  Ohio, that might be one.
3     Q.  Say that again?
4     A.  Krejci, K-R-E-C-J-I [as stated], I
5  think.
6     Q.  And where is that?
7     A.  It's in northern Ohio.
8     Q.  Any others?
9     A.  Nothing that comes to mind now.  I think
10 if you look at the dumps, uncontrolled dumps,
11 they're typically located near municipalities or
12 cities.  They're located along rivers.  That's not
13 uncommon.
14    Q.  If I could ask you to turn to Page 4 and
15 sort in the middle of the page, "In addition, as
16 I discussed in my 2018 report, SDD customers were
17 typically self-hauling their own waste while the
18 commercial haulers used hauler-owned facilities."
19       Do you see that?
20    A.  Yes.
21    Q.  Were SDD customers exclusively
22 self-hauling their own waste?
23    A.  No.  That's why I said "typically."
24    Q.  Let's talk about a situation, a

Page 33

1  hypothetical situation, where a waste hauler is
2  deciding whether to bring waste to a dump that it
3  does not own, that has no equity interest in.
4       Would the fact that a -- this
5  hauler had a relationship -- pre-existing
6  relationship hauling Customer A to this particular
7  dump make it more likely that it would haul
8  Customer B to that same dump?
9     A.  I don't know.  I don't know where you're
10 going with that.  What's the relationship with
11 Customer A versus Customer B?
12    Q.  The relationship with Customer A was
13 that the hauler takes Customer A's waste to a dump
14 that it does not own.
15       Would that make it more likely that
16 it would take Customer B's waste to that same dump
17 rather than a hauler that had no relationship with
18 the dump?
19    MS. NIJMAN:  Objection.  It didn't
20 change the hypothetical.
21 BY THE WITNESS:
22    A.  I'm just having trouble understanding
23 what you're saying.
24

9 (Pages 30 - 33)

Page 34

BY MR. ROMINE:

1   BY MR. ROMINE:
2       Q.   Maybe I didn't say it more clearly.
3            You have -- let's say you have two
4   haulers and you have one dump.  The dump is not
5   owned by either of the haulers.  The haulers have
6   no economic interest in the dump.  Hauler 1 takes
7   waste from Customer A.  Hauler 1 takes waste from
8   Customer A to the dump for whatever reason.
9   hauler 2 does not take any waste to the dump.
10           Would it be more likely that
11  Hauler 1 would take waste from other customers to
12  the dump based on its relationship with the
13  dump than --
14           MS. NIJMAN:  Objection.
15  BY MR. ROMINE:
16      Q.   Let me finish.
17           MS. NIJMAN:  Okay.
18  BY MR. ROMINE:
19      Q.   Would it be more likely that Hauler 1
20  would take another customer's waste to the dump
21  because it's already taking waste to the dump from
22  this customer?  Would it be more likely for that
23  hauler to take waste to the dump than some other
24  hauler who had no pre-existing relationship to the

Page 35

1   dump?
2       A.   It's pretty abstract, isn't it?
3       Q.   Yes.
4       A.   Yeah, I don't know.  I don't know.
5   There's not enough information there.  I mean, I
6   understand what you're saying.  I just don't.
7       Q.   At the bottom of that paragraph, it
8   says, "...the comment that Container Services
9   purchased supplies from the Site does not indicate
10  that it was not used for disposal."
11           Do you see that?
12      A.   Yes.
13      Q.   So this tends to show -- at least
14  "purchased supplies" part tends to show that
15  Container Services trucks could have gone to SDD?
16           MS. NIJMAN:  Objection, foundation,
17  misstatement.
18  BY THE WITNESS:
19      A.   Well, we know Container Services' trucks
20  were going to a air curtain instructor.  We know
21  that the South A dump sold certain materials, but
22  it doesn't necessarily connect Container Services
23  going to South A dump.
24

Page 36

1   BY MR. ROMINE:
2       Q.   I'm not asking you if it proves
3   conclusively that South A -- that Container
4   Services went to South A dump.
5            I'm asking you whether the fact
6   that Container Services purchased supplies from
7   South A dump tends to show that Container Services
8   trucks went to South A dump?
9       A.   Oh, I see what you're saying.  I don't
10  know.  By what standard do we make that decision?
11  I don't know.
12      Q.   You have no opinion on that one?
13      A.   No, I do not.
14      Q.   Have you ever rendered an opinion in a
15  litigation matter that a transporter selected or
16  did not select the site for disposal?
17      A.   I can't recall that I have.
18      Q.   Are you aware of any expert opining on
19  the issue of whether a transporter selected a site
20  for disposal?
21      A.   I can't say that I am.
22      Q.   If you go down to the bottom of Page 5,
23  I want to make sure I understand the last full
24  sentence on the bottom of Page 5.

Page 37

1            I understand you're saying
2   Container Services did not send McCall's waste to
3   the site, but then you're saying if it's assumed
4   that that's true, and I understand you're saying
5   it's not true, but if assumed it's not true, you
6   haven't seen any evidence that Container Services
7   selected the site for disposal?
8            Do you see that?
9       A.   Yes.
10      Q.   Again, same hypothetical.  If we assume
11  that Container Services transported McCall's waste
12  to the site I understand you say they didn't, but
13  if you we assume that that's true, who did select
14  the site for disposal?
15      A.   Oh, I don't know.
16      Q.   Okay.  I want to go to Page 6 but then
17  back to Page 5 for a moment but just for the time
18  being let's look at Page 6.
19           The last sentence before part d.
20  "...Dr. Dagdigian, providing two opposing basic
21  conclusions on a single subject."
22           Do you see that?
23      A.   Yes, I do.
24      Q.   Okay.  Now I want to turn back to

10 (Pages 34 - 37)

Page 38

1 Page 5.
2      In these in these two paragraphs
3 here beginning with the words, "At Section 11.2 of
4 his report..."
5      Do you see that?
6   A.   Yes, sir.
7   Q.   And then the last paragraph,
8 "Dr. Dagdigian further cites..."
9   A.   Yes.
10   Q.   So I understand, my question is:  Are
11 these two paragraphs here on Page 5 what you mean
12 when you say -- explain what you mean when you say,
13 they provide two basic -- "two opposing basic
14 conclusions"?
15   A.   So the statement on Page 6 about the
16 opposing opinions relate to Dr. Dagdigian's
17 opinions that he has not been asked to offer an
18 opinion about either McCall waste being disposed or
19 Waste Management of Ohio being disposed at the
20 South A dump, and then he goes on to describe that
21 the waste was disposed at South A dump.
22   Q.   I'm not sure I understood that.
23      So when you're saying, "opposing
24 basic conclusions," and you can correct me if I'm

Page 39

1 wrong, but one basic opposing -- excuse me -- one
2 basic conclusion is that he's not offering any
3 opinion on nexus, and then opposing that he says
4 things in his report which you're saying basically
5 do render an opinion on nexus?
6   A.   That I believe is an accurate search.
7   Q.   All right.  If we could go back to
8 Page 4 and sort of in the middle of the page, you
9 say, "Dr. Stradling does not address the
10 operational consideration that the hauling
11 companies were incentivized to transport waste to
12 landfills that they owned and operated."
13      Do you see that?
14   A.   Yes.
15   Q.   And when you say, "the hauling
16 companies," that would include Container Services,
17 correct?
18   A.   Yes.
19   Q.   If I understand you correctly, you're
20 saying a part of the incentive was so that they
21 wouldn't have to pay what's called a "tipping fee"
22 for dumping at their own dump; is that right?
23   A.   That would be a consideration, yes.
24   Q.   And --

Page 40

1   A.   A big consideration.
2   Q.   Pardon me?
3   A.   A big consideration.
4   Q.   Would there be other considerations
5 other than paying the tipping fee?
6   A.   It could be ease of operational
7 consistency.  In other words, they're dealing with
8 their own company.
9   Q.   Who paid the tipping fee in Grand
10 County?
11      MS. NIJMAN:  Object to foundation.
12 BY THE WITNESS:
13   A.   The hauler.
14 BY MR. ROMINE:
15   Q.   Was that you?
16   A.   Well, if I transported a dump load
17 there, a roll-off there, then I would be invoiced
18 for that.
19   Q.   Did you bill the customer a straight
20 bill for that fee or was it all included?
21   A.   Our charges were based upon a flat fee
22 for the service.
23   Q.   So there is no itemization for the
24 tipping fee?

Page 41

1   A.   To the customer?
2   Q.   Yeah.
3   A.   No.
4   Q.   What was the tipping fee at South A
5 dump?
6   A.   I do not know.
7   Q.   What was Container Services' operating
8 cost of driving a full truck for one mile?
9   A.   I haven't researched that.
10   Q.   Would there be a break-even point at
11 which a dump owned by a hauler would be so far away
12 that it would be cheaper to pay a tipping fee at a
13 dump that it didn't own than to transport that dump
14 a significant distance to a dump that it did own?
15   A.   In that example, yes, there would be a
16 point that it would not be economical.
17   Q.   Have you ever done such a calculation?
18   A.   I don't recall that I have, but in the
19 past, we've looked at haulers, their routes where
20 they would have gone, that type of information, so
21 it's possible that I don't recall specifically.
22   Q.   Have you ever seen such a calculation
23 done in other cases?
24   A.   No, I don't know that I recall that.

11 (Pages 38 - 41)

Page 42

1    Q.   But you opine in this case that
2   Container Services didn't haul waste to SDD because
3   it was cheaper for Container Services to bring
4   waste to dumps that it owned rather than SDD?
5    A.   That was the testimony of the deponents,
6   right?
7    Q.   Right.
8    A.   Right, Aldredge and Forney, they said
9   that.
10    Q.   Right.
11    A.   Yeah.
12    Q.   But is there anything other than
13   testimony of the witnesses that you base that
14   opinion on?
15    A.   For purposes of my opinion here today,
16   no.
17    Q.   In the Georgia Pacific case that you
18   mentioned at the beginning of your deposition, did
19   you advocate for NCR having a lesser allocation
20   than your opponent's advocacy?
21        MS. NIJMAN:  I'm going to object to the
22   extent that allocation is not part of this witness'
23   testimony or his report or relevant to the stage of
24   the trial.

Page 43

1   BY THE WITNESS:
2    A.   The allocation for that case...
3   BY MR. ROMINE:
4    Q.   Yeah.
5    A.   ...was done by a different expert.  That
6   wasn't my role.  I was looking at the transport of
7   waste paper by brokers, other pathways.
8    Q.   But did you advocate for allocation -- I
9   know there were other subjects too, and I'm not
10   asking if this was an exclusive rule, but I'm
11   asking you if you advocated for NCR to have, say, a
12   lesser allocation than other parties?
13        MS. NIJMAN:  Same objection.
14   BY THE WITNESS:
15    A.   That wasn't -- I didn't do an
16   allocation.  So, no, that wasn't part of my
17   opinion.
18   BY MR. ROMINE:
19    Q.   Okay.  I'm going to introduce Exhibit
20   No. 2.
21        (Wittenbrink Deposition Exhibit
22        No. 2 was marked for
23        identification.)
24

Page 44

1   BY MR. ROMINE:
2    Q.   Exhibit No. 2 is a printout of a legal
3   decision and the case is called Georgia Pacific
4   Consumer Products LP versus NCR Corporation and
5   there is a Reporter citation 358 F. Supp. 3d 613
6   and it's the Western District of Michigan.
7        MS. NIJMAN:  I'm going object to
8   redeposing this witness about a case that was
9   previously on his CV that is not new, that existed
10   on Page 7 of his 2018 report, was specifically
11   cited, and to the extent that there were any
12   questions about it, those questions could have been
13   and were asked in 2018.  In fact, Mr. Merrill asked
14   about this exact case, so I'm raising the same
15   objection.
16        And, again, if we continue on this
17   path, we will stop the questioning for now and wait
18   until the end of all of your questioning to call
19   the judge so that we can talk about all the issues.
20   BY MR. ROMINE:
21    Q.   I just want to turn your attention to
22   Page 31.
23        Do you see where it says,
24   "Witnesses such as Chris Wittenbrink tried to show

Page 45

1   that NCR should be responsible only for its
2   specific arrangement"?
3    A.   Yes.
4    Q.   Okay.  What I want to ask you is:  Is
5   that accurate?
6        MS. NIJMAN:  Object to form, foundation.
7   BY THE WITNESS:
8    A.   Okay.  I'm trying to recall this case,
9   which was over ten years ago.  So the statement
10   from the Court, "Witnesses such as Chris
11   Wittenbrink tried to show that NCR should be
12   responsible" --
13        THE REPORTER:  I'm sorry, sir.  Can you
14   back up, please.
15   BY THE WITNESS:
16    A.   Yes.  I apologize.
17        "Witnesses such as Chris
18   Wittenbrink tried to show that NCR should be
19   responsible only for its specific arrangement."
20        And the question was, "Is that
21   accurate"?
22   BY MR. ROMINE:
23    Q.   Yeah.
24    A.   I don't recall specifically, but I

12 (Pages 42 - 45)

Page 46

1  believe that what the court is pointing to it
2  wasn't my testimony. I showed the quantity of
3  broke waste paper, broke, B-R-O-K-E --
4      Q. Right.
5      A. -- that NCR transported directly from
6  its facilities.
7      Q. Okay. I got you.
8          I understand what you're saying,
9  but to me, in this paragraph, in the judge's
10 opinion it doesn't say one way or the other what
11 your opinion was really?
12     MS. NIJMAN: Objection. It sounds like
13 Counsel is testifying.
14 BY MR. ROMINE:
15     Q. And has a judge ever written an opinion
16 saying that your allocation opinion was less
17 credible that your adversary's?
18     MS. NIJMAN: Same objection as to
19 allocation. It's not an issue at this time.
20 BY THE WITNESS:
21     A. I don't recall that.
22         (Wittenbrink Deposition Exhibit
23         No. 3 was marked for
24         identification.)

Page 47

1  BY MR. ROMINE:
2      Q. This is Exhibit 3, Action Manufacturing
3  Co. versus Simon Wrecking Co., 428 F. Supp. 2d 288.
4      MS. NIJMAN: Again, this is a case that
5  was on his prior CV. It was discussed in his prior
6  deposition and the whole purpose of this deposition
7  is not to relitigate this entire case, which is
8  exactly what you're doing, so I'm going to ask that
9  we stop any of these questions right now and we
10 will call the judge at the end of this deposition
11 when your questions are over and other Counsels'
12 questions so that we can address this with him.
13 And then if the judge agrees with you, we can go
14 back to it but right now I'm instructing this
15 witness not to answer for the time being until we
16 speak to the judge.
17     MR. ROMINE: This is the last subject
18 and I only plan on asking two or three questions.
19     MS. NIJMAN: Okay. Go ahead.
20     MR. ROMINE: Thanks.
21 BY MR. ROMINE:
22     Q. If you could turn to Page 7 -- I'm
23 sorry, 37, Note 34.
24         (Witness peruses document.)

Page 48

1  BY MR. ROMINE:
2      Q. So it looks like Judge Brody found Ray
3  Dovell more experienced and credible than you?
4      MS. NIJMAN: Objection,
5  mischaracterization of the footnote.
6  BY THE WITNESS:
7      A. First, I'd just like to note for the
8  record this is where I met Counsel many years ago.
9          I'd like to read Footnote 34 into
10 the record, if that's all right.
11     Q. Please.
12     A. "The Simon Entities' own expert
13 calculated fewer drums for the CSDG parties
14 described in Ray Dovell's Expert Report: 12,922.9.
15 Because I found Dovell more experienced and
16 credible, and there is no reason for him to
17 overcount his client CSDG's drums, I accept
18 Dovell's higher count."
19     Q. Thank you.
20         If we could have like a five-,
21 ten-minute break, I'm just about done. I just want
22 to check my outline.
23     MS. NIJMAN: Sure.
24     MR. ROMINE: Thank you.

Page 49

1          (Whereupon, a break was taken,
2          after which, the following
3          proceedings were had:)
4      MR. ROMINE: I'm done for now. I'm
5  going to pass to other counsel. If they have
6  questions that I want to follow up on, I may ask
7  some follow-up questions but for right now I'm
8  done.
9          People on the phone, you're up.
10     MR. MERRILL: This is Frank Merrill, no
11 questions for Wittenbrink.
12     MR. LONG: This is Todd Long for
13 Conagra, no questions.
14     MR. KONCELIK: This is Joe Koncelik for
15 Valley Asphalt, no questions.
16     MS. NIJMAN: And I have no questions.
17     MR. ROMINE: Yeah. I just wanted to
18 make sure -- Thank you, Jennifer. Excuse me.
19         I just wanted to make sure. I
20 didn't hear anybody from Sherwin Williams on. I
21 just wanted to make sure nobody came on while we
22 were in the middle of the deposition.
23     THE REPORTER: No.
24     MS. NIJMAN: Reserved.

13 (Pages 46 - 49)

Page 50

1    THE REPORTER:  Are you ordering at this
2 time, Counsel?
3    MR. ROMINE:  Yes, absolutely.
4    MS. NIJMAN:  Same.
5    THE REPORTER:  Is there anyone online
6 that would like a copy of the transcript?
7    MR. MERRILL:  We do not want a copy.
8    MR. LONG:  No, thank you.
9        (Witness excused at 10:49 a.m.)
10        (Signature reserved.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 52

1 within 30 days or make other arrangements for
2 reading and signing, the deposition may be used as
3 fully as though signed, and this certificate will
4 then evidence such failure to appear as the reason
5 for signature being waived.
6        The undersigned is not interested in
7 the within case, nor of kin or counsel to any of
8 the parties.
9        Witness my official signature on this
10 19th day of November, 2025.
11
12
13 YVETTE BIJARRO-RODRIGUEZ, CSR
   One North Franklin Street
14 Suite 2100
   Chicago, Illinois 60606
15
16 License No. 084-003734
17
18
19
20
21
22
23
24

Page 51

1        REPORTER CERTIFICATION
2
3
4        The within and foregoing deposition of
5 the witness, CHRISTOPHER M. WITTENBRINK, was taken
6 before YVETTE BIJARRO-RODRIGUEZ, Certified
7 Shorthand Reporter, and there were present at the
8 taking of said deposition counsel as previously set
9 forth.
10        The said witness was first duly sworn
11 and was then examined upon oral interrogatories.
12 The questions and answers were taken down in
13 shorthand by the undersigned and
14 computer-transcribed under my personal direction.
15 The within and foregoing is a true,
16 correct and complete record of all of the questions
17 asked of and answers made by the said witness at
18 the time and place hereinabove referred to.
19        The signature of the witness was not
20 waived and the deposition was submitted to the
21 deponent per copy of the attached letter.  Pursuant
22 to Rule 30(e) of the Rules of Civil Procedure of
23 the United States District Courts, if the deponent
24 does not appear to read and sign the deposition

Page 53

1 Jennifer Nijman, Esq.
2 jn@nijmanfranzetti.com
3        November 20, 2025
4 RE: Hobart Corporation v. The Dayton Power & Light Company
5    11/5/2025, Christopher M Wittenbrink, J.D. (#7718310)
6    The above-referenced transcript is available for
7 review.
8    Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12    The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-midatlantic@veritext.com.
16    Return completed errata within 30 days from
17 receipt of testimony.
18    If the witness fails to do so within the time
19 allotted, the transcript may be used as if signed.
20
21
22        Yours,
23        Veritext Legal Solutions
24

14 (Pages 50 - 53)

Page 54

1 Hobart Corporation, Et Al. v. The Dayton Power & Light Company,
2 Christopher M Wittenbrink, J.D. (#7718310)
3         E R R A T A  S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____  _____
24 Christopher M Wittenbrink, J.D.      Date

Page 55

1 Hobart Corporation, Et Al. v. The Dayton Power & Light Company,
2 Christopher M Wittenbrink, J.D. (#7718310)
3         ACKNOWLEDGEMENT OF DEPONENT
4    I, Christopher M Wittenbrink, J.D., do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____  _____
12 Christopher M Wittenbrink, J.D.      Date
13 *If notary is required
14         SUBSCRIBED AND SWORN TO BEFORE ME THIS
15         _____ DAY OF _____, 20___.
16
17
18         _____
19         NOTARY PUBLIC
20
21
22
23
24

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830